Michael Pasquale, Esq.
Law Offices of Michael P. Pasquale, LLC
163 Madison Avenue, Suite 200-80
Morristown, New Jersey 07960
(973) 362-5344
Attorneys for Plaintiff,
Township of Lakewood

William P. Higgins, Jr., Esq.
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444

-and-

Edward Dauber, Esq.
Greenberg Dauber Epstein & Tucker
One Gateway Center, Suite 600
Newark, NJ 07102
Tel: 973.643.3700
Co-counsel for Plaintiff,
Lakewood Tenants Organization, Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TOWNSHIP OF LAKEWOOD, NEW JERSEY and LAKEWOOD TENANTS ORGANIZATION, INC., | : |
| | : |
| | : |
| | : Civil Action No. |
| Plaintiff, | : |
| v. | : Civil Action |
| | : |
| JULIAN CASTRO, Secretary, United States Department of Housing and Urban Development, | : **COMPLAINT** |
| | : |
| | : |
| Defendant. | : |
| | : |
| | : |

Plaintiff Township of Lakewood, New Jersey by and through its attorneys, the Law Offices of Michael P. Pasquale, LLC and Plaintiff Lakewood Tenants Organization, Inc. by and through its attorneys, McCarter & English, LLP and Greenberg Dauber Epstein & Tucker, by way of Complaint against Defendant JULIAN CASTRO, Secretary, United States Department of Housing and Urban Development, say:

## I. NATURE OF THIS ACTION

1.    This is an action for injunctive, declaratory and legal relief by a New Jersey municipality and the third party administrator of the municipality's Section 8 program administrator arising from wrongful actions of persons acting under the authority of the Defendant in violation of the United States Constitution and federal law that threaten the well-being of the Plaintiffs and Section 8 tenants. Section 8 of the United States Housing Act of 1937 ("Section 8") was enacted for the purpose of aiding low-income families in obtaining a decent, safe and affordable place to live and promoting economically mixed housing.  Section 8 seeks to achieve these goals by providing rent subsidies on behalf of low-income families living in rental housing owned primarily by private persons and entities.

2.    United States Department of Housing and Urban Development ("HUD") is responsible for operating the programs created and funded by Congress under and in accordance with the Housing Act.

3.      For almost 40 years, Plaintiff, Lakewood Township, New Jersey (the "Township"), as the public housing agency (the "PHA"), has had a Section 8 housing assistance program (currently known as a Housing Choice Voucher ("HCV") program), called the Lakewood Township Residential Assistance Program (the "Program" or "LTRAP"), pursuant to certain Annual Contribution Contracts ("ACCs") between the Township and HUD.

4.      From its inception, the Township has sub-contracted with Co-Plaintiff, Lakewood Tenants' Organization, Inc. ("LTO"), to administer the Program, a practice common among PHAs.

5.      The Township forwarded its original sub-contract with LTO to HUD for approval.  HUD responded by letter dated August 30, 1977 stating: "HUD is not a party to this Contract, and consequently our review and approval of the Contract is not required….  We do reemphasize our position that HUD looks to the approved Public Housing Agency [i.e. the Township] as the party responsible for the administration of the ACC in accordance with the Regulations, see 24 CFR 882.116."

6.      As the largest private sector administrator of federally-assisted affordable housing in Ocean County, New Jersey, and one of the largest in New Jersey, the Program presently serves more than 1,100 New Jersey, low-income households, consisting of approximately 8,400 individual Program beneficiaries.

These New Jersey residents are comprised mostly of the elderly, the disabled and children.

7.     During the almost 40 years of its existence, the Program has been administered with great success, helping thousands of New Jersey residents attain dependable, decent, safe and affordable housing.

8.     According to HUD's most reliable tool for measuring the annual performance of Section 8 programs, the Section Eight Management Assessment Program ("SEMAP"), the Program has consistently attained nearly perfect scores and SEMAP's highest performance rating.

9.     LTRAP's average SEMAP score for the most recent 4-year period is 99% -- one of the highest in the nation.  By comparison, the average SEMAP score for Section 8 housing agencies in New Jersey is 77.39%.

10.     From the inception of the Program to date, the Program has been run with very few complaints from the Program's tenants and participating landlords, and has established an outstanding audit track record of fiscal responsibility and integrity, as well as regulatory compliance with HUD.

11.     Beginning in the fall of 2011, HUD began waging a campaign of excessive and unjustified investigations of the Program, after the Program discontinued assistance to an individual, referred to herein as "Mr. N," who the Program had determined was collecting double subsidies.

12.     HUD's campaign of excessive and unjustified investigations became even more intense approximately one year later when the Program refused to reinstate Mr. N after an official of the HUD Fair Housing and Equal Opportunity Office ("FHEO") in Newark, New Jersey, contacted LTRAP and demanded that Mr. N's voucher be reinstated, threatening retaliation against LTRAP if the demand was not met.

13.     After the Program had suffered through no less than four disruptive, excessive and unjustified HUD examinations, HUD began to demand that LTO submit to yet another apparently pointless and excessive examination.

14.     HUD began to interpret decades old regulations in new ways and to apply them retroactively and disparately to LTO.  Pursuant to newly interpreted, disparately applied and selectively enforced regulations, HUD demanded that LTO submit to a retroactive audit of internal LTO books and ledgers.  LTO could not comply, because such records did not exist in the form demanded by HUD.  HUD then threatened to terminate, and ultimately purported to terminate, the Township's successful and beneficial Program that had existed over 38 years.

15.     During the course of HUD's groundless inquisitions, HUD  officials made a number of anti-Semitic remarks to LTO personnel.  LTO is run in large part by members of the Orthodox Jewish community.  HUD's excessive and unjustified abuse of power and disparate treatment of LTO and the Program was

5

either the result of anti-Semitism directed particularly to, Orthodox Jewish people, retaliation for LTO's fulfilling its responsibilities by refusing to reinstate the Section 8 client who was illegally gaming the system, or both.

16.     HUD's baseless and discriminatory acts are in direct contravention of the express language of the Housing Act, Presidential Executive Orders and HUD's mission as expressed by Congress.

17.     HUD's purported termination of one of the nation's most successful Section 8 housing assistance programs as it has existed for over 38 years, jeopardizes the housing of over eight thousand low-income New Jersey residents because, for among other reasons, it requires another housing agency that is currently administering 833 units to have the capacity to begin administering approximately 2,000 units within a two-week time period.

