UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

TOWNSHIP OF LAKEWOOD, NEW
JERSEY and LAKEWOOD TENANTS
ORGANIZATION, INC.,

                    Plaintiff,

    v.

JULIAN CASTRO, Secretary,
United States Department of Housing
and Urban Development,

                    Defendant.

Civ. Action No. 3:15-cv-06325-MAS-DEA

**MEMORANDUM OF LAW IN SUPPORT OF ORDER
TO SHOW CAUSE FOR  TEMPORARY RESTRAINTS AND A
PRELIMINARY INJUNCTION**

Michael Pasquale, Esq.
Law Offices of Michael P. Pasquale, LLC
163 Madison Avenue, Suite 200-80
Morristown, New Jersey 07960
(973) 362-5344
Attorneys for Plaintiff,
Township of Lakewood

William Higgins, Esq.
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey  07102
(973) 622-4444
Co-counsel for Plaintiff,
Lakewood Tenants Organization, Inc.

Edward Dauber, Esq.
Greenberg Dauber Epstein & Tucker
One Gateway Center, Suite 600
Newark, NJ 07102
Tel: (973) 643-3700
Co-counsel for Plaintiff,
Lakewood Tenants Organization, Inc.

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT ............................................................................ 1

SUMMARY OF FACTS .................................................................................... 7

LEGAL ARGUMENT
    PLAINTIFFS ARE ENTITLED TO A TRO AND PRELIMINARY
    INJUNCTION ............................................................................................ 29

A.    THE DISTRICT COURT HAS JURISDICTION TO ENTER
    INJUNCTIVE RELIEF AGAINST HUD ......................................... 29

B.    THE STANDARD FOR A TRO AND  PRELIMINARY
    INJUNCTION ................................................................................. 30

C.    PLAINTIFFS HAVE A REASONABLE LIKELIHOOD OF
    SUCCESS ON THE MERITS .......................................................... 31

    1.    The Township did not default under the ACC. ........................ 31

    2.    HUD did not have the authority under the ACC to
    declare a "default" because neither it's notice of the
    default nor its determination that there was a default were
    reasonable. ............................................................................ 32

    3.    HUD's declaration of a "default" under the ACC is
    unenforceable because it violates the implied covenant of
    good faith and fair dealing. ..................................................... 33

    4.    There is no rational basis for HUD's demanded audit and
    the Court should not permit HUD to conduct the audit for
    retaliatory and discriminatory  reasons. ................................... 37

    5.    HUD's actions have deprived Plaintiffs of both
    substantive and procedural due process under the law. ........... 40

D.      IN THE ABSENCE OF INJUNCTIVE RELIEF PLAINTIFFS AND SECTION 8 TENANTS IN LAKEWOOD WILL SUFFER IRREPARABLE HARM ....................................................43

E.      HARM TO PLAINTIFFS AND CITIZENS WOULD OUTWEIGH THE HARM TO HUD....................................................44

F.      GRANTING THE PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST ......................................................44

CONCLUSION ................................................................46

ME1 21031797v.1

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

Arnett v. Kennedy,
   416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) .........................................41

Ballas v. Tedescro,
   41 F. Supp. 2d 531 (D.N.J. 1999)...................................................................31

Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005)...................32

Cheruku v. Attorney General of U.S.,
   662 F.3d 198 (3rd Cir. 2011)...........................................................................39

Cleveland Bd. of Educ. v. Loudermill,
   470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) ....................................41

Doran v. Salem Inn, Inc.,
   422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648, (1975) .....................................43

Everett v. Housing Authority of the City of Shamokin,
   2014 WL 4411603 (M.D. Pa. 2014.)...............................................................42

Fed'n of State Massage Therapy Boards v. Academy of Oriental Therapy,
   LLC,
   No. 3:13-cv-06317, 2013 WL 5888094 (D.N.J. Oct. 28, 2013).......................30

Frank's GMC Truck Ctr., Inc. v. GMC,
   847 F.2d 100 (3d Cir.1988)............................................................................43

General Electric Co. v. Gilbert,
   429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976) .......................................38

Gloucester Township Housing Authority v. Franklin Square Associates,
   2013 WL 3990820 (D.N.J. August 2, 2013)....................................................29

I.N.S. v. Cardoza-Fonseca,
   480 U.S. 421 (1987).......................................................................................38

ME1 21031797v.1

Kaplan v. First Options of Chicago, Inc.,
  143 F.3d 807 (3d Cir. 1998) ...................................................................35, 36

Kos Pharm., Inc. v. Andrz Corp.,
  369 F.3d 700 ........................................................................................30

Massie v United States Department of Housing and Urban Development,
  620 F.3d 340 (3rd Cir. 2010) ...................................................................30

Metcalf Constr. Co. v. United States, 742 F.3d 984, 990 (Fed. Cir. 2014)32 BA_Cite_55

Minard Run Oil Co. v. U.S. Forest Service,
  670 F.3d 236 ........................................................................43, 44, 45

Neo Gen Screening, Inv. V. Telechem Int'l, Inc.,
  69 F. App'x 550 (3d Cir. 2003) ...............................................................31

New Jersey Retail Merchs. Ass'n v. Sidamon-Eristoff,
  669 F.3d 374 (3d Cir. 2012) ...................................................................31

Oburn v. Shapp,
  521 F.2d 142. (3rd Cir. 1975) ..................................................................38

Opticians Ass'n of Am. V. Indep. Opticians of Am.,
  920 F.2d 187 (3d Cir. 1990) ...................................................................30

Roundtree v. U.S. Dept. of Housing and Urban Development,
  2009 WL 7414663 (M.D. FL. 2009) .........................................................42

Runco Transp., Inc. v. Mid Valley School Dist.,
  2015 WL 672260 (M.D. PA 2015) ...........................................................42

Unger v. National Residents Matching Program,
  928 F.2d 1392 (3rd Cir. 1991) .................................................................41

United Roasters, Inc. v. Colgate-Palmolive Co.,
  649 F.2d 985 (4th Cir.), cert. denied, 454 U.S. 1054, 102 S.Ct. 599, 70 L.
  Ed.2d 590 (1981) ...............................................................................36

Vaqueria Tres Monjitas, Inc. v. Irizarry,
  587 F.3d 464 (1st Cir.2009) ...................................................................43

Watt v. Alaska,
   451 U.S. 259, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981) ...................................... 38

STATE CASES

Bak-A-Lum Corp. v. Alcoa Bldg. Prods., Inc.,
   69 N.J. 123, 351 A.2d 349 (1976) ................................................................... 36

Seidenberg v. Summit Bank,
   348 N.J. Super. 243, 791 A.2d 1068 (App. Div. 2002) ......................... 33, 34, 35

Sons of Thunder, Inc. v. Borden, Inc.,
   148 N.J. 396 (N.J., 1997) .......................................................................... 36, 37

Wilson v. Amerada Hess Corp.,
   168 N.J. 236 (2001) ...................................................................................... 36

STATE STATUTES

Title II of the Americans with Disabilities Act of 1990 ....................................... 14

Title IV of the Civil Rights Act of 1964 ............................................................... 14

§ 504 of the Rehabilitation Act of 1973 ............................................................... 14

§ 8 of the United States Housing Act of 1937 ("Section 8") ................................... 1

REGULATIONS

24 C.F.R. § 982.158 ................................................................................... 24, 31

CONSTITUTIONAL PROVISIONS

Fourteenth Amendment ................................................................................ 40, 41

ME1 21031797v.1

## PRELIMINARY STATEMENT

Plaintiffs seek the Court's assistance to prevent irreparable harm to thousands of Section 8 housing assistance recipients, applicants and participating landlords, as well as the destruction of a non-profit corporation that has been successfully administering Lakewood Township's Section 8 housing program with exceptional results for over 38 years.

This matter arises following an approximately four-year history of egregious abuse of governmental power and retaliatory and discriminatory conduct by the United States Department of Housing and Urban Development ("HUD").  HUD's abusive, retaliatory and discriminatory conduct culminated in its arbitrary decision, without adequate notice or cause, to terminate a highly successful, top rated, Section 8[1] housing assistance program called the Lakewood Township Residential Assistance Program (the "Program" or "LTRAP").  The Program is the largest private sector administrator of federally-assisted affordable housing in Ocean County, New Jersey, and one of the largest in New Jersey.  The Program presently serves more than 1,100 New Jersey, low-income households, consisting of approximately 8,400 individual Program beneficiaries.  These New Jersey residents are mostly comprised of the elderly, the disabled and children whose housing will be jeopardized by HUD's reckless actions.