18.     This action seeks to enjoin and restrain HUD from continuing its excessive and unjustified abuse of power and its disparate treatment of LTO and the Township's Program.  The action seeks to maintain the status quo during the pendency of this litigation by preventing HUD from terminating the successful and beneficial Program as it has existed for over 38 years.

## II. JURISDICTION

19.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. This action arises under judicial review provision of the Administrative

Procedures Act (the "APA"), 5 U.S.C. §§ 701-706, the United States Housing Act of 1937, 42 U.S.C. § 1437, *et seq.* (the "Housing Act" or the "Act"), and the First and Fifth Amendments to the United States Constitution. The Court has authority to issue the requested declaratory relief pursuant to 28 U.S.C. §§ 2201-2202.

### III. PARTIES

20.     Plaintiff Township of Lakewood, New Jersey is a municipality that was created by the New Jersey legislature on March 23, 1892. The population of the Township includes a large number of people who practice Orthodox Judaism. The Township is acting on behalf of and for the benefit of its citizens who are Section 8 applicants and recipients whose interests would be irreparably harmed by the disruption of service that would result from termination of the current Program.

21.     Plaintiff LTO is a New Jersey nonprofit corporation that has administered the Township's Program on a contract basis since 1977.

22.     Defendant Julian Castro is the Secretary of HUD. He is responsible for establishing policies for and operating the programs created and funded by Congress under the Housing Act. He is also responsible for the decisions and conduct of officials and employees of HUD in carrying out those responsibilities.

### IV. STATUTORY AND REGULATORY PROVISIONS

23.     In Section 2 of the Housing Act, Congress declared that it was the policy of the United States to, *inter alia*, "assist States and political subdivisions of

States to remedy unsafe housing conditions and the acute shortage of decent, safe, and affordable housing for low-income families."

24.     Section 8 authorizes housing assistance payments to be made by HUD "for the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing…."

25.     Section 8 includes the Section 8 HCV program, pursuant to which HUD enters into ACCs with PHAs so that those agencies may enter into contracts with the owners of existing dwelling units to rent units to low-income families with a portion of the rent to be paid by the federal government under a formula contained in the Act.

26.     HUD's regulations governing the HCV program are published at 24 C.F.R. Part 982.

## V. FACTS

**A.     History of the Section 8 Program in the Township of Lakewood, New Jersey**

27.     In 1977, HUD requested the Township to participate in a Section 8 housing assistance payment program, now known as the HCV program.  The Township agreed and entered into an ACC with HUD for the operation of the Program within the Township.

28.     Because the Township did not have the experience or administrative capacity to operate the Program, it entered into a contract (the "1977 Contract")

with LTO for administration of the program as an independent contractor. The Township and LTO tendered the 1977 Contract to HUD for approval on or about August 19, 1977. HUD responded in a letter dated August 30, 1977, that it was not a party to the 1977 Contract and that its approval was therefore not required.

29.     The 1977 Contract remains the basis for the Plaintiffs' operation of the Program. As the Program grew incrementally from 80 units to the current 1,058 units, the 1977 ACC was renewed over the past 38 years more than two dozen times on essentially the same terms and conditions.

30.     Each year, Congress establishes the administrative fees that are reasonable and necessary to run Section 8 housing assistance programs in various regions in the Country. The 1977 Contract calls for LTO to perform the management and administrative functions required for operation of the Program in exchange for payment of the applicable administrative fees (the "Administrative Fees") deemed reasonable and necessary by Congress for the operation of a Section 8 HCV program in Lakewood Township, New Jersey.

31.     The Program has been run in this fashion with HUD's knowledge and approval for more than 38 years.

32.     Other Section 8 housing assistance programs are run in a similar manner.

**B.     The Inquisition – HUD's excessive and unjustified abuse of power**

33.     By letter dated August 31, 2011, the Program was notified by another

housing agency that a tenant, Mr. N, was collecting Section 8 subsidies for two

separate dwellings, one from their agency and the second from LTRAP, and that

Mr. N was still occupying the dwelling with the voucher subsidy issued by their

agency.

34.     LTO investigated the allegations of the August 31, 2011 letter and

determined that Mr. N had, in fact, been collecting double subsidies for two and a

half months.  LTRAP notified Mr. N that, due to his failure to move into the

dwelling for which his LTRAP voucher was issued, the voucher had expired and

LTRAP was discontinuing his assistance.

35.     In apparent response to an informal discrimination complaint from

Mr. N, HUD sent a letter dated November 28, 2011, addressed to the Program.

HUD stated that it was "concerned with the LTRAP's success rate regarding the

issuing of Housing Choice Vouchers," although HUD had absolutely no reason for

its alleged "concern" based on the history of the Program.

36.     The November 28, 2011, letter demanded production, within a ten-day

time period, of eight different categories of information spanning an eighteen-

month time period.  It demanded information regarding "Families that were unable

10

to Lease Up [sic] or denied voucher/Date [sic] when family lost voucher or not qualified."

37.    LTO fully complied with the unusual and unjustified demands of the November 29, 2011, letter.

38.    On August 8, 2012 – nearly one year later -- Mr. N filed a formal Housing Discrimination Complaint.  The complaint asserted that LTRAP had "dropped Rental Assistance due to hospitalization."  Few additional facts were asserted.

39.    Shortly after Mr. N's complaint was filed, and prior to any official investigation of the matter by HUD, a HUD, Newark Equal Opportunity Specialist named Betzy Morales of the HUD Fair Housing and Equal Opportunity Office ("FHEO") in Newark, New Jersey, contacted LTRAP and demanded that Mr. N's voucher be reinstated, threatening retaliation against LTRAP if the demand was not met.  LTRAP refused this demand, having concluded that the expiration of Mr. N's voucher was warranted by the facts, was not motivated by discrimination, and that LTRAP's refusal to reinstate the voucher was LTRAP's dutiful obligation to maintain program integrity in accordance with HUD's requirements.

40.    In September of 2012, the Program responded to Mr. N's complaint. It cooperated with HUD's investigation over the course of approximately eight months, supplying lengthy responses to HUD's multiple data requests.

41.    Early in 2013, HUD sent LTRAP an amended complaint, which reasserted most of the allegations that were made in Mr. N's original complaint.