---

[1] Section 8 of the United States Housing Act of 1937 ("Section 8")

1

Plaintiff, Lakewood Township, New Jersey (the "Township"), as the public housing agency (the "PHA"), has had the Program for nearly 40 years pursuant to certain Annual Contribution Contracts ("ACCs") between the Township and HUD. From its inception, the Township has sub-contracted with Co-Plaintiff, Lakewood Tenants' Organization, Inc. ("LTO"), to administer the Program, an outsourcing practice common among PHAs.

Beginning in the fall of 2011, HUD began a campaign of excessive and unjustified investigations of the Program after the Program discontinued assistance to an individual, referred to herein as "Mr. N",  because it had determined that he was collecting double subsidies.  HUD's campaign of excessive and unjustified investigations became even more intense approximately one year later when the Program refused to reinstate Mr. N after an official of the HUD Fair Housing and Equal Opportunity Office ("FHEO") in Newark, New Jersey, contacted LTRAP and demanded that Mr. N's voucher be reinstated, threatening retaliation against LTRAP if the demand was not met.

After the Program had suffered through no less than four disruptive, excessive and unjustified HUD examinations, HUD began to demand that LTO submit to yet another apparently pointless and excessive examination.  The Township compensates LTO for its administration of the Program, by assigning to it the administrative fees (the "Administrative Fees") established by Congress as

2

reasonable and necessary to run a Section 8 housing assistance program in the region.  On a few occasions over the course of the decades-long operation of the Program, HUD has inquired about the establishment of a reserve account, currently referred to by HUD as an Unrestricted Net Position or "UNP," for Administrative Fees that exceed the actual costs of administering the Section 8 program. Throughout the history of the Program, the "actual cost" to the Township for LTO's administration of the Program has been equal to the federally-established Administrative Fees.  Consequently, there is never a deficit or surplus to the Township with respect to the cost of the Program.  The balance in the UNP for the Program is always zero.  HUD has been fully aware of the manner in which compensation to LTO for administration of the Program had been paid and accounted for since the Program's inception.  Over the history of the Program, HUD looked at the issue and has stated, in writing, that the Program's treatment of the UNP and the administrative fee is acceptable.  Beginning in September of 2013, however, HUD decided to revisit the same issue, and seemed to come to a different conclusion.

In September of 2013, for the first time in the history of the Program, HUD began to demand an audit of LTO's (as opposed to the Program's) records pertaining to the UNP.  LTO was at a loss to understand this demand since:

- The same issue had been previously investigated, resolved and "closed" in writing by HUD;

- The fees paid to LTO were equal to the fees established by Congress as reasonable to administer programs in the region;

- As recently confirmed by a study commissioned by HUD, the fees paid to LTO for administration of the Program for certain time periods in 2013 and 2014 were hundreds of thousands of dollars less than they would have been if the Administrative Fee more accurately reflected the actual costs of administering the Program;

- The fees paid to LTO became, in HUD terminology, "defederalized" - that is they cease to be federal funds and were subject only to state law;

- As a non-profit corporation, all of LTO's financial data has always been publicly available; and

- While the Program maintained records of a UNP with a "zero" balance as directed by HUD, LTO was not required to, and did not maintain, books and records of any UNP with respect to the "defederalized" fees earned by LTO.  LTO simply did not have the books and records in the format demanded by HUD, and HUD was aware of this.

Given the history of disruptive, excessive and unjustified HUD examinations, after the latest demand for an additional investigation, LTO contacted a number of legal and accounting professionals who concluded that HUD had no reason to audit the books of LTO.  Throughout 2014, LTO and its attorneys exchanged correspondence with HUD regarding the basis for HUD's demanded audit.  After a letter from HUD in December of 2014 threatening to

terminate the Program for failure to submit to the audit, representatives of the parties met in person on February 10, 2015. The parties discussed the dispute between them and the context under which the dispute had arisen as described more fully herein and in the Complaint. In a good faith effort to resolve the issues, Plaintiffs' counsel suggested that Plaintiffs might be willing to consider permitting an examination of LTO's records, provided that the scope of that examination was limited in light of the history of HUD's excessive and unjustified examinations of the Program in this matter. HUD stated that it would consider a global resolution of the issues between the parties and agreed to "speak with us [Plaintiffs' attorneys] before taking any further action against Lakewood Township or LTO in regard to the issues we discussed, including any formal declaration by HUD that the Township is in default of the ACC."

However, following the February 10, 2015 meeting, HUD did not contact Plaintiffs' counsel or anyone from the Program at all to discuss a resolution of the issues. Instead, as Plaintiffs would later learn, HUD was conspiring, behind Plaintiffs' backs, to terminate the Program without notice or cause.

By letter dated August 11, 2015, which was sent to Plaintiffs on August 12, 2015 (the "Termination Letter"), HUD announced that the Township was in "default" of the ACC for its failure to provide full access to all of the Township's records [presumably meaning the records of LTO]. In the Termination Letter,

HUD  falsely stated that "HUD has also tried to resolve Lakewood's ACC non-compliance with good faith negotiations."

HUD has no basis for declaring the alleged "default".  For the past approximately 40 years, the Township has always provided full access to the books and records of the Program, and, with HUD's full knowledge and written approval, LTO has not maintained books and records of any UNP with respect to the "defederalized" fees earned by LTO.  Even if HUD's claimed "default" is now the alleged failure to provide access to LTO's books and records, HUD's demand to review those records was the subject of discussion between the parties and was not flatly refused.  There is therefore no default under the ACC.

HUD's Termination Letter announced that, as a result of the alleged "default," effective September 1, 2015, HUD would transfer the entire Program to the Lakewood Housing Authority ("LHA") effectively terminating LTO's approximately 40 year old business and putting LTO's 20 employees out of work. The purported transfer of the Program, which HUD has declared must happen over the course of two weeks, also demonstrates a total disregard for the approximately 8,400 individuals served by the Program, the vast majority of whom are elderly, disabled and children, and shows that HUD is completely disregarding the administrative realities of such a transfer.  LHA administers 833 units through its Section 8 voucher program.  HUD's edict requires LHA to administer another

6

1,100 units by September 1, 2015, making LHA responsible for administering more than double the number of its current units.  It is absurd to believe that LHA has the capacity to increase its caseload by 122% and to hire another approximately 20 employees over the course of the next two weeks, without even considering the impossible administrative logistics of such a transfer within such a short time frame.  Program participants and applicants will suffer.  Landlords will go unpaid.  Tenants will be evicted.  In the absence of relief, Lakewood, LTO, LTO's employees and thousands of  Section 8 applicants and participants who are Township residents will be irreparably harmed.  In stark contrast there is absolutely no harm to HUD in preserving the status quo.

There is no basis for HUD to terminate the Program, and its termination will cause irreparable harm.  Respectfully, the Court should temporarily and preliminarily restrain HUD from terminating the Program.

## SUMMARY OF FACTS

For almost 40 years, the Township has had the Program, pursuant to certain Annual Contribution Contracts ("ACCs") between the Township and HUD. Declaration of the Honorable Albert Akerman, Mayor of Lakewood ("Ackerman Dec.") dated August 20, 2015, ¶2 and Exhibit A.  From its inception, the Township has sub-contracted with LTO to administer the Program, a practice common

among PHAs.  Id., ¶3 and Declaration of Meir Hertz ("Hertz Dec.") dated August 20, 2015, ¶3 and Exhibit B thereto.

The Program is the largest private sector administrator of federally-assisted affordable housing in Ocean County, New Jersey, and one of the largest in New Jersey.  Hertz Dec., ¶5.  The Program presently serves more than 1,100 New Jersey, low-income households, consisting of approximately 8,400 individual Program beneficiaries.  Id.  These New Jersey residents are comprised mostly of the elderly, the disabled and children.  Id.