42.    LTO responded to the amended complaint.

43.    On May 29 and 30, 2013 HUD sent a crew of approximately 15 agents to conduct on-site investigations and interviews (the "May 2013 Interrogation") at LTO's offices, allegedly in connection with Mr. N's complaint. Among others, a Ms. Brenda Edmondson, Chief, FHEO Newark Center Compliance Branch, took part in the May 2013 Interrogation. HUD interrogated nine of LTO's then eighteen employees, including LTO's CEO and CFO over the course of two full business days.

44.    During the May 2013 Interrogation, HUD officials demanded inspection of documents not previously requested. Because many of those records were stored digitally, LTO had to make computer terminals available to HUD agents and had to assign personnel to assist HUD with its unannounced document review. HUD occupied LTO's offices for two full business days impeding LTO's ability to administer the Program.

45.    Following the May 2013 interrogation, HUD-Newark officials again demanded that Mr. N be reinstated into LTRAP's Section 8 HCV program. LTRAP again refused on the ground that Mr. N's receipt of double Section 8

subsidies was fraudulent and sufficient grounds for their refusing to renew or
reinstate Mr. N's Program participation.

46.   Counsel to LTRAP thereupon requested that HUD-Newark FHEO
either issue to LTRAP a written demand for Mr. N's reinstatement or obtain a
specific written directive from the HUD Newark PIH [Public and Indian Housing]
Management Division demanding his reinstatement.  Neither the written demand
nor such a directive was ever issued, by either HUD-Newark FHEO or HUD
Newark PIH Management.

47.   By letter dated June 3, 2013, HUD-NJ FHEO Enforcement Chief,
Frank Vespa-Papaleo wrote to the Program's then attorneys (Nixon Peabody, LLP)
regarding Mr. N's complaint.

48.   The June 3, 2013, letter demanded production, no later than June 12,
2013, of (a) 32 separate categories of documents and (b) the complete contents of
130 current Section 8 participant and waiting-list applicant files.

49.   The June 3, 2013, letter demanded a list of all of LTO's "board
members from 2010 to present including their names, race, national origin, sex,
[and] disability status…."  It also demanded a "List or calendar of LTRAP office
holidays and closures from 2010 through 2013."

50.   The June 3, 2013, letter further advised that HUD would require
another two-day, on-site, interrogation of the Program during which HUD would

13

interview every single remaining staff member of the Program "including caseworkers, receptionists, etc." and would complete the review of any additional documents it saw fit.

51.    The scope of the documents demanded and the additional interrogation demanded in HUD's June 3, 2013, letter went so far beyond the scope of Mr. N's Complaint that Nixon Peabody responded on June 12, 2013, to HUD's June 3, 2013, letter.

52.    Nixon Peabody's June 12, 2013, letter pointed out LTO's extensive cooperation with HUD's investigation.  In response to HUD's citation of Title VI and Section 504 compliance review powers, Nixon Peabody noted that HUD's investigations to that point had violated the rules for compliance reviews in Handbook 8040.1.  Nixon Peabody also noted that, contrary to the requirement in the Handbook, HUD had failed to provide notice of the allegations the Program was facing.  Nothing in Mr. N's complaint supported the massive scope of the data demand in the June 3, 2013, letter.  Nixon Peabody asked HUD to meet its obligations to explain the allegations against the Program and to advise how the additional documents demanded by the June 3 letter related to those allegations.

53.    Nixon Peabody received no response to the requests in its June 12, 2013, letter to HUD.

54.     HUD also (a) launched a "Compliance Review" purporting to determine whether LTRAP was complying with the nondiscrimination requirements of Title IV of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, and Title II of the Americans with Disabilities Act of 1990 and (b) threatened to terminate the Program as it had existed for 38 years because LTO had not complied with HUD's impossible demands.

**C.     HUD's baseless "compliance review"**

55.     On August 23, 2013, Jay Golden, the HUD Region II Director, notified LTRAP by letter that HUD was launching a "compliance review" to determine whether LTRAP was in compliance with the nondiscrimination requirements of Title IV of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, and Title II of the Americans with Disabilities Act of 1990, as amended.

56.     Given the decades-long history of the Program, including more than a dozen prior "clean" periodic HUD and U.S. Department of Justice Fair Housing / Equal Opportunity investigations and reviews, HUD had no rational basis for this discrimination inquisition.

57.     HUD's August 23, 2013, letter contained 38 data requests (most of which had multiple parts), including another demand for copies of 130 tenant and waiting list applicant files.

58.     Many of the demands of HUD's August 23, 2013, letter duplicated requests that had been made in HUD's June 3, 2013, letter, but some demands were new and more extensive.

59.     Like the June 3, 2013, letter, the August 23, 2013, letter demanded production of a "List of all [LTRAP and LTO] board members from 2010 to present including, their names, race, national origin, sex, [and] disability status..." and a "List or calendar of LTRAP office holidays and closures from 2010 through 2013...."

60.     The August 23, 2013, letter also notified LTRAP that HUD would conduct another on-site inspection of LTRAP's office.  It demanded another 6 sets of documents to be reviewed on-site and advised that there would be additional interrogations of LTRAP staff.

61.     The August 23, 2013, letter identified Ms. Edmondson as the contact person for these compliance reviews.  She was the same agent who had participated in the two-business-day May 2013 Interrogation of LTRAP three months earlier.

62.     HUD had interrogated nine of LTO's then eighteen employees, including LTO's CEO and CFO, over the course of two full business days during the May 2013 Interrogation.  Over the following three months, two different branches of HUD had demanded two separate, additional, multi-day, on-site

interrogations of the Program's employees, including interviews of receptionists and other lower-ranking employees.

63.     By September 2013, LTO, following many hours of work, produced thousands of pages of documents and data about the Program. It had submitted to a multi-day inquisition by 15 HUD agents. Nonetheless, two different branches of HUD were then requiring (a) that the Program respond to two additional massive document-production demands and (b) that the Program submit to two separate additional multi-day interrogations of the Program.