During the almost 40 years of its existence, the Program has been administered with great success, helping thousands of New Jersey residents attain dependable, decent, safe and affordable housing.  Id., ¶6.  According to HUD's most reliable tool for measuring the annual performance of Section 8 programs, the Section Eight Management Assessment Program ("SEMAP"), the Program has consistently attained nearly perfect scores and SEMAP's highest performance rating.  LTRAP's average SEMAP score for the most recent 4-year period is 99% - - one of the highest in the nation.  Id., ¶6 and Exhibit D.  By comparison, the average SEMAP score for Section 8 housing agencies in New Jersey is 77.39%.  Id., ¶6 and Exhibit E.

From the inception of the Program to date, the Program has been run with very few complaints from the Program's tenants and participating landlords, and

has established an outstanding audit track record of fiscal responsibility and integrity, as well as regulatory compliance with HUD.  Id., ¶7.

By letter dated August 31, 2011, the Program was notified by another housing agency that a tenant, referred to herein as  "Mr. N," was collecting Section 8 subsidies for two separate dwellings, one from their agency and the second from LTRAP, and that Mr. N was still occupying the dwelling with the voucher subsidy issued by their agency.  Id., ¶8 and Exhibit F.  LTO investigated the allegations of the August 31, 2011 letter and determined that Mr. N had, in fact, been collecting double subsidies for two and a half months.  Id., ¶9.  LTRAP notified Mr. N that, due to his failure to move into the dwelling for which his LTRAP voucher was issued, the voucher had expired and LTRAP was discontinuing his assistance.  Id. and Exhibit G.

In apparent response to an informal discrimination complaint from Mr. N, HUD sent a letter dated November 28, 2011, addressed to the Program.  Id., ¶10 and Exhibit H.  HUD stated that it was "concerned with the LTRAP's success rate regarding the issuing of Housing Choice Vouchers," although HUD had absolutely no reason for its alleged "concern" based on the history of the Program.  Id.  The November 28, 2011 letter demanded production, within a ten day time period, of eight different categories of information spanning an eighteen month time period. Id.  It demanded information regarding "Families that were unable to Lease Up

[sic] or denied voucher/Date [sic] when family lost voucher or not qualified." Id.
LTO fully complied with the unusual and unjustified demands of the November
29, 2011 letter. Id.

On August 8, 2012 – nearly one year later – Mr. N filed a formal Housing
Discrimination Complaint. Id., ¶11 and Exhibit I. The complaint asserted that
LTRAP had "dropped Rental Assistance due to hospitalization." Id. Few
additional facts were asserted. Id. Shortly after Mr. N's complaint was filed, and
prior to any official investigation of the matter by HUD, an official of the HUD
Fair Housing and Equal Opportunity Office ("FHEO") in Newark, New Jersey,
contacted LTRAP and demanded that Mr. N's voucher be reinstated, threatening
retaliation against LTRAP if the demand was not met. Declaration of Henya
Richter ("Richter Dec.") dated August 20, 2015, ¶18 and Hertz Dec., ¶12. LTRAP
refused this demand, having concluded that the expiration of Mr. N's voucher was
warranted by the facts, was not motivated by discrimination, and that LTRAP's
refusal to reinstate the voucher was consistent with LTRAP's obligation to
maintain Program integrity in accordance with HUD's requirements. Hertz Dec.,
¶12.

In the fall of 2012, the Program responded to Mr. N's complaint. Id., ¶13
and Exhibit J. It cooperated with HUD's investigation over the course of

approximately eight months, supplying lengthy responses to HUD's multiple data requests.  Id. and see Exhibit K.

Early in 2013, HUD sent LTRAP an amended complaint, which reasserted most of the allegations that were made in Mr. N's original complaint.  Id., ¶14 and Exhibit L.  LTO responded to the amended complaint as well.  Id., ¶14.

On May 29 and 30, 2013, HUD sent a crew of approximately 15 agents to conduct on-site investigations and interviews (the "May 2013 Interrogation") at LTO's offices, allegedly in connection with  Mr. N's complaint.  Id., ¶15.  Among others, a Ms. Brenda Edmondson, Chief, FHEO Newark Center Compliance Branch, took part in the May 2013 Interrogation.  Id.  HUD interrogated nine of LTO's then eighteen employees, including LTO's CEO and CFO over the course of two full business days.  Id.  During the May 2013 Interrogation, HUD officials demanded inspection of documents not previously requested.  Id.  Because many of those records were stored digitally, LTO had to make computer terminals available to HUD agents and had to assign personnel to assist HUD with its unannounced document review.  Id.  HUD occupied LTO's offices for two full business days impeding LTO's ability to administer the Program.  Id.  During   the May 2013 Interrogation, HUD personnel posed a wide variety of disparaging, insulting and inappropriate questions and comments concerning the religious affiliation of LTO's management.  Id., ¶16.  These included (a) whether LTO's

Administrator/CEO required the staff to refer to him as "Rabbi," (b) shock that the Program's offices were open on Christmas and New Year's Day, and (c) inquiry of LTO's CEO about his involvement (he had none) with a rabbinical college located in Lakewood, New Jersey that had at that time recently obtained a significant, but controversial, grant from the state of New Jersey.  Id.  The implication of the last question was that because he was an Orthodox Jew he was presumably involved in obtaining government funds in an improper manner.  Id.

Following the May 2013 interrogation, HUD-Newark officials again demanded that Mr. N be reinstated into LTRAP's Section 8 HCV program.  Id., ¶17.  LTRAP again refused on the ground that Mr. N's receipt of double Section 8 subsidies was fraudulent and sufficient grounds for their refusing to renew or reinstate Mr. N's Program participation.  Id.  Counsel to LTRAP thereupon requested that HUD-Newark FHEO either issue to LTRAP a written demand for Mr. N's reinstatement or obtain a specific written directive from the HUD Newark PIH [Public and Indian Housing] Management Division demanding his reinstatement.  Id.  Neither the written demand nor such a directive was ever issued, by either HUD-Newark FHEO or HUD Newark PIH Management.  Id.

By letter dated June 3, 2013, HUD-NJ FHEO Enforcement Chief, Frank Vespa-Papaleo wrote to the Program's then attorneys (Nixon Peabody, LLP) regarding Mr. N's complaint. Id., Exhibit M.  The June 3, 2013 letter demanded

12

production, no later than June 12, 2013, of (a) 32 separate categories of documents and (b) the complete contents of 130 current Section 8 participant and waiting list applicant files.  Id.  The June 3, 2013 letter demanded a list of all of LTO's "board members from 2010 to present including their names, race, national origin, sex, [and] disability status…."  Id.  It also demanded a "List or calendar of LTRAP office holidays and closures from 2010 through 2013."  Id.  The June 3, 2013 letter further advised that HUD would require another two-day, on-site, interrogation of the Program during which HUD would interview every single remaining staff member of the Program "including caseworkers, receptionists, etc." and would complete the review of any additional documents it saw fit.  Id.  The scope of the documents requested and the additional interrogation demanded in HUD's June 3, 2013 letter went so far beyond the scope of Mr. N's Complaint that Nixon Peabody responded on June 12, 2013, to HUD's June 3, 2013 letter.  Id., Exhibit N.

Nixon Peabody's June 12, 2013 letter pointed out LTO's extensive cooperation with HUD's investigation.  Id.  In response to HUD's citation of Title VI and Section 504 compliance review powers, Nixon Peabody noted that HUD's investigations to that point had violated the rules for compliance reviews in Handbook 8040.1.  Id.  Nixon Peabody also noted that, contrary to the requirement in the Handbook HUD had failed to provide notice of the allegations the Program was facing.  Id.  Nothing in Mr. N's complaint supported the massive scope of the

13

data demand in the June 3, 2013 letter.  Id.  Nixon Peabody asked HUD to meet its obligations to explain the allegations against the Program and to advise how the additional documents demanded by the June 3 letter related to those allegations. Id.  Nixon Peabody received no response to the requests in its June 12, 2013 letter to HUD.  Id.