64.     HUD's interrogations of the Program were so extraordinary that they prompted an attorney from Nixon Peabody, a large international law firm with extensive HUD regulatory experience, to comment in an email to HUD dated September 11, 2013 that:

> In more than 20 years of fair housing work, I have never
> seen such extensive and overblown demands from HUD
> investigators. The two-pronged investigations now being
> pursued by HUD are burdensome and abusive, and force
> LTRAP to divert its resources from serving its clients'
> needs to answering redundant questions posed by HUD.
> It is becoming increasingly difficult to resist the
> conclusion that HUD personnel have decide to launch a
> campaign against LTRAP and to overwhelm it with
> impertinent and harassing demands that raise serious
> questions about HUD's motivations here.

65.     Given the history of the Program, HUD had no rational basis for its inquisitions.

17

66.   Similarly situated Programs have not been subjected to excessive discrimination investigations unless HUD had a rational basis for such investigations.

**D.   HUD threatens to terminate the Township's Program for LTO's failure to produce documents and records that HUD knows do not exist.**

67.   The excessive investigation of Mr. N's complaint, and the baseless discriminatory "compliance review," were not the only retaliatory actions taken by HUD against the Program.

68.   HUD has been fully aware since 1977 of the manner in which compensation to LTO for administration of the Program had been paid and accounted for.  Over the history of the Program, HUD looked at the issue and has stated, in writing, that it is acceptable.  Beginning in September of 2013, however, HUD decided to revisit the same issue, and seems to now have come to a different conclusion.

69.   Under the contracts between LTO and the Township, LTO performs the management and administrative functions required to operate the Program in exchange for payment in an amount equal to the Administrative Fees set by Congress to operate a Section 8 HCV program in the region.

70.   The Township insisted on this arrangement so that (a) the cost of the Program would be predictable, (b) accounting for the costs of the Program would be simplified, and (c) the Program would be self-sustaining and would never

18

become a financial burden on the Township. Over almost 40 years, administration of the Program did not cost the Township more or less than the built-in, federally-funded, Administrative Fee deemed reasonable and necessary by Congress for the operation of a Section 8 HCV program in Lakewood Township, New Jersey.

71.    In fact, as recently confirmed by the "Housing Choice Voucher Program Administrative Fee Study" (the "Fee Study"), a study commissioned by HUD, the fees paid to LTO for administration of the Program for certain time periods in 2013 and 2014 were hundreds of thousands of dollars less than they would have been if the Administrative Fee more accurately reflected the actual costs of administering the Program.

72.    The main purpose of the Fee Study was to identify and measure the actual costs of operating a high-performing and efficient housing choice voucher program and then propose a new administrative fee formula based on those findings and costs.

73.    In undertaking the Fee Study, HUD sought to address the critical need for data regarding the actual cost of administering the HCV programs.

74.    The Fee Study confirmed that which HUD had previously known to be true; in many jurisdictions, current administrative fee funding levels do not meet the reasonable costs of administering HCV programs.

75.     By email dated May 26, 2015, HUD transmitted to the Program "information on how the recommended fee formula proposed in the *Housing Choice Voucher Program Administrative Fee Study* would potentially impact your agency" (the "LTO Fee Study Report").

76.     The results of the LTO Fee Study Report, for the Study period of July 2013 – June 2014, stated that LTO was paid 33% ($315,190) less than it would have been paid if the Administrative Fee reflected the actual costs of administering the Program.

77.     PHAs are required to establish a reserve account, currently referred to by HUD as an Unrestricted Net Position or "UNP," for Administrative Fees that exceed the actual costs of administering the Section 8 program.

78.     The PHAs must use the funds in the UNP (and the interest thereon) to fund subsequent shortfalls in the cost of operating the program.

79.     The "actual cost" to the Township for administering the Program is equal to the federally-established Administrative Fees.  Consequently, there is never a deficit or surplus to the Township with respect to the cost of the Program. The balance in the UNP is always zero.

80.     By email dated August 9, 2011, HUD confirmed to LTO that LTO should report the UNP balance as "zero".

81.   Compensation for administration of the Program and the accounting for the costs of the Program have been handled as set forth above for at least the last 20 years.  HUD has been fully aware of this arrangement as evidenced by, among other things, the following:

- HUD's review and approval of LTRAP's year-end financial statements going back for at least 20 years; and

- Independent Public Accountant Audit Reports, going back to the inception of LTRAP, filed with, and accepted by, the Township, HUD, and the Federal Audit Clearinghouse.

82.   In 2000-2001, HUD conducted a seven-month long investigation of, among other things, the operation of the UNP (which was then called a "reserve surplus").

83.   In a letter dated January 26, 2001, Carmen Valenti, Director of the Office of Public Housing for HUD, stated:  "Upon further review, based on the current contract that LTO has with Lakewood Township, the Lakewood Tenants Organization is entitled to all Administrative Fees and therefore an Administrative Fee Reserve account would not accrue."

84.   Many PHAs throughout the United States have entered into sub-contracts with private nonprofit and for-profit companies to administer their Section 8 HCV programs.

85.   HUD may mandate that a PHA which handles its HCV administration "in-house" and does not "outsource" it always maintain a UNP for Administrative

Fees that exceed the costs of administering its HCV program. However, HUD does not mandate that HCV subcontractors always maintain a UNP.

86.     The Administrative Fees paid to PHA subcontractors are earned when paid and they become the property of the PHA subcontractors. Once paid to the PHA subcontractors these Administrative Fees become "defederalized" and "unrestricted federal funds."

87.     HUD does not unilaterally audit other PHA subcontractors' internal books and records. Nor has HUD sought to audit LTO's internal books and records at any time from 1977 to 2013.

88.     Following Nixon Peabody's June 12, 2013, letter, HUD reversed its position with respect to the manner in which, with HUD's full knowledge and approval over the prior 37 years, compensation for administration of the Program had been paid and accounted for.

89.     By email dated July 25, 2013, HUD announced that it was conducting a "Financial Management Review" of the Program.

90.     The July 25, 2013, email stated that the Financial Management Review would include, among other things, a review of the operation of the UNP, which was the very same issue that had been investigated, resolved and "closed" by HUD in 2000-2001.

91.   In September 2013, HUD conducted another two-day, on-site investigation of the Program, purportedly in connection with the Financial Management Review.

92.   All concerns raised by HUD in its Financial Management Review were addressed, with one exception.  HUD now demanded another on-site audit, this time of LTO's (as opposed to the Program's) records pertaining to the UNP for the four and a half year period from 2010 to June 2014, although at the time of the prior on-site inspection HUD - Quality Assurance Division personnel stated that the UNP issue was "off the table".