On August 23, 2013, Jay Golden, the HUD Region II Director, notified LTRAP by letter that HUD was launching a "compliance review" to determine whether LTRAP was in compliance with the nondiscrimination requirements of Title IV of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, and Title II of the Americans with Disabilities Act of 1990, as amended.  Id., Exhibit O.  Given the decades-long history of the Program, including more than a dozen prior "clean" routine HUD and U.S. Department of Justice Fair Housing / Equal Opportunity investigations and reviews, HUD had no rational basis for this discrimination inquisition.  See, id., ¶21.  HUD's August 23, 2013, letter contained 38 data requests (most of which had multiple parts), including another demand for copies of 130 tenant and waiting list applicant files.  Id., Exhibit O.  Many of the demands of HUD's August 23, 2013 letter duplicated requests that had been made in HUD's June 3, 2013 letter, but some demands were new and more extensive. Cf., id., Exhibit M and Exhibit O.

14

Like the June 3, 2013, letter, the August 23, 2013, letter demanded production of a "List of all [LTRAP and LTO] board members from 2010 to present including, their names, race, national origin, sex, [and] disability status…" and a "List or calendar of LTRAP office holidays and closures from 2010 through 2013…." Id. The August 23, 2013, letter also notified LTRAP that HUD would conduct another on-site inspection of LTRAP's office. Id., Exhibit O. It requested another 6 sets of documents to be reviewed on-site and advised that there would be additional interrogations of LTRAP staff. Id. The August 23, 2013 letter identified Ms. Edmondson as the contact person for these compliance reviews. Id. She was the same agent who had participated in the two business day May 2013 Interrogation of LTRAP three months earlier. See id. at ¶15 and Exhibit O. HUD had interrogated nine of LTO's then eighteen employees, including LTO's CEO and CFO over the course of two full business days during the May 2013 Interrogation. Id., ¶15. Over the following three months, two different branches of HUD had demanded two separate, additional, multi-day, on-site interrogations of the Program's employees, including interviews of receptionists and other lower-ranking employees. See, id., Exhibits M and O.

By September 2013, LTO, following many hours of work had produced thousands of pages of documents and data about the Program. Id., ¶15. It had submitted to a multi-day inquisition by approximately 15 HUD agents. Id.

15

Nonetheless, two different branches of HUD were then requiring that the Program respond to two additional massive document-production demands and that the Program submit to two separate additional multi-day interrogations of the Program. See, id., Exhibits M and O.

HUD's interrogations of the Program were so extraordinary that they prompted an attorney from Nixon Peabody, a large international law firm with extensive HUD regulatory experience, to comment in an email to HUD dated September 11, 2013 that:

> In more than 20 years of fair housing work, I have never seen such extensive and overblown demands from HUD investigators. The two-pronged investigations now being pursued by HUD are burdensome and abusive, and force LTRAP to divert its resources from serving its clients' needs to answering redundant questions posed by HUD. It is becoming increasingly difficult to resist the conclusion that HUD personnel have decided to launch a campaign against LTRAP and to overwhelm it with impertinent and harassing demands that raise serious questions about HUD's motivations here.

Id., Exhibit P.

HUD has been fully aware since 1977 of the manner in which compensation to LTO for administration of the Program had been paid and accounted for.  Id., ¶¶3 and 23-26 and Exhibits B, and Q to T.  Over the history of the Program, HUD looked at the issue and has stated, in writing, that it was acceptable.  See id. Exhibits Q and T.  Beginning in September of 2013 however, HUD decided to

revisit that issue, and now seems to now have come to a different conclusion.  Id., ¶28.

Under the contracts between LTO and the Township, LTO performs the management and administrative functions required to operate the Program in exchange for payment in an amount equal to the Administrative Fees deemed reasonable and necessary by Congress to operate a Section 8 HCV program in the region.  Id., ¶23.  The Township insisted on this arrangement so that the cost of the Program would be predictable, accounting for the costs of the Program would be simplified, and the Program would be self-sustaining and would never become a financial burden on the Township.  Id.  Over almost 40 years, administration of the Program did not cost the Township more or less than the built-in, federally-funded, Administrative Fee deemed reasonable and necessary by Congress for the operation of a Section 8 HCV program in Lakewood Township, New Jersey.  Id.

At various times over the approximately 40 year history of the Program, HUD made inquiries as to whether the Program had established a reserve account, currently referred to by HUD as an Unrestricted Net Position or "UNP", for Administrative Fees that exceed the actual costs of administering the Section 8 program.  Id., ¶24.  The Program's response has always been the same.  Id.  The "actual cost" to the Township for administering the Program is equal to the federally-established Administrative Fees.  Id.  Consequently, there is never a

17

deficit or surplus to the Township with respect to the cost of the Program.  Id.  The balance in the UNP is always zero. Id. and see Exhibit Q (HUD representative:  "In regards to the UNA [UNP], HQ is going to start looking at the UNA and NRA in VMS, could you please enter a zero in the UNA [UNP] and then on the Expense/Comments Tab, make the statement about the contract with LTO and that you don't have a UNA.").

In fact, in 2000-2001, HUD conducted a seven-month long investigation of, among other things, the operation of the UNP (which was then called a "reserve surplus").  Id., ¶26.  In a letter dated January 26, 2001, Carmen Valenti, Director of the Office of Public Housing for HUD, stated:  "Upon further review, based on the current contract that LTO has with Lakewood Township, the Lakewood Tenants Organzation is entitled to all Administrative Fees and therefore an Administrative Fee Reserve account would not accrue."  Id., Exhibit T, at the fourth page.

Since the inception of the Program, HUD has been fully aware of the manner in which the Township compensates LTO for LTO's operation of the Program as evidenced by, among other things, the following:

- HUD's review and approval of LTRAP's year-end financial statements going back for at least 20 years; and

- Independent Public Accountant Audit Reports ("IPA Reports"), going back to the inception of LTRAP, filed with, and accepted by, the Township, HUD, and the Federal Audit Clearinghouse.

See, id., ¶25 and Exhibits R and S.

By email dated July 25, 2013, HUD announced that it was conducting a "Financial Management Review" of the Program.  Id., ¶27 and Exhibit U.  The July 25, 2013 email stated that the Financial Management Review would include, among other things, a review of the operation of the UNP, which was the very same issue that had been previously investigated, resolved and "closed" by HUD in 2000-2001.  Id. and see Exhibit T.  In September 2013, HUD conducted another two-day, on-site investigation of the Program, purportedly in connection with the Financial Management Review.  Id., ¶28.  All concerns raised by HUD in its Financial Management Review were addressed, with one exception.  Id.  HUD now demanded another on-site audit, this time of LTO's (as opposed to the Program's) records pertaining to the UNP for the four and a half year period from 2010 to June 2014, although at the time of the prior on-site inspection HUD personnel stated that the UNP issue was "off the table."  Id.

LTO was at a loss to understand this demand since, among other reasons, the fees paid to LTO by the Township each year to administer the Program are equal to the fees established by Congress as reasonable and necessary to run a Section 8 housing assistance program in the region.  Id., ¶29.  In fact, as recently confirmed by a study commissioned by HUD, the fees paid to LTO for administration of the Program for certain time periods in 2013 and 2014 were hundreds of thousands of

dollars less than they would have been if the Administrative Fee more accurately reflected the actual costs of administering the Program.  Id. and see Exhibit W. HUD recently commissioned a "Housing Choice Voucher Program Administrative Fee Study" (the "Fee Study").  Id. and Exhibit V.  The main purpose of the study was to identify and measure the actual costs of operating a high-performing and efficient housing choice voucher (HCV) program and then propose a new administrative fee formula based on those findings and costs.  Id.  In undertaking this study, HUD sought to address the critical need for data regarding the actual cost of administering the HCV program.  Id.  The study's findings confirmed what HUD already know to be true – current administrative fee funding does not meet the reasonable costs of administering the program.  Id.

By email dated May 26, 2015, HUD transmitted to the Program "information on how the recommended fee formula proposed in the Housing Choice Voucher Program Administrative Fee Study would potentially impact your agency" (the "LTO Fee Study Report").  Id., ¶30 and Exhibit W.  The results of the LTO Fee Study Report, for the Study period of July 2013 – June 2014, stated that LTO was paid 33% ($315,190) less than it would have been paid if the Administrative Fee reflected the actual costs of administering the Program.  Id.

HUD's demand to conduct an on-site audit of LTO's (as opposed to the Program's) records pertaining to the UNP also made no sense to LTO because it is

20

LTO's understanding that, in HUD terminology, the fees paid to LTO become "defederalized"; that is they cease to be federal funds.  Id., ¶31 and see Exhibit X. HUD's request to audit LTO was also odd since, as a non-profit corporation, all of LTO's financial data has always been publically available.  Id., ¶32.