93.   The Program maintained records of a UNP with a "zero" balance as directed by HUD, but LTO was not required to, and did not maintain, books and records of any UNP with respect to the "defederalized" fees earned by LTO.  LTO simply did not have the books and records in the format demanded by HUD, and HUD was aware of this.

94.   Also, as a non-profit corporation, all of LTO's financial data has always been publically available.

95.   In the fall of 2013 and throughout 2014, HUD began, for the first time, to interpret regulations that were more than a decade old in ways that HUD had never interpreted them before.  HUD also retroactively applied these new

interpretations to LTO to justify efforts to conduct an audit of records that it knew did not exist.

96.    Because it was perplexed by the reversal of HUD's position, LTO sought the opinion of legal and accounting professionals regarding the claimed basis for HUD's new position.

97.    The legal and accounting professionals LTO consulted reached the same conclusions:   The Administrative Fees paid to PHA subcontractors are earned when paid and become the property of the PHA subcontractors.  Once paid to the PHA subcontractors the Administrative Fees paid by the PHA to the subcontract become "defederalized" and "unrestricted federal funds."  PHA subcontractors are not required to maintain UNPs, and HUD has no right to audit accounts and records of PHA subcontractors.

98.    Throughout 2014, HUD and LTO exchanged correspondence on this issue.  Finally, by letter dated December 5, 2014 (the "Threatened Termination Letter"), HUD threatened to terminate the contract of one of the most successful Section 8 housing assistance programs in the nation if LTO failed to submit to an audit of LTO's records.

99.    Plaintiffs are unaware of any legitimate ground for HUD's baseless and disparate treatment of the Program.

100.   During the May 2013 Interrogation, HUD personnel posed a wide variety of disparaging, insulting and inappropriate questions and comments concerning the religious affiliation of LTO's management.  These included (a) whether LTO's Administrator/CEO required the staff to refer to him as "Rabbi", (b) shock that the Program's offices were open on Christmas and New Year's Day, and (c) inquiry of LTO's CEO about his involvement (he had none) with a rabbinical college located in Lakewood, New Jersey, that had at that time recently obtained a significant, but controversial, grant from the state of New Jersey.  The implication of the last question was that because he was an Orthodox Jew he may have obtained government funds in an improper manner.

### E.     HUD's Surprise Attack

101.   On February 10, 2015, attorneys for the Plaintiffs met in person with the following HUD representatives: John Cahill, Esq., Regional Counsel; Louis J. Gioia, Attorney-Advisor; Dolores Melvin, Division Director, Public Housing; and Balu Thumar, Public Housing.  Judith De Haven of HUD's Quality Assurance Division joined the meeting by telephone.

102.   The parties to the meeting discussed the Threatened Termination Letter and the history of this matter as set forth more fully in this Complaint. Plaintiffs' representatives left the meeting with the impression that HUD would

look into Plaintiffs' claims and that the parties would work together toward a global resolution of any outstanding issues.

103.   After learning the facts as set forth more fully in this Complaint, HUD stated that it would consider a global resolution of the issues between the parties and agreed to "speak with us [Plaintiffs' attorneys] before taking any further action against Lakewood Township or LTO in regard to the issues we discussed, including any formal declaration by HUD that the Township is in default of the ACC." This agreement was memorialized in email correspondence from Plaintiffs' attorneys to HUD's counsel dated February 17, 2015.

104.   HUD did not, however, "speak" to Plaintiffs' attorney prior to taking any action against the Township or LTO.  Nor did HUD "speak" to Plaintiffs' counsel prior to declaring a default under the Township's ACC.  Following the February 10, 2015, meeting, HUD did not contact Plaintiffs to discuss a resolution of any issues.

105.   On or about Friday, August 7, 2015, the Mayor of Lakewood Township, Albert Akerman, was contacted by Maria Maio-Messano, Field Office Director for the Newark Field Office of HUD, and was advised that, in the following week (i.e. the week of August 10, 2015), HUD would be transferring the Program to the Lakewood Housing Authority ("LHA").

106.   On information and belief, HUD had contacted LHA and advised LHA that HUD would transfer the Program to LHA if the Board of Commissioners of LHA would vote to accept the transfer.  On information and belief, HUD indicated that if LHA did not accept the transfer, HUD would transfer the program to the New Jersey Department of Community Affairs.

107.   The LHA Board of Commissioners did not have a regular board meeting scheduled until September 22, 2015, but it called a special meeting on Tuesday, August 11, 2015, to vote on the issue, in light of HUD's apparent threat that administration of the program would otherwise be removed from local control.

108.   On Tuesday, August 11, 2015, the Board of Commissioners of LHA voted to accept the transfer of the Program from LTO.

109.   On Wednesday, August 12, 2015, Lourdes Castro Ramirez, HUD's Principal Deputy Assistant Secretary for PIH sent a "Termination Letter" dated August 11, 2015 to the Plaintiffs.

110.   In the Termination Letter, HUD stated that the Township was in default of its ACC agreement.  HUD knew that this allegation was in dispute and was the subject of discussion between the parties.  HUD stated that, as a result of the alleged "default," HUD would take control of the Program and transfer it to LHA effective September 1, 2015.

111.  In a separate letter dated August 12, 2015, Sonia L. Burgos, Director of the Office of Public Housing in HUD's Newark Field Office demanded the transfer to LHA of all current and historical documents relating to the Program as well as all funds and assets related to the Program and advised that Plaintiff's access to HUD systems would be terminated.

112.  In the Termination Letter, HUD stated that HUD had "waited more than 6 months to take action after its last compliance demand date" and that HUD had "tried to resolve Lakewood's ACC non-compliance with good faith negotiations."

113.  HUD had not tried to resolve the issues "with good faith negotiations."  HUD did not contact Plaintiffs to resolve any issues following the February 10, 2015, meeting.

114.  The Termination Letter terminates the Township's rights under the ACC, and, therefore, terminates LTO's rights under its sub-contract with the Township and transfers the Program to LHA without notice or an opportunity for the Township or LTO to be heard.

115.  LHA is a public corporation created under the laws of the State of New Jersey to provide housing for qualified individuals and families in accordance with rules and regulations prescribed by HUD.  LHA's purpose is, or should be, to

help provide low-income families with decent, safe and affordable places to live and to promote economically mixed housing.