Additionally, while the Program maintained records of a UNP with a "zero" balance as directed by HUD, LTO was not required to, and did not maintain, books and records of any UNP with respect to the "defederalized" fees earned by LTO. Id., ¶33, and see Exhibit Q (HUD representative:  "In regards to the UNA [UNP], HQ is going to start looking at the UNA and NRA in VMS, could you please enter a zero in the UNA [UNP] and then on the Expense/Comments Tab, make the statement about the contract with LTO and that you don't have a UNA.").  LTO simply did not have the books and records in the format demanded by HUD, and HUD was aware of this.  Id., ¶33.

Given the history of disruptive, excessive and unjustified HUD examinations, LTO contacted a number of legal and accounting professionals who concluded that HUD had no reason to conduct a federal audit of non-federal funds that were deemed reasonable in amount by Congress when paid to LTO.  See id., ¶34 and Exhibit Y.  Throughout 2014, LTO and its attorneys exchanged correspondence with HUD regarding the basis for HUD's demanded audit of these reasonable, "non-federal," funds.  Id., ¶35 and Exhibit Z.

21

After LTO had suffered through what seemed to be an endless series of retaliatory, discriminatory, disruptive, excessive and unjustified HUD inquisitions, it received a letter dated December 5, 2014 from HUD threatening to terminate the Program.  Id., ¶36 and Exhibit Z.

The Plaintiffs called a meeting with HUD following what appeared to be a series of no fewer than four retaliatory, discriminatory, disruptive, excessive and unjustified HUD examinations of the Program, culminating in a threat made in a letter dated December 5, 2014 from HUD to terminate the Program.  Declaration of Michael P. Pasquale ("Pasquale Dec.") dated August 19, 2015, ¶3.  On February 10, 2015, attorneys for the Plaintiffs met in person with the following HUD representatives: John Cahill, Esq., Regional Counsel; Louis J. Gioia, Attorney-Advisor; Dolores Melvin, Division Director, Public Housing; and Balu Thumar, Public Housing.  Judith De Haven of HUD's Quality Assurance Division joined the meeting by telephone.  Id., ¶2.  At the meeting the parties discussed the dispute between them and the context under which the dispute had arisen as described more fully in the Complaint in this matter.  Id., ¶3.  In particular, the parties discussed what the Plaintiffs perceived to be a history of disruptive, excessive and unjustified HUD examinations, and Plaintiffs' concern that HUD's request to audit the books and records of LTO with respect to a reserve fund that HUD knew that LTO did not maintain was potentially a demand for another disruptive, excessive

22

and unjustified HUD examination.  Id.  HUD assured Plaintiffs' counsel that it was not interested in an "audit" or an "investigation," but only sought a "review" of LTO's records.  Id.

The meeting was civil and everyone appeared to be interested in working toward a global resolution of the issues.  Id., ¶5.  In a good-faith effort to resolve the issues, Plaintiffs' counsel suggested that LTO might be willing to consider permitting a "review" of LTO's records, provided that the scope of that examination was limited in light of the history of HUD's examinations of the Program in this matter.   Id.   Contrary to the statements made in HUD's Termination Letter (as defined below), while the matter remained open for discussion, Plaintiffs did not make any "proposal" to "resolve the financial review issues", and HUD did not reject any offer.  Id.  At no point in the meeting did Plaintiffs flatly refuse the contemplated HUD "review" of LTO's records. Id.

HUD stated that it would consider a global resolution of the issues between the parties and agreed to "speak with us [Plaintiffs' attorneys] before taking any further action against Lakewood Township or LTO in regard to the issues we discussed, including any formal declaration by HUD that the Township is in default of the ACC."  Id. ¶6 and Exhibit A.

However, following the February 10, 2015 meeting, HUD did not contact Plaintiffs' counsel or anyone from the Program at all to discuss a resolution of the

issues.  See Ackerman Dec., ¶7, Hertz Dec., ¶39, and Pasquale Dec., ¶8.  Instead, as Plaintiffs would later learn, HUD was conspiring, behind Plaintiffs' backs, to terminate the Program without notice or cause.  See Akerman Dec., ¶¶8 and 9.

By letter dated August 11, 2015, which was sent to Plaintiffs on August 12, 2015 (the "Termination Letter"), HUD announced that the Township was in "default" under the ACC because it refused to submit to an audit.  See Hertz Dec., Exhibit BB, p. 3 ("Since Lakewood has refused and continues to refuse to provide full access to all of its records at its facility, access that is mandated by 14 (a)-(c) of its ACC and 24 C.F.R. § 982.158, Lakewood is in default of its ACC").  HUD's Termination Letter announced that, as a result of the alleged "default," effective September 1, 2015, HUD would transfer the entire Program to the Lakewood Housing Authority ("LHA") effectively terminating LTO's approximately 40 year old business and putting LTO's 20 employees out of work.  Id.

On August 12, 2015, the Program received a second letter from HUD.  Id., ¶41 and Exhibit CC.  This letter demanded that all information, documentation, income and assets of the Program be transferred to LHA "upon receipt of this letter," and further demanded that "The Township of Lakewood must fully comply with the demands stated in this letter within **14 calandar days of the date of this letter.**"  Id.  The letter also threatens to terminate Lakewood's access to all HUD systems, presumably on August 26, 2015.  Id.

24

It is impossible to comply with HUD's demands without disastrous, irreparable, consequences.  See Richter Dec., ¶¶5-13 and 16-17.  The purported transfer of the Program, which HUD has declared must happen over the course of two weeks, demonstrates a total disregard for the approximately 8,400 individual Township residents served by the Program, the vast majority of whom are elderly, disabled and children, and shows that HUD is completely detached from the administrative realities of such a transfer. Id.

LHA administers 833 units through its Section 8 voucher program.  Id., ¶6 and Exhibit A.  HUD's edict requires LHA to administer another approximately 1,100 units to LHA by September 1, 2015, making LHA responsible for administering more than double the amount of its current units.  See id.

In order to administer the Program, LTO employs 20 people, including a number of highly skilled caseworkers / bookkeepers and inspectors.  Id., ¶7 and 13. A number of LTO's employees have undergone extensive training unique to the HVC program.  Id.

Many of the processes involved in administering the Program are labor intensive and time sensitive.  Id., ¶8 and 9.  For example, units must be "recertified" annually as participant leases renew.  Id., ¶8.  This process takes approximately 4 months of work.  Id.  Among other things, all income and assets of all members of the household must be verified.  Id.  There must be an initial

25

inspection of the unit in accordance with HUD standards performed by someone with knowledge of those standards.  Id.  All needed repairs for a passing grade must be noted by the inspector.  Id.  The unit must be re-inspected after the repairs are made and at least 30 days before the Housing Assistance Payment (the "HAP") is approved.  Id.  No HAP will be made without HUD approval and a passing inspection, and HAP payments will not be made retroactively.  Id.  If there is a delay in this process as the result of LHA having an absence of qualified individuals for perform these tasks in a timely fashion, HAP payments will not be made to landlords and tenants with very limited means will be forced to pay the full rent or face eviction.  Id.

Similarly, there are approximately 30 participants in the Program that have been issued vouchers and that are looking for, or have already identified, a suitable home.  Id., ¶9.  Once these participants have identified a suitable unit, the unit must be inspected by a qualified inspector, and the lease and a housing assistance payment contract must be negotiated quickly.  Id.  It is not in the landlord's interest to have vacant units, and any delay in this process will make it likely that the landlord will lease the unit to a tenant that can "close" quickly.  Id.  Many of these participants will lose the units that they are hoping to rent under the Program if LHA has insufficient resources to address the labor intensive and time sensitive demands of this process and close quickly.  Id.