116.   The Executive Director of LHA is Mary Jo Grauso.

117.   Mary Jo Grauso is not Jewish.

118.   Upon information and belief, HUD has knowledge of many program participant and applicant complaints about LHA.

119.   Upon information and belief, the Program's SEMAP scores, performance ratings, routine audit history, knowledge of and adherence to HUD regulations, and diversity of programs like the Homeownership and Family Self Sufficiency programs are superior to most Section 8 HCV programs in New Jersey, including those operated by LHA.

120.   Program participants and applicants are better served by the LTO than they are by LHA.

121.   Although LTRAP delivers better service to those in need than does LHA, HUD evaluates and treats the entities involved in administering the programs disparately.

122.   LHA has historically failed to perform as well in fulfilling HUD's goal of aiding low-income families in obtaining a decent, safe and affordable place to live.

123.   The history of HUD's persecution of the Program, its disparate treatment of the Program, its selective enforcement in targeting the Program, its disproportionate and relentless campaign of excessive and unjustified investigations of the Program and the anti-Semitic questions and comments posed by HUD agents during the 2013 Interrogation cumulatively support the conclusion that HUD's actions were motivated by anti-Semitism directed at Orthodox Jewish people.

## VI.  CLAIMS FOR RELIEF

## CLAIM I – DUE PROCESS VIOLATIONS

### (Failure to Provide Procedural Due Process and Opportunity to Respond)

124.   Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 123.

125.   HUD's actions and proposed actions violate the Due Process Clause of the Fifth Amendment to the United States Constitution.

126.   HUD has engaged in an impermissible and unconstitutional course of conduct culminating in termination of the Program and the ACC agreement with the Township, thereby putting the housing of over 8,000, low-income residents of New Jersey in jeopardy.

127.   HUD has engaged in an impermissible and unconstitutional course of conduct culminating in HUD's termination of the Program, which would put

LTO's 20 employees out of work and would destroy LTO's successful, and

publically beneficial, business of approximately 40 years.

128.   Both Plaintiffs and the residents of State of New Jersey face

irreparable injury if HUD is permitted to carry out its termination.  LTO's business

will be destroyed, its 20 employees will be out of work and the housing of over

8,000 low-income residents of Lakewood, New Jersey will be in jeopardy.

129.   HUD's violations of the Fifth Amendment's Due Process clause are

numerous, blatant and shocking to the conscience.  They include:

> (i)   HUD's demand that LTO and the Township violate the law by providing housing assistance to an individual already receiving assistance under a different PHA program, and HUD's threat to punish if this demand was not met;

> (ii)   HUD's multiple, baseless and harassing investigations of LTO after it refused to comply with HUD's illegal request;

> (iii)   HUD's expression of impermissible bias in its interrogation of LTO's representatives on the basis of their religious affiliations and beliefs;

> (iv)   HUD's implementation of rules in a new manner and application of such new rules disparately, selectively, and retroactively, without notice or an opportunity to be heard, despite written agreement and four decades of approval and past implementation;

> (v)   HUD's demands for impermissible access to and attempts to restrict the private property of LTO; and

(vi)   HUD's termination of LTO's superior Program
providing housing assistance to over 8,000 New Jersey
residents in favor of the inferior LHA.

130.   The Township and LTO possess a property interest (a) in the ACC
agreement, (b) in the subcontract between the Township and LTO, (c) in the
continuing operation of the Program, and (d) in receipt of the funds with which to
operate the Program.

131.   LTO possesses a private property interest in certain fees paid to it by
the Township and in its right to the unrestricted use and enjoyment of its property.

132.   Plaintiffs have property interests in their respective agreements that
are protected by the Due Process Clause of the Fifth Amendment to the United
States Constitution.  These interests cannot be terminated or altered by a sudden
and new interpretation of rules and disparate application and enforcement of those
rules to the Program.

133.   The Township's contract with LTO, and LTO's fees earned under that
contract, are private property protected by the Due Process Clause of the Fifth
Amendment from impermissible taking by HUD.

134.   HUD has purported to terminate the Township's ACC agreement for
conduct consistent with nearly 40 years of transparent operations of the Program.
HUD has thereby deprived LTO of its livelihood and deprived the Township of the

ability to superbly and exceptionally meet the housing needs of more than 1,100 low income households consisting of more than 8,400 local residents.

135.   HUD's threat is not based upon any change in the law, or on any change in the contractual agreement or working relationship between the Township and LTO.  It is based solely on a *de facto,* retroactive change in the implementation of certain rules, unilaterally adopted and retroactively imposed by HUD.

136.   Plaintiffs were not provided with any notice, or any opportunity to comment, oppose, contest, or appeal HUD's *de facto* rule change prior to its adoption and imposition on the Plaintiffs.

137.   HUD has not provided Plaintiffs with adequate notice of HUD's purported termination of the ACC agreement and the operation of LTRAP.  Nor did Plaintiffs receive an adequate statement of the basis or reasons for the purported termination since the Plaintiffs' program has operated unchanged for more than 38 years.  Nor were Plaintiffs afforded an opportunity for a hearing, review, appeal or other means of contesting HUD's termination of the successful and beneficial Program, nor any other of the basic rudiments of Due Process of Law required by the Constitution.

138.   Under these circumstances, HUD's purported termination of the ACC agreement is in violation of Plaintiffs' right to Due Process of Law guaranteed by

the Fifth Amendment to the United States Constitution and should be declared

unlawful and enjoined by this Court.

## CLAIM II – EQUAL PROTECTION VIOLATIONS

### (Denial of Equal Protection and Disparate Treatment and Impact Because of HUD Discrimination Against Orthodox Jews)

139.   Plaintiffs re-allege and incorporate by reference the allegations

contained in paragraphs 1 through 138.

140.   HUD has treated the Township and LTO differently than other

similarly situated entities, including LHA, with no rational basis for the difference

in treatment.  Consequently, HUD's actions and proposed actions violate

Plaintiffs' right to equal protection of the laws as guaranteed by the Fourteenth

Amendment to the United States Constitution, which applies to United States

government agencies through the Fifth Amendment to the United States

Constitution.