26

There are also significant differences in the way that the Program is administered by LTO and the way the LHA administers its programs which will irreparably harm Program participants.    LTRAP runs one the most highly acclaimed Family Self-Sufficiency Programs (the "FSS Program") in the nation. Id., ¶10.   Although there is no longer a requirement to run the FSS Program, LTRAP voluntarily offers the FSS Program to all program participants.  Id.  The FSS Program is a highly successful program which helps participants to purchase homes.  Id.  The FSS Program offers the participants an incentive to increase their earned income.  Id.  As a participating household's income increases, its responsibility to pay part of the rent also increases (participants pay 30% of their income towards rent).  Id.  With the FSS Program, this increase is matched in an escrow account held for the participant.  Id.  When the participant graduates the program, the participant receives the full amount of the escrow account which it can use to make a down payment on a home.  Id.  While the escrow amounts vary, the Program has escrow amounts of up to $70,000.  In contrast to LTRAP, LHA limits its FSS Program and is in the process of "phasing out" their program.  Id., ¶10 and Exhibit B.

LTRAP also runs one of the most successful homeownership programs in the country.  Id., ¶11.  Homeownership programs offer participants the option to realize the opportunity for the American Dream by using the Section 8 subsidy for

27

mortgage payments rather than rental payments.  Id.  LTRAP has assisted more than 100 families who have purchased homes through this program.  Id.  By contrast, LHA, according to its website, had assisted only 27 as of November 2011. Id., Exhibit C.  According to its website, LHA limits participation in its homeownership program to 50 "slots" and places other restrictions on participation in its homeownership program.  Id.  LTRAP's homeownership program does not have similar restrictions.  Id.  LTRAP has four homeownership program closings anticipated in September 2015.  Id.  LHA has neither the capacity nor the expertise to process these cases and certainly will not be able to do so in a timely manner, which will jeopardize those applicants' ability to purchase homes for which they have a contract, deposit, mortgage commitment, and homeownership subsidy approval from LTRAP.  Id.

Both LHA and LTRAP have waiting lists for applicants that want to participate in the respective programs.  Id., ¶12.  There are approximately 650 applicants on LTRAP's waiting list and all have been on the list since 2004 and earlier.  Id.  LHA also has an extensive waiting list of thousands of applicants some of whom have been on its list since 2010.  Id.  If the Program is transferred to LHA, the waiting lists should be merged under HUD procedures, and HUD has a "first come, first served" rule with respect to these waiting lists.  Id.  It is therefore

likely that, for example, someone who may have been say 10th on LHA's waiting list will become 600th on LHA's waiting list at the stroke of HUD's pen.  Id.

Also, with the stroke of HUD's pen, LTO's non-profit business which has been successfully providing assistance to the low-income residents of New Jersey for nearly 40 years will be completely destroyed.  See Hertz Dec., Exhibits BB and CC.  LTO's 20 employees, four of whom have been employed by LTO for more than 20 years, will be without jobs with little more than two-week's notice. Richter Dec., ¶¶2 and 16.  Most of LTO's employees are the primary breadwinners for their families, supporting approximately 110 dependents.  Id., ¶16.

The Court should restrain HUD's senseless and irreparably destructive attempt to terminate the Program.

## LEGAL ARGUMENT

### PLAINTIFFS ARE ENTITLED TO A TRO AND PRELIMINARY INJUNCTION

A.   THE DISTRICT COURT HAS JURISDICTION TO ENTER INJUNCTIVE RELIEF AGAINST HUD

HUD is subject to suit in the District Court, having waived statutory immunity and there is subject matter jurisdiction over the dispute. See Gloucester Township Housing Authority v. Franklin Square Associates, 2013 WL 3990820 (D.N.J. August 2, 2013) (copy enclosed).

A District Court has the authority to enjoin HUD from action or require HUD to take affirmative action, including requiring HUD to reinstate a contract that it deemed terminated. Massie v United States Department of Housing and Urban Development, 620 F.3d 340, 358 (3rd Cir. 2010).

### B.   THE STANDARD FOR A TRO AND PRELIMINARY INJUNCTION

The primary purpose of temporary or preliminary injunctive relief is to preserve the status quo until a decision on the merits can be rendered.  See Kos Pharm., Inc. v. Andrz Corp., 369 F.3d 700, 708 (3d Cir. 2004; Opticians Ass'n of Am. V. Indep. Opticians of Am., 920 F.2d 187, 197 (3d Cir. 1990) (reversing denial of preliminary injunction); Fed'n of State Massage Therapy Boards v. Academy of Oriental Therapy, LLC, No. 3:13-cv-06317, 2013 WL 5888094, at *1 (D.N.J. Oct. 28, 2013) (granting temporary restraining order).  The "status quo" refers to the "the last, peaceable, noncontested status of the parties.  Kos Pharm., Inc., 369 F.3d at 708 (quoting Opticians Ass'n of Am., 920 F.2d at 197).

The standard for granting a temporary restraining order is the same as that for granting a preliminary injunction.  Fed'n of State Massage Therapy Boards, 2013 WL 5888094, at *1.  A preliminary injunction should be granted when (i) the movant shows a reasonable likelihood of success on the merits, (ii) the movant demonstrates he is likely to suffer irreparable harm in the absence of preliminary

relief, (iii) the harm to the moving party outweighs the harm to the non-moving party, and (iv) granting preliminary relief is in the public interest.  New Jersey Retail Merchs. Ass'n v. Sidamon-Eristoff, 669 F.3d 374, 385-86 (3d Cir. 2012); see also Neo Gen Screening, Inv. V. Telechem Int'l, Inc., 69 F. App'x 550, 554 (3d Cir. 2003); Ballas v. Tedescro, 41 F. Supp. 2d 531, 538 (D.N.J. 1999).

## C.   PLAINTIFFS HAVE A REASONABLE LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs are likely to succeed on the merits for many reasons.

### 1.   The Township did not default under the ACC.

HUD claims that the Township is in default under the ACC because it refused to submit to an audit.  See Hertz Dec., Exhibit BB, p. 3 ("Since Lakewood has refused and continues to refuse to provide full access to all of its records at its facility, access that is mandated by 14 (a)-(c) of its ACC and 24 C.F.R. § 982.158, Lakewood is in default of its ACC").  HUD's claim is simply not correct.  The Township has always granted HUD full access to its books and records regarding the Program.  See e.g. id., ¶24.  If HUD's claimed default is, instead, the refusal of LTO to submit to another disruptive, excessive and unjustified HUD examination, that claim is also incorrect.  Given the approximately four-year history of egregious abuse of governmental power and retaliatory and discriminatory conduct by HUD, HUD was no longer demanding an "audit" or an "investigation" of

31

LTO's books and records as of February 10, 2015, but instead stated that it sought only a "review" of those books and records.  Pasquale Dec., ¶4.  The parties were discussing the potential nature and extent of this "review" in light of the history of HUD's actions before HUD attacked without warning.  See Pasquale Dec., ¶¶3-8; Akerman Dec., ¶¶6-11 and Hertz Dec., ¶¶36-39.  HUD's request for a "review" of LTO's books and records was never flatly rejected.  Pasquale Dec., ¶5.  Therefore, the Township is not in default under the ACC either by virtue of its actions, or by virtue of LTO's actions, to the extent LTO's actions can constitute a breach of a contract between the Township and HUD.

> **2.    HUD did not have the authority under the ACC to declare a "default" because neither it's notice of the default nor its determination that there was a default were reasonable.**

The ACC states that "Upon written notice to the HA [defined as the Township], HUD may take possession of all of any HA property, rights or interests in connection with a program … if HUD determines that:  (1) the HA has failed to comply with any obligations under this consolidated ACC…."   Akerman Dec., Exhibit A, paragraph 15.  Where a contract does not otherwise state, a party's actions under a contract must be reasonable.  Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005); Metcalf Constr. Co. v. United States, 742 F.3d 984, 990 (Fed. Cir. 2014).  Therefore, the ACC requires both reasonable written notice to the Township of the alleged "default" and a reasonable determination by

HUD that a "default" had occurred.  Here, neither HUD's notice of the default nor its determination that there was a default were reasonable.

At the February 10, 2105 meeting, HUD agreed to "speak with us [Plaintiffs' attorneys] before taking any further action against Lakewood Township or LTO in regard to the issues we discussed, including any formal declaration by HUD that the Township is in default of the ACC."  See Pasquale Dec., Exhibit A.  After agreeing not to declare a "default of the ACC" prior to speaking to Plaintiffs' attorneys, HUD declared a "default of the ACC" approximately six months later without notice or warning to Plaintiffs.  See Pasquale Dec., ¶¶6-8; Akerman Dec., ¶¶6-11 and Hertz Dec., ¶¶36-39.  HUD's notice of the alleged "default", under the circumstances, was far from "reasonable."  Also, as set forth above, HUD had no reasonable basis for declaring any "default" under the ACC.  Therefore, HUD did not have the authority under the ACC to declare a "default" because neither it's notice of the "default" nor its determination that there was a "default" were reasonable.