141.   There is no rational basis or explanation for HUD's demand that the

Township and LTO reinstate funding to a person who never occupied the Program

dwelling and who had been receiving double subsidies.  Complying with such a

demand would have been a violation of law.

142.   There was no rational basis for HUD's interrogations of LTO

personnel and the multiple investigations that followed.  No proper explanation

was offered by HUD for these far-reaching and multiple investigations.

143.   There was no rational basis for HUD's (a) sudden application of long existing rules in a new manner, (b) its attempt to retroactively apply these newly interpreted rules to years past, and (c) its disparate application of these newly interpreted rules only to the Program.  These actions by HUD contradicted HUD's nearly 40 year-history of specifically approving in writing the Township and LTO's contractual arrangement and accounting methodology.

144.   The absence of a rational basis or explanation for HUD's detrimental actions towards Plaintiffs demands the strictest judicial scrutiny because it was accompanied by (a) HUD's disparate treatment of the Township and LTO as opposed to other similarly situated PHAs and their subcontractors, and (b) HUD's bias against the Program as demonstrated by its interrogation of LTO employees on their personal religious beliefs and customs, HUD's expressed disapproval of those beliefs, and anti-Semitic statements by HUD personnel.

145.   HUD officials know that many other PHAs throughout the country similarly outsource by contracting with independent organizations, both with non-profit and for-profit corporations, for the operation of their Section 8 HCV programs ("Similarly Situated Programs").  HUD's officials also know that these PHA's pay a portion (or 100%) of the applicable Administrative Fees deemed reasonable and necessary by Congress for the operation of those programs to those independent contractor organizations.

146.   These Similarly Situated Programs operate (a) without HUD objection, (b) without HUD accusations that such payments are improper under HUD's regulations, (c) without HUD demands for audits and investigations of those subcontractors' internal financial records, and (d) without the unilateral and/or retroactive imposition of federal restrictions on use of earned Administrative Fee revenues.

147.   HUD lacks any rational basis to distinguish between the contractual agreements governing the Program and the contractual agreements governing the Similarly Situated Programs.

148.   The Program assists more than over 8,400 New Jersey residents, and is comparatively one of the smaller-sized Section 8 HCV programs in the United States.

149.   Despite the Program's small size, and, according to HUD's own metrics and benchmarks, its 38-year unblemished, unimpeachable record of stellar performance, and few, if any, substantiated complaints, HUD has nevertheless devoted unprecedented resources to investigate, interrogate and audit the Program.

150.   Upon information and belief, the number, size and scope of investigations to which HUD has, without explanation, subjected Plaintiffs since 2011 is dramatically different than those to which it subjects Similarly Situated Programs, and far exceeds even those of much larger programs.

151.   Upon information and belief, HUD has subjected Plaintiffs to a multitude of unjustified investigations, but has failed to conduct justified investigations of LHA.

152.   The housing programs administered by Lakewood Township and LTO are operated on an equal-opportunity basis, without regard to race, color, creed, gender, disability, ethnicity, national origin, age, or sexual orientation.   LTO and LTRAP are operated on a strictly secular basis.

153.   The population of the Township was 59% Jewish in 2011, and the percentage of the Township's Jewish population has increased since then.   Much of the Township's Jewish population consists of Orthodox Jews.   The Executive Director of LTO and all its Trustees, as well as 50% of its staff are Jewish.   Many of them are Orthodox Jews.

154.   During HUD's investigations of Plaintiffs, its personnel and employees interrogated LTO's Jewish employees disapprovingly about their personal religious beliefs and customs, and they made anti-Semitic comments. This was an egregious abuse of power by government officials, effectively mainstreaming anti-Semitism.

155.   HUD's course of conduct, detrimental to Plaintiffs' property and liberty, lacks a rational basis and, appears from HUD's disparate treatment of

Plaintiffs and the improper interrogations and comments concerning religious faith made by HUD personnel to be driven by religious animus and bigotry.

156.   HUD's disparate treatment of Plaintiffs and its religious animus and bigotry based on the Plaintiffs' representation by Orthodox Jews deny to the Plaintiffs the Equal Protection of laws guaranteed by the Fifth Amendment to the United States Constitution.

## CLAIM III – BREACH OF CONTRACT

### (Termination of the Program in Breach of the Annual Contribution Contracts)

157.   Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 156.

158.   Since 1977, HUD interpreted its rules as not requiring the Township to maintain a UNP.

159.   In 2001, HUD expressly ruled that the Township was not required to maintain a UNP.

160.   HUD has now purported to terminate the Program as it has existed for over 38 years because the Township does not have documentation supporting the lack of a UNP that HUD had previously ruled the Township was not required to maintain.

161. HUD's purported termination of the Program as it has existed for over 38 years and its requirement that there be a UNP breach the ACC between HUD and the Township.

162. HUD's conduct following the February 10, 2015 meeting of the parties and its attempt to terminate the ACC without notice or grounds for termination of the ACC is a violation the duty of good faith and fair dealing.

163. Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to Declaratory Relief holding that HUD's inconsistent  implementation of rules and its proposed termination of the ACC is unlawful and not in accordance with law.

## CLAIM IV – ADMINISTRATIVE PROCEDURE ACT VIOLATIONS

### (Review of Agency Action Under Administrative Procedure Act, 5 U.S.C. § 701 et seq. and Relief Under the Declaratory Judgment Act, 28 U.S.C. § 2201)

164. Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 163.

165. Plaintiffs lack an adequate remedy in any other court.

166. HUD's actions are arbitrary, capricious, and not in accordance with law, and they deprive Plaintiffs of their constitutional rights.

167. HUD's demand that Plaintiffs issue a double subsidy to a program participant, and HUD's threat of retaliation if Plaintiffs failed to do so, were arbitrary, capricious and not in accordance with law.

168.   HUD's unlawful investigations, interrogations, bias and disparate treatment of Plaintiffs were arbitrary, capricious and not in accordance with law.

169.   HUD's retroactive new application of rules is arbitrary, capricious and not in accordance with law.

170.   Plaintiffs have suffered a legal wrong as a result of HUD's arbitrary, capricious and illegal acts.  Plaintiffs are likely to suffer additional imminent and irreparable harm if HUD either (a) terminates the Program as it has existed for over 38 years or (b) is permitted to leave open its several baseless investigations.