**3.    HUD's declaration of a "default" under the ACC is unenforceable because it violates the implied covenant of good faith and fair dealing.**

In every contract there is an implied covenant of good faith and fair dealing. See e.g. Seidenberg v. Summit Bank, 348 N.J. Super. 243, 791 A.2d 1068 (App. Div. 2002).

the application of the implied covenant of good faith and fair dealing has addressed three distinct type of situations: (1) when the contract does not provide a term necessary to fulfill the parties' expectations, *see e.g., Onderdonk,* 85 *N.J.* at 182, 425 *A.*2d 1057; (2) when bad faith served as a pretext for the exercise of a contractual right to terminate, *see e.g., Bak-A-Lum,* 69 *N.J.* at 130, 351 *A.*2d 349; and (3) when the contract expressly provides a party with discretion regarding its performance, *see e.g., Wilson,* 168 *N.J.* 236, 773 *A.*2d 1121.

Id., 348 N.J. Super at 260, 791 A.2d at 1078.  All three situations in which the

implied covenant of good faith and fair dealing are applied are present in this case.

The contract here, the ACC, "does not provide a term necessary to fulfill the

parties' expectations."  Id.  Although not expressly written in the ACC, it was the

Township's expectation that HUD would not declare a default under the ACC for

retaliatory or discriminatory reasons.  That term should be implied in the ACC.

HUD has breached that implied term as evidenced by its campaign of excessive

and unjustified investigations of the Program and its reckless attempt to destroy the

Program in a manner that jeopardizes an almost 40 year old, non-profit business,

all of its employees and their dependents and the housing of approximately 8,400

Program beneficiaries.  See Hertz Dec., ¶¶10-12 and 26-32 and Richter Dec., ¶¶5-

18.  HUD's actions otherwise make no sense.

Similarly, "when bad faith served as a pretext for the exercise of a

contractual right to terminate" the implied duty of good faith and fair dealing is

34

violated.  Seidenberg, 348 N.J. Super at 260.  Here, HUD's bad faith, its retaliatory and discriminatory conduct, served as a pretext for its exercise of a purported contractual right to terminate the ACC.  See Hertz Dec., ¶¶10-12 and 26-32 and Richter Dec., ¶¶5-18.

Finally, when a "contract expressly provides a party with discretion regarding its performance" and the part exercises that discretion to bring about results that were not contemplated at the time of the formation, that is to bring about results that were "not part of the deal" the duty of good faith and fair dealing is likewise violated.   Seidenberg, 348 N.J. Super at 260, 791 A.2d at 1078.  Even in the case where one party to a contract has "extraordinarily broad discretion" that party does not have "the right to act in bad faith or in a commercially unreasonable manner."  See e.g. Kaplan v. First Options of Chicago, Inc., 143 F.3d 807 (3d Cir. 1998).  As stated in Kaplan:

> one purpose of the implied covenant of good faith is to 'check the exercise of a party's discretion under a contract.' … Moreover, while it is true that the implied covenant will not negate or modify express terms, the terms in the parties' contracts leave great room for discretion and thus for the application of the implied covenant.

Id. at 818.  The duty of good faith and fair dealing requires that a party exercise its discretion "reasonably and with proper motive, ... not ... arbitrarily, capriciously, or

in a manner inconsistent with the reasonable expectations of the parties." Id. at 819.

Here, HUD did not exercise its discretion "reasonably and with proper motive". Id. HUD exercised its discretion arbitrarily, capriciously, and in a manner inconsistent with the reasonable expectations of the parties. Id. It was not "part of the deal" that HUD would unreasonably terminate the ACC for retaliatory and discriminatory reasons. See Hertz Dec., ¶¶10-12 and 26-32 and Richter Dec., ¶18. HUD has violated the duty of good faith and fair dealing and its declared "default" is unenforceable because of those violations. See Bak-A-Lum Corp. v. Alcoa Bldg. Prods., Inc., 69 N.J. 123, 129-30, 351 A.2d 349 (1976) (finding that defendant's conduct in terminating contract constituted bad faith although conduct did not violate express terms of written agreement) and Wilson v. Amerada Hess Corp., 168 N.J. 236, 244 (2001). " The obligation to perform in good faith exists in every contract, including those contracts that contain express and unambiguous provisions permitting either party to terminate the contract without cause. See United Roasters, Inc. v. Colgate-Palmolive Co., 649 F.2d 985 (4th Cir.), cert. denied, 454 U.S. 1054, 102 S.Ct. 599, 70 L. Ed.2d 590 (1981) and Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 421 (N.J., 1997)(though the ACC does not contemplate termination without cause but only for failure to meet enumerated conditions).

4.   **There is no rational basis for HUD's demanded audit and the Court should not permit HUD to conduct the audit for retaliatory and discriminatory reasons.**

There is no rational basis for HUD's audit of LTO's books and records. LTO's books and records are publicly available.   Hertz Dec., ¶31.   The Administrative Fee paid to LTO for administering the Program is a fee that has been deemed reasonable by Congress.  Id., ¶22.  HUD itself has acknowledged that the fees paid to LTO to administer the Program for the period of July 2013 – June 2014 were 33% ($315,190) less than LTO would have been paid if the Administrative Fee reflected the actual costs of administering the Program, and HUD has acknowledged that which it already knew to be true – current administrative fee funding does not meet the reasonable costs of administering the Program.  See id., ¶¶28 and 29.  HUD has been aware of the manner in which the Administrative Fees were paid to, and accounted for, by LTO for decades (id., ¶24) and has investigated and approved, in writing, of the manner in which the Administrative Fees were paid to, and accounted for, by LTO.  Id., ¶23 and Exhibit Q and ¶25 and Exhibit T.  In fact, with HUD's knowledge and approval, LTO did not maintain the records that HUD was seeking to audit (i.e., books and records of a UNP with respect to the fees earned by LTO).  See id., and id., ¶32.  HUD was also seeking to conduct a federal audit of "defederalized" funds.  Id., ¶30 and Exhibit X ("Are management fees earned in the Housing Choice Voucher program

(HCV) considered non-federal? Yes. HCVP management fees, along with the bookkeeping fee, are non-federal funds.").

To find that Plaintiffs are likely to prevail on the merits, "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a [p]rima facie case showing a reasonable probability that it will prevail on the merits." Oburn v. Shapp, 521 F.2d 142, 148. (3rd Cir. 1975).

The existence of prior contrary positions by a federal agency as to the meaning or application of its regulations reduces the deference that should be given the current interpretation. As the Supreme Court stated:

> An additional reason for rejecting the INS's request for heightened deference to its position is the inconsistency of the positions the BIA has taken through the years. An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is "entitled to considerably less deference" than a consistently held agency view. Watt v. Alaska, 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981); see also General Electric Co. v. Gilbert, 429 U.S. 125, 143, 97 S.Ct. 401, 411–412, 50 L.Ed.2d 343 (1976).

I.N.S. v. Cardoza-Fonseca, 480 U.S. 421 (1987), n.30.

Here, HUD's prior position, over a number of years was that the payment of the entire administrative fee to LTO was proper and there was no need for an administrative fee reserve.  Hertz Dec., Exhibits Q and T.  HUD now seeks to

declare a default and terminate LTO based on the conduct it expressly condoned, claiming that an administrative fee reserve is a regulatory requirement.  HUD fails to point to a specific unambiguous rule or regulation supporting its position that the long-condoned conduct is a violation.

Even if HUD's present position were found to be supported by regulation, HUD should not be permitted to change its position in this case and impose the drastic harm it seeks.  While the application of equitable estoppel against the government is the exception,  where the government makes an affirmative misrepresentation that is reasonably relied on, and does not disclose information that would suggest the correct result, estoppel may be imposed. Cf. Cheruku v. Attorney General of U.S., 662 F.3d 198 (3rd Cir. 2011) (no equitable estoppel because the document the plaintiff relied on in fact disclosed the rule relied on by the government so there was, in that case no affirmative misconduct).  However, HUD seeks to avoid judicial review of its actions altogether and to deprive Plaintiffs of their right to due process under the law.  Instead HUD seeks to act as its own judge, jury and executioner.