171.   Specifically, HUD's actions will:

- Jeopardize the housing, and, therefore, the health, welfare and safety of more than 8,000 residents of Lakewood, New Jersey;

- Destroy the successful and socially beneficial Program;

- Destroy the business of LTO; and

- Cause the 20 employees of LTO to become unemployed.

172.   HUD's actions are unconstitutional and are also contrary to the law obligating HUD "affirmatively to further" fair housing under the Fair Housing Act, 42 U.S.C. §§ 3601, et seq. (the "Act").

173.   Section 3608(e)(5) of the Act requires the Secretary of HUD to "administer the programs and activities related to housing and urban development in a manner *affirmatively to further* the policies" of the Act, including the mandate to use its programs to assist in ending discrimination.  This provision requires more

40

of HUD than merely avoiding intentional discrimination in violation of the Fifth Amendment.

174.   HUD's actions violate its affirmative obligation under Section 3608(e)(5) of the Act to assist in ending discrimination.

175.   Section 3608(e)(6) of the Act also requires the Secretary to make annual reports to Congress and to the public regarding the data underlying various HUD-administered programs that fall under the coverage of a list of specified laws. That list of laws is set forth in § 3608(f).  Executive Orders 11063 and 12892 are on the list.

176.   Executive Orders 11063 and 12892 (the "Executive Orders"), issued by Presidents Kennedy and Clinton, respectively, obligate the Secretary of HUD to further fair housing affirmatively.

177.   The Executive Orders direct the heads of federal agencies to "take all action necessary and appropriate to prevent discrimination" (Executive Order 11063, 27 Fed. Reg. 11527 (Nov. 20, 1962)) and to "ensure that [their] programs and activities relating to housing and urban development are administered in a manner affirmatively to further the goal of fair housing" (Executive Order 12892, 59 Fed Reg. 2939 (Jan. 17, 1994)).

178.   Congress explicitly made the Secretary of HUD responsible for keeping track of whether the programs he administers -- which include the Program -- comply with Executive Orders 11063 and 12892.

179.   HUD's actions violate its obligation "affirmatively to further" fair housing and ensure compliance with the Executive Orders under Section 3608(e)(6) of the Act.

180.   HUD's actions violate Section 553 of the APA which requires federal agencies to give notice of proposed adoption or significant change of substantive agency rules unless one of several exceptions to the general statutory requirement applies.

181.   HUD's sudden retroactive change to the application of rules that it had applied consistently for 38 years constitutes a substantive, legislative rule change that HUD could not lawfully implement without prior notice and, public comment, as prescribed by Section 553 of the APA.  None of the exceptions specified in Section 553 applies in this case.

182.   HUD's adoption and attempted enforcement of its retroactive *de facto* rule change without prior issuance of a public notice of the intended change and an opportunity for public comment constituted *in fact* a violation of Section 553 of the APA and cases decided thereunder.  It was, therefore, arbitrary, capricious, an

abuse of discretion, and not in accordance with law pursuant to § 706 of the APA and should be declared unlawful and set aside by the Court.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

(i)     Assume jurisdiction of this case;

(ii)    Enter a temporary restraining order, pending a determination on the merits of Plaintiffs' application for a preliminary injunction, and thereafter a preliminary injunction restraining and enjoining JULIAN CASTRO, Secretary, United States Department of Housing and Urban Development from: (1) taking possession of Plaintiff Township of Lakewood's Housing Choice Voucher Program or any property, rights or interest in connection therewith or transferring any of the foregoing to the Lakewood Housing Authority or to any other person; (2) taking possession of any associated Housing Choice Voucher funds or otherwise taking any action based on Lakewood Township's alleged default under the ACC; (3) requiring the transfer of current and historical information and documentation relating to the Township of Lakewood's HUD funded program participants or Housing Choice Voucher Program income and assets, Net Position of Assets, HAP funds, Unrestricted Position of assets, tenant income or other income to the Lakewood Housing Authority or to any other person; or (4)

terminating, limiting or impairing Plaintiffs' access to HUD data systems of any kind;

(iii)   Order a speedy hearing of this action for a declaratory judgment and advance this matter on the calendar of the Court, pursuant to Rule 57 of the Federal Rules of Civil Procedure;

(iv)   Issue judgments pursuant to the Court's authority under 28 U.S.C. §§ 2201 & 2202 declaring that Defendant's conduct described in this Complaint to be unlawful on the grounds set forth in the First through Fourth Claims of this Complaint;

(v)   Permanently enjoin Defendant, his employees, agents, and all others acting in concert with him from (i) terminating, transferring, or otherwise interfering with the ACC agreement, (ii) interfering with or obstructing the contractual agreement between the Plaintiffs for continued operation of the Program, (iii) continuing to engage in religious discrimination or any form of conduct displaying or suggesting religious animus or bigotry, (iv) seeking to impose HUD's new *de facto* rule change governing the payment, use of, accounting for, and accrual of earnings from the payment of Administrative Fees to LTO by the Township, (v) maintaining or initiating FMR and FHEO investigations or audits without a reasonable and objective basis for doing so, and (vi) engaging in any other conduct found to be unlawful by the Court.

(vi)    Award complete, further and proper specific relief in order to

obtain rights which Plaintiffs have been wrongfully denied by the Defendants'

unconstitutional and unlawful acts;

(vii)   Award Plaintiffs their costs and expenses of this action,

including attorneys' fees and interest, as authorized by the Equal Access to Justice

Act, 28 U.S.C. § 2412 and other law; and

(viii)  Award any other relief that the Court finds to be appropriate.

Dated:  August 21, 2015          THE LAW OFFICES OF MICHAEL PASQUALE
                                 Attorneys for Plaintiff,
                                 Lakewood Township


                                 By:  /s/ Michael Pasquale
                                      Michael Pasquale, Esq.
                                      A Member of the Firm

Dated:  August 21, 2015          McCARTER & ENGLISH, LLP
                                 Attorneys for Plaintiff,
                                 Lakewood Tenants Organization, Inc.


                                 By:  /s/ William P. Higgins, Jr.
                                      Special Counsel to the Firm

Dated:  August 21, 2015          GREENBERG DAUBER EPSTEIN &
                                 TUCKER
                                 Attorneys for Plaintiff,
                                 Lakewood Tenants Organization, Inc.


                                 By:  /s/ Edward Dauber
                                      Edward Dauber, Esq.
                                      A Member of the Firm