5.     **HUD's actions have deprived Plaintiffs of both substantive and procedural due process under the law.**

HUD's termination and transfer without affording Plaintiffs the right to respond violated the procedural and substantive due process rights of Plaintiffs and the Section 8 program participants that Plaintiff Township represents. Plaintiffs have a property interest subject to due process protection.  As set forth herein, Township and HUD are parties to a contract allowing HUD to transfer the program to another administrator only if there is a violation, that is, only if there is cause. Akerman Dec., Exhibit A, paragraph 15 of the ACC.   Contract rights under a contract that can be terminated only for cause are subject to due process protection as property.

Relevant Supreme Court cases and the cases we have cited from the First, Second, Fifth, Seventh and Ninth Circuits disclose two general types of contract rights that have been found to be property protected under the Fourteenth Amendment.  As the Second Circuit noted in S & D Maintenance, 844 F.2d at 966, the first type arises where the contract confers a protected status, such as those "characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure, or sometimes both, as frequently occurs in the case of social security benefits."  *The second, albeit related type of property interest arises where the contract itself includes a provision that the state*

*entity can terminate the contract only for cause*.  Id. at 967; see also Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538–39, 105 S.Ct. 1487, 1491–92, 84 L.Ed.2d 494 (1985) (recognizing a property right created by a for-cause termination provision); Arnett v. Kennedy, 416 U.S. 134, 166–67, 94 S.Ct. 1633, 1650–51, 40 L.Ed.2d 15 (1974) (same); Unger v. National Residents Matching Program, 928 F.2d 1392 (3rd Cir. 1991) (same).

The ACC does not contemplate termination without cause but only for failure to meet enumerated conditions.  Plaintiffs, therefore, have a protectable property right created by a for-cause termination provision.  Id.  In the context of the long standing arrangement, sanctioned by HUD, with severe results from termination, Plaintiffs were entitled to reasonable notice and an opportunity to respond prior to deprivation of their property interests.

As set forth herein and in the submitted declarations, Section 8 recipients and applicants, together with Plaintiffs, will be irreparably harmed if HUD is permitted to terminate and transfer administration of the Program to an agency that is not capable of handling the complex, labor intensive and time sensitive work of administering the Program including the processes of certification, re-certification of applicants, recipients and dwellings.  Richter Dec., ¶¶5-13.  The Township, by this action, is seeking to protect their interests.

In Roundtree v. U.S. Dept. of Housing and Urban Development, 2009 WL 7414663 (M.D. FL. 2009), the court issued an injunction prohibiting HUD from terminating payments to a multi-family property due to failure of the owner to meet upkeep requirements because the court held that tenants had a due process interest and had not received proper notice or an opportunity to respond.  The due process rights of tenants in connection with Section 8  have been recognized by courts in this Circuit. Everett v. Housing Authority of the City of Shamokin, 2014 WL 4411603 (M.D. Pa. 2014.).  Here, Plaintiffs should have had notice and an opportunity to be heard so that they could attempt to protect the rights of Program participants and participating landlords whose property rights under their leases will be deleteriously affected by HUD's unilateral and draconian actions.  Richter Dec., ¶¶5-13.

Egregious action by the governmental entity in connection with deprivation of property or liberty rights also provides the basis of a claim for a substantive due process violation.  See Runco Transp., Inc. v. Mid Valley School Dist., 2015 WL 672260 (M.D. PA 2015).

HUD's repetitive unwarranted investigations, its prejudicial statements, its disingenuous attempt to lull Plaintiffs into believing they would have an opportunity to respond before termination, and its attempt to terminate a 38 year

42

old business and Program which benefits thousands on two-week's notice gives rise to substantive and procedural due process claims.

D.     <u>IN THE ABSENCE OF INJUNCTIVE RELIEF PLAINTIFFS AND SECTION 8 TENANTS IN LAKEWOOD WILL SUFFER IRREPARABLE HARM</u>

The action threatened by HUD would destroy the business of LTO and put 20 people out of work. Richter Dec., ¶7 and 16. Such a drastic result constitutes irreparable harm.

> As a general matter, "a purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement," <u>Frank's GMC Truck Ctr., Inc. v. GMC</u>, 847 F.2d 100, 102 (3d Cir.1988), but "an exception exists where the potential economic loss is so great as to threaten the existence of the movant's business." <u>Vaqueria Tres Monjitas, Inc. v. Irizarry</u>, 587 F.3d 464, 485 (1st Cir.2009); <u>see</u> <u>also</u> <u>Doran v. Salem Inn, Inc.</u>, 422 U.S. 922, 932, 95 S.Ct. 2561, 45 L.Ed.2d 648, (1975) (irreparable injury shown where business "would suffer a substantial loss of business and perhaps even bankruptcy" absent injunctive relief).

<u>Minard Run Oil Co. v. U.S. Forest Service</u>, 670 F.3d 236, 255 (3rd Cir2011).

Thousands of Section 8 tenants in Lakewood would also suffer irreparable harm by being deprived of the high quality service and 38 years of excellence provided to them by LTO and by the transfer to an administrator with a lesser record that is simply not capable of handling the immediate transition without catastrophic consequences. Richter Dec.,¶¶5-17.

E.   **HARM TO PLAINTIFFS AND CITIZENS WOULD OUTWEIGH THE HARM TO HUD**

LTO would suffer the loss of its business and its employees the loss of their livelihood. Richter Dec., ¶¶ 7 and 16.  The over 110 dependents of the employees of LTO would also suffer as the primary breadwinners of their families become unemployed.  Id., ¶16.  Lakewood and its citizens in need of housing assistance would be deprived of the stellar services of LTO that it has enjoyed for 38 years. Id., ¶¶2-15.  By stark contrast, a preliminary injunction would result in no harm to HUD.

F.   **GRANTING THE PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST**

The grant of a preliminary injunction will benefit the public by preserving the status quo and retaining LTO, which has more than 38 years of experience and a stellar record in meeting the Section 8 needs of the disadvantaged citizens of Lakewood.  Richter Dec., ¶2 and Hertz Dec., 5-7.  In the absence of an injunction, the public will be relegated to the services of an organization that does not have the resources needed to adequately meet the needs of the approximately 8,400 individuals who are currently being well served by the Program.  Richter Dec., ¶13.  Also, the programs available through the LTRAP are more robust and widely available than those of the proposed transferee, LHA.  Id., ¶¶10 and 11.  Moreover, the sudden transfer demanded by HUD will inevitably result in severe disruption of

44

the Section 8 program in Lakewood due to, among other things, the complex time-consuming nature of the certification and re-certification process for tenants and dwellings.  See e.g. id., ¶¶5-9 and 12-13.  HUD can point to no harm to the public from maintaining the status quo because there is only benefit.

## CONCLUSION

Plaintiff is likely to succeed on the merits because HUD's declared default under the ACC was without basis or was otherwise unlawfully declared.  HUD's reckless and improper actions will cause irreparable harm by:

- Destroying a non-profit business that has been successfully and exceptionally operating the Township's Section 8 housing assistance program for over 38 years;

- Putting LTO's 20 employees out of work; and

- Jeopardizing the housing of approximately 8,400 Program participants.

HUD can point to no harm to the public from maintaining the status quo because there is only benefit.

Respectfully submitted,

THE LAW OFFICES OF MICHAEL PASQUALE
Attorneys for Plaintiff,
Lakewood Township

By:  /s/ Michael Pasquale
Michael Pasquale, Esq.
A Member of the Firm

McCARTER & ENGLISH, LLP
Attorneys for Plaintiff,
Lakewood Tenants Organization, Inc.

By:  /s/ William P. Higgins, Jr.
Special Counsel to the Firm

GREENBERG DAUBER EPSTEIN &
TUCKER
Attorneys for Plaintiff,
Lakewood Tenants Organization, Inc.


By:  /s/ Edward Dauber
       Edward Dauber, Esq.
       A Member of the Firm

Dated:  August 24, 2015

47