Michael Pasquale, Esq.
Law Offices of Michael P. Pasquale, LLC
163 Madison Avenue, Suite 200-80
Morristown, New Jersey 07960
(973) 362-5344
Attorneys for Plaintiff,
Township of Lakewood

William Higgins, Esq.
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444

-and-

Edward Dauber, Esq.
Greenberg Dauber Epstein & Tucker
One Gateway Center, Suite 600
Newark, NJ 07102
Tel: 973.643.3700
Co-counsel for Plaintiff,
Lakewood Tenants Organization, Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TOWNSHIP OF LAKEWOOD, NEW JERSEY and LAKEWOOD TENANTS ORGANIZATION, INC., <br><br> Plaintiffs, <br><br> v. <br><br> JULIAN CASTRO, Secretary, United States Department of Housing and Urban Development, <br><br> Defendant. | Civil Action No. 3:15-cv-06325-MAS-DEA <br><br><br><br><br> **DECLARATION OF MEIR N. HERTZ IN SUPPORT OF PLAINTIFFS' ORDER TO SHOW CAUSE** |

I, MEIR N. HERTZ, hereby declare as follows:

1.      I am the President and Chief Executive Officer of Lakewood Tenants, Inc. ("LTO"), a New Jersey non-profit corporation.  A true and correct copy of a letter dated September 6, 1979 from the Internal Revenue Service regarding LTO's status as a non-profit corporation and a true and correct copy of LTO's Amended Certificate of Incorporation duly adopted by its Board of Trustees on July 16, 2001 and ratified by the membership of the Corporation on November 13, 2001 are attached as Exhibit A.  I have been the President and Chief Executive Officer of LTO since its incorporation on or about July of 1977.  From my nearly 40-year involvement with LTO and my review of LTO's business records, I have personal knowledge of the facts set forth in this Declaration.  I make this Declaration in support of Plaintiffs' application for an Order to Show Cause in this matter.

2.      For almost 40 years, Plaintiff, Lakewood Township, New Jersey (the "Township"), as the public housing agency (the "PHA"), has had a Section 8 housing assistance program (currently known as a Housing Choice Voucher ("HCV") program), called the Lakewood Township Residential Assistance Program (the "Program" or "LTRAP"), pursuant to certain Annual Contribution Contracts ("ACCs") between the Township and HUD.

3.      From its inception, the Township has sub-contracted with LTO, to administer the Program, an outsourcing practice common among PHAs.  True and correct copies of LTO's original subcontract with the Township and the amendments and restatements thereof are attached as Exhibit B.

4.      The Township forwarded its original contract with LTO to HUD for approval. HUD responded by letter dated August 30, 1977 stating: "HUD is not a party to this Contract, and consequently our review and approval of the Contract is not required…. We do reemphasize

our position that HUD looks to the approved Public Housing Agency [i.e. the Township] as the party responsible for the administration of the ACC in accordance with the Regulations, see 24 CFR 882.116." A true and correct copy of HUD's letter dated August 30, 1977 is attached as Exhibit C.

5.      The LTRAP is the largest private sector administrator of federally-assisted affordable housing in Ocean County, New Jersey, and one of the largest in New Jersey. The Program presently serves more than 1,100 New Jersey, low-income households, consisting of approximately 8,400 individual Program beneficiaries.   These New Jersey residents are comprised mostly of the elderly, the disabled and children.

6.      During the almost 40 years of its existence, the Program has been administered with great success, helping thousands of New Jersey residents attain dependable, decent, safe and affordable housing.   According to HUD's most reliable tool for measuring the annual performance of Section 8 programs, the Section Eight Management Assessment Program ("SEMAP"), the Program has consistently attained nearly perfect scores and SEMAP's highest performance rating. LTRAP's average SEMAP score for the most recent 4-year period is 99% -- one of the highest in the nation. By comparison, the average SEMAP score for Section 8 housing agencies in New Jersey is 77.39%. True and correct copies of the letters from HUD reporting the Program's SEMAP scores for the fiscal years ended 2014 back through 2011 are attached as Exhibit D.    The average SEMAP score for housing agencies in New Jersey is publically available online.    True and correct copies of printouts of webpages from the affordablehousingonline.com website reporting the average SEMAP scores for housing agencies in New Jersey are attached as Exhibit E.

3

7.      From the inception of the Program to date, the Program has been run with very few complaints from the Program's tenants and participating landlords, and has established an outstanding audit track record of fiscal responsibility and integrity, as well as regulatory compliance with HUD.

8.      By letter dated August 31, 2011, the Program was notified by another housing agency that a tenant, referred to herein as "Mr. N," was collecting Section 8 subsidies for two separate dwellings, one from their agency and the second from LTRAP, and that Mr. N was still occupying the dwelling with the voucher subsidy issued by their agency. A true and correct copy of the August 31, 2011 letter is attached as Exhibit F.

9.      LTO investigated the allegations of the August 31, 2011 letter and determined that Mr. N had, in fact, been collecting double subsidies for two and a half months. LTRAP notified Mr. N that, due to his failure to move into the dwelling for which his LTRAP voucher was issued, the voucher had expired and LTRAP was discontinuing his assistance. A true and correct copy of the Program's letter to Mr. N is attached as Exhibit G.

10.     In apparent response to an informal discrimination complaint from Mr. N, HUD sent a letter dated November 28, 2011 addressed to the Program. A true and correct copy of the November 28, 2011 letter is attached as Exhibit H. The letter states that HUD was "concerned with the LTRAP's success rate regarding the issuing of Housing Choice Vouchers." HUD had absolutely no reason for this alleged "concern" based on the history of the Program. LTO fully complied with the demands of the November 28, 2011 letter.

11.     A true and correct copy of Mr. N's Housing Discrimination Complaint filed on August 8, 2012 is attached as Exhibit I.

12.     As set forth more fully in the Declaration of Henya Richter submitted herewith, shortly after Mr. N's complaint was filed, and prior to any official investigation of the matter by HUD, a HUD, Newark Equal Opportunity Specialist named Betzy Morales of the HUD Fair Housing and Equal Opportunity Office ("FHEO") in Newark, New Jersey, contacted LTRAP and demanded that Mr. N's voucher be reinstated, threatening retaliation against LTRAP if the demand was not met. LTRAP refused this demand, having concluded that the expiration of Mr. N's voucher was warranted by the facts, was not motivated by discrimination, and that LTRAP's refusal to reinstate the voucher was LTRAP's dutiful obligation to maintain Program integrity in accordance with HUD's requirements.

13.     In the fall of 2012, the Program responded to Mr. N's complaint. A true and correct copy of Program's letter to HUD dated September 19, 2012 is attached as Exhibit J. It cooperated with HUD's investigation over the course of approximately eight months, supplying lengthy responses to HUD's multiple data requests. A true and correct copy of one such "data request" is attached as Exhibit K.

14.     Early in 2013, HUD sent LTRAP an amended complaint, which reasserted most of the allegations that were made in Mr. N's original complaint. A true and correct copy of the amended complaint is attached as Exhibit L. LTO also responded to the amended complaint.

15.     On May 29 and 30, 2013 HUD sent a crew of approximately 15 agents to conduct on-site investigations and interviews (the "May 2013 Interrogation") at LTO's offices, allegedly in connection with Mr. N's complaint. Among others, a Ms. Brenda Edmondson, Chief, FHEO Newark Center Compliance Branch, took part in the May 2013 Interrogation. HUD interrogated nine of LTO's then eighteen employees, including me and LTO's CFO over the course of two full business days. During the May 2013 Interrogation, HUD officials demanded inspection of

documents not previously requested.  Because many of those records were stored digitally, LTO had to make computer terminals available to HUD agents and had to assign personnel to assist HUD with its unannounced document review.   HUD occupied LTO's offices for two full business days impeding LTO's ability to administer the Program.

16.     During the May 2013 Interrogation, HUD personnel posed a wide variety of disparaging, insulting and inappropriate questions and comments concerning the religious affiliation of LTO's management.  These included (a) whether I required the employees of LTO to refer to me as "Rabbi", (b) shock that the Program's offices were open on Christmas and New Year's Day, and (c) an inquiry to me about my involvement (and I had none) with a rabbinical college located in Lakewood, New Jersey that had at that time recently obtained a significant, but controversial, grant from the state of New Jersey.  The implication of the last question was that because I am an Orthodox Jew I may have been involved in obtaining government funds in an improper manner.

17.     Following the May 2013 interrogation, HUD-Newark officials again demanded that Mr. N be reinstated into LTRAP's Section 8 HCV program.  LTRAP again refused on the ground that Mr. N's receipt of double Section 8 subsidies was fraudulent and sufficient grounds for their refusing to renew or reinstate Mr. N's Program participation.  Counsel to LTRAP thereupon requested that HUD-Newark FHEO either issue to LTRAP a written demand for Mr. N's reinstatement or obtain a specific written directive from the HUD Newark PIH [Public and Indian Housing] Management Division demanding his reinstatement.  To my knowledge, neither the written demand nor such a directive was ever issued, by either HUD-Newark FHEO or HUD Newark PIH Management.

18.     A true and correct copy of HUD's letter dated June 3, 2013 to the Program's prior counsel (Nixon Peabody, LLP) is attached as Exhibit M.

19.     A true and correct copy of Nixon Peabody's letter dated June 12, 2013 to HUD is attached as Exhibit N.  To my knowledge, Nixon Peabody never received a response to the requests in its June 12, 2013 letter to HUD.

20.     A true and correct of HUD's letter dated August 23, 2013 to LTRAP is attached as Exhibit O.

21.     During the decades-long history of the Program, the Program has undergone more than a dozen "clean" periodic HUD and U.S. Department of Justice Fair Housing / Equal Opportunity investigations and reviews.

22.     A true and correct copy of an email from Nixon Peabody to HUD dated September 11, 2013 is attached as Exhibit P.

23.     Since the inception of the Program, LTO has performed the management and administrative functions required to operate the Program in exchange for payment in an amount equal to the Administrative Fees deemed reasonable and necessary by Congress to operate a Section 8 HCV program in the region.  See Exhibit B.  The Township insisted on this arrangement so that the cost of the Program would be predictable, accounting for the costs of the Program would be simplified, and the Program would be self-sustaining and would never become a financial burden on the Township.   Over the past approximately 40 years, administration of the Program did not cost the Township more or less than the built-in, federally-funded, Administrative Fee deemed reasonable and necessary by Congress for the operation of a Section 8 HCV program in Lakewood Township, New Jersey.

7

24.     On a few occasions, HUD has inquired about the establishment of a reserve account, currently referred to by HUD as an Unrestricted Net Position or "UNP", for Administrative Fees that exceed the actual costs of administering the Section 8 program. Throughout the history of the Program, the "actual cost" to the Township for LTO's administration of the Program has been equal to the federally-established Administrative Fees. Consequently, there is never a deficit or surplus to the Township with respect to the cost of the Program. The balance in the UNP for the Program is always zero. A true and correct copy of an email from HUD to LTRAP dated August 10, 2011 confirming that the balance of the UNP (which was referred to at the time as the UNA) for the Program should be "zero" is attached as Exhibit Q.

25.     Since the inception of the Program, HUD has been fully aware of the manner in which the Township compensates LTO for LTO's operation of the Program as evidenced by, among other things, the following:

- HUD's review and approval of LTRAP's year-end financial statements going back for at least 20 years (given the length of this submission we have only attached true and correct copies of the last three year-end financial statements as Exhibit R, but we will submit others upon request); and

- Independent Public Accountant Audit Reports ("IPA Reports"), going back to the inception of LTRAP, filed with, and accepted by, the Township, HUD, and the Federal Audit Clearinghouse (due to the length of this submission we have only attached true and correct copies of the last three IPA Reports as Exhibit S, but we will submit others upon request).

26.     In 2000-2001, HUD conducted a seven-month long investigation of, among other things, the operation of the UNP (which was then called an "Administrative Fee Reserve"). In a letter dated January 26, 2001, Carmen Valenti, Director of the Office of Public Housing for HUD, stated: "Upon further review, based on the current contract that LTO has with Lakewood Township, the Lakewood Tenants Organization is entitled to all Administrative Fees and

8

therefore an Administrative Fee Reserve account would not accrue." A true and correct copy of a letter from HUD to LTRAP dated January 26, 2001 is attached as <u>Exhibit T</u>.

27.     By email dated July 25, 2013, HUD announced that it was conducting a "Financial Management Review" of the Program.  The July 25, 2013 email stated that the Financial Management Review would include, among other things, a review of the operation of the UNP, which was the very same issue that had been previously investigated, resolved and "closed" by HUD in 2000-2001.  A true and correct copy of the July 25, 2013 email is attached as <u>Exhibit U</u>.

28.     In September 2013, HUD conducted another two-day, on-site investigation of the Program, purportedly in connection with the Financial Management Review.  All concerns raised by HUD in its Financial Management Review were addressed, with one exception.  HUD now demanded another on-site audit, this time of LTO's (as opposed to the Program's) records pertaining to the UNP for the four and a half year period from 2010 to June 2014, although at the time of the prior on-site inspection HUD personnel stated that the UNP issue was "off the table".

29.     LTO was at a loss to understand this demand since, among other reasons, the fees paid to LTO by the Township each year to administer the Program are equal to the fees established by Congress as reasonable and necessary to run a Section 8 housing assistance program in the region.  In fact, as recently confirmed by a study commissioned by HUD, the fees paid to LTO for administration of the Program for certain time periods in 2013 and 2014 were hundreds of thousands of dollars less than they would have been if the Administrative Fee more accurately reflected the actual costs of administering the Program.  HUD recently commissioned a "Housing Choice Voucher Program Administrative Fee Study" (the "Fee Study").  A true and correct copy of a letter (the "Fee Study Letter") to me describing the Fee Study is attached as

Exhibit V. As set forth in the Fee Study Letter, "The main purpose of the study was to identify and measure the actual costs of operating a high-performing and efficient housing choice voucher (HCV) program and then propose a new administrative fee formula based on those findings and costs." The Fee Study Letter goes on to state that "In undertaking this study, HUD sought to address the critical need for data regarding the actual cost of administering the HCV program." The Fee Study Letter further stated that "The study's findings have confirmed what we already know to be true – current administrative fee funding does not meet the reasonable costs of administering the program."

30.     By email dated May 26, 2015, HUD transmitted to the Program "information on how the recommended fee formula proposed in the Housing Choice Voucher Program Administrative Fee Study would potentially impact your agency" (the "LTO Fee Study Report"). The results of the LTO Fee Study Report, for the Study period of July 2013 – June 2014, stated that LTO was paid 33% ($315,190) less than it would have been paid if the Administrative Fee reflected the actual costs of administering the Program. A true and correct copy of the LTO Fee Study Report is attached as Exhibit W.

31.     HUD's demand to conduct an on-site audit of LTO's (as opposed to the Program's) records pertaining to the UNP also made no sense to LTO because it is LTO's understanding (see, for example, the true and correct copy of Questions and Answers from PIH Field Office Training on Asset Management attached as Exhibit X) that, in HUD terminology, the fees paid to LTO become "defederalized"; that is they cease to be federal funds.

32.     HUD's request to audit LTO was also odd since, as a non-profit corporation, all of LTO's financial data has always been publically available. See e.g. www.guidestar.org.

10

33.     Additionally, while the Program maintained records of a UNP with a "zero" balance as directed by HUD, LTO was not required to, and did not maintain, books and records of any UNP with respect to the "defederalized" fees earned by LTO. LTO simply did not have the books and records in the format demanded by HUD, and HUD was aware of this.

34.     Given the history of disruptive, excessive and unjustified HUD examinations, LTO contacted a number of legal and accounting professionals who concluded that HUD had no reason to conduct a federal audit of non-federal funds that were deemed reasonable in amount by Congress when paid to LTO. True and correct copies of the documents obtained by LTO from various legal and accounting professionals are attached as Exhibit Y.

35.     Throughout 2014, LTO and its attorneys exchanged correspondence with HUD regarding the basis for HUD's demanded audit of these reasonable, "non-federal", funds. True and correct copies of that correspondence is attached as Exhibit Z.

36.     After we had suffered through what seemed to be an endless series of retaliatory, discriminatory, disruptive, excessive and unjustified HUD inquisitions as set forth herein we received a letter dated December 5, 2014 from HUD threatening to terminate the Program (see Exhibit Z).

37.     As set forth more fully in the Declaration of Michael P. Pasquale submitted herewith, our attorneys met with HUD on February 10, 2015 to discuss the history of HUD's actions and its threat to terminate the Program.

38.     HUD stated that it would consider a global resolution of the issues between the parties and agreed to "speak with us [Plaintiffs' attorneys] before taking any further action against Lakewood Township or LTO in regard to the issues we discussed, including any formal declaration by HUD that the Township is in default of the ACC." A true and correct copy of

Michael Pasquale's email to John Cahill confirming these matters dated February 17, 2015 is attached hereto as Exhibit AA.

39.     At no time after February 10, 2015 did HUD contact me, or, to my knowledge, our attorneys, or anyone at LTO, to, as stated in HUD's Termination Letter (defined below), "resolve Lakewood's ACC non-compliance with good faith negotiations."

40.     Instead, without prior notice from HUD to LTO, we received a letter from HUD on August 12, 2015 (the "Termination Letter") stating, in essence, that HUD was terminating the Program effective September 1, 2015 and transferring the Program to another agency thereby destroying a successful, almost 40 year old, non-profit business that serves more than 1,100 New Jersey, low-income households, consisting of approximately 8,400 individual Program beneficiaries. A true and correct copy of the Termination Letter, which is dated August 11, 2015, but which was sent to us on August 12, 2015, is attached as Exhibit BB.

41.     HUD followed up with another letter that same day demanding that all information, documentation, income and assets of the Program be transferred to LHA "upon receipt of this letter", and further demanding that "The Township of Lakewood must fully comply with the demands stated in this letter within **14 calandar days of the date of this letter.**" HUD's second letter demands that the termination and transfer take place within an even shorter time frame (i.e. by August 26, 2015 rather than September 1, 2015). A true and correct copy of a letter from HUD to LTRAP dated August 12, 2015 is attached as Exhibit CC.

42.     Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August _____ , 2015.

_____
MEIR N. HERTZ

ME1 21008582v.3

# EXHIBIT A

MEJ 9768624v.1

**Internal Revenue Service**
District Director

Department of the Treasury

Date: **SEP** 6 1979

Employer Identification Number:
▓▓▓▓▓▓

Accounting Period Ending:
December 31
Form 990 Required: ☒ Yes ☐ No

Lakewood Tenants Organization, Inc.
419 First Street
Lakewood, New Jersey 08701

Person to Contact:
C. Anderson
Contact Telephone Number:
(201) 645-3157

Dear Applicant:

Based on information supplied, and assuming your operations will be as stated in your application for recognition of exemption, we have determined you are exempt from Federal income tax under section 501(c)(3) of the Internal Revenue Code.

We have further determined that you are not a private foundation within the meaning of section 509(a) of the Code, because you are an organization described in section 509(a)(1) and 170(b)(1)(A)(vi).

If your sources of support, or your purposes, character, or method of operation change, please let us know so we can consider the effect of the change on your exempt status and foundation status. Also, you should inform us of all changes in your name or address.

Generally, you are not liable for social security (FICA) taxes unless you file a waiver of exemption certificate as provided in the Federal Insurance Contributions Act. If you have paid FICA taxes without filing the waiver, you should contact us. You are not liable for the tax imposed under the Federal Unemployment Tax Act (FUTA).

Since you are not a private foundation, you are not subject to the excise taxes under Chapter 42 of the Code. However, you are not automatically exempt from other Federal excise taxes. If you have any questions about excise, employment, or other Federal taxes, please let us know.

Donors may deduct contributions to you as provided in section 170 of the Code. Bequests, legacies, devises, transfers, or gifts to you or for your use are deductible for Federal estate and gift tax purposes if they meet the applicable provisions of sections 2055, 2106, and 2522 of the Code.

The box checked in the heading of this letter shows whether you must file Form 990, Return of Organization Exempt from Income tax. If Yes is checked, you are required to file Form 990 only if your gross receipts each year are normally more than $10,000. If a return is required, it must be filed by the 15th day of of the fifth month after the end of your annual accounting period. The law imposes a penalty of $10 a day, up to a maximum of $5,000, when a return is filed late, unless there is reasonable cause for the delay.

You are not required to file Federal income tax returns unless you are subject to the tax on unrelated business income under section 511 of the Code. If you are subject to this tax, you must file an income tax return on Form 990-T. In this letter, we are not determining whether any of your present or proposed activities are unrelated trade or business as defined in section 513 of the Code.

You need an employer identification number even if you have no employees.

If an employer identification number was not entered on your application, a number will be assigned to you and you will be advised of it. Please use that number on all returns you file and in all correspondence with the Internal Revenue Service.

Because this letter could help resolve any questions about your exempt status and foundation status, you should keep it in your permanent records.

If you have any questions, please contact the person whose name and telephone number are shown in the heading of this letter.

Sincerely yours,

Cornelius J. Coleman
District Director

# Amended Certificate of Incorporation
## of the
# LAKEWOOD TENANTS ORGANIZATION, INC.

The original Certificate of Incorporation for Lakewood Tenants Organization, Inc., which was filed with the office of the New Jersey Secretary of State on or about July 18, 1977, is hereby amended as follows:

We, the undersigned, desiring to form a nonprofit corporation, pursuant to the New Jersey Nonprofit Corporation Statute, N.J.S. 15A:1-1, et seq., do hereby make, subscribe and acknowledge this certificate as follows:

1.    **Name:**   The name of the Corporation shall be *LAKEWOOD TENANTS ORGANIZATION, INC.* [the Corporation].

2.    **Purpose:**  The Corporation is formed exclusively for purposes for which a corporation may be formed under the New Jersey Nonprofit Corporation Act, N.J.S. 15A:1-1, et seq., and not for pecuniary profit or financial gain, and more specifically, for the purposes expressed in Section 501(c)(3) of the Internal Revenue Code of 1986. These purposes shall specifically include advancement, promotion, and administration of initiatives and programs providing affordable housing opportunities; homeownership; tenants' rights and tenant counseling; low-income mortgage program counseling; housing placement; arbitration and mediation of housing-related issues; dissemination of information concerning affordable housing and tenants' rights; acting as a monitor of topics concerning-, and a "watch-dog" of abuses concerning-, tenants' rights, housing quality, landlord–tenant laws and affordable housing issues; promotion and organization of tenants' associations; operation, administration and facilitation of programs (whether federally, state, locally or privately funded) benefiting tenants and/or fostering affordable housing, specifically including (as examples) rental assistance programs, housing rehabilitation programs, mortgage subsidy programs, programs transitioning renters to homeownership, housing rehabilitation and neighborhood revitalization programs; economic, community, and business development programs benefiting lower-income persons; programs for the acquisition, development, construction, operation, rental and/or sale of housing for lower-

income families, and such economic resources and programs as are designed to economically
uplift and empower lower-income persons or families.

No part of the assets, income, or profit of the Corporation shall be distributable to, or inure to the
benefit of its members, trustees or officers, except to the extent permitted under the New Jersey
Nonprofit Corporation Act, N.J.S. 15A:1-1, et seq., and the applicable sections of Subchapter F –
Exempt Organizations of the Internal Revenue Code of 1986.  The Corporation shall not operate
any listing service of its members, trustees or officers, or take steps which will serve to facilitate
the transaction of specific business by its members trustees or officers, or promote the private
interest of any member, trustee or officer, or engage in any activities which would constitute a
regular business of a kind ordinarily carried on for profit.

   4.      **Duration:**  The period of duration of the Corporation shall be perpetual.

   5.      **Powers:**  In furtherance of the purposes of the Corporation, the Corporation shall
have all general powers enumerated in the New Jersey Nonprofit Corporation Act, N.J.S. 15A:1-
1, et seq.  The Corporation shall have the power, either directly or indirectly, either alone or in
conjunction or cooperation with others, to do any and all lawful acts and things and to engage in
any and all lawful activities which may be necessary, useful, suitable, desirable, or proper for the
furtherance, accomplishment, fostering or attainment of any and all of the purposes for which the
Corporation is organized, and to aid or assist other organizations whose activities are such as to
further, accomplish, foster or attain any of such purposes.  Notwithstanding anything herein to
the contrary, the Corporation shall exercise only such powers as are in furtherance of the exempt
purposes of organizations as set forth in Section 501(c)(3) of the Internal Revenue Code of 1986
and the regulations thereunder as the same may now exist or as they may be hereafter amended
from time to time.

   6.      **Distribution on Dissolution or Liquidation:**  In the event of the liquidation or
dissolution of the Corporation, whether voluntary or involuntary, no member, trustee or officer
shall be entitled to any distribution or division of its remaining property or its proceeds, and the

balance of all money and other property received by the Corporation from any source, after the payment of all debts and obligations of the Corporation, shall be used or distributed subject to the direction of the Board of Trustees, or, in the alternative, in accordance with the order of the Superior Court of the State of New Jersey as provided by law, exclusively to qualified tax exempt organizations promoting tenants' rights, and to the greatest extent possible, consistent with the purposes of this Corporation as set forth hereinabove and in the Corporation's bylaws, and within the intendment of Section 501(c)(3) of the Internal Revenue Code of 1986 and the regulations thereunder as the same may now exist or as they may be hereafter amended from time to time.

7.     **Income and Distribution:** No part of the income of the Corporation shall inure to the benefit of any member, trustee, or officer of the corporation or any private individual (except that reasonable compensation may be paid for services rendered to or for the Corporation affecting one or more of its purposes), and no member, trustee, officer of the Corporation or any private individual shall be entitled to share in the distribution of any of the Corporate assets on dissolution of the Corporation.

8.     **Prohibited Activities:** No part of the activities of the Corporation shall be carrying on propaganda, or otherwise attempting to influence legislation, or participating in, or intervening in (including the publication and distribution of statements), any political campaign on behalf of any candidate for public office.

9.     **Principal Office:** The current principal office of the Corporation is located at 600 West Kennedy Boulevard, Lakewood, New Jersey. The location of the principal office may be changed by the Corporation, from time to time, by resolution of the Board of Trustees.

10.    **Registered Agent:** The current registered agent for service of process and for delivery of all notices shall be Meir N. Hertz, 600 West Kennedy Boulevard, Lakewood, NJ 08701.

11. **Number of Trustees:** The number of trustees shall be not less than three.

Certificate of Incorporation of
LAKEWOOD TENANTS ORGANIZATION, INC. PAGE 4

12. **Names of Trustees:** The names and addresses of the current Board of Trustees of the Corporation are as follows:

*Name*                                    *Address*
Meir Hertz

Edith Goldstein

Judith Pizzarelli

Simcha Greenwald

Ahron Notis

Moshe Sofer

Elimelech Mitnick



13. **Membership Corporation:** This is a membership corporation. Qualification of members shall be as stated in the by-laws.

14. **Election of Trustees:** The Trustees of the Corporation shall be elected in the manner provided by the bylaws.

15. **Age of Subscriber:** The subscriber is of the age of 18 years or over.

THIS AMENDED CERTIFICATE OF INCORPORATION has been duly adopted by the Board of Trustees of the Corporation and ratified by the membership of the Corporation in accordance with the Corporation's initial Certificate of Incorporation, its By-Laws, and all applicable laws.

I certify that the foregoing is a true copy of
an Amended Certificate of Incorporation
duly adopted by the Board of Trustees of the
Corporation on July 16, 2001, and ratified
by the membership of the Corporation on
November 13, 2001.

Ahron Notis, Secretary

# EXHIBIT B

AGREEMENT

made this 1st day of June in the year One Thousand Nine Hundred

and Seventy Seven

BETWEEN   LAKEWOOD TENANTS ORGANIZATION,
an unincorporated association with office
located at 502 5th Street

in the Township of Lakewood in the County of Ocean and State of
New Jersey, party of the first part:

AND   THE TOWNSHIP OF LAKEWOOD in the County of
Ocean, a municipal Corporation of the State of
New Jersey, 231 Third Street

in the Township of Lakewood in the County of Ocean and State of New Jersey,
party of the second part:

WITNESSETH, that the Lakewood Tenants Organization, an

unincorporated association, party of first part, and the Township of

Lakewood in the County of Ocean, a municipal corporation of the State of

New Jersey, party of second part, hereby mutually covenant and agree as

follows:

WHEREAS, the Township of Lakewood has agreed to participate

in a Housing Assistance Program for a total of eighty (80) units pursuant to the

Housing and Urban Development Act of 1974, commonly referred to as the

"Section 8" program of the original law the U.S. Housing Act of 1937, as

amended; and

WHEREAS, the Township Committee of the Township of Lakewood

by Resolution on March 24, 1977, designated the Lakewood Tenants Organization

as its agency to administer said program on behalf of the Township of Lakewood.

NOW, THEREFORE, the Lakewood Tenants Organization or its

successors and assigns covenants and agrees: 1) to act as the designated

agency of the Township of Lakewood to administer said program pursuant to

applicable Federal, State and local laws and regulations:

2) to submit to the municipal manager of the Township of Lakewood a list of the names and addresses of the individuals in the Lakewood Tenants Organization or its successors and assigns that will be responsible for the policy and administration of the program and to notify the manager of any changes on said list: 3) to account for all funds received pursuant to the aforesaid applicable laws: 4) to furnish any and all requested reports or documents of any nature to the Township Committee of the Township of Lakewood when requested including but not limited to an annual financial report of the Lakewood Tenants Organization-Section Eight Program or its successors and assigns and a list of the names and addresses of recipients of benefits. The aforesaid list of recipients of benefits shall be furnished immediately upon initiation of the program and annually thereafter or more often if requested: 5) to act at all times as an agency of the Township of Lakewood subject to their jurisdiction and control.

IT IS FURTHER AGREED that this contract may be assigned by the Lakewood Tenants Organization to a non-profit corporation about to be formed entitled Lakewood Tenants Organization.

IT IS FURTHER AGREED that this contract and all of the sections and subsections thereof are subject to approval by the Housing and Urban Development Authority of the United States, and should said contract be rejected by HUD none of the provisions herein shall become effective.

IT IS FURTHER AGREED that the Lakewood Tenants Organization or its successors or assigns, shall administer said program until the termination of the program or until the Township Committee of the Township of Lakewood rescinds its resolution designating the Lakewood Tenants Organization as its agency to administer the aforesaid program. Said rescission shall only be for reasonable cause as hereinafter defined.

Reasonable cause is defined as follows:

1. Failure or refusal by the Lakewood Tenants Organization of its successors or assigns to act in a timely and proper manner as the agency of the Township of Lakewood in administration of the Housing Assistance Program pursuant to the Housing and Urban Development Act of 1974, also known as Section 8 Program of the U.S. Housing Act of 1937, as amended.

2. Failure to comply with the laws, statutes, ordinances, rules and regulations and directives of the U.S. Department of Housing and Urban Development, the laws of the State of New Jersey, or the laws, lawful directions or orders of the Township Committee of the Township of Lakewood regarding said housing program.

3. Any criminal acts committed by the members of the organization in connection with the administration of said housing program.

4. Unlawful discrimination or failure to administer the said program along the guidelines established by the Department of Housing and Urban Development or the Township of Lakewood applicable to said project.

IN WITNESS WHEREOF the parties have hereunto caused the proper parties to affix their seal and signature the date and year first above written.

LAKEWOOD TENANTS ORGANIZATION

ATTEST:

By _____
MEIR HERTZ, President

_____
JACOB FRIEDMAN, Secretary

THE TOWNSHIP OF LAKEWOOD
in the County of Ocean

ATTEST:

By _____
H. GEORGE BUCKWALD, Mayor

_____
GIZELLA M. DOYLE, Clerk

R E S O L U T I O N

BE IT RESOLVED by the Township Committee of the Township of Lakewood in the County of Ocean, that,

WHEREAS, on June 1, 1977, the Township of Lakewood entered into an Agreement with the Lakewood Tenants Organization to administer the "Section 8" Existing Housing Assistance Payments Program of the Housing and Urban Development Act of 1974; and

WHEREAS, said Agreement of June 1, 1977, was subsequently clarified and amended by Agreements dated September 6, 1977, August 3, 1978 and September 7, 1978, by and between the Township of Lakewood and the Lakewood Tenants Organization and its successor, Lakewood Tenants Organization, Inc.; and

WHEREAS, the Housing and Community Development Act of 1974 contains in addition to the "Section 8" Existing Housing Assistance Payments Program, a "Section 8" Moderate Rehabilitation Program designed to preserve and revitalize existing neighborhood housing; and

WHEREAS, the Township Committee of the Township of Lakewood by Resolution dated July 5, 1979, authorized the Mayor and the Township Clerk to enter into a contract with HUD and execute any and all documents required with respect to applying for and obtaining up to sixty-six (66) units which may be available to the Township of Lakewood pursuant to the "Section 8" Moderate Rehabilitation Program; and

WHEREAS, by said Resolution of July 5, 1979, the Township of Lakewood has designated the Lakewood Tenants Organization, Inc. as the agency to administer the "Section 8" Moderate Rehabilitation Program; and further

WHEREAS, by said Resoltuion of July 5, 1979, the Municipal Manager and the Lakewood Tenants Organization, Inc. through its President, Rabbi Meir Hertz, were authorized to file any and all documents necessary for the application for said sixty-six (66) additional units; and

WHEREAS, on September 29, 1979, HUD approved the Township of Lakewood's application for the sixty-six (66) units applied for; and further

WHEREAS, HUD has recently indicated approval of all of the required submissions and budget forms for said program; and

WHEREAS, an Annual Contributions Contract with HUD must be executed by the Mayor and the Township Clerk for the sixty-six (66) units in question; and

WHEREAS, the Township of Lakewood and the Lakewood Tenants Organization, Inc. are desirous of amending the prior Agreements between them so as to properly include administration by the Lakewood Tenants Organization, Inc. of the "Section 8" Moderate Rehabilitation Program both as to the present sixty-six (66) units obtained and as to any future units obtained.

NOW, THEREFORE, BE IT RESOLVED, that the Mayor and the Township Clerk be and are hereby authorized to execute the Annual Contributions Contract with HUD for the sixty-six (66) units of "Section 8" Moderate Rehabilitation Program funding; and

BE IT FURTHER RESOLVED, that the attached Agreement between the Township of Lakewood and the Lakewood Tenants Organization, Inc. be and is hereby approved and incorporated herein by reference and the Mayor and the Township Clerk are hereby authorized to execute said Agreement; and

BE IT FURTHER RESOLVED, that a fully executed copy of the Agreement attached hereto shall be on file in the Township Clerk's office and available for public inspection with a duly certified copy of this Resolution.

I hereby certify that the above
is a true copy of a Resolution
duly adopted by the Township
Committee of the Township of
Lakewood in the County of Ocean,
at its meeting held on the 17th
day of April, 1980.

GIZELLA M. DOYLE,
Township Clerk

AGREEMENT

made this 6th day of September in the year One Thousand Nine Hundred
and Seventy Seven

BETWEEN   LAKEWOOD TENANTS ORGANIZATION,
an unincorporated association with office
located at 502 5th Street

in the Township of Lakewood in the County of Ocean and State of
New Jersey, party of the first part:

AND   THE TOWNSHIP OF LAKEWOOD in the County of
Ocean, a municipal corporation of the State of
New Jersey, 231 Third Street

in the Township of Lakewood in the County of Ocean and State of New Jersey,
party of the second part:

WITNESSETH, that the Lakewood Tenants Organization, an
unincorporated association, party of first part, and the Township of
Lakewood in the County of Ocean, a municipal corporation of the State of
New Jersey, party of second part, hereby mutually covenant and agree as
follows:

WHEREAS, the Township of Lakewood has agreed to participate
in a Housing Assistance Program for a total of eighty (80) units pursuant to the
Housing and Urban Development Act of 1974, commonly referred to as the
"Section 8" program of the original law the U.S. Housing Act of 1937, as
amended; and

WHEREAS, the Township Committee of the Township of Lakewood
by Resolution on March 24, 1977, designated the Lakewood Tenants Organization
as its agency to administer said program on behalf of the Township of Lakewood.

NOW, THEREFORE, the Lakewood Tenants Organization or its
successors and assigns covenants and agrees: 1) to act as the designated
agency of the Township of Lakewood to administer said program pursuant to
applicable Federal, State and local laws and regulations.

2) to submit to the municipal manager of the Township of Lakewood a list of the names and addresses of the individuals in the Lakewood Tenants Organization or its successors and assigns that will be responsible for the policy and administration of the program and to notify the manager of any changes on said list: 3) to account for all funds received pursuant to the aforesaid applicable laws: 4) to furnish any and all requested reports or documents of any nature to the Township Committee of the Township of Lakewood when requested including but not limited to an annual financial report of the Lakewood Tenants Organization—Section Eight Program or its successors and assigns and a list of the names and addresses of recipients of benefits. The aforesaid list of recipients of benefits shall be furnished immediately upon initiation of the program and annually thereafter or more often if requested: 5) to act at all times as an agency of the Township of Lakewood subject to their jurisdiction and control.

IT IS FURTHER AGREED that this contract may be assigned by the Lakewood Tenants Organization to a non-profit corporation about to be formed entitled Lakewood Tenants Organization.

IT IS FURTHER AGREED that the Lakewood Tenants Organization or its successors or assigns, shall administer said program until the termination of the program or until the Township Committee of the Township of Lakewood rescinds its resolution designating the Lakewood Tenants Organization as its agency to administer the aforesaid program. Said rescission shall only be for reasonable cause as hereinafter defined.

Reasonable cause is defined as follows:

1. Failure or refusal by the Lakewood Tenants Organization of its successors or assigns to act in a timely and proper manner as the agency of the Township of Lakewood in administration of the Housing Assistance Program pursuant to the Housing and Urban Development Act of 1974, also known as Section 8 Program of the U.S. Housing Act of 1937, as amended.

2. Failure to comply with the laws, statutes, ordinances, rules and regulations and directives of the U.S. Department of Housing and Urban Development, the laws of the State of New Jersey, or the laws, lawful directions or orders of the Township Committee of the Township of Lakewood regarding said housing program.

3. Any criminal acts committed by the members of the organization in connection with the administration of said housing program.

4. Unlawful discrimination or failure to administer the said program along the guidelines established by the Department of Housing and Urban Development or the Township of Lakewood applicable to said project.

IN WITNESS WHEREOF the parties have hereunto caused the proper parties to affix their seal and signature the date and year first above written.

LAKEWOOD TENANTS ORGANIZATION

ATTEST:

By _____
MEIR HERTZ, President

_____
JACOB FRIEDMAN, Secretary

THE TOWNSHIP OF LAKEWOOD
in the County of Ocean

ATTEST:

By _____
H. GEORGE BUCKWALD, Mayor

_____
GIZELLA M. DOYLE, Clerk

RESOLUTION

BE IT RESOLVED by the Township Committee of the Township
of Lakewood in the County of Ocean, that,

WHEREAS, on June 1st, 1977, the Township of Lakewood
entered into a contract with Lakewood Tenants Organization to
administer the "Section 8" Program of the Housing and Urban
Development Act of 1974; and

WHEREAS, said Agreement was for a total of eighty (80)
units pursuant to said Act; and

WHEREAS, an additional one hundred sixteen (116) units
are now needed,

NOW, THEREFORE, BE IT RESOLVED by the Township Committee
of the Township of Lakewood in the County of Ocean, that,

The contract of June 1st, 1977, be amended by changing
the eighty (80) units to one hundred ninety six (196) units and
any additional units as may become available in the future.

BE IT FURTHER RESOLVED that the Mayor and Township Clerk
be authorized to execute the contract with the Lakewood Tenants
Organization, as amended; and

BE IT FURTHER RESOLVED that the Mayor be authorized to sign
the Annual Contributions Contract form.

I hereby certify that the above is a
true copy of a resolution duly adopted
by the Township Committee of the Township
of Lakewood in the County of Ocean, at
its meeting held on August 3, 1978.

GIZELLA H. DOYLE
Township Clerk

AGREEMENT

made this 7th day of September in the year One Thousand Nine
Hundred and Seventy-Eight

       BETWEEN      LAKEWOOD TENANTS ORGANIZATION, INC.,
                        a non-profit corporation of the State of
                        New Jersey, with its principal office
                        located at 419 First Street

in the Township of Lakewood in the County of Ocean and State
of New Jersey, party of the first part:

       AND           THE TOWNSHIP OF LAKEWOOD in the County
                        of Ocean, a municipal corporation of
                        the State of New Jersey, 231 Third Street

in the Township of Lakewood in the County of Ocean and State
of New Jersey, party of the second part:

WITNESSETH, that the Lakewood Tenants Organization, Inc.,
a non-profit corporation of the State of New Jersey, party of
the first part, and the Township of Lakewood in the County of
Ocean, a municipal corporation of the State of New Jersey, party
of the second part, hereby mutually covenant and agree as follows:

WHEREAS, the Township of Lakewood had agreed to partici-
pate in a Housing Assistance Program for a total of eighty (80)
units pursuant to the Housing and Urban Development Act of 1974,
commonly referred to as the "Section 8" Program existing Housing
Assistance Payments Program (originally the U.S. Housing Act of
1937), as amended; and

WHEREAS, the Township Committee of the Township of
Lakewood by Resolution on March 24, 1977, designated Lakewood
Tenants Organization or its successor as its agency to administer
said program on behalf of the Township of Lakewood; and

WHEREAS, the Township of Lakewood and Lakewood Tenants
Organization have entered into an Agreement on June 1, 1977
with respect to establishment and administration of said Housing

Assistance Payments Program, said Agreement having been further clarified and amended by subsequent Agreements entered into by the Township of Lakewood and Lakewood Tenants Organization on September 6, 1977 and August 3, 1978; and

WHEREAS, by Resolution of the Township Committee of the Township of Lakewood, the Township has further clarified and amended the Agreement of June 1, 1977, in part by increasing the approved housing units, from eighty (80) units to one hundred ninety-seven (197) units and any additional units as may become available in the future; and

WHEREAS, the Lakewood Tenants Organization, Inc., a non-profit New Jersey corporation, having its principal office at 419 First Street, Lakewood, New Jersey, is the successor of the Lakewood Tenants Organization,

NOW, THEREFORE, the Township of Lakewood and the Lakewood Tenants Organization, Inc., a non-profit corporation of the State of New Jersey, covenant and agree as follows:

Lakewood Tenants Organization, Inc.,

(a)  Shall act as the designated agency of the Township of Lakewood to administer said program pursuant to applicable Federal, State and local laws and regulations;

(b)  Shall submit to the municipal manager of the Township of Lakewood a list of the names and addresses of the individuals in the Lakewood Tenants Organization, Inc., who will be responsible for the policy and administration of the program and to notify the manager of any changes on said list;

(c)  Shall account for all funds received pursuant to the aforesaid applicable laws;

-2-

(d)  Shall furnish any and all requested reports and documents of any nature to the Township Committee of the Township of Lakewood when requested including but not limited to an annual financial report of the Lakewood Tenants Organization, Inc., "Section 8" Program and a list of the names and addresses of recipients of benefits.  The aforesaid list of recipients of benefits shall be furnished immediately upon initiation of the program and annually thereafter or more if requested;

(e)  Shall act at all times as an agency of the Township of Lakewood subject to their jurisdiction and control.

IT IS FURTHER AGREED that pursuant to the prior under-standing and practice by and between said parties, the Township of Lakewood does hereby assign to Lakewood Tenants Organization, Inc. all funds which may have heretofore or may hereinafter be received by the Township of Lakewood from the Department of Housing and Urban Development, representing administrative fees and costs for the "Section 8", e x i s t i n g  H o u s i n g Assistance Payments Program, of the Housing and Urban Development Act of 1974, (originally the U.S. Housing Act of 1937), as amended; and

IT IS FURTHER AGREED that Lakewood Tenants Organization, Inc. shall allocate said administrative fees and costs in accordance with the regulations and requirements of the "Section 8", e x i s t i n g  Housing Assistance Payments Program, of the Housing and Urban Development Act of 1974, (originally the U.S. Housing Act of 1937), as amended; and

IT IS FURTHER AGREED that the Township of Lakewood shall have no further obligation whatsoever with respect to the payment

-3-

of administrative fees for services rendered in connection with
the "Section 8", e x i s t i n g Housing Assistance Payments
Program, of the Housing and Urban Development Act of 1974,
(originally the U.S. Housing Act of 1937), as amended; and

IT IS FURTHER AGREED that the Lakewood Tenants
Organization, Inc. shall administer said program until the
termination of the program or until the Township Committee of
the Township of Lakewood rescinds its Resolution designating
the Lakewood Tenants Organization, Inc. as its agency to
administer the aforesaid program.  Said rescission shall only
be for reasonable cause as hereinafter defined.

Reasonable Cause is defined as follows:

(1)  Failure or refusal by the Lakewood Tenants
Organization, Inc., to act in a timely and proper manner as the
agency of the Township of Lakewood in administration of the
Housing Assistance Program pursuant to the Housing and Urban
Development Act of 1974, also known as "Section 8" Program
of the U.S. Housing Act of 1937, as amended.

(2)  Failure to comply with the laws, statutes,
ordinances, rules and regulations and directives of the U.S.
Department of Housing and Urban Development, the laws of the
State of New Jersey, or the laws, lawful directions or orders
of the Township Committee of the Township of Lakewood regarding
said housing program.

(3)  Any criminal acts committed by the members
of the corporation in connection with the administration of
said housing program.

(4)  Unlawful discrimination or failure to
administer the said program along the guidelines established

-4-

by the Department of Housing and Urban Development or the Township of Lakewood applicable to said project.

IN WITNESS WHEREOF the parties have hereunto caused the proper parties to affix their seals and signatures the date and year first above written.

LAKEWOOD TENANTS ORGANIZATION, INC.
A Non-Profit Corporation of
the State of New Jersey

ATTEST:

BY: _____
MEIR HERTZ, President

JACOB FREEDMAN, Secretary

THE TOWNSHIP OF LAKEWOOD
in the County of Ocean

ATTEST:

BY: _____
JOHN Y. FRANKLIN, Mayor

GIZELLA M. DOYLE, Clerk

-5-



R E S O L U T I O N

BE IT RESOLVED by the Township Committee of the Township of Lakewood, in the County of Ocean, that

WHEREAS, the Township of Lakewood has previously agreed to participate in a Housing Assistance Program pursuant to the Housing and Urban Development Act of 1974, commonly referred to as the "Section 8" Existing Housing Assistance Payments Program (originally the United States Housing Act of 1927) as amended; and

WHEREAS, the Township Committee of the Township of Lakewood by Resolution dated March 24, 1977, designated the Lakewood Tenants Organization, or its successor, as its agent to administer said program on behalf of the Township of Lakewood; and

WHEREAS, the Township of Lakewood and Lakewood Tenants Organization have entered into an Agreement on June 1, 1977, with respect to establishment and administration of said Housing Assistance Payments Program, said Agreement having been further amended by subsequent Agreements entered into by and between the Township of Lakewood and Lakewood Tenants Organization and its successor, the Lakewood Tenants Organization, Inc., on September 6, 1977, August 3, 1978, and September 7, 1978; and

WHEREAS, the Township Committee of the Township of Lakewood has by resolution dated July 5, 1979, recognized the need for the Township of Lakewood to participate in the HUD "Section 8" Moderate Rehabilitation Program and has further designated the Tenants Organization, Inc, as an authorized representative in administering said program; and

WHEREAS, the Township of Lakewood and Lakewood Tenants Organization, Inc, have entered into an Agreement on April 30, 1980 effectuating that designation for the "Section 8" Moderate Rehabilitation Program; and

WHEREAS, the Township of Lakewood and Lakewood Tenants Organization, Inc. desire to enter into an additional cooperative

agreement and accompanying escrow agreement    (copies of which are attached hereto and incorporated herein by reference as though a part hereof) in order to cooperate further in meeting the housing needs of the citizens of Lakewood; and

WHEREAS, these agreements have been finally reduced to writing after substantive changes were made as a result of a meeting between the parties on August 19, 1982;

NOW, THEREFORE, BE IT RESOLVED that the attached agreement between the Township of Lakewood and the Lakewood Tenants Organization, Inc. be and is incorporated herein by reference and made a part hereof and the Mayor and Township Clerk are hereby authorized to execute said Agreement; and

BE IT FURTHER RESOLVED, that a fully executed copy of the Agreement attached hereto shall be on file in the Township Clerk's office and available for public inspection with a duly certified copy of this Resolution.

I hereby certify that the above is a true copy of a Resolution duly adopted by the Township Committee of the Township of Lakewood in the County of Ocean, at its meeting held on the 26th day of August, 1982.

_____
GIZELLA M. DOYLE
Township Clerk

<u>ESCROW AGREEMENT</u>

AMONG    LAKEWOOD TENANTS
ORGANIZATION, INC.

AND    THE TOWNSHIP OF LAKEWOOD

AND    UNITED JERSEY BANK-MIDSTATE

DATED:    August 27, 1982

<u>ESCROW AGREEMENT</u>

THIS ESCROW AGREEMENT, made this 27th day of August 1982,

| | | |
|---|---|---|
| AMONG | | LAKEWOOD TENANTS ORGANIZATION, INC., a non-profit corporation of the State of New Jersey, with its principal office located at 419 First Street, Lakewood, New Jersey, County of Ocean and State of New Jersey, |
| AND | | THE TOWNSHIP OF LAKEWOOD, in the County of Ocean, a municipal corporation of the State of New Jersey, 231 Third Street, Lakewood, New Jersey |
| AND | | UNITED JERSEY BANK-MIDSTATE 315 Madison Avenue, Lakewood, New Jersey. |

WHEREAS, by Agreement of even date, the Lakewood Tenants Organization, Inc. has agreed to deposit the sum of $80,000.00 into a specially designated escrow account; and

WHEREAS, the Lakewood Tenants Organization, Inc. has agreed with the Township of Lakewood that all interest earned on monies deposited in said account shall be disbursed to the Township of Lakewood for expenditures on housing needs of the citizens of Lakewood in accordance with the applicable HUD regulations; and

WHEREAS,    United Jersey Bank-Midstate has agreed to act as Escrow Agent with regard to the monies to be deposited; and

WHEREAS, the parties wish to set forth the terms under which such escrow account is to be administered;

NOW, THEREFORE, it is agreed by and among the parties as follows:

1.  The Escrow Account shall be known as the Township of Lakewood Escrow Account for the Lakewood Township Rental Assistance Program.

2 United Jersey Bank-Midstate who has been designated by the Township, shall serve as the Escrow Agent and shall be the only person entitled to disburse monies from said account, except as may be mutually agreed by the Lakewood Tenants Organization, Inc. and the Township of Lakewood.  The Escrow Agent shall only make disbursements in accordance with this Agreement and the Escrow Agent shall not have any personal liability so long as he acts in accordance with the terms and conditions of this Agreement.

3.  The Lakewood Tenants Organization, Inc. is and shall be the sole owner of and shall have all right, title and interest to all monies deposited into the account, except for the interest accruing thereon, which shall be governed in accordance with the terms hereof.

4.  The monies in the Escrow Account shall be invested in a manner which will ensure maximum interest income in accordance with applicable HUD requirements and consistent with the terms of this Agreement.  The monies shall be invested in Lakewood banks designated by the Township Committee.  In no event, however, shall the monies be invested in instruments for a period longer than six months.  The monies shall be invested with the express provision that the Lakewood Tenants Organization, Inc. shall have the right at its sole discretion to borrow against the instruments of investment and that said instruments will be available as collateral for such borrowings, whether the lending is from the institution holding the instruments or from some other institution.

5.  The Escrow Agent shall disburse monies in the Escrow Account to the Lakewood Tenants Organization, Inc. in accordance with the following provisions:

(a)  Notification to the Escrow Agent at least fifteen (15) days in advance of the maturity of the investment instru-

-2-

ment(s) that there will be at the date(s) of maturity a cash flow requirement of the Lakewood Tenants Organization, Inc., which necessitates the withdrawal of a sum certain,  Cash flow requirement shall be defined as:   (1)  Amounts required to make timely Housing Assistance Payments to participating owners when receipt of HUD requisitioned funds are anticipated, (2) Program expenditures exceeding current income from program administrative fees, or (3) monies borrowed and expended in order to meet the above.  After receipt of such notification and upon the maturity of the instrument(s), the Escrow Agent shall disburse the sum certain to the Lakewood Tenants Organization, Inc.  In such case, the Lakewood Tenants Organization, Inc. will be required to redeposit the sum withdrawn within thirty (30) days of the withdrawal, unless the Lakewood Tenants Organization, Inc. certifies at that time that the cash flow requirement still exists. In such event, redeposit or recertification will be required within thirty (30) days thereafter.

(b)  Notification to the Escrow Agent at least fifteen (15) days in advance of the maturity of the investment instrument(s) that for a given fiscal year, program operating costs for that year have exceeded the administrative fees earned for that year in an amount to be stated in the Notification.  Such Notification shall be accompanied by a fiscal report signed by the Lakewood Tenants Organization, Inc.'s accountant showing the amount of program operating expenditures for that year, the amount earned from administrative fees for that year, and the amount of escrow funds to be disbursed.  After receipt of such Notification and upon the maturity of the instrument(s), the Escrow Agent shall disburse the sum designated to the Lakewood Tenants Organization, Inc. and no redeposit shall be required.  In the event that sums advanced pursuant to Section (a) of this paragraph for the fiscal year in question have not been redeposited, such sums shall be deducted from the amount to be disbursed hereunder.

-3-

(c)   Notification to the Escrow Agent by the Lakewood Tenants Organization, Inc. of termination of any of the Agreements between the Township and the Lakewood Tenants Organization, Inc. regardless of the reason for termination, in which case all funds remaining in the Escrow Account including undisbursed interest shall be returned to the Lakewood Tenants Organization, Inc. upon the maturity of the investment instruments, and such funds shall thereafter be used by the Lakewood Tenants Organization, Inc. only for housing goals in accordance with the applicable HUD regulations.

(d)   Notification to the Escrow Agent by the Lakewood Tenants Organization, Inc. of the termination of the relationship between the Township and Lakewood Tenants Organization, Inc. whereby the Lakewood Tenants Organization, Inc. is the Township's designee for the administration of Section 8 or a similar or replacement housing assistance program in which case all funds remaining in the Escrow Account including undisbursed interest shall be returned to the Lakewood Tenants Organization, Inc. upon the maturity of the investment instruments, and such funds shall thereafter be used by the Lakewood Tenants Organization, Inc. only for housing goals in accordance with the applicable HUD regulations.

(e)   Notification to the Escrow Agent by the Lakewood Tenants Organization, Inc. of termination by the government of any of the housing programs being administered, in which case all funds remaining in the Escrow Account including undisbursed interest shall be returned to the Lakewood Tenants Organization, Inc. upon the maturity of the investment instruments, and such funds shall thereafter be used by the Lakewood Tenants Organization, Inc. only for housing goals in accordance with the applicable HUD regulations.

6.   The Township of Lakewood may apply to the Escrow Agent for disbursement of interest earned on the monies deposited

-4-

into the Escrow Account for expenditure on the housing and ancillary needs of the citizens of Lakewood in accordance with the applicable HUD regulations and the Cooperation Agreement of August 27th , 1982, between the Township and the Lakewood Tenants Organization, Inc.

Upon notification to the Escrow Agent of the sum to be withdrawn and the purpose to which it is to be put, the Escrow Agent shall disburse the amount of interest requested to the Township within fifteen (15) days of receipt of the Notification provided that the requisite amount of interest funds exists and are available.

The Township shall have the sole and full responsibility and liability for any and all such funds as it may receive or expend.

7.  The Escrow Agent shall provide a written report to the other parties hereto on a monthly basis detailing the status of the Escrow Account, including all investments made, their dates of maturity, interest rates, account numbers, institutions of deposit, and all monies deposited, disbursed, and interest earned during the past month.  All parties hereto, their accountants, and auditors and HUD representatives shall have access to the records of the Escrow Account.

8.  All notices hereunder shall be in writing by certified mail, return receipt requested to the addresses designated hereon or any successor address as to which all parties are given notice.

IN WITNESS WHEREOF, the undersigned have hereunto set their hands and seals the      27th      day of     August     , 1982.

LAKEWOOD TENANTS ORGANIZATION, INC.

BY: _____
      MEIR N. HERTZ, President

THE TOWNSHIP OF LAKEWOOD

BY: _____

IRA S. WOLF

LTO, INC., Secretary

UNITED JERSEY BANK-MIDSTATE

SIGNED, SEALED AND DELIVERED
IN THE PRESENCE OF:

BY: _____

ATTEST: _____

-5-

RESOLUTION

BE IT RESOLVED by the Township Committee of the Township of Lakewood, County of Ocean, that

WHEREAS, the Township of Lakewood has previously agreed to participate in a Federal Housing Assistance Program pursuant to the Housing and Urban Development Act 1974, commonly referred to as the "Section 8" Existing Housing Assistance Payments Program (originally the United States Housing Act of 1937) as amended, entering into an Annual Contributions Contract with the U.S. Department of Housing and Urban Development for the funding and implementation of this Program; and

WHEREAS, the Township Committee of the Township of Lakewood by Resolution dated March 24, 1977, designated the Lakewood Tenant's Organization, or its successor, or its agent, to administer said program on behalf of the Township of Lakewood as its Contract Administrative Agency; and

WHEREAS, the Township of Lakewood and the Lakewood Tenant's Organization have entered into an Agreement on June 1, 1977, with respect to establishment and administration of said Housing Assistance Payments Program, said Agreement having been further amended by several subsequent Agreements entered into by and between the Township of Lakewood and the Lakewood Tenant's Organization, Inc.; and

WHEREAS, currently all of the Section 8 Existing Housing Assistance Payments Programs contracted for the Township of Lakewood are administrated by its contract agency, the Lakewood Tenant's Organization, Inc., under the name "Lakewood Township Rental Assistance Program"; and

WHEREAS, the Lakewood Township Rental Assistance Program administers for the Township the following Section 8 Projects: Section 8 Existing Projects, # NJ39-E214-002/3/4/5/7/8/9/12/14; Section 8 Mod. Rehab., #NJ39-K214-001/3; Section 8 Housing Voucher, #NJ39-V214-003/4/5/7; and Section 8 Family Self Sufficiency, #NJ39-E214-013; and

WHEREAS, the U.S. Department of Housing And Urban Development (HUD) now requires a further amendment to the Annual Contributions Contract so as to accomplish the implementation of the new Family Self-Sufficiency Program (FSSP) in order to provide additional monies for said Program; and

WHEREAS, it has therefore become necessary to authorize a conforming amendment to the existing contract between the Township of Lakewood and the Lakewood Tenant's Organization, Inc., so as to include the Section 8 Family Self-Sufficiency Program and/or its successor programs as a project administered by the Lakewood Tenant's Organization, Inc., for the Township of Lakewood under the Lakewood Township Rental Assistance Program.

NOW, THEREFORE, BE IT RESOLVED by the Township Committee of the Township of Lakewood in the County of Ocean, State of New Jersey that the Mayor and Township Clerk be and hereby are authorized to execute any and all documents necessary to amend the existing contract by and between the Township and the Lakewood Tenant's Organization, Inc., as aforestated for the purposes of implementation and administration of the Family Self-Sufficiency Program (FSSP) and/or its successor programs.

BE IT FURTHER RESOLVED that the Executive Director of the Lakewood Township Rental Assistance Program be and hereby is authorized to execute and file any and all documents necessary for the implementation and operation of said FSS Program.

I hereby certify the above to be a true copy of a resolution duly adopted by the Township Committee of the Township of Lakewood in the County of Ocean, at its meeting held on the 25th day of November 1992.

_Bernadette Work_
BERNADETTE WORK, RMC

AGREEMENT

THIS AGREEMENT, made this 13 day of February, 1993,

BETWEEN:   LAKEWOOD TENANTS ORGANIZATION, INC.,
a non-profit corporation of the State
of New Jersey, with its principal
office located at 419 First Street
Lakewood, New Jersey, County of Ocean
and State of New Jersey,

AND:   THE TOWNSHIP OF LAKEWOOD, in the
County of Ocean, a municipal corporation
of the State of New Jersey, with offices
at 231 Third Street, Lakewood, New Jersey

WHEREAS, the Township of Lakewood has previously agreed to participate in a Housing Assistance Program pursuant to the Housing and Urban Development Act of 1974, commonly referred to as the "Section 8" Existing Housing Assistance Payments Program (originally the United States Housing Act of 1937) as amended; and

WHEREAS, the Township Committee of the Township of Lakewood by Resolution dated March 24, 1977, designated the Lakewood Tenants Organization, or its successor, as its agent to administer said program on behalf of the Township of Lakewood;  and

WHEREAS, the Township of Lakewood and Lakewood Tenants Organization have entered into an Agreement on June 1, 1977, with respect to establishment and administration of said Housing Assistance Payments Program, said Agreement having been further amended by subsequent Agreements entered into by and between the Township of Lakewood and Lakewood Tenants Organization and its successor, the Lakewood Tenants Organization, Inc., on September 6, 1977, August 3, 1978, September 7, 1978 and August 27, 1982, and

WHEREAS, the Township Committee of the Township of Lakewood has by resolution dated November 25, 1992, recognized the need for the Township of Lakewood to participate in the new HUD Section 8 Family Self Sufficiency Program ("FSSP") and/or its successor program(s) and towards that end has

further designated the Lakewood Tenants Organization, Inc. as its contract administrative agency in administering said program; and

WHEREAS, the Township of Lakewood and Lakewood Tenants Organization, Inc. now desire to enter into an additional Agreement in order to cooperate further in meeting the housing needs of the citizens of Lakewood by the inclusion of the FSSP and/or its successor programs into the projects and programs collectively administered by the Lakewood Tenants Organization, Inc. under the designation "Lakewood Township Rental Assistance Program" ("LTRAP");

NOW, THEREFORE, The Township of Lakewood and the Lakewood Tenants Organization, Inc. covenant and agree as follows:

1. All housing programs funded by the United States Department of Housing and Urban Development, "(HUD)", pursuant to Annual Contributions Contracts ("ACCs") entered into by and between the Township of Lakewood and HUD, including specifically the Section 8 Existing Program, Section 8 Moderate Rehabilitation Program, and Section 8 Family Self Sufficiency Program, (including all similar, subsequent or successor programs), whether same be in the form of Housing Certificates, Housing Vouchers or any subsequent "merged" Certificate/Voucher, shall be administered for the Township by the Lakewood Tenants Organization, Inc., as in the past.

2. All of the programs administered by the Lakewood Tenants Organization, Inc. pursuant to all of its agreements with the Township of Lakewood, including the Section 8 Existing Program, Section 8 Moderate Rehabilitation Program, and Section 8 Family Self Sufficiency Program, (including all similar, subsequent or successor programs), whether same be in the form of Housing Certificates, Housing Vouchers or any subsequent "merged" Certificate/Voucher, shall continue to be carried out under the name "Lakewood Township Rental Assistance Program" (hereinafter referred to as "LTRAP").

3.  LTRAP through its Executive Director is hereby required and is authorized to assume responsibility for all fiscal matters, including the signing of all quarterly requisition forms, year-end operating statements, budget forms, and all other documents calling for fiscal accountability and overall program responsibility under the Section 8 or similar, subsequent or successor housing assistance program.  The Rental Assistance Program shall serve as the Township's contract administrative agency for the administration of all such programs.

4.  The Township recognizes and agrees that all Administrative fees shall be allocated in the same manner as provided in the Agreements described in the preamble to this Agreement unless modified in writing by mutual consent of the parties.

5.  This Agreement is a separate agreement and in no way affects the prior agreements between the parties, all of which prior agreements shall remain in full force and effect.

IN WITNESS WHEREOF the undersigned have hereunto set their hands and seals the ___11th___ day of February, 1993.

LAKEWOOD TENANTS ORGANIZATION, INC.

BY: _____
MEIR N. HERTZ, President

LTO, INC., Secretary

THE TOWNSHIP OF LAKEWOOD

BY: _____
Mayor

SIGNED, SEALED AND DELIVERED
IN THE PRESENCE OF:

# EXHIBIT C



DEPARTMEN, OF HOUSING AND URBAN DEVELO, ,ENT
CAMDEN AREA OFFICE
THE PARKADE BUILDING, 519 FEDERAL STREET, CAMDEN, NEW JERSEY 08103

August 30, 1977

REGION II
26 Federal Plaza
New York, New York 10007

IN REPLY REFER TO:
2.3HHO

Mr. Thomas L. LaPointe
Municipal Manager
Township of Lakewood
Municipal Building
Lakewood, New Jersey  08701

Dear Mr. LaPointe:

We acknowledge receipt of your letter dated
August 19, 1977 transmitting a copy of the
Township's Contract with the Lakewood Tenants
Organization to administer the Section 8 Existing
Housing Program.

HUD is not a party to this Contract, and consequently
our review and approval of the Contract is not re-
quired.  Accordingly, the third or penultimate
paragraph on page 2 requiring HUD approval should
be deleted.  We do reemphasize our position that
HUD looks to the approved Public Housing Agency
as the party responsible for the administration
of the ACC in accordance with the Regulations, see
24CFR 882.116.  Additionally, the PHA shall not
delegate its statutory responsibility to authorize
eviction.

Upon deletion of the aforesaid inapplicable paragraph,
we would appreciate a copy of the Contract for our
files.

Sincerely,

Clarence L. Humphrey
Director
Housing Programs Management Branch

9/2/77.....
Referred to   Attorney to delete the above mentioned paragraph.
on 9/1/77.

G. Doyle, Clerk

# EXHIBIT D



U.S. Department of Housing and Urban Development
Newark Field Office - Region II
One Newark Center, 13th Floor
Newark, NJ 07102-5260
Telephone: 973-622-7900

MAR 1 0 2015

Mr. N. Hertz, Executive Director
Lakewood Township Rental Assistance Program
600 W. Kennedy Blvd.
P.O. Box 856
Lakewood, New Jersey   08701

L. T. R. A. P.

MAY 1 2 2015

RECEIVED

Dear Mr. Hertz:

SUBJECT: Section 8 Management Assessment Program (SEMAP) – FYE 12/31/14
            Lakewood Township Rental Assistance Program (LTRAP)

    Thank you for completing your Section 8 Management Assessment Program (SEMAP) certification for the Lakewood Township Rental Assistance Program (LTRAP). We appreciate your time and attention to the SEMAP assessment process. SEMAP enables HUD to better manage the Section 8 tenant - based program by identifying the LTRAP's capabilities and deficiencies related to the Section 8 program. As a result, HUD will be able to provide more effective program assistance to the LTRAP.

    The LTRAP's final SEMAP score for the fiscal year ended  **12/31/2014** is **100%**. The following are your scores for each indicator:

| | |
|---|---|
| Indicator 1 Selection from Waiting List (24CFR982.54(d)(1) and 982.204(a) | 15 |
| Indicator 2 Reasonable Rent (24CFR982.4, 982.54 (d) (15), 982.158(f)(7) and 24 CFR 982.516) | 20 |
| Indicator 3 Determination of Adjusted Income (24CFR part 5, subpart F and 24 CFR 982.516) | 20 |
| Indicator 4 Utility Allowance Schedule (24 CFR982.517) | 5 |
| Indicator 5 HQS Quality Control (24 CFR 982.405(b) | 5 |
| Indicator 6 HQS Enforcement (24 CFR 982.404) | 10 |
| Indicator 7 Expanding Housing Opportunities | 5 |
| Indicator 8 Payment Standards (24 CFR 982.503) | 5 |
| Indicator 9 Timely Annual Reexaminations (24CFR 5.617) | 10 |
| Indicator 10 Correct Tenant Rent Calculations (24CFR 982, Subpart K) | 5 |
| Indicator 11 Pre-Contract HQS Inspections (24CFR 982.305) | 5 |
| Indicator 12 Annual HQS Inspections (24 CFR 982.405. (a)) | 10 |
| Indicator 13 Lease Up | 20 |
| Indicator 14 Family Self-Sufficiency (24 CFR 984.105 and 984.305) | NA |
| Indicator 15 Deconcentration Bonus | NA |

Your overall performance rating is **High Performer.**

Thank you for your cooperation with the SEMAP process.  If you have any questions, please contact Melissa Bennett at (973) 776-7318.

Sincerely,

Sonia L. Burgos,
Director
Office of Public Housing

Enclosure

SEMAP MTCS Extract Details

Page 1 of 1

Get Help    |    ⏻ Logoff / Return to Secure Systems

**Assessment Profile**   Reports

List      Summary   Certification   Profile   Notifications   Comments

MELISSA
BENNETT
(H07188)
PIC Main

SEMAP

Logoff

Field Office:       2FPH NEWARK HUB OFFICE

Housing Agency:    NJ214 Lakewood RAP

PHA Fiscal Year End: 12/31/2014

# Multifamily Tenant Characteristics System

## SEMAP Indicators
### Program type: SEMAP
### Extract date: 12/31/2014

| Reporting Rate | |
|---|---|
| Percent Reported | 99 |
| **Late Reexamination** | |
| Percent Late Reexamination | 0 |
| **Tenant Rent Discrepancies** | |
| Percent of Family Rent Discrepancy | 0 |
| **HQS - Newly Leased Units(% of Units)** | |
| Passed Inspection Before Contract Effective | 98 |
| **Late HQS Inspections** | |
| Percent Late HQS Inspections | 0 |
| **Family Self-Sufficiency** | |
| Number of Families Enrolled | 13 |
| Percent With Escrow Balance | 0 |
| **Family Self-Sufficiency (FO Input)** | |
| Number of Mandatory FSS Slots | 0 |
| **Lease-up (FO Input)** | |
| Percent Leased | 98 |

Back to Profile



U.S. Department of Housing and Urban Development
Newark Field Office - Region II
One Newark Center, 13th Floor
Newark, NJ  07102-5260
Telephone:  973-622-7900

April 25, 2014

Mr. N. Hertz, Executive Director
Lakewood Township Rental Assistance Program
600 W. Kennedy Blvd.
P.O. Box 856
Lakewood, New Jersey   08701

L. T. R. A. P.

APR 3 0 2014

RECEIVED

Dear Mr. Hertz:

SUBJECT: Section 8 Management Assessment Program (SEMAP) – FYE 12/31/13
         Lakewood Township Rental Assistance Program (LTRAP)

Thank you for completing your Section 8 Management Assessment Program (SEMAP) certification for the Lakewood Township Rental Assistance Program (LTRAP).  We appreciate your time and attention to the SEMAP assessment process.  SEMAP enables HUD to better manage the Section 8 tenant - based program by identifying the LTRAP's capabilities and deficiencies related to the Section 8 program.  As a result, HUD will be able to provide more effective program assistance to the LTRAP.

The LTRAP's final SEMAP score for the fiscal year ended  12/31/2013 is 100%.  The following are your scores for each indicator:

| Indicator | Score |
|---|---|
| Indicator 1 Selection from Waiting List (24CFR982.54(d)(1) and 982.204(a) | 15 |
| Indicator 2 Reasonable Rent (24CFR982.4, 982.54 (d) (15), 982.158(f)(7) and 24 CFR 982.516) | 20 |
| Indicator 3 Determination of Adjusted Income (24CFR part 5, subpart F and 24 CFR 982.516) | 20 |
| Indicator 4 Utility Allowance Schedule (24 CFR982.517) | 5 |
| Indicator 5 HQS Quality Control (24 CFR 982.405(b) | 5 |
| Indicator 6 HQS Enforcement (24 CFR 982.404) | 10 |
| Indicator 7 Expanding Housing Opportunities | 5 |
| Indicator 8 Payment Standards (24 CFR 982.503) | 5 |
| Indicator 9 Timely Annual Reexaminations (24CFR 5.617) | 10 |
| Indicator 10 Correct Tenant Rent Calculations (24CFR 982, Subpart K) | 5 |
| Indicator 11 Pre-Contract HQS Inspections (24CFR 982.305) | 5 |
| Indicator 12 Annual HQS Inspections (24 CFR 982.405. (a)) | 10 |
| Indicator 13 Lease Up | 20 |
| Indicator 14 Family Self-Sufficiency (24 CFR 984.105 and 984.305) | NA |
| Indicator 15 Deconcentration Bonus | NA |

Your overall performance rating is **High Performer**.

Thank you for your cooperation with the SEMAP process.  If you have any questions, please contact Melissa Bennett at (973) 776-7318.

Sincerely,

Sonia L. Burgos,
Director
Office of Public Housing

Enclosure



U.S. Department of Housing and Urban Development
Newark Field Office - Region II
One Newark Center, 12th Floor
Newark, NJ  07102-5260

APR 2 6 2013

Mr. Meir N. Hertz
Executive Director
Lakewood Rental Assistance Program
600 W. Kennedy Blvd.
P.O. Box 856
Lakewood, New Jersey 08701

Dear Mr. Hertz:

Subject: Request for Waiver and Section 8 Management Assessment Program (SEMAP) Score
Lakewood RAP for FYE 12/31/2012

  We have received your letter dated March 4, 2013, requesting an approval to waive the SEMAP regulations at 24 CFR 985.101(b), which require HUD to designate an agency as troubled when the SEMAP Certification has not been submitted electronically by the deadline date.  Your request for a waiver has been granted.  Therefore, we thank you for completing your Section 8 Management Assessment Program (SEMAP) certification for the Lakewood RAP.

  We appreciate your time and attention to the SEMAP assessment process.  SEMAP enables HUD to better manage the Section 8 tenant-based program by identifying PHA capabilities and deficiencies related to the Section 8 program.  As a result, HUD will be able to provide more effective program assistance to PHAs.

  The Lakewood RAP final SEMAP score for the fiscal year ended 12/31/12 is 100%.  The following are your scores on each indicator:

| | |
|---|---|
| Indicator 1 Selection from Waiting List (24CFR982.54(d)(1) and 982.204(a) | 15 |
| Indicator 2 Reasonable Rent (24CFR982.4, 982.54 (d) (15), 982.158(f)(7) and 24 CFR 982.516) | 20 |
| Indicator 3 Determination of Adjusted Income (24CFR part 5, subpart F and 24 CFR 982.516) | 20 |
| Indicator 4 Utility Allowance Schedule (24 CFR982.517) | 5 |
| Indicator 5 HQS Quality Control (24 CFR 982.405(b) | 5 |
| Indicator 6 HQS Enforcement (24 CFR 982.404) | 10 |
| Indicator 7 Expanding Housing Opportunities | 5 |
| Indicator 8 Payment Standards (24 CFR 982.503) | 5 |
| Indicator 9 Timely Annual Reexaminations (24CFR 5.617) | 10 |
| Indicator 10 Correct Tenant Rent Calculations (24CFR 982, Subpart K) | 5 |
| Indicator 11 Pre-Contract HQS Inspections (24CFR 982.305) | 5 |
| Indicator 12 Annual HQS Inspections (24 CFR 982.405. (a)) | 10 |
| Indicator 13 Lease Up | 20 |
| Indicator 14 Family Self-Sufficiency (24 CFR 984.105 and 984.305) | NA |
| Indicator 15 Deconcentration Bonus | NA |

Your overall performance rating is **High-Performer**.

Please contact Melissa Bennett of my staff at (973) 776-7318, if you have any questions.  Thank you for your cooperation with the SEMAP process.

Sincerely,

Sonia L. Burgos
Director
Office of Public Housing

Enclosure

SEMAP MTCS Extract Details

Page 1 of 1

⊘ Get Help   |   ⏻ Logoff / Return to Secure Systems

| Assessment Profile | Reports | Submission | Approval |

List    Summary    Certification    Profile    Notifications    Comments

Fatimah Holder
(H13698)

PIC Main

SEMAP

Logoff

Hub:                    2HNWK Newark Hub
Field Office:          2FPH NEWARK HUB OFFICE
Housing Agency:    NJ214 Lakewood RAP
PHA Fiscal Year End: 12/31/2012

# Multifamily Tenant Characteristics System

SEMAP Indicators
Program type: SEMAP
Extract date: 12/31/2012

| Reporting Rate | |
| --- | --- |
| Percent Reported | 99 |
| Late Reexamination | |
| Percent Late Reexamination | 0 |
| Tenant Rent Discrepancies | |
| Percent of Family Rent Discrepancy | 0 |
| HQS - Newly Leased Units(% of Units) | |
| Passed Inspection Before Contract Effective | 100 |
| Late HQS Inspections | |
| Percent Late HQS Inspections | 0 |
| Family Self-Sufficiency | |
| Number of Families Enrolled | 47 |
| Percent With Escrow Balance | 95 |
| Family Self-Sufficiency (FO Input) | |
| Number of Mandatory FSS Slots | 0 |
| Lease-up (FO Input) | |
| Percent Leased | 100 |

Back to Profile



U.S. Department of Housing and Urban Development
Newark Field Office - Region II
One Newark Center, 12th Floor
Newark, NJ 07102-5260

Mr. Meir N. Hertz
Executive Director
Lakewood Rental Assistance Program
600 W. Kennedy Blvd.
P.O. Box 856
Lakewood, New Jersey 08701

Dear Mr. Hertz:

**Subject: Section 8 Management Assessment Program (SEMAP) Final Score
Lakewood RAP for FYE 12/31/2011**

Thank you for completing your Section 8 Management Assessment Program (SEMAP) certification for the Lakewood RAP. We appreciate your time and attention to the SEMAP assessment process. SEMAP enables HUD to better manage the Section 8 tenant-based program by identifying PHA capabilities and deficiencies related to the Section 8 program. As a result, HUD will be able to provide more effective program assistance to PHAs.

The Lakewood RAP final SEMAP score for the fiscal year ended 12/31/11 is 96%. The following are your scores on each indicator:

| | |
|---|---|
| Indicator 1 Selection from Waiting List (24CFR982.54(d)(1) and 982.204(a) | 15 |
| Indicator 2 Reasonable Rent (24CFR982.4, 982.54 (d) (15), 982.158(f)(7) and 24 CFR 982.516) | 20 |
| Indicator 3 Determination of Adjusted Income (24CFR part 5, subpart F and 24 CFR 982.516) | 20 |
| Indicator 4 Utility Allowance Schedule (24 CFR982.517) | 5 |
| Indicator 5 HQS Quality Control (24 CFR 982.405(b) | 5 |
| Indicator 6 HQS Enforcement (24 CFR 982.404) | 10 |
| Indicator 7 Expanding Housing Opportunities | 5 |
| Indicator 8 Payment Standards (24 CFR 982.503) | 5 |
| Indicator 9 Timely Annual Reexaminations (24CFR 5.617) | 10 |
| Indicator 10 Correct Tenant Rent Calculations (24CFR 982, Subpart K) | 5 |
| Indicator 11 Pre-Contract HQS Inspections (24CFR 982.305) | -0- |
| Indicator 12 Annual HQS Inspections (24 CFR 982.405. (a)) | 10 |
| Indicator 13 Lease Up | 20 |
| Indicator 14 Family Self-Sufficiency (24 CFR 984.105 and 984.305) | N/A |
| Indicator 15 Deconcentration Bonus | -0- |

Your overall performance rating is **High-Performer**.

We have recorded that your PHA has been rated zero on at least one of the performance indicators. Please take the necessary corrective action to ensure compliance with program rules. For each zero rating you must send HUD a written report describing the corrective action taken within 45 calendar days (**June 11, 2012**) or HUD may require a written corrective action plan (CAP) for **Indicator No.11: Pre-Contract HQS Inspections**.

Please contact Melissa Bennett of my staff at (973) 776-7318, if you have any questions.

Thank you for your cooperation with the SEMAP process.

Sincerely,

Sonia L. Burgos
Director
Office of Public Housing

Get Help  |  Logoff / Return to Secure Systems

| Assessment Profile | Reports | Submission | Approval | | |
|---|---|---|---|---|---|
| List | Summary | Certification | Profile | Notifications | Comments |

Fatimah Holder
(f113698)

PIC Main

SEMAP

Logoff

Hub:                 2HNWK Newark Hub
Field Office:        2FPH NEWARK HUB OFFICE
Housing Agency:      NJ214 Lakewood RAP
PHA Fiscal Year End: 12/31/2011

# Multifamily Tenant Characteristics System
## SEMAP Indicators
### Program type: SEMAP
### Extract date: 12/31/2011

| Reporting Rate | |
|---|---|
| Percent Reported | 100 |
| **Late Reexamination** | |
| Percent Late Reexamination | 0 |
| **Tenant Rent Discrepancies** | |
| Percent of Family Rent Discrepancy | 0 |
| **HQS - Newly Leased Units(% of Units)** | |
| Passed Inspection Before Contract Effective | 93 |
| **Late HQS Inspections** | |
| Percent Late HQS Inspections | 1 |
| **Family Self-Sufficiency** | |
| Number of Families Enrolled | 55 |
| Percent With Escrow Balance | 88 |
| **Family Self-Sufficiency (FO Input)** | |
| Number of Mandatory FSS Slots | 0 |
| **Lease-up (FO Input)** | |
| Percent Leased | 100 |

Back to Profile

# SEMAP Indicators Report
## As of December 31, 2011

| | |
|---|---|
| Housing Authority: | **NJ214** |
| Housing Authority FYE: | **December 31** |
| Total Points: | **130** |
| Total Possible Points: | **135** |
| Score: | **96%** |

Download in Excel   Print Page   View Entire Report

**Current SEMAP Indicator Information**

Most Recent SEMAP Indicator Information

| Indicators 1-7: Indicator details | Indicator 8: Payment Standards | Indicator 9: Annual Reexaminations | Indicator 10: Correct Tenant Rent Calculations | Indicator 11: Precontract HQS Inspections | Indicator 12: Annual HQS Inspections | Indicator 13: Lease-Up | Indicator 14: Family Self-Sufficiency Enrollment | Indicator 15: Deconcentration Bonus |
|---|---|---|---|---|---|---|---|---|

**Reporting Rate as of December 31, 2011**

| Program Type | VMS Units Leased | As of MM/YY | Port-Outs | Port-Ins | Number of 50058s Required (#) | Number of 50058s Reported (#) | Reporting Rate (%) |
|---|---|---|---|---|---|---|---|
| All Voucher Funded Assistance | 1057 | 11/11 | 10 | 44 | 1091 | 1087 | 100 |

| | PHA Response | Indicator Points Possible | Actual |
|---|---|---|---|

**Indicator 11: Pre-contract HQS Inspections**                                    5          0

Each newly leased unit passed HQS inspection
before the beginning date of the assisted              Yes
lease and HAP contract.

| | |
|---|---|
| Percent of units that did pass HQS inspection before the beginning date of the assisted lease and HAP contract (%) (SEMAP scores zero points when fewer than 98 percent of newly leased units pass the HQS inspection before the beginning of the lease/HAP as indicated by percentages as shown in red and bold.) | 93 |

| Number of Families in Current Database | Number of Inspections On or Before Effective Date |
|---|---|
| 14 | 13 |

**[-] Families where HQS inspection did not pass before lease and HAP contract:**

| Last name, First name, Middle Initial | Date unit passed precontract HQS inspection | Effective date of HAP contract |
|---|---|---|
| HARRIS T L | 06/30/2011 | 06/01/2011 |

# EXHIBIT E

Freehold Housing Authority in New Jersey

(https://plus.google.com/103980518196062758796/)

New Jersey (/housing-search/New-Jersey/) / Monmouth County (/housing-search/New-Jersey/Monmouth-County/) / Freehold (/housing-search/New-Jersey/ reehold)
/ Freehold Housing Authority (/housing-authority/New-Jersey/Freehold/NJ069/)

| Low Income Cell Program | Halfway Housing | Low Income Senior Apartments | Need to sell yo |
|---|---|---|---|
| $350/Mo/unlimited | Secure! | local.com/Senior_Apartments | local.com/s |
| 1000 Free Text/250 Free Minutes Every Month | Safe, Affordable FL Halfway Houses Located Care and Accountability | Looking For Senior Apartments? Find It Near You with Local.com! | Calculate the Selling our free online looking |

## Freehold Housing Authority

107 Throckmorton Street

Freehold (/housing-search/New-Jersey/Freehold/), Monmouth
County (/housing-search/New-Jersey/Monmouth-County/), NJ
(/housing-search/New-Jersey/) (/housing-search/)

732-462-2421 ()

FREE Section 8/Public Housing
Waiting List Alerts

Join 252,000+ others
searching for housing
assistance and signup for
our weekly wait list alerts.

Enter your email address here .

[ Sign Up ]

## ❶ Public Housing Waiting List Statuses

| Family | Senior or Disabled | Other |
|---|---|---|
| Open | Open | Not Applicable |

The Housing Authority of the Borough of Freehold (HABF) is currently accepting
public housing waiting list applications for families and senior/disabled individuals.

The HABF offers six family communities ranging in size from 1 to 3 bedrooms, and
one community dedicated to senior/disabled individuals

There are two ways to apply
1. Visit the HABF to pick up an application, located at 107 Throckmorton Street,
Freehold, NJ 07728, during normal office hours.
2. Download part 1 (http://freeholdhousingauthority.com/Portfols/147/Application%
20for%20Admission%20Public%20Housing%20(Family)%20part%201.pdf) and part 2
(http://freeholdhousingauthority.com/Portfols/147/Application%20for%20Admissions
20Public%20Housing%20(Family)%20part%202.pdf) of application, then print and
complete.

Once the application has been completed, it can be mailed or hand-delivered to the
address listed above

Be sure to include copies of these documents with your application: birth certificates,
social security cards, photo IDs for all adult household members, current utility bill,
current lease agreement, proof of all income, verification of all assets.

The HABF does have a preference point system that may improve your spot on the
waiting list: involuntarily displaced, substandard housing, rent burden, veteran, live
and/or work in Freehold

More information can be found by visiting the HABF website
at http://freeholdhousingauthority.com/ (http://freeholdhousingauthority.com/), or by
calling 732-462-2421 during normal office hours.

Apartments for Rent
Brownild and affordable. Heat and hot water included!

## Resident Characteristics

as of June 30, 2015

Freehold Housing Authority operates 85 affordable units across its public housing portfolio.

### Bedroom Sizes of Public Housing Units

The bedroom sizes of Freehold Housing Authority public housing units range from studio
apartments to 3 bedroom apartments. The housing authority's public housing inventory
includes: 24% studio apartments, 29% 1 bedroom apartments, 14% 2 bedroom apartments
and 24% 3 bedroom apartments.

### Vacancies in Public Housing Portfolio

Affordable Apartments
in Freehold from
ApartmentSmart
(http://apartmentsmart.com/apartments/New-
Jersey/Freehold/)

Heritage Village at Elton
Corner
(http://apartmentsmart.com/New-
Jersey/Freehold/Heritage-
Village-at-Elton-
Corner/24808)
1 - 2 BR

Monmouth County
Independent Living Complex
(http://apartmentsmart.com/New-
Jersey/Freehold/Monmouth-
County-Independent-Living-
Complex/46820)

Burgerville Group Home
(http://apartmentsmart.com/New-
Jersey/Freehold/Bergerville-
Group-Home/24808)

Rug Mill Seniors
(http://apartmentsmart.com/New-
Jersey/Freehold/Rug-Mill-
Seniors/43234)

**1**
Public Housing Projects ❷

**85**
Public Housing Units ❷

**Small (50 - 249)**
Public Housing Size ❷

**No units**
Section 8 See ❷

**Low-Rent**
Program Type ❷

Find More in Freehold
(/housing-search/New-
Jersey/Freehold/)
Search Nearby Housing
Authorities

Find More in Monmouth
County (/housing-
search/New-
Jersey/Monmouth-
County/)
Search Nearby Housing
Authorities

Find More in New
Jersey (/housing-
search/New-Jersey/)
Search Nearby Housing
Authorities

As of Freehold Housing Authority's most recent Resident Characteristics Report (June 30, 2015), the 18 month average number of units occupied was 79 out of a total 85 rental units. This represents a 16 month average vacancy rate of 7.06%.

### Family Type

Of the 73 households who reported head of household data in the housing authority's most recent RCR report, 37 (50.68%) were elderly, 36 (49.32%) were non-elderly, 47 (64.38%) were disabled, 10 (26.03%) contained children and 16 (21.92%) were headed by a female.

### Tenant Contributions to Rent

Residents of public housing pay rent based on their income. The rent contribution of the tenant is called the Total Tenant Payment (TTP). The TTP is generally 30% of a resident's income with a $25 (National minimum) to $50 (Some PHA's) minimum rent. Based on the information in the most recent Resident Characteristics Report (June 30, 2015) the minimum rent in Freehold Housing Authority's public housing developments is $50.

The average tenant rent contribution for Freehold Housing Authority's public housing developments is $630.

The TTP distribution across all public housing units in the Freehold Housing Authority portfolio is:

| Project | $0 | $1-25 | $26-50 | $51-100 | $101-200 | $201-350 | $351-500 | $500 And Up |
|---|---|---|---|---|---|---|---|---|
| Monmouth Ct | 0% | 0% | 0% | 0% | 1% | 41% | 20% | 38% |

Showing 1 to 1 of 1 entries

Previous 1 Next

The average tenant contribution for elderly residents residing in all properties across the housing authority's public housing portfolio is $285. The average rent payment for disabled residents is $496. The average TTP for non-elderly, non disabled renters in the housing authority's public housing units is $992. Households headed by females had a total tenant payment of $1013.

### Race and Ethnicity

The HUD Resident Characteristics Report provides updated Head of Household race and ethnicity data at the housing authority and property level. Across all properties in the Freehold Housing Authority portfolio, 22% of households identified as Black, 73% identified as White, and 30% identified as Hispanic or Latino.

### Income of Public Housing Residents

HUD divides household income into four categories: Extremely Low Income (ELI) for households earning less than 30% of the median, Very Low Income (VLI) for households earning between 30% and 50% of the median, Low Income (LI) for households earning between 50% and 80% of the median and Above Low Income for households earning 81% of the median and over.

Of the public housing residents residing in Freehold Housing Authority properties, 48 were Extremely Low Income, 13 were Very Low Income, 10 were Low Income and 8 were Above Low Income.

The average annual income of public housing residents living in Freehold Housing Authority properties is $26,235. Of all public housing residents, 0% have no income and 30% earn more than $25,000 while 70% have incomes that fall between $0 and $25,000.

The distribution of incomes among the housing authority's public housing residents is:

| No Income | $1-5,000 | $5,001-10,000 | $10,001-15,000 | $15,001-20,000 | $20,001-25,000 | $25,000 and Up |
|---|---|---|---|---|---|---|
| 0% | 0% | 14% | 27% | 15% | 14% | 30% |

The HUD RCR data includes source of income information as well. This data includes five categories of family income: wage income, welfare income, SSI/SS/Pension income, other income and no income. Some families receive income in multiple categories.

Among families residing in Freehold Housing Authority public housing 37% have wage income, 0% have welfare income, 72% have SSI/SS/Pension income, 29% have other income and 0% have no income.

### Household Information of Public Housing Residents

As of the last HUD RCR report (June 30, 2015), there were a total of 79 households containing 149 total persons residing in the housing authority's public housing properties. The average household size across all properties in the housing authority's public housing portfolio was 1.9.

Across all units operated by the housing authority, 26.03% of households included children. Across all household members in Freehold Housing Authority public housing units 4.7% are aged zero to five and 18.8% are aged 6 to 17.

30.9% of all residents across the housing authority were age 62 or older and are considered seniors while 45.0% of all residents were aged 18 to 61.

### Length of Stay at Public Housing Properties

The HUD RCR report includes length of stay data for Freehold Housing Authority public housing communities. 16.46% of all families residing in public housing have lived there for less than 1 year, 13.92% have lived in public housing for 1 to 2 years while 69.62% have lived in public housing for more than 2 years.

### Assisted Unit Distribution What is Housing Assistance?

The Freehold Housing Authority administers a public housing program. The housing authority owns and manages 1 projects which contain 85 affordable rental units.

According to HUD, Freehold Housing Authority is determined to be a Small public housing authority, meaning it manages between 50 - 249 public housing units.

Freehold Housing Authority is among the 21% of New Jersey housing authorities that only offer public housing. Section 8 assistance in its target area is administered by another nearby housing authority.

*Source: United States Department of Housing and Urban Development (hud.gov, 2014)*

⅛ Share    Like   Share

## SEMAP Performance What are SEMAP Scores?

Each year HUD reviews and scores the housing authority's Section 8 program management based on 14 different criteria. This score is a reflection of how well the housing authority manages the Section 8 waiting list, the physical quality of housing assisted with Section 8 and the financial management of the program.

From 2001 to 2006, Freehold Housing Authority scored an average of 73 points out of the last set of publicly available data. The housing authority had a high score of 80 in 2001 and a low score of 68 in 2002. The average SEMAP Score for Housing Authorities in New Jersey is 77.38.

Freehold Housing Authority has an average score that is less than the average New Jersey housing authority. Higher SEMAP scores indicate more effective financial management, a smoother waiting list process and higher quality physical conditions at assisted properties.

*Source: President's Open Government Directive (hud.gov/production/, 2012)*

⅛ Share    Like   Share

## Latest Public Housing Inspection Scores What are REAC Scores?

Every public housing project is inspected every one to three years by HUD.

As of the last set of publicly available data, Freehold Housing Authority manages one rental property which has an inspection score of 90. To be a passing score, a public housing property must have a score of 60 or more. As of the last set of publicly available data, Monmouth Ct has a passing score.

*Source: United States Department of Housing and Urban Development (data.gov, 2014)*

## Housing Authority Annual and 5 Year Plans

Public housing agencies, also called public housing authorities, which receive funding from HUD, are required to submit and receive approval from the US Department of Housing and Urban Development of both an Annual Plan and a 5 Year Plan. These plans establish each housing authority's policies, strategies, programs and operations for meeting the housing needs of persons within their target area.

The housing authority plans include specific details about the cost of renovations to real estate (also known as capital improvements), changes to Section 8 HCV policies, planned redevelopment of public housing projects and other major administrative changes.

Following are the HUD-approved public housing agency plans for Freehold Housing Authority.

| Year | Date Approved | Plan PDF Document |
|---|---|---|
| 2010 | 12/8/09 | Plan (http://cdn.affordablehousingonline.com/ha-plans/39389.pdf) |
| 2009 | 11/18/08 | Plan (http://cdn.affordablehousingonline.com/ha-plans/36559.pdf) |
| 2008 | 11/20/07 | Plan (http://cdn.affordablehousingonline.com/ha-plans/34105.pdf) |
| 2007 | 12/11/06 | Plan (http://cdn.affordablehousingonline.com/ha-plans/30260.pdf) |
| 2006 | 12/14/05 | Plan (http://cdn.affordablehousingonline.com/ha-plans/26307.pdf) |
| 2005 | 11/22/04 | Plan (http://cdn.affordablehousingonline.com/ha-plans/22486.pdf) |
| 2004 | 11/6/03 | Plan (http://cdn.affordablehousingonline.com/ha-plans/18637.pdf) |
| 2003 | 11/14/02 | Plan (http://cdn.affordablehousingonline.com/ha-plans/14704.pdf) |
| 2002 | 11/14/01 | Plan (http://cdn.affordablehousingonline.com/ha-plans/11053.pdf) |
| 2001 | 1/16/01 | Plan (http://cdn.affordablehousingonline.com/ha-plans/7243.pdf) |
| 2000 | 3/24/00 | Plan (http://cdn.affordablehousingonline.com/ha-plans/3301.pdf) |

† Learn More About Our Data (http://affordablehousingonline.com/affordable-housing-data)

Blog (/blog) | About Us (/about-us) | Housing Q & A (/housing-common-questions) | Section 8 Q & A (/section-8-housing) | List Apartments (/list-apartments) | Housing Help (/housing-help) | What Is Affordable Housing? (/what-is-affordable-housing) | Privacy (/privacy-policy) | Contact Us (/contact-us) | ⚲ Equal Housing (/equal-housing)

Copyright 2002-2015, David Layfield and ApartmentSmart.com, Inc.

(https://plus.google.com/103880591990027587/#69)

New Jersey (/housing-search/New-Jersey/)  /  Morris County (/housing-search/New-Jersey/Morris-County/)  /  Madison (/housing-search/New-Jersey/Madison/)
 /  Madison Housing Authority (/housing-authority/New-Jersey/Madison/NJ105/)

| Low Income Cell Program | Section 8 Senior Apartments | Halfway Housing | Find your Hon |
|---|---|---|---|
| wireless.verc.com | location=Senior_Apartments | sfc.net | Compare apartment cost |
| 1000 Free Text/500 Free Minutes Every Month | Looking For Senior apartments? Find it Now You with Local cost! | Safe, Affordable C1 Halfway Houses Excellent Care and Accountability | Instant Online Housing Obligation Free! |

## Madison Housing Authority

24 Central Avenue

Madison (/housing-search/New-Jersey/Madison/), Morris County
(/housing-search/New-Jersey/Morris-County/), NJ (/housing-
search/New-Jersey/) (/housing-search/)

973-377-0258 https://www.rosenet.org/gov/housing-authority
(https://www.rosenet.org/gov/housing-authority)

### FREE Section 8/Public Housing Waiting List Alerts

Join 252,000+ others searching for housing assistance and signup for our weekly wait list alerts.

Enter your email address here...

[ Sign Up ]

### ❶ Section 8 Waiting List Status: Closed

Share 〈21〉

The Madison Housing Authority (MHA) Section 8 Housing Choice Voucher waiting list is currently closed. This waiting list was last open in 2015. There is no notice of when this waiting list will reopen.

Qualified applicants were placed onto the waiting list by date and time of application submission

Did you know that you can apply for Section 8 anywhere in the country? If your local Section 8 waiting list is closed, you can apply to programs elsewhere. See all open waiting lists across the country on our Waiting Lists page (/open-section-8-waiting-lists).

### Income Property For Sale
Chicago Houses w/ Tenants in Place 10%+ Returns | Turnkey Properties
○ ○

### ❶ Public Housing Waiting List Statuses

| Family | Senior or Disabled | Other |
|---|---|---|
| Closed | Closed | Not Applicable |

The Madison Housing Authority (MHA) is not accepting Public Housing waiting list applications at this time.

### Prices for Senior Housing
Compare Pricing & Services on Top 5 Senior Living Communities by City
○ ○

### Resident Characteristics

as of June 30, 2015

Madison Housing Authority operates 134 affordable units across its public housing portfolio.

#### Bedroom Sizes of Public Housing Units

The bedroom sizes of Madison Housing Authority public housing units range from 1 bedroom apartments to 4 bedroom apartments. The housing authority's public housing inventory includes: 60% 1 bedroom apartments, 22% 2 bedroom apartments, 16% 3 bedroom apartments and 2% 4 bedroom apartments

#### Vacancies in Public Housing Portfolio

---

Affordable Apartments in Madison from ApartmentSmart (http://apartmentsmart.com/apartments/New-Jersey/Madison/)

**1**
Public Housing Projects ❷

**133**
Public Housing Units ❷

**190**
Section 8 Vouchers ❷

**Small (50 - 249)**
Public Housing Size ❷

**Small (50 - 249)**
Section 8 Size ❷

**Combined**
Program Type ❷

**Find More in Madison** (/housing-search/New-Jersey/Madison/)
Search Nearby Housing Authorities

**Find More in Morris County** (/housing-search/New-Jersey/Morris-County/)
Search Nearby Housing Authorities

**Find More in New Jersey** (/housing-search/New-Jersey/)
Search Nearby Housing Authorities



As of Madison Housing Authority's most recent Resident Characteristics Report (June 30, 2015), the 16-month average number of units occupied was 130 out of a total 134 rental units. This represents a 16-month average vacancy rate of 2.99%.

### Family Type

Of the 127 households who reported head of household data in the housing authority's most recent RCR report, 80 (62.99%) were elderly, 47 (37.01%) were non-elderly, 83 (65.35%) were disabled, 31 (24.41%) contained children and 25 (19.69%) were headed by a female.

### Tenant Contributions to Rent

Residents of public housing pay rent based on their income. The rent contribution of the tenant is called the Total Tenant Payment (TTP). The TTP is generally 30% of a residents income with a $25 (National minimum) to $50 (some PHA's) minimum rent. Based on the information in the most recent Resident Characteristics Report (June 30, 2015) the minimum rent in Madison Housing Authority's public housing developments is $50.

The average tenant rent contribution for Madison Housing Authority's public housing developments is $680.

The TTP distribution across all public housing units in the Madison Housing Authority portfolio is:

| Project | $0 | $1-25 | $26-50 | $51-100 | $101-200 | $201-350 | $351-500 | $500 and Up |
|---|---|---|---|---|---|---|---|---|
| Madison HU | 0% | 0% | 1% | 0% | 1% | 21% | 17% | 60% |

Showing 1 to 1 of 1 entries

Previous  **1**  Next

The average tenant contribution for elderly residents residing in all properties across the housing authority's public housing portfolio is $338. The average rent payment for disabled residents is $349. The average TTP for non-elderly, non-disabled renters in the housing authority's public housing units is $679. Households headed by females had a total tenant payment of $1004.

### Race and Ethnicity

The HUD Resident Characteristics Report provides updated Head of Household race and ethnicity data at the housing authority and property level. Across all properties in the Madison Housing Authority portfolio, 14% of households identified as Black, 82% identified as White, and 20% identified as Hispanic or Latino.

### Income of Public Housing Residents

HUD divides household income into four categories: Extremely Low Income (ELI) for households earning less than 30% of the median, Very Low Income (VLI) for households earning between 30% and 50% of the median, Low Income (LI) for households earning between 50% and 80% of the median and Above Low Income for households earning 81% of the median and over.

Of the public housing residents residing in Madison Housing Authority properties, 35 were Extremely Low Income, 55 were Very Low Income, 30 were Low Income and 9 were Above Low Income.

The average annual income of public housing residents living in Madison Housing Authority properties is $30,706. Of all public housing residents, 0% have no income and 58% earn more than $25,000 while 42% have incomes that fall between $0 and $25,000.

The distribution of incomes among the housing authority's public housing residents is:

| No Income | $1-5,000 | $5,001-10,000 | $10,001-15,000 | $15,001-20,000 | $20,001-25,000 | $25,000 and Up |
|---|---|---|---|---|---|---|
| 0% | 1% | 5% | 10% | 12% | 14% | 58% |

The HUD RCR data includes source of income information as well. The data includes five categories of family income: wage income, welfare income, SSI/SSP/Pension income, other income and no income. Some families receive income in multiple categories.

Among families residing in Madison Housing Authority public housing 40% have wage income, 1% have welfare income, 71% have SSI/SSP/Pension income, 29% have other income and 0% have no income.

### Household Information of Public Housing Residents

As of the last HUD RCR report (June 30, 2015), there were a total of 129 households containing 227 total persons residing in the housing authority's public housing properties. The average household size across all properties in the housing authority's public housing portfolio was 1.8.

Across all units operated by the housing authority, 24.41% of households included children. Across all household members in Madison Housing Authority public housing units 4.4% are aged zero to five and 18.5% are aged 6 to 17.

39.6% of all residents across the housing authority were age 62 or older and are considered seniors while 37.4% of all residents were aged 18 to 61.

### Length of Stay at Public Housing Properties

The HUD RCR report includes length of stay data for Madison Housing Authority public housing communities. 13.95% of all families residing in public housing have lived there for less than 1 year, 6.98% have lived in public housing for 1 to 2 years while 79.07% have lived in public housing for more than 2 years.

### Assisted Unit Distribution What is Housing Assistance?

The Madison Housing Authority administers both a public housing and Section 8 housing voucher program. The housing authority owns and manages 1 projects which contain 133 affordable rental units. It also administers 180 Section 8 housing vouchers.

According to HUD, Madison Housing Authority is determined to be a Small public housing authority, meaning it manages between 50 - 249 public housing units. Also according to the Department of Housing and Urban Development, the housing authority is designated as Small, meaning it administers 50 - 249 Section 8 vouchers.

Comparing the housing assistance distribution of Madison Housing Authority between Public Housing Units (41%) and Section 8 Housing Vouchers (59%) to that of all housing authorities in New Jersey, Madison Housing Authority has a larger proportion of public housing units than the average housing authority. The housing authority's proportion of Section 8 vouchers under management is larger than the average housing authority in New Jersey.

*Source: United States Department of Housing and Urban Development (hud.gov, 2014)*

### SEMAP Performance What are SEMAP Scores?

Each year HUD reviews and scores the housing authority's Section 8 program management based on 14 different criteria. This score is a reflection of how well the housing authority manages the Section 8 waiting list, the physical quality of housing assisted with Section 8 and the financial management of the program.

From 2001 to 2009, Madison Housing Authority scored an average of 88 points as of the last set of publicly available data. The housing authority had a high score of 100 in 2003 and a low score of 74 in 2006. The average SEMAP Score for Housing Authorities in New Jersey is 77.79.

Madison Housing Authority has an average score that is more than the average New Jersey housing authority. Higher SEMAP scores indicate more effective financial management, a smoother waiting list process and higher quality physical conditions at assisted properties.

*Source: President's Open Government Directive (hud.gov/offices/pih, 2012)*

### Latest Public Housing Inspection Scores What are REAC Scores?

Every public housing project is inspected every one to three years by HUD.

As of the last set of publicly available data, Madison Housing Authority manages one rental property which has an inspection score of 85. To be a passing score, a public housing property must have a score of 80 or more. As of the last set of publicly available data, Madison Ha has a passing score.

*Source: United States Department of Housing and Urban Development (data.gov, 2014)*

### Housing Authority Annual and 5 Year Plans

Public housing agencies, also called public housing authorities, which receive funding from HUD, are required to submit and receive approval from the US Department of Housing and Urban Development of both an Annual Plan and a 5 Year Plan. These plans establish each housing authority's policies, strategies, programs and operations for meeting the housing needs of persons within their target area.

The housing authority plans include specific details about the cost of renovations to real estate (also known as capital improvements), changes to Section 8 HCV policies, planned redevelopment of public housing projects and other major administrative changes.

Following are the HUD-approved public housing agency plans for Madison Housing Authority.

| Year | Date Approved | Plan PDF Document |
|------|---------------|-------------------|
| 2010 | 3/18/10 | Plan (http://cdn.affordablehousingonline.com/ha-plans/39432.pdf) |
| 2008 | 4/17/08 | Plan (http://cdn.affordablehousingonline.com/ha-plans/34148.pdf) |
| 2007 | 4/4/07 | Plan (http://cdn.affordablehousingonline.com/ha-plans/30302.pdf) |
| 2006 | 3/7/06 | Plan (http://cdn.affordablehousingonline.com/ha-plans/26409.pdf) |
| 2005 | 3/1/05 | Plan (http://cdn.affordablehousingonline.com/ha-plans/22530.pdf) |
| 2004 | 5/21/04 | Plan (http://cdn.affordablehousingonline.com/ha-plans/18580.pdf) |
| 2003 | 3/28/03 | Plan (http://cdn.affordablehousingonline.com/ha-plans/14745.pdf) |
| 2002 | 3/29/02 | Plan (http://cdn.affordablehousingonline.com/ha-plans/11098.pdf) |
| 2000 | 5/9/00 | Plan (http://cdn.affordablehousingonline.com/ha-plans/3341.pdf) |

† Learn More About Our Data (http://affordablehousingonline.com/affordable-housing-data)

Blog (/blog) | About Us (/about-us) | Housing Q & A (/housing-common-questions) | Section 8 Q & A (/section-8-housing) | List Apartments (/list-apartments) | Housing Help (/housing-help) | What Is Affordable Housing? (/what-is-affordable-housing) | Privacy (/privacy-policy) | Contact Us (/contact-us) | 🏠 Equal Housing (/equal-housing)

Copyright 2002-2015, David Layfield and ApartmentSmart.com, Inc.

(https://plus.google.com/103980581960827587909)

New Jersey (/housing-search/New-Jersey/)   /   Hudson County (/housing-search/New-Jersey/Hudson-County/)
/   Jersey City (/housing-search/New-Jersey/Jersey-City/)
/   Jersey City Housing Authority (/housing-authority/New-Jersey/Jersey-City/NJ009/)



THE ULTIMATE
TRAVEL COMPANION
ADVENTURE DUFFELS



# Jersey City Housing Authority

Building #7

Jersey City (/housing-search/New-Jersey/Jersey-City/), Hudson County
(/housing-search/New-Jersey/Hudson-County/), NJ (/housing-search/New-
Jersey/) (/housing-search/)

201-706-4601 http://www.jcha-gov.us/ (http://www.jcha-gov.us/)

## FREE Section 8/Public Housing Waiting List Alerts

Join 252,000+ others searching for
housing assistance and signup for
our weekly wait list alerts.

Enter your email address here...

Sign Up

## ❶ Section 8 Waiting List Status: Closed

Share ⎡1⎤

The Jersey City Housing Authority (JCHA) Section 8 Housing Choice Voucher waiting list is
currently closed. The waiting list has been closed since 2002. There is no notice of when it will
reopen.

According to the JCHA website, there are 3,836 families currently assisted by its Section 8 vouchers.

As of February 2015, there are more than 3,000 families on the waiting list, and the turnover rate is
about 200 vouchers per year. Families without a local preference are expected to wait 7-18 years to
reach the top of the list after applying.

**Did you know** that you can apply for Section 8 anywhere in the country? If your local Section 8
waiting list is closed, you can apply to programs elsewhere. See all open waiting lists across the
country on our Waiting Lists page (/open-section-8-waiting-lists).

### 18 Park Jersey City
Luxury Apartments In Jersey City. Now Accepting Applications!

## ❶ Public Housing Waiting List Statuses

| Family | Senior or Disabled | Other |
|--------|--------------------|-------|
| Closed | Closed | Not Applicable |

The Jersey City Housing Authority is not accepting public housing waiting list applications at this time.

### 225 Grand Jersey City, NJ
Luxury Apartments In Jersey City. Contact Today For More Information.

## Resident Characteristics

as of June 30, 2015

Jersey City Housing Authority operates 2,361 affordable units across its public housing portfolio.

### Bedroom Sizes of Public Housing Units

The bedroom sizes of Jersey City Housing Authority public housing units range from studio apartments to 5 bedroom apartments. The housing authority's public housing inventory includes: 2% studio apartments, 36% 1 bedroom apartments, 30% 2 bedroom apartments, 23% 3 bedroom apartments, 8% 4 bedroom apartments and 1% 5 bedroom apartments.

### Vacancies in Public Housing Portfolio

As of Jersey City Housing Authority 's most recent Resident Characteristics Report (June 30, 2015), the 16-month average number of units occupied was 2,027 out of a total 2,361 rental units. This represents a 16-month average vacany rate of 14.15%.

### Family Type

Of the 1,590 households who reported head of household data in the housing authority's most recent RCR report, 446 (28.05%) were elderly, 1,144 (71.95%) were non-elderly, 717 (45.09%) were disabled, 637 (40.06%) contained children and 577 (36.29%) were headed by a female.

### Tenant Contributions to Rent

Residents of public housing pay rent based on their income. The rent contribution of the tenant is called the Total Tenant Payment (TTP). The TTP is generally 30% of a residents income with a $25 (National minimum) to $50 (some PHA's) minimum rent. Based on the information in the most recent Resident Characteristics Report (June 30, 2015) the minimum rent in Jersey City Housing Authority 's public housing developments is $50.

The average tenant rent contribution for Jersey City Housng Authority 's public housing developments is $493.

The TTP distribution across all public housing units in the Jersey City Housing Authority portfolio is:

| Project | $0 | $1-25 | $26-50 | $51-100 | $101-200 | $201-350 | $351-500 | $500 and Up |
|---------|-----|-------|--------|---------|----------|----------|----------|-------------|
| Barbara Place Terrace | 0% | 0% | 0% | 5% | 11% | 22% | 14% | 49% |
| Berry Grdns | 0% | 0% | 1% | 1% | 6% | 54% | 17% | 22% |
| Booker T Washington Apts | 0% | 0% | 9% | 6% | 14% | 32% | 14% | 25% |
| Curries Woods | 0% | 0% | 1% | 3% | 6% | 32% | 14% | 44% |
| Glenview I | 3% | 0% | 0% | 0% | 8% | 22% | 28% | 39% |

| Project | $0 | $1-25 | $26-50 | $51-100 | $101-200 | $201-350 | $351-500 | $500 and Up |
|---|---|---|---|---|---|---|---|---|
| Gloria Robinson Court Homes Ii | 2% | 0% | 2% | 2% | 8% | 31% | 12% | 44% |
| Gloria Robinson Court Homes Iii | 0% | 0% | 0% | 0% | 4% | 21% | 25% | 50% |
| Holland Grdns | 0% | 0% | 7% | 6% | 10% | 42% | 13% | 23% |
| Hudson Grdns | 0% | 0% | 2% | 3% | 8% | 39% | 11% | 37% |
| Lafayette Senior Living Center | 0% | 0% | 0% | 0% | 3% | 63% | 18% | 16% |

Showing 1 to 10 of 15 entries

Previous [1] [2] [Next]

The average tenant contribution for elderly residents residing in all properties across the housing authority's public housing portfolio is $309. The average rent payment for disabled residents is $276. The average TTP for non-elderly, non-disabled renters in the housing authority's public housing units is $553. Households headed by females had a total tenant payment of $394.

## Race and Ethnicity

The HUD Resident Characteristics Report provides updated Head of Household race and ethnicity data at the housing authority and property level. Across all properties in the Jersey City Housing Authority portfolio, 73% of households identified as Black, 25% identified as White, and 22% identified as Hispanic or Latino.

## Income of Public Housing Residents

HUD divides household income into four categories: Extremely Low Income (ELI) for households earning less than 30% of the median, Very Low Income (VLI) for households earning between 30% and 50% of the median, Low Income (LI) for households earning between 50% and 80% of the median and Above Low Income for households earning 81% of the median and over.

Of the public housing residents residing in Jersey City Housing Authority properties, 1,041 were Extremely Low Income, 438 were Very Low Income, 260 were Low Income and 158 were Above Low Income.

The average annual income of public housing residents living in Jersey City Housing Authority properties is $21,715. Of all public housing residents, 1% have no income and 28% earn more than $25,000 while 71% have incomes that fall between $0 and $25,000.

The distribution of incomes among the housing authority's public housing residents is:

| No Income | $1-5,000 | $5,001-10,000 | $10,001-15,000 | $15,001-20,000 | $20,001-25,000 | $25,000 and Up |
|---|---|---|---|---|---|---|
| 1% | 5% | 26% | 17% | 13% | 9% | 28% |

The HUD RCR data includes source of income information as well. The data includes five categories of family income: wage income, welfare income, SSI/SS/Pension income, other income and no income. Some families receive income in multiple categories.

Among families residing in Jersey City Housing Authority public housing 43% have wage income, 11% have welfare income, 60% have SSI/SS/Pension income, 18% have other income and 0% have no income.

## Household Information of Public Housing Residents

As of the last HUD RCR report (June 30, 2015), there were a total of 2,001 households containing 4,221 total persons residing in the housing authority's public housing properties. The average household size across all properties in the housing authority's public housing portfolio was 2.1.

Across all units operated by the housing authority, 40.06% of households included children. Across all household members in Jersey City Housing Authority public houins units 6.8% are aged zero to five and 21.3% are aged 6 to 17.

22.6% of all residents across the housing authority were age 62 or older and are considered seniors while 49.3% of all residents were aged 18 to 61.

## Length of Stay at Public Housing Properties

The HUD RCR report includes length of stay data for Jersey City Housing Authority public housing communities. 7.05% of all families residing in public housing have lived there for less than 1 year, 4.8% have lived in public housing for 1 to 2 years while 88.15% have lived in public housing for more than 2 years.



## Assisted Unit Distribution What is Housing Assistance?

The Jersey City Housing Authority administers both a public housing and Section 8 housing voucher program. The housing authority owns and manages 29 projects which contain 2,551 affordable rental units. It also administers 3,606 Section 8 housing vouchers.

According to HUD, Jersey City Housing Authority is determined to be a Large public housing authority, meaning it manages between 1,250 - 9,999 public housing units. Also according to the Department of Housing and Urban Development, the housing authority is designated as Large, meaning it administers 1,250 - 9,999 Section 8 vouchers.

Comparing the housing assistance distribution of Jersey City Housing Authority between Public Housing Units (40%) and Section 8 Housing Vouchers (60%) to that of all housing authorities in New Jersey, Jersey City Housing Authority has a larger proportion of public housing units than the average housing authority. The housing authority's proportion of Section 8 vouchers under management is larger than the average housing authority in New Jersey.

*Source United States Department of Housing and Urban Development (hud.gov, 2014)*



## SEMAP Performance What are SEMAP Scores?

Each year HUD reviews and scores the housing authority's Section 8 program management based on 14 different criteria. This score is a reflection of how well the housing authority manages the Section 8 waiting list, the physical quality of housing assisted with Section 8 and the financial management of the program.

From 2001 to 2009, Jersey City Housing Authority scored an average of 87 points as of the last set of publicly available data. The housing authority had a high score of 99 in 2009 and a low score of 69 in 2002. The average SEMAP Score for Housing Authorities in New Jersey is 77.39.

Jersey City Housing Authority has an average score that is more than the average New Jersey housing authority. Higher SEMAP scores indicate more effective financial management, a smoother waiting list process and higher quality physical conditions at assisted properties.

*Source President's Open Government Directive (hud.gov/offices/pih/, 2012)*

## Latest Public Housing Inspection Scores What are REAC Scores?

Every public housing project is inspected every one to three years by HUD.

Jersey City Housing Authority manages 18 rental properties which, as of the last set of publicly available data, have an average inspection score of 57. The scores for properties managed by Jersey City Housing Authority range from a high of 99 to a low of 0.

The highest scoring property in the Jersey City Housing Authority portfolio is Lafayette Senior Living Center and the lowest scoring property is A Harry Moore Apartments.

To be a passing score a public housing property must have a score of 60 or more. 56% of properties managed by Jersey City Housing Authority have a passing score.

*Source United States Department of Housing and Urban Development (data.gov, 2014)*

## Housing Authority Annual and 5 Year Plans

Public housing agencies, also called public housing authorities, which receive funding from HUD, are required to submit and receive approval from the US Department of Housing and Urban Development of both an Annual Plan and a 5 Year Plan. These plans establish each housing authority's policies, strategies, programs and operations for meeting the housing needs of persons within their target area.

The housing authority plans include specific details about the cost of renovations to real estate (also known as capital improvements), changes to Section 8 HCV policies, planned redevelopment of public housing projects and other major administrative changes.

Following are the HUD-approved public housing agency plans for Jersey City Housing Authority .

(https://plus.google.com/103980581990827587969)

New Jersey (/housing-search/New-Jersey/) / Middlesex County (/housing-search/New-Jersey/Middlesex-County/) / Sayreville (/housing-search/New-Jersey/Sayreville/)
/ Housing Authority of the Borough of Sayreville (/housing-authority/New-Jersey/Sayreville/NJ106)

 

BID: $4,400          BID: $7,000

Bank Foreclosures
REO Properties
Fixer Uppers
72,000+ Listings

Abandoned Homes
HUD Foreclosures
Properties as Low as $200
ForeclosureFreeForeclosures.com

## Housing Authority of the Borough of Sayreville



650 Washington Road

Sayreville (/housing-search/New-Jersey/Sayreville/),

Middlesex County (/housing-search/New-

Jersey/Middlesex-County/), NJ (/housing-

search/New-Jersey/) (/housing-search/)

732-721-8044 http://www.sayrevilleha.org/index.html
(http://www.sayrevilleha.org/index.html)

---

### FREE Section 8/Public Housing Waiting List Alerts

Join 252,000+ others searching for housing assistance and signup for our weekly wait list alerts.

Enter your email address here...

[ Sign Up ]

---

### ❶ Section 8 Waiting List Status: Closed

Share [272]

The Housing Authority of the Borough of Sayreville (HABS) Section 8 Housing Choice Voucher waiting list is **closed**. It was last open for nearly two months in May 2015. There is no notice of when this waiting list will reopen.

Applications were available in the HABS office at 650 Washington Road, Sayreville, NJ 08872.

For more information, visit the HABS website at http://www.sayrevilleha.org/index.html (http://www.sayrevilleha.org/index.html) or call 732-721-8400.

**Did you know** that you can apply for Section 8 anywhere in the country? If your local Section 8 waiting list is closed, you can apply to programs elsewhere. See all open waiting lists across the country on our Waiting Lists page (/open-section-8-waiting-lists).

 IT'S NEVER TOO EARLY OR TOO LATE TO START SAVING.

## Assisted Unit Distribution What is Housing Assistance?

The Housing Authority of the Borough of Sayreville administers a Section 8 housing voucher program. The housing authority administers 174 Section 8 housing vouchers.

According to HUD, Housing Authority of the Borough of Sayreville is designated as Small, meaning it administers 50 - 249 Section 8 vouchers.

Housing Authority of the Borough of Sayreville is among the 25% of New Jersey housing authorities that only offer Section 8 voucher assistance. If there are any public housing units available in the target area, those units are administered by another housing authority.

*Source: United States Department of Housing and Urban Development (hud.gov, 2014)*

## SEMAP Performance What are SEMAP Scores?

Each year HUD reviews and scores the housing authority's Section 8 program management based on 14 different criteria. This score is a reflection of how well the housing authority manages the Section 8 waiting list, the physical quality of housing assisted with Section 8 and the financial management of the program.

---

**Affordable Apartments in Sayreville from ApartmentSmart**
(http://apartmentsmart.com/apartments/New-Jersey/Sayreville/)

Goletto Enterprises, Inc.
(http://apartmentsmart.com/New-Jersey/Sayreville/Goletto-Enterprises-Inc/25266)

Sayreville Senior Housing
(http://apartmentsmart.com/New-Jersey/Sayreville/Sayreville-Senior-Housing/43180)

**174**
Section 8 Vouchers ❓

**No units**
Public Housing Size ❓

**Small (50 - 249)**
Section 8 Size ❓

**Section 8**
Program Type ❓

**Find More in Sayreville** (/housing-search/New-Jersey/Sayreville/)
Search Nearby Housing Authorities

**Find More in Middlesex County** (/housing-search/New-Jersey/Middlesex-County/)
Search Nearby Housing Authorities

**Find More in New Jersey** (/housing-search/New-Jersey/)
Search Nearby Housing Authorities

From 2001 to 2009, Housing Authority of the Borough of Sayreville scored an average of 95 points on of the last set of publicly available data. The housing authority had a high score of 100 in 2003 and a low score of 80 in 2001. The average SEMAP Score for Housing Authorities in New Jersey is 77.39

Housing Authority of the Borough of Sayreville has an average score that is more than the average New Jersey housing authority. Higher SEMAP scores indicate more effective financial management, a smoother waiting list process and higher quality physical conditions at acquired properties.

*Source: President's Open Government Directive (hud.gov/sites/opgv, 2012)*

## Housing Authority Annual and 5 Year Plans

Public housing agencies, also called public housing authorities, which receive funding from HUD, are required to submit and receive approval from the US Department of Housing and Urban Development of both an Annual Plan and a 5 Year Plan. These plans establish each housing authority's policies, strategies, programs and operations for meeting the housing needs of persons within their target area.

The housing authority plans include specific details about the cost of renovations to real estate (also known as capital improvements), changes to Section 8 HCV policies, planned redevelopment of public housing projects and other major administrative changes.

Following are the HUD approved public housing agency plans for Housing Authority of the Borough of Sayreville.

| Year | Date Approved | Plan PDF Document |
|------|------|------|
| 2010 | 2/9/10 | Plan (http://cdn.affordablehousingonline.com/ha-plans/39411.pdf) |
| 2009 | 1/12/09 | Plan (http://cdn.affordablehousingonline.com/ha-plans/36500.pdf) |
| 2008 | 1/11/08 | Plan (http://cdn.affordablehousingonline.com/ha-plans/34128.pdf) |
| 2007 | 12/29/06 | Plan (http://cdn.affordablehousingonline.com/ha-plans/30281.pdf) |
| 2006 | 1/6/06 | Plan (http://cdn.affordablehousingonline.com/ha-plans/26388.pdf) |
| 2005 | 1/12/05 | Plan (http://cdn.affordablehousingonline.com/ha-plans/22509.pdf) |
| 2004 | 1/13/04 | Plan (http://cdn.affordablehousingonline.com/ha-plans/18658.pdf) |
| 2003 | 2/25/03 | Plan (http://cdn.affordablehousingonline.com/ha-plans/14725.pdf) |
| 2002 | 10/13/01 | Plan (http://cdn.affordablehousingonline.com/ha-plans/11075.pdf) |
| 2001 | 1/10/01 | Plan (http://cdn.affordablehousingonline.com/ha-plans/7263.pdf) |
| 2000 | 3/20/00 | Plan (http://cdn.affordablehousingonline.com/ha-plans/3321.pdf) |

† Learn More About Our Data (http://affordablehousingonline.com/affordable-housing-data)

Blog (/blog) | About Us (/about-us) | Housing Q & A (/housing-common-questions) | Section 8 Q & A (/section-8-housing) | List Apartments (/list-apartments) | Housing Help (/housing-help) | What Is Affordable Housing? (/what-is-affordable-housing) | Privacy (/privacy-policy) | Contact Us (/contact-us) | Equal Housing (/equal-housing)
Copyright 2002-2015, David Layfield and ApartmentSmart.com, Inc.

# EXHIBIT F



Michael Sepe
Eleanor Levovitz Senior Citizen Housing
500 Clifton Avenue
Lakewood, NJ 08701
Phone 732-364-2304
Fax 732-364-5662
eleanorlevovitz@optonline.net

August 31, 2011

NJ214 Lakewood RAP
419 First Street
Lakewood NJ 08701-0871
Att: Henya ext 22
Fax  732-367-6645

Re: ████████████████

According to HUD EIV Multiple Subsidy Report the above names tenant, Mr.
████ moved into your project on 6/15/2011. Mr. ████ however, is a tenant
in our project since July 2009 and has not yet moved out of his apartment.

When double subsidy occurs assistance should be terminated in the *new* unit
until a move-out is received from us to you for Mr. ████

Please advise how you are handling this.

Very truly yours
Michael Sepe

1

4

# EXHIBIT F

ME1 9768624v.1

# EXHIBIT G



# Lakewood Township
# Residential Assistance Program

600 W. Kennedy Blvd. - P.O. Box 856 - Lakewood, N.J. 08701 - 732.362.0660 - Fax 732.367.6645
www.ltrap.org - e-mail: info@ltrap.org



**Meir N. Hertz, PHM**
CEO/Executive Director

**Henya Richter, CFO**
Supervisor

SEPTEMBER 21, 2011

CASE# 276103



This letter is written in response to your letter dated September 12, 2011 requesting a " FAIR HEARING".

Attached please find a copy of this Agency's Administration plan. I refer you to pages 11 and 12 section which indicate when an informal review is not required, specifically section XIII C. 4.

Basically, no informal hearing is required when a voucher expires. Your voucher expired on 7/13/2011. Since you did not lease a unit by this date your voucher has expired and has been terminated.

Sincerely,

Lakewood township residential assistance program

JANNETTE RODRIGUEZ, CASEWORKER

# EXHIBIT H



U.S. Department of Housing and Urban Development
Newark Field Office – Region II
One Newark Center, 13th Floor
Newark, NJ 07102-5260
Telephone: 973-622-7900

November 28, 2011

Mr. Meir N. Hertz, PHM
Executive Director
Lakewood RAP
600 W. Kennedy Blvd
P.O. Box 856
Lakewood, NJ 08701-0871

Dear Mr. Hertz,

Please be advised this office is concerned with the LTRAP's success rate regarding the issuing of Housing Choice Vouchers. We are confident that the PHA was successful in meeting target audiences, when last selecting name from it waiting list.

Therefore, with respect to the PHA's voucher issuing success; we request the following information for the past 18 month's history:

- Names of families, current addresses & telephone numbers
- Voucher Bedroom size
- Race/National origin
- Date entered waiting list
- Date offered a voucher
- Date Lease Up
- Copy of current waiting list
- Families that were unable to Lease Up or denied voucher/Date when family lost the voucher or not qualified.

This request can be simplified by submitting for NEW LEASE-UP 50058's. The reminding information can be faxed to my attention. Please provide this information by December 8, 2011.

Thank you for your cooperation.

Sincerely,

Balu Thumar
Acting Director
Office of Public Housing

6

# EXHIBIT I

ME1 9768624v.1



**U.S. Department Of Housing and Urban Development**
New York State Office
Jacob K. Javits Federal Building
26 Federal Plaza
New York, New York  10278-0068
http://www.hud.gov/local/nyn/nynopen.html  L.T.R.A.P
RECEIVED

Lakewood Township
Residential Assistance Program                    SEP 13 2012
600 W. Kennedy Blvd.
P. O. Box 856
Lakewood, NJ 08701
                                                  SEP 0 6 2012
Dear Respondent:

Subject:  Housing Discrimination Complaint
          ▓▓▓▓▓▓▓▓▓▓ v. Lakewood Township R.A.P., et al.
          Inquiry No.    343120
          HUD Case No.   02-12-0784-8
          Sect. 504 No.  02-12-0167-4
          Title VI No.   02-12-0089-6
          ADA No.        02-12-0093-D

     We have received a formal complaint alleging that you have engaged in one or
more discriminatory housing practices under the Federal Fair Housing Law, 42 U.S.C.
Sections 3601-3619, Section 504 of the Rehabilitation Act of 1973, Title VI of the
Civil Rights Act of 1964 and Title II of the Americans with Disabilities Act of 1990
(ADA).  We are required by statute to send you a copy of the complaint.

     We are enclosing a copy of the complaint for you.  The alleged discriminatory
practices are identified in this complaint. We have made no determination as to
whether the complaint against you has merit.

     The purpose of this letter is to inform you of: 1) the rights you have in
responding to this complaint, 2) the rights each complainant has, and 3) the steps
the U.S. Department of Housing and Urban Development (the Department) will take to
determine whether the complaint has merit.

     In order to insure that the Department informs you properly of the law's
requirements, this notification letter contains language required by the law.  A
similar letter is used to notify all parties whenever a formal complaint has been
filed with the Department under the Federal Fair Housing Law.

     We are governed by federal law, which sets out what steps we must take when a
formal complaint is filed.  The law also includes steps that you can take to answer
or refute the allegations of this complaint.

     Under federal law, any answer from you to this complaint can be filed within 10
calendar days of your receipt of this letter or receipt of a letter notifying you of
any amendments to this complaint.  Your answer must be signed and you must affirm
that you have given a truthful response by including the statement "I declare under

penalty of perjury that the foregoing is true and correct."

You will be allowed to amend your statement at any time, if our investigation shows that it is reasonable and fair for you to do so.

Our responsibility under the law is to undertake an impartial investigation and, at the same time, encourage all sides to reach an agreement, where appropriate, through conciliation. The law requires us to complete our investigation within 100 days of the date of the official filing of the complaint. If we are unable to meet the 100-day requirement for issuing a determination, the law requires that we notify you and the complainant(s) and explain the reasons why the investigation of the complaint is not completed.

In handling this complaint, we will conduct an impartial investigation of all claims that the Fair Housing Act has been violated. If the investigation indicates that there is not evidence establishing jurisdiction, the case will be dismissed. At any point, you can request that our staff assist you in conciliating (or settling) this complaint with the complainant(s). If the case is not resolved, we will complete our investigation and decide whether or not the evidence indicates that there has been a fair housing violation. If the parties involved have not reached an agreement to settle the complaint, the Department will issue a determination as to whether there is reasonable cause to believe a discriminatory housing practice has occurred.

If our investigation indicates that there is reasonable cause to believe that an unlawful discriminatory housing practice has occurred, the Department must issue a charge. If the investigation indicates that there is no reasonable cause to believe that discrimination has occurred, the complaint will be dismissed. In either event, you will be notified in writing.

If the determination is one of reasonable cause, the notification will advise you and the complainant(s) of your rights to choose, within 20 days, whether you wish to have the case heard by an Administrative Law Judge, or to have the matter referred for trial in the appropriate U.S. District Court.

Each complainant has the legal right to file such a suit, even if the complaint formed the basis for a charge, as long as an Administrative Law Judge has not started a hearing on the record with respect to the charge. Under federal law, even if the Department dismisses the complaint, each complainant still has the right to file an individual lawsuit under the Fair Housing Law in an appropriate federal, state or local court within two years of the date of the alleged discriminatory practice or of the date when a conciliation agreement has been violated. The law does not count, as part of the two-year period, any of the time when a proceeding is pending with the Department.

There may be other applicable federal, state or local statutes under which you and/or the complainant(s) may initiate court action. You may consult a private attorney in this regard.

The law also requires us to notify you that section 818 of the Fair Housing Act makes it unlawful for you, or anyone acting on your behalf, to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, any right granted or protected under the Federal Fair Housing Law.  The law also makes it illegal for anyone to coerce, threaten or interfere with any person for having aided or encouraged any other person in the exercise or enjoyment of, any right or protection granted to them under the Federal Fair Housing Law.

Some explanatory material on the law is enclosed for your information.

If you have any questions regarding this case, please contact your investigator, Ms. Betzaida Morales at (973) 776-7308.  Please refer to the case number at the top of this letter in those contacts, and keep this office advised of any change of your address or telephone number. We hope this information has been helpful to you.

Sincerely,

Jay Golden
Region II Director
Office of Fair Housing
    and Equal Opportunity

Enclosures

# Housing Discrimination Complaint

**U.S. Department of Housing and Urban Development**
Office of Fair Housing and Equal Opportunity

OMB Approval No. 2529-0011

**Please type or print this form**

Public Reporting Burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

Read this entire form and all the instructions carefully before completing. All questions should be answered. However, if you do not know the answer or if a question is not applicable, leave the question unanswered and fill out as much of the form as you can. Your complaint should be signed and dated. Where more than one individual or organization is filing the same complaint, and all information is the same, each additional individual or organization should complete boxes 1 and 7 of a separate complaint form and attach it to the original form. Complaints may be presented in person or mailed to the HUD State Office covering the State where the complaint arose (see list on back of form), or any local HUD Office, or to the Office of Fair Housing and Equal Opportunity, U.S. Department of HUD, Washington, D.C. 20410.

**This section is for HUD use only.**

| Number: 02-12-0184 8 | (Check the applicable box) ☒ Referral & Agency (specify) HUD ☐ Systemic ☐ Military Referral | Jurisdiction: ☒ Yes ☐ No ☐ Additional info | Signature of HUD personnel who established jurisdiction |
|---|---|---|---|
| Filing Date: 09-05-2012 | | | |

**1. Name of Aggrieved Person or Organization** (last name, first name, middle initial) (Mr., Mrs., Miss, Ms.)    Home Phone    Business Phone

Street Address (city, county, State & zip code)

**2. Against Whom is this complaint being filed?** (last name, first name, middle initial)
Lakewood Residential Assistance Program    Phone Number (732) 367-0660

Street Address (city, county, State & zip code)
600 W. Kennedy Blvd. Lkwd. NJ 08701

Check the applicable box which describe(s) the party named above.
☐ Builder  ☐ Owner  ☐ Broker  ☐ Salesperson  ☐ Supt. or Manager  ☐ Bank or Other Lender  ☒ Other

If you named an individual above who appeared to be acting for a company in this case, check this box ☐ and write the name and address of the company in this space:
Name: Janette Rodriguez    Address: 600 W. Kennedy Blvd. Lkwd, NJ

Name and identify others (if any) you believe violated the law in this case:
Lakewood Residential Assistance Agency

**3. What did the person you are complaining against do?** Check all that apply and give the most recent date these act(s) occurred in block No. 6a below.
☒ Refuse to rent, sell, or deal with you  ☐ Falsely deny housing was available  ☐ Engage in blockbusting  ☐ Discriminate in broker's services
☒ Discriminate in the conditions or terms of sale, rental occupancy, or in services or facilities  ☒ Advertise in a discriminatory way  ☐ Discriminate in financing  ☐ Intimidated, interfered, or coerced you to keep you from the full benefit of the Federal Fair Housing Law
☒ Other (explain) Dropped Rental Assistance due to hospitalization.

**4. Do you believe that you were discriminated against because of your race, color, religion, sex, handicap, the presence of children under 18, or a pregnant female in the family or your national origin?** Check all that apply.

| ☐ Race or Color | ☐ Religion (specify) | ☒ Sex | ☒ Handicap | ☐ Familial Status | ☒ National Origin |
|---|---|---|---|---|---|
| ☐ Black ☐ White ☒ Other | | ☒ Male ☒ Female | ☒ Physical ☐ Mental | ☐ Presence of children under 18 in the family ☐ Pregnant female | ☒ Hispanic ☐ Asian or Pacific Islander ☐ American Indian or Alaskan Native ☐ Other (specify) |

**5. What kind of house or property was involved?**
☐ Single-family house
☐ A house or building for 2, 3, or 4 families
☐ A building for 5 families or more
☒ Other, including vacant land held for residential use (explain)

**Did the owner live there?**
☐ Yes
☒ No
☐ Unknown

**Is the house or property**
☐ Being sold?
☒ Being rented?

**What is the address of the house or property?** (street, city, county, State & zip code)

**6. Summarize in your own words what happened.** Use this space for a brief and concise statement of the facts. Additional details may be submitted on an attachment. Note: HUD will furnish a copy of the complaint to the person or organization against whom the complaint is made.

See Attached letters and Documents.

**6a. When did the act(s) checked in item 3 occur?** (include the most recent date if several dates are involved)
8/8/12

**7.** I declare under penalty of perjury that I have read this complaint (including any attachments) and that it is true and correct.
Signature & Date ► X _____
August 8, 201_

Previous editions are obsolete
Alba R. Ortiz
Notary Public State of NJ
My Commission Expires _____

form HUD-903 (7/2001)
ref Handbook 8024.1

9/1/11

To whom it may concerned,

My father ▓▓▓▓ ▓▓▓▓ came to visit me those days, however, he got ill and was hospitalize. The day was 7/1/2011 feeling ill health wise and admitted him 7/2/11. The name of hospital is Birtual of Berlin. He was there from 7/2/11 to 7/08/11. However, after being discharge he was brought back to the emergency room on 7/10/11 with severe panic attacks. And once again on 7/12/11 with the same symptoms. ▓▓▓▓ ▓▓▓▓ was taken to see a doctor in Hammonton, New Jersey in a clinic. The Doctor name is Dr. Berjara on 7/21/11, the # is 609-567-0200. Then a new appointment was done with Dr. Seltzer Gregory tel. # 856-237-8045. Also, another appointment with a psychiatrist at 3pm telephone # 856-361-2710. Another appointment with Berlin hospital on 8/19/11 at 7am for an endoscopy & colonoscopy. On 8/25/11 ▓▓▓▓ had another appointment with Dr. Berjara at

9:15 am telephone # 609-567-0200.
And for these reasons that Mr.
▮▮▮▮▮▮ ▮▮▮▮ has not been able
to move due to having alot of
appointment & hospitalization back to head.

Thank you.

# EXHIBIT J

# Lakewood Township
# Residential Assistance Program

600 W. Kennedy Blvd. – P.O.Box 856 – Lakewood, N.J. 08701 – 732.367.0660 – Fax 732.367.6645
www.ltrap.org – e-mail: info@ltrap.org



Meir N. Hertz, PHM
CEO/EXECUTIVE DIRECTOR

Henya Richter, CFO
SUPERVISOR

Mr. Jay Golden, Region II Director                    September 19, 2012
Office of Fair Housing and Equal Opportunity
U.S. Dept of HUD
New York State Office
Jacob K. Javits Federal Bldg.
26 Federal Plaza
New York, NY 10278-0068

Dear Mr. Golden:

Subject:        ███████ v. Lakewood Township R.A.P.
                Inquiry No.   343120
                HUD Case No.02-12-0784-8
                Sect. 504 No. 02-12-0167-4
                Title VI No.: 02-12-0089-6
                ADA No.      02-12-0093-D

This letter will confirm receipt of your letter dated September 6, 2012 received here on September 13, 2012 regarding the subject complaint.

Please accept this letter as a preliminary answer to the complaint filed by Mr. ██████ LTRAP reserves the right to supplement this response with additional facts and documents as the need arises.

Mr. ██████ complains that LTRAP "dropped (his) rental assistance due to hospitalization." This is incorrect. LTRAP was not even aware of Mr. ██████ hospitalization until after his voucher expired. What Mr. Nieves apparently means to say is that he lost his voucher due to his hospitalization, i.e., circumstances beyond his control. However, this is also incorrect. Mr. ██████ loss of his voucher is unrelated to his hospitalization. To wit:

Mr. ██████ was issued a Housing Choice Voucher by LTRAP, on April 12, 2011. The initial expiration date of this Voucher was June 13, 2011. This voucher was granted a 30 day extension to 7/13/2011, which was necessary only to enable him to lease on June 15th the unit he had requested on May 27, 2011. The lease was approved, and contracts were executed effective June 15, 2011. HAP payments were paid to the owner, again effective June 15, and the file was submitted to HUD via the PIC system. Simply stated, the voucher was extended to accommodate Mr. Nieves and assistance was granted to him, not denied to him, (copies of the Voucher and corresponding HUD Form 52517, Request for Tenancy Approval, are attached for your review.)



On August 31, 2011, we were informed by Mr. Michael Sepe of the Eleanor Levovitz Senior Citizen Housing Complex in Lakewood, that the HUD EIV system was showing a duplicate record for Mr. ▓▓▓ who was living in a subsidized unit in his building. Mr. Sepe additionally informed us that Mr. ▓▓▓ was in fact *still* living in that unit, and that he had never moved into the unit that LTRAP was subsidizing. At that point Mr. ▓▓▓ was simultaneously receiving Section 8 rent subsidies on two apartments for 2 ½ months.

Mr. ▓▓▓ was then contacted by his LTRAP caseworker Janette Rodriguez, and he confirmed to her that he in fact signed the lease for the LTRAP subsidized apartment but never moved into it. Thus, he acknowledged that he was receiving rental assistance on two apartments simultaneously, while only occupying one unit (at the Eleanor Levovitz Apartments). Janette Rodriguez explained to Mr. ▓▓▓ (in Spanish) that this was a breach of program regulations, since Section 8 subsidy can only be paid for an occupied unit. It was at this point that Janette Rodriguez advised Mr. ▓▓▓ that his voucher was never properly utilized, and in any case, its term had expired, since no further Voucher extensions had been requested nor approved.

LTRAP was compelled to recoup the 2 ½ months rent from the landlord, and subsequently had to get LTRAP's attorney, Michael Cohn, Esq. involved in fending-off a threatened lawsuit by the landlord.

It was only after all this information was relayed to Mr. ▓▓▓ that he submitted the letter which he attached to the complaint claiming his inability to move into the unit due to his hospitalization. However, the letter indicates that he fell ill on July 1, two weeks *after* his lease-up date. Furthermore, this Agency was not notified in a timely manner that Mr. ▓▓▓ took ill or was hospitalized and would not be able to move in. In fact, the first time that this Agency heard of his illness was by this letter dated September 1, 2011, 2 ½ months after the lease date and commencement of HAP payments.

In short, Mr. ▓▓▓ never requested a voucher extension for any reason. As per this Agency's Administrative Plan, page 5, LTRAP may at its own discretion award an extension to a Voucher over the 120 day maximum if the voucher holder presents evidence of hospitalization, (excerpt from LTRAP Administrative Plan attached). However, in the instant case, this was never requested nor approved, because Mr. ▓▓▓ represented that he found a unit, moved in, and HAP payments began. He never notified us that he was unable to move into the unit. LTRAP only became aware of this situation when his previous landlord advised us that he was still living in his original HUD subsidized unit, (copy of letter attached). Again, Mr. ▓▓▓ did not fall ill until after this Agency leased him in the new unit as of June 15, 2011; hence there was no reason why he hadn't moved into the unit, nor is there any justification for not advising this Agency that he was unable to move into the unit. Simply stated, there was no justification for collecting double subsidy on two separate units simultaneously. But even more on point, the HCV expiration is not related to the hospitalization.



Clearly, what the record shows is that Mr. ⬛ is using his hospitalization as a subterfuge for the real reason he did not request a voucher extension, namely, that he believed at the time that he secured a unit and did not need an extension, not realizing that this double-dipping would be uncovered via the EIV database. To now allege discrimination is merely a further attempt to obfuscate the facts of this case.

The decision to terminate Mr. ⬛ voucher was based on HUD regulations as well as this Agency's policies clearly explained in its Administrative Plan. No discriminatory actions were taken. In fact, shortly after this incident, this Agency received a letter from the Newark Area HUD Office requesting extensive lease-up statistics for our Housing Choice Voucher Program, (see letter from Balu Thumar dated November 28. 2011), attached. This Agency furnished all the information requested, and at that same time contacted our HUD representative to find out what prompted this inquiry. We were informed that there was a complaint made against this Agency, and based on the timing of the complaint, we believe that that complaint was also filed on behalf of Mr. ⬛. I am attaching a copy of the spreadsheet furnished at that time, to obviate a redundant request for duplicative data. It is evident from the attached spreadsheet, which lists all those called from our Waiting List during that 18-months period, that there was no basis whatsoever for the complaint of discrimination. Those successful, as well as unsuccessful, in utilizing their voucher were from all segments of the population. It is evident that, HUD also agreed that there was no discrimination, as there were no findings or recommendations following our submittal of the relevant data.

I trust that the above will answer the instant complaint, and warrant dismissal of this charge.

Please note that a second copy of this complaint was addressed to Ms. Janette Rodriguez, who was Mr. ⬛ caseworker. Please note that she is no longer employed with this Agency. Her replacement, Luz Montalvo, never dealt with this case.

I declare under penalty of perjury that the foregoing is true and correct.

Sincerely,
LAKEWOOD TOWNSHIP
RESIDENTIAL ASSISTANCE PROGRAM

Meir N. Hertz, PHM
Executive Director
Cc: Ms.Betzaida Morales, Investigator HUD Newark Office via fax and regular mail
    Michael Cohn, Esquire

# Voucher
## Housing Choice Voucher Program

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

OMB No. 2577-0169
(exp. 07/31/2007)

Public Reporting Burden for this collection of information is estimated to average 0.05 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

This collection of information is authorized under Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f).  The information is used to authorize a family to look for an eligible unit and specifies the size of the unit.  The information also sets forth the family's obligations under the  Housing Choice Voucher Program.

| | |
|---|---|
| Please read entire document before completing form Fill in all blanks below.  Type or print clearly. | Voucher Number *1149A* |
| 1.  Insert unit size in number of bedrooms.  (This is the number of bedrooms for which the Family qualifies, and is used in determining the amount of assistance to be paid on behalf of the Family to the owner.) | 1.  Unit Size *1* |
| 2.  Date Voucher Issued (mm/dd/yyyy) Insert actual date the Voucher is issued to the Family. | 2.  Issue Date (mm/dd/yyyy) *4/12/11* |
| 3.  Date Voucher Expires (mm/dd/yyyy) Insert date sixty days after date Voucher is issued.  (See Section 6 of this form.) | 3.  Expiration Date  (mm/dd/yyyy) *6/13/11* |
| 4.  Date Extension Expires (if applicable)(mm/dd/yyyy) (See Section 6. of this form) | 4.  Date Extension Expires (mm/dd/yyyy) *1/13/11* |
| 5.  Name of Family Representative ▓▓▓▓▓▓▓▓▓▓▓▓ | 6  Signature of Family Representative | Date Signed (mm/dd/yyyy) *4/12/11* |
| 7.  Name of Public Housing Agency (PHA) LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM | | |
| 8.  Name and Title of PHA Official MEIR HERTZ, PHM EXECUTIVE DIRECTOR | 9.  Signature of PHA Official | Date Signed (mm/dd/yyyy) *4/12/11* |

## 1.  Housing Choice Voucher Program

A.  The public housing agency (PHA) has determined that the above named family (item 5) is eligible to participate in the housing choice voucher program.  Under this program, the family chooses a decent, safe and sanitary unit to live in.  If the owner agrees to lease the unit to the family under the housing choice voucher program, and if the PHA approves the unit, the PHA will enter into a housing assistance payments (HAP) contract with the owner to make monthly payments to the owner to help the family pay the rent.

B.  The PHA determines the amount of the monthly housing assistance payment to be paid to the owner.  Generally, the monthly housing assistance payment by the PHA is the difference between the applicable payment standard and 30 percent of monthly adjusted family income.  In determining the maximum  initial housing assistance payment for the family, the PHA will use the payment standard in effect on the date the tenancy is approved by the PHA.  The family may choose to rent a unit for more than the payment standard, but this choice does not change the amount of the PHA's assistance payment.  The actual amount of the PHA's assistance payment will be determined using the gross rent for the unit selected by the family.

## 2.  Voucher

A.  When issuing this voucher the PHA expects that if the family finds an approvable unit, the PHA will have the money available to enter into a  HAP contract with the owner.  However, the PHA is under no obligation to the family, to any owner, or to any other person, to approve a tenancy.  The PHA does not have any liability to any party by the issuance of this voucher.

B.  The  voucher does not give the family any right to participate in the PHA's  housing choice voucher program.  The family becomes a participant in the PHA's housing choice voucher program when the HAP contract between the PHA and the owner takes effect.

C.  During the initial or any extended term of this voucher, the PHA may require the family to report progress in leasing a unit at such intervals and times as determined by the PHA.

## 3.  PHA Approval or Disapproval of Unit or Lease

A.  When the family finds a suitable unit where the owner is willing to participate in the program, the family must give the PHA the request for tenancy approval (on the form supplied by the PHA), signed by the owner and the family, and a copy of the lease, including the HUD-prescribed tenancy addendum. Note: Both documents must be given to the PHA no later than the expiration date stated in Item 3 or 4 on top of page one of this voucher.

B.  The family must submit these documents in the manner that is required by the PHA. PHA policy may prohibit the family from submitting more than one request for tenancy approval at a time.

C.  The lease must include, word-for-word, all provisions of the tenancy addendum required by HUD and supplied by the PHA.  This is done by adding the HUD tenancy addendum to the lease used by the owner.  If there is a difference between any provisions of the HUD tenancy addendum and any provisions of the owner's lease, the provisions of the HUD tenancy addendum shall control.

**Request for Tenancy Approval**
Housing Choice Voucher Program

**U.S. Department of Housing
and Urban Development**
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 07/31/2007)

Public reporting burden for this collection of information is estimated to average .08 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collection displays a valid OMB control number.

Eligible families submit this information to the Public Housing Authority (PHA) when applying for housing assistance under Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). The PHA uses the information to determine if the family is eligible, if the unit is eligible, and if the lease complies with program and statutory requirements. Responses are required to obtain a benefit from the Federal Government. The information requested does not lend itself to confidentiality.

| 1. Name of Public Housing Agency (PHA) LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM | 2. Address of Unit (street address, apartment number, city, State & zip code) 700 Clifton av. apt 16, Lakewood, NJ 08701 |
|---|---|

| 3. Requested Beginning Date of Lease 6-15-11 | 4. Number of Bedrooms 1 | 5. Year Constructed 1968 | 6. Proposed Rent 895- | 7. Security Deposit Amt. 1,342.50 | 8. Date Unit Available for Inspection 6/13/2011 |
|---|---|---|---|---|---|

9. Type of House/Apartment

☐ Single Family Detached   ☐ Semi-Detached / Row House   ☐ Manufactured Home   ☑ Garden / Walkup   ☐ Elevator / High-Rise

10. If this unit is subsidized, indicate type of subsidy:   N/A

☐ Section 202   ☐ Section 221(d)(3)(BMIR)   ☐ Section 236 (insured or noninsured)   ☐ Section 515 Rural Development

☐ Home   ☐ Tax Credit

☐ Other (Describe Other Subsidy, including Any State or Local Subsidy) _____

11. Utilities and Appliances
The owner shall provide or pay for the utilities and appliances indicated below by an "O". The tenant shall provide or pay for the utilities and appliances indicated below by a "T". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Specify fuel type | | | | | Provided by | Paid by |
|---|---|---|---|---|---|---|---|
| Heating | ☑ Natural gas | ☐ Bottle gas | ☐ Oil | ☐ Electric | ☐ Coal or Other | O | O |
| Cooking | ☑ Natural gas | ☐ Bottle gas | ☐ Oil | ☐ Electric | ☐ Coal or Other | O | O |
| Water Heating | ☑ Natural gas | ☐ Bottle gas | ☐ Oil | ☐ Electric | ☐ Coal or Other | O | O |
| Other Electric | | | | | | O | T |
| Water | | | | | | O | O |
| Sewer | | | | | | O | O |
| Trash Collection | | | | | | O | O |
| CENTRAL Air Conditioning | | | | | | N/A | |
| Refrigerator | | | | | | O | O |
| Range/Microwave | | | | | | O | O |
| Other (specify) | | | | | | | |

12. Owner's Certifications.

a. The program regulation requires the PHA to certify that the rent charged to the housing choice voucher tenant is not more than the rent charged for other unassisted comparable units.

Owners of projects with more than 4 units must complete the following section for most recently leased comparable unassisted units within the premises.

| Address and Unit number | Date Rented | Rental Amount |
|---|---|---|
| 1. 700 Clifton apt 6 | 2/13/2011 | 895- |
| 2. 700 Clifton av apt 66 | Aug 2010 | 895- |
| 3. 435 Faulk St apt 1C | Jan 2010 | 875- |

b. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving leasing of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

c. Check one of the following:

_____ Lead-based paint disclosure requirements do not apply because this property was built on or after January 1, 1978.

___✓___ The unit, common areas servicing the unit, and exterior painted surfaces associated with such unit or common areas have been found to be lead-based paint free by a lead-based paint inspector certified under the Federal certification program or under a federally accredited State certification program.

_____ A completed statement is attached containing disclosure of known information on lead-based paint and/or lead-based paint hazards in the unit, common areas or exterior painted surfaces, including a statement that the owner has provided the lead hazard information pamphlet to the family.

13. The PHA has not screened the family's behavior or suitability for tenancy. Such screening is the owner's own responsibility.

14. The owner's lease must include word-for-word all provisions of the HUD tenancy addendum.

15. The PHA will arrange for inspection of the unit and will notify the owner and family as to whether or not the unit will be approved.



| Print or Type Name of Owner | Print or Type Name of Household Head |
|---|---|
| Signature | Signature (Household Head) |
| Address | Present Address of Family (street address, apartment no., city, State, & zip code) |
| Telephone Number | Date (mm/dd/yy) | Telephone Number | Date (mm/dd/yyyy) 5/27/11 |
| OWNER SOCIAL SECURITY OR TAX ID NUMBER | |

Print or Type Name of Owner Representative (if different than owner)

OWNER'S REPRESENTATIVE MUST PROVIDE DOCUMENTATION OF OWNER'S AUTHORIZATION FOR REP TO SIGN ON OWNERS' BEHALF (i.e. management agreement, power of attorney, letter of authorization)
Signature

Business Address

| Telephone Number | Date (mm/dd/yyyy) |
|---|---|



Michael Sepe
Eleanor Levovitz Senior Citizen Housing
500 Clifton Avenue
Lakewood, NJ 08701
Phone 732-364-2304
Fax 732-364-5662
eleanorlevovitz@optonline.net

August 31, 2011

NJ214 Lakewood RAP
419 First Street
Lakewood NJ 08701-0871
Att:  Henya ext 22
Fax   732-367-6645

Re:  ▉▉▉▉▉▉▉▉▉▉▉

According to HUD EIV Multiple Subsidy Report the above names tenant, Mr.
▉▉▉, moved into your project on 6/15/2011. Mr. ▉▉▉, however, is a tenant
in our project since July 2009 and has not yet moved out of his apartment.

When double subsidy occurs assistance should be terminated in the _new_ unit
until a move-out is received from us to you for Mr. ▉▉▉

Please advise how you are handling this.

Very truly yours

Michael Sepe

1



U.S. Department of Housing and Urban Development
Newark Field Office – Region II
One Newark Center, 13th Floor
Newark, NJ 07102-5260
Telephone:  973-622-7900

November 28, 2011

Mr. Meir N. Hertz, PHM
Executive Director
Lakewood RAP
600 W. Kennedy Blvd
P.O. Box 856
Lakewood, NJ 08701-0871

Dear Mr. Hertz,

Please be advised this office is concerned with the LTRAP's success rate regarding the issuing of Housing Choice Vouchers.  We are confident that the PHA was successful in meeting target audiences, when last selecting name from it waiting list.

Therefore, with respect to the PHA's voucher issuing success; we request the following information for the past 18 month's history:

- Names of families, current addresses & telephone numbers
- Voucher Bedroom size
- Race/National origin
- Date entered waiting list
- Date offered a voucher
- Date Lease Up
- Copy of current waiting list
- Families that were unable to Lease Up or denied voucher/Date when family lost the voucher or not qualified.

This request can be simplified by submitting for NEW LEASE-UP 50058's. The reminding information can be faxed to my attention. Please provide this information by December 8, 2011.

Thank you for your cooperation.

Sincerely,

Balu Thumar
Acting Director
Office of Public Housing

months of the date a determination of ineligibility was made to the point where they again become income eligible for the program. It shall be the Applicant's/Participant's responsibility to notify LTRAP and to provide all necessary proof thereof, within the six months grace period, if they seek revised eligibility. LTRAP will not consider requests for revised eligibility submitted after the six months grace period.

2. Applicants who fail to respond to a HA letter and otherwise fail to express continued interest shall be removed from the List, (see purge process above).
3. Applicants when reached on the Waiting List, will not be given the option of delaying the assistance and keeping their name and/or position on the Waiting List. When their name is reached they may either accept the assistance or their name will be withdrawn from the Waiting List. If they choose not to accept the assistance (i.e., they are receiving assistance from another agency), their name will be removed from the Waiting List. The applicant may re-apply when applications intake reopens.
4. Applicants who request to be removed from the Waiting List will be taken off the list and will not be reinstated if the applicant later wishes to have his name returned to the List.
5. Inactive Applicatio..s shall be retained by LTRAP for a period of five years.
6. Once an Applicant is removed from the Waiting List, such an Applicant wishing to reapply will be required to file a new application when application intake reopens and shall be assigned a new application date and number.

## E. Records

LTRAP records with respect to applications for admission shall indicate for each application the date and time of receipt; the determination by LTRAP as to eligibility or ineligibility of the applicant; the preference rating, if any, and any offers to provide a Certificate/Voucher.

## III. ISSUING AND DENYING VOUCHERS

## A. Issuing Vouchers

When a family is selected in accordance with the selection preferences contained in this Administrative Plan, the participant will be provided with an oral briefing, a voucher holder's package, and shall be issued a Voucher.

The initial term of the Voucher shall be 60 days. This means that the Voucher Holder has sixty (60) days to find a suitable unit, and move-in, pending Agency approval. An extension of an additional 30 days may be provided upon written request by the Voucher Holder. A final extension of 30 days may be provided upon written request by the Voucher Holder. The overall maximum term within which the Voucher Holder must find a suitable, ready for occupancy unit, and actually move in, shall not exceed 120 days.

The time period for finding and moving into a suitable unit under the Section 8 Housing Choice Voucher Program may be extended beyond the initial 120 day maximum, if the voucher holder presents to this Agency, in writing, evidence of hospitalization or other similar medical confinement, showing that s/he could not find and move into such living accommodations within the initial 120 day period. Extensions may be made in 30-day segments, at the sole discretion of the Authority, after the Voucher holder has exhausted the 120-day initial deadline to find and move into such accommodations. In no event shall the extension period exceed an additional 120 days.

Lease up July 1, 2010-Dec 31, 2011

| Name | Address | Tel No. | Vouch Size | Race | Ethnicity | Date Entered Waiting List | Date Called From W.L. | Date Offered Voucher | Date Lease up | Date Denied or Lost Voucher | Reason |
|------|---------|---------|-----------|------|-----------|--------------------------|----------------------|---------------------|--------------|----------------------------|--------|
| | | | 3 | W | N | 5/2/2003 | 7/28/2010 | 8/18/2010 | 11/1/2010 | | |
| | | | 3 | W | N | 1/10/2003 | 7/28/2010 | 2/2/2011 | 3/1/2011 | | recalled on very low income |
| | | | 2 | W | N | 1/2/2003 | 7/28/2010 | 8/16/2010 | 9/1/2010 | | |
| | | | 3 | W | N | 1/17/2003 | 7/28/2010 | 10/11/2010 | 12/1/2010 | | |
| | | | 4 | W | N | 9/15/2003 | 7/28/2010 | 11/10/2010 | 12/15/2010 | | |
| | | | 4 | W | N | 1/31/2003 | 7/28/2010 | 10/8/2010 | 10/15/2010 | | |
| | | | 4 | W | N | 1/31/2003 | 7/28/2010 | 9/6/2010 | 10/1/2010 | | |
| | | | 3 | W | N | 1/31/2003 | 7/28/2010 | 11/18/2010 | 9/15/2010 | | ported to LHA because of conflict |
| | | | 3 | W | N | 1/31/2003 | 7/28/2010 | 8/1/2011 | 7/1/2011 | | recalled on very low list/ported out of start |
| | | | 3 | W | N | 2/14/2003 | 7/28/2010 | 8/18/2010 | 9/1/2010 | | |
| | | | 3 | W | N | 2/13/2003 | 7/28/2010 | 10/28/2010 | 11/1/2010 | | |
| | | | 3 | W | N | 2/14/2003 | 7/28/2010 | 8/18/2010 | 9/1/2010 | | |
| | | | 4 | W | N | 2/27/2003 | 7/28/2010 | 6/1/2011 | 8/15/2011 | | recalled on very low list |
| | | | 3 | W | N | 2/28/2003 | 7/28/2010 | 8/24/2010 | 9/15/2010 | | |
| | | | 2 | B | N | 3/7/2003 | 7/28/2010 | 8/12/2010 | 8/15/2010 | | |
| | | | 3 | B | N | 5/14/2003 | 7/28/2010 | 8/12/2010 | | 11/11/2010 | voucher expired |
| | | | 2 | W | Y | 3/14/2003 | 7/28/2010 | 8/16/2010 | 10/1/2010 | | |
| | | | 2 | B | N | 7/1/2002 | 7/28/2010 | 12/15/2010 | 2/15/2011 | | recalled was non resident |
| | | | 2 | W | N | 3/21/2003 | 7/28/2010 | 8/10/2010 | 9/1/2010 | | |
| | | | 2 | W | N | 1/28/2003 | 7/28/2010 | 8/4/2010 | 10/1/2010 | | |
| | | | 4 | W | N | 6/28/2002 | 1/20/2011 | 2/11/2011 | 4/15/2011 | | recalled was non resident |
| | | | 2 | B | N | 7/15/2002 | 1/20/2011 | 2/15/2011 | 7/1/2011 | | recalled was non resident |
| | | | 2 | W | N | 7/1/2002 | 1/20/2011 | 2/1/2011 | 2/15/2011 | | recalled assets went down. |
| | | | 3 | W | N | 8/30/2002 | 1/20/2011 | 2/10/2011 | 2/15/2011 | | recalled was non resident |
| | | | 3 | W | N | 4/11/2003 | 1/20/2011 | 4/12/2011 | 8/15/2011 | | |
| | | | 3 | B | N | 4/25/2003 | 1/20/2011 | 5/25/2011 | 6/1/2011 | | |
| | | | | W | N | 5/2/2003 | 1/20/2011 | | | 1/31/2011 | ineligible |
| | | | 3 | W | N | 5/2/2003 | 1/10/2011 | 4/5/2011 | 4/15/2011 | | |
| | | | 6 | W | N | 5/2/2003 | 1/20/2011 | 2/11/2011 | 5/15/2011 | | |
| | | | 4 | W | N | 5/9/2003 | 1/20/2011 | 3/14/2011 | | 7/13/2011 | voucher expired |
| | | | 3 | W | N | 5/9/2003 | 1/20/2011 | 2/8/2011 | 2/15/2011 | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2 W | Y | 5/12/2003 | 1/20/2011 | 1/28/2011 | 3/1/2011 | |
| 1 W | Y | 5/29/2003 | 1/20/2011 | 4/12/2011 | | 7/13/2011 voucher expired |
| 3 W | N | 5/30/2003 | 1/20/2011 | 2/24/2011 | 3/15/2011 | |
| 3 W | N | 6/13/2003 | 3/21/2011 | 6/7/2011 | 7/1/2011 | |
| 2 W | N | 6/20/2003 | 3/21/2011 | 4/1/2011 | 4/15/2011 | |
| 2 W | Y | 5/29/2003 | 3/21/2011 | 6/21/2011 | 8/1/2011 | |
| 3 W | N | 6/20/2003 | 3/21/2011 | 4/2/2011 | 4/15/2011 | |
| 2 W | N | 7/27/2003 | 3/21/2011 | 5/3/2011 | 5/1/2011 | |
| 4 W | N | 7/18/2003 | 3/21/2011 | 3/28/2011 | 4/1/2011 | |
| 3 W | N | 7/25/2003 | 3/21/2011 | 3/30/2011 | 4/1/2011 | |
| 2 W | Y | 7/25/2003 | 3/21/2011 | 5/13/2011 | | 7/12/2011 voucher expired |
| 2 B | N | 7/25/2003 | 3/21/2011 | 4/6/2011 | 5/15/2011 | |
| 3 W | N | 7/25/2003 | 3/21/2011 | 5/2/2011 | 5/15/2011 | |
| 3 W | N | 7/25/2003 | 3/21/2011 | 4/1/2011 | 5/15/2011 | |

# EXHIBIT K



**U.S. Department of Housing and Urban Development**
Newark Field Office-Region II
One Newark Center, 13th Floor
Newark, NJ 07102-5260
Telephone: (973) 622-7900

CERTIFIED MAIL-RETURN RECEIPT REQUESTED          SEP 2 0 2012

Lakewood Township Residential Assistance Program
600 W. Kennedy Blvd.
Lakewood, NJ 08701-0871

Dear Respondent:

SUBJECT:  ▆▆▆▆▆▆▆▆▆▆ Lakewood Township R.A.P., et al.
          Title VIII Complaint No.: 02-12-0784-8
          Title VI No.: 02-12-0089-6
          Sect. 504 No.: 02-12-0167-4
          ADA No.: 02-12-0093-D

        You have been advised by the Office of Fair Housing and Equal Opportunity
(FHEO) in a letter dated September 6, 2012, that we have received the subject
complaint, which is now under investigation. The complainant alleged that you
engaged in one or more discriminatory housing practices under the Federal Fair
Housing Law, 42 U.S.C. §3601-19 (the Act), Title VI of the Civil Rights Act of 1964
(Title VI), Section 504 of the Rehabilitation Act of 1973 (Section 504) and Title II of
the Americans with Disabilities Act of 1990 (ADA).

        In order for FHEO to proceed with the investigation of this complaint as
quickly as possible, we are requesting submission of certain documents and
information. Your response to the enclosed data request should be submitted within 10
days of receipt of this letter. This information is requested under the authority of the
regulation implementing the Fair Housing Amendments Act of 1988 at 24 C.F.R.
Section 103.215(a), Title VI at 24 C.F.R. Part 1, Section 504 at 24 C.F.R. Part 8 and
ADA at 28 C.F.R. Part 35.

        Your answer must be signed with an affirmation stating, "I declare under
penalty of perjury that the foregoing is true and correct."

        Please be advised that this request is not exhaustive. As the investigation
proceeds, additional information may be required.

I must reiterate that our office is operating under time frames imposed by Federal statute and, as such, is required to complete this investigation in a timely manner. We hope that you will cooperate in providing all the information required to process this case and respond to our request within ten days of the receipt of this letter.

If you have any questions with regard to this complaint investigation, please call Ms. Betzaida Morales at (973) 776-7308.

Sincerely,

Wanda S. Nieves
Director
Newark FHEO Center
Office of Fair Housing and
    Equal Opportunity

Enclosure

## DATA REQUEST

1. Provide a written statement indicating your position regarding the allegations asserted by the complainant at Question 3, 4, and 6 of the Housing Discrimination Form a copy of which is enclosed.

2. Provide a list of names, title and contact information (telephone numbers) for any persons involved in the decision to terminate the Complainant's Housing Choice (Section 8) voucher and identify their national origin.

3. Provide the name, address, and contact information of the person who was next approved for a voucher, once the Complainant was terminated from the voucher program. Provide the date on which that voucher was approved and identify that person's national origin.

4. Provide a copy of the Reasonable Accommodation Policy for the Lakewood Township Residential Assistance Program (LTRAP).

5. Provide a listing of all tenants who requested a reasonable accommodation from July 13, 2010 through July 13, 2011 and identify their national origin (if known). Include the date accommodation was requested, describe the accommodation requested and indicate whether or not the request was granted. For all requests not granted, please provide the reason(s) for the denial.

6. Provide a complete copy of the Complainant's case file.

7. If the Respondent is a recipient of federal funds, please specify the type of funding received and when it was received.

8. Provide any other information you deem relevant to this complaint investigation.

# Housing Discrimination Complaint

U.S. Department of Housing and Urban Development
Office of Fair Housing and Equal Opportunity

OMB Approval No. 2529-0011

Please type or print this form

Public Reporting Burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

Read this entire form and all the instructions carefully before completing. All questions should be answered. However, if you do not know the answer or if a question is not applicable, leave the question unanswered and fill out as much of the form as you can. Your complaint should be signed and dated. Where more than one individual or organization is filing the same complaint, and all information is the same, each additional individual or organization should complete boxes 1 and 7 of a separate complaint form and attach it to the original form. Complaints may be presented in person or mailed to the HUD State Office covering the State where the complaint arose (see list on back of form), or any local HUD Office, or to the Office of Fair Housing and Equal Opportunity, U.S. Department of HUD, Washington, D.C. 20410.

| This section is for HUD use only | | | |
|---|---|---|---|
| Number: 02-12-0784-8 | (Check the applicable box): ☒ Referral & Agency (specify) ☐ Systemic ☐ Military Referral | Jurisdiction: ☐ Yes ☐ No ☐ Additional Info: | Signature of HUD personnel who established jurisdiction |
| Filing Date: 09-05-2012 | HUD | | |

1. Name of Aggrieved Person or Organization (last name, first name, middle initial) (Mr.,Mrs.,Miss,Ms.) | Home Phone | Business Phone |

Street Address (city, county, State & zip code)

2. Against Whom is this complaint being filed? (last name, first name, middle initial)
Lakewood Residential Assistance Program
Phone Number (732) 367-0660

Street Address (city, county, State & zip code)
600 W. Kennedy Blvd, Lkwd, NJ 08701 @

Check the applicable box or boxes which describe(s) the party named above:
☐ Builder ☐ Owner ☐ Broker ☐ Salesperson ☐ Supt. or Manager ☐ Bank or Other Lender ☒ Other

If you named an individual above who appeared to be acting for a company in this case, check this box ☒ and write the name and address of the company in this space:

Name: Janette Rodriguez
Address: 600 W. Kennedy Blvd, Lkwd, NJ

Name and identify others (if any) you believe violated the law in this case:
Lakewood Residential Assistance Agency

3. What did the person you are complaining against do? Check all that apply and give the most recent date those act(s) occurred in block No. 6a below.
☒ Refuse to rent, sell, or deal with you ☐ Falsely deny housing was available ☐ Engage in blockbusting ☐ Discriminate in broker's services
☒ Discriminate in the conditions or terms of sale, rental occupancy, or in services or facilities ☒ Advertise in a discriminatory way ☐ Discriminate in financing ☐ Intimidated, interfered, or coerced you to keep you from the full benefit of the Federal Fair Housing Law
☒ Other (explain) Dropped Rental Assistance due to hospitalization.

4. Do you believe that you were discriminated against because of your race, color, religion, sex, handicap, the presence of children under 18, or a pregnant female in the family or your national origin? Check all that apply.

| ☐ Race or Color | ☐ Religion (specify) | ☒ Sex | ☒ Handicap | ☐ Familial Status | ☒ National Origin |
|---|---|---|---|---|---|
| ☐ Black ☐ White ☒ Other | | ☒ Male ☐ Female | ☒ Physical ☐ Mental | ☐ Presence of children under 18 in the family ☐ Pregnant female | ☒ Hispanic ☐ Asian or Pacific Islander ☐ American Indian or Alaskan Native ☐ Other (specify) |

5. What kind of house or property was involved?
☐ Single-family house
☐ A house or building for 2, 3, or 4 families
☐ A building for 5 families or more
☒ Other, including vacant land held for residential use (explain)

Did the owner live there?
☐ Yes
☒ No
☐ Unknown

Is the house or property
☐ Being sold?
☒ Being rented?

What is the address of the house or property?
(street, city, county, State & zip code)

6. Summarize in your own words what happened. Use this space for a brief and concise statement of the facts. Additional details may be submitted on an attachment.
Note: HUD will furnish a copy of the complaint to the person or organization against whom the complaint is made.

See Attached letter and Documents.

6a. When did the act(s) checked in item 3 occur? (Include the most recent date if several dates are involved)
8/8/12 @V

7. I declare under penalty of perjury that I have read this complaint (including any attachments) and that it is true and correct.

Signature & Date
X
August 8, 2012

Alba R. Ortiz
Notary Public State of NJ
My Commission Expires

Previous editions are obsolete

Page 1 of 3

form HUD-903 (7/2001)
ref Handbook 8024.1

9/1/11

To whom it may concerned,

My father ████████ came
to visit me those days, however,
he got ill and was hospitalize.
The day was 7/1/2011 feeling
ill health wise and admitted him
7/2/11. The name of hospital is
Birtual of Berlin. He was there
from 7/2/11 to 7/08/11. However,
after being discharge he was
brought back to the emergency
room on 7/10/11 with seveul
panic attacks. And once again on
7/12/11 with the same symptoms.
████████ ████ was taken to see
a doctor in Hammonton, New Jersey
in a Clinic. The Doctor name is Dr. Berjaira
on 7/21/11, the # is 609-567-0200.
Then a new appointment was done
with Dr. seltzer Gregory tel # 856-237-8045.
Also, another appointment with a psychiatrist
at 3pm telephone # 856-361-2710.
Another appointment with Berlin hospital
on 8/19/11 at 7am for an endoscopy &
colonoscopy. On 8/25/11 ████████ had
another appointment with Dr. Berjaira at

9:15 am telephone # 609-567-0200.
And for these reasons that Mr.
███████ ███████ has not been able
to move due to having alot of
appointment & hospitalization back to back.

Thank you.

# EXHIBIT L



**U.S. Department of Housing and Urban Development**
Newark Field Office – Region II
One Newark Center, 13th Floor
Newark, NJ 07102-5260
Telephone: (973) 622-7900

CERTIFIED MAIL - RETURN RECEIPT REQUESTED

Meir N. Hertz
Lakewood Township
Residential Assistance Program
600 W. Kennedy Blvd.                    **MAR 0 4 2013**
P.O. Box 856
Lakewood, NJ 08701

Dear Respondent:

SUBJECT: ████████ v. Lakewood Township R.A.P., et al.
        Section 504 No.: 02-12-0784-8
        Title VI No.: 02-12-0089-6
        ADA No.: 02-12-0093-D

     We have received a formal complaint alleging that you have engaged in one or more discriminatory housing practices under the Fair Housing Act of 1968, as amended (the "Act"), Title VI of Civil Rights Act of 1964, as amended ("Title VI") and under Section 504 of the Rehabilitation Act of 1973 ("Section 504") and Title II of the Americans with Disabilities Act of 1990 ("ADA"). We are required by statute to provide you with a copy of the complaint. The Complainant amended the complaint to remove Janette Rodriguez as a Respondent and add Meir N. Hertz, CFO/Executive Director and Henya Richter, CFO, Supervisor as Respondents. The complaint was also amended to remove "Advertise in a discriminatory way." This letter serves as notice of the amended complaint.

     We are enclosing a copy of the amended complaint for you. The alleged discriminatory practices are identified in this amended complaint.

     We have made no determination as to whether the complaint against you has merit.

     The purpose of this letter is to inform you of: 1) the rights you have in responding to this complaint; 2) the rights each complainant has; and 3) the steps the U.S. Department of Housing and Urban Development (the Department) will take to determine whether the complaint has merit.

In order to insure that the Department informs you properly of the law's requirements, this notification letter contains language required by law. A similar letter is used to notify all parties whenever a formal complaint has been filed with the Department under the Federal Fair Housing Law.

We are governed by federal law, which sets out the steps we must take whenever a formal complaint has been filed. It also includes the steps that you can take to answer or refute the allegations of this complaint.

Under federal law, we request that any answer from you to this complaint be filed within 10 calendar days of your receipt of this letter. Your answer must be signed and you must affirm that you have given a truthful response by including the statement "I declare under penalty of perjury that the foregoing is true and correct."

You will be allowed to amend your statement at any time, if our investigation shows that it is reasonable and fair for you to do so.

Our responsibility under the law is to undertake an impartial investigation and, at the same time, encourage all sides to reach an agreement, where appropriate, through conciliation. The law requires us to complete our investigation within 100 days of the date of the official filing of the complaint. If we are unable to meet the 100-day requirement for issuing a determination, the law requires that we notify you and the complainant and explain the reasons why the investigation of the complaint has not been completed.

In handling this complaint, we will conduct an impartial investigation of all claims that the Act and or Title VI have been violated. If the investigation indicates there is no evidence establishing jurisdiction, the case will be dismissed. At any point, you may request that our staff assist you in conciliating (or settling) this complaint with the complainant. If the case is not resolved, we will complete our investigation and decide whether or not the evidence indicates that there has been a violation of law. If the parties involved have not reached an agreement to settle the complaint, the Department will issue a determination as to whether there is reasonable cause to believe a discriminatory housing practice has occurred.

If our investigation indicates that there is reasonable cause to believe that an unlawful discriminatory housing practice has occurred, the Department must issue a charge. If the investigation indicates that there is no reasonable cause to believe that discrimination has occurred, the complaint will be dismissed. In either event, you will be notified in writing.

If the determination is one of reasonable cause, the notification will advise you and the complainant of your right to choose, within 20 days, whether you wish to have the case heard by an Administrative Law Judge, or to have the matter referred for trial in the appropriate U.S. District Court.

Each complainant has the legal right to file such a suit, even if the complaint formed the basis for a charge, as long as an Administrative Law Judge has not started a hearing on the record with respect to the charge. Under federal law, even if the Department dismisses the complaint, each complainant still has the right to file an individual lawsuit under the Fair Housing Act in an appropriate federal, state or local

court within two years of the date of the alleged discriminatory practice or of the date when a conciliation agreement has been violated. The law does not count, as part of the two-year period, any of the time when a proceeding is pending with the Department.

There may be other applicable federal, state or local statutes under which you and/or the complainant may initiate court action. You may consult a private attorney in this regard.

The law also requires us to notify you that Section 818 of the Act makes it unlawful for you, or anyone acting on your behalf, to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, any right granted or protected under the Federal Fair Housing Law. The law also makes it illegal for anyone to coerce, threaten or interfere with any person for having aided or encouraged any other person in the exercise or enjoyment of, any right or protection granted to them under the Act.

Some explanatory material is enclosed for your information.

If you have any questions regarding this case, please contact the assigned investigator, Ms. Betzaida Morales, at (973) 776-7308. Please refer to the case number at the top of this letter in those contacts, and keep this Office advised of any change of your address or telephone number. We hope this information has been helpful to you.

Sincerely,

Jay Golden
Region II Director
Office of Fair Housing
and Equal Opportunity

cc:    Harry J. Kelly

Enclosures

# Housing Discrimination Complaint

**U.S. Department of Housing and Urban Development**
Office of Fair Housing and Equal Opportunity

OMB Approval No. 2529-0011

*Amended #1*

**Please type or print this form**

Public Reporting Burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

Read this entire form and all the instructions carefully before completing. All questions should be answered. However, if you do not know the answer or if a question is not applicable, leave the question unanswered and fill out as much of the form as you can. Your complaint should be signed and dated. Where more than one individual or organization is filing the same complaint, and all information is the same, each additional individual or organization should complete boxes 1 and 7 of a separate complaint form and attach it to the original form. Complaints may be presented in person or mailed to the HUD State Office covering the State where the complaint arose (see list on back of form), or any local HUD Office, or to the Office of Fair Housing and Equal Opportunity, U.S. Department of HUD, Washington, D.C. 20410.

| This section is for HUD use only. | | | |
|---|---|---|---|
| Number(s) | Check the applicable box | Jurisdiction: ☑ Yes ☐ No | Signature of HUD personnel who established Jurisdiction |
| Filing Date: | ☐ Referral & Agency (specify) ☑ Systemic(s) ☐ Military Referral | ☑ Additional info: | |

**1. Name of Aggrieved Person or Organization** (last name, first name, middle initial) (Mr., Mrs., Miss, Ms.)

Home Phone          Business Phone

Street Address (city, county, State & zip code)

**2. Against Whom is this complaint being filed?** (last name, first name, middle initial)

**Lakewood Residential Assistance Program**

Phone Number: **732-367-0060**

Street Address (city, county, State & zip code)
**600 W. Kennedy Blvd., Lakewood, NJ 08701**

Check the applicable box or boxes which describe(s) the party named above:
☐ Builder  ☐ Owner  ☐ Broker  ☐ Salesperson  ☐ Supt. or Manager  ☐ Bank or Other Lender  ☐ Other

If you named an individual who appeared to be acting for a company in this case, check this box ☐ and write the name and address of the company in this space:

Name: **Meir N. Hertz, CFO/Executive Director**   Address: **600 W. Kennedy Blvd., Lakewood, NJ 08701**

...me and identify others (if any) you believe violated the law in this case:

**Henya Richter, CFO, Supervisor**

**3. What did the person you are complaining against do?** Check all that apply and give the most recent date these act(s) occurred in block No. 6a below.

☑ Refuse to rent, sell, or deal with you
☐ Falsely deny housing was available
☐ Engage in blockbusting
☐ Discriminate in broker's services
☑ Discriminate in the conditions or terms of sale, rental occupancy, or in services or facilities
☐ Advertise in a discriminatory way
☐ Discriminate in financing
☐ Intimidated, interfered, or coerced you to keep you from the full benefit of the Federal Fair Housing Law
☑ Other (explain) **Dropped rental assistance due to hospitalization**

**4. Do you believe that you were discriminated against because of your race, color, religion, sex, handicap, the presence of children under 18, or a pregnant female in the family or your national origin?** Check all that apply.

| Race or Color | Religion (specify) | Sex | ☑ Handicap | Familial Status | ☑ National Origin |
|---|---|---|---|---|---|
| ☐ Black | | ☐ Male | ☑ Physical | ☐ Presence of children under 18 in the family | ☑ Hispanic  ☐ American |
| ☐ White | | ☐ Female | ☐ Mental | ☐ Pregnant female | ☐ Asian or Pacific Islander  ☐ Indian or Alaskan Native  ☐ Other (specify) |
| ☐ Other | | | | | |

**5. What kind of house or property was involved?**
☐ Single-family house
☐ A house or building for 2, 3, or 4 families
☐ A building for 5 families or more
☑ Other, including vacant land held for residential use (explain)

**Did the owner live there?**
☐ Yes
☑ No
☐ Unknown

**Is the house or property**
☐ Being sold?
☑ Being rented?

**What is the address of the house or property?** (street, city, county, State & zip code)

**6. Summarize in your own words what happened.** Use this space for a brief and concise statement of the facts. Additional details may be submitted on an attachment.
Note: HUD will furnish a copy of the complaint to the person or organization against whom the complaint is made.

**See attached letters and documents**

**6a. When did the act(s) checked in item 3 occur?** (include the most recent date if several dates are involved)

**08/08/12**

**7.** ...declare under penalty of perjury that I have read this complaint (including any attachments) and that it is true and correct.

Signature & Date

Previous editions are obsolete

Page 1 of 3

form HUD-903 (7/2001)
ref Handbook 8024.1

000271

9/1/11

To whom it may concerned,

My father ██████████ came to visit me those days, however, He got ill and was hospitalize. The day was 7/1/2011 feeling ill health wise and admitted him 7/2/11. The name of hospital is Birtual of Berlin. He was there from 7/2/11 to 7/08/11. However, after being discharge he was brought back to the emergency room on 7/10/11 with several panic attacks. And once again on 7/12/11 with the same symptoms. ██████████ was taken to see a doctor in Hammonton, New Jersey in a clinic. The Doctor name is Dr. Berjara on 7/21/11, the # is 609-567-0200. Then, a new appointment was done with Dr. Seltzer Gregory tel # 856-237-8045. Also, another appointment with a psychiatrist at 3pm telephone # 856-361-2710. Another appointment with Berlin hospital on 8/19/11 at 7am for an endoscopy & colonoscopy. On 8/25/11 ██████ had another appointment with Dr. Berjara at

000272

9:15 am telephone # 609-567-0200.
And for these reasons that Mr.
███████████ has not been able
to move due to having alot of
appointment & hospitalization. back to back.

Thank you.

000273

# EXHIBIT M



U.S. Department of Housing and Urban Development
Newark Field Office – Region II
One Newark Center, 13th Floor
Newark, NJ 07102-5260
Telephone: (973) 776-7312; Fax: (973) 645-6423
Frank.vespa-papaleo@hud.gov

June 3, 2013

**VIA EMAIL AT HKELLY@NIXONPEABODY.COM**

Harry J. Kelly, Esq.
Nixon Peabody LLP
401 9th Street, N.W., Suite 900
Washington, D.C. 20004-2128

Dear Mr. Kelly:

SUBJECT:   ██████████ v. Lakewood Township R.A.P., et al.
Section 504 No.: 02-12-0784-8
Title VI No.: 02-12-0089-6
ADA No.: 02-12-0093-D

As you are aware, on May 29 and 30, 2013, HUD staff conducted an on-site investigation in the above-reference matter. While on-site, HUD staff requested a variety of documents, which you advised would be produced. Below is a listing of the documents were are requesting that your client provide no later than June 12, 2013. The documents may be produced in electronic format readable as a "PDF."

Additionally, as I advised you, we will need to schedule additional time to visit your client's office in order to complete additional employee interviews and complete and the on-site visit. Therefore, we'd like to schedule the final two days for our on-site for June 25 and 26, 2013.

Please confirm that your clients will be available on those dates. We will send a small team of staff to interview the remaining staff (including caseworkers, receptionists, etc) over the course of the two days and complete any additional document review at that time, and would like to ensure LTRAP's cooperation as HUD completes the investigation.

As you have asserted that you represent each employee and contractor of LTRAP and wish to attend each interview, please let us know if you will be participating by telephone or will be attending in person. We look forward to finalizing the dates as soon as possible. After we secure the dates we can discuss any outstanding issues and details concerning our follow up visit to LTRAP, including a schedule of interviews.

13

We very much appreciate your cooperation with regard to the above.  Do not hesitate to contact me if you have any further questions.

Sincerely,

J. Frank Vespa-Papaleo, Chief
Enforcement Branch
Newark FHEO Center

CC:   Jay Golden, FHEO Region 2 Director
      Wanda S. Nieves, Newark FHEO Center Director
      Betzy Morales, FHEO Investigator

FOLLOW UP REQUEST TO LTRAP FOR DOCUMENTS REQUESTED AT ON-SITE

1. Job/position descriptions for all LTRAP staff (including employees and contracted staff).

2. List of all landlords paid with LTRAP vouchers/funds, including landlord's name, property address, name of LTRAP participant.

3. Recertification letters (in English and Spanish), including: (1) so-called "First Letter" to tenant advising of recertification; (2) inspection letter to landlord.

4. Record Retention Policy (or policy regarding procedures and process for scanning files, etc) accompanied by board resolution adopting policy.

5. List of participants of the Homeownership Program since 2010, by race, national origin, and disability, and amount of benefit/funds provided by LTRAP for each participant; also provide the address of the property purchased, price of property and seller's name.

6. List of participants of Family Self Sufficiency Program (FSSP) since 2010, by race, national origin, and disability, and amount of benefit/funds provided by LTRAP for each participant; also include any referrals made by LTRAP on behalf of participants in the FSSP.

7. With regard to LTRAP and the Lakewood Tenant Organization, please provide:
    a. List of all board members from 2010 to the present, including their names, race, national origin, sex, disability status, date of appointment, length of term, contact information, and resume; also include the names of the officers of the board.
    b. List of the board meeting dates, times and meeting locations since 2010, including the agenda for each meeting and advertisement(s) of public meeting notification(s);
    c. Minutes of all board meetings from 2010 to the present.

8. Copy of a blank caseworker summary sheet.

9. Copy of the caseworker caseload/assignment list provided to LTRAP staff in May 2013.

10. List of all individuals who came off the LTRAP waitlist since 2010, and indicate the date they came off waitlist, date of lease-up, addressed of leased-up property, landlord's name, whether determined to be ineligible and date, date of ineligibility determination(s), and any other disposition for each).

11. Copy of "RTA" letter and copy of most recent application for LTRAP Section 8 program.

15

12. Copy of LTRAP Welcome Packet (in English and all other languages provided).

13. List or calendar of LTRAP office holidays and closures from 2010 through 2013.

14. Copy of employment contracts for any LTRAP staff.

15. Copy of contracts between LTRAP and its housing inspectors (Eli Green and Steven Resnick).

16. Copy of LTRAP's Reasonable Accommodations log, and date created and implemented.

17. Copied of all reasonable accommodations requests made to LTRAP by participants from 2010 to the present.

18. Copy of LTRAP's Reasonable Accommodations Policy, and date created and implemented.

19. Copy of LTRAP's Reasonable Accommodations Form, and date created and implemented.

20. Written record appointing LTRAP's Section 504 Coordinator, and date of appointment; copy of Board resolution 9if any) appointing the Section 504 Coordinator.

21. Copy of training materials provided to LTRAP regarding Section 504 Coordinator functions, Reasonable Accommodations Policy, Reasonable Accommodations Form, or Language Access Plan.

22. Copy of emails from LTRAP management distributing copy of or information about LTRAP's Section 504 Coordinator, Reasonable Accommodations Policy, Reasonable Accommodations Form, or Language Access Plan.

23. Copy of the Family Self Sufficiency Program Manual, copy of any advertisements and informational flyers disseminated about the program and a list of agencies and partners outreached and flyers submitted, dates of public meetings held to create awareness about the program.

24. Copy of the Family Homeownership Program Manual, copy of any advertisements and informational flyers disseminated about the program and a list of agencies and partners outreached and flyers submitted, dates of public meetings held to create awareness about the program.

25. Copy of LTRAP's Fair Housing Plan.

26. List of any appeals requested of voucher terminations since 2010, including name of LTRAP participant, case number, date of termination, date of hearing, copy of all notification letters regarding termination and hearings, hearing officer name, and race, national origin and disability status of any individuals requesting appeal. Also include the names of any individuals that participated in such hearings who served as translator or interpreter for the participant, and the relationship to the participant.

27. Copy of the termination letter LTRAP sent to any participants since 2010.

28. Copy of LTRAP Employee Manual.

29. Copy of LTRAP's "purge letter" and dates of any purging of waitlist.

30. List of organizations with which LTRAP conducts outreach, and for each organization include name of point of contact, email address, and phone number, and last date of contact.

31. Copy of LTRAP's most recent employee list.

32. Electronic copy (PDF) of each of the following complete files (list attached hereto as Appendix A, which are Current Section 8 Participants and Waitlist).

17

Appendix A

<u>Current Section 8 Participants</u>
1.  5519
2.  6096
3.  1856
4.  1939
5.  3035
6.  6837
7.  0650
8.  0157
9.  1600
10. 6584
11. 0215
12. 1894
13. 2196
14. 0564
15. 9386
16. 7943
17. 5232
18. 0410
19. 7045
20. 7020
21. 3902
22. 2717
23. 5346
24. 8571
25. 6942
26. 6182
27. 5824
28. 4555
29. 1090
30. 0339
31. 0615
32. 9214
33. 5878
34. 4994
35. 0308
36. 5570
37. 1958
38. 8548
39. 8401
40. 9226
41.  4445
42. 3202
43. 1087

44. 7140
45. 7613
46. 1767
47. 4755
48. 0220-
49. 6267
50. 0465-
51. 3665-
52. 9890-
53. 4178-
54. 6137
55. 7148
56. 3076
57. 9443
58. 3534
59. 8759
60. 5050
61. 2586
62. 3422
63. 4721
64. 9582
65. 6978
66. 6529
67. 1405
68. 0883
69. 7169
70. 1803
71. 3504
72. 3903
73. 4421
74. 8865
75. 8745
76. 1519
77. 0568
78. 3664
79. 0633(
80. 0519

Waiting List
1.   202650 -
2.   202902 -
3.   202970 -
4.   203677 -
5.   203686-
6.   204077 -
7.   274346 -

8.  274495
9.  274556
10. 274638
11. 274751
12. 275479-
13. 275488
14. 275532
15. 275706
16. 275715-
17. 275717
18. 275741
19. 275742
20. 275878-
21. 275961-
22. 275962
23. 276061
24. 276098-
25. 276163-
26. 276166-
27. 276167
28. 276248
29. 276249
30. 276306-
31. 276331-
32. 276333-
33. 276448-
34. 276564-
35. 276632
36. 276778-
37. 276795
38. 276860-
39. 276878-
40. 277119
41. 203594-
42. 276043-
43. 276132-
44. 276170-
45. 276223-
46. 276365-
47. 276477-
48. 276771
49. 274841-
50. 275609-

# EXHIBIT N



# NIXON PEABODYLLP

401 9th Street N.W.
Suite 900
Washington, D.C. 20004-2128
(202) 585-8000
Fax: (202) 585-8080
Direct Dial: (202) 585-8712
E-Mail: hkelly@nixonpeabody.com

June 12, 2013

**VIA EMAIL/U.S. POSTAL SERVICE**

J. Frank Vespa-Papaleo, Chief
Enforcement Branch, Newark FHEO Center
U.S. Department of Housing and Urban Development
Newark Field Office -- Region II
One Newark Center, 13th Floor
Newark, NJ 07102-5260

> RE:  ▮▮▮▮▮ v. Lakewood Township R.A.P., et al.
> Title VIII Complaint No.: 02-12-0784-8
> Section 504 No.: 02-12-0167-4
> Title VI No.: 02-12-0089-6
> ADA No.: 02-12-0093-D

Dear Mr. Vespa-Papaleo:

I received your letter dated June 3, 2013 (the "June 3 Letter," received by electronic mail on June 5, 2013), which contains a list of 32 additional sets of documents requested by HUD. One of those items includes a request for us to produce a total of 130 client files for HUD's review in addition to those that your staff reviewed during the onsite interviews at LTRAP's offices last month. Your letter also states your intention to return to the office of the Lakewood Township Residential Assistance Program ("LTRAP") for two more days of interviews of an undisclosed number of persons.

The requests made in the June 3 Letter are unreasonable and clearly seek information irrelevant to any allegation against LTRAP. They are based on the specious presumption that, for some unexplained reason, HUD must conduct a fishing expedition. The only allegation against LTRAP is a claim by one individual, Mr. ▮▮▮▮▮ that was clearly made in retaliation against LTRAP because LTRAP stopped that claimant from continuing to defraud the federal government. The request in the June 3 Letter bear no connection whatsoever to the original Title VIII complaint by Mr. ▮▮▮▮▮ – which should have been dismissed on the basis of the information provided by LTRAP to HUD long ago – or any legitimate compliance review under HUD's Title VI or Section 504 rules.

J. Frank Vespa-Papaleo, Chief
June 12, 2013
Page 2

This request is even more surprising as LTRAP has been very cooperative throughout this process. Let me note the following facts that demonstrate LTRAP's cooperation:

1. In October 2012, LTRAP directly responded to HUD's first data request, and I provided a further voluminous response to a subsequent data request in December 2012.

2. When you announced your plans last month for an onsite inspection of LTRAP, you initially proposed a plan to conduct interviews of 18 persons, nearly the entire organization staff including the receptionist, over a two-day period. Aside from the obvious unlikelihood of conducting interviews of 18 persons during that short period, your plan also failed to consider the right of LTRAP and its employees to be represented by counsel, in violation of HUD's handbook rules. You also advised that you would bring a team of 8 persons for the on-site interviews. You made no additional request for documents prior to your visit to LTRAP, other than to request copies of the waiting list and lists of recent terminations and other administrative decisions. Further, there is no apparent, relevant information that could be gained from interviewing staff already disclosed as being uninvolved in any of the allegations in this case.

3. On May 24, 2013, you agreed to scale back your interview request from 18 persons to 6 – 8 persons.

4. Notwithstanding your agreement on May 24 to a scaled-down list of interviews, you sent me a list on May 28, 2013 of 16 persons that you wanted to interview. After further negotiations, we agreed to abide by the previous limit of 6 – 8 persons.

5. When you arrived at LTRAP on May 29, 2013, HUD again changed its mind and, without notice, brought a squad of 15 persons for the interviews, almost twice the size of the party that you had previously announced. Your squad made immediate demands for LTRAP to produce additional documents – including access to all of LTRAP's tenant files. HUD's failure to provide any sort of reasonable notice about the size of its squad and additional document demands presented a problem for everyone since the requested files are kept in electronic form and there were simply not enough computers available for an immediate and simultaneous review by multiple persons.

6. Despite these unwarranted and intrusive demands, LTRAP made every effort to provide access to documents, including assigning 3 of its staff to work with HUD officials as they reviewed tenant files on the screen. LTRAP is not a large organization, and between the persons assigned to assist your document review, the persons unable to work at their terminals, and the persons who spent hours

14503138.1

NIXON PEABODY LLP

J. Frank Vespa-Papaleo, Chief
June 12, 2013
Page 3

speaking with you during interviews, your onsite investigation essentially brought LTRAP's operations to a halt during the busiest time of the month.

7. Notwithstanding our agreement to limit the interviews to 6 – 8 people on May 29-30, you demanded to interview 9 persons. In a spirit of cooperation, we consented to exceed the previously agreed established.

As this list demonstrates, LTRAP has fully cooperated with HUD's requests for information and to conduct staff interviews. Having worked hard to cooperate with HUD's demands, I am deeply troubled by what appears to be HUD's search for something – anything – that would justify its increasingly intrusive inquiries and by constantly shifting the goal posts of the investigation. It is my understanding that, shortly after receiving LTRAP's original response to Mr. ███████complaint, HUD staff notified LTRAP officials that if LTRAP did not provide a voucher to ███████ – in spite of the fact that LTRAP had found that Mr. ████ had defrauded the United States by accepting two Section 8 subsidies simultaneously – HUD would pursue an investigation until some misconduct was identified.[1] While I am reluctant to label this as retaliation for LTRAP's refusal to perpetuate ██████ embezzlement, I cannot square HUD's ever more burdensome demands with any legitimate investigatory goals at this point.[2]

Indeed, the record demonstrates that HUD has violated its own rules in pursuing this matter. My review indicates that HUD has violated important provisions of its own compliance review rules. Specifically:

1. Your demand for additional documents at the onsite visit on May 29, 2013 violated Handbook 8040.1, Para. 21(b), which requires HUD to send notice of the documents it wants to review prior to an onsite visit. *See* Appendix 3.8 for form letter. While we sought to accommodate all of your requests, they imposed an exceptional and unnecessary burden on LTRAP and its staff. HUD's rules recognize the need to work cooperatively to provide reasonable notice of

---

[1]   Indeed, when we first became involved in this matter, my colleague Richard Price discussed this matter with Ms. Betzy Morales of your staff and advised her to contact HUD's Office of Public and Indian Housing ("PIH") if she wanted to resolve this matter by providing a voucher to someone who could have been referred to HUD's Inspector General for prosecution. In consideration of Mr. ████ age and economic status, LTRAP did not want to subject him to legal process (which might have caused him to lose all subsidies), but it made sure that future fraud was prevented. Ms. Morales never has reported to us about whether she contacted PIH and if so, what advice it provided. Unless she got a clear statement from PIH that Mr. ████ should be given a voucher, however, the entire matter should have been resolved by a finding that Mr. ████ was not entitled to receive a voucher from LTRAP and therefore could not possibly be the victim of discrimination.

[2]   HUD's refusal to acknowledge the facts of this case was underlined dramatically during questioning of Ms. Richter during the onsite interviews, when she was asked about the "termination" of Mr. ████ voucher. As she immediately pointed out, Mr. ████ voucher was never terminated. It expired by its own operation when Mr. ████ failed to move into the unit that he had selected. LTRAP has explained this point consistently in all communications with HUD, but apparently HUD simply cannot accept facts that do not square with its conception of this case. Indeed, the ongoing investigation and compliance review can only be justified by ignoring what actually happened here.

14503138 1

NIXON PEABODY LLP

J. Frank Vespa-Papaleo, Chief
June 12, 2013
Page 4

document needs. Much of the delay and upset that occurred during the onsite
interviews could have been avoided if HUD had complied with the requirements
of its own Handbook and provided us with at least some notice of the additional
materials you needed. Since HUD did notify us of its desire to look at the waiting
list and other administrative lists, it surely had time to advise us that it wanted to
look at tenant files also.

2.   Even more troubling, HUD has violated its obligation to provide due process with
respect to the basis for its compliance review. According to Handbook 8040.1,
HUD is supposed to provide notice about the nature of the allegations against
LTRAP or its program no later than the onsite visit:

> d.  Recipient's Right To Know Allegations. *A recipient of HUD
> financial assistance is entitled to know the allegations against its
> program or those aspects of its program which will be reviewed.*
> Therefore, the investigator shall summarize the allegations and define
> the type of compliance review to be undertaken.

Handbook 8040.1, Para. 21(d) (emphasis added). Aside from the
allegations made by Mr. ▆▆▆ – to which we have provided a full and
exculpatory response – HUD has never provided LTRAP with any
information about "the allegations against its program or those aspects of
its program" which are under review. Perhaps if HUD had provided this
information, some of the extraordinary demands made by HUD would
make some sense. As it is, LTRAP has not been provided with due
process in this compliance review to date. Certainly many of the
questions that were asked during the interviews – such as what holidays
employees received or whether they were required to refer to Rabbi Hertz
by his religious title – are totally impertinent to Mr. ▆▆▆ complaint and
raise deeply troubling questions about HUD's motivations here and what it
thinks it is investigating. Whatever the goals of its investigation are, it is
long past time to share them with LTRAP and to specify how the new
investigatory demands contained in the June 3 Letter relate to those
allegations.[3]

As the large squad of personnel that came to LTRAP's office demonstrates, HUD has
limitless resources at its command and apparently intends to use them on this matter. LTRAP is
a small, public-service oriented organization that has consistently received high scores for
compliance and operations under HUD's PIH Office. There is no way that LTRAP can match

---

[3]   Earlier this year, we received an amended version of Mr. ▆▆▆ complaint. We asserted several objections to
the amended complaint (to which, as of this date, HUD has not responded) and pointed out the amended
complaint did not substantively expand the claims against LTRAP. Nothing in the amended complaint can
explain the widening scope of HUD's investigation or satisfy HUD's duty to explain the allegations against
LTRAP.

14503138 1

J. Frank Vespa-Papaleo, Chief
June 12, 2013
Page 5

the resources HUD can deploy. LTRAP can only rely on faithful observance by HUD of the limits on its investigatory powers and by the protections provided by the Constitution.

LTRAP has cooperated, and will continue to cooperate, with appropriate information requests but we will no longer facilitate a fishing expedition. Before we respond to any further document requests or schedule additional interviews, HUD must provide (1) the full and candid statement of the allegations against LTRAP or its program required by Handbook 8040.1 and (2) an explanation of how the additional information requested in the June 3 Letter relates to those allegations. HUD's invocations of the scope of compliance reviews under 24 CFR §§ 1.6, 1.7, 8.55 and 8.56 do not constitute a statement of the allegations, and *prima facie*, do not support the compliance reviews HUD is pursuing. Nothing in Mr. ██████ complaint could in any way justify this top-to-bottom scouring of LTRAP's employees and their records. If HUD is, as we expect, without any rational basis for this fishing expedition, then HUD must conclude this matter immediately by dismissing ██████ complaint and terminating the compliance reviews, in light of the large, persuasive and exculpatory body of information HUD has already received.

Please provide the information requested above at your earliest opportunity.

Very truly yours,

Harry J. Kelly

HJK
cc:    Jay Golden, FHEO Region 2 Director
       Wanda S. Nieves, Newark FHEO Center Director
       Betzy Morales, FHEO Investigator
       Sonia Burgos, Director, PIH-Newark
       Melissa Bennett, PIH-Newark

14503138.1

# EXHIBIT O



U.S. Department of Housing and Urban Development
Office of Fair Housing & Equal Opportunity, Region 2
Jacob K. Javits Federal Building
26 Federal Plaza, 35th Floor
New York, New York 10278-0068
http://www.hud.gov/local/nyn/



August 23, 2013

CERTIFIED MAIL – RETURN RECEIPT REQUESTED/REGULAR MAIL

Meir N. Hertz, Administrator/CEO
Lakewood Township Rental Assistance Program
600 West Kennedy Boulevard
Lakewood, New Jersey 08701-0871

SUBJECT:   Title VI Compliance Review:        Docket No.:   02-13-R006-6
           Section 504 Compliance Review:     Docket No.:   02-13-R008-4
           ADA Compliance Review:             Docket No.:   02-13-R006-ADA

Dear Mr. Hertz:

The purpose of this letter is to advise you that the U.S. Department of Housing and Urban
Development ("HUD"), Office of Fair Housing and Equal Opportunity ("FHEO") will conduct a
compliance review of the Lakewood Township Rental Assistance Program ("LTRAP"). FHEO
is authorized to conduct reviews of recipients who receive Federal financial assistance in order to
determine their compliance with specific nondiscrimination requirements. LTRAP is a recipient
of Federal financial assistance and, therefore, subject to those requirements. FHEO will
determine whether LTRAP is in compliance with the nondiscrimination requirements of Title VI
of the Civil Rights Act of 1964 ("Title VI"), Section 504 of the Rehabilitation Act of 1973
("Section 504") and Title II of the Americans with Disabilities Act of 1990, as amended
("ADA").

Title VI prohibits discrimination on the basis of race, color or national origin in programs
or activities which receive Federal financial assistance. HUD regulations implementing Title VI
provides for the periodic review of practices of HUD recipients. 24 C.F.R. § 1.7(a). Title VI
states, "No person in the United States shall, on the ground of race, color or national origin, be
excluded from participation in, be denied the benefits of, or be subjected to discrimination under
any program or activity receiving Federal financial assistance." See 42 U.S.C. § 2000d.

Section 504 prohibits discrimination on the basis of disability in programs or activities
which receive Federal financial assistance. HUD regulations implementing Section 504 provides
for periodic review of the practices of HUD recipients. 24 C.F.R. § 8.56(a). Section 504 states,

21

Lakewood Township Rental Assistance Program
Title VI No.:      02-13-R006-6
Section 504 No:  02-13-R008-4
ADA No.:          02-13-R006-ADA

"No otherwise qualified individual with disabilities in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." See 29 U.S.C. § 794.

The ADA prohibits discrimination in services, benefits, or activities of a public entity. Federal regulations implementing the ADA provides for compliance reviews of the practices of HUD recipients.  36 C.F.R. § 35.172.  The ADA states that "[n]o qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." See 42 U.S.C. § 12141.

The compliance review will cover disability issues, and an assessment of LTRAP's efforts to ensure equal opportunity for persons regardless of race, color, national origin or disability which will include, but not be limited to, the services provided to those who are Limited English Proficient.

Enclosed is a request for data.  The data should cover the period of January 1, 2010 to August 31, 2013, unless otherwise indicated.  Please provide the information requested in Section "A" by September 27, 2013.   Please have the information requested in Section "B" available during the on-site review.  Any information identified in Section B that is stored electronically must be printed out for our review and you must permit HUD staff to access the LTRAP computer and printing systems in order to access electronically-stored files, in order for FHEO to verify the information.  This information is requested under the authority of the regulations implementing Title VI, at 24 CFR § 1.6(b), Section 504, at 24 C.F.R § 8.55(b), and the ADA, at 36 C.F.R § 35.172.

These regulatory provisions require that a recipient of Federal financial assistance make available to FHEO information that may be pertinent to reach a compliance determination.  Once the requested data is reviewed, the team leader(s) assigned to conduct the review will contact you and/or your designated representative to schedule an on-site visit.  It is anticipated that the on-site review will commence during the first quarter of Fiscal Year 2014 (October-December 2014).  The exact dates will be confirmed with you by telephone or email.

In addition to LTRAP staff and contractors, FHEO may also conduct interviews with LTRAP recipients and participants, members of the board that oversees LTRAP, members of the public, and others.  Please have LTRAP staff, contractors and Board members available for interviews.  HUD reserves the right to conduct any interview(s) under oath.

LTRAP is also advised that a recipient is prohibited from harassing or intimidating any individual who provides information to FHEO during the compliance review.  Persons interviewed by FHEO will be informed of this prohibition.  If such harassment or intimidation occurs, that person may file a separate complaint alleging these acts.

-2-

Lakewood Township Rental Assistance Program
Title VI No.:      02-13-R006-6
Section 504 No:  02-13-R008-4
ADA No.:         02-13-R006-ADA

It is our intention to complete this review as quickly as possible.  If you have questions pertaining to this review or any of the data requested herein, please contact Ms. Brenda Edmondson, Chief, Compliance Branch, at (973) 776-7307 or by email at brenda.d.edmondson@hud.gov.  You may direct all correspondence in this matter directly to Ms. Edmondson at Newark FHEO Center, One Newark Center, 13th Floor, Newark, NJ 07102.

Thank you for your anticipated cooperation.

Sincerely,

Jay Golden
Region II Director
Office of Fair Housing
     and Equal Opportunity

Enclosures

-3-

23

Lakewood Township Rental Assistance Program
Title VI No.:      02-13-R006-6
Section 504 No:  02-13-R008-4
ADA No.:          02-13-R006-ADA

## DATA REQUEST

## SECTION A

**A.** Please provide the following information **PRIOR TO THE ON-SITE** portion of the compliance review. For each item requested, include copies in all languages (e.g., English, Spanish, etc.) and formats (e.g., large print format, braille, etc.) in which they have been made available. If only available in English, advise accordingly, for each document.

1.  Copies of the following LTRAP documents:

    a.   Admissions and Occupancy Policy/Procedure;
    b.   Section 8 Administrative Plan;
    c.   Resident Selection Plan/Procedure;
    d.   Record Retention Policy;
    e.   Policy regarding storage of LTRAP physical and electronic files;
    f.   Fair Housing Plan;
    g.   Employee Manual;
    h.   (Blank) Caseworker Summary Sheet/Form;
    i.   "RTA" Letter;
    j.   Employee List from 2010 to the present;
    k.   Re-Certification Packet, including the so-called "First Letter" to tenant advising of recertification and inspection letter(s) to participating landlord; and
    l.   Welcome Packet; and
    m.   Application

    For each, please identify date each was created, revised, approved for use, and implemented.

2.  Copies of the following LTRAP documents:

    a.   Section 504 Grievance Procedure;
    b.   Service/Emotional Support Animal and Pet Policies;
    c.   Communication with vision-impaired tenants and applicants policy;
    d.   Section 504 Needs Assessment and Transition Plan;
    e.   Section 504 Self-Evaluation;
    f.   Reasonable Accommodation Policy;
    g.   Reasonable Accommodation Procedure;
    h.   Reasonable Accommodations Forms; and
    i.   Reasonable Accommodations Log

    For each, please identify date each was created, revised, approved for use, and implemented.

-4-

Lakewood Township Rental Assistance Program
Title VI No.:       02-13-R006-6
Section 504 No:    02-13-R008-4
ADA No.:            02-13-R006-ADA

3. Provide a list of all participating landlords paid with LTRAP vouchers/funds, including the name and race/ethnicity of the LTRAP participant, landlord's name, property address, apartment complex name, and the landlord's mailing address and email address, telephone number. For each unit, identify whether the unit is above the Fair Market Rent. In addition, for each unit, identify the amenities of the unit or the building in which the unit is located, including, but not limited to air conditioning, pool, double kitchens, home offices, and fitness rooms/facilities.

4. Provide a copy of LTRAP's "purge" letter and dates of any purging of LTRAP's waitlist, from January 1, 2010 to August 15, 2013, including copies of letters for all individuals sent purge letters. Include copies in all languages and formats that were used for this purpose, and in which they have been made available. If only available in English, advise accordingly.

5. Provide the name, telephone number and email address of the staff member(s) responsible for coordinating tasks relating to Section 504. Provide a copy of their job descriptions and when such duties and functions were assigned and by whom.

6. Copies of the pre-application (if any), application form, and form letters used in notifying applicants of their status for LTRAP's Section 8 Housing Assistance Programs, including Homeownership Program and Family Self Sufficiency Program. Include copies in all languages and formats in which they have been made available. If only available in English, advise accordingly.

7. Current list of all individuals currently on the waiting lists for LTRAP's Section 8 Housing Assistance Program. Include each person's race/ethnicity, family size, bedroom size requested, and disability status. Provide a copy of the computer printout(s), if applicable, and a spreadsheet containing this information.

8. Current list of all individuals currently participating/receiving Section 8 vouchers from LTRAP ("participants" or "voucher holders"). Include each person's race/ethnicity, family size, disability status, and number of bedrooms. Provide a copy of the computer printout(s), if applicable, and a spreadsheet containing this information.

9. Copies of form HUD-50058's for each head of household or family for those currently receiving a Section 8 voucher.

10. As to the Section 8 Housing Assistance Program, Family Self Sufficiency Program and Home Ownership Program, identify the total number of reasonable accommodation requests received by LTRAP for the period from January 1, 2010 through August 15, 2013, on the basis of disability. For each request, please identify the individual's:

   a.    Name;
   b.    Address;
   c.    Telephone number;

25

Lakewood Township Rental Assistance Program
Title VI No.:      02-13-R006-6
Section 504 No:   02-13-R008-4
ADA No.:          02-13-R006-ADA

d.   Email address;
e.   Disability status;
f.   Accommodation requested;
g.   Date of request;
h.   National origin/race;
i.   Limited English Proficiency status;
j.   Disposition of request(Date of action, and was request granted, denied or pending);
k.   Who Reviewed the request; and
l.   Copies of all forms used and/or correspondence sent

Provide all supporting documentation. Include copies in all languages and formats in which they were made available. If only available in English, advise accordingly.

11. Provide a copy of all requests received by LTRAP from January 1, 2010 to August 15, 2013 to have a voucher holder use the voucher to rent from a direct relative. Provide LTRAPs response to these requests.

Please have these files available for review during the on-site portion of this compliance review.

11. Of the participating landlords, identify those landlords that own a residential building with an elevator. Provide the addresses of these buildings, identify whether the elevators were under repair or not in use for any period of time.

12. For LTRAP's Section 8 Housing Assistance Program, Family Self Sufficiency Program and Home Ownership Program, provide a list of applicants and participants who filed grievances, appeals and/or received hearings for the period of January 1, 2010 through August 31, 2013. Identify any applicants and participants who have disabilities and/or are Limited English Proficient. Provide records showing that LTRAP provided communications assistance to those with disabilities and language assistance to those with Limited English Proficient in LTRAP's hearings, as well as to inform such persons about the procedures and grievance process. Identify the dates of the hearings, name of hearing officer, disposition, and whether the person providing any interpretation was provided by LTRAP or by the applicant or participant.

13. The total number of voucher terminations for the period from January 1, 2010 through August 15, 2013. Identify any applicants and voucher holders or participants who have disabilities and those who have Limited English Proficiency. Provide records showing that LTRAP's employees provided language assistance to those with limited English proficiency before LTRAP's voucher termination, as well as to inform such persons about the procedures and grievance process.

14. The total number of employees, full and part-time, including race/ethnicity/color and if any are persons with disabilities, for each position. Identify the same information for any

-6-

Lakewood Township Rental Assistance Program
Title VI No.:      02-13-R006-6
Section 504 No:  02-13-R008-4
ADA No.:          02-13-R006-ADA

individuals who are not employees but provide individual contracted services for LTRAP, including to conduct housing inspections.  Provide a copy of the job description for such employees or contractors and contracts for any employees or contractors.

15. Provide copies of any advertisements, notices, or announcements used to recruit or hire employees or contractors for LTRAP since January 1, 2010, and identify when such were published, where it was published, and the position(s) for which they were published.

16. List of organizations with which LTRAP conducts outreach, and for each organization include the name of the point of contact, email address, and phone number, and last date of contact.

17. Copy of the Language Access Plan (LAP), together with any revisions to same.  Explain when such plan was drafted, revised, approved by the board overseeing LTRAP, and how such LAP was implemented and include all languages in which the policy or implementation information was made available to the public, participants and employees/contractors.

18. Identify all of LTRAP's employees since January 1, 2010 to the present, and identify those who speak languages other than English, including any who communicate through sign language interpretation.  Provide their:

    a.   Name;
    b.   Position;
    c.   Race/national origin;
    d.   Disability status;
    e.   Language(s) spoken;
    f.   Work telephone number;
    g.   Address;
    h.   Email address;
    i.   Schedule (days/hours); and
    j.   Frequency (hours or days per week or month) staff use the non-English language from 2010 to the present to facilitate with LTRAP participants with limited English proficiency in accessing LTRAP's programs and services.

19. Identify if LTRAP has contracted with any individuals or agencies for foreign-language translating or interpreting services for persons with Limited English Proficiency.  If so, provide a copy of such contract, as well as the total amount of payment from LTRAP for such contract for each year since 2010. If no such contract exists, provide the names of any individuals who have provided interpreting or translation services to LTRAP whether paid or as a volunteer, including dates provided, language provided (including sign language), and who from LTRAP requested such service.

20. Advise whether LTRAP or any of its participating landlords require voucher holders or applicants to speak or write English.  If so, identify which properties or landlords have such a policy or procedure, and provide copies of any such procedures or policies.

Lakewood Township Rental Assistance Program
Title VI No.:      02-13-R006-6
Section 504 No:  02-13-R008-4
ADA No.:           02-13-R006-ADA

21. Advise whether LTRAP or any of its participating landlords have policies that prevent a voucher holder from keeping assistance animals. If so, identify which properties or landlords have such a policy or procedure, and provide copies of any such procedures or policies.

22. Identify if LTRAP has been the subject of any local, state or federal inquiry, complaint, charge, investigation or private lawsuit regarding discrimination by any current or former LTRAP employees, applicant, participants or contractors. If any, provide the case name, caption, docket number, date of matter, and disposition of each matter.

23. Provide information about the level of accessibility of LTRAP's website to the disabled and those publications for persons with vision-impairments, as well as the accessibility of LTRAP's website to those with Limited English Proficiency. Also, provide the name and contact information for the individual or contractor responsible for developing, maintaining, or revising LTRAP's website.

24. Identify if LTRAP has on its staff any licensed or certified interpreters or translators for persons with Limited English Proficiency or for persons with hearing-impairments that utilize sign language interpretation or other assistance. Provide a listing of the languages each individual is certified to translate or interpret.

25. Identify which documents or services provided by LTRAP utilize certified or licensed interpreters and/or translators, and provide the accrediting or certification agency.

26. List of participants in the Homeownership Program since 2010, by race, national origin, and disability, and amount of benefit/funds provided by LTRAP for each participant; also provide the address of the property purchased, price of property and seller's name.

27. List of participants in the Family Self Sufficiency Program (FSSP) since 2010, by race, national origin, and disability, and amount of benefit/funds provided by LTRAP for each participant; also include any referrals made by LTRAP on behalf of participants in the FSSP.

28. With regard to LTRAP and the Lakewood Tenant Organization, please provide:

    a. List of all board members from January 1, 2010 to the present, including their names, race, national origin, sex, disability status, date of appointment, length of term, contact information, and resume; also include the names of the officers of the board.

    b. List of the board meeting dates, times and meeting locations since January 1, 2010, including the agenda for each meeting and advertisement(s) of public meeting notification(s);

    c. Minutes of all board meetings from January 1, 2010 to the present; and

    d. Public notices of the board

-8-

28

Lakewood Township Rental Assistance Program
Title VI No.:      02-13-R006-6
Section 504 No:   02-13-R008-4
ADA No.:          02-13-R006-ADA

29. List of all individuals who came off the LTRAP waitlist since January 1, 2010, and indicate:
    a. the date they came off waitlist;
    b. date of lease-up;
    c. address of leased-up property;
    d. landlord's name; and
    e. whether the applicant was determined to be ineligible, reason for ineligibility, and date of ineligibility determination(s).

30. List or calendar of LTRAP's office holiday schedule and closures from January 1, 2010 through 2013 and any notices posted for the public to identify LTRAP's schedule or office closure dates.

31. Written record appointing LTRAP's Section 504 Coordinator, and date of appointment; copy of Board resolution (if any) appointing the Section 504 Coordinator, and copy of all communication to LTRAP staff, contractors or participants about such appointment or existence of a Section 504 Coordinator.

32. Copy of training materials provided to LTRAP staff, contractors or participants regarding the Section 504 Coordinator's functions, Reasonable Accommodations Policy, Reasonable Accommodations Forms, or Language Assistance Plan.

33. Copy of emails from LTRAP management distributing a copy of or information about LTRAP's Section 504 Coordinator, Reasonable Accommodation Policy, Reasonable Accommodation Forms, or Language Assistance Plan.

34. Copy of the Family Self Sufficiency Program Manual, copy of any advertisements and informational flyers disseminated about the program, a list of agencies and partners who were contacted about this program, and locations of public meetings held to create awareness about the program. Provide this documentation from January 1, 2010 through August 15, 2013.

35. Copy of all termination letters LTRAP sent to any voucher holders from January 1, 2010 to August 15, 2013.

38. Copy of each of the following complete files (list attached hereto as Appendix A, and includes Current Section 8 Participants and Applicants on the Waitlist).

29

Lakewood Township Rental Assistance Program
Title VI No.:     02-13-R006-6
Section 504 No:  02-13-R008-4
ADA No.:          02-13-R006-ADA

**Appendix A**

<u>Current Section 8 Participants</u>
1. 5519 -
2. 6096 -
3. 1856 -
4. 1939 -
5. 3035-}
6. 6837 -
7. 0650 -
8. 0157 -
9. 1600- }
10. 6584 -
11. 0215 –
12. 1894 –
13. 2196 –
14. 0564 –
15. 9386 –
16. 7943 –
17. 5232
18. 0410
19. 7045·
20. 7020
21. 3902·
22. 2717
23. 5346·
24. 8571 ·
25. 6942 ·
26. 6182·
27. 5824·
28. 4555·
29. 1090·.
30. 0339·,
31. 0615·
32. 9214·ˈ
33. 5878·
34. 4994·ˌ
35. 0308·ˈ
36. 5570-}
37. 1958·
38. 8548·
39. 8401·
40. 9226-1
41. 4445·
42. 3202·ˈ

Lakewood Township Rental Assistance Program
Title VI No.:      02-13-R006-6
Section 504 No:   02-13-R008-4
ADA No.:          02-13-R006-ADA

43. 1087-
44. 7140
45. 7613-
46. 1767-
47. 4755-
48. 0220-
49. 6267-
50. 0465-l
51. 3665-
52. 9890-
53. 4178-
54. 6137-
55. 7148-
56. 3076-
57. 9443-
58. 3534-
59. 8759-
60. 5050-
61. 2586-
62. 3422-
63. 4721-
64. 9582-
65. 6978-
66. 6529-
67. 1405-
68. 0883-
69. 7169-
70. 1803 ·
71. 3504-l
72. 3903-
73. 4421-
74. 8865-
75. 8745-
76. 1519-
77. 0568-
78. 3664-
79. 06330-Lo
80. 0519-Alv

<u>Waiting List</u>
1. 202650 –
2. 202902 –
3. 202970 –
4. 203677 –
5. 203686-

Lakewood Township Rental Assistance Program
Title VI No.:        02-13-R006-6
Section 504 No:   02-13-R008-4
ADA No.:            02-13-R006-ADA

6.   204077 –
7.   274346 –
8.   274495 –
9.   274556 –
10. 274638 –
11. 274751 –
12. 275479– .
13. 275488 –
14. 275532 –
15. 275706 –
16. 275715– :
17. 275717 –
18. 275741 –
19. 275742 –
20. 275878–
21. 275961–
22. 275962 –
23. 276061 –
24. 276098–
25. 276163·
26. 276166·
27. 276167·
28. 276248·
29. 276249·
30. 276306·
31. 276331·
32. 276333–
33. 276448–
34. 276564–
35. 276632·
36. 276778–
37. 276795·
38. 276860·
39. 276878–
40. 277119·
41. 203594–
42. 276043–
43. 276132·
44. 276170–
45. 276223–
46. 276365–:
47. 276477–
48. 276771·
49. 274841–:
50. 275609·

Lakewood Township Rental Assistance Program
Title VI No.:       02-13-R006-6
Section 504 No:   02-13-R008-4
ADA No.:          02-13-R006-ADA

## SECTION B

B. At the time of the **ON-SITE**, please have the following information and individuals available. Documents must be made available in hard copies and accessible to HUD staff electronically, using LTRAP's computer system:

1.     The Waiting List log, both handwritten and computerized, if applicable.

2.     The Reasonable Accommodation log, both handwritten and computerized, if applicable.

3.     Please provide at least fifty files for the period of 1/1/10 – 12/31/10 for the following:

- Ineligible applicants and subsequent appeals or hearings.
- Terminations and subsequent appeals or hearings.
- Participant complaints, grievances and appeals.

4.     LTRAP employees, LTRAP contractors, and members of the Board of the Lakewood Tenant Organization for interviews.

5.     The total number of new participants in LTRAP's Section 8 Housing Assistance Program for the period 1/1/10 – 10/1/13. Include name, application date, race/ethnicity, preferences, disability status, income, number in household, family or elderly, bedroom size, and date placed in program.

6.     All requests for an exception to 24 C.F.R. §982.306(d) received by LTRAP for the period from January 2010 to date.

# EXHIBIT P

From: Kelly, Harry
Sent: Wednesday, September 11, 2013 11:47 AM
To: Greene, Bryan (Bryan.Greene@hud.gov)
Subject: ███████v. LTRAP, Title VIII No. 02-12-0784-8 (and related proceedings) -- Follow-up

Bryan –

I called your office yesterday to follow-up a matter that I raised with you back in June. It relates to a complaint filed against one of our clients, the Lakewood Township Resident Assistance Program (LTRAP). Following my earlier contact with you, I hoped that the HUD-NJ office had determined to wrap up remaining work on the subject complaint. In recent weeks, however, we have received notice that the HUD-NJ office actually intends to expand the scope of its investigation, far beyond the allegations in the current complaint. At this point, HUD's actions can only be described as burdensome and abusive. My hope is that after reviewing the background below and the attached documents, you will conclude that HUD has whatever it needs in order to complete action on the pending complaint, and, in the absence of any actual evidence supporting the new compliance reviews, can terminate these proceedings as quickly as possible on the basis of the information in its possession now.

Let me outline some of the critical events that have led to this posture:

1. Last fall, LTRAP responded to the original complaint filed by Mr. ███████ and cooperated with HUD's investigation, over the course of several months supplying lengthy responses to HUD's multiple data requests.
2. Earlier this year, HUD sent us an amended complaint, which reasserted most of the allegations that were contained in the original complaint. We responded to this complaint as well.
3. Last May, HUD-NJ scheduled on-site inspection and interviews, bringing in a crew of 15 agents, occupying LTRAP's offices for two full business days, and making it essentially impossible for LTRAP to perform its regular services for its Section 8 clients.
4. When it arrived at LTRAP's offices, HUD demanded to examine additional documents, beyond those previously requested. Because LTRAP maintains its records on a digitized basis, LTRAP had to make computer terminals available to HUD inspectors and to assign its personnel – who had many other client-related tasks to perform – to assist HUD in the unannounced document review.
5. During the on-site interrogation of LTRAP staff, HUD personnel (including HUD-NJ OFHEO Enforcement chief Frank Vespa-Papaleo and Brenda Edmondson, HUD-NJ OFHEO Compliance Branch Chief) posed a wide-variety of questions concerning the religious affiliation of LTRAP's management, including whether LTRAP's Administrator/CEO required the staff to refer to him as "Rabbi" (the answer, of course, was no). These questions had nothing to do with the ███████ complaint itself. This interrogation was impertinent, offensive and – I hate to use this term, but I am at a loss for any other way to put this – anti-Semitic. Nevertheless, I anticipated that, with the exception of a handful of documents identified in the course of these interrogations, HUD had the materials it needed and was prepared to wrap up its investigation.
6. On June 3, 2013, however, after the completion of the on-site inspection, Mr. Vespa-Papaleo sent me a letter (Attachment A), confirming that he intended to schedule a second on-site inspection and attaching a list of

1

another 32 data and document requests, including a request for the complete contents of 130 current Section 8 participants and waiting list applicant files. This list went far beyond the handful of documents discussed during the interrogations and pushed the scope of HUD's investigation even further beyond the narrow focus of Mr. ▉▉▉ complaint.

7.  In a letter dated June 12, 2013 (Attachment B), I responded to Mr. Vespa-Papaleo's message, pointing out the extensive actions that LTRAP had done to cooperate with HUD's investigation. Mr. Vespa-Papaleo had cited Title VI and Section 504 compliance review powers to justify the scope of HUD's investigations, and so in the letter, I pointed out the ways in which HUD's investigations to that point had violated the rules for compliance reviews in Handbook 8040.1. As I pointed out in that letter (pg. 4), the handbook requires HUD to provide notice about the allegations it is facing. HUD has not done that – certainly, nothing in the ▉▉▉ complaints supported the massive scope of the data demand in the June 3, 2013 letter. I demanded that HUD meet its obligations to explain the allegations against LTRAP and how the additional documents demanded by the June 3 letter related to those allegations.

8.  Although I have never received a response to my June 12 letter, I did reach out to you thereafter to express my concerns about HUD's actions to date. In the absence of a response from HUD and any further action on the June 3 requests, I assumed that HUD-NJ had decided in the end that it had whatever it needed to complete its investigation.

9.  In recent weeks, however, it has become clear that HUD intends to restart and expand its investigation of LTRAP. First, on August 23, 2013, Jay Golden, the HUD Region II Director, sent a letter to LTRAP (Attachment C), notifying it that HUD had formally opened compliance reviews of LTRAP under Title IV, Section 504, and the ADA. Attached to the letter are another 38 data requests (most of which have multiple parts), including another demand for copies of 130 tenant and waiting list applicant files. Some of these requests overlap requests made previously by Mr. Vespa-Papaleo but many are new and far more extensive.

10. The August 23 letter also notifies LTRAP that HUD will conduct a separate on-site inspection of LTRAP's office, including a request for yet another 6 sets of documents to review on site and apparently another set of interrogations of LTRAP staff. Please note that Ms. Edmondson, who had participated in the interrogations during the May on-site investigation, was identified as the contact person for these compliance reviews. I cannot conceive of what questions she would pose to LTRAP's staff in connection with these compliance reviews that she did not have an opportunity to ask when she participated vigorously in the interrogations of LTRAP staff last May.

11. The August 23 letter provides no information about the allegations behind the compliance reviews, so it is impossible to understand what HUD is attempting to investigate and whether this latest request has any rational relation to a permissible investigation. As with the questions posed at the on-site investigation in May, many of the data requests attached to the August 23 letter are impertinent and raise serious charges about the motivations behind these compliance reviews. The newest data request, for example, asks for information about LTRAP's office holiday schedule (#30) and information about LTRAP's board, including, among other topics, the members' national origin, race, sex and disability status (#28).

12. Additionally, last week, Mr. Vespa-Papaleo sent me an email message, notifying me that he intended to schedule a second on-site interview and reasserting the document demand contained in the June 3 letter. HUD has already interrogated nine of LTRAP's 18 employees, including its CEO and CFO, and I cannot fathom what useful information further interviews of receptionists and other lower-ranking employees will produce, other than to further harass LTRAP and frustrate its ability to serve its clients.

13. As of the moment, therefore, we have two separate data requests, with a total of 72 data requests and notices that in the coming weeks, HUD will conduct two more sets of on-site interrogations of LTRAP's staff.

LTRAP has cooperated with HUD in the past in investigating the ▉▉▉ complaint, and wants to continue to cooperate with HUD's legitimate oversight activities. But at this point, HUD has gone far beyond the allegations asserted in the ▉▉▉ complaint, and has provided no explanation for its ever-widening inquiries. In more than 20 years of fair housing work, I have never seen such extensive and overblown demands from HUD investigators. The two-pronged investigations now being pursued by HUD are burdensome and abusive, and force LTRAP to divert its resources from serving its clients' needs to answering redundant questions posed by HUD. It is becoming increasingly difficult to resist the conclusion that HUD personnel have decide to launch a campaign against LTRAP and to overwhelm it with

impertinent and harassing demands that raise serious questions about HUD's motivations here. We are not anxious to go to court to seek protection, but it is becoming difficult to believe that LTRAP can expect HUD to act in a neutral, even-handed manner here.

I would like to talk to you after you have read this message and its attachments. My hope is that we can reach an agreement about how HUD can conclude its investigation of the original allegations of the ████ complaint and, in the absence of any other well-founded basis for pursuing compliance reviews, agree to terminate other proceedings as quickly as possible on the basis of the information in its possession now.

Please call me at your earliest opportunity. I look forward to hearing from you soon. Thanks!  HJK


**Harry J. Kelly**
Partner

NIXON PEABODY

401 9th Street NW
Suite 900
Washington, DC 20004-2128
 (202) 585-8712
 (202) 288-4291
 (866) 947-3557
hkelly@nixonpeabody.com
www.nixonpeabody.com

Please consider the environment before printing this email
This email message and any attachments are confidential. If you are not the intended recipient, please immediately reply to the sender and delete the message from your email system. Thank you.

3

# EXHIBIT Q

**Henya Richter**

| | |
|---|---|
| **From:** | Young, Patricia <patricia.young@hud.gov> |
| **Sent:** | Wednesday, August 10, 2011 9:36 AM |
| **To:** | 'henya@ltrap.org' |
| **Subject:** | RE: UNA |
| **Attachments:** | image001.jpg |

If you could please put that comment in the month of June and continue forward that would be great!!  Thanks Henya!!

**From:** henya@ltrap.org [mailto:henya@ltrap.org]
**Sent:** Wednesday, August 10, 2011 8:28 AM
**To:** Young, Patricia
**Subject:** RE: UNA

Sure, can I do it starting with the July submission or do you want me to correct all the months?

Henya Richter, CFO
Lakewood Township
Residential Assistance Program
600 W. Kennedy Blvd.
P.O. Box 856
Lakewood, NJ 08701
732-367-0660 ext 22
732-367-6645 fax
henya@ltrap.org

**From:** Young, Patricia [mailto:patricia.young@hud.gov]
**Sent:** Tuesday, August 09, 2011 1:52 PM
**To:** 'henya@ltrap.org'
**Subject:** UNA

It's me again!! ☺  In regards to the UNA, HQ is going to start looking at the UNA and NRA in VMS, could you please enter a zero in the UNA and then on the Expense/Comments Tab, make the statement about the contract with LTO and that you don't have a UNA.

Thanks Henya!!

# EXHIBIT R

Balance Sheet                                                                 Page 1 of 3



### *Real Estate Assessment Center*

### Financial Assessment Subsystem (FASS-PH)

My Inbox   PHA Info   FDS   DCF   Submit   Edit Flags   Reports   Logout

Balance Sheet

Income Statement

| PHA Information | |
|---|---|
| PHA Code: | NJ214   Fiscal Year End Date: 12/31/2014 |
| PHA Name: | Lakewood Township Residential Assistance Prog |
| Submission Type: | Unaudited/A-133 |
| Program Name: | Housing Choice Vouchers |
| Select Entity: | Program List Mod Rehab Projects |

| Balance Sheet | | | |
|---|---|---|---|
| Line Item # | Description | Value | Details |
| **Assets** | **Current Assets Cash:** | | |
| 111 | Cash - Unrestricted | $ 41097 | - |
| 112 | Cash - Restricted - Modernization and Development | $ | - |
| 113 | Cash - Other Restricted | $ 480995 | [Details] |
| 114 | Cash - Tenant Security Deposits | $ | - |
| 115 | Cash - Restricted for Payment of Current Liabilities | $ | [Details] |
| 100 | **Total Cash** | $ 522092 | - |
| | **Receivables:** | | |
| 121 | Accounts Receivable - PHA Projects | $ | - |
| 122 | Accounts Receivable - HUD Other Projects | $ 9510 | [Details] |
| 124 | Accounts Receivable - Other Government | $ | - |
| 125 | Accounts Receivable - Miscellaneous | $ 12581 | [Details] |
| 126 | Accounts Receivable - Tenants | $ | - |
| 126.1 | Allowance for Doubtful Accounts -Tenants | $ | - |
| 126.2 | Allowance for Doubtful Accounts - Other | $ 0 | - |
| 127 | Notes, Loans, & Mortgages Receivable - Current | $ | - |
| 128 | Fraud Recovery | $ 70525 | - |
| 128.1 | Allowance for Doubtful Accounts - Fraud | $ -70525 | - |
| 129 | Accrued Interest Receivable | $ | - |
| 120 | **Total Receivables, Net of Allowances for Doubtful Accounts** | $ 22091 | - |
| 131 | Investments - Unrestricted | $ | - |
| 132 | Investments - Restricted | $ | [Details] |
| 135 | Investments - Restricted for Payment of Current Liability | $ | [Details] |
| 142 | Prepaid Expenses and Other Assets | $ | - |
| 143 | Inventories | $ | - |
| 143.1 | Allowance for Obsolete Inventories | $ | - |
| 144 | Inter Program Due From | $ 77 | - |
| 145 | Assets Held for Sale | $ | - |
| 150 | **Total Current Assets** | $ 544260 | - |

Balance Sheet

| | | | | |
|---|---|---|---|---|
| | | NonCurrent Assets | | |
| | | Fixed Assets: | | |
| | 161 | Land | $ | - |
| | 162 | Buildings | $ | - |
| | 163 | Furniture, Equipment & Machinery - Dwellings | $ | - |
| | 164 | Furniture, Equipment & Machinery - Administration | $ | - |
| | 165 | Leasehold Improvements | $ | - |
| | 166 | Accumulated Depreciation | $ | - |
| | 167 | Construction in Progress | $ | - |
| | 168 | Infrastructure | $ | - |
| | 160 | Total Capital Assets, Net of Accumulated Depreciation | $ 0 | - |
| | 171 | Notes, Loans and Mortgages Receivable - Non-Current | $ | [Details] |
| | 172 | Notes, Loans, & Mortgages Receivable - Non Current - Past Due | $ | [Details] |
| | 173 | Grants Receivable - Non Current | $ | - |
| | 174 | Other Assets | $ | [Details] |
| | 176 | Investments in Joint Ventures | $ | [Details] |
| | 180 | Total Non-Current Assets | $ 0 | - |
| | 200 | Deferred Outflow of Resources | $ | - |
| | 290 | Total Assets and Deferred Outflow of Resources | $ 544260 | - |
| Liabilities and Equity | | Liabilites | | |
| | | Current Liabilities: | | |
| | 311 | Bank Overdraft | $ | - |
| | 312 | Accounts Payable <= 90 Days | $ 58208 | - |
| | 313 | Accounts Payable >90 Days Past Due | $ | - |
| | 321 | Accrued Wage/Payroll Taxes Payable | $ | - |
| | 322 | Accrued Compensated Absences - Current Portion | $ | - |
| | 324 | Accrued Contingency Liability | $ | - |
| | 325 | Accrued Interest Payable | $ | - |
| | 331 | Accounts Payable - HUD PHA Programs | $ 3863 | [Details] |
| | 332 | Account Payable - PHA Projects | $ | - |
| | 333 | Accounts Payable - Other Government | $ 1194 | - |
| | 341 | Tenant Security Deposits | $ | - |
| | 342 | Unearned Revenue | $ | [Details] |
| | 343 | Current Portion of Long-term Debt - Capital Projects/Mortgage Revenue Bonds | $ | - |
| | 344 | Current Portion of Long-term Debt - Operating Borrowings | $ | - |
| | 345 | Other Current Liabilities | $ | - |
| | 346 | Accrued Liabilities - Other | $ | - |
| | 347 | Inter Program - Due To | $ | - |
| | 348 | Loan Liability - Current | $ | [Details] |
| | 310 | Total Current Liabilities | $ 63265 | - |
| | | NonCurrent Liabilities: | | |
| | 351 | Long-term Debt, Net of Current - Capital Projects/Mortgage Revenue | $ | [Details] |

Balance Sheet

| | | | |
|---|---|---|---|
| | ~~Projects/Mortgage Revenue~~ | | |
| 352 | Long-term Debt, Net of Current - Operating Borrowings | $ | - |
| 353 | Non-current Liabilities - Other | $ 293611 | |
| 354 | Accrued Compensated Absences - Non Current | $ | - |
| 355 | Loan Liability - Non Current | $ | [Details] |
| 356 | FASB 5 Liabilities | $ | |
| 357 | Accrued Pension and OPEB Liabilities | $ | [Details] |
| 350 | **Total Non-Current Liabilities** | $ 293611 | - |
| 300 | **Total Liabilities** | $ 356876 | - |
| 400 | Deferred Inflow of Resources | $ | - |
| Equity | **Equity** | | |
| 508.4 | Net Investment in Capital Assets | $ | - |
| 511.4 | Restricted Net Position | $ 187384 | - |
| 512.4 | Unrestricted Net Position | $ 0 | - |
| 513 | **Total Equity - Net Assets / Position** | $ 187384 | - |
| 600 | **Total Liabilities, Deferred Inflows of Resources and Equity - Net Assets/Position** | $ 544260 | - |

[ Save ] [ Reset ]

**Note:**
# If you add or alter line items, press the SAVE button to save all your changes.
# When you press the SAVE button, all totals fields will be calculated and displayed.
# All fields marked with * are mandatory.

Income Statement                                                      Page 1 of 3



### *Real Estate Assessment Center*

## Financial Assessment Subsystem (FASS-PH)

My Inbox   PHA Info   FDS   DCF   Submit   Edit Flags   Reports   Logout

Balance Sheet
Income Statement

| PHA Information | |
|---|---|
| PHA Code: | NJ214        Fiscal Year End Date:12/31/2014 |
| PHA Name: | Lakewood Township Residential Assistance Prog |
| Submission Type: | Unaudited/A-133 |
| Program Name: | Housing Choice Vouchers |
| Select Entity: | Program List Mod Rehab Projects |

### Income Statement

| Line Item # | Description | Value | Details |
|---|---|---|---|
| 70300 | Net Tenant Rental Revenue | $ | - |
| 70400 | Tenant Revenue - Other | $ | - |
| 70500 | Total Tenant Revenue | $ 0 | - |
| 70600 | HUD PHA Operating Grants | $ 15941689 | [Details] |
| 70610 | Capital Grants | $ | - |
| 70800 | Other Government Grants | $ | - |
| 71100 | Investment Income - Unrestricted | $ | [Details] |
| 71200 | Mortgage Interest Income | $ | - |
| 71300 | Proceeds from Disposition of Assets Held for Sale | $ | - |
| 71310 | Cost of Sale of Assets | $ | - |
| 71400 | Fraud Recovery | $ 18534 | [Details] |
| 71500 | Other Revenue | $ 686373 | - |
| 71600 | Gain or Loss on Sale of Capital Assets | $ | - |
| 72000 | Investment Income - Restricted | $ | [Details] |
| 70000 | Total Revenue: | $ 16646596 | - |
| | Expenses | | |
| | Administrative: | | |
| 91100 | Administrative Salaries | $ | - |
| 91200 | Auditing Fees | $ 10263 | - |
| 91300 | Management Fee | $ | [Details] |
| 91310 | Book-keeping Fee | $ | - |
| 91400 | Advertising and Marketing | $ | - |
| 91500 | Employee Benefit contributions - Administrative | $ | - |
| 91600 | Office Expenses | $ | - |
| 91700 | Legal Expense | $ | - |
| 91800 | Travel | $ | - |
| 91810 | Allocated Overhead | $ | - |
| 91900 | Other | $ 1027910 | - |
| 91000 | Total Operating - Administrative | $ 1038173 | - |
| 92000 | Asset Management Fee | $ | - |

Income Statement

| | Tenant Services | | |
|---|---|---|---|
| 92100 | Tenant Services - Salaries | $ | - |
| 92200 | Relocation Costs | $ | - |
| 92300 | Employee Benefit Contributions - Tenant Services | $ | - |
| 92400 | Tenant Services - Other | $ | - |
| 92500 | Total Tenant Services | $ 0 | - |
| | Utilities | | |
| 93100 | Water | $ | - |
| 93200 | Electricity | $ | - |
| 93300 | Gas | $ | - |
| 93400 | Fuel | $ | - |
| 93500 | Labor | $ | - |
| 93600 | Sewer | $ | - |
| 93700 | Employee Benefit Contributions - Utilities | $ | - |
| 93800 | Other Utilities Expense | $ | - |
| 93000 | Total Utilities | $ 0 | - |
| | Ordinary Maintenance and Operations: | | |
| 94100 | Ordinary Maintenance and Operations - Labor | $ | - |
| 94200 | Ordinary Maintenance and Operations - Materials and Other | $ | - |
| 94300 | Ordinary Maintenance and Operations Contracts | $ | - |
| 94500 | Employee Benefit Contributions - Ordinary Maintenance | $ | - |
| 94000 | Total Maintenance | $ 0 | - |
| 95100 | Protective Services - Labor | $ | - |
| 95200 | Protective Services - Other Contract Costs | $ | - |
| 95300 | Protective Services - Other | $ | - |
| 95500 | Employee Benefit Contributions - Protective Services | $ | - |
| 95000 | Total Protective Services | $ 0 | - |
| 96110 | Property Insurance | $ | - |
| 96120 | Liability Insurance | $ | - |
| 96130 | Workmen's Compensation | $ | - |
| 96140 | All Other Insurance | $ | - |
| 96100 | Total Insurance Premiums | $ 0 | - |
| | General Expenses: | | |
| 96200 | Other General Expenses | $ | - |
| 96210 | Compensated Absences | $ | - |
| 96300 | Payments in Lieu of Taxes | $ | - |
| 96400 | Bad debt - Tenant Rents | $ | - |
| 96500 | Bad debt - Mortgages | $ | - |
| 96600 | Bad debt - Other | $ | - |
| 96800 | Severance Expense | $ | - |
| 96000 | Total Other General Expenses | $ 0 | - |
| 96710 | Interest of Mortgage (or Bonds) Payable | $ | - |
| 96720 | Interest on Notes Payable (Short and Long Term) | $ | - |

Income Statement

| | | | |
|---|---|---|---|
| 96730 | Amortization of Bond Issue Costs | $ | - |
| 96700 | Total Interest Expense and Amortization Cost | $ 0 | - |
| 96900 | Total Operating Expenses | $ 1038173 | - |
| 97000 | Excess of Operating Revenue over Operating Expenses | $ 15608423 | - |
| 97100 | Extraordinary Maintenance | $ | - |
| 97200 | Casualty Losses - Non-capitalized | $ | - |
| 97300 | Housing Assistance Payments | $ 14739804 | [Details] |
| 97350 | HAP Portability-In | $ 681235 | - |
| 97400 | Depreciation Expense | $ | - |
| 97500 | Fraud Losses | $ | - |
| 97800 | Dwelling Units Rent Expense | $ | - |
| 90000 | Total Expenses | $ 16459212 | - |
| 10010 | Operating Transfer In | $ | - |
| 10020 | Operating transfer Out | $ | - |
| 10030 | Operating Transfers from/to Primary Government | $ | - |
| 10040 | Operating Transfers from/to Component Unit | $ | - |
| 10070 | Extraordinary Items, Net Gain/Loss | $ | - |
| 10080 | Special Items (Net Gain/Loss) | $ | - |
| 10093 | Transfers between Program and Project - In | $ | - |
| 10094 | Transfers between Project and Program - Out | $ | - |
| 10100 | Total Other financing Sources (Uses) | $ 0 | - |
| 10000 | Excess (Deficiency) of Total Revenue Over (Under) Total Expenses | $ 187384 | - |
| | Memo Account Information: | | |
| *11020 | Required Annual Debt Principal Payments | $ 0 | - |
| *11030 | Beginning Equity | $ 0 | - |
| 11040 | Prior Period Adjustments, Equity Transfers and Correction of Errors | $ | [Details] |
| *11170 | Administrative Fee Equity | $ 0 | [Details] |
| *11180 | Housing Assistance Payments Equity | $ 187384 | [Details] |
| *11190 | Unit Months Available | 12696 | [Details] |
| *11210 | Number of Unit Months Leased | 12379 | - |

| Save | | Reset | | Validate |

Note:
# If you add or alter line items, press the SAVE button to save all your changes.
# When you press the SAVE button, all totals fields will be calculated and displayed.
# All fields marked with * are mandatory.



# *Real Estate Assessment Center*

## Financial Assessment Subsystem (FASS-PH)

My Inbox   PHA Info   FDS   DCF   Submit   Edit Flags   Reports   Logout

BalanceSheet+

Income Statement+

|  | PHA Information | |
|---|---|---|
| PHA Code: | NJ214   Fiscal Year End Date: 12/31/2013 | |
| PHA Name: | Lakewood Township Residential Assistance Prog | |
| Submission Type: | Unaudited/Non-A-133 | |
| Program Name: | Housing Choice Vouchers | |
| Select Entity: | | Program List Mod Rehab Projects |

|  | Balance Sheet | | |
|---|---|---|---|
| Line Item # | Description | Value | Details |
| **Assets** | **Current Assets Cash:** | | |
| 111 | Cash - Unrestricted | $ | - |
| 112 | Cash - Restricted - Modernization and Development | $ | - |
| 113 | Cash - Other Restricted | $ 676973 | - |
| 114 | Cash - Tenant Security Deposits | $ | - |
| 115 | Cash - Restricted for Payment of Current Liabilities | $ | - |
| **100** | **Total Cash** | **$ 676973** | - |
|  | **Receivables:** | | |
| 121 | Accounts Receivable - PHA Projects | $ 4985 | - |
| 122 | Accounts Receivable - HUD Other Projects | $ | [Details] |
| 124 | Accounts Receivable - Other Government | $ | : |
| 125 | Accounts Receivable - Miscellaneous | $ | [Details] |
| 126 | Accounts Receivable - Tenants | $ | - |
| 126.1 | Allowance for Doubtful Accounts -Tenants | $ | - |
| 126.2 | Allowance for Doubtful Accounts - Other | $ 0 | - |
| 127 | Notes, Loans, & Mortgages Receivable - Current | $ | - |
| 128 | Fraud Recovery | $ 32232 | - |
| 128.1 | Allowance for Doubtful Accounts - Fraud | $ -31036 | - |
| 129 | Accrued Interest Receivable | $ | - |
| **120** | **Total Receivables, Net of Allowances for Doubtful Accounts** | **$ 6181** | - |
| 131 | Investments - Unrestricted | $ | - |
| 132 | Investments - Restricted | $ | - |
| 135 | Investments - Restricted for Payment of Current Liability | $ | - |
| 142 | Prepaid Expenses and Other Assets | $ | - |
| 143 | Inventories | $ | - |

Balance Sheet

| | | | |
|---|---|---|---|
| 143.1 | Allowance for Obsolete Inventories | $ | - |
| 144 | Inter Program Due From | $ 75 | - |
| 145 | Assets Held for Sale | $ | - |
| 150 | Total Current Assets | $ 683229 | - |
| | NonCurrent Assets | | |
| | Fixed Assets: | | |
| 161 | Land | $ | - |
| 162 | Buildings | $ | - |
| 163 | Furniture, Equipment & Machinery - Dwellings | $ | - |
| 164 | Furniture, Equipment & Machinery - Administration | $ | - |
| 165 | Leasehold Improvements | $ | - |
| 166 | Accumulated Depreciation | $ | - |
| 167 | Construction in Progress | $ | - |
| 168 | Infrastructure | $ | - |
| 160 | Total Capital Assets, Net of Accumulated Depreciation | $ 0 | - |
| 171 | Notes, Loans and Mortgages Receivable - Non-Current | $ | [Details] |
| 172 | Notes, Loans, & Mortgages Receivable - Non Current - Past Due | $ | [Details] |
| 173 | Grants Receivable - Non Current | $ | - |
| 174 | Other Assets | $ | [Details] |
| 176 | Investments in Joint Ventures | $ | [Details] |
| 180 | Total Non-Current Assets | $ 0 | - |
| 190 | Total Assets: | $ 683229 | - |
| 200 | Deferred Outflow of Resources | $ | - |
| 290 | Total Assets and Deferred Outflow of Resources | $ 683229 | - |
| Liabilities and Equity | Liabilites | | |
| | Current Liabilities: | | |
| 311 | Bank Overdraft | $ | - |
| 312 | Accounts Payable < = 90 Days | $ 65268 | - |
| 313 | Accounts Payable >90 Days Past Due | $ | - |
| 321 | Accrued Wage/Payroll Taxes Payable | $ | - |
| 322 | Accrued Compensated Absences - Current Portion | $ | - |
| 324 | Accrued Contingency Liability | $ | - |
| 325 | Accrued Interest Payable | $ | - |
| 331 | Accounts Payable - HUD PHA Programs | $ 289338 | [Details] |
| 332 | Account Payable - PHA Projects | $ | - |
| 333 | Accounts Payable - Other Government | $ 3936 | - |
| 341 | Tenant Security Deposits | $ | - |
| 342 | Unearned Revenue | $ | [Details] |
| 343 | Current Portion of Long-term Debt - Capital Projects/Mortgage Revenue Bonds | $ | [Details] |

Balance Sheet

| | | | |
|---|---|---|---|
| | Projects/Mortgage Revenue Bonds | | |
| 344 | Current Portion of Long-term Debt - Operating Borrowings | $ | - |
| 345 | Other Current Liabilities | $ | - |
| 346 | Accrued Liabilities - Other | $ | - |
| 347 | Inter Program - Due To | $ | - |
| 348 | Loan Liability - Current | $ | [Details] |
| 310 | Total Current Liabilities | $ 358542 | - |
| | NonCurrent Liabilities: | | |
| 351 | Long-term Debt, Net of Current - Capital Projects/Mortgage Revenue | $ | [Details] |
| 352 | Long-term Debt, Net of Current - Operating Borrowings | $ | - |
| 353 | Non-current Liabilities - Other | $ 324687 | - |
| 354 | Accrued Compensated Absences - Non Current | $ | - |
| 355 | Loan Liability - Non Current | $ | [Details] |
| 356 | FASB 5 Liabilities | $ | - |
| 357 | Accrued Pension and OPEB Liabilities | $ | [Details] |
| 350 | Total Non-Current Liabilities | $ 324687 | - |
| 300 | Total Liabilities | $ 683229 | - |
| 400 | Deferred Inflow of Resources | $ | - |
| Equity | Equity | | |
| 508.4 | Net Investment In Capital Assets | $ | - |
| 511.4 | Restricted Net Position | $ | - |
| 512.4 | Unrestricted Net Position | $ 0 | - |
| 513 | Total Equity - Net Assets / Position | $ 0 | - |
| 600 | Total Liab., Def. Inflow of Res., and Equity - Net Assets / Position | $ 683229 | - |

Save   Reset

Note:
# If you add or alter line items, press the SAVE button to save all your changes.
# When you press the SAVE button, all totals fields will be calculated and displayed.
# All fields marked with * are mandatory.



## *Real Estate Assessment Center*

### Financial Assessment Subsystem (FASS-PH)

| My Inbox | PHA Info | FDS | OCF | Submit | Edit Flags | Reports | Logout |
|---|---|---|---|---|---|---|---|

BalanceSheet+

Income Statement+

| PHA Information | |
|---|---|
| PHA Code: | NJ214    Fiscal Year End Date: 12/31/2013 |
| PHA Name: | Lakewood Township Residential Assistance Prog |
| Submission Type: | Unaudited/Non-A-133 |
| Program Name: | Housing Choice Vouchers |
| Select Entity: | Program List  Mod Rehab Projects |

### Income Statement

| Line Item # | Description | Value | Details |
|---|---|---|---|
| 70300 | Net Tenant Rental Revenue | $ | - |
| 70400 | Tenant Revenue - Other | $ | - |
| **70500** | **Total Tenant Revenue** | **$ 0** | - |
| 70600 | HUD PHA Operating Grants | $ 14831762 | [Details] |
| 70610 | Capital Grants | $ | - |
| 70800 | Other Government Grants | $ | - |
| 71100 | Investment Income - Unrestricted | $ | [Details] |
| 71200 | Mortgage Interest Income | $ | - |
| 71300 | Proceeds from Disposition of Assets Held for Sale | $ | - |
| 71310 | Cost of Sale of Assets | $ | - |
| 71400 | Fraud Recovery | $ 51062 | [Details] |
| 71500 | Other Revenue | $ 707178 | - |
| 71600 | Gain or Loss on Sale of Capital Assets | $ | - |
| 72000 | Investment Income - Restricted | $ 1599 | [Details] |
| **70000** | **Total Revenue:** | **$ 15591601** | - |
| | **Expenses** | | |
| | **Administrative:** | | |
| 91100 | Administrative Salaries | $ | - |
| 91200 | Auditing Fees | $ 9775 | - |
| 91300 | Management Fee | $ | - |
| 91310 | Book-keeping Fee | $ | - |
| 91400 | Advertising and Marketing | $ | - |
| 91500 | Employee Benefit contributions - Administrative | $ | - |
| 91600 | Office Expenses | $ | - |
| 91700 | Legal Expense | $ | - |
| 91800 | Travel | $ | - |
| 91810 | Allocated Overhead | $ | - |

Income Statement

| | | | |
|---|---|---|---|
| 91810 | Allocated Overhead | $ | - |
| 91900 | Other | $ 886229 | - |
| **91000** | **Total Operating - Administrative** | **$ 896004** | - |
| 92000 | Asset Management Fee | $ | - |
| | **Tenant Services** | | |
| 92100 | Tenant Services - Salaries | $ | - |
| 92200 | Relocation Costs | $ | - |
| 92300 | Employee Benefit Contributions - Tenant Services | $ | - |
| 92400 | Tenant Services - Other | $ 51140 | - |
| **92500** | **Total Tenant Services** | **$ 51140** | - - |
| | **Utilities** | | |
| 93100 | Water | $ | - |
| 93200 | Electricity | $ | - |
| 93300 | Gas | $ | - |
| 93400 | Fuel | $ | - |
| 93500 | Labor | $ | - |
| 93600 | Sewer | $ | - |
| 93700 | Employee Benefit Contributions - Utilities | $ | - |
| 93800 | Other Utilities Expense | $ | - |
| **93000** | **Total Utilities** | **$ 0** | - |
| | **Ordinary Maintenance and Operations:** | | |
| 94100 | Ordinary Maintenance and Operations - Labor | $ | - |
| 94200 | Ordinary Maintenance and Operations - Materials and Other | $ | - |
| 94300 | Ordinary Maintenance and Operations Contracts | $ | - |
| 94500 | Employee Benefit Contributions - Ordinary Maintenance | $ | - |
| **94000** | **Total Maintenance** | **$ 0** | - |
| 95100 | Protective Services - Labor | $ | - |
| 95200 | Protective Services - Other Contract Costs | $ | - |
| 95300 | Protective Services - Other | $ | - |
| 95500 | Employee Benefit Contributions - Protective Services | $ | - |
| **95000** | **Total Protective Services** | **$ 0** | - |
| 96110 | Property Insurance | $ | - |
| 96120 | Liability Insurance | $ | - |
| 96130 | Workmen's Compensation | $ | - |
| 96140 | All Other Insurance | $ | - |
| **96100** | **Total Insurance Premiums** | **$ 0** | - |
| | **General Expenses:** | | |
| 96200 | Other General Expenses | $ | - |
| 96210 | Compensated Absences | $ | - |
| 96300 | Payments In Lieu of Taxes | $ | - |

Income Statement                                                                                                Page 3 of 4

| Code | Description | Amount | Details |
|------|-------------|--------|---------|
| 96400 | Bad debt - Tenant Rents | $ | |
| 96500 | Bad debt - Mortgages | $ | |
| 96600 | Bad debt - Other | $ | |
| 96800 | Severance Expense | $ | |
| 96000 | Total Other General Expenses | $ 0 | |
| 96710 | Interest of Mortgage (or Bonds) Payable | $ | |
| 96720 | Interest on Notes Payable (Short and Long Term) | $ | |
| 96730 | Amortization of Bond Issue Costs | $ | |
| 96700 | Total Interest Expense and Amortization Cost | $ 0 | |
| 96900 | Total Operating Expenses | $ 947144 | |
| 97000 | Excess of Operating Revenue over Operating Expenses | $ 14644457 | |
| 97100 | Extraordinary Maintenance | $ | |
| 97200 | Casualty Losses - Non-capitalized | $ | |
| 97300 | Housing Assistance Payments | $ 15314994 | [Details] |
| 97350 | HAP Portability-In | $ 681978 | |
| 97400 | Depreciation Expense | $ 0 | |
| 97500 | Fraud Losses | $ | |
| 97800 | Dwelling Units Rent Expense | $ | |
| 90000 | Total Expenses | $ 16944116 | |
| 10010 | Operating Transfer In | $ | |
| 10020 | Operating transfer Out | $ | |
| 10030 | Operating Transfers from/to Primary Government | $ | |
| 10040 | Operating Transfers from/to Component Unit | $ -50731 | |
| 10070 | Extraordinary Items, Net Gain/Loss | $ | |
| 10080 | Special Items (Net Gain/Loss) | $ | |
| 10093 | Transfers between Program and Project - In | $ | |
| 10094 | Transfers between Project and Program - Out | $ | |
| 10100 | Total Other financing Sources (Uses) | $ -50731 | |
| 10000 | Excess (Deficiency) of Total Revenue Over (Under) Total Expenses | $ -1403246 | |
| | Memo Account Information: | | |
| *11020 | Required Annual Debt Principal Payments | $ 0 | |
| *11030 | Beginning Equity | $ 645329 | |
| 11040 | Prior Period Adjustments, Equity Transfers and Correction of Errors | $ 757917 | [Details] |
| *11170 | Administrative Fee Equity | $ 0 | [Details] |
| *11180 | Housing Assistance Payments Equity | $ 0 | [Details] |
| *11190 | Unit Months Available | 12696 | [Details] |
| *11210 | Number of Unit Months Leased | 12484 | |

| Save | Reset | Validate |

Income Statement

**Note:**

\# If you add or alter line items, press the SAVE button to save all your changes.

\# When you press the SAVE button, all totals fields will be calculated and displayed.

\# All fields marked with * are mandatory.

Balance Sheet                                                                    Page 1 of 3



# Real Estate Assessment Center
## Financial Assessment Subsystem (FASS-PH)

| My Inbox | PHA Info | FDS | DCF | Submit | Edit Flags | Reports | Logout |
|----------|----------|-----|-----|--------|-----------|---------|--------|

BalanceSheet ♦
Income Statement ♦

**PHA Information**

| | |
|---|---|
| PHA Code: | NJ214   Fiscal Year End Date:12/31/2012 |
| PHA Name: | Lakewood Township Residential Assistance Prog |
| Submission Type: | Unaudited/A-133 |
| Program Name: | Housing Choice Vouchers |
| Select Entity: | Program List Mod Rehab Projects |

## Balance Sheet

| Line Item # | Description | Value | Details |
|---|---|---|---|
| **Assets** | **Current Assets Cash:** | | |
| 111 | Cash - Unrestricted | $ | - |
| 112 | Cash - Restricted - Modernization and Development | $ | - |
| 113 | Cash - Other Restricted | $ 808893 | - |
| 114 | Cash - Tenant Security Deposits | $ | - |
| 115 | Cash - Restricted for Payment of Current Liabilities | $ | - |
| **100** | **Total Cash** | $ 808893 | - |
| | **Receivables:** | | |
| 121 | Accounts Receivable - PHA Projects | $ | - |
| 122 | Accounts Receivable - HUD Other Projects | $ 1514 | - |
| 124 | Accounts Receivable - Other Government | $ 130148 | - |
| 125 | Accounts Receivable - Miscellaneous | $ | - |
| 126 | Accounts Receivable - Tenants | $ | - |
| 126.1 | Allowance for Doubtful Accounts -Tenants | $ | - |
| 126.2 | Allowance for Doubtful Accounts - Other | $ 0 | - |
| 127 | Notes, Loans, & Mortgages Receivable - Current | $ | - |
| 128 | Fraud Recovery | $ 24744 | - |
| 128.1 | Allowance for Doubtful Accounts - Fraud | $ -18243 | - |
| 129 | Accrued Interest Receivable | $ | - |
| 120 | Total Receivables, Net of Allowances for Doubtful Accounts | $ 138163 | - |
| 131 | Investments - Unrestricted | $ | - |
| 132 | Investments - Restricted | $ | - |
| 135 | Investments - Restricted for Payment of Current Liability | $ | - |
| 142 | Prepaid Expenses and Other Assets | $ | - |
| 143 | Inventories | $ | - |

Balance Sheet

| | | | |
|---|---|---|---|
| 143.1 | Allowance for Obsolete Inventories | $ | - |
| 144 | Inter Program Due From | $ | - |
| 145 | Assets Held for Sale | $ | - |
| 150 | **Total Current Assets** | $ 947056 | - |
| | **NonCurrent Assets** | | |
| | **Fixed Assets:** | | |
| 161 | Land | $ | - |
| 162 | Buildings | $ | - |
| 163 | Furniture, Equipment & Machinery - Dwellings | $ | - |
| 164 | Furniture, Equipment & Machinery - Administration | $ | - |
| 165 | Leasehold Improvements | $ | - |
| 166 | Accumulated Depreciation | $ | - |
| 167 | Construction in Progress | $ | - |
| 168 | Infrastructure | $ | - |
| 160 | **Total Capital Assets, Net of Accumulated Depreciation** | $ 0 | - |
| 171 | Notes, Loans and Mortgages Receivable - Non-Current | $ | - |
| 172 | Notes, Loans, & Mortgages Receivable - Non Current - Past Due | $ | - |
| 173 | Grants Receivable - Non Current | $ | - |
| 174 | Other Assets | $ | - |
| 176 | Investments in Joint Ventures | $ | - |
| 180 | **Total Non-Current Assets** | $ 0 | - |
| 190 | **Total Assets:** | $ 947056 | - |
| **Liabilities and Equity** | **Liabilities** | | |
| | **Current Liabilities:** | | |
| 311 | Bank Overdraft | $ | - |
| 312 | Accounts Payable <= 90 Days | $ 17766 | - |
| 313 | Accounts Payable >90 Days Past Due | $ | - |
| 321 | Accrued Wage/Payroll Taxes Payable | $ | - |
| 322 | Accrued Compensated Absences - Current Portion | $ | - |
| 324 | Accrued Contingency Liability | $ | - |
| 325 | Accrued Interest Payable | $ | - |
| 331 | Accounts Payable - HUD PHA Programs | $ | - |
| 332 | Account Payable - PHA Projects | $ | - |
| 333 | Accounts Payable - Other Government | $ 9145 | - |
| 341 | Tenant Security Deposits | $ | - |
| 342 | Deferred Revenues | $ | - |
| 343 | Current Portion of Long-term Debt - Capital Projects/Mortgage Revenue Bonds | $ | - |
| 344 | Current Portion of Long-term Debt - Operating Borrowings | $ | - |

Balance Sheet

| | | | |
|---|---|---|---|
| 345 | Other Current Liabilities | $ | - |
| 346 | Accrued Liabilities - Other | $ | - - |
| 347 | Inter Program - Due To | $ | - |
| 348 | Loan Liability - Current | $ | - |
| **310** | **Total Current Liabilities** | **$ 26911** | - |
| | **NonCurrent Liabilities:** | | |
| 351 | Long-term Debt, Net of Current - Capital Projects/Mortgage Revenue | $ | - |
| 352 | Long-term Debt, Net of Current - Operating Borrowings | $ | - |
| 353 | Non-current Liabilities - Other | $ 274816 | - |
| 354 | Accrued Compensated Absences - Non Current | $ | - |
| 355 | Loan Liability - Non Current | $ | - |
| 356 | FASB 5 Liabilities | $ | - |
| 357 | Accrued Pension and OPEB Liabilities | $ | - |
| **350** | **Total Non-Current Liabilities** | **$ 274816** | - |
| **300** | **Total Liabilities** | **$ 301727** | - |
| **Equity** | **Equity** | | |
| 508.1 | Invested In Capital Assets, Net of Related Debt | $ | - |
| 511.1 | Restricted Net Assets | $ 645329 | - |
| *512.1 | Unrestricted Net Assets | $ 0 | - |
| **513** | **Total Equity/Net Assets** | **$ 645329** | - |
| **600** | **Total Liabilities and Equity/Net Assets:** | **$ 947056** | - |

Save    Reset

**Note:**
# If you add or alter line items, press the SAVE button to save all your changes.
# When you press the SAVE button, all totals fields will be calculated and displayed.
# All fields marked with * are mandatory.



# Real Estate Assessment Center

## Financial Assessment Subsystem (FASS-PH)

My Inbox | PHA Info | FDS | DCF | Submit | Edit Flags | Reports | Logout

BalanceSheet+

Income Statement +

| PHA Information | |
|---|---|
| PHA Code: | NJ214    Fiscal Year End Date:12/31/2012 |
| PHA Name: | Lakewood Township Residential Assistance Prog |
| Submission Type: | Unaudited/A-133 |
| Program Name: | Housing Choice Vouchers |
| Select Entity: | Program List Mod Rehab Projects |

| Income Statement | | | |
|---|---|---|---|
| Line Item # | Description | Value | Details |
| 70300 | Net Tenant Rental Revenue | $ | - |
| 70400 | Tenant Revenue - Other | $ | - |
| 70500 | Total Tenant Revenue | $ 0 | - |
| 70600 | HUD PHA Operating Grants | $ 14970052 | [Details] |
| 70610 | Capital Grants | $ | - |
| 70800 | Other Government Grants | $ | - |
| 71100 | Investment Income - Unrestricted | $ | [Details] |
| 71200 | Mortgage Interest Income | $ | - |
| 71300 | Proceeds from Disposition of Assets Held for Sale | $ | - |
| 71310 | Cost of Sale of Assets | $ | - |
| 71400 | Fraud Recovery | $ 33944 | [Details] |
| 71500 | Other Revenue | $ 682168 | - |
| 71600 | Gain or Loss on Sale of Capital Assets | $ | - |
| 72000 | Investment Income - Restricted | $ 8776 | [Details] |
| 70000 | Total Revenue | $ 15694940 | - |
| | Expenses | | |
| | Administrative: | | |
| 91100 | Administrative Salaries | $ | - |
| 91200 | Auditing Fees | $ 9776 | - |
| 91300 | Management Fee | $ | - |
| 91310 | Book-keeping Fee | $ | - |
| 91400 | Advertising and Marketing | $ | - |
| 91500 | Employee Benefit contributions - Administrative | $ | - |
| 91600 | Office Expenses | $ | - |
| 91700 | Legal Expense | $ | - |
| 91800 | Travel | $ | - |
| 91810 | Allocated Overhead | $ | - |

Income Statement

| | | | |
|---|---|---|---|
| 91610 | Allocated Overhead | $ | - |
| 91900 | Other | $ 1046614 | - |
| 91000 | Total Operating - Administrative | $ 1056390 | - |
| 92000 | Asset Management Fee | $ | - |
| | Tenant Services | | |
| 92100 | Tenant Services - Salaries | $ | - |
| 92200 | Relocation Costs | $ | - |
| 92300 | Employee Benefit Contributions - Tenant Services | $ | - |
| 92400 | Tenant Services - Other | $ 51098 | - |
| 92500 | Total Tenant Services | $ 51098 | - |
| | Utilities | | |
| 93100 | Water | $ | - |
| 93200 | Electricity | $ | - |
| 93300 | Gas | $ | - |
| 93400 | Fuel | $ | - |
| 93500 | Labor | $ | - |
| 93600 | Sewer | $ | - |
| 93700 | Employee Benefit Contributions - Utilities | $ | - |
| 93800 | Other Utilities Expense | $ | - |
| 93000 | Total Utilities | $ 0 | - |
| | Ordinary Maintenance and Operations: | | |
| 94100 | Ordinary Maintenance and Operations - Labor | $ | - |
| 94200 | Ordinary Maintenance and Operations - Materials and Other | $ | - |
| 94300 | Ordinary Maintenance and Operations Contracts | $ | - |
| 94500 | Employee Benefit Contributions - Ordinary Maintenance | $ | - |
| 94000 | Total Maintenance | $ 0 | - |
| 95100 | Protective Services - Labor | $ | - |
| 95200 | Protective Services - Other Contract Costs | $ | - |
| 95300 | Protective Services - Other | $ | - |
| 95500 | Employee Benefit Contributions - Protective Services | $ | - |
| 95000 | Total Protective Services | $ 0 | - |
| 96110 | Property Insurance | $ | - |
| 96120 | Liability Insurance | $ | - |
| 96130 | Workmen's Compensation | $ | - |
| 96140 | All Other Insurance | $ | - |
| 96100 | Total Insurance Premiums | $ 0 | - |
| | General Expenses: | | |
| 96200 | Other General Expenses | $ | - |
| 96210 | Compensated Absences | $ | - |
| 96300 | Payments in Lieu of Taxes | $ | - |

Income Statement

| Code | Description | Amount | Details |
|---|---|---|---|
| 96400 | Bad debt - Tenant Rents | $ | - |
| 96500 | Bad debt - Mortgages | $ | - |
| 96600 | Bad debt - Other | $ | - |
| 96800 | Severance Expense | $ | - |
| 96000 | **Total Other General Expenses** | $ 0 | - |
| 96710 | Interest of Mortgage (or Bonds) Payable | $ | - |
| 96720 | Interest on Notes Payable (Short and Long Term) | $ | - |
| 96730 | Amortization of Bond Issue Costs | $ | - |
| 96700 | **Total Interest Expense and Amortization Cost** | $ 0 | - |
| 96900 | **Total Operating Expenses** | $ 1107488 | - |
| 97000 | **Excess of Operating Revenue over Operating Expenses** | $ 14587452 | - |
| 97100 | Extraordinary Maintenance | $ | - |
| 97200 | Casualty Losses - Non-capitalized | $ | - |
| 97300 | Housing Assistance Payments | $ 14801797 | [Details] |
| 97350 | HAP Portability-In | $ 637695 | - |
| 97400 | Depreciation Expense | $ 0 | - |
| 97500 | Fraud Losses | $ | - |
| 97800 | Dwelling Units Rent Expense | $ | - |
| 90000 | **Total Expenses** | $ 16546980 | - |
| 10010 | Operating Transfer In | $ | - |
| 10020 | Operating transfer Out | $ | - |
| 10030 | Operating Transfers from/to Primary Government | $ | - |
| 10040 | Operating Transfers from/to Component Unit | $ | - |
| 10070 | Extraordinary Items, Net Gain/Loss | $ | - |
| 10080 | Special Items (Net Gain/Loss) | $ | - |
| 10093 | Transfers between Program and Project - In | $ | - |
| 10094 | Transfers between Project and Program - Out | $ | . |
| 10100 | **Total Other financing Sources (Uses)** | $ 0 | - |
| 10000 | **Excess (Deficiency) of Total Revenue Over (Under) Total Expenses** | $ -852040 | - |
| | **Memo Account Information:** | | |
| *11020 | Required Annual Debt Principal Payments | $ 0 | - |
| *11030 | Beginning Equity | $ 1497369 | - |
| 11040 | Prior Period Adjustments, Equity Transfers and Correction of Errors | $ | [Details] |
| *11170 | Administrative Fee Equity | $ 0 | [Details] |
| *11180 | Housing Assistance Payments Equity | $ 645329 | [Details] |
| *11190 | Unit Months Available | 12696 | [Details] |
| *11210 | Number of Unit Months Leased | 12596 | - |

[ Save ] [ Reset ] [ Validate ]

Case 3:15-cv-06325-MAS-DEA   Document 4-2   Filed 08/24/15   Page 176 of 387 PageID: 303

**Note:**

\# If you add or alter line items, press the SAVE button to save all your changes.

\# When you press the SAVE button, all totals fields will be calculated and displayed.

\# All fields marked with * are mandatory.

# EXHIBIT S

LAKEWOOD TOWNSHIP RESIDENTIAL
ASSISTANCE PROGRAM
Lakewood, New Jersey

COMPARATIVE FINANCIAL STATEMENTS
For the Years Ended December 30, 2014 and 2013

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
Lakewood, New Jersey
FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014 AND 2013

## TABLE OF CONTENTS

|  | PAGE |
|---|---|
| Management's Discussion and Analysis | 1-4 |
| Independent Auditor's Report | 5-6 |
| **FINANCIAL STATEMENTS** | |
| Comparative Statements of Net Position | 7 |
| Comparative Statements of Revenue, Expenses and Changes in Net Position | 8 |
| Comparative Statements of Cash Flows | 9 |
| Notes to Financial Statements | 10-14 |
| **SUPPLEMENTAL INFORMATION** | |
| Schedule of Expenditures of Federal Awards | 15 |
| Financial Data Schedule | 16-20 |
| **OTHER REPORTS AND COMMENTS** | |
| Independent Auditor's Report on Internal Control Over Financial Reporting and on Compliance and Other Matters Based on an Audit of Financial Statements Performed in Accordance with Government Auditing Standards | 21-22 |
| Independent Auditor's Report on Compliance with Requirements Applicable to Each Major Program and Internal Control Over Compliance in Accordance with OMB Circular A-133 | 23-24 |
| Status of Prior Audit Findings | 25 |
| Schedule of Findings and Questioned Costs | 25 |

LAKEWOOD TOWNSHIP RENTAL
ASSISTANCE PROGRAM
MANAGEMENT'S DISCUSSION AND ANALYSIS
At December 31, 2014

As Management of the Lakewood Township Rental Assistance Program, we offer readers of the Program's financial statements this narrative overview and analysis of the financial activities of the Program for the fiscal year ended December 31, 2014.  We encourage readers to consider the information presented here in conjunction with the Program's financial statements as presented elsewhere in this Report.

A - Financial Highlights

At December 13, 2014, the Program had total assets of $550,487 and total liabilities of $363,103. The difference between total assets and total liabilities of the program ($187,384) represents unspent housing assistance payment subsidies at December 31, 2014. The Program does not accumulate administrative fee reserves since all net revenues of the program are payable to its managing agent, Lakewood Tenants Organization, Inc. in accordance with the program management agreement.

The Program had Total Revenues (including investment income) of $16,778,336 and $16,419,159 for the years ended December 31, 2014 and 2013, respectively.  Total expenditures for the years ended December 31, 2014 and 2013 totaled $16,590,952 and $17,064,519, respectively.

The Program made no capital expenditures during the fiscal year.

The Program's Total Federal Awards amounted to $16,018,813 for the fiscal year.

B – Using the Annual Report

1 – Management's Discussion and Analysis

The Management's Discussion and Analysis is intended to serve as an introduction to the Program's financial statements.  The Program's financial statements and Notes to Financial Statements included in this Report were prepared in accordance with generally accepted accounting principles (GAAP) applicable to governmental entities in the United States of America for Proprietary Fund types.

2 –Financial Statements

The financial statements are designed to provide readers with a broad overview of the Program's finances, in a manner similar to a private-sector business.   They consist of the Comparative Statements of Net Position, Comparative Statements of Revenue, Expenses and Changes in Net Position, and Comparative Statements of Cash Flows.

The Comparative Statements of Net Position present information on all the Program's assets and liabilities, with the difference between the two reported as net position.  Increases or decreases in net position will serve as a useful indicator of whether the financial position of the Program is improving or deteriorating.

The Comparative Statements of Revenues, Expenses and Changes in Net Position present information showing the change in the Program's net position during the most recent fiscal year. All changes in net position are reported as soon as the underlying event giving rise to the change occurs, regardless of the timing of related cash flows. Thus, revenues and expenses are reported in this statement for some items that will only result in cash flows in future fiscal periods (e.g.; depreciation and earned but unused vacation leave).

1

LAKEWOOD TOWNSHIP RENTAL ASSISTANCE PROGRAM
MANAGEMENT'S DISCUSSION AND ANALYSIS (CONTINUED)
At December 31, 2014

The Comparative Statements of Cash Flows present information showing how the Program's cash and cash equivalents position changed during the year. The statements classify cash receipts and cash payments as resulting from operating activities, capital and related financing activities and investing activities.

The financial statements report on the Program's activities. The activities are primarily supported by HUD subsidies and grants. The Program's function is to provide decent, safe and sanitary housing to low income and special needs populations. The financial statements can be found on pages 7 through 9.

3 – Notes to Financial Statements

The Notes to Financial Statements provide additional information that is essential to a full understanding of the data provided in the financial statements. The Notes to Financial Statements can be found in this Report after the financial statements.

4 – Supplemental Information

The schedule of expenditures of Federal awards is presented for purpose of additional analysis as required by U.S. Office of Management and Budget Circular A-133, Audits of States, Local Governments, and Non-profit Organizations. The Schedule of Expenditures of Federal Awards can be found on page 15 of this report.

C – The Program as a Whole

The Program's revenues are primarily subsidies and grants received from HUD. The Program receives subsidies each month based on a pre-approved amount determined by HUD. Pursuant to its management agreement with Lakewood Tenants Organization, Inc. all net revenues of the program are paid to Lakewood Tenants Organization, Inc. as its management fee for administering the program. Approximately 93.5% of the Program's expenses are housing assistance payments made to landlords on behalf of low and moderate income tenants participating in its housing assistance payments program.

D – Budgetary Highlights

For the year ended December 31, 2014, individual program or grant budgets were prepared by the Program and were approved by the Board of Commissioners. The budgets were prepared in accordance with the accounting procedures prescribed by the applicable funding Program.

E – Capital Assets and Debt Administration

1 – Capital Assets

Since the program is administered by the Lakewood Tenants Organization, Inc., the program does not own any capital assets. Capital assets are not a significant aspect of the Program's operations.

2 – Long Term Debt

The Program does not have any long-term debt at this time.

2

LAKEWOOD TOWNSHIP RENTAL ASSISTANCE PROGRAM
MANAGEMENT'S DISCUSSION AND ANALYSIS (CONTINUED)
At December 31, 2014

F – Significant Changes from FYE December 31, 2013 to December 31, 2014

Changes in the Statement of Net Assets

Total cash and cash equivalents decreased by $148,864 due primarily to the repayment of $289,338 to HUD for set-aside funding previously received from HUD that was not used to make housing assistance payments. That amount is included in accounts payable to HUD at December 31, 2013. During the year ended December 31, 2014 the Program received $187,384 of housing assistance payment subsidies in excess of housing assistance payments made. That amount is included in restricted cash and restricted net position at December 31, 2014. Additionally, family self-sufficiency escrow deposits decreased by approximately $30,000 due primarily to the disbursement of FSS escrow balances to participants that have completed the requirements of their program.

Accounts receivable from other governments decreased by $1,255 ($3,730 in 2014 vs. $4,985 in 2014). This amount represents l housing assistance payments made on behalf of families moving into Lakewood from other jurisdictions that were not collected from the issuing agencies as of the end of each fiscal year.

FSS escrow funds decreased by $31,076 as previously discussed.

Changes in the Statement of Revenues, Expenses and Changes in Net Assets

HUD operating grants decreased $357,894 when compared to the year ended December 31, 2013. Housing assistance payment subsidies increased $241,822, and administrative fee subsidies (including family self-sufficiency coordinator grants) increased $116,072.

Operating expenses decreased $473,567 compared to the prior fiscal year. This decrease is primarily due to housing assistance payments decreasing $585,387, or 3.6%, and administrative expenses increasing $12,680, or 12.2%. The decrease in housing assistance payments is due primarily to a slight decrease in the number of unit months leased. The total number of unit months under lease decreased slightly from 12,580 in 2013 to 12,475 in 2014. Additionally, the average housing assistance payment increased from $1,279 in 2013 to $1,243 in 2014.

G – Economic Factors and Next Year's Budgets and Rates

The following factors were considered in preparing the Program's budget for the fiscal year ending December 31, 2015:
        1 – The state of the economy, particularly in light of the federal budget cuts and their impact on future Federal funding for housing programs
        2 – Rising rental costs and housing costs in general within the Township of Lakewood, which impacts the Program's ability to serve eligible families.

H – Contacting the Program's Financial Management

The financial report is designed to provide a general overview of the Program's finances for all those with an interest. Questions concerning any of the information provided in this report or requests for additional financial information should be addressed to the Executive Director, Lakewood Tenants Organization, Inc., 600 W Kennedy Boulevard, Lakewood, NJ 08701.

3

LAKEWOOD TOWNSHIP RENTAL ASSISTANCE PROGRAM
MANAGEMENT'S DISCUSSION AND ANALYSIS (CONTINUED)
At December 31, 2014

**Computations of Net Position are as follows:**

|  | Year Ended | |
|---|---|---|
|  | Dec. 31, 2014 | Dec. 31, 2013 |
| Cash and Other Current Assets | $ 550,487 | $ 683,855 |
| Capital Assets - Net | - | - |
| Total Assets | 550,487 | 683,855 |
| Less: Total Liabilities | (363,103) | (683,855) |
| Net Position | 187,384 | - |
| Restricted Net Assets - Housing Assist. Payment Reserves | - | - |
| Unrestricted Net Assets - Housing Payment Reserves | - | - |
| Total Net Assets | $ - | $ - |

**Computations of Changes in Net Position are as follows:**

|  | Year Ended | |
|---|---|---|
|  | Dec. 31, 2014 | Dec. 31, 2013 |
| Revenues | | |
| HUD Subsidies | $ 16,018,813 | $ 15,660,919 |
| Other Income | 758,991 | 758,240 |
| Total Operating Revenues | 16,777,804 | 16,419,159 |
| Expenses | | |
| Total Operating Expenses | 1,084,090 | 972,270 |
| Housing Assistance Payments | 15,506,862 | 16,092,249 |
| Total Operating Expenses | 16,590,952 | 17,064,519 |
| Excess of Operating Revenues Over Expenses | 186,852 | (645,360) |
| Non-Operating Revenues | | |
| Interest on Investments | 532 | 31 |
| Increase in Net Position | 187,384 | (645,329) |
| Net Assets Prior | - | 645,329 |
| Total Net Position | $ 187,384 | $ - |

4



**CERTIFIED PUBLIC ACCOUNTANTS**

2035 HAMBURG TURNPIKE, UNIT H
WAYNE, NEW JERSEY 07470
TELEPHONE: (973) 831-6969
FAX: (973) 831-6972
E-MAIL: POLCARICO@OPTONLINE.NET

<u>INDEPENDENT AUDITOR'S REPORT</u>

Board of Commissioners
Lakewood Township Residential Assistance Program
Lakewood, New Jersey

We have audited the accompanying financial statements of the Lakewood Township Residential Assistance Program, which comprise the Comparative Statements of Net Position as of December 31, 2014 and 2013 and the related Statements of Revenues, Expenses and Changes in Net Position and Cash Flows for the years then ended, and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America. This includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in *Government Auditing Standards* issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Lakewood Township Residential Assistance Program, as of December 31, 2014 and 2013, and the changes in net position, and its cash flows for the years then ended, in accordance with the accounting principles generally accepted in the United States of America.

5

### INDEPENDENT AUDITORS' REPORT
(Continued)

**Other Matters**

*Required Supplementary Information*

Accounting principles generally accepted in the United States of America require that the management's discussion and analysis presented on pages 1-4 be presented to supplement the basic financial statements. Such information, although not a part of the basic financial statements, is required by the Governmental Accounting Standards Board, who considers it to be an essential part of financial reporting for placing the financial statements in an appropriate operational, economic, or historical context. We have applied certain limited procedures to the required supplementary information in accordance with auditing standards generally accepted in the United States of America, which consisted of inquiries of management about the methods of preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic financial statements, and other knowledge we obtained during our audit of the financial statements. We do not express an opinion or provide any assurance on the information because the limited procedures do not provide us with sufficient evidence to express an opinion or provide any assurance.

*Other Information*

Our audits were conducted for the purpose of forming an opinion on the financial statements of the Lakewood Township Residential Assistance Program. The Financial Data Schedule is presented for purposes of additional analysis and is not a required part of the basic financial statements. The schedule of expenditures of federal awards is presented for purposes of additional analysis as required by U. S. Office of management and Budget Circular A-133, *Audits of States, Local Governments, and Non-Profit Organizations*, and is also not a required part of the financial statements.

The financial data schedule and schedule of expenditures of federal awards are the responsibility of management and were derived from and directly relate to the underlying accounting and other records used to prepare the basic financial statements. Such information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards general accepted in the United States of America. In our opinion, the financial data schedule and the schedule of expenditures of federal awards are fairly stated in all material respects in relation to the financial statements as a whole.

**Other Reporting Required by Government Auditing Standards**

In accordance with *Government Auditing Standards* we have also issued our report dated July 15, 2015 on our consideration of the Lakewood Township Residential Assistance Program's internal control over financial reporting and on our tests of its compliance with certain provisions of laws, regulations, contracts, and grant agreements and other matters. The purpose of that report is to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to provide an opinion on internal control over financial reporting or on compliance. That report is an integral part of an audit performed in accordance with *Government Auditing Standards* in considering the Authority's internal control over financial reporting and compliance.

*Polcari & Company*

POLCARI & COMPANY
CERTIFIED PUBLIC ACCOUNTANTS

Wayne, New Jersey
July 15, 2015

6

POLCARI & CO.
CERTIFIED  PUBLIC  ACCOUNTANTS

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
Lakewood, New Jersey
COMPARATIVE STATEMENTS OF NET POSITION
At December 31, 2014 and 2013

|  | 12/31/2014 | 12/31/2013 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS** | | |
| Cash and Cash Equivalents - Unrestricted | $ 47,401 | $ 352,573 |
| Cash - Restricted | 480,995 | 324,687 |
| Total Cash | 528,396 | 677,260 |
| | | |
| Accounts Receivable - Other Government | 3,730 | 4,985 |
| Accounts Receivable - Fraud (Net) | - | 1,196 |
| Accounts Receivable - HUD | 9,510 | 414 |
| Accounts Receivable - Other (Net) | 8,851 | - |
| Total Current Assets | 550,487 | 683,855 |
| | | |
| TOTAL ASSETS | $ 550,487 | $ 683,855 |
| | | |
| **LIABILITIES** | | |
| **CURRENT LIABILITIES** | | |
| Accounts Payable: | | |
| Vendors and Contractors | $ 58,372 | $ 65,894 |
| Due to HUD | 9,926 | 289,338 |
| Other Governments | 1,194 | 3,936 |
| Total Current Liabilities | 69,492 | 359,168 |
| | | |
| **NON-CURRENT LIABILITIES** | | |
| Family Self-Sufficiency Escrow Deposits | 293,611 | 324,687 |
| | | |
| TOTAL LIABILITIES | 363,103 | 683,855 |
| | | |
| **NET POSITION** | | |
| | | |
| Restricted | 187,384 | - |
| Unrestricted | - | - |
| TOTAL NET POSITION | $ 187,384 | $ - |

See Notes to Financial Statements.

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
Lakewood, New Jersey
COMPARATIVE STATEMENTS OF REVENUE, EXPENSES
AND CHANGES IN NET POSITION
For the Years Ended December 31, 2014 and 2013

|  | 2014 | 2013 |
|---|---|---|
| **REVENUES** | | |
| HUD Operating Grants | $  16,018,813 | $   15,660,919 |
| Fraud Recoveries | 37,068 | 51,062 |
| Other Revenues | 721,923 | 707,178 |
| Total Revenues | 16,777,804 | 16,419,159 |
| **EXPENSES** | | |
| Administration | 1,033,810 | 921,130 |
| Tenant Services | 50,280 | 51,140 |
| Housing Assistance Payments | 15,508,862 | 16,092,249 |
| Total Operating Expenses | 16,590,952 | 17,064,519 |
| Excess of Operating Revenues Over Expenses | 186,852 | (645,360) |
| **NON-OPERATING REVENUES** | | |
| Interest on Investments | 532 | 31 |
| Increase in Net Position | 187,384 | (645,329) |
| Beginning Net Position | - | 645,329 |
| **ENDING NET POSITION** | $      187,384 | $              - |

See Notes to Financial Statements.

8

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
Lakewood, New Jersey
COMPARATIVE STATEMENTS OF CASH FLOWS
For the Years Ended December 31, 2014 and 2013

|  | 2014 | 2013 |
|---|---|---|
| CASH FLOWS FORM OPERATING ACTIVITIES |  |  |
| Operating Grants Received from HUD | $ 16,009,717 | $ 15,950,124 |
| Cash Received From Other Operating Revenues | 752,591 | 758,560 |
| Cash Payments for Housing Assistance | (15,786,274) | (16,047,587) |
| Cash Payments for Goods and Services | (1,125,430) | (796,018) |
| Net Cash Provided by Operating Activities | (149,396) | (134,921) |
|  |  |  |
| CASH FLOWS FROM INVESTING ACTIVITIES |  |  |
| Receipts of Interest and Dividends | 532 | 31 |
| Net Cash Provided By Investing Activities | 532 | 31 |
|  |  |  |
| Increase in Cash and Cash Equivalents | (148,864) | (134,890) |
|  |  |  |
| Cash and Cash Equivalents - Beginning of Year | 677,260 | 812,150 |
|  |  |  |
| Cash and Cash Equivalents - End of Year | $ 528,396 | $ 677,260 |

Reconciliation of Operating Income to Net Cash Provided by Operating Activities

| Operating Income | $ 186,852 | $ (645,360) |
|---|---|---|
| Adjustments to Reconcile Operating Income to Net Cash Provided by Operating Activities: |  |  |
| Decrease/(Increase) in Assets: |  |  |
| Accounts Receivable - Other | (8,851) | 130,148 |
| Accounts Receivable - Other Governments | 1,255 | (4,985) |
| Accounts Receivable - Fraud | 1,196 | 5,305 |
| Accounts Receivable - HUD | (9,096) | 1,100 |
| Increase (Decrease) in Liabilities: |  |  |
| Accounts Payable | (7,522) | 46,104 |
| Due to HUD | (279,412) | 288,105 |
| Accounts Payable - Other Governments | (2,742) | (5,209) |
| Family Self-Sufficiency Escrow Payable | (31,076) | 49,871 |
|  | $ (149,396) | $ (134,921) |

See Notes to Financial Statements.

9

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
DECEMBER 31, 2014
NOTES TO FINANCIAL STATEMENTS

**NOTE 1 – Summary of Organization, Activities and Significant Accounting Policies:**

1. **Organization** – The Lakewood Township Residential Assistance Program (LTRAP, the Program) was created by resolution of the Council of the Township of Lakewood to receive subsidies and provide rental assistance to low and moderate income residents of the Township of Lakewood in accordance with rules and regulations of the United States Department of Housing and Urban Development (HUD) and its Annual Contributions Contract with HUD. The Township has contracted with the Lakewood Tenant Organization, Inc. (LTO) to administer the Program. In consideration for its management of the Program, LTO receives a management fee equal to 100% of the subsidies and fees paid or payable to the Township of Lakewood under its contract with HUD.

2. **Activities** – The financial statements include all the accounts of the Lakewood Township Residential Assistance Program. All of these accounts, as previously noted, are managed by the Lakewood Tenants Organization, Inc. (LTO) pursuant to its contract with LTRAP.

3. **Significant Accounting Policies** - The Governmental Accounting Standards Board (GASB) is the accepted standard-setting body for establishing governmental accounting and financial reporting principles. The more significant of the Program's accounting principles, including those required by GASB Statement No. 34, are described below.

   a. **Basis of Accounting** – The financial statements report on the Program as a whole. The Comparative Statements of Activities demonstrate the degree to which the direct expenses of the Program's function are offset by program revenues. Direct expenses are those that are clearly identifiable with the Program's function. Program revenue includes charges for services which are based on exchange or exchange-like transactions and grants and contributions that are restricted to meeting the operational or capital requirements of the Program's programs.

   The accrual basis of accounting and the economic resources measurement focus are used for measuring financial position and operating results. Under the accrual basis of accounting, transactions are recognized when they occur, regardless of when cash is received or disbursed. Revenues are recognized in the accounting period in which they are earned and expenses recognized in the period incurred. Grant revenues and similar items are recognized as revenue when all eligibility requirements imposed by the provider have been met.

   Using the accrual basis of accounting is consistent with the proprietary fund focus on measuring all the costs of providing goods or services for the period and matching those costs with the revenues earned during the period by providing the goods or services.

   b. **Report Presentation** – The financial statements included in this Report were prepared in accordance with GAAP in the United States of America applicable to governmental entities for Proprietary Fund Types. In accordance with GASB Statement No. 34, the report includes Management's Discussion and Analysis. The Enterprise Fund is used for activities which are financed and operated in a manner similar to a private business enterprise where the intent is that the costs (expenses, including depreciation) of providing goods or services to its clients on a continuing basis be financed or recovered primarily through user charges or operating subsidies.

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
DECEMBER 31, 2014
NOTES TO FINANCIAL STATEMENTS
(Continued)

Significant accounting policies are as follows:

1 – Cash and cash equivalents are stated at cost, which approximates market.  Cash and cash equivalents include cash in banks, petty cash, certificates of deposit and other investments with original maturities of less than three months from the date of purchase.  Investments are recorded at fair value based on quoted market prices.  Fair value is the amount at which a financial instrument could be exchanged in a current transaction between willing parties.

2 – Collection losses on accounts receivable are charged against an allowance for doubtful accounts.

3 – Equipment is recorded at cost for all programs and depreciation is computed on the straight-line basis.

4 – Repairs funded out of operations, such as painting, roofing and plumbing, are charged against income for all programs.

5 – The Program is subsidized by the Federal Government.  The Program is not subject to Federal or State income taxes, nor is it required to file Federal and State income tax returns.

6 – Operating subsidies received from HUD are recorded as income when earned.

7 – The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that effect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements, and reported amounts of revenues and expenses during the reporting period.

8 - The Program has elected not to apply to its proprietary activities Financial Accounting Standards Board Statements and Interpretations, Accounting Principles Board Opinions, and Accounting Research Bulletins of the Committee of accounting Procedure issued after November 30, 1989.

**NOTE 2 – Cash and Cash Equivalents**

The Program maintains cash and investments in local banks.  These funds are covered by the Governmental Unit Depository Protection Act, which requires the institutions to pool collateral for all of the Program's deposits and have the collateral held by an approved custodian in the Township's name.

Cash and equivalents of $528,396 and $677,260 at December 31, 2014 and 2013, respectively, consisted of the following:

|  | Dec. 31, 2014 | | Dec. 31, 2013 |
|---|---|---|---|
| Checking Accounts | $ 234,785 | $ | 352,573 |
| FSS Escrow Accounts | 293,611 | | 324,687 |
| Total Cash | $ 528,396 | $ | 677,260 |

11

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
DECEMBER 31, 2014
NOTES TO FINANCIAL STATEMENTS
(Continued)

## NOTE 2 – Cash and Cash Equivalents (Continued)

The carrying amount of the Program's cash and cash equivalents held in banks as of December 31, 2014 was $528,396 and the bank balances were $543,640. Of the bank balances, $250,000 was covered by FDIC insurance and $293,640 was covered by a collateral pool maintained by the banks as required by New Jersey statutes.

The Program's cash and cash equivalents are categorized as prescribed in GASB 40 to give an indication of the level of risk assumed by the Program.  As described above, $293,640 of the Program's deposits exceeded FDIC insurance and were covered under the New Jersey Government Unit Deposit Protection Act (GUDPA).   Under GUDPA, the Program's deposits are collateralized by securities held by the pledging institutions trust department.   The securities deposits collateralized are not in the Program's name.

## NOTE 3 – Accounts Receivable - Net

Accounts Receivable, net of an allowance for doubtful accounts at December 31, 2014 and 2013 consisted of the following:

|  | Dec. 31, 2014 | | Dec. 31, 2013 |
|---|---|---|---|
| Fraud Recoveries | $ | 70,541 | $ | 32,248 |
| Portability Receivables |  | 3,730 |  | 4,985 |
| Accounts Receivable - Other |  | 8,851 |  | - |
| Housing Choice Voucher Program Subsidies |  |  |  |  |
| Receivable from HUD |  | 9,510 |  | 414 |
| Less: Allowance for Doubtful Accounts |  | (70,541) |  | (31,052) |
|  | $ | 22,091 | $ | 6,595 |

Accounts receivable – fraud recoveries represent receivables due from tenants and landlords for housing assistance payments made erroneously – either due to fraudulent reporting of income by tenants or overpayments made to landlords due to the delinquency of tenants in reporting income at the time of recertification.

Portability receivables represent accounts receivable from other housing programs for tenants moving to Lakewood under the portability provisions of the housing choice voucher program.

## NOTE 4 – Non-current Liabilities – Family Self-Sufficiency Escrow

The Family Self-Sufficiency (FSS) escrow balances of $293,611 and $324,687 at December 31, 2014 and 2013, respectively, represent amounts held in escrow on behalf of subsidized tenants enrolled in the Agency's FSS Program.  These funds will be released to the tenant upon satisfactory completion of the tenant's agreed-upon services program.   In the event the tenant does not complete his or her program requirements, the funds will be returned to HUD. The Program does not anticipate that any participants will be eligible to receive payments from escrow during 2015.  Thus, no amounts are included in current liabilities.

12

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
DECEMBER 31, 2014
NOTES TO FINANCIAL STATEMENTS
(Continued)

## NOTE 5 – Risk Management

The Program is exposed to various risks of loss related to torts, theft, damage to and destruction of assets; errors and omissions; and natural disasters for which the Managing Agent carries commercial insurance.  During the year ended December 31, 2014, the Program's risk management program, in order to deal with potential liabilities, consisted of various insurance policies for fire, general liability, crime, auto and public-officials errors and omissions.  Periodically, but not less than annually, the Managing Agent conducts physical inspections of rental units participating in the program for the purpose of determining potential liability issues.  Liabilities are reported when it is probable that a loss has occurred and the amount of the loss can be reasonably estimated.  Settled claims relating to the commercial insurance have not exceeded the amount of insurance in any of the past three fiscal years.

## NOTE 6 – Economic Dependency

For the years ended December 31, 2014 and December 31, 2013, substantially all of the Program's revenues were received from the United States Department of Housing and Urban Development, which are subject to availability of funds and Congressional approval, as well as the Agency's compliance with Federal rules and regulations.

## NOTE 7 – Accounts Payable - HUD

Accounts payable to HUD at December 31, 2014 and December 31, 2013 consists of the following:

|  | 2014 | 2013 |
|---|---|---|
| Interest Earned on Restricted Net Assets | $    3,863 | $    1,599 |
| Mod. Rehab. 2014 Year-end Settlement | 6,063 | - |
| Unspent set-aside subsidy funding received from HUD | - | 287,739 |
| Total Payable to HUD | $    9,926 | $ 289,338 |

## NOTE 8 – Restricted Net Position

Restricted Net Position of $187,513 at December 31, 2014 consists of unspent housing assistance payment grants.  Prior to January 1, 2005 excess funds advanced by HUD to the Program for the payment of housing assistance payments were returned to HUD at the end of the Program's fiscal year.  In accordance with HUD's PIH Notice 2006-03, starting January 1, 2005 excess funds disbursed by HUD to the Program for the payment of Housing Assistance Payments that are not so utilized are not returned to HUD, but become part of the undesignated fund balance and may only be used to assist qualified families up to the number of units under contract.  As of November 2007, HUD is reverting to treating these funds as restricted in order to comply with generally accepted accounting principles.
Administrative fees paid by HUD to the Program in excess of administrative expenses are part of the undesignated fund balance and are considered to be "administrative fee reserves".  Administrative fee reserves accumulated prior to January 1, 2005 are subject to all requirements applicable to administrative fee reserves including, but not limited to, 24 CFR982.155 – i.e. "other housing purposes permitted by state or local law".  Excess administrative fees earned in 2005 and subsequent years must be used for activities related to the provision of tenant-based rental assistance authorized under Section 8 of the United States Housing Act of 1937, including related development activities.

13

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
DECEMBER 31, 2014
NOTES TO FINANCIAL STATEMENTS
(Continued)

**NOTE 8 – Restricted Net Position (Continued)**

In accordance with HUD requirements, the Program's restricted and unrestricted fund balance consists of the following components as of December 31, 2014:

| | | | |
|---|---|---|---|
| **Administrative Fee Equity - Included in Unrestricted Net Position** | | | |
| Administrative Fee Reserves as of December 31, 2013 | $ | - | |
| Subsidy Received December 31, 2014 | | 1,027,910 | |
| Administrative Expenses December 31, 2014 | | (1,074,223) | |
| Interest Earned for the year ended December 31, 2014 | | 500 | |
| Portability Administrative Fees Earned December 31, 2014 | | 27,279 | |
| 50% of fiscal year December 31, 2014 Fraud Recoveries (net) | | 18,534 | $ - |
| **Housing Assistance Payment Equity - Included in Restricted Net Position** | | | |
| Housing Assistance Payment Reserves as of December 31, 2013 | $ | - | |
| Subsidy Received December 31, 2014 | | 14,913,779 | |
| HAP Payments December 31, 2014 | | (14,758,338) | |
| FSS Forfeitures During FYE Dec. 31, 2014 | | 13,409 | |
| 50% of fiscal year December 31, 2014 Fraud Recoveries (net) | | 18,534 | 187,384 |
| **Total Net Position** | | | $ 187,384 |

**NOTE 9 – Accounts Payable – Other Governments**

Accounts payable to other governments of $1,194 and $3,936 at December 31, 2014 and 2013, respectively, represent payments due to receiving programs for tenants moving from Lakewood to their jurisdictions under the portability provisions of the housing choice voucher program.

**NOTE 10 – Subsequent Events**

Events that occur after the balance sheet date but before the financial statements were available to be issued must be evaluated for recognition or disclosure. The effects of subsequent events that provide evidence about conditions that existed at the balance sheet date are recognized in the accompanying financial statements. Subsequent events which provide evidence about conditions that existed after the balance sheet date require disclosure in the accompanying notes. Management has evaluated subsequent events through July 15, 2015, the date on which the financial statements were available to be issued and concluded that no subsequent events have occurred that would require recognition in the financial statements or disclosure in the notes to the financial statements.

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
Lakewood, New Jersey

SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS
For the Year Ended December 31, 2014

|  | Expenditures |
|---|---|
| **HOUSING ASSISTANCE PAYMENTS PROGRAM** | |
| Section 8 Housing Choice Voucher Program (CFDA # 14.871) | $ 15,941,689 |
| Low Income Housing Assistance Program  - Section 8<br>    Moderate Rehab Program (CFDA # 14.856) | 77,124 |
| Total Federal Expenditures | $  16,018,813 |

NOTES TO SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS

1. Basis of Presentation - The Schedule of Expenditures of Federal Awards is presented in accordance with
   generally accepted accounting principles and is presented in accordance with the requirements of
   OMB Circular A-133.  Therefore, some amounts presented in this schedule  may differ from amounts
   presented in. or used in the preparation of the general purpose financial statements.

2. There were no subrecipient activities during the audit period.

## Lakewood Township Residential Assistance Prog  (NJ214)
### Lakewood, NJ
**Entity Wide Balance Sheet Summary**

Submission Type:  Audited/A-133                                    Fiscal Year End:  12/31/2014

| | 14.871 Housing Choice Vouchers | 14.856 Lower Income Housing Assistance Program_Section 8 Moderate | Subtotal | Total |
|---|---|---|---|---|
| 111  Cash - Unrestricted | $41,097 | $6,304 | $47,401 | $47,401 |
| 112  Cash - Restricted - Modernization and Development | | $0 | | |
| 113  Cash - Other Restricted | $480,995 | $0 | $480,995 | $480,995 |
| 114  Cash - Tenant Security Deposits | | $0 | | |
| 115  Cash - Restricted for Payment of Current Liabilities | | $0 | | |
| 100  Total Cash | $522,092 | $6,304 | $528,396 | $528,396 |
| 121  Accounts Receivable - PHA Projects | | $0 | | |
| 122  Accounts Receivable - HUD Other Projects | $9,510 | $0 | $9,510 | $9,510 |
| 124  Accounts Receivable - Other Government | $3,730 | $0 | $3,730 | $3,730 |
| 125  Accounts Receivable - Miscellaneous | $8,851 | $0 | $8,851 | $8,851 |
| 126  Accounts Receivable - Tenants | | $0 | | |
| 126.1  Allowance for Doubtful Accounts -Tenants | | $0 | | |
| 126.2  Allowance for Doubtful Accounts - Other | $0 | $0 | $0 | $0 |
| 127  Notes, Loans, & Mortgages Receivable - Current | | $0 | | |
| 128  Fraud Recovery | $70,525 | $16 | $70,541 | $70,541 |
| 128.1  Allowance for Doubtful Accounts - Fraud | -$70,525 | -$16 | -$70,541 | -$70,541 |
| 129  Accrued Interest Receivable | | $0 | | |
| 120  Total Receivables, Net of Allowances for Doubtful Accounts | $22,091 | $0 | $22,091 | $22,091 |
| 131  Investments - Unrestricted | | $0 | | |
| 132  Investments - Restricted | | $0 | | |
| 135  Investments - Restricted for Payment of Current Liability | | $0 | | |
| 142  Prepaid Expenses and Other Assets | | $0 | | |
| 143  Inventories | | $0 | | |
| 143.1  Allowance for Obsolete Inventories | | $0 | | |
| 144  Inter Program Due From | $77 | $0 | $77 | $77 |
| 145  Assets Held for Sale | | $0 | | |
| 150  Total Current Assets | $544,260 | $6,304 | $550,564 | $550,564 |
| 161  Land | | $0 | | |
| 162  Buildings | | $0 | | |
| 163  Furniture, Equipment & Machinery - Dwellings | | $0 | | |
| 164  Furniture, Equipment & Machinery - Administration | | $0 | | |
| 165  Leasehold Improvements | | $0 | | |
| 166  Accumulated Depreciation | | $0 | | |
| 167  Construction in Progress | | $0 | | |
| 168  Infrastructure | | $0 | | |
| 160  Total Capital Assets, Net of Accumulated Depreciation | $0 | $0 | $0 | $0 |
| 171  Notes, Loans and Mortgages Receivable - Non Current | | $0 | | |
| 172  Notes, Loans, & Mortgages Receivable - Non Current - Past Due | | $0 | | |
| 173  Grants Receivable - Non Current | | $0 | | |
| 174  Other Assets | | $0 | | |

16

## Lakewood Township Residential Assistance Prog  (NJ214)
## Lakewood, NJ
### Entity Wide Balance Sheet Summary

Submission Type: Audited/A-133                    Fiscal Year End: 12/31/2014

| | 14.871 Housing Choice Vouchers | 14.856 Lower Income Housing Assistance Program_Section 8 Moderate | Subtotal | Total |
|---|---|---|---|---|
| 176  Investments in Joint Ventures | | $0 | | |
| 180  Total Non-Current Assets | $0 | $0 | $0 | $0 |
| 200  Deferred Outflow of Resources | | $0 | | |
| 290  Total Assets and Deferred Outflow of Resources | $544,260 | $6,304 | $550,564 | $550,564 |
| 311  Bank Overdraft | | $0 | | |
| 312  Accounts Payable <= 90 Days | $58,208 | $164 | $58,372 | $58,372 |
| 313  Accounts Payable >90 Days Past Due | | $0 | | |
| 321  Accrued Wage/Payroll Taxes Payable | | $0 | | |
| 322  Accrued Compensated Absences - Current Portion | | $0 | | |
| 324  Accrued Contingency Liability | | $0 | | |
| 325  Accrued Interest Payable | | $0 | | |
| 331  Accounts Payable - HUD PHA Programs | $3,863 | $6,063 | $9,926 | $9,926 |
| 332  Account Payable - PHA Projects | | $0 | | |
| 333  Accounts Payable - Other Government | $1,194 | $0 | $1,194 | $1,194 |
| 341  Tenant Security Deposits | | $0 | | |
| 342  Unearned Revenue | | $0 | | |
| 343  Current Portion of Long-term Debt - Capital Projects/Mortgage Revenue | | $0 | | |
| 344  Current Portion of Long-term Debt - Operating Borrowings | | $0 | | |
| 345  Other Current Liabilities | | $0 | | |
| 346  Accrued Liabilities - Other | | $0 | | |
| 347  Inter Program - Due To | | $77 | $77 | $77 |
| 348  Loan Liability - Current | | $0 | | |
| 310  Total Current Liabilities | $63,265 | $6,304 | $69,569 | $69,569 |
| 351  Long-term Debt, Net of Current - Capital Projects/Mortgage Revenue | | $0 | | |
| 352  Long-term Debt, Net of Current - Operating Borrowings | | $0 | | |
| 353  Non-current Liabilities - Other | $293,611 | $0 | $293,611 | $293,611 |
| 354  Accrued Compensated Absences - Non Current | | $0 | | |
| 355  Loan Liability - Non Current | | $0 | | |
| 356  FASB 5 Liabilities | | $0 | | |
| 357  Accrued Pension and OPEB Liabilities | | $0 | | |
| 350  Total Non-Current Liabilities | $293,611 | $0 | $293,611 | $293,611 |
| 300  Total Liabilities | $356,876 | $6,304 | $363,180 | $363,180 |
| 400  Deferred Inflow of Resources | | $0 | | |
| 508.4  Net Investment in Capital Assets | | $0 | | |
| 511.4  Restricted Net Position | $187,384 | $0 | $187,384 | $187,384 |
| 512.4  Unrestricted Net Position | $0 | $0 | $0 | $0 |
| 513  Total Equity - Net Assets / Position | $187,384 | $0 | $187,384 | $187,384 |
| 600  Total Liabilities, Deferred Inflows of Resources and Equity - Net | $544,260 | $6,304 | $550,564 | $550,564 |

17

## Lakewood Township Residential Assistance Prog  (NJ214)
## Lakewood, NJ
### Entity Wide Revenue and Expense Summary

Submission Type: Audited/A-133                    Fiscal Year End:  12/31/2014

| | 14.871 Housing Choice Vouchers | 14.856 Lower Income Housing Assistance Program_Section 8 Moderate | Subtotal | Total |
|---|---|---|---|---|
| 70300  Net Tenant Rental Revenue | | $0 | | |
| 70400  Tenant Revenue - Other | | $0 | | |
| 70500  Total Tenant Revenue | $0 | $0 | $0 | $0 |
| 70600  HUD PHA Operating Grants | $15,941,689 | $77,124 | $16,018,813 | $16,018,813 |
| 70610  Capital Grants | | $0 | | |
| 70710  Management Fee | | $0 | | |
| 70720  Asset Management Fee | | $0 | | |
| 70730  Book Keeping Fee | | $0 | | |
| 70740  Front Line Service Fee | | $0 | | |
| 70750  Other Fees | | $0 | | |
| 70700  Total Fee Revenue | | $0 | | |
| 70800  Other Government Grants | | $0 | | |
| 71100  Investment Income - Unrestricted | $500 | $32 | $532 | $532 |
| 71200  Mortgage Interest Income | | $0 | | |
| 71300  Proceeds from Disposition of Assets Held for Sale | | $0 | | |
| 71310  Cost of Sale of Assets | | $0 | | |
| 71400  Fraud Recovery | $37,068 | $0 | $37,068 | $37,068 |
| 71500  Other Revenue | $721,923 | $0 | $721,923 | $721,923 |
| 71600  Gain or Loss on Sale of Capital Assets | | $0 | | |
| 72000  Investment Income - Restricted | | $0 | | |
| 70000  Total Revenue | $16,701,180 | $77,156 | $16,778,336 | $16,778,336 |
| 91100  Administrative Salaries | | $0 | | |
| 91200  Auditing Fees | $10,263 | $77 | $10,340 | $10,340 |
| 91300  Management Fee | | $0 | | |
| 91310  Book-keeping Fee | | $0 | | |
| 91400  Advertising and Marketing | | $0 | | |
| 91500  Employee Benefit contributions - Administrative | | $0 | | |
| 91600  Office Expenses | | $0 | | |
| 91700  Legal Expense | | $0 | | |
| 91800  Travel | | $0 | | |
| 91810  Allocated Overhead | | $0 | | |
| 91900  Other | $1,013,860 | $9,790 | $1,023,470 | $1,023,470 |
| 91000  Total Operating - Administrative | $1,023,943 | $9,867 | $1,033,810 | $1,033,810 |
| 92000  Asset Management Fee | | $0 | | |
| 92100  Tenant Services - Salaries | | $0 | | |
| 92200  Relocation Costs | | $0 | | |
| 92300  Employee Benefit Contributions - Tenant Services | | $0 | | |
| 92400  Tenant Services - Other | $50,280 | $0 | $50,280 | $50,280 |
| 92500  Total Tenant Services | $50,280 | $0 | $50,280 | $50,280 |

18

## Lakewood Township Residential Assistance Prog (NJ214)
### Lakewood, NJ
### Entity Wide Revenue and Expenae Summary

Submission Type: Audited/A-133                    Fiscal Year End: 12/31/2014

| | 14.871 Housing Choice Vouchers | 14.856 Lower Income Housing Assistance Program_Section 8 Moderate | Subtotal | Total |
|---|---|---|---|---|
| 93100 Water | | $0 | | |
| 93200 Electricity | | $0 | | |
| 93300 Gas | | $0 | | |
| 93400 Fuel | | $0 | | |
| 93500 Labor | | $0 | | |
| 93600 Sewer | | $0 | | |
| 93700 Employee Benefit Contributions - Utilities | | $0 | | |
| 93800 Other Utilities Expense | | $0 | | |
| 93000 Total Utilities | $0 | $0 | $0 | $0 |
| 94100 Ordinary Maintenance and Operations - Labor | | $0 | | |
| 94200 Ordinary Maintenance and Operations - Materials and Other | | $0 | | |
| 94300 Ordinary Maintenance and Operations Contracts | | $0 | | |
| 94500 Employee Benefit Contributions - Ordinary Maintenance | | $0 | | |
| 94000 Total Maintenance | $0 | $0 | $0 | $0 |
| 95100 Protective Services - Labor | | $0 | | |
| 95200 Protective Services - Other Contract Costs | | $0 | | |
| 95300 Protective Services - Other | | $0 | | |
| 95500 Employee Benefit Contributions - Protective Services | | $0 | | |
| 95000 Total Protective Services | $0 | $0 | $0 | $0 |
| 96110 Property Insurance | | $0 | | |
| 96120 Liability Insurance | | $0 | | |
| 96130 Workmen's Compensation | | $0 | | |
| 96140 All Other Insurance | | $0 | | |
| 96100 Total Insurance Premiums | $0 | $0 | $0 | $0 |
| 96200 Other General Expenses | | $0 | | |
| 96210 Compensated Absences | | $0 | | |
| 96300 Payments in Lieu of Taxes | | $0 | | |
| 96400 Bad debt - Tenant Rents | | $0 | | |
| 96500 Bad debt - Mortgages | | $0 | | |
| 96600 Bad debt - Other | | $0 | | |
| 96800 Severance Expense | | $0 | | |
| 96000 Total Other General Expenses | $0 | $0 | $0 | $0 |
| 96710 Interest of Mortgage (or Bonds) Payable | | $0 | | |
| 96720 Interest on Notes Payable (Short and Long Term) | | $0 | | |
| 96730 Amortization of Bond Issue Costs | | $0 | | |
| 96700 Total Interest Expense and Amortization Cost | $0 | $0 | $0 | $0 |
| 96900 Total Operating Expenses | $1,074,223 | $9,887 | $1,084,090 | $1,084,090 |
| 97000 Excess of Operating Revenue over Operating Expenses | $15,626,957 | $67,289 | $15,694,246 | $15,694,246 |

19

## Lakewood Township Residential Assistance Prog  (NJ214)

Lakewood, NJ

### Entity Wide Revenue and Expense Summary

Submission Type:  Audited/A-133                                    Fiscal Year End:- 12/31/2014

| | 14.871 Housing Choice Vouchers | 14.856 Lower Income Housing Assistance Program_Section 8 Moderate | Subtotal | Total |
|---|---|---|---|---|
| 97100  Extraordinary Maintenance | | $0 | | |
| 97200  Casualty Losses - Non-capitalized | | $0 | | |
| 97300  Housing Assistance Payments | $14,758,338 | $67,289 | $14,825,627 | $14,825,627 |
| 97350  HAP Portability-In | $681,235 | $0 | $681,235 | $681,235 |
| 97400  Depreciation Expense | | $0 | | |
| 97500  Fraud Losses | | $0 | | |
| 97600  Capital Outlays  - Governmental Funds | | $0 | | |
| 97700  Debt Principal Payment - Governmental Funds | | $0 | | |
| 97800  Dwelling Units Rent Expense | | $0 | | |
| 90000  Total Expenses | $16,513,796 | $77,156 | $16,590,952 | $16,590,952 |
| 10010  Operating Transfer In | | $0 | | |
| 10020  Operating transfer Out | | $0 | | |
| 10030  Operating Transfers from/to Primary Government | | $0 | | |
| 10040  Operating Transfers from/to Component Unit | | $0 | | |
| 10050  Proceeds from Notes, Loans and Bonds | | $0 | | |
| 10060  Proceeds from Property Sales | | $0 | | |
| 10070  Extraordinary Items, Net Gain/Loss | | $0 | | |
| 10080  Special Items (Net Gain/Loss) | | $0 | | |
| 10091  Inter Project Excess Cash Transfer In | | $0 | | |
| 10092  Inter Project Excess Cash Transfer Out | | $0 | | |
| 10093  Transfers between Program and Project - In | | $0 | | |
| 10094  Transfers between Project and Program - Out | | $0 | | |
| 10100  Total Other financing Sources (Uses) | $0 | $0 | $0 | $0 |
| 10000  Excess (Deficiency) of Total Revenue Over (Under) Total Expenses | $187,384 | $0 | $187,384 | $187,384 |
| 11020  Required Annual Debt Principal Payments | $0 | $0 | $0 | $0 |
| 11030  Beginning Equity | $0 | $0 | $0 | $0 |
| 11040  Prior Period Adjustments, Equity Transfers and Correction of Errors | | $0 | $0 | $0 |
| 11050  Changes in Compensated Absence Balance | | $0 | | |
| 11060  Changes in Contingent Liability Balance | | $0 | | |
| 11070  Changes in Unrecognized Pension Transition Liability | | $0 | | |
| 11080  Changes in Special Term/Severance Benefits Liability | | $0 | | |
| 11090  Changes in Allowance for Doubtful Accounts - Dwelling Rents | | $0 | | |
| 11100  Changes in Allowance for Doubtful Accounts - Other | | $0 | | |
| 11170  Administrative Fee Equity | $0 | $0 | $0 | $0 |
| 11180  Housing Assistance Payments Equity | $187,384 | $0 | $187,384 | $187,384 |
| 11190  Unit Months Available | 12896 | 96 | 12792 | 12792 |
| 11210  Number of Unit Months Leased | 12379 | 96 | 12475 | 12475 |

20



**CERTIFIED PUBLIC ACCOUNTANTS**

2035 HAMBURG TURNPIKE, UNIT H
WAYNE, NEW JERSEY 07470
TELEPHONE: (973) 831-6969
FAX: (973) 831-6972
E-MAIL: POLCARICO@OPTONLINE.NET

**INDEPENDENT AUDITOR'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING AND ON COMPLIANCE AND OTHER MATTERS BASED ON AN AUDIT OF FINANCIAL STATEMENTS PERFORMED IN ACCORDANCE WITH GOVERNMENT AUDITING STANDARDS**

Board of Commissioners
Lakewood Township Residential Assistance Program
Lakewood, New Jersey

We have audited, in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in *Government Auditing Standards* issued by the Comptroller General of the United States, the financial statements of the Lakewood Township Residential Assistance Program ("the Program") as of and for the year ended December 31, 2014 and the related notes to the financial statements, which collectively comprise the Lakewood Township Residential Assistance Program's basic financial statements and have issued our report thereon dated July 15, 2015.

<u>Internal Control Over Financial Reporting</u>

In planning and performing our audit of the financial statements, we considered the Lakewood Township Residential Assistance Program's internal control over financial reporting (internal control) to determine the audit procedures that are appropriate in the circumstances for the purpose of expressing our opinion on the financial statements, but not for the purpose of expressing an opinion on the effectiveness the Lakewood Township Residential Assistance Program's internal control over financial reporting. Accordingly, we do not express an opinion on the effectiveness of the Program's internal control.

A deficiency in internal control exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect and correct misstatements on a timely basis. A material weakness is a deficiency or combination of deficiencies in internal control, such that there is a reasonable possibility that a material misstatement of the entity's financial statements will not be prevented, or detected and corrected on a timely basis. A significant deficiency is a deficiency, or a combination of deficiencies, in internal control that is less severe than a material weakness, yet important enough to merit attention by those charged with governance.

Our consideration of internal control was for the limited purpose described in the first paragraph of this and was not designed to identify all deficiencies in internal control that might be material weaknesses or significant deficiencies. Given these limitations, during our audit we did not identify any deficiencies in internal control that we consider to be material weaknesses. However, material weaknesses may exist that have not been identified.

21

**INDEPENDENT AUDITOR'S REPORT ON INTERNAL CONTROL OVER FINANCIAL
REPORTING AND ON COMPLIANCE AND OTHER MATTERS BASED ON AN AUDIT OF
FINANCIAL STATEMENTS PERFORMED IN ACCORDANCE WITH GOVERNMENT
AUDITING STANDARDS
(Continued)**

<u>Compliance and Other Matters</u>

As part of obtaining reasonable assurance about whether the Lakewood Township
Residential Assistance Program's financial statements are free of material misstatement, we
performed tests of its compliance with certain provisions of laws, regulations, contracts and grant
agreements, noncompliance with which could have a direct and material effect on the
determination of financial statement amounts.  However, providing an opinion on compliance with
those provisions was not an objective of our audit and, accordingly, we do not express such an
opinion.  The results of our tests disclosed no instances of noncompliance or other matters that
are required to be reported under *Government Auditing Standards*.

<u>Purpose of this Report</u>

The purpose of this report is solely to describe the scope of our testing of internal control
and compliance and the results of that testing, and not to provide an opinion on the effectiveness
of the entity's internal control or on compliance.  The report is an integral part of an audit
performed in accordance with Government Auditing Standards in considering the entity's internal
control and compliance.  Accordingly, this communication is not suitable for any other purpose.

*Polcari & Company*

POLCARI & COMPANY
CERTIFIED PUBLIC ACCOUNTANTS

Wayne, New Jersey
July 15, 2015





**CERTIFIED PUBLIC ACCOUNTANTS**

2035 HAMBURG TURNPIKE, UNIT H
WAYNE, NEW JERSEY 07470
TELEPHONE: (973) 831-6969
FAX: (973) 831-6972
E-MAIL: POLCARICO@OPTONLINE.NET

## INDEPENDENT AUDITOR'S REPORT ON COMPLIANCE WITH REQUIREMENTS APPLICABLE TO EACH MAJOR PROGRAM AND INTERNAL CONTROL OVER COMPLIANCE IN ACCORDANCE WITH OMB CIRCULAR A-133

Board of Commissioners
Lakewood Township Residential Assistance Program
Lakewood, New Jersey

Report on Compliance for Each Major Federal Program

We have audited the Lakewood Township Residential Assistance Program's compliance with the types of compliance requirements described in the *OMB Circular A-133 Compliance Supplement* that could have a direct and material effect on each of Lakewood Township Residential Assistance Program's major federal programs for the year ended December 31, 2014. The Lakewood Township Residential Assistance Program's major federal programs are identified in the summary of auditor's results section of the accompanying Schedule of Findings and Questioned Costs.

Management's Responsibility

Management is responsible for compliance with the requirements of laws, regulations, contracts and grants applicable to each of its major federal programs.

Auditor's Responsibility

Our responsibility is to express an opinion on compliance for each of the Lakewood Township Residential Assistance Program's major federal programs based on our audit of the types of compliance requirements referred to above. We conducted our audit of compliance in accordance with auditing standards generally accepted in the United States of America; the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States; and Office of Management and Budget Circular A-133, Audits of States, Local Governments and Non-Profit Organizations. Those standards and OMB Circular A-133 require that we plan and perform the audit to obtain reasonable assurance about whether noncompliance with the types of compliance requirements referred to above that could have a direct and material effect on a major federal program occurred. An audit includes examining, on a test basis, evidence about the Lakewood Township Residential Assistance Program's compliance with those requirements and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion on compliance for each major federal program. However, our audit does not provide a legal determination of the Lakewood Township Residential Assistance Program's compliance.

Opinion on Each Major Federal Program

In our opinion, the Lakewood Township Residential Assistance Program complied, in all material respects, with the types of compliance requirements referred to above that could have a direct and material effect on each of its major federal programs for the year ended December 31, 2014.

23

**INDEPENDENT AUDITOR'S REPORT ON COMPLIANCE WITH REQUIREMENTS
APPLICABLE TO EACH MAJOR PROGRAM AND INTERNAL CONTROL OVER
COMPLIANCE IN ACCORDANCE WITH OMB CIRCULAR A-133
(Continued)**

Report on Internal Control Over Compliance

     The management of the Lakewood Township Residential Assistance Program is responsible for establishing and maintaining effective internal control over compliance with the types of compliance requirements referred to above.  In planning and performing our audit of compliance, we considered Lakewood Township Residential Assistance Program's internal control over compliance with the types of requirements that could have a direct and material effect on each major federal program in order to determine the auditing procedures that are appropriate in the circumstances for the purpose of expressing our opinion on compliance for each major federal program and to test and report on internal control over compliance in accordance with OMB Circular A-133, but not for the purpose of expressing an opinion on the effectiveness of internal control over compliance. Accordingly, we do not express an opinion on the effectiveness of the Lakewood Township Residential Assistance Program's s internal control over compliance.

     A deficiency in internal control over compliance exists when the design or operation of a control over compliance does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect and correct noncompliance with a type of compliance requirement of a federal program on a timely basis. A material weakness in internal control over compliance is a deficiency, or combination of deficiencies in internal control over compliance, such that there is a reasonable possibility that material noncompliance with a type of compliance requirement of a federal program will not be prevented, or detected and corrected on a timely basis. A significant deficiency in internal control over compliance is a deficiency, or a combination of deficiencies, in internal control over compliance with a type of compliance requirement of a federal program that is less severe than a material weakness, yet important enough to merit attention by those charged with governance.

     Our consideration of internal control over compliance was for the limited purpose described in the first paragraph of this section and was not designed to identify all deficiencies in internal control over compliance that might be deficiencies, significant deficiencies or material weaknesses or significant deficiencies. We did not identify any deficiencies in internal control over compliance that we consider to be material weaknesses.  However, material weaknesses may exist that have not been identified.

Purpose of this Report

     The purpose of this report on internal control over compliance is solely to describe the scope of our testing of internal control over compliance and the results of that testing based on the requirements of OMB Circular A-133.  Accordingly, the report is not suitable for any other purpose.

*Polcari & Company*

POLCARI & COMPANY
CERTIFIED PUBLIC ACCOUNTANTS

Wayne, New Jersey
July 15, 2015



LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
Lakewood, New Jersey
December 31, 2014

SCHEDULE OF FINDINGS AND QUESTIONED COSTS

**SECTION 1 - SUMMARY OF AUDIT RESULTS**

PRIOR AUDIT FINDINGS
The prior audit contained no findings.

CURRENT AUDIT FINDINGS

Financial Statements

| | | |
|---|---|---|
| Type of Auditor's Report Issued: | Unmodified | |

Internal Control over Financial Reporting:
    Material Weakness(es) Identified? _____ yes __X__ no
    Significant Deficiency(s) identified that are not
      considered to be material weakness(es)? _____ yes __X__ none reported
Noncompliance Material to Financial Statements Noted? _____ yes __X__ no

Federal Awards

Internal Control over Major Programs:
    Material Weakness(es) Identified? _____ yes __X__ no
    Significant Deficiency(s) identified that are not
      considered to be material weakness(es)? _____ yes __X__ none reported

Type of audit report issued on compliance for
    major programs:                         Unmodified

Any audit findings disclosed that are required to be
    reported in accordance with section 510(a) of
    Circular A-133                      _____ yes __X__ no

Identification of Major Programs

| CFDA Number | Name of Federal Program or Cluster |
|---|---|
| 14.871 | Housing Choice Voucher Program |

Dollar Threshold used to distinguish between type A
    and type B Programs                    $480,564

Auditee qualified as low-risk?        __X__ yes _____ no

**SECTION 2 – FINANCIAL STATEMENT FINDINGS**
None.

**SECTION 3 – FEDERAL AWARD FINDINGS AND QUESTIONED COSTS**
None.

LAKEWOOD TOWNSHIP RESIDENTIAL
ASSISTANCE PROGRAM
Lakewood, New Jersey

COMPARATIVE FINANCIAL STATEMENTS
For the Two Years Ended December 31, 2013 and 2012

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
Lakewood, New Jersey
FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2013 AND 2012

## TABLE OF CONTENTS

| | PAGE |
|---|---|
| Management's Discussion and Analysis | 1-4 |
| Independent Auditors' Report | 5-6 |
| **FINANCIAL STATEMENTS** | |
| Comparative Statements of Net Position | 7 |
| Comparative Statements of Revenue, Expenses and Changes in Net Position | 8 |
| Comparative Statements of Cash Flows | 9 |
| Notes to Financial Statements | 10-14 |
| **SUPPLEMENTAL INFORMATION** | |
| Schedule of Expenditures of Federal Awards | 15 |
| Financial Data Schedule | 16-20 |
| **OTHER REPORTS AND COMMENTS** | |
| Report on Compliance and on Internal Control Over Financial Reporting Based on an Audit of Financial Statements Performed in Accordance with Government Auditing Standards | 21-22 |
| Independent Auditor's Report on Compliance with Requirements Applicable to Each Major Program and Internal Control Over Compliance In Accordance With OMB Circular A-133 | 23-24 |
| Status of Prior Audit Findings | 25 |
| Schedule of Findings and Questioned Costs | 25 |

LAKEWOOD TOWNSHIP RENTAL
ASSISTANCE PROGRAM
MANAGEMENT'S DISCUSSION AND ANALYSIS
At December 31, 2013

As Management of the Lakewood Township Rental Assistance Program, we offer readers of the Program's financial statements this narrative overview and analysis of the financial activities of the Program for the fiscal year ended December 31, 2013.  We encourage readers to consider the information presented here in conjunction with the Program's financial statements as presented elsewhere in this Report.

A - Financial Highlights

At December 13, 2013, the Program had total assets of $683,855.  Total assets of the program are equal to its total liabilities at the close of the most recent fiscal year since the program did not have any unspent housing assistance payment subsidies at December 31, 2013. The Program does not accumulate administrative fee reserves since all net revenues of the program are payable to its managing agent, Lakewood Tenants Organization, Inc. in accordance with the program management agreement.

The Program had Total Revenues (including investment income) of $16,419,159 and $15,764,438 for the years ended December 31, 2013 and 2012, respectively.  Total expenditures for the years ended December 31, 2013 and 2012 totaled $17,064,519 and $16,625,286, respectively.

The Program made no capital expenditures during the fiscal year.

The Program's Total Federal Awards amounted to $15,660,919 for the fiscal year.

B – Using the Annual Report

1 – Management's Discussion and Analysis

The Management's Discussion and Analysis is intended to serve as an introduction to the Program's financial statements.  The Program's financial statements and Notes to Financial Statements included in this Report were prepared in accordance with GAAP applicable to governmental entities in the United States of America for Proprietary Fund types.

2 –Financial Statements

The financial statements are designed to provide readers with a broad overview of the Authority's finances, in a manner similar to a private-sector business.  They consist of the Comparative Statements of Net Position, Comparative Statements of Revenue, Expenses and Changes in Net Position, and Comparative Statements of Cash Flows.
The Comparative Statements of Net Position present information on all the Authority's assets end liabilities, with the difference between the two reported as net position.  Increases or decreases in net position will serve as a useful indicator of whether the financial position of the Authority is improving or deteriorating.
The Comparative Statements of Revenues, Expenses and Changes in Net Position present information showing the change in the Authority's net position during the most recent fiscal year. All changes in net position are reported as soon as the underlying event giving rise to the change occurs, regardless of the timing of related cash flows. Thus, revenues and expenses are reported in this statement for some items that will only result in cash flows in future fiscal periods (e.g.; depreciation and earned but unused vacation leave).

1

LAKEWOOD TOWNSHIP RENTAL ASSISTANCE PROGRAM
MANAGEMENT'S DISCUSSION AND ANALYSIS (CONTINUED)
At December 31, 2013

The Comparative Statements of Cash Flows present information showing how the Authority's cash and cash equivalents position changed during the year. The statements classify cash receipts and cash payments as resulting from operating activities, capital and related financing activities and investing activities.

The financial statements report on the Authority's activities. The activities are primarily supported by HUD subsidies and grants. The Authority's function is to provide decent, safe and sanitary housing to low income and special needs populations. The financial statements can be found on pages 7 through 9.

3 – Notes to Financial Statements

The Notes to Financial Statements provide additional information that is essential to a full understanding of the data provided in the financial statements. The Notes to Financial Statements can be found in this Report after the financial statements.

4 – Supplemental Information

The schedule of expenditures of Federal awards is presented for purpose of additional analysis as required by U.S. Office of Management and Budget Circular A-133, Audits of States, Local Governments, and Non-profit Organizations. The Schedule of Expenditures of Federal Awards can be found on page 15 of this report.

C – The Program as a Whole

The Program's revenues are primarily subsidies and grants received from HUD. The Program receives subsidies each month based on a pre-approved amount determined by HUD. Pursuant to its management agreement with Lakewood Tenants Organization, Inc. all net revenues of the program are paid to Lakewood Tenants Organization, Inc. as its management fee for administering the program. Approximately 94% of the Program's expenses are housing assistance payments made to landlords on behalf of low and moderate income tenants participating in its housing assistance payments program.

D – Budgetary Highlights

For the year ended December 31, 2013, individual program or grant budgets were prepared by the Program and were approved by the Board of Commissioners. The budgets were prepared in accordance with the accounting procedures prescribed by the applicable funding Program.

E – Capital Assets and Debt Administration

1 – Capital Assets

Since the program is administered by the Lakewood Tenants Organization, Inc., the program does not own any capital assets. Capital assets are not a significant aspect of the Program's operations.

2 – Long Term Debt

The Program does not have any long-term debt at this time.

2

LAKEWOOD TOWNSHIP RENTAL ASSISTANCE PROGRAM
MANAGEMENT'S DISCUSSION AND ANALYSIS (CONTINUED)
At December 31, 2013

F – Significant Changes from FYE December 31, 2012 to December 31, 2013

Changes in the Statement of Net Assets

Total cash and cash equivalents decreased by $134,890 due primarily to the expenditure of $645,329 for housing assistance payments (HAP) in excess of HAP subsidies received. This reduction was partially offset by the receipt of approximately $289,000 of set-aside funding from HUD that was not used to make housing assistance payments. This amount is included in accounts payable to HUD at December 31, 2013. Also, a receivable of $130,048 from Lakewood Tenants Organization at December 31, 2012 was collected in 2013. Additionally, family self-sufficiency escrow deposits increased by approximately $50,000.

Accounts receivable from other government increased $4,985 since all housing assistance payments made on behalf of families moving into Lakewood from other jurisdictions were not collected from the issuing agencies as of December 31, 2013.

Accounts payable increased $48,104 as the Program settled outstanding invoices on a more timely basis during the prior fiscal year.

FSS escrow funds increased $49,871 due to increased participation in the program..

Changes in the Statement of Revenues, Expenses and Changes in Net Assets

HUD operating grants increased $612,593 when compared to the year ended December 31, 2012. Housing assistance payment subsidies increased $763,473, and administrative fee subsidies (including family self-sufficiency coordinator grants) decreased $150,880.

Operating expenses increased $439,233 compared to the prior fiscal year. This increase is primarily due to housing assistance payments increasing $584,151, or 3.8%, and administrative expenses decreasing $144,960, or 13.6%. The increase in housing assistance payments is due primarily to increases in rents in the Lakewood community. The total number of unit months under lease decreased slightly from 12,892 in 2012 to 12,580 in 2013. Additionally, the average housing assistance payment increased from $1,222 in 2012 to $1,279 in 2013, which is consistent with the housing market in the Lakewood, New Jersey area.

G – Economic Factors and Next Year's Budgets and Rates

The following factors were considered in preparing the Program's budget for the fiscal year ending December 31, 2014:

      1 – The state of the economy, particularly in light of the federal budget cuts and their impact on future Federal funding for housing programs

      2 – Rising rental costs and housing costs in general within the Township of Lakewood, which impacts the Program's ability to serve eligible families.

H – Contacting the Program's Financial Management .

The financial report is designed to provide a general overview of the Program's finances for all those with an interest. Questions concerning any of the information provided in this report or requests for additional financial information should be addressed to the Executive Director, Lakewood Tenants Organization, Inc., 600 W Kennedy Boulevard, Lakewood, NJ 08701.

3

LAKEWOOD TOWNSHIP RENTAL ASSISTANCE PROGRAM
MANAGEMENT'S DISCUSSION AND ANALYSIS (CONTINUED)
At December 31, 2013

**Computations of Net Position are as follows:**

|  | Year Ended | |
|---|---|---|
|  | Dec. 31, 2013 | Dec. 31, 2012 |
| Cash and Other Current Assets | $   683,855 | $    950,313 |
| Capital Assets - Net | - | - |
| Total Assets | 683,855 | 950,313 |
| Less: Total Liabilities | (683,855) | (304,984) |
| Net Position | - | 645,329 |
| Restricted Net Assets - Housing Assist. Payment Reserves | - | 645,329 |
| Unrestricted Net Assets - Housing Payment Reserves | - | - |
| Total Net Assets | $           - | $    645,329 |

**Computations of Changes in Net Position are as follows:**

|  | Year Ended | |
|---|---|---|
|  | Dec. 31, 2013 | Dec. 31, 2012 |
| **Revenues** | | |
| HUD Subsidies | $ 15,660,919 | $   15,048,326 |
| Other Income | 758,240 | 716,112 |
| Total Operating Revenues | 16,419,159 | 15,764,438 |
| **Expenses** | | |
| Total Operating Expenses | 972,270 | 1,117,188 |
| Housing Assistance Payments | 16,092,249 | 15,508,098 |
| Total Operating Expenses | 17,064,519 | 16,625,286 |
| Excess of Operating Revenues Over Expenses | (645,360) | (860,848) |
| **Non-Operating Revenues** | | |
| Interest on Investments | 31 | 8,808 |
| Increase in Net Position | (645,329) | (852,040) |
| Net Assets Prior | 645,329 | 1,497,369 |
| Total Net Position | $           - | $    645,329 |

4



**CERTIFIED PUBLIC ACCOUNTANTS**

INDEPENDENT AUDITOR'S REPORT

2035 HAMBURG TURNPIKE, UNIT H
WAYNE, NEW JERSEY 07470
TELEPHONE: (973) 831-6969
FAX: (973) 831-6972
E-MAIL: POLCARICO@OPTONLINE.NET

Board of Commissioners
Lakewood Township Residential Assistance Program
Lakewood, New Jersey

We have audited the accompanying financial statements of the Lakewood Township Residential Assistance Program, which comprise the Comparative Statements of Net Position as of December 31, 2013 and 2012 and the related Statements of Revenues, Expenses and Changes in Net Position and Cash Flows for the years then ended, and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America. This includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in *Government Auditing Standards* issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Lakewood Township Residential Assistance Program, as of December 31, 2013 and 2012, and the changes in net position, and its cash flows for the years then ended, in accordance with the accounting principles generally accepted in the United States of America.

5

INDEPENDENT AUDITORS' REPORT
(Continued)

**Other Matters**

*Required Supplementary Information*

Accounting principles generally accepted in the United States of America require that the management's discussion and analysis presented on pages 1-4 be presented to supplement the basic financial statements. Such information, although not a part of the basic financial statements, is required by the Governmental Accounting Standards Board, who considers it to be an essential part of financial reporting for placing the financial statements in an appropriate operational, economic, or historical context. We have applied certain limited procedures to the required supplementary information in accordance with auditing standards generally accepted in the United States of America, which consisted of inquiries of management about the methods of preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic financial statements, and other knowledge we obtained during our audit of the financial statements. We do not express an opinion or provide any assurance on the information because the limited procedures do not provide us with sufficient evidence to express an opinion or provide any assurance.

*Other Information*

Our audits were conducted for the purpose of forming an opinion on the financial statements of the Lakewood Township Residential Assistance Program. The Financial Data Schedule is presented for purposes of additional analysis and is not a required part of the basic financial statements. The schedule of expenditures of federal awards is presented for purposes of additional analysis as required by U. S. Office of management and Budget Circular A-133, *Audits of States, Local Governments, and Non-Profit Organizations*, and is also not a required part of the financial statements.

The financial data schedule and schedule of expenditures of federal awards are the responsibility of management and were derived from and directly relate to the underlying accounting and other records used to prepare the basic financial statements. Such information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards general accepted in the United States of America. In our opinion, the financial data schedule and the schedule of expenditures of federal awards are fairly stated in all material respects in relation to the financial statements as a whole.

**Other Reporting Required by Government Auditing Standards**

In accordance with *Government Auditing Standards* we have also issued our report dated August 8, 2014 on our consideration of the Lakewood Township Residential Assistance Program's internal control over financial reporting and on our tests of its compliance with certain provisions of laws, regulations, contracts, and grant agreements and other matters. The purpose of that report is to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to provide an opinion on internal control over financial reporting or on compliance. That report is an integral part of an audit performed in accordance with *Government Auditing Standards* in considering the Authority's internal control over financial reporting and compliance.

*Polcari & Company*

POLCARI & COMPANY
CERTIFIED PUBLIC ACCOUNTANTS

Wayne, New Jersey
August 8, 2014

6


CERTIFIED   PUBLIC   ACCOUNTANTS

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
Lakewood, New Jersey
COMPARATIVE STATEMENTS OF NET POSITION
At December 31, 2013 and 2012

|  | 12/31/2013 | 12/31/2012 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS** | | |
| Cash and Cash Equivalents – Unrestricted | $ 352,573 | $ 3,257 |
| Cash - Restricted | 324,687 | 808,893 |
| Total Cash | 677,260 | 812,150 |
| Accounts Receivable – Other Government | 4,985 | - |
| Accounts Receivable – Fraud (Net) | 1,196 | 6,501 |
| Accounts Receivable – HUD | 414 | 1,514 |
| Accounts Receivable – Other (Net) | - | 130,148 |
| Total Current Assets | 683,855 | 950,313 |
| **TOTAL ASSETS** | $ 683,855 | $ 950,313 |
| **LIABILITIES** | | |
| **CURRENT LIABILITIES** | | |
| Accounts Payable: | | |
| Vendors and Contractors | $ 65,894 | $ 19,790 |
| Due to HUD | 289,338 | 1,233 |
| Other Governments | 3,936 | 9,145 |
| Total Current Liabilities | 359,168 | 30,168 |
| **NON-CURRENT LIABILITIES** | | |
| Family Self-Sufficiency Escrow Deposits | 324,687 | 274,816 |
| **TOTAL LIABILITIES** | 683,855 | 304,984 |
| **NET POSITION** | | |
| Restricted | - | 645,329 |
| Unrestricted | - | - |
| TOTAL NET POSITION | $ - | $ 645,329 |

See Notes to Financial Statements.

7

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
Lakewood, New Jersey
COMPARATIVE STATEMENTS OF REVENUE, EXPENSES
AND CHANGES IN NET POSITION
For the Years Ended December 31, 2013 and 2012

|  | 2013 | 2012 |
|---|---|---|
| **REVENUES** | | |
| HUD Operating Grants | $ 15,660,919 | $ 15,048,326 |
| Fraud Recoveries | 51,062 | 33,944 |
| Other Revenues | 707,178 | 682,168 |
| Total Revenues | 16,419,159 | 15,764,438 |
| **EXPENSES** | | |
| Administration | 921,130 | 1,066,090 |
| Tenant Services | 51,140 | 51,098 |
| Housing Assistance Payments | 16,092,249 | 15,508,098 |
| Total Operating Expenses | 17,064,519 | 16,625,286 |
| Excess of Operating Revenues Over Expenses | (645,360) | (860,848) |
| **NON-OPERATING REVENUES** | | |
| Interest on Investments | 31 | 8,808 |
| Increase in Net Position | (645,329) | (852,040) |
| Beginning Net Position | 645,329 | 1,497,369 |
| **ENDING NET POSITION** | $        - | $ 645,329 |

See Notes to Financial Statements.

8

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
Lakewood, New Jersey
COMPARATIVE STATEMENTS OF CASH FLOWS
For the Years Ended December 31, 2013 and 2012

|  | 2013 | 2012 |
|---|---|---|
| **CASH FLOWS FORM OPERATING ACTIVITIES** |  |  |
| Operating Grants Received from HUD | $ 15,950,124 | $ 15,047,529 |
| Cash Received From Other Operating Revenues | 758,560 | 759,970 |
| Cash Payments for Housing Assistance | (16,047,587) | (15,604,971) |
| Cash Payments for Goods and Services | (796,018) | (1,153,453) |
| Net Cash Provided by Operating Activities | (134,921) | (950,925) |
|  |  |  |
| **CASH FLOWS FROM INVESTING ACTIVITIES** |  |  |
| Receipts of Interest and Dividends | 31 | 8,808 |
| Net Cash Provided By Investing Activities | 31 | 8,808 |
|  |  |  |
| **CASH FLOWS FROM CAPITAL AND RELATED FINANCING ACTIVITIES** |  |  |
| Purchase of Equipment | - | - |
| Net Cash Used For Capital and Related Activities | - | - |
|  |  |  |
| Increase in Cash and Cash Equivalents | (134,890) | (942,117) |
|  |  |  |
| Cash and Cash Equivalents - Beginning of Year | 812,150 | 1,754,267 |
|  |  |  |
| Cash and Cash Equivalents - End of Year | $ 677,260 | $ 812,150 |

Reconciliation of Operating Income to Net Cash Provided by Operating Activities

|  | 2013 | 2012 |
|---|---|---|
| Operating Income | $ (645,360) | $ (860,848) |
| Adjustments to Reconcile Operating Income to Net Cash Provided by Operating Activities: |  |  |
| Decrease/(Increase) in Assets: |  |  |
| Accounts Receivable - Other | 130,148 | 45,345 |
| Accounts Receivable - Other Governments | (4,985) |  |
| Accounts Receivable - Fraud | 5,305 | (1,487) |
| Accounts Receivable - HUD | 1,100 | (1,514) |
| Increase (Decrease) in Liabilities: |  |  |
| Accounts Payable | 46,104 | (36,285) |
| Due to HUD | 288,105 | 717 |
| Accounts Payable - Other Governments | (5,209) | 1,919 |
| Family Self-Sufficiency Escrow Payable | 49,871 | (98,792) |
|  | $ (134,921) | $ (950,925) |

See Notes to Financial Statements.

9

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
DECEMBER 31, 2013
NOTES TO FINANCIAL STATEMENTS

**NOTE 1 –Summary of Organization, Activities and Significant Accounting Policies:**

1. **Organization** – The Lakewood Township Residential Assistance Program (LTRAP, the Program) was created by resolution of the Council of the Township of Lakewood to receive subsidies and provide rental assistance to low and moderate income residents of the Township of Lakewood in accordance with rules and regulations of the United States Department of Housing and Urban Development (HUD) and its Annual Contributions Contract with HUD. The Township has contracted with the Lakewood Tenant Organization, Inc. (LTO) to administer the Program. In consideration for its management of the Program, LTO receives a management fee equal to 100% of the subsidies and fees paid or payable to the Township of Lakewood under its contract with HUD.

2. **Activities** – The financial statements include all the accounts of the Lakewood Township Residential Assistance Program. All of these accounts, as previously noted, are managed by the Lakewood Tenants Organization, Inc. (LTO) pursuant to its contract with LTRAP.

3. **Significant Accounting Policies** - The Governmental Accounting Standards Board (GASB) is the accepted standard-setting body for establishing governmental accounting and financial reporting principles. The more significant of the Program's accounting principles, including those required by GASB Statement No. 34, are described below.

   a. **Basis of Accounting** – The financial statements report on the Program as a whole. The Comparative Statements of Activities demonstrate the degree to which the direct expenses of the Program's function are offset by program revenues. Direct expenses are those that are clearly identifiable with the Program's function. Program revenue includes charges for services which are based on exchange or exchange-like transactions and grants and contributions that are restricted to meeting the operational or capital requirements of the Program's programs.

      The accrual basis of accounting and the economic resources measurement focus are used for measuring financial position and operating results. Under the accrual basis of accounting, transactions are recognized when they occur, regardless of when cash is received or disbursed. Revenues are recognized in the accounting period in which they are earned and expenses recognized in the period incurred. Grant revenues and similar items are recognized as revenue when all eligibility requirements imposed by the provider have been met.

      Using the accrual basis of accounting is consistent with the proprietary fund focus on measuring all the costs of providing goods or services for the period and matching those costs with the revenues earned during the period by providing the goods or services.

   b. **Report Presentation** – The financial statements included in this Report were prepared in accordance with GAAP in the United States of America applicable to governmental entities for Proprietary Fund Types. In accordance with GASB Statement No. 34, the report includes Management's Discussion and Analysis. The Enterprise Fund is used for activities which are financed and operated in a manner similar to a private business enterprise where the intent is that the costs (expenses, including depreciation) of providing goods or services to its clients on a continuing basis be financed or recovered primarily through user charges or operating subsidies.

10

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
DECEMBER 31, 2013
NOTES TO FINANCIAL STATEMENTS
(Continued)

Significant accounting policies are as follows:

1 – Cash and cash equivalents are stated at cost, which approximates market. Cash and cash equivalents include cash in banks, petty cash, certificates of deposit and other investments with original maturities of less than three months from the date of purchase. Investments are recorded at fair value based on quoted market prices. Fair value is the amount at which a financial instrument could be exchanged in a current transaction between willing parties.

2 – Collection losses on accounts receivable are charged against an allowance for doubtful accounts.

3 – Equipment is recorded at cost for all programs and depreciation is computed on the straight-line basis.

4 – Repairs funded out of operations, such as painting, roofing and plumbing, are charged against income for all programs.

5 – The Program is subsidized by the Federal Government. The Program is not subject to Federal or State income taxes, nor is it required to file Federal and State income tax returns.

6 – Operating subsidies received from HUD are recorded as income when earned.

7 – The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements, and reported amounts of revenues and expenses during the reporting period.

8 – The Program has elected not to apply to its proprietary activities Financial Accounting Standards Board Statements and Interpretations, Accounting Principles Board Opinions, and Accounting Research Bulletins of the Committee of accounting Procedure issued after November 30, 1989.

## NOTE 2 – Cash and Cash Equivalents

The Program maintains cash and investments in local banks. These funds are covered by the Governmental Unit Depository Protection Act, which requires the institutions to pool collateral for all of the Program's deposits and have the collateral held by an approved custodian in the Township's name.

Cash and equivalents of $677,260 and $812,150 at December 31, 2013 and 2012, respectively, consisted of the following:

|  | Dec. 31, 2013 | Dec. 31, 2012 |
|---|---|---|
| Checking Accounts | $ 352,573 | $ 537,334 |
| FSS Escrow Accounts | 324,687 | 274,816 |
| Total Cash | $ 677,260 | $ 812,150 |

11

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
DECEMBER 31, 2013
NOTES TO FINANCIAL STATEMENTS
(Continued)

## NOTE 2 – Cash and Cash Equivalents (Continued)

The carrying amount of the Program's cash and cash equivalents held in banks as of December 31, 2013 was $677,260 and the bank balances were $706,487. Of the bank balances, $250,000 was covered by FDIC insurance and $456,487 was covered by a collateral pool maintained by the banks as required by New Jersey statutes.

The Program's cash and cash equivalents are categorized as prescribed in GASB 40 to give an indication of the level of risk assumed by the Program.  As described above, $456,487 of the Program's deposits exceeded FDIC insurance and were covered under the New Jersey Government Unit Deposit Protection Act (GUDPA).  Under GUDPA, the Program's deposits are collateralized by securities held by the pledging institutions trust department.  The securities deposits collateralized are not in the Program's name.

## NOTE 3 – Accounts Receivable - Net

Accounts Receivable, net of an allowance for doubtful accounts at December 31, 2013 and 2012 consisted of the following:

|  | Dec. 31, 2013 | Dec. 31, 2012 |
|---|---|---|
| Fraud Recoveries | $      32,248 | $      24,760 |
| Portability Receivables | 4,985 | - |
| Due from Lakewood Tenants Organization | - | 130,148 |
| Housing Choice Voucher Program Subsidies Receivable from HUD | 414 | 1,514 |
| Less: Allowance for Doubtful Accounts | (31,052) | (18,259) |
|  | $        6,595 | $      138,163 |

Accounts receivable – fraud recoveries represent receivables due from tenants and landlords for housing assistance payments made erroneously – either due to fraudulent reporting of income by tenants or overpayments made to landlords due to the delinquency of tenants in reporting income at the time of recertification.

Portability receivables represent accounts receivable from other housing programs for tenants moving to Lakewood under the portability provisions of the housing choice voucher program.

Amounts due from Lakewood Tenants Organization (LTO) at December 31, 2012 represents an overpayment made to the program's managing agent.  This overpayment was the result of the United States Department of Housing and Urban Development (HUD) charging the program approximately $112,000 for over-leasing of units that occurred in 2007.  During 2010, in connection with its review of Net Restricted Assets within the housing choice voucher program, HUD notified LTRAP that valid housing payments made to landlords on behalf of qualified tenants in 2007 must be repaid to the program since the number of unit months leased in that year exceeded the amount authorized in the Annual Contributions Contract.  That amount was recorded as a receivable in 2012 and was repaid to the program by LTO in December 2013.

12

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
DECEMBER 31, 2013
NOTES TO FINANCIAL STATEMENTS
(Continued)

## NOTE 4 – Non-current Liabilities – Family Self-Sufficiency Escrow

The Family Self-Sufficiency (FSS) escrow balances of $324,687 and $274,816 at December 31, 2013 and 2012, respectively, represent amounts held in escrow on behalf of subsidized tenants enrolled in the Agency's FSS Program. These funds will be released to the tenant upon satisfactory completion of the tenant's agreed-upon services program. In the event the tenant does not complete his or her program requirements, the funds will be returned to HUD. The Program does not anticipate that any participants will be eligible to receive payments from escrow during 2014. Thus, no amounts are included in current liabilities.

## NOTE 5 – Risk Management

The Program is exposed to various risks of loss related to torts, theft, damage to and destruction of assets; errors and omissions; and natural disasters for which the Managing Agent carries commercial insurance. During the year ended December 31, 2013, the Program's risk management program, in order to deal with potential liabilities, consisted of various insurance policies for fire, general liability, crime, auto and public-officials errors and omissions. Periodically, but not less than annually, the Managing Agent conducts physical inspections of rental units participating in the program for the purpose of determining potential liability issues. Liabilities are reported when it is probable that a loss has occurred and the amount of the loss can be reasonably estimated. Settled claims relating to the commercial insurance have not exceeded the amount of insurance in any of the past three fiscal years.

## NOTE 6 – Economic Dependency

For the years ended December 31, 2013 and December 31, 2012, substantially all of the Program's revenues were received from the United States Department of Housing and Urban Development, which are subject to availability of funds and Congressional approval, as well as the Agency's compliance with Federal rules and regulations.

## NOTE 8 – Accounts Payable - HUD

Accounts payable to HUD at December 31, 2013 consists of the following:

| | |
|---|---|
| Interest Earned on Restricted Net Assets | $    1,599 |
| Unspent set-aside subsidy funding received from HUD | 287,739 |
| Total Payable to HUD | $ 289,338 |

## NOTE 7 – Restricted Net Assets

Restricted Net Assets of $645,329 at December 31, 2012 consists of unspent housing assistance payment grants. Prior to January 1, 2005 excess funds advanced by HUD to the Program for the payment of housing assistance payments were returned to HUD at the end of the Program's fiscal year. In accordance with HUD's PIH Notice 2006-03, starting January 1, 2005 excess funds disbursed by HUD to the Program for the payment of Housing Assistance Payments that are not so utilized are not returned to HUD, but become part of the undesignated fund balance and may only be used to assist qualified families up to the number of units under contract. As of November 2007, HUD is reverting to treating these funds as restricted in order to comply with generally accepted accounting principles.

13

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
DECEMBER 31, 2013
NOTES TO FINANCIAL STATEMENTS
(Continued)

### NOTE 8 – Restricted Net Assets (Continued)

Administrative fees paid by HUD to the Program in excess of administrative expenses are part of the undesignated fund balance and are considered to be "administrative fee reserves". Administrative fee reserves accumulated prior to January 1, 2005 are subject to all requirements applicable to administrative fee reserves including, but not limited to, 24 CFR982.155 – i.e. "other housing purposes permitted by state or local law". Excess administrative fees earned in 2005 and subsequent years must be used for activities related to the provision of tenant-based rental assistance authorized under Section 8 of the United States Housing Act of 1937, including related development activities.

In accordance with HUD requirements, the Program's restricted and unrestricted fund balance consists of the following components as of December 31, 2013:

| | | |
|---|---:|---:|
| **Administrative Fee Equity - included in Unrestricted Net Assets** | | |
| Administrative Fee Reserves as of December 31, 2012 | $ - | |
| Subsidy Received December 31, 2013 | 911,838 | |
| Administrative Expenses December 31, 2013 | (962,569) | |
| Portability Administrative Fees Earned December 31, 2013 | 25,200 | |
| 50% of fiscal year December 31, 2013 Fraud Recoveries (net) | 25,531 | $ - |
| **Housing Assistance Payment Equity - included in Restricted Net Assets** | | |
| Housing Assistance Payment Reserves as of December 31, 2012 | $ 645,329 | |
| Subsidy Received December 31, 2013 | 14,669,665 | |
| HAP Payments December 31, 2013 | (15,340,525) | |
| FSS Forfeitures During FYE Dec. 31, 2013 | -- | |
| Interest on Housing Assistance Payments | - | |
| 50% of fiscal year December 31, 2013 Fraud Recoveries (net) | 25,531 | - |
| **Total Net Assets** | | $ - |

### NOTE 9 – Accounts Payable – Other Governments

Accounts payable to other governments of $3,936 and $9,145 at December 31, 2013 and 2012, respectively, represent payments due to receiving programs for tenants moving from Lakewood to their jurisdictions under the portability provisions of the housing choice voucher program.

### NOTE 10 – Subsequent Events

Events that occur after the balance sheet date but before the financial statements were available to be issued must be evaluated for recognition or disclosure. The effects of subsequent events that provide evidence about conditions that existed at the balance sheet date are recognized in the accompanying financial statements. Subsequent events which provide evidence about conditions that existed after the balance sheet date require disclosure in the accompanying notes. Management has evaluated subsequent events through August 8, 2014, the date on which the financial statements were available to be issued and concluded that no subsequent events have occurred that would require recognition in the financial statements or disclosure in the notes to the financial statements.

14

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
Lakewood, New Jersey

SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS
For the Year Ended December 31, 2013

| | Expenditures |
|---|---|
| **HOUSING ASSISTANCE PAYMENTS PROGRAM** | |
| Section 8 Housing Choice Voucher Program (CFDA # 14.871) | $ 15,581,503 |
| Low Income Housing Assistance Program - Section 8 Moderate Rehab Program (CFDA # 14.856) | 79,416 |
| Total Federal Expenditures | $ 15,660,919 |

NOTES TO SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS

1. Basis of Presentation - The Schedule of Expenditures of Federal Awards is presented in accordance with generally accepted accounting principles and is presented in accordance with the requirements of OMB Circular A-133. Therefore, some amounts presented in this schedule may differ from amounts presented in, or used in the preparation of the general purpose financial statements.

2. There were no subrecipient activities during the audit period.

15

Lakewood Township Residential Assistance Prog  (NJ214)
Lakewood, NJ
Entity Wide Balance Sheet Summary

Submission Type: Audited/A-133                    Fiscal Year End: 12/31/2013

| | 14,871 Housing Choice Vouchers | 14.856 Lower Income Housing Assistance Program_Section 8 Moderate | Subtotal | ELIM | Total |
|---|---|---|---|---|---|
| 111 Cash - Unrestricted | $352,286 | $287 | $352,573 | | $352,573 |
| 112 Cash - Restricted - Modernization and Development | | $0 | | | |
| 113 Cash - Other Restricted | $324,687 | $0 | $324,687 | | $324,687 |
| 114 Cash - Tenant Security Deposits | | $0 | | | |
| 115 Cash - Restricted for Payment of Current Liabilities | | $0 | | | |
| 100 Total Cash | $676,973 | $287 | $677,260 | $0 | $677,260 |
| | | | | | |
| 121 Accounts Receivable - PHA Projects | | $0 | | | |
| 122 Accounts Receivable - HUD Other Projects | | $414 | $414 | | $414 |
| 124 Accounts Receivable - Other Government | $4,985 | $0 | $4,985 | | $4,985 |
| 125 Accounts Receivable - Miscellaneous | | $0 | | | |
| 126 Accounts Receivable - Tenants | | $0 | | | |
| 126.1 Allowance for Doubtful Accounts -Tenants | | $0 | | | |
| 126.2 Allowance for Doubtful Accounts - Other | $0 | $0 | $0 | | $0 |
| 127 Notes, Loans & Mortgages Receivable - Current | | $0 | | | |
| 128 Fraud Recovery | $32,232 | $16 | $32,248 | | $32,248 |
| 128.1 Allowance for Doubtful Accounts - Fraud | -$31,036 | -$16 | -$31,052 | | -$31,052 |
| 129 Accrued Interest Receivable | | $0 | | | |
| 120 Total Receivables, Net of Allowances for Doubtful Accounts | $6,181 | $414 | $6,595 | $0 | $6,595 |
| | | | | | |
| 131 Investments - Unrestricted | | $0 | | | |
| 132 Investments - Restricted | | $0 | | | |
| 135 Investments - Restricted for Payment of Current Liability | | $0 | | | |
| 142 Prepaid Expenses and Other Assets | | $0 | | | |
| 143 Inventories | | $0 | | | |
| 143.1 Allowance for Obsolete Inventories | | $0 | | | |
| 144 Inter Program Due From | $75 | $0 | $75 | -$75 | $0 |
| 145 Assets Held for Sale | | $0 | | | |
| 150 Total Current Assets | $683,229 | $701 | $683,930 | -$75 | $683,855 |
| | | | | | |
| 161 Land | | $0 | | | |
| 162 Buildings | | $0 | | | |
| 163 Furniture, Equipment & Machinery - Dwellings | | $0 | | | |
| 164 Furniture, Equipment & Machinery - Administration | | $0 | | | |
| 165 Leasehold Improvements | | $0 | | | |
| 166 Accumulated Depreciation | | $0 | | | |
| 167 Construction in Progress | | $0 | | | |
| 168 Infrastructure | | $0 | | | |
| 160 Total Capital Assets, Net of Accumulated Depreciation | $0 | $0 | $0 | $0 | $0 |
| | | | | | |
| 171 Notes, Loans and Mortgages Receivable - Non-Current | | $0 | | | |
| 172 Notes, Loans, & Mortgages Receivable - Non Current - Past Due | | $0 | | | |
| 173 Grants Receivable - Non Current | | $0 | | | |
| 174 Other Assets | | $0 | | | |
| 176 Investments in Joint Ventures | | $0 | | | |
| 180 Total Non-Current Assets | $0 | $0 | $0 | $0 | $0 |
| | | | | | |
| 190 Total Assets | $683,229 | $701 | $683,930 | -$75 | $683,855 |
| | | | | | |
| 200 Deferred Outflow of Resources | | $0 | | | |
| | | | | | |
| 290 Total Assets and Deferred Outflow of Resources | $683,229 | $701 | $683,930 | -$75 | $683,855 |

Lakewood Township Residential Assistance Prog  (NJ214)
Lakewood, NJ
Entity Wide Balance Sheet Summary

Submission Type: Audited/A-133                    Fiscal Year End: 12/31/2013

| | 14.871 Housing Choice Vouchers | 14.856 Lower Income Housing Assistance Program_Section 8 Moderate | Subtotal | ELIM | Total |
|---|---|---|---|---|---|
| 311 Bank Overdraft | | $0 | | | |
| 312 Accounts Payable <= 90 Days | $65,266 | $628 | $65,894 | | $65,894 |
| 313 Accounts Payable >90 Days Past Due | | $0 | | | |
| 321 Accrued Wage/Payroll Taxes Payable | | $0 | | | |
| 322 Accrued Compensated Absences - Current Portion | | $0 | | | |
| 324 Accrued Contingency Liability | | $0 | | | |
| 325 Accrued Interest Payable | | $0 | | | |
| 331 Accounts Payable - HUD PHA Programs | $289,338 | $0 | $289,338 | | $289,338 |
| 332 Account Payable - PHA Projects | | $0 | | | |
| 333 Accounts Payable - Other Government | $3,936 | $0 | $3,936 | | $3,936 |
| 341 Tenant Security Deposits | | $0 | | | |
| 342 Unearned Revenue | | $0 | | | |
| 343 Current Portion of Long-term Debt - Capital Projects/Mortgage Revenue | | $0 | | | |
| 344 Current Portion of Long-term Debt - Operating Borrowings | | $0 | | | |
| 345 Other Current Liabilities | | $0 | | | |
| 346 Accrued Liabilities - Other | | $0 | | | |
| 347 Inter Program - Due To | | $75 | $75 | -$75 | $0 |
| 348 Loan Liability - Current | | $0 | | | |
| 310 Total Current Liabilities | $358,642 | $701 | $359,243 | -$75 | $359,168 |
| | | | | | |
| 351 Long-term Debt, Net of Current - Capital Projects/Mortgage Revenue | | $0 | | | |
| 352 Long-term Debt, Net of Current - Operating Borrowings | | $0 | | | |
| 353 Non-current Liabilities - Other | $324,687 | $0 | $324,687 | | $324,687 |
| 354 Accrued Compensated Absences - Non Current | | $0 | | | |
| 355 Loan Liability - Non Current | | $0 | | | |
| 356 FASB 5 Liabilities | | $0 | | | |
| 357 Accrued Pension and OPEB Liabilities | | $0 | | | |
| 350 Total Non-Current Liabilities | $324,687 | $0 | $324,687 | $0 | $324,687 |
| | | | | | |
| 300 Total Liabilities | $683,229 | $701 | $683,930 | -$75 | $683,855 |
| | | | | | |
| 400 Deferred Inflow of Resources | | $0 | | | |
| | | | | | |
| 508.4 Net Investment in Capital Assets | | $0 | | | |
| 511.4 Restricted Net Position | | $0 | | | |
| 512.4 Unrestricted Net Position | $0 | $0 | $0 | | $0 |
| 513 Total Equity - Net Assets / Position | $0 | $0 | $0 | $0 | $0 |
| | | | | | |
| 600 Total Liab., Def. Inflow of Res., and Equity - Net Assets / Position | $683,229 | $701 | $683,930 | -$75 | $683,855 |

17

Lakewood Township Residential Assistance Prog (NJ214)

Lakewood, NJ

**Entity Wide Revenue and Expense Summary**

Submission Type: Audited/A-133                    Fiscal Year End: 12/31/2013

| | 14.871 Housing Choice Vouchers | 14.856 Lower Income Housing Assistance Program_Section 8 Moderate | Subtotal | ELIM | Total |
|---|---|---|---|---|---|
| 70300 Net Tenant Rental Revenue | | $0 | | | |
| 70400 Tenant Revenue - Other | | $0 | | | |
| 70500 Total Tenant Revenue | $0 | $0 | $0 | | $0 |
| | | | | | |
| 70600 HUD PHA Operating Grants | $15,581,503 | $79,416 | $15,660,919 | | $15,660,919 |
| 70610 Capital Grants | | $0 | | | |
| 70710 Management Fee | | $0 | | | |
| 70720 Asset Management Fee | | $0 | | | |
| 70730 Book Keeping Fee | | $0 | | | |
| 70740 Front Line Service Fee | | $0 | | | |
| 70750 Other Fees | | $0 | | | |
| 70700 Total Fee Revenue | | $0 | | | |
| | | | | | |
| 70800 Other Government Grants | | $0 | | | |
| 71100 Investment Income - Unrestricted | | $31 | $31 | | $31 |
| 71200 Mortgage Interest Income | | $0 | | | |
| 71300 Proceeds from Disposition of Assets Held for Sale | | $0 | | | |
| 71310 Cost of Sale of Assets | | $0 | | | |
| 71400 Fraud Recovery | $51,062 | $0 | $51,062 | | $51,062 |
| 71500 Other Revenue | $707,178 | $0 | $707,178 | | $707,178 |
| 71600 Gain or Loss on Sale of Capital Assets | | $0 | | | |
| 72000 Investment Income - Restricted | $0 | $0 | $0 | | $0 |
| 70000 Total Revenue | $16,339,743 | $79,447 | $16,419,190 | | $16,419,190 |
| | | | | | |
| 91100 Administrative Salaries | | $0 | | | |
| 91200 Auditing Fees | $9,775 | $75 | $9,850 | | $9,850 |
| 91300 Management Fee | | $0 | | | |
| 91310 Book-keeping Fee | | $0 | | | |
| 91400 Advertising and Marketing | | $0 | | | |
| 91500 Employee Benefit contributions - Administrative | | $0 | | | |
| 91600 Office Expenses | | $0 | $0 | | $0 |
| 91700 Legal Expense | | $0 | | | |
| 91800 Travel | | $0 | | | |
| 91810 Allocated Overhead | | $0 | | | |
| 81900 Other | $901,654 | $9,626 | $911,280 | | $911,280 |
| 91000 Total Operating - Administrative | $911,429 | $9,701 | $921,130 | | $921,130 |
| | | | | | |
| 92000 Asset Management Fee | | $0 | | | |
| 92100 Tenant Services - Salaries | | $0 | | | |
| 92200 Relocation Costs | | $0 | | | |
| 92300 Employee Benefit Contributions - Tenant Services | | $0 | | | |
| 92400 Tenant Services - Other | $51,140 | $0 | $51,140 | | $51,140 |
| 92500 Total Tenant Services | $51,140 | $0 | $51,140 | | $51,140 |

Lakewood Township Residential Assistance Prog (NJ214)
Lakewood, NJ
Entity Wide Revenue and Expense Summary

Submission Type: Audited/A-133                                      Fiscal Year End: 12/31/2013

| | 14.871 Housing Choice Vouchers | 14.856 Lower Income Housing Assistance Program_Section 8 Moderate | Subtotal | ELIM | Total |
|---|---|---|---|---|---|
| 93100 Water | | $0 | | | |
| 93200 Electricity | | $0 | | | |
| 93300 Gas | | $0 | | | |
| 93400 Fuel | | $0 | | | |
| 93500 Labor | | $0 | | | |
| 93600 Sewer | | $0 | | | |
| 93700 Employee Benefit Contributions - Utilities | | $0 | | | |
| 93800 Other Utilities Expense | | $0 | | | |
| 93000 Total Utilities | $0 | $0 | $0 | | $0 |
| | | | | | |
| 94100 Ordinary Maintenance and Operations - Labor | | $0 | | | |
| 94200 Ordinary Maintenance and Operations - Materials and Other | | $0 | | | |
| 94300 Ordinary Maintenance and Operations Contracts | | $0 | | | |
| 94500 Employee Benefit Contributions - Ordinary Maintenance | | $0 | | | |
| 94000 Total Maintenance | $0 | $0 | $0 | | $0 |
| | | | | | |
| 95100 Protective Services - Labor | | $0 | | | |
| 95200 Protective Services - Other Contract Costs | | $0 | | | |
| 95300 Protective Services - Other | | $0 | | | |
| 95500 Employee Benefit Contributions - Protective Services | | $0 | | | |
| 95000 Total Protective Services | $0 | $0 | $0 | | $0 |
| | | | | | |
| 96110 Property Insurance | | $0 | | | |
| 96120 Liability Insurance | | $0 | | | |
| 96130 Workmen's Compensation | | $0 | | | |
| 96140 All Other Insurance | | $0 | | | |
| 96100 Total Insurance Premiums | $0 | $0 | $0 | | $0 |
| | | | | | |
| 96200 Other General Expenses | | $0 | | | |
| 96210 Compensated Absences | | $0 | | | |
| 96300 Payments in Lieu of Taxes | | $0 | | | |
| 96400 Bad debt - Tenant Rents | | $0 | | | |
| 96500 Bad debt - Mortgages | | $0 | | | |
| 96600 Bad debt - Other | | $0 | | | |
| 96800 Severance Expense | | $0 | | | |
| 96000 Total Other General Expenses | $0 | $0 | $0 | | $0 |
| | | | | | |
| 96710 Interest of Mortgage (or Bonds) Payable | | $0 | | | |
| 96720 Interest on Notes Payable (Short and Long Term) | | $0 | | | |
| 96730 Amortization of Bond Issue Costs | | $0 | | | |
| 96700 Total Interest Expense and Amortization Cost | $0 | $0 | $0 | | $0 |
| | | | | | |
| 96900 Total Operating Expenses | $962,569 | $9,701 | $972,270 | | $972,270 |
| | | | | | |
| 97000 Excess of Operating Revenue over Operating Expenses | $15,377,174 | $69,746 | $15,446,920 | | $15,446,920 |
| | | | | | |
| 97100 Extraordinary Maintenance | | $0 | | | |
| 97200 Casualty Losses - Non-capitalized | | $0 | | | |
| 97300 Housing Assistance Payments | $16,340,625 | $69,746 | $16,410,271 | | $16,410,271 |
| 97350 HAP Portability-In | $681,978 | $0 | $681,978 | | $681,978 |
| 97400 Depreciation Expense | $0 | $0 | $0 | | $0 |
| 97500 Fraud Losses | | $0 | | | |
| 97600 Capital Outlays - Governmental Funds | | $0 | | | |

Lakewood Township Residential Assistance Prog  (NJ214)
Lakewood, NJ
Entity Wide Revenue and Expense Summary

Submission Type: Audited/A-133                    Fiscal Year End:  12/31/2013

| | 14.871 Housing Choice Vouchers | 14.856 Lower Income Housing Assistance Program_Section 8 Moderate | Subtotal | ELIM | Total |
|---|---|---|---|---|---|
| 97700  Debt Principal Payment - Governmental Funds | | $0 | | | |
| 97800  Dwelling Units Rent Expense | | $0 | | | |
| 90000  Total Expenses | $16,985,072 | $79,447 | $17,064,519 | | $17,064,519 |
| | | | | | |
| 10010  Operating Transfer In | | $0 | | | |
| 10020  Operating transfer Out | | $0 | | | |
| 10030  Operating Transfers from/to Primary Government | | $0 | | | |
| 10040  Operating Transfers from/to Component Unit | | $0 | | | |
| 10050  Proceeds from Notes, Loans and Bonds | | $0 | | | |
| 10060  Proceeds from Property Sales | | $0 | | | |
| 10070  Extraordinary Items, Net Gain/Loss | | $0 | | | |
| 10080  Special Items (Net Gain/Loss) | | $0 | | | |
| 10091  Inter Project Excess Cash Transfer In | | $0 | | | |
| 10092  Inter Project Excess Cash Transfer Out | | $0 | | | |
| 10093  Transfers between Program and Project - In | | $0 | | | |
| 10094  Transfers between Project and Program - Out | | $0 | | | |
| 10100  Total Other financing Sources (Uses) | $0 | $0 | $0 | | $0 |
| | | | | | |
| 10000  Excess (Deficiency) of Total Revenue Over (Under) Total Expenses | -$645,329 | $0 | -$645,329 | | -$645,329 |
| | | | | | |
| 11020  Required Annual Debt Principal Payments | $0 | $0 | $0 | | $0 |
| 11030  Beginning Equity | $645,329 | $0 | $645,329 | | $645,329 |
| 11040  Prior Period Adjustments, Equity Transfers and Correction of Errors | $0 | $0 | $0 | | $0 |
| 11050  Changes in Compensated Absence Balance | | $0 | | | |
| 11060  Changes in Contingent Liability Balance | | $0 | | | |
| 11070  Changes in Unrecognized Pension Transition Liability | | $0 | | | |
| 11080  Changes in Special Term/Severance Benefits Liability | | $0 | | | |
| 11090  Changes in Allowance for Doubtful Accounts - Dwelling Rents | | $0 | | | |
| 11100  Changes in Allowance for Doubtful Accounts - Other | | $0 | | | |
| 11170  Administrative Fee Equity | $0 | $0 | $0 | | $0 |
| | | | | | |
| 11180  Housing Assistance Payments Equity | $0 | $0 | $0 | | $0 |
| 11190  Unit Months Available | 12696 | 96 | 12792 | | 12792 |
| 11210  Number of Unit Months Leased | 12484 | 96 | 12580 | | 12580 |
| 11270  Excess Cash | | $0 | | | |
| 11610  Land Purchases | | $0 | | | |
| 11620  Building Purchases | | $0 | | | |
| 11630  Furniture & Equipment - Dwelling Purchases | | $0 | | | |
| 11640  Furniture & Equipment - Administrative Purchases | | $0 | | | |
| 11650  Leasehold Improvements Purchases | | $0 | | | |
| 11660  Infrastructure Purchases | | $0 | | | |
| 13510  CFFP Debt Service Payments | | $0 | | | |
| 13901  Replacement Housing Factor Funds | | $0 | | | |

20



**CERTIFIED PUBLIC ACCOUNTANTS**

2035 HAMBURG TURNPIKE, UNIT H
WAYNE, NEW JERSEY 07470
TELEPHONE: (973) 831-6969
FAX: (973) 831-8972
E-MAIL: POLCARICO@OPTONLINE.NET

### INDEPENDENT AUDITOR'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING AND ON COMPLIANCE AND OTHER MATTERS BASED ON AN AUDIT OF FINANCIAL STATEMENTS PERFORMED IN ACCORDANCE WITH GOVERNMENT AUDITING STANDARDS

Board of Commissioners
Lakewood Township Residential Assistance Program
Lakewood, New Jersey

We have audited, in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in *Government Auditing Standards* issued by the Comptroller General of the United States, the financial statements of the Lakewood Township Residential Assistance Program ("the Program") as of and for the year ended December 31, 2013 and the related notes to the financial statements, which collectively comprise the Lakewood Township Residential Assistance Program's basic financial statements and have issued our report thereon dated August 8, 2014.

<u>Internal Control Over Financial Reporting</u>

In planning and performing our audit of the financial statements, we considered the Lakewood Township Residential Assistance Program's internal control over financial reporting (internal control) to determine the audit procedures that are appropriate in the circumstances for the purpose of expressing our opinion on the financial statements, but not for the purpose of expressing an opinion on the effectiveness the Lakewood Township Residential Assistance Program's internal control over financial reporting. Accordingly, we do not express an opinion on the effectiveness of the Program's internal control.

A deficiency in internal control exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect and correct misstatements on a timely basis. A material weakness is a deficiency or combination of deficiencies in internal control, such that there is a reasonable possibility that a material misstatement of the entity's financial statements will not be prevented, or detected and corrected on a timely basis.   A significant deficiency is a deficiency, or a combination of deficiencies, in internal control that is less severe than a material weakness, yet important enough to merit attention by those charged with governance.

Our consideration of internal control was for the limited purpose described in the first paragraph of this and was not designed to identify all deficiencies in internal control that might be material weaknesses or significant deficiencies.  Given these limitations, during our audit we did not identify any deficiencies in internal control that we consider to be material weaknesses. However, material weaknesses may exist that have not been identified.

21

### INDEPENDENT AUDITOR'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING AND ON COMPLIANCE AND OTHER MATTERS BASED ON AN AUDIT OF FINANCIAL STATEMENTS PERFORMED IN ACCORDANCE WITH GOVERNMENT AUDITING STANDARDS
### (Continued)

#### Compliance and Other Matters

As part of obtaining reasonable assurance about whether the Lakewood Township Residential Assistance Program's financial statements are free of material misstatement, we performed tests of its compliance with certain provisions of laws, regulations, contracts and grant agreements, noncompliance with which could have a direct and material effect on the determination of financial statement amounts. However, providing an opinion on compliance with those provisions was not an objective of our audit and, accordingly, we do not express such an opinion. The results of our tests disclosed no instances of noncompliance or other matters that are required to be reported under *Government Auditing Standards*.

#### Purpose of this Report

The purpose of this report is solely to describe the scope of our testing of internal control and compliance and the results of that testing, and not to provide an opinion on the effectiveness of the entity's internal control or on compliance. The report is an integral part of an audit performed in accordance with Government Auditing Standards in considering the entity's internal control and compliance. Accordingly, this communication is not suitable for any other purpose.

*Polcari & Company*

POLCARI & COMPANY
CERTIFIED PUBLIC ACCOUNTANTS

Wayne, New Jersey
August 8, 2013

22





**CERTIFIED PUBLIC ACCOUNTANTS**

2035 HAMBURG TURNPIKE, UNIT H
WAYNE, NEW JERSEY 07470
TELEPHONE: (973) 831-6969
FAX: (973) 831-6972
E-MAIL: POLCARICO@OPTONLINE.NET

**INDEPENDENT AUDITOR'S REPORT ON COMPLIANCE WITH REQUIREMENTS APPLICABLE TO EACH MAJOR PROGRAM AND INTERNAL CONTROL OVER COMPLIANCE IN ACCORDANCE WITH OMB CIRCULAR A-133**

Board of Commissioners
Lakewood Township Residential Assistance Program
Lakewood, New Jersey

<u>Report on Compliance for Each Major Federal Program</u>

We have audited the Lakewood Township Residential Assistance Program's compliance with the types of compliance requirements described in the *OMB Circular A-133 Compliance Supplement* that could have a direct and material effect on each of Lakewood Township Residential Assistance Program's major federal programs for the year ended December 31, 2013. The Lakewood Township Residential Assistance Program's major federal programs are identified in the summary of auditor's results section of the accompanying Schedule of Findings and Questioned Costs.

<u>Management's Responsibility</u>

Management is responsible for compliance with the requirements of laws, regulations, contracts and grants applicable to each of its major federal programs.

<u>Auditor's Responsibility</u>

Our responsibility is to express an opinion on compliance for each of the Lakewood Township Residential Assistance Program's major federal programs based on our audit of the types of compliance requirements referred to above. We conducted our audit of compliance in accordance with auditing standards generally accepted in the United States of America; the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States; and Office of Management and Budget Circular A-133, Audits of States, Local Governments and Non-Profit Organizations. Those standards and OMB Circular A-133 require that we plan and perform the audit to obtain reasonable assurance about whether noncompliance with the types of compliance requirements referred to above that could have a direct and material effect on a major federal program occurred. An audit includes examining, on a test basis, evidence about the Lakewood Township Residential Assistance Program's compliance with those requirements and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion on compliance for each major federal program. However, our audit does not provide a legal determination of the Lakewood Township Residential Assistance Program's compliance.

<u>Opinion on Each Major Federal Program</u>

In our opinion, the Lakewood Township Residential Assistance Program complied, in all material respects, with the types of compliance requirements referred to above that could have a direct and material effect on each of its major federal programs for the year ended December 31, 2013.

23

**INDEPENDENT AUDITOR'S REPORT ON COMPLIANCE WITH REQUIREMENTS
APPLICABLE TO EACH MAJOR PROGRAM AND INTERNAL CONTROL OVER
COMPLIANCE IN ACCORDANCE WITH OMB CIRCULAR A-133
(Continued)**

<u>Report on Internal Control Over Compliance</u>

The management of the Lakewood Township Residential Assistance Program is responsible for establishing and maintaining effective internal control over compliance with the types of compliance requirements referred to above. In planning and performing our audit of compliance, we considered Lakewood Township Residential Assistance Program's internal control over compliance with the types of requirements that could have a direct and material effect on each major federal program in order to determine the auditing procedures that are appropriate in the circumstances for the purpose of expressing our opinion on compliance for each major federal program and to test and report on internal control over compliance in accordance with OMB Circular A-133, but not for the purpose of expressing an opinion on the effectiveness of internal control over compliance. Accordingly, we do not express an opinion on the effectiveness of the Lakewood Township Residential Assistance Program's s internal control over compliance.

A deficiency in internal control over compliance exists when the design or operation of a control over compliance does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect and correct noncompliance with a type of compliance requirement of a federal program on a timely basis. A material weakness in internal control over compliance is a deficiency, or combination of deficiencies in internal control over compliance, such that there is a reasonable possibility that material noncompliance with a type of compliance requirement of a federal program will not be prevented, or detected and corrected on a timely basis. A significant deficiency in internal control over compliance is a deficiency, or a combination of deficiencies, in internal control over compliance with a type of compliance requirement of a federal program that is less severe then a material weakness, yet important enough to merit attention by those charged with governance.

Our consideration of internal control over compliance was for the limited purpose described in the first paragraph of this section and was not designed to identify all deficiencies in internal control over compliance that might be deficiencies, significant deficiencies or material weaknesses or significant deficiencies. We did not identify any deficiencies in internal control over compliance that we consider to be material weaknesses. However, material weaknesses may exist that have not been identified.

<u>Purpose of this Report</u>

The purpose of this report on internal control over compliance is solely to describe the scope of our testing of internal control over compliance and the results of that testing based on the requirements of OMB Circular A-133. Accordingly, the report is not suitable for any other purpose.

*Polcari & Company*

POLCARI & COMPANY
CERTIFIED PUBLIC ACCOUNTANTS

Wayne, New Jersey
August 8, 2014

24



LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
Lakewood, New Jersey
December 31, 2013

SCHEDULE OF FINDINGS AND QUESTIONED COSTS

## SECTION 1 - SUMMARY OF AUDIT RESULTS

PRIOR AUDIT FINDINGS
The prior audit contained no findings.

CURRENT AUDIT FINDINGS

**Financial Statements**

| | | | |
|---|---|---|---|
| Type of Auditor's Report Issued: | | Unmodified | |
| Internal Control over Financial Reporting: | | | |
| Material Weakness(es) Identified? | _____ yes | X no | |
| Significant Deficiency(s) identified that are not considered to be material weakness(es)? | _____ yes | X none reported | |
| Noncompliance Material to Financial Statements Noted? | _____ yes | X no | |

**Federal Awards**

| | | | |
|---|---|---|---|
| Internal Control over Major Programs: | | | |
| Material Weakness(es) Identified? | _____ yes | X no | |
| Significant Deficiency(s) identified that are not considered to be material weakness(es)? | _____ yes | X none reported | |

Type of audit report issued on compliance for
major programs:         Unmodified

Any audit findings disclosed that are required to be
reported in accordance with section 510(a) of
Circular A-133        _____ yes   X   no

Identification of Major Programs

| CFDA Number | Name of Federal Program or Cluster |
|---|---|
| 14.871 | Housing Choice Voucher Program |

Dollar Threshhold used to distinguish between type A
and type B Programs        $469,828

Auditee qualified as low-risk?     X   yes      _____ no

## SECTION 2 – FINANCIAL STATEMENT FINDINGS
None.

## SECTION 3 – FEDERAL AWARD FINDINGS AND QUESTIONED COSTS
None.

LAKEWOOD TOWNSHIP RESIDENTIAL
ASSISTANCE PROGRAM
Lakewood, New Jersey

COMPARATIVE FINANCIAL STATEMENTS
For the Two Years Ended December 31, 2012 and 2011

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
Lakewood, New Jersey
FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2012 AND 2011

## TABLE OF CONTENTS

| | PAGE |
|---|---|
| Management's Discussion and Analysis | 1-4 |
| Independent Auditors' Report | 5-6 |
| **FINANCIAL STATEMENTS** | |
| Comparative Statements of Net Position | 7 |
| Comparative Statements of Revenue, Expenses and Changes in Net Position | 8 |
| Comparative Statements of Cash Flows | 9 |
| Notes to Financial Statements | 10-14 |
| **SUPPLEMENTAL INFORMATION** | |
| Schedule of Expenditures of Federal Awards | 15 |
| Financial Data Schedule | 16-20 |
| **OTHER REPORTS AND COMMENTS** | |
| Report on Compliance and on Internal Control Over Financial Reporting Based on an Audit of Financial Statements Performed in Accordance with Government Auditing Standards | 21-22 |
| Independent Auditor's Report on Compliance with Requirements Applicable to Each Major Program and Internal Control Over Compliance In Accordance With OMB Circular A-133 | 23-24 |
| Status of Prior Audit Findings | 25 |
| Schedule of Findings and Questioned Costs | 25 |

LAKEWOOD TOWNSHIP RENTAL ASSISTANCE PROGRAM
MANAGEMENT'S DISCUSSION AND ANALYSIS
At December 31, 2012

As Management of the Lakewood Township Rental Assistance Program, we offer readers of the Program's financial statements this narrative overview and analysis of the financial activities of the Program for the fiscal year ended December 31, 2012. We encourage readers to consider the information presented here in conjunction with the Program's financial statements as presented elsewhere in this Report.

A - Financial Highlights

Assets of the Program exceeded its liabilities at the close of the most recent fiscal year by $645,329. All of the program's net assets are restricted. As discussed in Note 7 to the financial statements, these restricted net assets consist of housing assistance payment reserves, which may only be used to assist additional families up to the number of units under contract. The Program does not accumulate administrative fee reserves since all net revenues of the program are payable to its managing agent, Lakewood Tenants Organization, Inc. in accordance with the program management agreement.

The Program had Total Revenues (including investment income) of $15,773,246 and $15,292,961 for the years ended December 31, 2012 and 2011, respectively. Total expenditures for the years ended December 31, 2012 and 2011 totaled $16,625,286 and $15,843,563, respectively.

The Program made no capital expenditures during the fiscal year.

The Program's Total Federal Awards amounted to $15,048,326 for the fiscal year.

B – Using the Annual Report

1 – Management's Discussion and Analysis

The Management's Discussion and Analysis is intended to serve as an introduction to the Program's financial statements. The Program's financial statements and Notes to Financial Statements included in this Report were prepared in accordance with GAAP applicable to governmental entities in the United States of America for Proprietary Fund types.

2 –Financial Statements

The financial statements are designed to provide readers with a broad overview of the Authority's finances, in a manner similar to a private-sector business. They consist of the Comparative Statements of Net Position, Comparative Statements of Revenue, Expenses and Changes in Net Position, and Comparative Statements of Cash Flows.

The Comparative Statements of Net Position present information on all the Authority's assets and liabilities, with the difference between the two reported as net assets. Increases or decreases in net assets will serve as a useful indicator of whether the financial position of the Authority is improving or deteriorating.

The Comparative Statements of Revenues, Expenses and Changes in Net Position present information showing the change in the Authority's net assets during the most recent fiscal year. All changes in net assets are reported as soon as the underlying event giving rise to the change occurs, regardless of the timing of unrelated cash flows. Thus, revenues and expenses are reported in this statement for some items that will only result in cash flows in future fiscal periods (e.g.; depreciation and earned but unused vacation leave).

1

LAKEWOOD TOWNSHIP RENTAL ASSISTANCE PROGRAM
MANAGEMENT'S DISCUSSION AND ANALYSIS (CONTINUED)
At December 31, 2012

The Comparative Statements of Cash Flows present information showing how the Authority's cash and cash equivalents position changed during the year. The statements classify cash receipts and cash payments as resulting from operating activities, capital and related financing activities and investing activities.

The financial statements report on the Authority's activities. The activities are primarily supported by HUD subsidies and grants. The Authority's function is to provide decent, safe and sanitary housing to low income and special needs populations. The financial statements can be found on pages 7 through 9.

3 – Notes to Financial Statements

The Notes to Financial Statements provide additional information that is essential to a full understanding of the data provided in the financial statements. The Notes to Financial Statements can be found in this Report after the financial statements.

4 – Supplemental Information

The schedule of expenditures of Federal awards is presented for purpose of additional analysis as required by U.S. Office of Management and Budget Circular A-133, Audits of States, Local Governments, and Non-profit Organizations. The Schedule of Expenditures of Federal Awards can be found on page 15 of this report.

C – The Program as a Whole

The Program's revenues are primarily subsidies and grants received from HUD. The Program receives subsidies each month based on a pre-approved amount determined by HUD. Pursuant to its management agreement with Lakewood Tenants Organization, Inc. all net revenues of the program are paid to Lakewood Tenants Organization, Inc. as its management fee for administering the program. Approximately 93% of the Program's expenses are housing assistance payments made to landlords on behalf of low and moderate income tenants participating in its housing assistance payments program.

D – Budgetary Highlights

For the year ended December 31, 2012, individual program or grant budgets were prepared by the Program and were approved by the Board of Commissioners. The budgets were prepared in accordance with the accounting procedures prescribed by the applicable funding Program.

E – Capital Assets and Debt Administration

1 – Capital Assets

Since the program is administered by the Lakewood Tenants Organization, Inc., the program does not own any capital assets. Capital assets are not a significant aspect of the Program's operations.

2 – Long Term Debt

The Program does not have any long-term debt at this time.

2

LAKEWOOD TOWNSHIP RENTAL ASSISTANCE PROGRAM
MANAGEMENT'S DISCUSSION AND ANALYSIS (CONTINUED)
At December 31, 2012

F – Significant Changes from FYE December 31, 2011 to December 31, 2012

Changes in the Statement of Net Assets

Total cash and cash equivalents decreased $942,117 due primarily to the expenditure of $15,508,098 for housing assistance payments compared to $14,698,927 in the prior fiscal year.

Accounts receivable other government decreased $45,345 because all portability receivables were collected during the current fiscal year.

Accounts payable decreased $36,265 as the Program settled outstanding invoices on a more timely basis during the current fiscal year.

FSS escrow funds decreased $98,792 as various participants either completed the program or forfeited their funds by not complying with FSS regulations.

Changes in the Statement of Revenues, Expenses and Changes in Net Assets

HUD operating grants increased $517,747 when compared to the year ended December 31, 2011.   Housing assistance payment subsidies increased $535,534, and administrative fee subsidies (including family self-sufficiency coordinator grants) decreased $18,647.   The Lower Income Housing MOD Rehab grant increased $860.

Operating expenses increased $781,723 compared to the prior fiscal year. This increase is primarily due to housing assistance payments increasing $809,171, or 5.5%, tenant services expenses increasing from $0 to $51,098, and administrative expenses decreasing $78,546, or 6.9%. The increase in housing assistance payments is due primarily to increases in rents in the Lakewood community. The total number of unit months under lease decreased slightly from 12,792 in 2011 to 12,692 in 2012.   Additionally, the average housing assistance payment increased from $1,149 in 2011 to $1,222 in 2012, which is consistent with the housing market in the Lakewood, New Jersey area.

G – Economic Factors and Next Year's Budgets and Rates

The following factors were considered in preparing the Program's budget for the fiscal year ending December 31, 2013:

1 – The state of the economy, particularly in light of the federal budget cuts and their impact on future Federal funding for housing programs

2 – Rising rental costs and housing costs in general within the Township of Lakewood, which impacts the Program's ability to serve eligible families.

H – Contacting the Program's Financial Management

The financial report is designed to provide a general overview of the Program's finances for all those with an interest.  Questions concerning any of the information provided in this report or requests for additional financial information should be addressed to the Executive Director, Lakewood Tenants Organization, Inc., 600 W Kennedy Boulevard, Lakewood, NJ 08701.

3

LAKEWOOD TOWNSHIP RENTAL ASSISTANCE PROGRAM
MANAGEMENT'S DISCUSSION AND ANALYSIS (CONTINUED)
At December 31, 2012

**Computations of Net Assets are as follows:**

|  | Year Ended | |
|---|---|---|
|  | Dec. 31, 2012 | Dec. 31, 2011 |
| Cash and Other Current Assets | $ 950,313 | $ 1,934,774 |
| Capital Assets - Net | - | - |
| Total Assets | 950,313 | 1,934,774 |
| Less: Total Liabilities | (304,984) | (437,405) |
| Net Assets | 645,329 | 1,497,369 |
| Restricted Net Assets - Housing Assist. Payment Reserves | 645,329 | 1,497,369 |
| Unrestricted Net Assets - Housing Payment Reserves | - | - |
| Total Net Assets | $ 645,329 | $ 1,497,369 |

**Computations of Changes in Net Assets are as follows:**

|  | Year Ended | |
|---|---|---|
|  | Dec. 31, 2012 | Dec. 31, 2011 |
| **Revenues** | | |
| HUD Subsidies | $ 15,048,326 | $ 14,530,579 |
| Other Income | 716,112 | 738,425 |
| Total Operating Revenues | 15,764,438 | 15,269,004 |
| **Expenses** | | |
| Total Operating Expenses | 1,117,188 | 1,144,636 |
| Housing Assistance Payments | 15,508,098 | 14,698,927 |
| Total Operating Expenses | 16,625,286 | 15,843,563 |
| Excess of Operating Revenues Over Expenses | (860,848) | (574,559) |
| **Non-Operating Revenues** | | |
| Interest on Investments | 8,808 | 23,957 |
| Increase in Net Assets | (852,040) | (550,602) |
| Prior Period Adjustment | - | (43,378) |
| Net Assets Prior | 1,497,369 | 2,091,349 |
| Total Net Assets | $ 645,329 | $ 1,497,369 |

4



**CERTIFIED PUBLIC ACCOUNTANTS**

2035 HAMBURG TURNPIKE, UNIT H
WAYNE, NEW JERSEY 07470
TELEPHONE: (973) 831-6969
FAX: (973) 831-6972
E-MAIL: POLCARICO@OPTONLINE.NET

<u>INDEPENDENT AUDITORS' REPORT</u>

Board of Commissioners
Lakewood Township Residential Assistance Program
Lakewood, New Jersey

We have audited the accompanying Comparative Statements of Net Position of the Lakewood Township Residential Assistance Program, herein referred to as the Program, as of end for the year ended December 31, 2012, and the related Statements of Revenues, Expenses and Changes in Net Position and Cash Flows for the year then ended.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in *Government Auditing Standards* issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that the evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Lakewood Township Residential Assistance Program, as of December 31, 2012, and the results of its operations, and its cash flows for the years then ended, in accordance with the accounting principles generally accepted in the United States of America.

5

## INDEPENDENT AUDITORS' REPORT
(Continued)

**Other Matters**

*Required Supplementary Information*

Accounting principles generally accepted in the United States of America require that the management's discussion and analysis presented on pages 1-4 be presented to supplement the basic financial statements. Such information, although not a part of the basic financial statements, is required by the Governmental Accounting Standards Board, who considers it to be an essential part of financial reporting for placing the financial statements in an appropriate operational, economic, or historical context. We have applied certain limited procedures to the required supplementary information in accordance with auditing standards generally accepted in the United States of America, which consisted of inquiries of management about the methods of preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic financial statements, and other knowledge we obtained during our audit of the financial statements.

*Other Information*

Our audits were conducted for the purpose of forming an opinion on the financial statements of the Lakewood Township Residential Assistance Program. The Financial Data Schedule is presented for purposes of additional analysis and is not a required part of the basic financial statements. The schedule of expenditures of federal awards is presented for purposes of additional analysis as required by U. S. Office of management and Budget Circular A-133, *Audits of States, Local Governments, and Non-Profit Organizations*, and is also not a required part of the financial statements.

The financial data schedule and schedule of expenditures of federal awards are the responsibility of management and were derived from and directly relate to the underlying accounting and other records used to prepare the basic financial statements. Such information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards general accepted in the United States of America. In our opinion, the financial data schedule and the schedule of expenditures of federal awards are fairly stated in all material respects in relation to the financial statements as a whole.

**Other Reporting Required by Government Auditing Standards**

In accordance with *Government Auditing Standards* we have also issued our report dated September 20, 2013 on our consideration of the Lakewood Township Residential Assistance Program's internal control over financial reporting and on our tests of its compliance with certain provisions of laws, regulations, contracts, and grant agreements and other matters. The purpose of that report is to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to provide an opinion on internal control over financial reporting or on compliance. That report is an integral part of an audit performed in accordance with *Government Auditing Standards* in considering the Authority's internal control over financial reporting and compliance.

*Polcari & Company*

POLCARI & COMPANY
CERTIFIED PUBLIC ACCOUNTANTS

Wayne, New Jersey
September 20, 2013

6


POLCARI & CO.
CERTIFIED PUBLIC ACCOUNTANTS

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
Lakewood, New Jersey
COMPARATIVE STATEMENTS OF NET POSITION
At December 31, 2012 and 2011

|  | 12/31/2012 | 12/31/2011 |
|---|---|---|
| **ASSETS** | | |
| CURRENT ASSETS | | |
| Cash and Cash Equivalents - Unrestricted | $ 3,257 | $ 2,149 |
| Cash - Restricted | 808,893 | 1,752,118 |
| Total Cash | 812,150 | 1,754,267 |
| | | |
| Accounts Receivable - Other Government | - | 45,345 |
| Accounts Receivable - Fraud (Net) | 6,501 | 5,014 |
| Accounts Receivable - HUD | 1,514 | - |
| Accounts Receivable - Other (Net) | 130,148 | 130,148 |
| Total Current Assets | 950,313 | 1,934,774 |
| | | |
| TOTAL ASSETS | $ 950,313 | $ 1,934,774 |
| | | |
| **LIABILITIES** | | |
| CURRENT LIABILITIES | | |
| Accounts Payable: | | |
| Vendors and Contractors | $ 19,790 | $ 56,055 |
| Due to HUD | 1,233 | 516 |
| Other Governments | 9,145 | 7,226 |
| Total Current Liabilities | 30,168 | 63,797 |
| | | |
| NON-CURRENT LIABILITIES | | |
| Family Self-Sufficiency Escrow Funds | 274,816 | 373,608 |
| | | |
| TOTAL LIABILITIES | 304,984 | 437,405 |
| **NET POSITION** | | |
| | | |
| Restricted | 645,329 | 1,497,369 |
| Unrestricted | - | - |
| TOTAL NET POSITION | $ 645,329 | $ 1,497,369 |

See Notes to Financial Statements.

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
Lakewood, New Jersey
COMPARATIVE STATEMENTS OF REVENUE, EXPENSES
AND CHANGES IN NET POSITION
For the Years Ended December 31, 2012 and 2011

|  | 2012 | 2011 |
|---|---|---|
| **REVENUES** | | |
| HUD Operating Grants | $ 15,048,326 | $ 14,530,579 |
| Fraud Recoveries | 33,944 | 46,804 |
| Other Revenues | 682,168 | 691,621 |
| Total Revenues | 15,764,438 | 15,269,004 |
| | | |
| **EXPENSES** | | |
| Administration | 1,066,090 | 1,144,636 |
| Tenant Services | 51,098 | - |
| Housing Assistance Payments | 15,508,098 | 14,698,927 |
| Total Operating Expenses | 16,625,286 | 15,843,563 |
| | | |
| Excess of Operating Revenues Over Expenses | (860,848) | (574,559) |
| | | |
| **NON-OPERATING REVENUES** | | |
| Interest on Investments | 8,808 | 23,957 |
| | | |
| Increase in Net Assets | (852,040) | (550,602) |
| | | |
| Prior Period Adjustments | - | (43,378) |
| | | |
| Beginning Net Position | 1,497,369 | 2,091,349 |
| | | |
| ENDING NET POSITION | $ 645,329 | $ 1,497,369 |

See Notes to Financial Statements.

8

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
Lakewood, New Jersey
COMPARATIVE STATEMENTS OF CASH FLOWS
For the Years Ended December 31, 2012 and 2011

|  | 2012 | 2011 |
|---|---|---|
| CASH FLOWS FORM OPERATING ACTIVITIES |  |  |
| Operating Grants Received from HUD | $    15,047,529 | $    14,612,803 |
| Cash Received From Other Operating Revenues | 759,970 | 704,965 |
| Cash Payments for Housing Assistance | (15,604,971) | (14,698,927) |
| Cash Payments for Goods and Services | (1,153,453) | (1,244,845) |
| Net Cash Provided by Operating Activities | (950,925) | (626,004) |
|  |  |  |
| CASH FLOWS FROM INVESTING ACTIVITIES |  |  |
| Receipts of Interest and Dividends | 8,808 | 23,957 |
| Net Cash Provided By Investing Activities | 8,808 | 23,957 |
|  |  |  |
| CASH FLOWS FROM CAPITAL AND RELATED FINANCING ACTIVITIES |  |  |
| Purchase of Equipment | - | - |
| Net Cash Used For Capital and Related Activities | - | - |
|  |  |  |
| Increase in Cash and Cash Equivalents | (942,117) | (602,047) |
|  |  |  |
| Cash and Cash Equivalents - Beginning of Year | 1,754,267 | 2,356,314 |
|  |  |  |
| Cash and Cash Equivalents - End of Year | $    812,150 | $    1,754,267 |

Reconciliation of Operating Income to Net Cash Provided by Operating Activities

| | | |
|---|---|---|
| Operating Income | $    (860,848) | $    (574,559) |
| Prior Period Adjustment | - | (43,378) |
| Adjustments to Reconcile Operating Income to Net Cash Provided by Operating Activities: |  |  |
| Decrease/(Increase) in Assets: |  |  |
| Accounts Receivable - Other Governments | 45,345 | (23,985) |
| Accounts Receivable - Fraud | (1,487) | 45,741 |
| Accounts Receivable - HUD | (1,514) | 90,471 |
| Other Accounts Receivable | - | (11,838) |
| Increase (Decrease) in Liabilities: |  |  |
| Accounts Payable | (36,265) | 45,197 |
| Due to HUD | 717 | (8,247) |
| Accounts Payable - Other Governments | 1,919 | (4,640) |
| Family Self-Sufficiency Escrow Payable | (98,792) | (140,766) |
|  | $    (950,925) | $    (626,004) |

See Notes to Financial Statements.

9

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
DECEMBER 31, 2012
NOTES TO FINANCIAL STATEMENTS

**NOTE 1 –Summary of Organization, Activities and Significant Accounting Policies:**

1. **Organization** – The Lakewood Township Residential Assistance Program (LTRAP, the Program) was created by resolution of the Council of the Township of Lakewood to receive subsidies and provide rental assistance to low and moderate income residents of the Township of Lakewood in accordance with rules and regulations of the United States Department of Housing and Urban Development (HUD) and its Annual Contributions Contract with HUD. The Township has contracted with the Lakewood Tenant Organization, Inc. (LTO) to administer the Program. In consideration for its management of the Program, LTO receives a management fee equal to 100% of the subsidies and fees paid or payable to the Township of Lakewood under its contract with HUD.

2. **Activities** – The financial statements include all the accounts of the Lakewood Township Residential Assistance Program. All of these accounts, as previously noted, are managed by the Lakewood Tenants Organization, Inc. (LTO) pursuant to its contract with LTRAP.

3. **Significant Accounting Policies** - Tha Governmental Accounting Standards Board (GASB) is the accepted standard-setting body for establishing governmental accounting and financial reporting principles. The more significant of the Program's accounting principles, including those required by GASB Statement No. 34, are described below.

   a. **Basis of Accounting** – The financial statements report on the Program as a whole. The Comparative Statements of Activities demonstrate the degree to which the direct expenses of the Program's function are offset by program revenues. Direct expenses are those that are clearly identifiable with the Program's function. Program revenue includes charges for services which are based on exchange or exchange-like transactions and grants and contributions that are restricted to meeting the operational or capital requirements of the Program's programs.

   The accrual basis of accounting and the economic resources measurement focus are used for measuring financial position and operating results. Under the accrual basis of accounting, transactions are recognized when they occur, regardless of when cash is received or disbursed. Revenues are recognized in the accounting period in which they are earned and expenses recognized in the period incurred. Grant revenues and similar items are recognized as revenue when all eligibility requirements imposed by the provider have been met.

   Using the accrual basis of accounting is consistent with the proprietary fund focus on measuring      all the costs of providing goods or services for the period and matching those costs with the revenues earned during the period by providing the goods or services.

   b. **Report Presentation** – The financial statements included in this Report were prepared in accordance with GAAP in the United States of America applicable to governmental entities for Proprietary Fund Types. In accordance with GASB Statement No. 34, the report includes Management's Discussion and Analysis. The Enterprise Fund is used for activities which are financed and operated in a manner similar to a private business enterprise where the intent is that the costs (expenses, including depreciation) of providing goods or services to its clients on a continuing basis be financed or recovered primarily through user charges or operating subsidies.

10

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
DECEMBER 31, 2012
NOTES TO FINANCIAL STATEMENTS
(Continued)

Significant accounting policies are as follows:

1 – Cash and cash equivalents are stated at cost, which approximates market. Cash and cash equivalents include cash in banks, petty cash, certificates of deposit and other investments with original maturities of less than three months from the date of purchase. Investments are recorded at fair value based on quoted market prices. Fair value is the amount at which a financial instrument could be exchanged in a current transaction between willing parties.

2 – Collection losses on accounts receivable are charged against an allowance for doubtful accounts.

3 – Equipment is recorded at cost for all programs and depreciation is computed on the straight-line basis.

4 – Repairs funded out of operations, such as painting, roofing and plumbing, are charged against income for all programs.

5 – The Program is subsidized by the Federal Government. The Program is not subject to Federal or State income taxes, nor is it required to file Federal and State income tax returns.

6 – Operating subsidies received from HUD are recorded as income when earned.

7 – The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements, and reported amounts of revenues and expenses during the reporting period.

8 - The Program has elected not to apply to its proprietary activities Financial Accounting Standards Board Statements and Interpretations, Accounting Principles Board Opinions, and Accounting Research Bulletins of the Committee of accounting Procedure issued after November 30, 1989.

## NOTE 2 – Cash and Cash Equivalents

The Program maintains cash and investments in local banks. These funds are covered by the Governmental Unit Depository Protection Act, which requires the institutions to pool collateral for all of the Program's deposits and have the collateral held by an approved custodian in the Township's name.

Cash and equivalents of $812,150 and $1,754,267 at December 31, 2012 and 2011, respectively, consisted of the following:

|  | Dec. 31, 2012 | Dec. 31, 2011 |
|---|---|---|
| Checking Accounts | $   537,334 | $   1,380,659 |
| FSS Escrow Accounts | 274,816 | 373,608 |
| Total Cash | $   812,150 | $   1,754,267 |

11

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
DECEMBER 31, 2012
NOTES TO FINANCIAL STATEMENTS
(Continued)

## NOTE 2 – Cash and Cash Equivalents (Continued)

The carrying amount of the Program's cash and cash equivalents held in banks as of December 31, 2012 was $812,150 and the bank balances were $823,104. Of the bank balances, $250,000 was covered by FDIC insurance and $573,104 was covered by a collateral pool maintained by the banks as required by New Jersey statutes.

The Program's cash and cash equivalents are categorized as prescribed in GASB 40 to give an indication of the level of risk assumed by the Program. As described above, $573,104 of the Program's deposits exceeded FDIC insurance and were covered under the New Jersey Government Unit Deposit Protection Act (GUDPA). Under GUDPA, the Program's deposits are collateralized by securities held by the pledging institutions trust department. The securities deposits collateralized are not in the Program's name.

## NOTE 3 – Accounts Receivable - Net

Accounts Receivable, net of an allowance for doubtful accounts at December 31, 2012 and 2011 respectively, consisted of the following:

|  | Dec. 31, 2012 | Dec. 31, 2011 |
|---|---|---|
| Fraud Recoveries | $ 24,760 | $ 30,008 |
| Portability Receivables | - | 45,345 |
| Due from Lakewood Tenants Organization | 130,148 | 130,148 |
| Housing Choice Voucher Program Subsidies Receivable from HUD | 1,514 | - |
| Less: Allowance for Doubtful Accounts | (18,259) | (24,992) |
|  | $ 138,163 | $ 180,507 |

Accounts receivable – fraud recoveries represent receivables due from tenants and landlords for housing assistance payments made erroneously – either due to fraudulent reporting of income by tenants or overpayments made to landlords due to the delinquency of tenants in reporting income at the time of recertification.

Portability receivables represent accounts receivable from other housing programs for tenants moving to Lakewood under the portability provisions of the housing choice voucher program.

Amounts due from Lakewood Tenants Organization represents an overpayment made to the program's managing agent. This overpayment was the result of the United States Department of Housing and Urban Development (HUD) charging the program approximately $112,000 for over-leasing of units that occurred in 2007. During 2010, in connection with its review of Net Restricted Assets within the housing choice voucher program, HUD notified LTRAP that valid housing payments made to landlords on behalf of qualified tenants in 2007 must be repaid to the program since the number of unit months leased in that year exceeded the amount authorized in the Annual Contributions Contract. That amount has been recorded as accounts receivable in 2012.

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
DECEMBER 31, 2012
NOTES TO FINANCIAL STATEMENTS
(Continued)

## NOTE 4 – Non-current Liabilities – Family Self-Sufficiency Escrow

The Family Self-Sufficiency (FSS) escrow balances of $274,816 and $373,608 at December 31, 2012 and 2011, respectively, represent amounts held in escrow on behalf of subsidized tenants enrolled in the Agency's FSS Program. These funds will be released to the tenant upon satisfactory completion of the tenant's program. In the event the tenant does not complete his or her program requirements, the funds will be returned to HUD. The Program does not anticipate that any participants will be eligible to receive payments from escrow during 2013. Thus, no amounts are included in other liabilities.

## NOTE 5 – Risk Management

The Program is exposed to various risks of loss related to torts, theft, damage to and destruction of assets; errors and omissions; and natural disasters for which the Managing Agent carries commercial insurance. During the year ended December 31, 2012, the Program's risk management program, in order to deal with potential liabilities, consisted of various insurance policies for fire, general liability, crime, auto and public-officials errors and omissions. Periodically, but not less than annually, the Managing Agent conducts physical inspections of rental units participating in the program for the purpose of determining potential liability issues. Liabilities are reported when it is probable that a loss has occurred and the amount of the loss can be reasonably estimated. Settled claims relating to the commercial insurance have not exceeded the amount of insurance in any of the past three fiscal years.

## NOTE 6 – Economic Dependency

For the years ended December 31, 2012 and December 31, 2011, substantially all of the Program's revenues were received from the United States Department of Housing and Urban Development, which are subject to availability of funds and Congressional approval, as well as the Agency's compliance with Federal rules and regulations.

## NOTE 7 – Restricted Net Assets

Restricted Net Assets of $645,329 at December 31, 2012, consists of the following:

| | |
|---|---|
| Family Self-Sufficiency Escrow Accounts | $274,816 |
| Unspent Housing Assistance Payment Grants | 370,513 |
| **Total Restricted Net Assets** | $645,329 |

Unspent Housing Assistance Payment Grants
Prior to January 1, 2005 excess funds advanced by HUD to the Program for the payment of housing assistance payments were returned to HUD at the end of the Program's fiscal year. In accordance with HUD's PIH Notice 2006-03, starting January 1, 2005 excess funds disbursed by HUD to the Program for the payment of Housing Assistance Payments that are not so utilized are not returned to HUD, but become part of the undesignated fund balance and may only be used to assist additional families up to the number of units under contract. As of November 2007, HUD is reverting to treating these funds as restricted in order to comply with generally accepted accounting principles. HUD has indicated that any HAP amounts received by a PHA and not expended should be reported as restricted cash and restricted net assets.

13

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
DECEMBER 31, 2012
NOTES TO FINANCIAL STATEMENTS
(Continued)

## NOTE 7 – Restricted Net Assets (Continued)

Administrative fees paid by HUD to the Program in excess of administrative expenses are part of the undesignated fund balance and are considered to be "administrative fee reserves". Administrative fee reserves accumulated prior to January 1, 2005 are subject to all requirements applicable to administrative fee reserves including, but not limited to, 24 CFR982.155 – i.e. "other housing purposes permitted by state or local law". Excess administrative fees earned in 2005 and subsequent years must be used for activities related to the provision of tenant-based rental assistance authorized under Section 8 of the United States Housing Act of 1937, including related development activities.

In accordance with HUD requirements, the Program's restricted and unrestricted fund balance consists of the following components as of December 31, 2012:

**Administrative Fee Equity - included in Unrestricted Net Assets**

| | | |
|---|---:|---:|
| Administrative Fee Reserves as of December 31, 2011 | $ - | |
| Subsidy Received December 31, 2012 | 1,063,860 | |
| Administrative Expenses December 31, 2012 | (1,107,488) | |
| Portability Administrative Fees Earned December 31, 2012 | 26,656 | |
| 50% of fiscal year December 31, 2012 Fraud Recoveries (net) | 16,972 | $ - |

**Housing Assistance Payment Equity - Included in Restricted Net Assets**

| | | |
|---|---:|---:|
| Housing Assistance Payment Reserves as of December 31, 2011 | $ 1,497,369 | |
| Subsidy Received December 31, 2012 | 13,906,192 | |
| HAP Payments December 31, 2012 | (14,801,797) | |
| FSS Forfeitures During FYE Dec. 31, 2012 | 17,817 | |
| Interest on Housing Assistance Payments | 8,776 | |
| 50% of fiscal year December 31, 2012 Fraud Recoveries (net) | 16,972 | 645,329 |

| **Total Net Assets** | | $ 645,329 |
|---|---|---:|

## NOTE 8 – Accounts Payable – Other Governments

Accounts payable to other governments of $9,145 and $7,226 at December 31, 2012 and 2011, respectively, represent payments due to receiving programs for tenants moving from Lakewood to their jurisdictions under the portability provisions of the housing choice voucher program.

## NOTE 9 – Subsequent Events

The Organization has evaluated subsequent events through September 20, 2013, the date on which the financial statements were available to be issued.

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
Lakewood, New Jersey

SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS
For the Year Ended December 31, 2012

|  | Expenditures |
|---|---|
| **HOUSING ASSISTANCE PAYMENTS PROGRAM** |  |
| Section 8 Housing Choice Voucher Program (CFDA # 14.871) | $ 14,970,052 |
| Low Income Housing Assistance Program  - Section 8 Moderate Rehab Program (CFDA # 14.856) | 78,274 |
| Total Federal Expenditures | $ 15,048,326 |

NOTES TO SCHEDULE OF EXPENDITURES OF FEDERAL AWARDS

1. Basis of Presentation - The Schedule of Expenditures of Federal Awards is presented in accordance with generally
   accepted accounting principles and is presented in accordance with the requirements of OMB Circular A-133.
   Therefore, some amounts presented in this schedule  may differ from amounts presented in, or used in the
   preparation of the general purpose financial statements.

2. There were no subrecipient activities during the audit period.

15

Lakewood Township Residential Assistance Prog  (NJ214)

Lakewood, NJ

### Entity Wide Balance Sheet Summary

Submission Type: Audited/A-133                Fiscal Year End:  12/31/2012

| | 14.871 Housing Choice Vouchers | 14.856 Lower Income Housing Assistance Program_Section 8 Moderate Rehabilitat | Subtotal | ELIM | Total |
|---|---|---|---|---|---|
| 111 Cash - Unrestricted | | $3,257 | $3,257 | | $3,257 |
| 112 Cash - Restricted - Modernization and Development | | $0 | | | . |
| 113 Cash - Other Restricted | $808,893 | $0 | $808,893 | | $808,893 |
| 114 Cash - Tenant Security Deposits | | $0 | | | |
| 115 Cash - Restricted for Payment of Current Liabilities | | $0 | | | |
| 100 Total Cash | $808,893 | $3,257 | $812,150 | | $812,150 |
| | | | | | |
| 121 Accounts Receivable - PHA Projects | | $0 | | | |
| 122 Accounts Receivable - HUD Other Projects | $1,514 | $0 | $1,514 | | $1,514 |
| 124 Accounts Receivable - Other Government | $130,148 | $0 | $130,148 | | $130,148 |
| 125 Accounts Receivable - Miscellaneous | | $0 | | | |
| 126 Accounts Receivable - Tenants | | $0 | | | |
| 126.1 Allowance for Doubtful Accounts -Tenants | | $0 | | | |
| 126.2 Allowance for Doubtful Accounts - Other | $0 | $0 | $0 | | $0 |
| 127 Notes, Loans, & Mortgages Receivable - Current | | $0 | | | |
| 128 Fraud Recovery | $24,744 | $16 | $24,760 | | $24,760 |
| 128.1 Allowance for Doubtful Accounts - Fraud | -$18,243 | -$16 | -$18,259 | | -$18,259 |
| 129 Accrued Interest Receivable | | $0 | | | |
| 120 Total Receivables, Net of Allowances for Doubtful Accounts | $138,163 | $0 | $138,163 | | $138,163 |
| | | | | | |
| 131 Investments - Unrestricted | | $0 | | | |
| 132 Investments - Restricted | | $0 | | | |
| 135 Investments - Restricted for Payment of Current Liability | | $0 | | | |
| 142 Prepaid Expenses and Other Assets | | $0 | | | |
| 143 Inventories | | $0 | | | |
| 143.1 Allowance for Obsolete Inventories | | $0 | | | |
| 144 Inter Program Due From | | $0 | | | |
| 145 Assets Held for Sale | | $0 | | | |
| 150 Total Current Assets | $947,056 | $3,257 | $950,313 | | $950,313 |
| | | | | | |
| 161 Land | | $0 | | | |
| 162 Buildings | | $0 | | | |
| 163 Furniture, Equipment & Machinery - Dwellings | | $0 | | | |
| 164 Furniture, Equipment & Machinery - Administration | | $0 | | | |
| 165 Leasehold Improvements | | $0 | | | |
| 166 Accumulated Depreciation | | $0 | | | |
| 167 Construction in Progress | | $0 | | | |
| 168 Infrastructure | | $0 | | | |
| 160 Total Capital Assets, Net of Accumulated Depreciation | $0 | $0 | $0 | | $0 |
| | | | | | |
| 171 Notes, Loans and Mortgages Receivable - Non-Current | | $0 | | | |
| 172 Notes, Loans, & Mortgages Receivable - Non Current - Past Due | | $0 | | | |
| 173 Grants Receivable - Non Current | | $0 | | | . |
| 174 Other Assets | | $0 | | | |
| 176 Investments in Joint Ventures | | $0 | | | |

Lakewood Township Residential Assistance Prog  (NJ214)

Lakewood, NJ

### Entity Wide Balance Sheet Summary

Submission Type:  Audited/A-133                    Fiscal Year End:  12/31/2012

| | 14.871 Housing Choice Vouchers | 14.856 Lower Income Housing Assistance Program_Section 8 Moderate Rehabilitat | Subtotal | ELIM | Total |
|---|---|---|---|---|---|
| 180  Total Non-Current Assets | $0 | $0 | $0 | | $0 |
| 190  Total Assets | $947,056 | $3,257 | $950,313 | | $950,313 |
| 311  Bank Overdraft | | $0 | | | |
| 312  Accounts Payable <= 90 Days | $17,766 | $2,024 | $19,790 | | $19,790 |
| 313  Accounts Payable >90 Days Past Due | | $0 | | | |
| 321  Accrued Wage/Payroll Taxes Payable | | $0 | | | |
| 322  Accrued Compensated Absences - Current Portion | | $0 | | | |
| 324  Accrued Contingency Liability | | $0 | | | |
| 325  Accrued Interest Payable | | $0 | | | |
| 331  Accounts Payable - HUD PHA Programs | | $1,233 | $1,233 | | $1,233 |
| 332  Account Payable - PHA Projects | | | | | |
| 333  Accounts Payable - Other Government | $9,145 | $0 | $9,145 | | $9,145 |
| 341  Tenant Security Deposits | | $0 | | | |
| 342  Deferred Revenues | | $0 | | | |
| 343  Current Portion of Long-term Debt - Capital Projects/Mortgage Revenue Bonds | | $0 | | | |
| 344  Current Portion of Long-term Debt - Operating Borrowings | | $0 | | | |
| 345  Other Current Liabilities | | $0 | | | |
| 346  Accrued Liabilities - Other | | $0 | | | |
| 347  Inter Program - Due To | | $0 | | | |
| 348  Loan Liability - Current | | $0 | | | |
| 310  Total Current Liabilities | $26,911 | $3,257 | $30,168 | | $30,168 |
| 351  Long-term Debt, Net of Current - Capital Projects/Mortgage Revenue | | $0 | | | |
| 352  Long-term Debt, Net of Current - Operating Borrowings | | $0 | | | |
| 353  Non-current Liabilities - Other | $274,816 | $0 | $274,816 | | $274,816 |
| 354  Accrued Compensated Absences - Non Current | | $0 | | | |
| 355  Loan Liability - Non Current | | $0 | | | |
| 356  FASB 5 Liabilities | | $0 | | | |
| 357  Accrued Pension and OPEB Liabilities | | $0 | | | |
| 350  Total Non-Current Liabilities | $274,816 | $0 | $274,816 | | $274,816 |
| 300  Total Liabilities | $301,727 | $3,257 | $304,984 | | $304,984 |
| 508.1  Invested in Capital Assets, Net of Related Debt | | $0 | | | |
| 511.1  Restricted Net Assets | $645,329 | $0 | $645,329 | | $645,329 |
| 512.1  Unrestricted Net Assets | $0 | $0 | $0 | | $0 |
| 513  Total Equity/Net Assets | $645,329 | $0 | $645,329 | | $645,329 |
| 600  Total Liabilities and Equity/Net Assets | $947,056 | $3,257 | $950,313 | | $950,313 |

17

### Lakewood Township Residential Assistance Prog  (NJ214)
### Lakewood, NJ
#### Entity Wide Revenue and Expense Summary

Submission Type: Audited/A-133          Fiscal Year End:  12/31/2012

| | 14.871 Housing Choice Vouchers | 14.856 Lower Income Housing Assistance Program_Section 8 Moderate Rehabilitat | Subtotal | ELIM | Total |
|---|---|---|---|---|---|
| 70300  Net Tenant Rental Revenue | | $0 | | | |
| 70400  Tenant Revenue - Other | | $0 | | | |
| 70500  Total Tenant Revenue | $0 | $0 | $0 | | $0 |
| | | | | | |
| 70600  HUD PHA Operating Grants | $14,970,052 | $78,274 | $15,048,326 | | $15,048,326 |
| 70610  Capital Grants | | $0 | | | |
| 70710  Management Fee | | $0 | | | |
| 70720  Asset Management Fee | | $0 | | | |
| 70730  Book Keeping Fee | | $0 | | | |
| 70740  Front Line Service Fee | | $0 | | | |
| 70750  Other Fees | | $0 | | | |
| 70700  Total Fee Revenue | | $0 | | | |
| | | | | | |
| 70800  Other Government Grants | | $0 | | | |
| 71100  Investment Income - Unrestricted | | $32 | $32 | | $32 |
| 71200  Mortgage Interest Income | | $0 | | | |
| 71300  Proceeds from Disposition of Assets Held for Sale | | $0 | | | |
| 71310  Cost of Sale of Assets | | $0 | | | |
| 71400  Fraud Recovery | $33,944 | $0 | $33,944 | | $33,944 |
| 71500  Other Revenue | $682,168 | $0 | $682,168 | | $682,168 |
| 71600  Gain or Loss on Sale of Capital Assets | | $0 | | | |
| 72000  Investment Income - Restricted | $8,776 | $0 | $8,776 | | $8,776 |
| 70000  Total Revenue | $15,694,940 | $78,306 | $15,773,246 | | $15,773,246 |
| | | | | | |
| 91100  Administrative Salaries | | $0 | | | |
| 91200  Auditing Fees | $9,776 | $74 | $9,850 | | $9,850 |
| 91300  Management Fee | | $0 | | | |
| 91310  Book-keeping Fee | | $0 | | | |
| 91400  Advertising and Marketing | | $0 | | | |
| 91500  Employee Benefit contributions - Administrative | | $0 | | | |
| 91600  Office Expenses | | $0 | | | |
| 91700  Legal Expense | | $0 | | | |
| 91800  Travel | | $0 | | | |
| 91810  Allocated Overhead | | $0 | | | |
| 91900  Other | $1,046,614 | $9,626 | $1,056,240 | | $1,056,240 |
| 91000  Total Operating - Administrative | $1,056,390 | $9,700 | $1,056,090 | | $1,056,090 |
| | | | | | |
| 92000  Asset Management Fee | | $0 | | | |
| 92100  Tenant Services - Salaries | | $0 | | | |
| 92200  Relocation Costs | | $0 | | | |
| 92300  Employee Benefit Contributions - Tenant Services | | $0 | | | |
| 92400  Tenant Services - Other | $51,098 | $0 | $51,098 | | $51,098 |
| 92500  Total Tenant Services | $51,098 | $0 | $51,098 | | $51,098 |
| | | | | | |
| 93100  Water | | $0 | | | |
| 93200  Electricity | | $0 | | | |
| 93300  Gas | | $0 | | | |
| 93400  Fuel | | $0 | | | |
| 93500  Labor | | $0 | | | |

Lakewood Township Residential Assistance Prog  (NJ214)

Lakewood, NJ

Entity Wide Revenue and Expense Summary

Submission Type:  Audited/A-133

Fiscal Year End:  12/31/2012

| | 14.871 Housing Choice Vouchers | 14.856 Lower Income Housing Assistance Program_Section 8 Moderate Rehabilital | Subtotal | ELIM | Total |
|---|---|---|---|---|---|
| 93600  Sewer | | $0 | | | |
| 93700  Employee Benefit Contributions - Utilities | | $0 | | | |
| 93800  Other Utilities Expense | | $0 | | | |
| 93000  Total Utilities | $0 | $0 | $0 | | $0 |
| | | | | | |
| 94100  Ordinary Maintenance and Operations - Labor | | $0 | | | |
| 94200  Ordinary Maintenance and Operations - Materials and Other | | $0 | | | |
| 94300  Ordinary Maintenance and Operations Contracts | | $0 | | | |
| 94500  Employee Benefit Contributions - Ordinary Maintenance | | $0 | | | |
| 94000  Total Maintenance | $0 | $0 | $0 | | $0 |
| | | | | | |
| 95100  Protective Services - Labor | | $0 | | | |
| 95200  Protective Services - Other Contract Costs | | $0 | | | |
| 95300  Protective Services - Other | | $0 | | | |
| 95500  Employee Benefit Contributions - Protective Services | | $0 | | | |
| 95000  Total Protective Services | $0 | $0 | $0 | | $0 |
| | | | | | |
| 96110  Property Insurance | | $0 | | | |
| 96120  Liability Insurance | | $0 | | | |
| 96130  Workmen's Compensation | | $0 | | | |
| 96140  All Other Insurance | | $0 | | | |
| 96100  Total Insurance Premiums | $0 | $0 | $0 | | $0 |
| | | | | | |
| 96200  Other General Expenses | | $0 | | | |
| 96210  Compensated Absences | | $0 | | | |
| 96300  Payments In Lieu of Taxes | | $0 | | | |
| 96400  Bad debt - Tenant Rents | | $0 | | | |
| 96500  Bad debt - Mortgages | | $0 | | | |
| 96600  Bad debt - Other | | $0 | | | |
| 96800  Severance Expense | | $0 | | | |
| 96000  Total Other General Expenses | $0 | $0 | $0 | | $0 |
| | | | | | |
| 96710  Interest of Mortgage (or Bonds) Payable | | $0 | | | |
| 96720  Interest on Notes Payable (Short and Long Term) | | $0 | | | |
| 96730  Amortization of Bond Issue Costs | | $0 | | | |
| 96700  Total Interest Expense and Amortization Cost | $0 | $0 | $0 | | $0 |
| | | | | | |
| 96900  Total Operating Expenses | $1,107,488 | $9,700 | $1,117,188 | | $1,117,188 |
| | | | | | |
| 97000  Excess of Operating Revenue over Operating Expenses | $14,387,452 | $58,606 | $14,656,058 | | $14,656,058 |
| | | | | | |
| 97100  Extraordinary Maintenance | | $0 | | | |
| 97200  Casualty Losses - Non-capitalized | | $0 | | | |
| 97300  Housing Assistance Payments | $14,801,797 | $68,606 | $14,870,403 | | $14,870,403 |
| 97350  HAP Portability-In | $637,695 | $0 | $637,695 | | $637,695 |
| 97400  Depreciation Expense | $0 | $0 | $0 | | $0 |
| 97500  Fraud Losses | | $0 | | | |
| 97600  Capital Outlays - Governmental Funds | | $0 | | | |

Lakewood Township Residential Assistance Prog  (NJ214)

Lakewood, NJ

### Entity Wide Revenue and Expense Summary

Submission Type: Audited/A-133          Fiscal Year End: 12/31/2012

| | 14.871 Housing Choice Vouchers | 14.856 Lower Income Housing Assistance Program_Section 8 Moderate Rehabilitat | Subtotal | ELIM | Total |
|---|---|---|---|---|---|
| 97700  Debt Principal Payment - Governmental Funds | | $0 | | | |
| 97600  Dwelling Units Rent Expense | | $0 | | | |
| 90000  Total Expenses | $16,546,980 | $78,306 | $16,625,286 | | $16,625,286 |
| | | | | | |
| 10010  Operating Transfer In | | $0 | | | |
| 10020  Operating transfer Out | | $0 | | | |
| 10030  Operating Transfers from/to Primary Government | | $0 | | | |
| 10040  Operating Transfers from/to Component Unit | | $0 | | | |
| 10050  Proceeds from Notes, Loans and Bonds | | $0 | | | |
| 10060  Proceeds from Property Sales | | $0 | | | |
| 10070  Extraordinary Items, Net Gain/Loss | | $0 | | | |
| 10080  Special Items (Net Gain/Loss) | | $0 | | | |
| 10091  Inter Project Excess Cash Transfer In | | $0 | | | |
| 10092  Inter Project Excess Cash Transfer Out | | $0 | | | |
| 10093  Transfers between Program and Project - In | | $0 | | | |
| 10094  Transfers between Project and Program - Out | | $0 | | | |
| 10100  Total Other financing Sources (Uses) | $0 | $0 | $0 | | $0 |
| | | | | | |
| 10000  Excess (Deficiency) of Total Revenue Over (Under) Total Expenses | -$852,040 | $0 | -$852,040 | | -$852,040 |
| | | | | | |
| 11020  Required Annual Debt Principal Payments | $0 | $0 | $0 | | $0 |
| 11030  Beginning Equity | $1,497,369 | $0 | $1,497,369 | | $1,497,369 |
| 11040  Prior Period Adjustments, Equity Transfers and Correction of Errors | | $0 | | | |
| 11050  Changes in Compensated Absence Balance | | $0 | | | |
| 11060  Changes in Contingent Liability Balance | | $0 | | | |
| 11070  Changes in Unrecognized Pension Transition Liability | | $0 | | | |
| 11080  Changes in Special Term/Severance Benefits Liability | | $0 | | | |
| 11090  Changes in Allowance for Doubtful Accounts - Dwelling Rents | | $0 | | | |
| 11100  Changes in Allowance for Doubtful Accounts - Other | | $0 | | | |
| 11170  Administrative Fee Equity | $0 | $0 | $0 | | $0 |
| 11180  Housing Assistance Payments Equity | $645,329 | $0 | $645,329 | | $645,329 |
| 11190  Unit Months Available | 12696 | 96 | 12792 | | 12792 |
| 11210  Number of Unit Months Leased | 12596 | 96 | 12692 | | 12692 |
| 11270  Excess Cash | | $0 | | | |
| 11610  Land Purchases | | $0 | | | |
| 11620  Building Purchases | | $0 | | | |
| 11630  Furniture & Equipment - Dwelling Purchases | | $0 | | | |
| 11640  Furniture & Equipment - Administrative Purchases | | $0 | | | |
| 11650  Leasehold Improvements Purchases | | $0 | | | |
| 11660  Infrastructure Purchases | | $0 | | | |
| 13510  CFFP Debt Service Payments | | $0 | | | |
| 13901  Replacement Housing Factor Funds | | $0 | | | |



**CERTIFIED PUBLIC ACCOUNTANTS**

2035 HAMBURG TURNPIKE, UNIT H
WAYNE, NEW JERSEY 07470
TELEPHONE: (973) 831-6969
FAX: (973) 831-6972
E-MAIL: POLCARICO@OPTONLINE.NET

**INDEPENDENT AUDITOR'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING AND COMPLIANCE AND OTHER MATTERS BASED ON AN AUDIT OF FINANCIAL STATEMENTS PERFORMED IN ACCORDANCE WITH GOVERNMENT AUDITING STANDARDS**

Board of Commissioners
Lakewood Township Residential Assistance Program
Lakewood, New Jersey

We have audited, in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in *Government Auditing Standards* issued by the Comptroller General of the United States, the financial statements of the Lakewood Township Residential Assistance Program ("the Program") as of and for the year ended December 31, 2012 and the related notes to the financial statements, which collectively comprise the Lakewood Township Residential Assistance Program's basic financial statements and have issued our report thereon dated September 20, 2013.

<u>Internal Control Over Financial Reporting</u>

In planning and performing our audit, we considered the Lakewood Township Residential Assistance Program's internal control over financial reporting (internal control) to determine the audit procedures that are appropriate in the circumstances for the purpose of expressing our opinion on the financial statements, but not for the purpose of expressing an opinion on the effectiveness of the Authority's internal control over financial reporting. Accordingly, we do not express an opinion on the effectiveness of the Authority's internal control over financial reporting.

A deficiency in internal control exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect and correct misstatements on a timely basis. A material weakness is a deficiency or combination of deficiencies in internal control, such that there is a reasonable possibility that a material misstatement of the entity's financial statements will not be prevented, or detected and corrected on a timely basis. A significant deficiency is a deficiency, or a combination of deficiencies, in internal control that is less severe than a material weakness, yet important enough to merit attention by those charged with governance.

Our consideration of internal control was for the limited purpose described in the first paragraph of this and was not designed to identify all deficiencies in internal control that might be material weaknesses or significant deficiencies. Given these limitations, during our audit we did not identify any deficiencies in internal control that we consider to be material weaknesses. However, material weaknesses may exist that have not been identified.

21

**INDEPENDENT AUDITOR'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING AND COMPLIANCE AND OTHER MATTERS BASED ON AN AUDIT OF FINANCIAL STATEMENTS PERFORMED IN ACCORDANCE WITH GOVERNMENT AUDITING STANDARDS**
**(Continued)**

<u>Compliance and Other Matters</u>

As part of obtaining reasonable assurance about whether the Lakewood Township Residential Assistance Program's financial statements are free of material misstatement, we performed tests of its compliance with certain provisions of laws, regulations, contracts and grant agreements, noncompliance with which could have a direct and material effect on the determination of financial statement amounts. However, providing an opinion on compliance with those provisions was not an objective of our audit and, accordingly, we do not express such an opinion. The results of our tests disclosed no instances of noncompliance or other matters that are required to be reported under *Government Auditing Standards*.

<u>Purpose of this Report</u>

The purpose of this report is solely to describe the scope of our testing of internal control and compliance and the results of that testing, and not to provide an opinion on the effectiveness of the entity's internal control or on compliance. The report is an integral part of an audit performed in accordance with Government Auditing Standards in considering the entity's internal control and compliance. Accordingly, this communication is not suitable for any other purpose.

*Polcari & Company*

POLCARI & COMPANY
CERTIFIED PUBLIC ACCOUNTANTS

Wayne, New Jersey
September 20, 2013





**CERTIFIED PUBLIC ACCOUNTANTS**

2035 HAMBURG TURNPIKE, UNIT H
WAYNE, NEW JERSEY 07470
TELEPHONE: (973) 831-6989
FAX: (973) 831-6972
E-MAIL: POLCARICO@OPTONLINE.NET

## INDEPENDENT AUDITOR'S REPORT ON COMPLIANCE WITH REQUIREMENTS APPLICABLE TO EACH MAJOR PROGRAM AND INTERNAL CONTROL OVER COMPLIANCE IN ACCORDANCE WITH OMB CIRCULAR A-133

Board of Commissioners
Lakewood Township Residential Assistance Program
Lakewood, New Jersey

Report on Compliance for Each Major Federal Program

We have audited the Lakewood Township Residential Assistance Program's ("The Program") compliance with the types of compliance requirements described in the U. S. Office of Management and Budget (OMB) Circular A-133 Compliance Supplement that could have a direct and material effect on each of the Authority's major federal programs for the year ended December 31, 2012. The Lakewood Township Residential Assistance Program's major federal programs are identified in the summary of auditor's results section of the accompanying Schedule of Findings and Questioned Costs.

Management's Responsibility

Management is responsible for compliance with the requirements of laws, regulations, contracts and grants applicable to each of its major federal programs.

Auditor's Responsibility

Our responsibility is to express an opinion on the housing authority's compliance for each of its major federal programs based on our audit of the types of compliance requirements referred to above. We conducted our audit of compliance in accordance with auditing standards generally accepted in the United States of America; the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States; and Office of Management and Budget Circular A-133, Audits of States, Local Governments and Non-Profit Organizations. Those standards and OMB Circular A-133 require that we plan and perform the audit to obtain reasonable assurance about whether noncompliance with the types of compliance requirements referred to above that could have a direct and material effect on a major federal program occurred. An audit includes examining, on a test basis, evidence about the housing authority's compliance with those requirements and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion. Our audit does not provide a legal determination of the Lakewood Township Residential Assistance Program's compliance with those requirements.

Opinion on Each Major Federal Program

In our opinion, the Lakewood Township Residential Assistance Program complied, in all material respects, with the types of compliance requirements referred to above that could have a direct and material effect on each of its major federal programs for the year ended December 31, 2012.

## INDEPENDENT AUDITOR'S REPORT ON COMPLIANCE WITH REQUIREMENTS APPLICABLE TO EACH MAJOR PROGRAM AND INTERNAL CONTROL OVER COMPLIANCE IN ACCORDANCE WITH OMB CIRCULAR A-133
### (Continued)

<u>Report on Internal Control Over Compliance</u>

The management of the Lakewood Township Residential Assistance Program is responsible for establishing and maintaining effective internal control over compliance with the types of compliance requirements referred to above. In planning and performing our audit of compliance, we considered the housing authority's internal control over compliance with the types of requirements that could have a direct and material effect on each major federal program in order to determine the auditing procedures that are appropriate in the circumstances for the purpose of expressing our opinion on compliance for each major federal program and to test and report on internal control over compliance in accordance with OMB Circular A-133, but not for the purpose of expressing an opinion on the effectiveness of internal control over compliance. Accordingly, we do not express an opinion on the effectiveness of the Authority's internal control over compliance.

A deficiency in an entity's internal control over compliance exists when the design or operation of a control over compliance does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect and correct noncompliance with a type of compliance requirement of a federal program on a timely basis. A material weakness in internal control over compliance is a deficiency, or combination of deficiencies in internal control over compliance, such that there is a reasonable possibility that material noncompliance with a type of compliance requirement of a federal program will not be prevented, or detected and corrected on a timely basis. A significant deficiency in internal control over compliance is a deficiency, or a combination of deficiencies, in internal control over compliance with a type of compliance requirement of a federal program that is less severe than a material weakness, yet important enough to merit attention by those charged with governance.

Our consideration of the internal control over compliance was for the limited purpose described in the first paragraph of this section and was not designed to identify all deficiencies in internal control over compliance that might be deficiencies, significant deficiencies or material weaknesses or significant deficiencies. We did not identify any deficiencies in internal control over compliance that we consider to be material weaknesses. However, material weaknesses may exist that have not been identified.

<u>Purpose of this Report</u>

The purpose of this report on internal control over compliance is solely to describe the scope of our testing of internal control over compliance and the results of that testing based on the requirements of OMB Circular A-133. Accordingly, the report is not suitable for any other purpose.



POLCARI & COMPANY
CERTIFIED PUBLIC ACCOUNTANTS

Wayne, New Jersey
September 20, 2013

24

POLCARI & CO.
CERTIFIED PUBLIC ACCOUNTANTS

LAKEWOOD TOWNSHIP RESIDENTIAL ASSISTANCE PROGRAM
Lakewood, New Jersey
December 31, 2012

## SCHEDULE OF FINDINGS AND QUESTIONED COSTS

### SECTION 1 - SUMMARY OF AUDIT RESULTS

PRIOR AUDIT FINDINGS
The prior audit contained no findings.

CURRENT AUDIT FINDINGS

**Financial Statements**

| | | |
|---|---|---|
| Type of Auditor's Report Issued: | Unmodified | |
| Internal Control over Financial Reporting: | | |
| Material Weakness(es) Identified? | _____ yes | __X__ no |
| Significant Deficiency(s) Identified that are not considered to be material weakness(es)? | _____ yes | __X__ none reported |
| Noncompliance Material to Financial Statements Noted? | _____ yes | __X__ no |

**Federal Awards**

| | | |
|---|---|---|
| Internal Control over Major Programs: | | |
| Material Weakness(es) Identified? | _____ yes | __X__ no |
| Significant Deficiency(s) Identified that are not considered to be material weakness(es)? | _____ yes | __X__ none reported |

Type of audit report issued on compliance for
major programs:                                    Unmodified

Any audit findings disclosed that are required to be
reported in accordance with section 510(a) of
Circular A-133                          _____ yes    __X__ no

Identification of Major Programs

CFDA
Number    Name of Federal Program or Cluster
14.871    Housing Choice Voucher Program

Dollar Threshhold used to distinguish between type A
and type B Programs                              $451,450

Auditee qualified as low-risk?          __X__ yes    _____ no

### SECTION 2 – FINANCIAL STATEMENT FINDINGS
None.

### SECTION 3 – FEDERAL AWARD FINDINGS AND QUESTIONED COSTS
None.

25

# EXHIBIT T



JAN 26 2001

U.S. Department of Housing and Urban Development
Office of Public Housing
One Newark Center
Newark, NJ 07102-5260

Mr. Meir Hertz
Executive Director
Lakewood Township Rental Assistance Program
600 West Kennedy Boulevard
P.O. Box 856
Lakewood, New Jersey 08701

Dear Mr. Hertz:

Subject:  Lakewood Township Rental Assistance Program (LTRAP) - Section 8 Management
Review

We are in receipt of your response dated December 29, 2000, to the Section 8 Management
Review conducted by this office during the month of October 2000.

## MANAGEMENT AND OCCUPANCY

Finding No. 1:  Rent Reasonableness

As stated in our letter dated November 29, 2000, at the time of the review it was evident that
LTRAP was currently in the process of developing a data base of comparable unassisted units.
The auditors were given a folder containing data that was not organized or assembled in any kind
of order that could be easily audited or reviewed. During the review, HUD staff was shown back-
up data for comparable unassisted units. However, the data was incomplete. The data contained
some of the required information such as, address (location), rental amount, bedroom size and
unit type. The data contained sparse information regarding other characteristics such as, quality
and size, utilities provided, and amenities.

The format of the spreadsheet was acceptable and called for all the required information. We
agree that this will be a useful tool for comparability analysis provided that all the information
discussed above can be obtained and recorded.

LTRAP states in its letter that they have assembled, and are utilizing, all the information
required by the regulations and is in the process of recording the information on a spreadsheet
that will support the information obtained from their market survey.

In order to clear this finding, LTRAP must provide our office with evidence that unassisted
comparable units have been identified and that the rent reasonableness study has been completed

and includes all information required by the regulations.

Finding No. 2:  Waiting List

Federal regulation 24 CFR 982.204  requires that:

The waiting list must contain the following information for each applicant listed:

(1) Applicant name;
(2) Family unit size (number of bedrooms for which family qualifies
    under PHA occupancy standards);
(3) Date and time of application;
(4) Qualification for any local preference;
(5) Racial or ethnic designation of the head of household.

The list provided, at the time of the review, contained applicants with a status of terminated, quit or withdrawn.  For these cases, the information provided does not contain application date/time, unit size, preference status, and race/ethnicity.   The remainder of the list contains active program participants.  For these cases, the list does not contain an application date/time and unit size.  This list **did not** contain any active applicants.  The entire list includes only those who have been terminated, withdrawn, quit, or leased.

At the time of the review, it was agreed that LTRAP would reprogram the master waiting list in order to provide all required information.  The list provided with your letter dated December 29, 2000, also fails to provide all necessary information.  For those families with a status of terminated, withdrawn or quit, this list does contain an application date, however, it does not contain race/ethnicity, unit size, and preference status.  The remainder of the list contains current program participants.  In these cases, the information provided includes, name, and race/ethnicity.  It does not include, application date, unit size, and preference status.  Similar to the list discussed above, this list **does not** include active applicants.

We recognize that making retroactive corrections for inactive applicants to include the required information would be difficult and unnecessary at this time.  However, LTRAP must make corrections to ensure that the master waiting list complies with 24 CFR 982.204.

We have no objection to LTRAP utilizing "snap shot" or sub-lists in order to facilitate tenant selection.  However, LTRAP should retain copies of these lists following each update.

This finding will remain open until LTRAP  provides satisfactory evidence that corrective action has been taken.

Error No. 1:  Administrative Plan - Selection Preferences

We recognize that LTRAP has requested an opinion from HUD Headquarters, regarding a local residency preference.  We believe that our opinion is correct, however we will abide by any

determination provided.

Error No. 2:  Administrative Plan - Residency Requirement for Non-Resident Participants

Based on LTRAP's response, that its Administrative Plan will be amended, this error is cleared subject to the submission of the amended Administrative Plan.  Please forward the revised Plan and a Board resolution adopting the change to this office.

FINANCIAL MANAGEMENT

Finding:  Failure to establish PHA Administrative Fee Reserve

Status: Closed

Upon further review, based on the current contract that LTO has with Lakewood Township, the Lakewood Tenants Organization is entitled to all Administrative Fees and therefore an Administrative Fee Reserve account would not accrue.

Observation:  Our financial review reveals that LTRAP is the recipient of HUD funds however, administrative fees and other activities are posted to the Lakewood Tenant Organization (LTO) books.

Based on the contractual agreement between LTO and LTRAP, this concern is closed. However, our recommendation was directed to the contract recipient (LTRAP) and should be responded to by Lakewood Township.

Status: Open

Our recommendation advised Lakewood Township ( HUD Contracted Recipient ) to require that LTO breakout the operating expenses on the Financial Statement, so that they may determine the cost relative to operating the program.  We further advised Lakewood Township to do a comparative analysis to determine the cost of operating a program of similar size.  We feel that the Township should respond to this observation.  As far the Administrative Fees established by Congress, these fees have been established as reasonable cost; however, based on our knowledge of the program, rarely does the actual program operation cost equal the Administrative Fees Earned.  All Admin. Fees earned in excess of the administrative expenses can and should be used for other housing needs (i.e. Homeownership Counseling etc).

Recommendation: The agency should ensure that these resolutions and agreements are in conformance with all applicable State, Local and Federal Law.  Additionally, provide us with the entity responsible for fiduciary oversight of LTO/LTRAP.  The Lakewood Township should require that LTO reflect all operating cost on the Financial Statement. The Township should do a comparative analysis of other entities that operate programs of similar size.  Based on the aforementioned analysis the Township should determine if the operating cost is reasonable.

**HOUSING QUALITY STANDARDS (HQS)**

Finding No. 1 :  HQS - 8  out of 18 units failed  inspection

Based on  our review  of the LTRAP 's  and independent inspecting contractor's report (AdCar), we  agreed with your argument on above HQS  deficiencies that there are no such scientific standards  to compare with our inspection. Therefore, every inspector will have their own objective interpretation of the HQS guidelines.

Also,  based on your response , it is clear that you have taken all measures and followed-up with the Landlords to correct all deficiencies identified in our report. Therefore, we are clearing  this finding  and hope that our recommendations may have provided an additional tool in improving  the agency's operation .

Sincerely,

Carmen Valenti
Director
Office of Public Housing

# EXHIBIT U

## Henya Richter

| | |
|---|---|
| From: | Johnson, Nehemiah A <Nehemiah.A.Johnson@hud.gov> |
| Sent: | Thursday, July 25, 2013 9:45 AM |
| To: | 'henya@ltrap.org' |
| Subject: | Financial Management Review (FMR) -- Lakewood Township Rental Assistance Program (NJ214) |

Mr. Hertz:

The Department of Housing and Urban Development (HUD), Office of Public and Indian Housing, Quality Assurance Division (QAD) has scheduled the subject on-site review of the Lakewood Township RAP (NJ214) Housing Choice Voucher (HCV) program.

The scope of the financial validation review will include the Net Restricted Assets for the entire period beginning with January 1, 2005 forward, through current closed accounting month, and for Unrestricted Net Assets the Lakewood Township RAP fiscal year 2007 through August 2013.  The review will be conducted on site by viewing the PHA financial and program utilization source documents for *total* HCV Housing Assistance Payments (HAP) and *detailed* Administrative Expenses (AE).

Please advise if the timeframe of September 17 -- 20, 2013, is conducive for you and key staff that will be involved in the review.


Nehemiah Johnson
Quality Assurance / Public Housing
U.S. Dept. of Housing and Urban Development
Strom Thurmond Federal Building
1835 assembly St., 13th Floor
Columbia, SC 29201
(803) 765-5356

# EXHIBIT V



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, DC 20410-5000

PRINCIPAL DEPUTY ASSISTANT SECRETARY
FOR PUBLIC AND INDIAN HOUSING

April 9, 2015

Dear Executive Director:

Yesterday HUD released the *Housing Choice Voucher Program Administrative Fee Study*. The main purpose of the study was to identify and measure the actual costs of operating a high-performing and efficient housing choice voucher (HCV) program and then propose a new administrative fee formula based on those findings and costs. The Executive Summary, Draft Final Report, and a PowerPoint presentation that provides an overview of the study are now available at the following website: http://www.huduser.org/portal/hcvfeestudy.html.

I encourage you to visit the HUD website to download the study and other materials. I also invite you to watch the webcast of HUD's public briefing on the study's findings and recommended fee formula, which will be held on April 17th. The HUD webcast will also be recorded and available for future viewing. Further information on this event is available at the following website: http://www.huduser.org/HousingChoiceVouchers/index.html.

In undertaking this study, HUD sought to address the critical need for data regarding the actual cost of administering the HCV program. The last study on HCV administrative costs was conducted over twenty years ago and was based on administrative data rather than actual levels of effort by Public Housing Agency (PHA) staff. Furthermore, the existing formula is based on the Fair Market Rent (FMR) with no documented connection to the actual cost of administering the HCV program. As you are aware, administrative fees have consistently been prorated downward since 2008. HUD has been very concerned that the significant administrative fee pro-rations in recent years have impeded and disrupted PHA operations and hampered efforts to carry-out basic programmatic responsibilities. In these challenging budgetary times, it is vital that HUD and Congress have accurate, reliable information about how much it costs to administer an effective and efficient HCV program, and that the fee formula reflects the actual cost drivers of program administration.

The study's findings have confirmed what we already know to be true – current administrative fee funding does not meet the reasonable costs of administering the program. For example, for the July 2013 through June 2014 period that the study analyzed, the fees received for the average PHA covered only 77 percent of the estimated cost to administer the program. Under the fee formula recommended by the study, 92 percent of PHAs would have received higher fees for that period of time.

Clearly one of the most immediate concerns from a PHA's perspective is how the study's recommended fee formula would impact your individual agency. To help answer this question, HUD will provide you with the study's analysis that compared the fees received by your PHA from July 2013 through June 2014 to the fees your PHA would have received under the new formula for the same time period. In addition, we are updating that analysis to provide your PHA with the same information for Calendar Year (CY) 2014. Since administrative fees are

established on a CY basis, the CY 2014 comparison may be more illustrative of the potential impact of the study's recommended formula for your agency. HUD plans to provide you this information by the end of April, 2015.

Now that the study is complete, the Department plans to develop a proposed rule for a new administrative fee formula using the study's findings. HUD will issue a Notice of Information to help inform the development of the proposed rule and we want to hear from you. We will also reach out to PHAs through convening sessions and other forums over the next several months. Our goal is to complete and publish the proposed rule before the end of CY 2015.

In closing, I wish to express the Department's sincerest appreciation to both the 60 PHAs that participated in the study and the members of the Expert and Industry Review Group (EITRG). The EITRG consisted of representatives from the major affordable housing industry groups, Executive Directors and HCV Program Directors from high performing PHAs, affordable housing industry technical assistance providers, housing researchers, and other experts. The EITRG's insights and suggestions greatly strengthened both the study's approach and presentation of the findings. With respect to the participating PHAs, over the eight week time measurement period, HCV staff reported on what they were working on at 12-15 random points each day for a period of 40 days. The study ultimately collected 581,000 responses from more than 900 PHA staff. Leadership and staff at these agencies also freely shared their expertise and insights on all aspects of HCV administration with the study team. We are very grateful for their invaluable contribution to this study.

Sincerely,

Lourdes Castro Ramirez
Principal Deputy Assistant Secretary
    for Public and Indian Housing

# EXHIBIT W

**From:** Financial Management Center [mailto:FinancialManagementCenter@hud.gov]
**Sent:** Tuesday, May 26, 2015 2:41 PM
**To:** Henya Richter
**Subject:** NJ214_FND_20150526_AdminFeeStudy_M15-064

Communications on or through the United States Department of Housing and Urban Development computer systems may be monitored to secure effective system operation and for other lawful purposes.

The information contained in this email is confidential and may be subject to legal privilege. If you are not the intended recipient, you must not use, copy, distribute, or disclose this email, or any part of it's contents, or take any action in reliance on it. If you have received this email in error, please email the sender by replying to this message.

All reasonable precautions have been taken to ensure no viruses are present in this email. The United States Department of Housing and Urban Development cannot accept responsibility for loss or damage arising from the use of this email or attachments and recommend that you subject these to your virus checking procedures prior to use.



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-5000

OFFICE OF PUBLIC AND INDIAN HOUSING

Dear Executive Director:

This letter provides information on how the recommended fee formula proposed in the *Housing Choice Voucher Program Administrative Fee Study* would potentially impact your agency.

Principal Deputy Assistant Secretary Castro-Ramírez's April 9, 2015 letter to you acknowledged that one of the most immediate concerns from a PHA's perspective is to understand how the study's recommended fee formula would impact your individual agency. To help answer that question, the attachment to this letter contains a summary of the study's analysis comparing the actual fees received by your PHA from July 2013 through June 2014 (the study period) and for Calendar Year (CY) 2014 to the fees your PHA would have received under the new formula for those same periods.

When reviewing the attachment, it is important to note the proration percentages that in part determined the actual fee funding received by the PHA during the study period and CY 2014 are significantly different. The proration that applied to the study period is 75 percent while the proration that applied to CY 2014 is almost 80 percent. This is why, for example, the actual fees received by some PHAs during CY 2014 may have increased when compared to the study period even though the number of leased units decreased. The change in the proration and the impact on the actual fees received is the main reason why the percentage change between the funding that would have been received under the proposed formula and the actual fees received will differ between the two comparison periods.

In addition, please keep in mind that the amounts provided for the study's proposed formula and the resulting percentage change in the funding is based on a straight forward application of the formula and does not assume any phase-in or transition adjustments. The study recommends that in implementing a new fee formula HUD should consider a transition or phase-in plan to all PHAs time to adjust to the new fees. The study further noted that a transition or phase-in is particularly important for PHAs facing a decrease in funding under the new formula. The purpose of the data provided in the attachment is to help facilitate further analysis, discussion, and comment regarding the proposed formula in the study and how HUD may need to modify or refine the proposed formula when developing a new fee formula. The attachment should not in any way be considered advance notice of the actual fee the PHA would receive upon the implementation of a new administrative fee formula.

As noted in my letter to you of April 30, 2015, HUD is in the process developing a tool that will be posted along with the administrative fee comparative data for all PHAs for the study period and CY 2014. This tool will allow the user to generate additional comparisons based on other funding scenarios that may be of interest to them. For example, the user will be able to change the proration percentage from the actual proration that was in effect at the time period in question to any proration percentage to compare the amount of funding the PHA would have

received under the current formula (based on the assumptions entered by the user) and the recommended fee formula.

The Tool will also provide information on the individual variables used to calculate the PHA's full fee amount under the recommended formula. The new Admin Fee Tool to test the different pro-ration models and the comparative data for all PHAs will be posted in the near future at the HCV Admin Fee Study website: http:/www.huduser.org/portal/hcvfeestudy.html.

Should you have any questions regarding the comparative data in the attachment or about the forthcoming Admin Fee Tool, please submit your questions by email to: HCVAdminFeeStudy@hud.gov.

I hope this information is helpful to you.

Sincerely,

Milan Ozdinec
Deputy Assistant Secretary
    Office of Public Housing and Voucher Programs

Enclosure

**PHA Code:** NJ214
**PHA Name:** LAKEWOOD RAP HOUSING AUTHORITY

**Study Period (July 2013 – June 2014)**

| Vouchers Under Lease (a) | Fees Received Under Existing Formula (b) | Fees Under Proposed Formula (c) | Admin Fee per Unit Month Leased (UML) - Proposed Formula | Percent Change in Fee Funding – Study Period |
|---|---|---|---|---|
| 1,064 | $945,934 | $1,261,124 | $98.58 | 33% |

(a) This count includes port-in vouchers and excludes port-out vouchers. This is the voucher count used for the proposed formula. The existing formula uses a count that excludes port-in vouchers and includes port-out vouchers.
(b) 75% average proration. These fees are calculated as the total fees paid by HUD to the PHA (including fees for Mainstream 5 vouchers) plus port-in fees received from other PHAs and minus port-out fees paid to other PHAs.
(c) This is a straight application of the proposed formula, with no proration and no phase-in or hold harmless provisions.

**Calendar Year 2014 (January 2014 – December 2014)**

| Vouchers Under Lease (a) | Fees Received Under Existing Formula (b) | Fees Under Proposed Formula (c) | Admin Fee per Unit Month Leased (UML) - Proposed Formula | Percent Change in Fee Funding – Study Period |
|---|---|---|---|---|
| 1,070 | $1,021,757 | $1,291,786 | $100.51 | 26% |

(a) This count includes port-in vouchers and excluding port-out vouchers. This is the voucher count used for the proposed formula. The existing formula uses a count that excludes port-in vouchers and includes port-out vouchers.
(b) 79.769% average proration. These fees are calculated as the total fees paid by HUD to the PHA (including fees for Mainstream 5 vouchers) plus port-in fees received from other PHAs and minus port-out fees paid to other PHAs.
(c) This is a straight application of the proposed formula, with no proration and no phase-in or hold harmless provisions.

# EXHIBIT X

# QUESTIONS AND ANSWERS FROM REGIONAL PIH FIELD OFFICE TRAINING ON ASSET MANAGEMENT

This document includes answers to various questions raised by HUD/PIH Field Staff during regional trainings held in August and September of 2007 on Asset Management.

Because of its general applicability, this document is being made available both to HUD and PHA staff. As a result, questions have been revised for broader readership. Additionally, while some of the questions are similar to ones previously addressed either through the Asset Management Help Desk or the Frequently Asked Questions (FAQs) posted on the REAC website, the document nonetheless serves as a compilation of the subject material.

### Table of Contents

I. Financial Management......................................................................2

A. *Fee for Service, Program Income, and Front-Line vs. Management Fee Expenses*..............................................................................................*2*
B. *Capital Fund*...................................................................................*6*
C. *Excess Cash*...................................................................................*7*
D. *Assignment of Assets and Liabilities and other Balance Sheet Questions*....*8*
E. *Other FDS Reporting Questions*............................................................*8*
F. *Mixed Financed Projects and Component Units*.........................................*9*
G. *Project-Based Budgeting*...................................................................*10*
H. *Fungibility*....................................................................................*11*

II. Project-Based Management..............................................................11
III. Operating Subsidy.......................................................................13
IV. General Questions........................................................................15

## I. Financial Management

### A. Fee for Service, Program Income, and Front-Line vs. Management Fee Expenses

#### 1. Can a COCC charge different fees to different AMPs?

With respect to, say, the management fee, the answer is "yes." A PHA cannot charge more than the allowable fee, but could charge less at some projects, if desired. The same would be true for centralized maintenance performed under fee-for-service. A PHA could decide to charge different rates, provided the rate did not exceed market standards. The fee rate must be documented as "reasonable".

#### 2. At what point during the year and how often does the COCC charge the management fee to the AMPs?

Generally, a COCC would charge management and bookkeeping fees to the AMPs on a monthly basis, to be reflected in each month's financial statements. However, a COCC could make adjustments throughout the year, with appropriate documentation.

#### 3. Can a COCC charge a different fee-for-service to an AMP when there is an "after-hours" emergency?

Yes. For example, a COCC could charge a higher fee for emergency work orders than it would for routine work. As always, the fees must be in the best interests of the project and not cost more than if performed by on-site staff, if appropriate.

#### 4. Will the management fee schedules in the Supplement to PIH Notice 2007-9 be updated?

Yes. See the following link for the 2008 management fee schedules:
http://www.hud.gov/offices/pih/programs/ph/am/docs/tablefees08.pdf

#### 5. Can one AMP charge another AMP for services?

Yes. For example, if the service provided between two AMPs is a specialized maintenance technician, such as a plumber, the PHA has two viable options. One option would be for the PHA to designate this specialist as a shared resource and charge the direct costs of this employee (salary, benefits, etc.) to each of the AMPs

where the work is performed.

A shared resource is a resource used over a small number of projects. The guidance associated with the use of a shared resource appears in the Supplement to PIH Notice 2007-9. The guidance calls for the use of a "reasonable methodology" to separate "the amount of time spent on providing services to AMPs..."

**6.  Are management fees earned in the Housing Choice Voucher program (HCV) considered non-federal?**

Yes.  HCVP management fees, along with the bookkeeping fee, are non-federal funds.  As stated in the Supplement attached to PIH Notice 2007-09, "any reasonable fees earned by the COCC will be treated as local revenue subject only to the controls and limitations imposed by the PHA's Board or other authorized governing body."

**7. When fees go to the COCC, are they de-federalized at that point?**

Yes.  As stated in the Supplement to PIH notice 2007-9, "any reasonable fees earned by the PHA/COCC will be treated as local revenue subject only to the controls and limitations imposed by the PHA's management, Board, or other authorized governing body." PHAs opting for "phase-in" to fee reasonableness must consider HUD's guidance regarding reasonable phase-in amounts, or adequately document fees which the PHA asserts are required to sustain operations, in order for these fees to be deemed de-federalized.

**8.  Will HUD require PHAs to explain how the fees earned by the COCC were spent?**

No.  A PHA will not be required to explain or justify to HUD the expenditure of fee income.  However, as a requirement under GAAP, a PHA will be required to include the financial statement of the COCC along with the PHA's annual financial submission to REAC.

**9.  Regarding the first year of implementation of project-based budgeting and accounting, will all fee income be "de-federalized" including the six months of working capital?**

If a PHA is operating under the fee-for-service model, where the fees charged are reasonable, all fee income, including the COCC working capital, is de-federalized. Where a PHA requires an extension of one or more years to achieve fee reasonableness, the PHA should document fees required to sustain central operating activities. HUD will issue guidance to prescribe reasonable "phase-in" levels, which, when complied with, results in de-federalized resources to the COCC. Consideration may be given to A-87 during the first year of implementation of project-based accounting. This first year establishes a "baseline" for overhead costs.

Provided the PHA includes an acceptable plan for achieving fee reasonableness in its Annual Plan, the stepped-down fees that the PHA will charge through 2011 are considered de-federalized.

**10. Do the fee schedules for property management fees account for both small and large PHAs in a specific locality?**

The fee schedules are based on the management fees paid, by locale, in HUD's Multifamily Housing programs. There is not a different fee schedule for large/small PHAs (just as there is not a different schedule for "small" and "large" owners in FHA), so these schedules are to be used for all small and large PHAs that adopt a COCC.

**11.  How should a PHA account for travel time in fee-for-service charges for maintenance work?**

A project should only be charged for the hours worked.  In establishing the hourly rate to charge, overhead costs, such as down time lost to travel, should be factored into the rate charged.  For example, a plumber would not bill for the hours traveled to and from the job, but the costs associated with the travel would be part of the hourly rate that is charged.

**12.  How are ROSS Grants treated under asset management?**

The nature of the ROSS grants does not change; however, the PHA may now charge the ROSS program a management fee for recovery of overhead. Additionally, the ROSS grant will continue to be reported as a separate program on the FDS.

**13. What form of documentation is required to validate reasonable market rates for fee-for-service maintenance charges?**

HUD does not require any specific type of documentation to determine and prove cost reasonableness, but the PHA must ensure that documentation is complete and available.  Formal bid documents or documents related to similar, previous work performed at the PHA are two examples of documentation that will be considered reasonable market rates for fee-for-service arrangements. The PHA should consider guidance as set forth in OMB Circular A-87 which relates to Cost Principles.

**14. How can a COCC be profitable if on-site costs are cheaper?**

If performing a front-line service on-site is more cost-effective than performing it centrally, the services should be performed on-site. Under these circumstances, the PHA presumably would not utilize fee-for-service for this activity. In terms of COCC "profitability", PHAs are permitted to charge "reasonable" fees, again which requires reasonable documentation.

**15. Is the Capital Fund Management Fee (earned by the COCC for administering the Capital Fund Program) considered de-federalized fee income?**

Yes. As stated in the Supplement to PIH Notice 2007-9, "any reasonable fees earned by the PHA/COCC will be treated as local revenue subject only to the controls and limitations imposed by the PHA's management, Board, or other authorized governing body."

**16. Are property management and bookkeeping fees based on occupancy?**

Yes. Both the property management and bookkeeping fees will be based on occupied units and HUD-approved vacancies. The only fee not based on occupancy is the Asset Management Fee, which is based on the total number of ACC units.

**17. Why are "reasonable" Board training costs allowed as a front-line expense?**

This policy is consistent with HUD's treatment of resident-owned/co-op housing.

**18. What will an agency in Louisville's jurisdiction be able to use for their property management fee if their cost structure is actually closer to Cincinnati's?**

Each jurisdiction should use the fee schedules for the market where they are located. However, if PHAs feel that those fees do not reflect the local market, they may use compelling local market data as support and justification that the fees they would like to charge are reasonable.

**19. Are PHAs required to have "reasonable" management fees in Year One of project-based budgeting and accounting?**

No. PHAs are not required to achieve fee reasonableness in Year One. Furthermore, if a PHA cannot operate under the guidelines of fee reasonableness during their second year of implementation, PHAs can, with appropriate documentation, extend their phase-in period for an additional two years. The phase-in levels should be reasonable, and HUD will post guidance on for phase-in requests on the Asset Management website.

**20. How does cost reasonableness factor in for a small PHA of 12 units?**

Small PHAs utilizing a COCC and converting to asset management follow the same fee-for-service guidance as larger PHAs. Small PHAs opting for no COCC are bound to administrative fee reasonableness standards, again for the local market, as per **Table 9.1 of the Supplement to the HUD Handbook 7475.1, "80th**

Percentile Administrative Costs in FHA Housing by Multifamily Field Office (2005 Data)."

Hence, if a small PHA decides to convert to asset management under one of the four options granted to them in the Supplement to PIH Notice 2007-9, that agency must abide by the cost reasonableness standards included in the option selected.

**21. What is considered a "reasonable" methodology for prorating central office staff that is performing allowable front-line activities?**

A PHA could prorate these costs based on percentage of units, bedroom distribution, turnover, or other reasonable method.

**22. Are there any rules/regulations for how the COCC may use de-federalized fee income? Are there any sanctions if the COCC does not use the revenue generated from fee income in the best interest of the AMPs?**

As stated in the Supplement to PIH notice 2007-9, "any reasonable fees earned by the PHA/COCC will be treated as local revenue subject only to the controls and limitations imposed by the PHA's management, Board, or other authorized governing body

*B. Capital Fund*

**23. With regard to Budget Line Item 1406 (Operations) of the Capital Fund, can these funds be used for the COCC?**

With respect to PHAs implementing the fee-for-service model of asset management,  BLI 1406 (Operations), as well as BLI 1408 (Management Improvements), may only be used to support project operations, not the COCC. The only instance where Capital Fund proceeds may be used to support the COCC, other than the Capital Fund management fee, is when a PHA uses the Capital Fund to construct/modernize a COCC building that is still a public housing program asset.  Small PHAs that do not convert to asset management do not have a COCC and, therefore, have no restrictions on the amount of Capital Funds that can be transferred to operations.  Larger (i.e., not designated "small) PHAs who wish to fund the COCC through transfers to operations may do so under Section 226 of the 2008 Appropriations Act. However, they must realize any such proceeds through Allocation of Overhead and are therefore restricted from fee-for-service (since they may not recover overhead costs through fees, they do not qualify for defederalzation of funds to the COCC.)

**24. Can small PHAs converting to asset management use 10 percent of the Capital Fund for the management fee?**

Yes.  A small PHA that converts to asset management and creates a COCC can

charge 10% of the Capital Fund for a "management fee". A small PHA that does not convert to asset management or does not establish a separate COCC can spend 10% of the Capital Fund on "Administration." The difference is that a PHA that establishes a COCC does not need to document actual costs (it can charge 10% without documentation). Additionally, the income received from the fee by a COCC is not considered Program income.

**25. With respect to capital budgets and FDS reporting, will PHAs have to report each budget line item (BLI) by AMP? If so, how detailed will this report have to be?**

HUD is still examining the best way to modify the BLI structure in order to be more consistent with the FDS and also to reflect "project-level" expenditures. HUD is also exploring ways to streamline the requisitioning process.

**26. For small PHAs converting to asset management with no COCC, can the Capital Fund dollars in BLI 1406 be used to fund non-site specific costs? Or are front-line and administrative costs at a small PHA considered the same for this example?**

Small PHAs can transfer 100% of the Capital Fund for operations. However, in reviewing a PHA's stop-loss application, HUD will examine total administrative costs of the PHA's Operating Fund program.

**27. For Capital Fund Grants for 2007 and future years, if the PHA's 2007 Annual Plan has already been approved, but the plans were based on "old" developments, will the PHA need to revise the plans accordingly (i.e., based on AMPs)?**

More guidance will be provided in early 2008 regarding changes to the Annual Plan and required Capital Fund reporting by the AMPs. PHAs should continue to use the old development numbers in their Annual Plans until further guidance is issued.

*C. Excess Cash*

**28. If a PHA assesses a project for the asset management fee based on un-audited statements, and, later, the audited statements show that the PHA did not have sufficient excess cash to pay the full asset management fee, would the COCC have to return the excess charge?**

Yes. If the amount of excess cash as determined on the previous year's audited financial statement is less than that on the un-audited version, the COCC would be able to keep the asset management fee up to the amount of excess cash held by the AMP. If there was no excess cash available, the COCC would not be able to keep any of the asset management fee collected. In essence, the COCC may retain only asset management fee revenue to the extent of excess cash available based on

audited financial data.

**29. If an AMP does not have sufficient excess cash to pay the asset management fee, could another AMP cover this shortage?**

No. The availability of excess cash is determinable at the project level. The maximum level of an asset management fee payable by a particular AMP may not be influenced by the capacity of another AMP to pay, or not pay, an asset management fee. So, each AMP is limited to paying a maximum per unit amount which is based on its respective number of ACC units

Payment of an asset management fee to the COCC can be made throughout the PHA's fiscal year, but only up to a project's excess cash, as calculated from the prior year's FDS (Supplement to PIH Notice 2007-9, page 37). The excess cash calculation is performed once the PHA's books are closed.

**30. Do PHAs have to send excess cash calculations to the Field Office?**

No.

**31. Do PHAs have to get the Field Office's approval for transfers between AMPs and the COCC if there is excess cash?**

No. PHAs do not need to receive HUD approval for transfers between AMPs or from the COCC to an AMP. PHAs may not "transfer" funds from the AMPs to the COCC, *except* within the first year of project-based budgeting and accounting.

**32. Can excess cash be used for non-Public Housing purposes?**

Only qualified asset management fees may be paid with excess cash, which is defederalized revenue to the COCC.

**33. With regards to transferring excess cash, if a PHA has two ACCs, can funds be transferred between AMPs of the two ACCs?**

No. The Operating Fund Rule permits transfer of funds only between projects within the same ACC.

*D. Assignment of Assets and Liabilities and other Balance Sheet Questions*

**34. How often can PHAs change their allocations of assets/liabilities, after the initial assignments?**

There is no specific program limitation in assigning non- real property assets and liabilities. However, a PHA: (1) is generally limited to six months of working capital to the COCC, (2) has the ability to transfer funds from one project to another

subject to fungibility provisions, , and (3) may want to seek advice from its auditor
when changing allocations.  Any such re-allocation must be reasonable, necessary,
and not cause undue burden to a particular project (i.e. reallocation of liabilities
must be reasonable and documented). Regarding real property, the PHA should
assess relevant guidance including Notice 2007-28 at
http://www.hud.gov/offices/pih/publications/notices/07/pih2007-28.pdf

### E. Other FDS Reporting

### 35. Does income from the sale of home ownership units belong to the COCC or is it split between AMPs?

The PHA must assess the Use Agreement with respect to sales proceeds, which
likely remain federalized. In this case, these proceeds should be reported as
Program resources, not de-federalized COCC assets. Use of the proceeds is
governed by the specific terms of the approved disposition.  Page 30 of the
Supplement to PIH Notice 2007-9 reads: "proceeds from asset disposals of an AMP
– i.e. the sale of a project's maintenance vehicle – are considered to be assets of the
AMP and not of the COCC.  With HUD approval, certain proceeds may be
transferred to the COCC but may still be restricted."

### 36. If an AMP is sold, where do these proceeds go?

While the use of the sales proceeds is determined by the disposition application, the
proceeds, generally, are first recognized as a "gain on sale of asset" at the AMP
level. The asset may be transferred to an Other AMP category, whereby the
proceeds remain Program in nature.

### 37. On the proposed new FDS, why are the Operating Fund and Capital Fund rolled up for reporting purposes?  Doesn't this give an inaccurate representation of the AMP's financial state?

This method provides a consolidated picture of the financial state of an AMP.
However, if a PHA wants to know an AMP's operational performance, the PHA
may assess  the Operating Fund column for that AMP

### F. Mixed Financed Projects and Component Units

### 38. What if there is a development with 120 floating, mixed finance units that the PHA wants to place within three separate AMPs.  Would this be permitted?

If the units are all contained within one legal entity, they should be maintained
under one AMP.  However, if there are multiple phases to the mixed-finance
project, with separate legal entities, there would be multiple AMPs.

**39. A mixed-finance development has Public Housing Operating Subsidy pledged as part of a financing commitment. Can the PHA revise its commitment to reflect allowable higher amounts? How will funds be distributed and allocated?**

A PHA is bound by its regulatory and operating (R/O) agreement with its mixed-finance developer. If that agreement allows for revisions in the pledge of Operating Subsidy, the PHA can make an adjustment. Otherwise, the PHA is bound by the R/O.

**40. If a development company in a mixed-finance project hires a private management company, how are funds assigned to the project?**

The use of a third-party management company does not change the PEL assigned to the project, the operating subsidy eligibility for that project, or the agency's pledged amount under the R/O agreement.

**41. What about mixed-finance projects where the management company is a PHA affiliate/instrumentality? Does that change how funds are assigned between the PHA and the project?**

If the PHA manages the project directly or through an affiliate/instrumentality, it receives the management fee that the owner has negotiated for that project. If the PHA does not manage the properties, the PHA receives the difference between the allowable fee established under the guidelines and the actual fee paid to the management company.

**42. How will HUD staff conduct reviews of Public Housing units in mixed-finance developments?**

The Field Office review will mostly be concerned with the public housing units and not the market rate units. HUD recognizes that mixed-finance projects present unique challenges that may require an alternative approach to monitoring (including the fact that these projects often have multiple entities conducting reviews). All ACC units remain subject to HUD's physical condition quality inspections.

**43. How are excess cash and residual receipts handled in mixed-finance public housing units?**

For mixed-finance projects, the excess cash calculations do not include the one-month of operating expenses.

**44. How are PHAs to fund mixed-finance projects where the R/O agreements commit to more in subsidy than the project earns?**

As with any other contract, the PHA must honor any such agreements. To the

extent that a mixed-finance project receives more in subsidy under its R/O agreement than it gets under the Operating Fund formula, the PHA would either need to fund the difference with project reserves or with excess cash from another project or business activity.

### G. Project-Based Budgeting

**45. Will resident councils be involved in approving budgets, or will it just be PHA Boards who give approval?**

There is no specific approval needed from resident councils for project budgets; the only budgetary approval a PHA must receive is from the PHA Board through the use of Form HUD-52574. However, PHAs may find it useful to involve residents in the budgeting process.

**46. Does HUD maintain a prescribed AMP-level budget format for troubled AMPs or AMPs managed by troubled PHAs?**

No. HUD does not require PHAs to follow a specific budgetary format, but the PHA's budget must readily reconcile with the AMP-level FDS. To assist PHAs in the budget creation process, HUD has created the Project Based Budget Tool, which can be found at the following site:
http://www.hud.gov/offices/pih/programs/ph/am/docs/pbt.xls
The format in this tool is optional.

**47. Is the COCC required to have a budget?**

If a PHA is applying for Stop-Loss, it will need to create and submit a Board-approved COCC budget with its submission package. However, a PHA that is not applying for Stop-Loss will not be required, but is strongly encouraged, to create a COCC budget.

### H. Fungibility

**48. The West Ridge Housing Authority completed the Year 2 Stop-Loss Kit Submission. Since the PHA is applying for Year 2 Stop-Loss, would the PHA be able to transfer funds to the COCC in Year 1 if they are applying for Stop Loss in Year 2?**

Yes. If the PHA is only applying for Year 2, it does not need to demonstrate cost reasonableness in Year 1 and has complete fungibility between projects and the COCC.

**49. During the first 6 months of a year, can a PHA that is not applying for Stop-Loss transfer funds from an AMP to the COCC?**

Yes. During the first year of implementation, all Operating Funds are completely fungible between projects and the COCC. After the first year of project-based budgeting/accounting, no PHA may transfer (permanently or temporarily) funds from a project to a COCC.

**50. Can Housing Choice Voucher (HCV) funds be transferred to AMPs to help with operations?**

No. HCV funds cannot be transferred to AMPs to help with operating costs. A PHA may only use its management fee income from the HCV program to subsidize AMPs.

## II. Project-Based Management

**51. Under the new system of on-site management reviews, how much time will be permitted for the Field Office to send the results of its reviews to PHAs?**

Field Office staff will likely have between 30-60 days to complete the results of the on-site management review and submit to the PHA.

## III. Operating Subsidy

**52. Regarding Project Expense Levels (PELs), is the age of a property based on the Date of Funding Availability (DOFA)?**

Yes. The age of a project is determined by the difference between the DOFA and December 31, 2000. When different projects are combined or buildings from different projects are combined to form a new project, the age of the property will be the weighted average age of the different buildings in the new project based on their number of units (Federal Register, Docket No. FR-5016-N-02).

**53. Will Project-Expense Levels (PELs) be adjusted each year for inflation?**

Yes. Also, if a PHA determines that an AMP's PEL does not reflect the local market conditions, the PHA may file for an appeal, as outlined in PIH Notice 2007-7.

**54. How does the formula account for wide swings in the market each year (e.g., the ups and downs of insurance due to coastal storms)?**

PHAs are encouraged to proactively plan for changes in market conditions as part of project-based budgeting, consistent with norms of the broader multifamily industry. Furthermore, as described in PIH 2007-7, Guidance on Appeals under Subpart G of the Revisions to the Public Housing Operating Fund Program, HUD has instituted an appeals process under which PHAs can appeal their PELs.

**55. The public housing stock can be different than multifamily housing. How does its location or other variables differ from private housing and how is that accounted for in the PEL formula?**

The PEL formula takes into account 10 variables, including geographical area and bedroom mix. Since public housing is typically older, contains larger units, and is located in more impacted neighborhoods than multifamily housing, PELs for public housing are higher than what would be assigned for private multifamily housing. The PEL formula also includes the "Ownership Type" coefficient, wherein PHAs are treated as "non-profits", which results in 10% higher costs than for-profit (unlimited dividend) projects. For more information regarding the PEL calculation, please refer to the Federal Register, Docket No. FR-5016-N-02, which can accessed through the following site:
http://www.hud.gov/offices/pih/programs/ph/am/of/index.cfm#pel

**56. Does the Operating Fund formula take into account residents who have $0 rents?**

Yes. The formula takes into account zero-renters, as well as "negative" renters, in that subsidy eligibility is determined based on the difference between Formula Expenses and Formula Income. However, for the first three years of the new Operating Fund formula (2007-2009), a PHA's Formula Income is based on its dwelling rental income from 2004. Thus, if a PHA had zero-renters in 2004, those amounts are reflected in the PHAs "frozen" Formula Income.

**57. Are add-ons available for different economic situations?**

No. There is no add-on for any economic situations. However, PHAs can appeal their PELs if they feel that the operating model's predictions are not accurate.

**58. Does the PEL formula take into account any extra amenities like common spaces, pools, and other community spaces?**

The PEL is benchmarked to the operating costs in HUD's Multifamily Housing programs. Thus, to the extent that private housing has amenities, the cost to maintain those amenities is reflected in the database and, therefore, a project's PEL.

**59. Does the formula take into account natural disasters for areas like Miami/New Orleans, which had some of its public housing stock destroyed?**

While the Formula does not take into account natural disasters, a unit vacant due to disaster is an "allowable" vacancy. Moreover, PHAs in disaster areas can apply for waivers or can appeal their PELs per the guidance in PIH Notice 2007-7.

**60. How will HUD calculate rental income beginning in FFY 2010?**

The Operating Fund rule does not specify how the Department shall determine formula income in 2010. Thus, no decision has been made with respect to how formula income will be determined in 2010.

**61. Formula income, for subsidy purposes, is based on the rental income a PHA earned in 2004. However, this information was maintained at the agency-level. How will PHAs now calculate frozen rental income at the project level when they prepare project-level subsidy requests for CY 2008?**

PHAs will have to break out the total formula income per AMP from 2004. The total amount of formula income for each AMP should equal the PHA-level formula income from 2004. HUD has created the Project Level Frozen Formula Income Worksheet in order to assist PHAs with this calculation, which can be found at http://www.hud.gov/offices/pih/programs/ph/am/of/formulaincometool.xls.

**62. Does a PHA with more than 250 units, but just one AMP, receive the $4 PUM asset management fee?**

Yes. Any PHA with 250 or more units receives the $4 PUM asset management fee, regardless of the number of AMPs. Please refer to CFR 990 part 190 (f) for more information.

**63. Are mixed-finance projects subject to proration?**

HOPE VI projects are treated the same as non-HOPE VI projects for purposes of proration.

**64. How will approved changes to AMP groupings in 2007 affect AMP-level operating subsidy calculations for the 2008 funding year? Is there a cut-off date for changes to AMP groupings as a result of the operating subsidy calculation?**

Please refer to PIH Notice 2007-28 for specific deadlines for the submission of AMP changes.

**IV. General Questions**

**65. Can a national management company obtain a contract with a PHA for property management and then subcontract that work to a local firm?**

Yes. A PHA may hire a private management company if it feels it would be in the best interest of the AMPs. That management company may subcontract for all or a portion of its work. Some PHAs, however, have clauses in their management contracts requiring PHA approval of any subcontracting activity.

**66. Can you give an example of an AMP renting space to a COCC and vice-**

versa?

If an AMP has ground floor commercial space, the AMP could lease that space to the COCC, and the revenue would be recognized in the AMP's financial statements. On the other hand, if a COCC is assigned an asset purchased/developed with public housing funds (say, a central administrative building), the COCC cannot charge an AMP rent for that space.

### 67. Could a COCC "close down" and retain all their federal and non-federal funds?

Under Section 18 of the 1937 Housing Act, a PHA may request to dispose of a public housing asset and use the proceeds for low-income housing, defined earlier in the statute as housing assisted under Section 8 or Section 9 (Public Housing). If a PHA closes entirely its public housing program, any public housing operating reserves would need to be returned to HUD because the statute only permits operating funds to pay for the operation and maintenance of public housing. Further, PHA assets funded through Section 9 would likely remain federalized assets, subject to return to the federal government and/or utilized for Public Housing objectives.

### 68. Are there any measures to ensure that PHAs are in compliance with asset management before fees are de-federalized?

No. HUD does not require prior HUD approval for PHAs to begin the fee-for-service model, including the use of fee income for non-program purposes. However, the financial reporting requirement will disclose this status, and HUD requirements apply.

### 69. Why would a tenant who pays no rent to the PHA also receive a utility reimbursement check?

This type of tenant is considered a "negative renter." This situation occurs when 30% of the tenant's household income (their contribution towards shelter) is less than the utility allowance.

For example, if a family has an adjusted income of $200/month, 30% of this income would be $60. If the family lives in a unit where the utility allowance is $80, the family would pay no rent to the PHA but would receive a check for $20 to assist with its utility bill.

### 70. Are PHAs allowed to have net income even though they are non-profit entities?

Yes. Similar to other non-profits, PHAs can generate net assets, which should be used to support their public missions.

**71. Under site-based management, must projects abide by HUD procurement requirements?**

PHAs must still abide by 24 CFR 85.36 and associated instructions. Most "project" purchases, however, are below the small purchase threshold.

**72. Have there been conversations on obtaining national blanket contracts available to PHAs for large dollar purchases – for example, a blanket contract for Energy STAR for energy-efficient washers and dryers, stoves and refrigerators?**

No. HUD has not considered obtaining national blanket contracts for large purchases. The only approved blanket contract accessible to PHAs is the Department of Energy's (DOE) bulk purchase program. If a PHA can find three quotes for a product on the DOE website, it can use DOE's system for purchasing E-products. However, if the system does not yield at least three quotes, the PHA will be required to use the conventional procurement process.

**73. Are there privately managed projects that have no maintenance staff and where the project manager would call contractors for all needed services?**

HUD has not had experience with this type of situation. HUD believes that it would be unusual, but possible, for all maintenance services to be contracted out. Generally, the routine maintenance is handled by someone on-site or, in the case of small PHA's, a maintenance worker is shared across projects.

**74. A small PHA is eligible for a $2 PUM asset management fee if it converts to asset management and has more than one AMP. Should a PHA with a total of 220 units and two adjacent sites (100 units and 120 units) that are very similar divide the sites among two AMPs to receive the extra Asset Management Fee?**

Many local factors would determine the best course of action in this case.

**75. How can PHAs arrange services in the best interests of the AMPs if they are required to pay prevailing wages for maintenance?**

Prevailing wages are required for maintenance work performed in-house and by contractors.

**76. Will PHAs be required to submit the Multifamily Tenant Characteristics Systems (MTCS) reports by AMP?**

No. MTCS was the old system used prior to the introduction of PIC and is no longer used. PHAs will continue to transmit their form HUD-50058 to PIC. Most PHAs transmit 50058s in batches. It is the PHA's discretion whether to submit

50058s from the AMP or from the central office.

**77. What sanctioning mechanisms will HUD employ for troubled AMPs and troubled PHAs?**

The sanctions for troubled/poor performing PHAs and projects will remain the same. HUD can require various corrective actions, including, for serious breaches of the ACC, it can require a change in management or ownership. These remedies can be applied at either the project or the PHA level.

**78. What will be the process for PHAs to dispose of or demolish non-performing projects?**

The process for demolition or disposition activities has not been modified. PHAs are still required to follow the guidance as published in the revision to 24 CFR 970 - Demolition or Disposition of Public Housing Projects; Final Rule.

**79. How is the flow of funds going to work for small PHAs that are not converting to asset management?**

For small PHAs that have decided not to convert to asset management, the Operating Fund subsidy will still be awarded and accounted for at the PHA-level. For these PHAs will be that the subsidy amount will be based on the new formula. In effect, the "agency" becomes the "project."

**80. What method will PHAs use to determine the property management fees if the provided table in the Supplement to PIH Notice 2007-9 does not have their exact city?**

A PHA should use the fee schedule for the local HUD Multifamily Office that oversees HUD subsidized projects in its jurisdiction.

**81. The SAGIS training indicated that the formula income would be pre-populated. Is this true?**

Yes.

**82. Can a PHA have different admissions policies for different AMPs?**

Yes. Different admissions policies for residency at each property can apply (e.g. elderly versus family).

**83. Are shared resources required to maintain timesheets?**

With shared resources, one must either maintain time sheets or have a reasonable method for determining how the shared resources are prorated. The guidance

associated with the use of a shared resource appears in the Supplement to 2007-09, Financial Management Handbook, page 41. The guidance calls for the use of a "reasonable methodology" to separate "the amount of time spent on providing services to AMPs..." For example, a PHA could develop a fee-for-service billing structure between and among AMPs. This would be similar to the structure that would be put in place if the PHA adopted central maintenance. A PHA could also prorate the costs of resources based on the number of units at each project where the service is shared. The PHA must demonstrate that the fees charged to the AMPs were reasonable, necessary, and in the best interest of the project.

**84. How will PILOT be applied at the project level? Could a PHA ask for a waiver from the local government for a specific AMP?**

For purposes of determining Operating Subsidy, the add-on for PILOT will be calculated at the project level. PHAs will be paid this add-on regardless of whether the local government actually waives the PILOT payment.

**85. If small PHAs that have opted to convert to asset management are reviewed and are found to not have successfully converted, is HUD going to take back the $2 PUM asset management fee add-on that they received?**

No. A small PHA only needs to be actively engaged in the conversion to asset management to be eligible for the fee.

**86. Has the Office of Fair Housing and Equal Opportunity (FHEO) commented on the regulations regarding PHAs having site-based waiting lists? Will PHAs still have to request a waiver through the Field Office FHEO staff?**

The current requirements regarding site-based waiting lists have not changed as a result of the conversion to asset management. PHAs have been permitted for several years to establish site-based waiting lists.

**87. What is the largest AMP allowed?**

There is no limit on the size of an AMP, but all AMP groupings must be "reasonable." For example, in New York City, there are many cases where there are more than 1,000 units on a contiguous site and, therefore, the units are grouped as one AMP. However, in another PHA with 1,000 units contained in smaller clusters throughout the city, it might be reasonable to have five to ten AMPs.

**88. How does the Declaration of Trust (DOT) change under asset management?**

The DOT does not change. As with current requirements, all public housing assets must be under a DOT, which, in effect, is a use restriction.

**89. How will asset management affect the annual audit?**

The Department recognizes that the conversion to asset management may affect audit coverage. As a result, more guidance on this subject will be issued shortly, including changes to the A-133 Compliance Supplement.

**90. Will PHAs be permitted to use de-federalized fee income earned by the COCC to pay for Independent Public Audit (IPA) or Inspector General (IG) audit findings?**

Yes. PHAs may use their fee income in any way they deem necessary, as long as it is in accordance with all state and local laws.

**91. How should small PHAs with only one or two employees comply with audit findings regarding segregation of duties?**

Often times in very small agencies, it is difficult to maintain segregation of duties and, therefore, the PHA must implement other means of compensating controls.

# EXHIBIT Y



January 2, 2014

Meir N. Hertz
Chief Executive Officer
Lakewood Township Residential Assistance Program
600 W. Kennedy Blvd.
P.O. Box 856
Lakewood, NJ 08701

Re: Housing Assistance Payment Reporting and Defederalized Funds

Dear Mr. Hertz:

You have asked for my opinion regarding the following matters. In performing my analysis I have been informed by legal counsel for Lakewood Township Residential Assistance Program (LTRAP) that LTRAP is the program name that the Lakewood Township uses for its Housing Choice Voucher (HCV) program that it operates under an agreement with HUD.

### Reporting by LTRAP in HUD's Voucher Management System (VMS)

My understanding of the methodology that LTRAP uses is that the reporting in VMS is done on an accrual basis. The vast majority of Housing Assistance Payments (HAP) are made and reported in the month to which the payments pertain. Additionally, when a liability for a HAP payment is incurred but not paid during the month it pertains to, that liability is accrued on the books of LTRAP and also reported in VMS at that time for the applicable month. There are many various situations that could cause a delay in actually issuing a payment to a landlord – such as delays in receiving all of the requisite paperwork (proof of ownership of the property, passed inspections, executed lease agreements to name a few). Additionally, there may be situations that are much more rare where LTRAP does not become aware of the liability for a HAP payment until a later month, at which time LTRAP immediately accrues the liability on its books and makes the appropriate reporting in VMS for the applicable month.

This methodology is a reasonable implementation of the requirement that information reported in VMS be done as "incurred" rather than on a cash basis. It also complies with HUD's requirement that the monthly information in VMS be updated anytime there is new information indicating that prior information was either incorrect or incomplete. The monthly reporting information in VMS is subject to continual change and is not a static amount.

### Recording of HAP activity in LTRAP's general ledger

The procedures that LTRAP utilizes to record HAP activity in its general ledger are as described above. This is in accordance with accrual basis accounting. An expense is recorded when the event giving rise to an entity's obligation to expend its resources occurs (occupancy by a qualified tenant in the property of a qualified landlord) without regard to the timing of the actual settlement of that obligation by expending resources (making a HAP payment).



Meir N. Hertz
January 2, 2014
Page 2 of 2



As you know, generally accepted accounting principles and HUD regulations require public housing authorities (PHAs) to use accrual basis accounting. It also ensures that when LTRAP's Net Restricted Assets (NRA) is measured at fiscal year end, that the amount reported is correct. Additionally, by using the accrual basis for both general ledger recording, and VMS reporting, the amount of NRA reflected on both should agree to each other.

**Defederalization of Administrative Fee funds**

Lakewood Township, under its LTRAP program, has contracted with the Lakewood Tenant Organization (LTO) to administer Lakewood Township's HCV program. Under the terms of the agreement, LTO has agreed to perform these services for a fee that is equal to the amount of HCV Administrative Fees earned by LTRAP. The level of HCV Administrative Fees are set by HUD annually, and reflect what has been determined by HUD to be an adequate amount that a PHA needs to administer this federal program on behalf of HUD in its jurisdiction. By definition, HUD has established what it believes is the reasonable cost to administer the program. The structure that LTRAP utilizes ensures that the costs to administer the program do not exceed the HUD administrative fee revenue and that HAP funds are not used to pay administrative costs. Based on these factors, and HUD's prior approval of the arrangement with LTO, it is my opinion that once the fee to LTO has been earned, the HCV Administrative Fees used to pay those fees have in effect been defederalized and LTO is not accountable to HUD. LTO is a contractor to LTRAP, not a grant sub-recipient.

In conclusion, I believe your methodology of reporting HAP payments in LTRAP's general ledger and the corresponding reporting in VMS is appropriate and in accordance with HUD directives. It is also my opinion that funds properly earned by LTO to administer the HCV program are defederalized.

I have reviewed LTRAP's letter to HUD (dated January 2, 2014) that is in response to HUD's Report on QAD Financial Management Review at LTRAP dated December 3, 2013. As for the matters discussed therein regarding accounting and reporting for HAP and NRA in accordance with generally accepted accounting principles and HUD regulations, I concur with the information contained in the letter. Other matters in the letter are outside of my personal knowledge.

Should you have any further questions regarding this don't hesitate to contact me.

Sincerely,

CohnReznick LLP

Allan C. Kitchen
Partner

ACK:jm


# NIXON
# PEABODY

Richard Michael Price
*Partner*
T 202-585-8716
rprice@nixonpeabody.com

Nixon Peabody LLP
401 9th Street NW
Suite 900
Washington, DC 20004-2128
202-585-8000

January 2, 2014

Mr. Balu Thumar
Acting Director
Office of Public Housing
U.S. Department of Housing and Urban Development
One Newark Center, 13th Floor
Newark, NJ 07102-5620

Re:   Lakewood Township Rental Assistance Program ("LTRAP")
      Housing Choice Voucher Program

Dear Mr. Thumar:

This letter is in response to your December 3, 2013 letter to Mr. Hertz. Please advise us of the status of the on-site reviews.

At the outset we believe there are certain basic misunderstandings as to the existence and nature of Lakewood Township Residential Assistance Program ("LTRAP") and Lakewood Tenants Organization ("LTO"). LTRAP is a federally-funded (HUD) program sponsored by Lakewood Township as the PHA under an ACC with HUD. LTRAP has no separate incorporation. LTO is an existing entity that contracts with the Township to administer Lakewood Township's Residential Assistance Program, including the Section 8 Housing Choice Voucher ("HCV") program. LTO's fee is set at the HCV Administrative Fees; the Administrative Fees are set by HUD annually and are per se reasonable. As such, once the fee is earned by LTO and paid to LTO by Lakewood Township the fee is defederalized and LTO is not accountable to HUD, as LTO is a contractor, not a grant sub-recipient.

We are enclosing a copy of an August 30, 1977 letter by Clarence L. Humphrey, Director, Housing Programs Management Branch to Thomas L. LaPointe, Municipal Manager of Lakewood Township. Mr. Humphrey explains that LTO's selection was beyond HUD's review and approval. We are also enclosing a copy of an April 24, 1990 letter from John Franklin, Mayor of Lakewood Township to Theodore Britton, responding to an earlier inquiry into LTO's selection and status. Finally, we are enclosing a July 9, 1996 letter from Kevin E. Marchman, HUD Acting Assistant Secretary for Public and Indian Housing to Mr. Hertz confirming that LTO's selection was appropriate and remains so.

Mr. Balu Thumar
January 2, 2014
Page 2

It appears that this issue is re-explored every so often, but we are not aware of any information that requires a repeat of the same inquiry at this time. We believe this letter appropriately addresses your concerns.

Sincerely,

Richard Michael Price

Enclosures



CAMDEN AREA OFFICE
THE PARKADE BUILDING, 519 FEDERAL STREET, CAMDEN, NEW JERSEY 08103

August 30, 1977

REGION II
26 Federal Plaza
N. Y., New York 10007

IN REPLY REFER TO:
2.3HHO

Mr. Thomas L. LaPointe
Municipal Manager
Township of Lakewood
Municipal Building
Lakewood, New Jersey  08701

Dear Mr. LaPointe:

We acknowledge receipt of your letter dated
August 19, 1977 transmitting a copy of the
Township's Contract with the Lakewood Tenants
Organization to administer the Section 8 Existing
Housing Program.

HUD is not a party to this Contract, and consequently
our review and approval of the Contract is not re-
quired.  Accordingly, the third or penultimate
paragraph on page 2 requiring HUD approval should
be deleted.  We do reemphasize our position that
HUD looks to the approved Public Housing Agency
as the party responsible for the administration
of the ACC in accordance with the Regulations, see
24CFR 882.116.  Additionally, the PHA shall not
delegate its statutory responsibility to authorize
eviction.

Upon deletion of the aforesaid inapplicable paragraph,
we would appreciate a copy of the Contract for our
files.

Sincerely,

Clarence L. Humphrey
Director
Housing Programs Management Branch

9/2/77.....
Referred to  Attorney to delete the above mentioned paragraph.
on 9/1/77.

G. Doyle, Clerk



# Township of Lakewood

MUNICIPAL BUILDING
LAKEWOOD, NEW JERSEY 08701 • 201-364-2500



John J. Franklin, *Mayor*
H. George Buckwald, *Deputy Mayor*
*Committeemen:*
  Jerome Greenberg
  Robert W. Singer
  Richard L. Work

April 24, 1990

Theodore R. Britton, Jr., Manager
U.S. Department of Housing
 and Urban Development
Newark Office, Region II
Military Park Building
60 Park Place
Newark, NJ  07102-5504

Dear Mr. Britton:

   This letter is written in response to your letter dated April 3, about your receipt of an "anonymous" letter containing various allegations about the operation of the Lakewood Housing Authority and the Lakewood Township Rental Assistance Program.

   Thank you for bringing these complaints to my attention, and for according to the Township the right to respond.

   Preliminarily, I should like to state, that while the letter which you received may be anonymous to you, it is not all that anonymous to the governing body of this Township.  While we cannot be absolutely certain as to the true identity of the author of the letter containing these false allegations, we do believe that it was penned, or "inspired", by a former commissioner of the Authority, whom the Township Committee declined to re-appoint to the Lakewood Housing Authority Board of Commissioners, for ample reason.  Even without getting into the history, grounds for this conclusion are the record of similar past efforts by this party, as well as an established pattern of focusing personal attacks repeatedly against the two named individuals.   In short, what we apparently have here is a personal, rather than a real, issue.

   As to the specific concerns raised in the anonymous letter, they indicate a basic misunderstanding which must be cleared-up; namely, the nature, role and relationship which the Township of Lakewood has with the Section 8 programs and its contract administrative agency, the Lakewood Tenants Organization.  The



Township of Lakewood is not a Public Housing Authority. It contracted with HUD in 1977 (via the Annual Contributions Contract) to operate the Section 8 Programs by default, after the then Board of Commissioners of the Lakewood Housing Authority declined for the third time in three years (1975-1977) HUD's invitation to operate the Section 8 program. Lacking an in-house administrative capacity to operate the program, the Township sub-contracted with the Lakewood Tenants Organization to administer the program, with the understanding and agreement that the operation would not draw on Township resources, but would have to be economically self-sufficient. This arrangement was reached at the time with the explicit consent and written approval of the HUD Field Office, and has worked very well since the inception of the programs. This recitation of the relationship between the Township and the Lakewood Tenants Organization, its contract administrative agency, is not intended as a dis-association from the primary role and responsibility of the Township regarding the operation of these programs. On the contrary, the Township justifiably takes immense, direct pride in the fact that the programs are well administered and well received locally.

The point is that we have locally an atypical situation; not that of a PHA, and one which was fashioned of necessity and has proven extremely successful. Since the administration of the Section 8 programs are performed by a contract agency, similar to other Township contract services, the Township looks to goal achievement and performance criteria to measure the success of the programs' administration. I can state without reservation, as we have stressed all along in every application to the Department for additional funding, that by any yardstick, the present administration is run by an extremely competent, universally acclaimed (property owners as well as renters) administration. Since its inception in 1977, the program has grown steadily from 80 units to nearly 700. The program is run on a sound fiscal basis, with a healthy operating reserve. Over the past twelve years, the Township has received few, if any, verifiable complaints regarding the operation of its Section 8 programs by the Lakewood Tenants Organization. The Executive Director and staff at L.T.R.A.P. are thoroughly trained and very knowledgeable.

Notwithstanding all the foregoing, as to the Executive Director personally, please be assured that Rabbi Hertz ably serves both as the Executive Director of the Lakewood Township Rental Assistance Program and the Lakewood Housing Authority. He splits his daily work load and work time between these two Agencies. In addition, Rabbi Hertz spends many hours evenings and week-ends in meetings as well as at the office, on L.T.R.A.P. business.

Rabbi Hertz is readily accessible all day, every day, at either one of these offices (364-1300 or 367-0660). Indeed, the allegation itself is deliberately mis-leading. The distance between the offices of the two Agencies is less than two minutes travel time; far less than the distance and time spent in routine travel by Executive Directors at other PHAs in the normal course of their duties traveling from site to site. Rabbi Hertz draws a salary commensurate with the duties, responsibilities, professional requirements, and the actual hours invested in his positions at both the Lakewood Township Rental Assistance Program and the Lakewood Housing Authority.

Rabbi Hertz served in the capacity of Executive Director of the Lakewood Township Rental Assistance Program with distinction for 8 years (1977-1985)

2

before being asked jointly by the Township Committee of the Township of Lakewood and the Board of Commissioners of the Lakewood Housing Authority to assume the additional position of Executive Director of the Lakewood Housing Authority. The Township Committee and the Board of Commissioners in turning to Rabbi Hertz firmly felt that the Authority needed strong, proven leadership. Rabbi Hertz joined the Authority at a most difficult time, when the former Executive Director resigned after findings of gross mismanagement were reported in a comprehensive, highly critical study issued by a local Blue Ribbon panel (which included the Chairman of the Authority at the time, Mr. William Melton, who still serves as a Commissioner). This report, issued in March 1985, was forwarded to the HUD Area Office at the time and should still be in your files.

Assumption by Rabbi Hertz of the dual positions was strongly recommended by the Board of Commissioners and the Township Committee in view of Rabbi Hertz's uncontested record of professionalism, housing expertise, and integrity. Furthermore, this move was cleared in advance with the HUD-Newark Area Office and won its approval. I recall that at the time, there was a shared feeling that, in addition to gaining an able administrator for the Housing Authority, bringing both Agencies under a single administrator would prove advantageous as far as uniformity of internal administrative procedures, economies of scale, closer adherence to federal regulations, and better service to the public through the elimination of conflicting standards and procedures.

We have not regretted this decision. Its benefits locally have proven themselves through the expansion of the programs and their smooth coordination. You have to look no further than your own Management Reviews, as well as five Fiscal Audits at the Lakewood Housing Authority, and many more at L.T.R.A.P., all completed without a single finding. The remarkable growth of the programs at L.T.R.A.P., from 80 units to 700 units administered, and the meticulous attention to detail and close adherence to all federal regulations also attest to Rabbi Hertz's intimate, constant professional involvement and ability. As you are aware, LTRAP has earned every award issued by your Area Office for Voucher lease-up and various programs' implementation. LTRAP, led by Rabbi Hertz, has served the Newark Area Office as well on a voluntary basis, by sharing its experience and expertise with other PHAs and offering day-long training to other PHAs. It is because of all the above, the long-established record of success and achievement of Rabbi Hertz, that we find the anonymous allegations to be so insidious and objectionable.

It would be most unfortunate if mischievous allegations would succeed in casting aspersions on the fine reputation of a person who has accomplished so much for the needy of our community. We understand your own sensitivity to any complaint, regardless of its source and merit, and your need to address the same. It is for precisely this reason that we have taken the trouble to fully assure you that the complaints which you received lack any foundation or merit.

With respect to Mr. La Pointe, this allegation is similarly without foundation, and purely malicious. Mr. LaPointe does not get paid for each meeting of the Lakewood Housing Authority Board of Commissioners. Mr. LaPointe does not get any payment whatever from the Lakewood Housing Authority, in any shape, form or manner; nor does the Township of Lakewood derive any payment from the Lakewood Housing Authority other than the PILOT. Mr. LaPointe's position as

the Township's Housing Coordinator, and his position as City Manager, are both paid for by the Township.

I hope that I was able to answer your questions and also shed some light on this matter. Unfortunately, I cannot guarantee that you will not receive similar mischievous letters in the future. I can assure you, however, that this Township's governing body takes its Housing Authority appointments seriously, has a Township Committeeman assigned to the Authority as permanent liaison, and has a close, cooperative working relationship with the Authority. We therefore find satisfaction and take pride in the work of the Lakewood Housing Authority.

Again, I thank you for your courtesy in affording us the right to respond fully to your inquiry. If you have any other questions at any time, we will be most willing to provide further information and assistance.

Sincerely,

TOWNSHIP OF LAKEWOOD

John J. Franklin
Mayor

JJF:eh

c.c. Mr. Siegfried W. Steele, Chairman
    Lakewood Housing Authority

07/09/96  04:30    HUD ASST SEC FOR PIH → 2029737758                    NO.673  P002



U. S. Department of Housing and Urban Development
Washington, D.C. 20410-5000

JUL - 9 1996

OFFICE OF THE ASSISTANT SECRETARY
FOR PUBLIC AND INDIAN HOUSING

Mr. Meir Hertz
Executive Director
Lakewood Tenants Organization
600 West Kennedy Boulevard
Box 871
Lakewood, NJ  08701

    RE:  <u>Procurement Requirements</u>

Dear Mr. Hertz:

    We received the June 19, 1996 letter from your counsel,
Charles L. Edson, describing the history and status of the
Lakewood Tenants Organization ("LTO"). Based on the facts as
stated in Mr. Edson's letter, and our general understanding of
LTO's status, we understand that Lakewood Township previously
designated LTO as its agency for certain limited purposes. As
such, LTO qualifies as a public housing agency under the U.S.
Housing Act of 1937 as amended. HUD's procurement rules do not
apply to Lakewood Township's selection of LTO as a public housing
agency. Selection is a different question from operation, and we
do not address, nor have before use, any questions regarding
public housing agency procurement of goods or services.
Accordingly, we have no information that would lead us to
question either LTO's designation, or the present structure under
which LTO operates.

                    Sincerely,

                    Kevin E. Marchman
                    Acting Assistant Secretary for
                      Public and Indian Housing



Meir N. Hertz, PHM
Lakewood Township Residential Assistance Program
600 W. Kennedy Blvd.
P.O. Box 856
Lakewood, NJ 08701

RE: Lakewood Tenants Organizations
QAD Financial Review

Dear Mr. Hertz:

The following excerpt is taken right from HUD's web site and their section that pertains to "QAD" :

Quality Assurance Division (QAD)

**Mission Statement**

The mission of the Quality Assurance Division is to improve the management performance level, accountability, and data reporting of local public housing agencies participating in the Department's voucher rental assistance and homeownership programs and to maximize the cost and management effectiveness and efficiency of the programs.

**Objectives**

The objectives of the QAD, in support of its mission, are

- To act as advisor on all aspects of quality assurance for the voucher programs, including HA performance, cost containment, data integrity, and Departmental requirements;
- To conduct analytical reviews of HA operations to identify programmatic errors, outdated administrative policies and procedures, cost or financial management errors, and data integrity problems;
- To review statutory, regulatory and administrative policies associated with Department programs to determine changes required to foster improved program performance, accountability, cost-effectiveness and greater service to the public;
- To develop and implement program corrective actions and improvements;
- To implement all activities related to improving the quality of operation of the assigned voucher programs at the Department and the public housing agencies (PHAs;
- To Review PHA operations on a wide array of performance and financial indicators, identify and recommended corrective actions and ensures their implementation;
- To review and analyze data submitted to the Department on program performance, use and costs; and analyze Department policies for impact on the cost and efficiency of programs and recommends changes as appropriate; and

- To analyze a variety of rental housing market data; and maintain data on program costs and operations.

The scope of responsibility of the QAD encompasses tenant-based Section 8 subsidy programs and the quality assurance of all PHA financial management activities required for those programs. Additionally, the QAD is responsible for providing technical assistance to HA to ensure that Department financial reporting requirements are adhered to.

The entire excerpt, above, refers to "HA Operations" or "review PHA Operations", not one mention in their mission statement or objectives that they will review the operations of an independent contractor or outside consultant. The Lakewood Tenants Organization (LTO), is an independent subcontractor, established as a nonprofit, with its own EIN Number, to administer the HCV program for the Lakewood Township.

In addition, none of the HUD funds for Administrative Fees or HAP Payments are disbursed directly to LTO. These funds are disbursed directly to Lakewood Township. Lakewood Township then pays the administrative fees to LTO for Servicing/Administering the HCV program for them. LTO has a contract with Lakewood Township to perform this service,. This contract has been reviewed and approved by HUD. The practice of paying the entire Administrative fee to a service company or independent contractor is a common practice in the industry. In accordance with CFR 982.152, Administrative Fees may only be used to cover costs incurred to perform responsibilities for the HCV program , in accordance with HUD regulations and requirements. LTO is performing these responsibilities, and as such, is receiving a payment of these Administrative fees, to cover their operating expenses.

Based on my experience of over 30 years in this industry, as a CPA, providing Financial consulting services and training to Housing Authorities across the country, as well as the information I have read through regarding this issue, and researching the HUD regulations, I do not see how QAD has the authority to perform a Financial Review of the Lakewood Tenants organization, a Non – profit, Non – Housing Authority, servicing company for the Lakewood Township.

If you have any further questions feel free to contact me at 610.937.0326.

Respectfully submitted,

Jack T. Blosky, CPA





**NOVOGRADAC
& COMPANY** LLP®

CERTIFIED PUBLIC ACCOUNTANTS

February 2, 2015

Ms. Henya Richter
Lakewood Township Residential Assistance Program
600 W. Kennedy Blvd.
P.O. Box 856
Lakewood, NJ 08701

## RE: USE OF ADMINISTRATIVE FEES EARNED IN CONNECTION WITH THE HOUSING CHOICE VOUCHER PROGRAM

**Facts:**

Lakewood Township ("PHA") signed an Annual Contributions Contract with U.S. Department of Housing and Urban Development ("HUD") in 1977 for the Housing Choice Voucher Program ("HCVP").

PHA receives Housing Assistance Payments ("HAP") and administrative fees directly from HUD. Administrative fees are earned for the operation of the HCVP to cover both direct costs and indirect costs incurred for administering the program.

Since its inception, PHA subcontracted with Lakewood Tenants Organization, Inc. ("LTO") to administer the HCVP. LTO created Lakewood Township Residential Assistance Program ("LTRAP") to administer the vouchers and tenant payment under the HCVP. LTRAP assists over 1,100 households. Under the terms of the contact between PHA and LTO, PHA compensates LTO based on the administrative fees earned according to the HUD published bookkeeping and management fees.

**Issue:**

Is the administrative fee received by LTO for operation of the HCVP a restricted federal fund?

**Conclusion:**

No, the administrative fee received by LTO is not a restricted federal fund.

**Discussion:**

The administrative fee for the HCVP is paid for the operation of the program. The fee is calculated based on the number of units leased as of the first day of each month multiplied by a rate that is set by HUD every year. LTO is not required to document or demonstrate actual costs to earn an administrative fee.

Page 1

**HOUSING CHOICE VOUCHER PROGRAM ADMINISTRATIVE FEE**
**February 2, 2015**
**Page 2 of 2**

PHA may elect to receive the administrative fee as a fee-for-service, in lieu of overhead allocations, for the indirect or overhead costs. The fee-for-service received by PHA is considered non-program income, and is considered earned.[1] PHA then disburses such fees to LTO in accordance with their Subcontract Agreement.

Under OMB Circular A-87, *Cost Principles for State, Local, and Indian Tribal Governments,* and 24 CFR Part 85, *Administrative Requirements for Grants and Cooperative Agreements to State, Local, and Federally Recognized Indian Tribal Governments,* any reasonable fees earned by PHA will be treated as local revenue subject only to the controls and limitations imposed by PHA's management, board, or other authorized governing body.

PHA is considered to have earned the administrative fee and may use the funds in accordance with its mission, subject only to any local, but not federal restrictions.[2] There are then no restrictions on amounts earned by LTO.

NOVOGRADAC & COMPANY LLP

by: Bentley D. Stanton, CMA, CPA

---

[1] 24 CFR Part 990 7.2
[2] OMB Circular A-87, *Cost Principles for State, Local, and Indian Tribal Governments,* and 24 CFR Part 85, *Administrative Requirements for Grants and Cooperative Agreements to State, Local, and Federally Recognized Indian Tribal Governments*

**Page 2**

# EXHIBIT Z



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
**WASHINGTON, DC 20410-5000**

OFFICE OF PUBLIC AND INDIAN HOUSING
Quality Assurance Division

December 3, 2013

Meir Hertz, CEO
Lakewood Township RAP
600 W. Kennedy
Blvd. Lakewood,
NJ 08701

Dear Mr. Hertz:

The Department of Housing and Urban Development (HUD), Office of Public and Indian Housing, Quality Assurance Division (QAD) was recently onsite at the Lakewood Township Rental Assistance Program (LTRAP) to conduct a Financial Management Review of the Housing Choice Voucher (HCV) program. The primary purpose of the review was to ensure that HCV program funds have been expended and reported appropriately.

The specific purpose of our visit from September 10 – 12, 2013 was to:

- Validate the Net Restricted Assets (NRA) balance ending December 2011, December 2012, and July 2013.
- Validate the Unrestricted Net Assets (UNA) as of July 2013.
- Validation and analysis of Administrative Expenses for current period July 2012 through June 2013.
- Analysis of specific line items on the Lakewood Township RAP Financial Data Schedule (FDS) submission including *Prior period adjustments.*
- Confirm the availability of cash and/or investments sufficient to support the UNA and NRA balances calculated.

The results of our review are presented in the enclosed report. The report contains one finding and two concerns for which a formal Corrective Action Plan (CAP) must be prepared and sent to Mr. Joseph Russell at Joseph.R.Russell@hud.gov , with a copy furnished to Ms. Sonia Burgos at Sonia.L.Burgos@hud.gov . Your response must be received within 30 days from the date of this report.

We appreciate the cooperation extended to the QAD staff during our visit.

Sincerely,

MaryAnn Creager
Supervisor Program Analyst
Quality Assurance Division

Enclosure

cc: Sonia Burgos, Director of Public Housing Baltimore Hub Office
    Barbara Lamb, Division Director, Financial Management Center
    Miguel Fontanez, Director, Financial Management Division

Financial Management Review (NJ214) Lakewood Township Rental Assistance Program

**Background:** The Shortfall Prevention Team (SPT) requested that the QAD review the Housing Assistance Payments (HAP) expenses and the NRA balances as of December 2011, December 2012 and July 2013; and the administrative expenses and the UNA balance as of July 2013 as reported by LTRAP in the Voucher Management System (VMS). In the process of working with the LTRAP regarding a potential shortfall of HAP funds, the SPT discovered significant fluctuations in reported monthly HAP and NRA making it difficult to accurately determine if the housing authority was in fact facing a scenario of not having enough HAP funds to pay for their current voucher obligations. Further, without a reported UNA balance that may be used to cover any funding shortfall, the SPT was unable to determine the true amount of funds available to the PHA to avoid termination of participants. Also, in the process of scheduling the review, QAD realized the LTRAP does not report an Unrestricted Net Asset (UNA) balance in VMS. Upon further inquiry with the housing authority QAD learned that the LTRAP contracts with a non-profit organization, the Lakewood Tenants Organization (LTO), to administer the Housing Choice Voucher (HCV) program. Under the contract, LTRAP via "pass through" the entire monthly Administrative Fee disbursement received from HUD is transferred to the LTO, and the LTO administers the HCV program paying all of the HCV administrative expenses. As a result, the LTRAP proclaims the transfer of monthly Administrative Fee disbursements to the LTO results in a de-federalization of the fees and the funds are no longer subject to HUD regulation. As a result, even though requested, the QAD was not provided with any source records that would permit us to validate the UNA balance.

The QAD informed the Newark HUD Field Office of LTRAP's position regarding the Administrative Fees and reporting of their UNA. Since source records were not made available to the QAD to allow us to review the administrative expenses and validate a UNA balance, a determination was made to review and validate only those portions of the HCV program affecting HAP and NRA. The Newark HUD Field Office will continue to work with LTRAP regarding their contractual arrangement with the LTO and the LTRAP legal obligations under the HCV program.

## Verification of Net Restricted Assets (NRA)

**Verification of Net Restricted Assets (NRA) balances as of December 31, 2011, December 31, 2012, and July 31, 2013.**

The Quality Assurance Division (QAD) completed an analysis of the NRA account balance for the Housing Assistance Payments (HAP) related funds received and expended during calendar years 2005-2012; for calendar year 2013 our analysis covered the period through July 2013. The HAP incremental payments listed in HUD's Central Accounting and Payment System (HUDCAPS) for each month in the review period were used to determine the total HAP funding.

The general ledgers and other financial source documentation provided by the LTRAP financial staff were used to determine the amount of Fraud Recovery, interest income, FSS Escrow Forfeitures and the total HAP related expenses incurred. The total validated expenditures were deducted from the revenue for the same time period to arrive at the NRA balances at the three periods within the scope of our review.

Financial Management Review (NJ214) Lakewood Township Rental Assistance Program

*Table No. 1, Column 1,* indicates the amount that should have been used to calculate any NRA off-set to the PHA's 2012 renewal funding. QAD also identified the cash available for offset as of **December 31, 2011.** *Table No. 1, Columns 2 and 3* indicate what the NRA balance should have been and reconciled cash balances as of **December 31, 2012** and **July 31, 2013,** respectively.

*Table 1*

|                                       | 12.31.2011   | 12.31.2012   | 7.31.2013    |
|---------------------------------------|--------------|--------------|--------------|
| Validated NRA Balance per QAD         | $1,549,683   | $686,259     | ($31,802)    |
| NRA Balance Per VMS                   | $1,497,369   | $637,338     | $0.00        |
| QAD NRA - PHA NRA VMS (Variance)      | ($52,314)    | ($49,921)    | $31,802      |
| Validated Cash Balance (reconciled)   | $1,378,373   | $534,003     | $9,637       |
| QAD NRA - PHA Cash (Variance)         | ($171,310)   | ($152,256)   | $22,165      |

The primary cause of the variance between the PHA reported NRA balance and the QAD validated NRA balance is a result of the PHA accruing their HAP expenses throughout the years, which creates artificially lower NRA balances in VMS. This is further explained under "Findings" below.

## FINDINGS

### Finding No 1: The cash balances were insufficient to support the NRA validated balances.

**Condition:** The LTRAP total cash and investments as of December 31, 2011 and December 31, 2012 were insufficient to support the validated NRA balance as indicated in Table No. 1.

**Criteria:** The 24 CFR 982.151 provides that under the Annual Contributions Contract (ACC) the PHA agrees to *"to administer the program in accordance with HUD regulations and requirements"* and that the *"program receipts in excess of current needs must be promptly invested in accordance with HUD requirements".* Under 24 CFR 982.156 the PHA *"must practice good cash management and invest all funds received in excess of current needs".* This means that the NRA must be backed by cash or cash equivalents that can be liquidated within 24 hours.

PIH Notice 2011-27 and PIH Notice 2012-9 advise PHA's *"that funds in the HAP NRA account shall only be used for eligible HAP needs in the current and future CYs. The ACC requires PHAs to use HAP funding to cover rental assistance payments only. HAP and/or HAP NRA shall not under any circumstances be used for any other purpose, such as to cover administrative expenses or be loaned, advanced or transferred (referred to as operating transfers due to/due from) to other component units or other programs such as Low Rent Public Housing. Use of HAP for any purpose other than eligible HAP needs is a violation of law, and such illegal uses or transfers will result in sanctions and possible breach of the ACC. In instances where a PHA is found to have misappropriated HAP*

Financial Management Review (NJ214) Lakewood Township Rental Assistance Program

*and/or HAP NRA funds by using the funds for any purpose other than valid HAP expenses for units up to the baseline, HUD will require the immediate return of the funds to the HAP or HAP NRA account. HUD may take action against a PHA or any party that has used HAP funds and/or the HAP NRA account for non-HAP purposes."*

**Cause:**  The HCV program was over-leased was by 467 vouchers for calendar year 2007 causing an additional $126,776 of HAP funds to be inappropriately expended.  If over leasing occurs such that a Housing Authority exceeds its baseline units under the ACC for the calendar year, then all funds necessary to cover the cost of excess units above the baseline must come from reserves in the Unrestricted Net Assets account.  Currently, the LTRAP has an Accounts Receivable - LTO recorded in the sum of $130,148, which includes the amount for over leasing.  The remaining $3,372 ($130,148 - $126,776) is the result of incorrectly accounting for Fraud Recovery resulting in excess funds being sent to LTO as administrative funds, when a portion was HAP (see Concern No. 1 below for additional details).

**Effect:**  The PHA is at risk for breach of the Annual Contributions Contract (ACC) as a result of failing to maintain sufficient cash to back the validated NRA balance and for spending HCV HAP funds to cover operating costs. The shortage of HAP funds prevents the PHA from fulfilling their primary purpose of assisting as many families as possible with funds made available. Further, the misrepresentation of funds failed to provide HUD with information that would allow early intervention to avoid potential shortfall resulting in possible termination of participants.

**Corrective Action No. 1:**  The LTRAP must immediately ensure that $130,148 in HAP funds are returned from LTO to the HCV HAP account.  The LTRAP must work with the Field Office in developing a repayment agreement if deemed necessary.

**Corrective Action No. 2:** The LTRAP must correct fund balances in VMS beginning with December 2012 and come forward to July 2013 so the balances match the QAD validated NRA balances for the same time periods.

## CONCERNS

### Concern No. 1:  The NRA balance was incorrectly calculated and reported in VMS.

**Condition:** The LTRAP under-reported the NRA equity balances as indicated in Table 1 due to reporting HAP expenses in VMS on an accrual basis.

**Cause:**  PIH Notice 2010-16 states *"NRA is the amount reported on the income statement at line 11180 – Housing Assistance Payment Equity. The NRA that shall be reported in the VMS must then be updated through the end of each reporting month"*. This field provides the "present" NRA balance by adjusting NRA to reflect HAP funds received and *__expended__* to date since the end of the most recent PHA fiscal year (FY). Please note the term 'expended' means actually paid, not accrued.

**PIH Notice 2011-67** provides *"HUD is required to control disbursement of funds to PHAs in such a way as to ensure that PHAs do not receive federal funds before they are needed. Treasury Financial Manual, Vol. 1, Part 6, Section 2025 states: "Advances to a recipient organization will be limited to the minimum amounts necessary for immediate disbursement*

Financial Management Review (NJ214) Lakewood Township Rental Assistance Program

*Table No. 1, Column 1,* indicates the amount that should have been used to calculate any NRA off-set to the PHA's 2012 renewal funding. QAD also identified the cash available for offset as of December 31, 2011. *Table No. 1, Columns 2 and 3* indicate what the NRA balance should have been and reconciled cash balances as of **December 31, 2012** and **July 31, 2013,** respectively.

*Table 1*

|  | 12.31.2011 | 12.31.2012 | 7.31.2013 |
|---|---|---|---|
| Validated NRA Balance per QAD | $1,549,683 | $686,259 | ($31,802) |
| NRA Balance Per VMS | $1,497,369 | $637,338 | $0.00 |
| **QAD NRA - PHA NRA VMS (Variance)** | **($52,314)** | **($549,921)** | **$31,802** |
| Validated Cash Balance (reconciled) | $1,378,373 | $534,003 | $9,637 |
| **QAD NRA - PHA Cash (Variance)** | **($171,310)** | **($152,256)** | **$22,165** |

The primary cause of the variance between the PHA reported NRA balance and the QAD validated NRA balance is a result of the PHA accruing their HAP expenses throughout the years, which creates artificially lower NRA balances in VMS. This is further explained under "Findings" below.

## FINDINGS

### Finding No 1: The cash balances were insufficient to support the NRA validated balances.

**Condition:** The LTRAP total cash and investments as of December 31, 2011 and December 31, 2012 were insufficient to support the validated NRA balance as indicated in Table No. 1.

**Criteria: The 24 CFR 982.151** provides that under the Annual Contributions Contract (ACC) the PHA agrees to *"to administer the program in accordance with HUD regulations and requirements"* and that the *"program receipts in excess of current needs must be promptly invested in accordance with HUD requirements".* Under 24 CFR 982.156 the PHA *"must practice good cash management and invest all funds received in excess of current needs".* This means that the NRA must be backed by cash or cash equivalents that can be liquidated within 24 hours.

**PIH Notice 2011-27** and **PIH Notice 2012-9** advise PHA's *"that funds in the HAP NRA account shall only be used for eligible HAP needs in the current and future CYs. The ACC requires PHAs to use HAP funding to cover rental assistance payments only. HAP and/or HAP NRA shall not under any circumstances be used for any other purpose, such as to cover administrative expenses or be loaned, advanced or transferred (referred to as operating transfers due to/due from) to other component units or other programs such as Low Rent Public Housing. Use of HAP for any purpose other than eligible HAP needs is a violation of law, and such illegal uses or transfers will result in sanctions and possible breach of the ACC. In instances where a PHA is found to have misappropriated HAP*

Financial Management Review (NJ214) Lakewood Township Rental Assistance Program

*and/or HAP NRA funds by using the funds for any purpose other than valid HAP expenses for units up to the baseline, HUD will require the immediate return of the funds to the HAP or HAP NRA account. HUD may take action against a PHA or any party that has used HAP funds and/or the HAP NRA account for non-HAP purposes."*

**Cause:** The HCV program was over-leased was by 467 vouchers for calendar year 2007 causing an additional $126,776 of HAP funds to be inappropriately expended. If over leasing occurs such that a Housing Authority exceeds its baseline units under the ACC for the calendar year, then all funds necessary to cover the cost of excess units above the baseline must come from reserves in the Unrestricted Net Assets account. Currently, the LTRAP has an Accounts Receivable - LTO recorded in the sum of $130,148, which includes the amount for over leasing. The remaining $3,372 ($130,148 - $126,776) is the result of incorrectly accounting for Fraud Recovery resulting in excess funds being sent to LTO as administrative funds, when a portion was HAP (see Concern No. 1 below for additional details).

**Effect:** The PHA is at risk for breach of the Annual Contributions Contract (ACC) as a result of failing to maintain sufficient cash to back the validated NRA balance and for spending HCV HAP funds to cover operating costs. The shortage of HAP funds prevents the PHA from fulfilling their primary purpose of assisting as many families as possible with funds made available. Further, the misrepresentation of funds failed to provide HUD with information that would allow early intervention to avoid potential shortfall resulting in possible termination of participants.

**Corrective Action No. 1:** The LTRAP must immediately ensure that $130,148 in HAP funds are returned from LTO to the HCV HAP account. The LTRAP must work with the Field Office in developing a repayment agreement if deemed necessary.

**Corrective Action No. 2:** The LTRAP must correct fund balances in VMS beginning with December 2012 and come forward to July 2013 so the balances match the QAD validated NRA balances for the same time periods.

## CONCERNS

### Concern No. 1:  The NRA balance was incorrectly calculated and reported in VMS.

**Condition:** The LTRAP under-reported the NRA equity balances as indicated in Table 1 due to reporting HAP expenses in VMS on an accrual basis.

**Cause:** PIH Notice 2010-16 states *"NRA is the amount reported on the Income statement at line 11180 – Housing Assistance Payment Equity. The NRA that shall be reported in the VMS must then be updated through the end of each reporting month".* This field provides the "present" NRA balance by adjusting NRA to reflect HAP funds received and ___expended___ to date since the end of the most recent PHA fiscal year (FY). Please note the term 'expended' means actually paid, not accrued.

**PIH Notice 2011-67** provides *"HUD is required to control disbursement of funds to PHAs in such a way as to ensure that PHAs do not receive federal funds before they are needed. Treasury Financial Manual, Vol.1, Part 6, Section 2025 states: "Advances to a recipient organization will be limited to the minimum amounts necessary for immediate disbursement*

Financial Management Review (NJ214) Lakewood Township Rental Assistance Program

*needs and will be timed to be in accord only with the actual immediate cash requirements of the recipient organization in carrying out the purpose of an approved program or project. The timing and amount of cash advances will be as close as is administratively feasible to the actual disbursements by the recipient organization for direct program costs and the proportionate share of any allowable indirect costs."*

**Effect:**  The process of disbursing only the funds required for current HAP costs has resulted in the reestablishment of HUD-held program reserves, whereby excess HAP funds will remain obligated but undisbursed at the HUD level rather than being held by the PHAs. This will move new budget authority into the program reserves if it is not needed for current costs. Also, of more importance, the existing NRA balances currently held by PHAs will ultimately also be transitioned to the cash management process and the program reserves. This shall be accomplished either via their use in lieu of HUD disbursing additional budget authority and/or through a final transition effected through the PHA returning funds to HUD to be held on their behalf.

The practice of reporting HAP expenses in VMS before expending the funds, and likewise reducing the NRA reported balance by the same amounts, will result in an incorrect amount of NRA being transitioned back to HUD. If LTRAP continues to report NRA in the VMS as reduced by accrued HAP, the 'true' NRA balance, as backed by cash, will remain unknown to HUD when final transition of PHA held reserves is completed.

**Recommended Corrective Action No. 1:**  As stated under Corrective Action No. 2, the LTRAP must correct fund balances in VMS beginning with December 2012 and come forward to July 2013 so the balances match the QAD validated NRA balances for the same time periods.

**Recommended Corrective Action No. 2:**  The LTRAP staff must report the NRA balance for VMS based on those funds that are *expended* for HAP instead of accrued.

**Concern No. 2:  Fraud Recovery was incorrectly reported in VMS.**

**Condition:**  LTRAP reported in the VMS 100% of the Fraud Recovery collected and reduced the HAP expenses by the same amount.

**Cause:**  The LTRAP misunderstood the VMS reporting requirements pertaining to Fraud Recovery. The VMS User's Manual defines the reporting requirements as follows:

- *Fraud Recovery – Total Collected this Month* as the "Total dollar amount recouped by the HA as fraud recoveries during the month that is applied to the NRA account. This consists of the lesser of one-half the amount recovered of the total recovery minus the costs incurred by the PHA in the recovery. This amount should NOT be deducted from HAP expenses as reported for the month in the HAP expenses sections. Total dollar amount recouped is cash collected – not revenue recorded."

**Effect:**  By failing to accurately report in VMS the LTRAP failed to provide HUD with information useful in determining the housing authority's actual financial position.

Financial Management Review (NJ214) Lakewood Township Rental Assistance Program

**Recommended Corrective Action No. 3:** The LTRAP must make the necessary corrections in VMS beginning in December 2012 and come forward to the most recent submission in VMS.

**Recommended Corrective Action No. 4:** As mentioned under Corrective Action No. 1, LTRAP is owed $3,372 back from the LTO and aggressive action must be taken immediately to recover those funds.

## ADMINISTRATIVE EXPENSES REVIEW

The QAD staff was unable to review the administrative expenses as explained above. Although we requested the administrative financial records on more than one occasion, the LTRAP refused to furnish the documents.   The inability to review administrative financial records severely hampered our efforts to conduct a speedy and effective audit of the HCV program.   The Newark Field Office will follow-up on this situation with the LTRAP Executive Director.   QAD reserves the right to conduct a follow-up onsite visit once this issue is resolved.

## TECHINICAL ASSISTANCE

The QAD staff worked with the LTRAP staff on how to properly account for Fraud Recovery and the proper calculation of the NRA balance.



Richard Michael Price
*Partner*
T 202-585-8716
rprice@nixonpeabody.com

Nixon Peabody LLP
401 9th Street NW
Suite 900
Washington, DC 20004-2128
202-585-8000

January 2, 2014

Mr. Balu Thumar
Acting Director
Office of Public Housing
U.S. Department of Housing and Urban Development
One Newark Center, 13th Floor
Newark, NJ 07102-5620

Re:   Lakewood Township Rental Assistance Program ("LTRAP")
      Housing Choice Voucher Program

Dear Mr. Thumar:

This letter is in response to your December 3, 2013 letter to Mr. Hertz. Please advise us of the status of the on-site reviews.

At the outset we believe there are certain basic misunderstandings as to the existence and nature of Lakewood Township Residential Assistance Program ("LTRAP") and Lakewood Tenants Organization ("LTO"). LTRAP is a federally-funded (HUD) program sponsored by Lakewood Township as the PHA under an ACC with HUD. LTRAP has no separate incorporation. LTO is an existing entity that contracts with the Township to administer Lakewood Township's Residential Assistance Program, including the Section 8 Housing Choice Voucher ("HCV") program. LTO's fee is set at the HCV Administrative Fees; the Administrative Fees are set by HUD annually and are per se reasonable. As such, once the fee is earned by LTO and paid to LTO by Lakewood Township the fee is defederalized and LTO is not accountable to HUD, as LTO is a contractor, not a grant sub-recipient.

We are enclosing a copy of an August 30, 1977 letter by Clarence L. Humphrey, Director, Housing Programs Management Branch to Thomas L. LaPointe, Municipal Manager of Lakewood Township. Mr. Humphrey explains that LTO's selection was beyond HUD's review and approval. We are also enclosing a copy of an April 24, 1990 letter from John Franklin, Mayor of Lakewood Township to Theodore Britton, responding to an earlier inquiry into LTO's selection and status. Finally, we are enclosing a July 9, 1996 letter from Kevin E. Marchman, HUD Acting Assistant Secretary for Public and Indian Housing to Mr. Hertz confirming that LTO's selection was appropriate and remains so.

Mr. Balu Thumar
January 2, 2014
Page 2

It appears that this issue is re-explored every so often, but we are not aware of any information that requires a repeat of the same inquiry at this time. We believe this letter appropriately addresses your concerns.

Sincerely,

Richard Michael Price

Enclosures

14764844.3

**NIXON PEABODY**

ATTORNEYS AT LAW          Richard Michael Price
                         Partner
NIXONPEABODY.COM         T 202-585-8716
@NIXONPEABODYLLP         rprice@nixonpeabody.com

                         Nixon Peabody LLP
                         401 9th Street NW
                         Suite 900
                         Washington, DC  20004-2128
                         202-585-8000

February 14, 2014

Mr. Balu Thumar
Acting Director
Office of Public Housing
U.S. Department of Housing and Urban Development
One Newark Center, 13th Floor
Newark, NJ  07102-5620

Re:   Lakewood Township Rental Assistance Program ("LTRAP")
      Housing Choice Voucher Program

Dear Mr. Thumar:

This letter follows up our January 2, 2014 letter and discussions with HUD staff.  We appreciate consideration that LTO is a fee for services independent company, not a sub-grantee or sub-recipient and as such fees earned by LTO are de-federalized.  We also appreciate your understanding that LTRAP is a program name for Lakewood Township.

We still do not understand how the documents requested in your December 3, 2013 letter can be relevant to LTRAP.  We also do not understand why HUD continues to request organizational information decades after first accepting the current organizational structure.  That said, attached please find:

1.   By-Laws for LTO
2.   Articles of Incorporation  for LTO
3.   Registration and Good Standing Certificates for LTO
4.   Incumbancy Certificate

Thank you for your time.

Sincerely,

*Richard Michael Price*

Richard Michael Price

RECEIVED
CHIEF COUNSEL'S OFFICE
FEB 18 2014
WTS NO 14-151
ASSIGNEE

Enclosures
cc:   Ms. Diana Caballero
14857822.2

Opt-Out: Not Defined

# By-Laws
## OF
## Lakewood Tenants Organization, Inc.

### Article I: Organization

**1.  Name**

The name of this Organization shall be: Lakewood Tenants Organization, Inc.

**2.  Seal**

The Organization shall have a seal that shall be in the following form:



**3.  Change of Name**

The Organization may, at its pleasure, by a vote of the membership body, change its name.

### Article II: Purpose

The purposes for which the Organization is formed are as stated in the Amended Certificate of Incorporation.

### Article III: Membership

**1.  Eligibility**

Any person who is a resident of the Township of Lakewood, County of Ocean, and State of New Jersey, shall be eligible for membership, provided such person is not a property owner who derives rental income benefits from the rent subsidy programs operated by LTO, and further provided that such person is:

  a).  a tenant himself, or

By-Laws of
Lakewood Tenants Organization, Inc. — June 2005                    page 2

b)    has demonstrated a significant commitment or concern for the protection and advancement of tenants' rights.

2.    Selection

New members may be proposed by any member in good standing for acceptance by the Board of Trustees.

3.    Removal for Cause

Any member may be removed from membership by a majority vote of the regular members, at any meeting of said members called for such purpose, upon grounds that his words or conduct have been intentionally detrimental to the purposes of the Organization. Any member whose removal is sought shall be served with written notice of the nature of the complaints against him at least 10 days prior to the meeting at which his removal will be considered, and shall be given an opportunity to be heard at such meeting.

4.    Dues

The dues of this Organization shall be $5.00 per dwelling unit per year, or $7.00 per unit for two years. The dues of this Organization for tenants belonging to a tenants association of 10 members or more which is affiliated with this Organization shall be $2.00 per dwelling unit per year and $3.00 per dwelling unit for two years. Dues for senior citizens shall be $1.00 per dwelling unit per year. Members who have belonged to the Organization for a minimum of three years may purchase a lifetime membership in lieu of all future dues for a one time additional payment of $15.00. Unless otherwise specified at the time payment is made, all membership dues shall be attributed to the calendar year in which they are paid.

5.    Membership Term

All annual and biannual memberships shall run by calendar years and shall be effective from the date that dues for that calendar year are paid. Annual memberships shall expire on December 31 of the calendar year in which the membership commenced. Biannual memberships shall expire on December 31 of the calendar year following the year in which the membership commenced.

6.    Suspension and Removal for Non-Payment of Dues

Subject to further restrictions concerning voting as provided for in paragraph VII, no one may exercise any rights or privileges of membership in the Organization during any calendar year until any dues owed for that year have been paid. Nevertheless, members whose membership expired on December 31 of the prior calendar year shall remain on the Organization's mailing list and membership rolls until August 1 of the current calendar year, at which time they shall be automatically removed from the membership rolls of the Organization if dues owed for that calendar year have still not been paid.

To: 917323676645                From: (2027088696)                00/12/15 09:55 AM    Page 19 of 76

By-Laws of
Lakewood Tenants Organization, Inc. — June 2005                    page 3

## Article IV: BOARD OF TRUSTEES

### 1.    General Duties and Authority

The Board of Trustees shall be the governing body of the corporation. Its duties shall include, but not be limited to, carrying out the stated purposes of the corporation and determining its charitable, fiscal, and personnel policies. The Board shall also be vested with the authority to establish the rights, privileges, and duties of members of the Organization.

### 2.    Composition, Term and Selection

The Board of Trustees shall be composed of at least 5, but not more than 9 Board members. The exact number of Board members within these limits will be specified by an ordinary resolution of the Board of Trustees. At regular annual elections of Board members, normally held at the general membership meeting in the Fall, as many Board members will be elected as necessary to fill all vacancies in the Board of Trustees as of January 1 of the following calendar year. At emergency elections of Board members or at regular elections postponed until January or later, all vacancies in the Board of Trustees existing on the date of the emergency election will be filled.

Beginning with the regular annual election of Board members to be held in calendar 2005, each new term of office for a Board member will be for the minimum number of years that will result in that Board member's term of office ending in a different year than any other Board member's term of office. When two or more Board members are elected in the same election, their terms will be staggered to the extent necessary so that none of them are granted a term in office of more years then necessary in order to avoid having a newly elected Board member's term end in the same year as any other Board member.

To be eligible to be a member of the Board of Trustees, an individual must either have been a member in good standing of the Organization for a period of at least 3 years prior to his or her election to the Board of Trustees, or must be a member of the Organization who has demonstrated, to the satisfaction of the Board of Trustees, an active interest and participation in the cause of tenants' rights.

Regular terms of Board members shall begin on January 1 and shall terminate on December 31 of the appropriate calendar years. If an election is postponed beyond January 1, in accordance with Article VII, the incumbent Board will continue to serve until a valid election is held.

### 3.    Vacancies

Should a vacancy occur on the Board of Trustees for any reason, the remaining members of the Board shall choose a successor to serve out the unexpired term of the vacant Board position.

To: 917323676645                      From: (2027080696)                08/12/15 09:56 AM     Page 20 of 76

4.      Meetings

a).     The Board shall meet regularly, but not less than 4 times annually, at a place and time designated by a majority of the members of the Board, or, in default of their designation, at a place and time designated by the Chairman of the Board. All Board members shall be notified of the time and place of regularly scheduled meetings at least one week prior to the meeting date.   Agendas for regular meetings shall be prepared in advance and available for inspection at least one day prior to the scheduled meeting. Board members wishing to add items for discussion to the agenda shall contact the Secretary at least five days prior to the meeting at which the Board member wishes the item to be discussed.

b).     Special meetings of this Board may be called by the President or upon the request of any 3 members of the Board, when they deem it in the best interest of the Organization. Notices for special meetings shall be delivered to all Board members at least 3 days before the date set for the meeting. The notice of a special meeting shall state the reason that the meeting has been called, the business to be transacted at the meeting, and by whom it was called.

c).     Emergency meetings may be called upon 24 hours' notice by any member of the Board. The reason for the meeting and the business to be brought before the Board shall be given to each Board member. No other business can be conducted at an emergency meeting other than that business for which the meeting was called.

d).     For regular, special or emergency meetings, a quorum shall consist of not less than 3 members of the Board.

e).     Except where otherwise specified, the decisions of the Board shall be by majority vote. Each member shall have one vote and such voting may be done by proxy, to the extent not prohibited by law. The Board of Trustees may make such rules and regulations covering its meetings as it may determine appropriate.

5.      Termination of Board Membership

Any Board member absent for 2 regular or special meetings during any calendar year without proper excuse will be subject to possible termination for that reason. A Board member may also be removed whenever other sufficient cause exists for such removal. A vote of two thirds (2/3) of the members of the Board is required to remove any member of the Board. Removal of a Board member may only be voted upon at a meeting if the notice for that meeting specifically states that the issue of removal of that particular individual will be considered and specifically states the reason for which such removal is sought. The Board member whose removal is sought shall be given an opportunity to be heard at that meeting.

6.      Committees

By-Laws of
Lakewood Tenants Organization, Inc. — June 2005                                  **page 5**

The Board may establish from time to time such ad hoc or standing committees as it may consider appropriate.

### 7.   Nominating Committee

The chairman shall select from the Board of Trustees a nominating committee to present a slate of Board members to the general membership. Said committee shall be approved by two thirds (2/3) of the Board members present at the meeting where these items are on the agenda.

## Article V: OFFICERS

### 1.   Titles and Selections

The officers of the corporation shall consist of a President, Vice-President, Secretary, Treasurer, and such Assistant Secretaries and Assistant Treasurers as may be appointed by the Board from time to time. The term of all officers shall be to serve at the pleasure of the Board of Trustees.

### 2.   President

The President shall be the chief executive officer of the corporation, shall preside at General Membership meetings, and shall be vested with the necessary authority and responsibility to conduct the day-to-day affairs of the Organization and to execute the policies and mandates of the Board. The President shall act as the duly authorized representative of the corporation and the Board in all matters for which the Board has not formally designated some other person to act. He shall be one of the officers who may sign the checks or drafts of the corporation. He shall serve as an ex-officio member of all committees. The President, if a member of the Board, shall also serve as Chairman of the Board.

### 3.   Vice-President

The Vice-President shall, in the event of the absence or inability of the President to exercise his office, become acting President of the Corporation with all rights, privileges and powers as if he had been duly elected President. He shall also perform such other duties as are assigned to him from time to time by the President or the Board.

### 4.   Secretary

The Secretary shall be charged with preparation and dissemination of agendas, notices, minutes, and records of the Board and the corporation, and shall also act as custodian of all such records and documents. He shall present to the membership at any meetings any communication addressed to him as Secretary of the corporation. He shall attend to all correspondence of the corporation and shall exercise all duties incident to the office of Secretary.

By-Laws of
Lakewood Tenants Organization, Inc. — June 2005                    page 6

**5.     Treasurer**

The Treasurer shall be charged with the collection, banking, and disbursement of dues and other funds, as well as the maintenance of all necessary accounts and records and the preparation of financial statements on a quarterly basis. He shall exercise all duties incident to the office of Treasurer.

## Article VI: EMPLOYEES AND COMPENSATION

**1.     Manner of Fixing Compensation**

The Board of Trustees or whomever they so delegate shall hire and fix the compensation of any and all employees that they, or their delegate, may determine to be necessary for effective accomplishment of the purpose of the Organization. All other personnel policies and the powers attendant thereto shall also be vested in the Board of Trustees or its delegate.

**2.     No Compensation for Trustees and Officers**

No trustee or officer shall by reason of his office be entitled to receive any salary or compensation, but nothing herein shall be construed to prevent a trustee or officer from receiving any compensation from the Organization for duties other than as a trustee or officer, provided, however, that said trustee or officer shall not participate in any decision directly affecting the amount of compensation he is to receive.

## Article VII: ELECTIONS AND MEMBERSHIP MEETINGS

**1.     General Membership Meeting**

A meeting of all members of the Organization shall be held once during each calendar year, at a time and place designated by the Board of Trustees for the express, but not sole, purpose of electing a new Board of Trustees. At said meeting, the outgoing officers and Board will advise the membership of the current activities and financial status of the corporation. The membership shall vote upon any questions submitted to it by the Board of Trustees. Other general membership meetings may be called from time to time at the discretion of the Board of Trustees.

The Order of Business at general meetings shall be:

1. Roll Call
2. Reading of the minutes of the preceding meeting
3. Reports of Committees
4. Reports of Officers
5. Old and unfinished business

O:\War\out\LTO\Key Docs\bylaws whpaul June 05 doc

Opt-Out: Not Defined

To: 917323676645                    From: (2027086696)                    08/12/15 09:59 AM    Page 23 of 76

By-Laws of
Lakewood Tenants Organization, Inc. — June 2005                    page 7

      6.  New Business
      7.  Adjournment

2.    **Nominations**

a).    Not less than 80 days prior to a scheduled general membership meeting at which an election of Trustees will be held, the President will cause all members in good standing to be mailed notice of the time and place of the meeting and of the nominations and election procedures. All nominations for members of the Board of Trustees must be submitted in writing to the President no less than 60 days prior to the date scheduled for the annual general membership meeting.

b).    All nominations to the Board of Trustees shall be by slate only, which must consist of a full list of names of as many individuals as there are positions to be filled on the Board of Trustees at the following election. To be valid, each nominating slate must be signed by every individual who is nominated on that slate, as well as by two other members of the Organization, then in good standing. No individual member may sign more than one slate for any election in any capacity. The slate submitted by the nominating committee, as provided for in Section 7 of Article IV, shall be signed by a majority of the members of the nominating committee. If any signature or any name on a proposed slate are invalid or ineligible, the entire slate shall be disqualified. Where terms of differing lengths are to be voted on at a single election, slates must specify for each candidate the term for which that candidate has been nominated.

3.    **Voting Eligibility**

To be eligible to vote at any General Membership meeting, members must have belonged to the Organization and have paid their current dues at least thirty days prior to the date the election is held.

4.    **Voting Methods**

Voting at all general membership meetings, including the election of Trustees, may be by voice vote, hand count or paper ballot; except that for any contested election of officers or trustees, paper ballots shall be provided and there shall not appear in any place on the ballots any mark that might tend to indicate the person who cast the ballot. Each dwelling unit shall have one vote.

5.    **Voting by Slate Only**

Voting for Trustees shall be by slate only, in accordance with nominating procedures set forth in Section 2 of this Article. The slate receiving the most votes shall be elected provided it receives more than one third of the votes cast. If no slate receives more than one third of the votes cast, a runoff election shall be held at the same meeting between the top three slates. (If a tie occurs for third place, the top four slates will participate in the runoff.) If two slates receive more than one third (1/3) of the votes cast, and are tied, a runoff election shall be held at the same meeting

Q:\Worddoc\LTO\Org Docs\By-laws adopted June 05.doc

By-Laws of
Lakewood Tenants Organization, Inc. — June 2005                    page 8

between the top two slates. Balloting shall continue, if necessary, until one slate has received a plurality of votes in excess of one third (1/3) of the votes cast

6.      Certification of Voting

At all votes by ballot the chairman of the meeting shall appoint a committee of three who shall act as Inspectors of Election and who shall, at the conclusion of such balloting, certify in writing to the Chairman the results. The certified copy shall be physically affixed to the minutes of that meeting. No Inspector of Election shall be a candidate for office or be personally interested in the question voted upon.

7.      Postponing Elections

If weather, transportation problems, or other causes beyond the control of the Board interfere with attendance at or the conduct of a general membership meeting, the Board shall have the power to reschedule the election to a subsequent meeting to be held within 30 days. If all slates proposed for election to the Board are disqualified after the deadline for nominations, the Board shall reschedule the election to allow sufficient time for new nominations.


Article VIII: AMENDMENTS

Any member of the Board may propose an amendment to the By-Laws for consideration by the Board. The By-Laws of the Organization may be amended at any meeting of the Board, provided that the agenda for that meeting specifically states an amendment to the By-Laws will be considered at the meeting, and further provided that each member of the Board has received a copy of the text of the proposed amendment 10 days prior to that meeting. The proposed amendment may be modified at the Board meeting at which it is considered. The vote of two thirds (2/3) of the full Board of Trustees shall be required for the adoption of any amendment to the By-Laws.


I certify that the foregoing is a true copy of the By-Laws of Lakewood Tenants Organization, Inc. adopted by the Board of Trustees on the 15th of Dec , 2005.


_____
                    , Secretary

Amended Certificate of Incorporation
of the
# LAKEWOOD TENANTS ORGANIZATION, INC.

The original Certificate of Incorporation for Lakewood Tenants Organization, Inc., which was filed with the office of the New Jersey Secretary of State on or about July 18, 1977, is hereby amended as follows:

We, the undersigned, desiring to form a nonprofit corporation, pursuant to the New Jersey Nonprofit Corporation Statute, N.J.S. 15A:1-1, et seq., do hereby make, subscribe and acknowledge this certificate as follows:

1.    Name:    The name of the Corporation shall be *LAKEWOOD TENANTS ORGANIZATION, INC.* [the Corporation].

2.    Purpose:    The Corporation is formed exclusively for purposes for which a corporation may be formed under the New Jersey Nonprofit Corporation Act, N.J.S. 15A:1-1, et seq., and not for pecuniary profit or financial gain, and more specifically, for the purposes expressed in Section 501(c)(3) of the Internal Revenue Code of 1986. These purposes shall specifically include advancement, promotion, and administration of initiatives and programs providing affordable housing opportunities; homeownership; tenants' rights and tenant counseling; low-income mortgage program counseling; housing placement; arbitration and mediation of housing-related issues; dissemination of information concerning affordable housing and tenants' rights; acting as a monitor of topics concerning-, and a "watch-dog" of abuses concerning-, tenants' rights, housing quality, landlord–tenant laws and affordable housing issues; promotion and organization of tenants' associations; operation, administration and facilitation of programs (whether federally, state, locally or privately funded) benefiting tenants and/or fostering affordable housing, specifically including (as examples) rental assistance programs, housing rehabilitation programs, mortgage subsidy programs, programs transitioning renters to homeownership, housing rehabilitation and neighborhood revitalization programs; economic, community, and business development programs benefiting lower-income persons; programs for the acquisition, development, construction, operation, rental and/or sale of housing for lower-

To: 917323676645                    From: (2027080696)                08/12/15 10:02 AM    Page 26 of 76

Certificate of Incorporation of
LAKEWOOD TENANTS ORGANIZATION, INC.                                                    PAGE 2

income families, and such economic resources and programs as are designed to economically uplift and empower lower-income persons or families.

No part of the assets, income, or profit of the Corporation shall be distributable to, or inure to the benefit of its members, trustees or officers, except to the extent permitted under the New Jersey Nonprofit Corporation Act, N.J.S. 15A:1-1, et seq., and the applicable sections of Subchapter F – Exempt Organizations of the Internal Revenue Code of 1986. The Corporation shall not operate any listing service of its members, trustees or officers, or take steps which will serve to facilitate the transaction of specific business by its members trustees or officers, or promote the private interest of any member, trustee or officer, or engage in any activities which would constitute a regular business of a kind ordinarily carried on for profit.

4.      Duration:  The period of duration of the Corporation shall be perpetual.

5.      Powers:  In furtherance of the purposes of the Corporation, the Corporation shall have all general powers enumerated in the New Jersey Nonprofit Corporation Act, N.J.S. 15A:1-1, et seq.  The Corporation shall have the power, either directly or indirectly, either alone or in conjunction or cooperation with others, to do any and all lawful acts and things and to engage in any and all lawful activities which may be necessary, useful, suitable, desirable, or proper for the furtherance, accomplishment, fostering or attainment of any and all of the purposes for which the Corporation is organized, and to aid or assist other organizations whose activities are such as to further, accomplish, foster or attain any of such purposes.  Notwithstanding anything herein to the contrary, the Corporation shall exercise only such powers as are in furtherance of the exempt purposes of organizations as set forth in Section 501(c)(3) of the Internal Revenue Code of 1986 and the regulations thereunder as the same may now exist or as they may be hereafter amended from time to time.

6.      Distribution on Dissolution or Liquidation:  In the event of the liquidation or dissolution of the Corporation, whether voluntary or involuntary, no member, trustee or officer shall be entitled to any distribution or division of its remaining property or its proceeds, and the

Certificate of Incorporation of
LAKEWOOD TENANTS ORGANIZATION, INC.                                          PAGE 3

balance of all money and other property received by the Corporation from any source, after the payment of all debts and obligations of the Corporation, shall be used or distributed subject to the direction of the Board of Trustees, or, in the alternative, in accordance with the order of the Superior Court of the State of New Jersey as provided by law, exclusively to qualified tax exempt organizations promoting tenants' rights, and to the greatest extent possible, consistent with the purposes of this Corporation as set forth hereinabove and in the Corporation's bylaws, and within the intendment of Section 501(c)(3) of the Internal Revenue Code of 1986 and the regulations thereunder as the same may now exist or as they may be hereafter amended from time to time.

7.   **Income and Distribution:**  No part of the income of the Corporation shall inure to the benefit of any member, trustee, or officer of the corporation or any private individual (except that reasonable compensation may be paid for services rendered to or for the Corporation affecting one or more of its purposes), and no member, trustee, officer of the Corporation or any private individual shall be entitled to share in the distribution of any of the Corporate assets on dissolution of the Corporation.

8.   **Prohibited Activities:**  No part of the activities of the Corporation shall be carrying on propaganda, or otherwise attempting to influence legislation, or participating in, or intervening in (including the publication and distribution of statements), any political campaign on behalf of any candidate for public office.

9.   **Principal Office:**  The current principal office of the Corporation is located at 600 West Kennedy Boulevard, Lakewood, New Jersey.  The location of the principal office may be changed by the Corporation, from time to time, by resolution of the Board of Trustees.

10.  **Registered Agent:**  The current registered agent for service of process and for delivery of all notices shall be Meir N. Hertz, 600 West Kennedy Boulevard, Lakewood, NJ 08701.

11.  **Number of Trustees:**  The number of trustees shall be not less than three.

Certificate of Incorporation of
LAKEWOOD TENANTS ORGANIZATION, INC.                                    PAGE 4

12.  Names of Trustees:  The names and addresses of the current Board of Trustees of the Corporation are as follows:

*Name*                                          *Address*
Meir Hertz

Edith Goldstein

Judith Pizzarelli                                                    t 5G

Simcha Greenwald

Ahron Notis

Moshe Sofer

Elimelech Mitnick



13.  **Membership Corporation:**  This is a membership corporation.  Qualification of members shall be as stated in the by-laws.

14.  **Election of Trustees:**  The Trustees of the Corporation shall be elected in the manner provided by the bylaws.

15.  Age of Subscriber:  The subscriber is of the age of 18 years or over.

THIS AMENDED CERTIFICATE OF INCORPORATION has been duly adopted by the Board of Trustees of the Corporation and ratified by the membership of the Corporation in accordance with the Corporation's initial Certificate of Incorporation, its By-Laws, and all applicable laws.

Certificate of Incorporation of
LAKEWOOD TENANTS ORGANIZATION, INC.                                    PAGE 5

I certify that the foregoing is a true copy of
an Amended Certificate of Incorporation
duly adopted by the Board of Trustees of the
Corporation on July 16, 2001, and ratified
by the membership of the Corporation on
November 13, 2001.

Ahron Notis, Secretary



U.S. Department of Housing and Urban Development
Office of Chief Counsel
One Newark Center, 12th Floor
Newark, NJ 07102-5260
Telephone: (973) 622-7900

APR 14 2014

Mr. Meir Hertz, Executive Director
Lakewood Township Rental Assistance Program
600 W. Kennedy Blvd.
P.O. Box 856
Lakewood, New Jersey  08701

Dear Mr. Hertz:

SUBJECT: Newark Field Office Review of Documentation Related to
Lakewood Township Rental Assistance Program (LTRAP)

  The Newark Field Office is in the process of addressing issues that resulted from two on-site reviews that were conducted at your agency in fiscal year 2013. These reviews were conducted by the Newark Office of Fair Housing and Equal Opportunity in May 2013 and the Housing Voucher Quality Assurance Division in September 2013.

  This letter addresses the following issues: (1) the relationship between the Lakewood Township Rental Assistance Program (LTRAP) and the Lakewood Tenants Organization (LTO); (2) the validity of the use of federal funds in which the entire amount of LTRAP's Housing Choice Voucher Program Administrative Fees are paid to the LTO; and (3) claims by the LTO that the use of these fees are not subject to HUD review nor audit.

  The following documents are referred to throughout this letter for your information: (1) a letter dated 8/30/77 to the Township from Clarence L. Humphrey as Director of HUD's Housing Programs Management Branch (the "Humphrey Letter") (2) a letter dated 4/24/90 from John J. Franklin as the Township's mayor (the "Mayor's Letter") to Theodore Britton of HUD's Newark Field Office (3) a letter dated 9/20/95 addressed to the Executive Director of LTRAP, attaching an earlier version of the Consolidated ACC [Form HUD-52520 (6/93)] (the "1995 ACC") with no funding exhibits attached, that is signed by the then-mayor of the Township on 10/5/95 on behalf of the LTRAP (4) the Employment Agreement dated 12/28/95 (the "Employment Contract") between the Executive Director of LTRAP and the LTO (5) a letter dated 7/9/96 to the Executive Director of the LTO from Kevin E. Marchman as HUD's Acting Assistant Secretary for Public and Indian Housing (the "Marchman Letter") (6) a letter dated 7/21/98 to the Executive Director of LTRAP attaching a copy of a Consolidated ACC [Form HUD-52520 (12/97)](the "1998 ACC") that is signed by the Executive Director of LTRAP but lists the Township of Lakewood (the "Township") as the HA on the "PIH Section 8 - Funding Exhibit," and (7) two letters dated 12/15/00 and 1/2/14 from Richard Michael Price, Esq. of

Nixon Peabody LLP. We assume that these documents are readily available for your reference since either you or your representatives have provided us with copies.

Our review revealed that the LTO operates LTRAP on behalf of the Township. The LTO and LTRAP are not separate entities. The LTO (not LTRAP) is the name of the legal entity that acts to administer the Township's Section 8 programs pursuant to the terms of the Agency Agreement. LTRAP is an operating unit of the LTO. Also, the LTO's Agency Agreement was not approved by HUD. We have not found any evidence that the substance of the Agency Agreement received the approval of HUD or that the selection of the LTO satisfies State and/or Local procurement requirements, if applicable. We have determined the following:

A. No evidence that HUD approved Agency Agreement.

We disagree with a conclusion made by Mr. Price in his 12/15/00 and 1/2/14 letters that HUD has determined "the [Agency Agreement] was appropriate and remains so." As evidence of this conclusion, Mr. Price points to the Humphrey Letter and Marchman Letter. However, neither makes that assertion. The Humphrey Letter merely states that since HUD is not a party to the agreement, HUD's review and approval thereof shall not be required. The Marchman Letter states only that HUD's procurement rules do not apply to the LTO's selection as a public housing agency. Neither letter addresses the substance of the Agency Agreement. Accordingly, these letters cannot support a claim that HUD has found the Agency Agreement to be appropriate. Therefore, we have not seen any evidence that HUD determined the Agency Agreement to be appropriate or otherwise granted its approval of the agreement.

B. Applicability of Procurement Rules.

The Marchman Letter makes clear that HUD's procurement rules do not apply to the Township's "selection of LTO as a public housing agency." *See, the Marchman Letter.* Notwithstanding the inapplicability of HUD's procurement rules, State and Local laws regarding procurement may apply to such selection. Nothing in the documentation with which we have been provided indicates whether or not the selection of the LTO satisfies any applicable State or local procurement rules.

The Township and the LTO are together the "PHA" under the ACC. We have determined that both the Township and the LTO constitute a "PHA" in this matter.

C. PHA defined.

The Housing Choice Voucher Program, which if also referred to as the "Section 8 Program", is generally administered by State or local government entities called public housing agencies (or PHAs). HUD provides housing assistance funds and funds for PHA administration of this program to the PHA. *See, 24 C.F.R.*

*§982.1(a).* A PHA includes "...both (1) any State, county, municipality, or other governmental entity or public body which is authorized to administer the program (or an agency or instrumentality of such entity), and ...(2)(ii) [a]ny other public or private non-profit entity that was administering a Section 8 tenant-based assistance program pursuant to a contract with the contract administrator of such program (HUD or PHA) on October 21, 1998." *See, 24 C.F.R. §982.4(b).*

Based on the information that we have been presented, it appears that the LTO is a non-profit entity that has been administering a Section 8 tenant-based assistance program for the Township since 10/21/98 and before, as evidenced by both the 1998 ACC and the Agency Agreement. For this reason, we find that the Township and the LTO together meet the definition of a PHA and therefore constitute the PHA of the Housing Choice Voucher Program run by the Township in Lakewood, New Jersey. The identity of the PHA in this instance should be shared by both the Township and the LTO, which appears to be consistent with the parties shared responsibility on the copies of the Consolidated ACCs. Particularly, since they both refer to LTRAP, which we have determined above to be an operational unit of the LTO, and name the Township as the HA on a funding exhibit.

D.  LTO is not merely a contractor or service provider.

The PHA must have authority to administer the program. *See, 24 C.F.R. §982.51(a).* In fact, the Marchman Letter that Mr. Price often references in and attaches to his correspondence with HUD on this matter, specifically concludes that the LTO qualifies as a public housing agency. Furthermore, the Marchman Letter specifies that the LTO was selected by the Township to act as a public housing agency; not as a contractor or service provider. We note that the Township does not also see itself as a public housing agency.

A PHA is required to submit evidence of any change that affects its status as a PHA, its authority to administer the program, or its jurisdiction. *See, 24 C.F.R. §982.51(b).* We have not received any documentation that suggests that the LTO has made a case that it has undergone a change that affects its status as a PHA pursuant to the governing regulations. For these reasons, we disagree with the repeated characterization of the LTO as merely a contractor or service provider.

In addition, the unsupported payment of Administrative Fees to the LTO violates HUD's rules. We have determined that LTRAP's unsupported payment of the full amount of the administrative fees to the LTO violates HUD's financial management rules applicable to the Section 8 HCV program.

E.  No evidence of such Agreement found.

We could not find any evidence in the Agency Agreement to establish the Township's agreement to pay the full amount of the administrative fees to the

LTO, in exchange for its administration of LTRAP. Although the Cohn Letter makes reference to the Agency Agreement having been amended over the years, the Newark Field Office have not been provided with these agreements. Reference to a financial arrangement between the Township and the LTO is however noted in the Mayor's Letter. Specifically, the Mayor's Letter describes the agreement to be that LTRAP "would not draw on the Township's resources;" the LTO was required to be "economically self-sufficient." Nothing in the Agency Agreement or the Mayor's Letter suggests that the LTO should be allowed to charge a fee against program receipts that is not supported by allowable program expenses. Moreover, even if such a written agreement could be found, the regulations suggest that the Township could not agree to such an arrangement.

F. The LTO must comply with HUD requirements, including audit.

The governing regulations require that the PHA comply with HUD regulations and other HUD requirements for the program, in addition to the consolidated ACC and the PHA's HUD-approved applications for program funding. *See, 24 C.F.R. §982.52 and §982.153.* Such compliance requirements are similarly echoed in the terms of the ACC. *See, Paragraph 10 of the 1998 ACC.* Accordingly, as a PHA, both the Township and the LTO are required to comply with all applicable HUD regulations and requirements and the terms of the Consolidated ACCs and any and all HUD-approved application(s) pursuant to which the HCV program receives HUD funding.

LTO did not respond to HUD's requirements in notice PIH-2014-01, Guidance on Reporting Public Housing Agency Executive Compensation HUD-52725. The notice applies to all PHAs that administer a public housing or housing choice voucher program. This notice supersedes those parts of PIH-2011-48. The guidance in that notice pertaining to conducting comparability analysis remains in effect. The key changes include:

a. There are no reporting exemptions;
b. The submission date is not tied to the submission of the HUD-52723 form;
c. Data must be submitted for the top management official and top financial official;
d. The types of compensation that must be reported have changed;
e. Compensation data is required for no more than three employees, and
f. Source of funds must be reported for those employees with total cash compensation exceeding $155,500.

Please be advised that applicable HUD requirements include subjecting a PHA to its audit requirements. *See, 24 CFR 982.159(b).* Therefore, we find that the Township and the LTO are both subject to HUD's audit requirements. However, notwithstanding our determination that the LTO (together with the Township)constitutes a PHA in this matter, the Agency Agreement, by its own terms, makes it clear that the LTO agrees "to act as the designated agency of the

Township to administer said program pursuant to applicable Federal, State and local laws and regulation." Furthermore, the failure to administer the program in accordance with the laws, statutes, ordinance, rules and regulations and directives of HUD constitutes "reasonable cause" that can serve as a basis, under the Agency Agreement, for the Township to rescind its resolution designating the LTO as its agency to administer the Township's Section 8 program.

   G. HUD regulates the use of Administrative Fees.

     In accordance with the ACC, HUD agrees to make payments to the PHA, over a specified term, for housing assistance payments to owners and for the PHA administrative fee. *See, 24 C.F.R. §982.151(a)(1).* Generally, administrative fees are calculated based on the amount of rental assistance vouchers being administered by a PHA in a fiscal year. *See, HUD Notice PIH 2013-25.* They are paid to a PHA based on its projection regarding vouchers covered by

     tenant leases. *See, Section 20.6 of the Guidebook.* Administrative fees may only be used to cover costs incurred to perform the administrative responsibilities for the program in accordance with HUD regulations and requirements. *See, 24 C.F.R. §982.152, and Paragraph 4(b)(2) of the 1998 ACC.* Specifically, amounts paid by HUD to the PHA for a program and any other amounts received by the PHA in connection with the program (which are defined as "program receipts"), may only be used to pay program expenditures. *See, Paragraph 11(a) of the 1998 ACC.* The term "program expenditures" is defined to refer to those amounts which may be charged against program receipts in accordance with the Consolidated ACC and HUD requirements. *See, the 1998 ACC.*

   Recognizing that the administrative fees are calculated based on projections and not based on allowable expenses that may be incurred by a PHA, HUD rules require that any funds received in excess of allowable program expenditures be maintained in an Administrative Fee Reserve, returned to HUD or invested in accordance with HUD requirements. *See, 24 C.F.R. §982.155 and Paragraphs 11(d) and 12 of the 1998 ACC.* Although it is conceivable that the full amount of administrative fees may be used to pay for allowable program expenditures of LTRAP and therefore no Administrative Fee Reserve need to be maintained, HUD is not able to make that determination because neither the Township nor the LTO have produced evidence that the administrative fees are being charged against allowable program expenditures.

   Most importantly, any contention that the parties may contract to set the LTO's fee at the full amount of the administrative fees paid by HUD seems contrary to the purpose of the administrative fees and efforts by HUD to control such spending using taxpayer dollars. We emphasize this in light of recent reductions in appropriations. By way of example, we note that HUD has implemented a cap on the amount of executive compensation that can be paid from Section 8 funds. *See, HUD's Notice PIH 2012-14*

*2012-14 (HA).*  Therefore, we disagree with any contention that the administrative fees paid to the LTO are "de-federalized," or otherwise beyond the scrutiny of HUD.

Based on the discussion above, we have determined that (1) LTRAP is an operating unit of the LTO; (2) the Township and the LTO together constitute the PHA in this matter; (3) the unsupported payment of the entire amount of the program's administrative fees to the LTO violates HUD's rules regarding the use of administrative fees; (4) use of administrative fees are subject to HUD's review and approval; and (5) we find no claims that the use of these fees are not subject to HUD review nor audit.

If you should have any questions, please contact me at (973) 776-7210.

Sonia L. Burgos                                           4/14/14

Director
Office of Public Housing


Cc:     Debra Torres, Regional Administrator
        Shie-Fong sun, Associate Regional Counsel
        Wanda Nieves, Director, FHEO
        MaryAnn Creager, Supervisor Program Analyst, QAD



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, DC 20410-5000

OFFICE OF PUBLIC AND INDIAN HOUSING
Quality Assurance Division

June 19, 2014

Mr. Meir Hertz, CEO
Lakewood Township Residential Assistance Program
600 West Kennedy Boulevard
P.O. Box 856
Lakewood, NJ 08701

Dear Mr. Hertz:

In accordance with 24 CFR 982.158(a) through (d), and at the decision of The Department of Housing and Urban Development (HUD) Office of General Council, the HUD Office of Public and Indian Housing, Quality Assurance Division (QAD) has scheduled the Lakewood Township Residential Assistance Program (LTRAP), an operating unit of Lakewood Tenants Organization (LTO), together constituting the Public Housing Authority (PHA) for participation in a Financial Management Review. The primary purpose of the review will be to ensure that HCV administrative program funds have been expended and reported appropriately.

The review objectives include:

- Reconciliation of the Unrestricted Net Position (UNP) balance ending with the most current closed accounting month, anticipated to be June 2014.
- Analysis of Administrative Expenses charged to the HCV program for the PHAs fiscal year 2010 through June 2014.
- Confirm the availability of cash and/or investments sufficient to support the validated UNP balance as of June 2014.
- The QAD also reserves the right to examine additional documentation and financial records deemed necessary during the course of our review.

The scope of the Financial Management review for the UNP and analysis of administrative expenses will begin with the PHA's fiscal year 2010 through the most current closed accounting month, which is anticipated to be June 2014. The review will be conducted onsite by viewing the PHA financial and program utilization source documents for the *detailed* Administrative Expenses (AE).

The review has been scheduled to begin **Tuesday, July 8, 2014** with an entrance conference beginning at **9:00 A.M.** We would appreciate all appropriate staff members being available at this time. The QAD review team will include:

> John Phillips, Director, Quality Assurance Division
> Ms. MaryAnn Creager, Supervisory Program Analyst
> Mr. Jon McLaughlin, Senior Quality Assurance Specialist
> Mr. Joe Russell, Program Analyst

In addition to the QAD staff, we anticipate the attendance of at least one Newark Field Office staff for all or a portion of the review.

2

In order to quickly and efficiently complete the review please ensure all source documents supporting your UNP balances, and current administrative expenses for the period under review are available to the QAD staff upon their arrival, with the exception of those highlighted on the next page that are necessary in advance of our arrival. If you have any questions, please contact me at 614.469.5737 ext. 8228 or via e-mail at: joseph.r.russell@hud.gov.

An email notification to you regarding this planned review was sent on June 18, 2014 for which we have had no response.   We will appreciate acknowledgement of this introduction letter no later than close of normal business on June 24, 2014.

Sincerely,

Joseph R. Russell
Program Analyst, Quality Assurance Division

cc:  Milan Ozdinec, Deputy Assistance Secretary, Office of Public Housing and Voucher Programs
Michael Dennis, Director, Office of Housing Choice Voucher Program
John Phillips, Director, Quality Assurance Division – Office of Housing Choice Voucher Program
Sonia Burgos, Director, Newark Hub Office of Public & Indian Housing
Robert Boepple, Deputy Director, Financial Management Center
MaryAnn Creager, Supervisory Program Analyst, Quality Assurance Division
Honorable Menashe Miller, Mayor, Lakewood Township New Jersey

Attachment

3

Attachment:

**Supporting Documents Required for Financial Management Review will be required for LTRAP and LTO which together constitute the Public Housing Authority:**

Please have all relevant HCV program financial documentation available to the QAD Staff upon their arrival at the Agency and/or provide information via email in advance of onsite review where noted below.

Documents must cover the entire identified review period except where noted and must include all detail information for Administrative Expenses for the HCV program.   Documentation should include:

1. PHA monthly final trial balances from the PHA FY2010 through June 2014.  We understand the month of June may not be closed as of the date of this letter.  (Please email these as soon as they have been gathered).

2. PHA monthly closed general ledgers for the same periods as noted in paragraph No. 1 above.

3. Bank statements and ALL investment records (HCV Program only) for the latest closed accounting month reviewed, anticipated to be June 2014. Please also provide bank reconciliations.

4.  Negotiated General Depository Agreement for all financial accounts that hold HCV funds.

5. Additional financial records: General ledger detail, subsidiary ledgers, income statements, check registers, balance sheets, additional bank statements, etc., that the PHA may have used to record administrative transactions may be required if the trial balances do not provide sufficient information to allow the reviewers to conduct a speedy and effective review. Please have this additional documentation available upon our request if needed. Final trial balances and general ledgers required are those that contain ALL financial information related to the HCV Program.

6. All supporting documentation for any prior period adjustments or inter-program transfers that may have occurred in the past (including Due From/Due To).

7. Available IPA audit reports for the PHA's FYE 2010 through the most current audit.

8. All supporting documents that show the tracking and recording of Port-in HAP expenses, Port-in reimbursements and administrative fees earned on port-in vouchers, if not recorded separately in the trial balances and general ledgers.

9.  QAD reserves the right to re-visit the Restricted Net Position (RNP), formerly Net Restricted Assets (NRA) accounts if issues are uncovered during the course of this review that may warrant changes to the previous QAD review findings noted during our September 2013 review.

Space accommodations will be needed for the Quality Assurance and Field Office staff while on-site.  If possible, we would appreciate access to a telephone with conference calling capabilities.

Please contact the QAD staff immediately if you have any questions regarding the documentation requested.

**LAKEWOOD TOWNSHIP**
RESIDENTIAL ASSISTANCE PROGRAM

600 West Kennedy Boulevard • P.O. Box 856 • Lakewood, N.J. 08701
732.367.0660 • F: 732.367.6645 • www.ltrap.org • E: info@ltrap.org

*Keeping the Promise of Affordable Housing for over Four Decades*

MEIR N. HERTZ, CEO
HENYA RICHTER, CFO



June 20, 2014

Mr. Joseph R. Russell
Program Analyst
Department of Housing & Urban Development
PIH-Quality Assurance Division
200 N. High Street, Suite 717
Columbus, Oh 43215

Dear Mr. Russell:

This letter is written in response to your email dated June 18, 2014 in which you request to schedule a Financial Management Review (FMR) of LTRAP's Unrestricted Net Position (UNP).

By letter dated June 11, 2014, a copy of which was sent to Ms. MaryAnn Creager , this agency responded to Ms. Sonia Burgos' letter received by this agency on April 22, 2014, which may potentially impact this issue. This agency is still awaiting a response from the field office, inasmuch as this entire question has been dealt with, cleared and closed in its entirety.

Sincerely,

LAKEWOOD TOWNSHIP
RESIDENTIAL ASSISTANCE PROGRAM

Meir N. Hertz
CEO

Opt-Out: Not Defined

 GREENBERG DAUBER EPSTEIN & TUCKER | COUNSELLORS AT LAW

A PROFESSIONAL CORPORATION

EDWARD J. DAUBER

June 25, 2014

*Via email at MaryAnn.Creager@hud.gov*

Ms. MaryAnn Creager
Department of Housing & Urban Development
Supervisory Program Analyst
OHVP, Quality Assurance Division, Team 1
Columbus Center
Columbus, OH 43215

Re:   Lakewood Tenants Organization

Dear Ms. Creager:

This Firm represents the Lakewood Tenants Organization ("LTO"). We are in receipt of the recent communications exchanged between LTO and HUD, including your June 23, 2014 email to Meir Hertz and Joseph Russell's June 19, 2014 letter to Meir Hertz. Both communications concern a Financial Management Review that your office has unilaterally scheduled for July 8 through July 10. We have also been provided a copy of Sonia Burgos' undated letter, received by LTO on April 22, 2014, and Meir Hertz's June 11, 2014 letter responding to Ms. Burgos to which, we understand, HUD has not responded.

In the recent communications, you have dismissed LTO's questions and concerns and demanded access to LTO's books and records, as distinguished from the records of the Lakewood Township Residential Assistance Program ("LTRAP") which HUD has consistently been provided. The basis for this newly asserted position appears to be a decision from the HUD Office of General Counsel. Given that LTO has not been provided a copy of that decision, we cannot comment upon it.

Nonetheless, it appears that HUD is now revisiting an issue that it has raised many times over the years, with each time HUD approving LTO's actions involving LTRAP. More specifically, from in or about 1977, LTO has worked to make LTRAP one of the premier public housing agencies ("PHA") in the country. Indeed, LTO frequently receives HUD's highest performance ratings for its management of this PHA, receiving a perfect 100% SEMAP score in each of the past three years. For over 37 years, HUD understood, recognized and acquiesced that LTRAP is the program created by Lakewood and constitutes the PHA for the Township's Section 8 program and that LTO is the fee for service, third party administrator of LTRAP. Indeed, beginning, in August 1977, Clarence Humphrey, the Director of Housing Programs Management Branch, differentiated between LTRAP, the program created by Lakewood Township, and LTO, the administrator of the program.

Suite 600, One Gateway Center, Newark, New Jersey 07102 | Tel: 973.643.3700 | Fax: 973.643.1218
Email: edauber@greenbergdauber.com | Web: www.greenbergdauber.com

Opt-Out: Not Defined

Ms. MaryAnn Creager
June 25, 2014
Page 2

Similarly, HUD has understood, recognized and acquiesced that LTRAP, as the PHA, paid LTO the entire administrative fee that it received to manage the PHA. As a result, LTRAP did not create or maintain any administrative fee reserve fund because it had no excess administrative fee to deposit into that fund.

Periodically over the years, HUD has raised questions concerning the administrative fee reserve fund and each time HUD approved LTO's and LTRAP's actions with respect to that fund. Indeed, for example, HUD raised this very issue during a 2000 management review. On December 29, 2000, LTRAP responded to this concern by, among other things, quoting from its auditor's opinion that LTRAP did not need an administrative fee reserve because the entire administrative fee was paid to LTO, so there was nothing for deposit into that reserve account.

On January 26, 2001, Mr. Valenti, the Director of the HUD-Newark Office of Public Housing, responded to LTRAP's explanations and closed HUD's "concern" pertaining to the absence of an administrative fee reserve. Specifically, he explained that upon "further review, based on the current contract that LTO has with Lakewood Township, the Lakewood Tenants Organization is entitled to all Administrative Fees and therefore an Administrative Fee would not accrue." Ultimately, by May 1, 2001 letter, Mr. Valenti cleared the review in its entirety.

In fact, more recently in August 2011, Patricia Young, Financial Analyst at the HUD Financial Management Center, reached out to LTRAP and explained that she was familiar with LTRAP's payment of its entire administrative fee to LTO and also that, as a result, LTRAP did not maintain a UNA account. Ms. Young did not question or criticize the relationship or the payment of the entire administrative fee, but simply asked LTRAP to enter a zero in a computer entry for UNA, and then in the "Expense/Comments" tab, to make a notation "about the contract with LTO and that you don't have a UNA."

In short, for the past 37 years, HUD approved both the payment by LTRAP, as the PHA, of the entire administrative fee to LTO for it to manage the PHA and that LTRAP did not need to create or maintain a UNA. HUD did not seek to audit LTO or to regulate or approve of what LTO did with the monies that it earned and received from Lakewood to manage LTRAP.

In your June 23, 2014 email, you insist on reviewing LTO's books and records and assert that this issue has been resolved because of an internal decision that we have not seen. That purported resolution, however, ignores and is contrary to 37 years of interactions between the parties, not to mention 37 years of HUD taking a contrary position. The basis for HUD's reversal of its prior position is unclear and not explained. More importantly, we question both whether HUD may suddenly change its position and whether it may attempt to do so retroactively and unilaterally. Given this, we request that you forward this letter to HUD's Office of General Counsel for an explanation and a response.

Ms. MaryAnn Creager
June 25, 2014
Page 3

Finally, while we disagree entirely with the direction HUD is taking on this matter, and without waiving our objections to both that direction and to the Department's demand for review of LTO's financial records, we trust that you can determine from LTO's filed Form 990s for the years 2010, 2011, 2012 and 2013 that LTO's total expenses of administering the LTRAP program for that four year period have exceeded the administrative fees received from the Township. Moreover, my client has just learned that the pro-rated administrative fee for the Housing Choice Voucher Program (HCVP) will be 64% of eligibility, reduced from 68.5% in 2013, a pro-rata level that already resulted in an operating loss of $186,000 for LTO in 2013 alone, and will surely eliminate any net revenues in 2014.

In the meantime, given HUD's long-standing approval of the contractual relationship between the Township and LTO, the curious, unexplained change in HUD's position and the fact that LTO has incurred expenses in excess of administrative fees paid in the years of your proposed inquiry, my client is not prepared to participate in the proposed on-site review process you propose until we have received the requested explanation and response from the Office of General Counsel.

Very truly yours,

Edward J. Dauber

EJD/lac
cc:  Milan Ozdinec, *via e-mail*
     Michael Dennis, *via e-mail*
     John Phillips, *via e-mail*
     Sonia Burgos, *via e-mail*
     Joseph R. Russell, *via e-mail*
     Robert Boepple, *via e-mail*
     Shie-Fong Sun, Esq., *via e-mail*
     Honorable Mensashe Miller, *via e-mail*
     Meir Hertz, *via e-mail*



U.S. Department of Housing and Urban Development
New York State Office
Jacob K. Javits Federal Building
26 Federal Plaza
New York, New York 10278-0068
http://www.hud.gov/local/nyn/nynopen.html

December 5, 2014

Edward J. Dauber, Esq.
Greenberg Dauber Epstein & Tucker PC
One Gateway Center, Suite 600
Newark, New Jersey 07102

  Re: <u>Lakewood Tenants Organization</u>

Dear Mr. Dauber:

  This responds to your June 25, 2014, letter requesting an explanation as to the legal basis for an on-site review of Lakewood Tenants Organization, Inc. ("LTO") by HUD's Quality Assurance Division ("QAD"). You claim that Lakewood Township created Lakewood Township Residential Assistance Program ("LTRAP") to serve as the PHA for the Township's Section 8 program and that LTO is "the fee for service, third party administrator of LTRAP." HUD has long "understood, recognized and acquiesced" in this arrangement, part of which is that LTRAP pays over its entire Section 8 administrative fee to LTO to manage LTRAP, as the PHA. Since all of a reserve, which may only be used for limited purposes. Your position is that administrative fee is paid over to LTO, no administrative fee reserve fund was created by LTRAP because it had no excess income to credit to a reserve. You also claim that LTO's Form 990s demonstrate that LTO's total expenses of administering the LTRAP program exceeded the paid administrative fees. Thus, a financial review is not necessary.

  This is sheer sophistry.

  Under the regulatory scheme and the Annual Contributions Contract (ACC), administrative fees may only be used for certain purposes and any excess funds must be deposited into a reserve, which may only be used for limited purposes. Your position is that once LTRAP pays LTO all of the administrative fees, there is nothing left to audit or review. If this were true, HUD could not ensure that administrative fees were properly expended in accordance with the regulations.

  The fact of the matter is that LTRAP is simply a program office of LTO and the name that LTO takes when it administers Lakewood's Section 8 program. Both have the same employees, address, and have shared the same counsel. LTO's IRS filings indicate that it is the organization that has been receiving and administering federal funds provided by HUD for Lakewood's Section 8 program. Accordingly, HUD's QAD has the authority to review LTO's records pursuant to 24 C.F.R. § 982.158.

2

### The regulatory scheme.

The Housing Choice Voucher Program regulations provide that the PHA must maintain complete and accurate accounts and other records for the program in accordance with HUD requirements, in a manner that permits speedy and effective audit. 24 C.F.R. § 982.158(a); ACC ¶ 14(a). The PHA must furnish to HUD accounts and other records, reports, documents and information, as required by HUD. 24 C.F.R. § 982.158(b); ACC ¶ 14(b). HUD and the Comptroller General of the United States shall have full and free access to all PHA offices and facilities, and to all accounts and other records of the PHA that are pertinent to administration of the program, including the right to examine or audit the records and to make copies. ACC ¶ 14(c) The PHA must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and shall provide any information or assistance needed to access the records. 24 C.F.R. § 982.158(c).

HUD may approve administrative fees to the PHA for certain purposes, including ongoing administrative fees, certain extraordinary costs, and costs to assist families. 24 C.F.R. § 982.152(a)(1). Administrative fees may only be used to cover costs incurred to perform PHA responsibilities for the program in accordance with HUD regulations and requirements. 24 C.F.R § 982.152(a)(3).

The PHA must maintain an administrative fee reserve for the program. 24 C.F.R. § 982.155(a); ACC ¶ 12. The PHA must credit to the reserve the total of: (1) the amount by which program administrative fees paid by HUD for a PHA fiscal year exceed the PHA program administrative expenses for the fiscal year; plus (2) interest earned on the reserve. 24 C.F.R. § 982.155(a)(2), ACC ¶ 12(a). The PHA must use funds in the reserve to pay program administrative expenses in excess of administrative fees paid by HUD for a PHA fiscal year. Since 2004, any administrative fees that are subsequently moved into the Unrestricted Net Assets[1] account (formerly known as the administrative fee reserve) at the PHA's fiscal year (FY) end must only be used for activities related to the provision of tenant-based rental assistance authorized under Section 8, including related development activities. See HUD Notice PIH 2014-05. If the PHA has not adequately administered the program, HUD may prohibit use of funds in the reserve, and may direct the PHA to use funds in the reserve to improve administration of the program or to reimburse ineligible expenses. 24 C.F.R. § 982.155(b)(3); ACC ¶ 12(c).

Unless otherwise required or permitted by HUD, all program receipts[2] must be promptly deposited with a financial institution selected as depositary by the PHA in accordance with HUD

---

[1]   Under the Governmental Accounting Standards Board (GASB) updated terminology in accordance with GASB Statement No. 63 regarding equity, Unrestricted Net Assests is reffered to as Unrestricted Net Position.

[2]   "Program receipts" means HUD payments to the PHA under the consolidated ACC, and any other amounts received by the PHA in connection with the program. 24 C.F.R. § 982.4 (Definitions).

3

requirements. 24 C.F.R. § 982.156(a); ACC ¶ 13(a). The PHA may only withdraw deposited program receipts for use in connection with the program in accordance with HUD requirements. 24 C.F.R. § 982.156(b); ACC ¶ 13(c).

LTRAP is a program office of LTO and the name that LTO takes when it is administering rental assistance programs on behalf of Lakewood Township.

Shortly after its founding, LTO contracted with Lakewood Township to administer Section 8 Rental Assistance Programs. *See Employment Agreement between Meir N. Hertz and Lakewood Tenants Organization, Inc.* (Dec. 28, 1995) (hereinafter "*Employment Contract*"); *Letter from Richard Michael Price, Counsel for LTO/LTRAP to Carmen Valenti, Director – Office of Public Housing* (Dec. 15, 2000) (hereinafter "*Price 12/15/00 Letter*"); *and Letter from Richard Michael Price, Counsel for LTO/LTRAP to Balu Thumar, Acting Director – Office of Public Housing* (Jan 2, 2014). These agreements between Lakewood Township and LTO were entered into because the Lakewood Housing Authority initially refused HUD's invitation to administer Section 8 programs, and Lakewood Township did not possess the administrative capacity to run the program itself. *See Letter from John Franklin, Lakewood Township Mayor to Theodore Britton, HUD Newark Field Office* (Apr. 24, 1990), (hereinafter "*Franklin 4/24/1990 Letter*"). According to a letter from then-Mayor John Franklin, LTO was thus brought in as a "contract administrative agency" to administer these Section 8 Housing programs, which are run under the name LTRAP. *See id.* Accordingly, LTRAP has no incorporation or organization of its own and is not a separate legal entity from LTO. Instead it is merely the name of the Section 8 program run by LTO as an agent of Lakewood Township. *See Agreement dated 6/1/77 between Lakewood Township and LTO.*[3]

Notably, this fact has been clearly expressed by LTO, as well as by LTO/LTRAP's own counsel. LTO Board of Trustees resolutions have explicitly stated that LTO administers LTRAP. *See LTO Board of Trustees Resolution 9512-03* ("Hertz is a key employee of the [LTO] in its administration of [LTRAP]"). LTO/LTRAP's counsel also affirmed this fact in a 2000 letter:

It seems that HUD believes that LTRAP is a separate entity from LTO. However . . . LTRAP is the name of the program that LTO operates, and, as such, LTRAP has no separate incorporation . . . [the Director of Public Housing] also questions that LTRAP receives HUD funds, but the funds were posted to LTO. Again,

---

[3] Your letter refers to LTRAP as the PHA. PHA is defined as "[a]ny State, county, municipality, or other governmental entity or public body which is authorized to administer the program (*or an agency or instrumentality of such an entity*). 24 C.F.R. § 982.4 (emphasis added). The agreement between LTO and Lakewood states that LTO is to "act as the designated agency of the Township of Lakewood to administer [the Section 8] program pursuant to applicable Federal, State and local laws and regulation [and] to account for all funds received pursuant to the aforesaid applicable laws[.]"

4

LTRAP is the name of the program that LTO operates and under which
LTO receives and disburses funds under the Section 8 program.

*Price 12/15/00 Letter* (emphasis added). Finally, the New Jersey Superior Court has taken a
similar view on the relationship and structure of LTO/LTRAP, describing it in the following
manner:

> Pursuant to an agreement dated August 27, 1982, between the Township of
> Lakewood and LTO, all programs theretofore administered by LTO were to be
> carried out thereafter under the name of LTRAP. LTO was immediately to
> commence use of such name when acting as the Township's designee with
> respect to rental assistance programs. All references hereafter to LTRAP or
> LTO shall be deemed interchangeable.

*Lakewood Residents Ass'n, Inc. v. Township of Lakewood*, 294 N.J. Super. 207, 212 fn. 2, 682
A.2d 1232 (Law Div.1994) (emphasis added) (affirmed by *Lakewood Residents Ass'n, Inc. v.
Lakewood Housing Authority*, 294 N.J. Super. 146, 149, 682 A.2d 1201 (App. Div. 1996).[4]

**LTO's tax filings indicate that notwithstanding any program names or formalities it
may use, it is the actual organization receiving funds from HUD for Lakewood's
Section 8 Program.**

Since LTRAP is merely the name that LTO takes on when it is acting as the agency of the
Township for the Section 8 program, it is clear that any funds provided to LTRAP are actually
received and used by LTO. *See Price 12/15/00 Letter*. However, this fact is also clearly
evidenced by LTO's IRS filings. Part VIII of LTO's IRS Form 990 indicates that LTO's source
of income is: Line (1E) Government Grants. This is in contrast to LTO's claims that it derives
its income from management fees. This arrangement is further illustrated by the fact that LTO's
filings indicate that it receives 92% of its funding from a governmental unit. *See LTO IRS Form
990 – Schedule A Reason for Public Charity Status*. Finally, on LTO's IRS Form 990 Schedule
O, *LTO indicates that it has a Section 8 contract with HUD. See Id. Schedule O.*

QAD financial review demands.

Notwithstanding any representations that were made in the past, HUD has a right under
the ACC and the program regulations to full and free access to all PHA offices and facilities, and
to all accounts and other records of the PHA that are pertinent to administration of the program.
HUD does not have to establish cause for such a request. It does not matter who is in control of

---

[4] You cite to an August 1977 letter from Clarence Humphrey, Director of Housing Programs
Management Branch as evidence that HUD has changed its position over the years. You state
that the letter "differentiated between LTRAP, the program created by Lakewood Township, and
LTO[.]" (August 30, 1977) At no point does Mr. Humphrey mention LTRAP so he could not
have differentiated between it and LTO.

5

the information HUD seeks, it simply must be provided by the PHA, who has ultimate responsibility for the documentation.

After QAD attempted to schedule a full Financial Management Review of the program, Henya Richter, LTRAP's CFO, responded by email dated August 14, 2013, stating:

> [O]ur agency is unique as it does not have UNA. The Lakewood Tenants Organization, Inc., (LTO) is contracted to administer the Lakewood Township Residential Assistance Program, (LTRAP). Under this contract, LTO receives the full administrative fees earned. All expenses are then paid out of LTO's accounts and not LTRAP. ... The administrative fee is paid in full each month to LTO, so there is never any UNA. ... As a result, the only item you will be reviewing is the NRA balances.

Contracts between non-federal entities do not supersede the requirements under federal regulations or the ACC. And unsubstantiated representations of an organization we are seeking to review do not trump HUD's right to ensure the protection of the public fisc.

On September 4, 2013, QAD requested, via email, a copy of the executed contract between LTO and LTRAP and any invoices that relate to LTO billing the LTRAP for administration of the program. On September 9, 2013, QAD followed up reminding LTRAP that there would be an on-site entrance conference the following morning and that "copies of invoices specifically showing the charges for services rendered by LTO to LTRAP" should be made available.

After LTO/LTRAP's unwillingness to cooperate, by letter dated June 19, 2014, QAD once again scheduled an on-site Financial Management Review and explained the objective and scope of such review. Once again, by your letter dated June 25, 2014, LTO/LTRAP refused to participate in the review.

These demands remain open. LTO/LTRAP must allow HUD to conduct a full Financial Management Review as described in QAD's June 19, 2014 letter within 30 days of date of this letter. Should LTO/LTRAP fail to comply with this final demand it will be considered in default of its ACC and the applicable program regulations. If LTO/LTRAP goes into default of its ACC over this issue, HUD will consider transferring LTO/LTRAP's entire HCV program to another PHA. HUD may also take any other administrative or legal actions it deems appropriate.

For the reasons set forth above, LTO must allow the QAD to conduct its financial review. If you have any questions, or wish to discuss this matter, please call Louis Gioia, Attorney-Advisor, at 212-542-7211.

Sincerely,

John J. Cahill
Regional Counsel for
New York/New Jersey

6

cc: Hon. Menashe Miller, Mayor, Township of Lakewood, NJ

STATE OF NEW JERSEY
DEPARTMENT OF THE TREASURY
DIVISION OF REVENUE AND ENTERPRISE SERVICES

LAKEWOOD TENANTS ORGANIZATION, INC.
0100043825

*I, the Treasurer of the State of New Jersey, do hereby certify that the above-named New Jersey Non Profit Corporation was registered by this office on July 13, 1977.*

*As of the date of this certificate, said business continues as an active business in good standing in the State of New Jersey, and its Annual Reports are current.*

*I further certify that the registered agent and registered office are:*

Henya Richter
600 W. Kennedy Blvd

Lakewood, NJ 08701

*I further certify that as of the date of this certificate, the following amendments and changes are on file in this office:*

| | |
|---|---|
| Revoked For Failure To Pay Annual Reports | 02/16/2002 |
| Reinstated (Annual Reports) | 06/21/2002 |
| Revoked For Failure To Pay Annual Reports | 02/16/2005 |
| Change Of Agent And Office | 01/16/2014 |
| Reinstatement With Agent Change | 01/16/2014 |

IN TESTIMONY WHEREOF, I have
hereunto set my hand and affixed my
Official Seal at Trenton, this
16th day of January, 2014

Andrew P Sidamon-Eristoff
State Treasurer

Certification# 130847544
Verify this certificate at
https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp

Page 1 of 1

Opt-Out: Not Defined

*STATE OF NEW JERSEY*
*DEPARTMENT OF THE TREASURY*
*DIVISION OF REVENUE AND ENTERPRISE SERVICES*

*LAKEWOOD TENANTS ORGANIZATION, INC.*

*0100043825*

*I, the Treasurer of the State of New Jersey, do hereby certify that the above-named New Jersey Non Profit Corporation was registered by this office on July 13, 1977.*

*As of the date of this certificate, said business continues as an active business in good standing in the State of New Jersey, and its Annual Reports are current.*

*I further certify that the registered agent and registered office are:*

> *Henya Richter*
> *600 W. Kennedy Blvd*
>
> *Lakewood, NJ 08701*

*I further certify that the incorporator is:*

> *Xx*
> *Xx*
> *Xx*
> *Xx, NJ 99999*

*I further certify that as of the date of this certificate, the following were listed as officers/directors of this business on the last Annual Report filed in this office on: January 16, 2014.*

| | |
|---|---|
| *President* | |
| *Secretary* | *Solomon Moskowitz* |
| *Treasurer* | *Moshe Sofer* |
| *Vice President* | *Simcha Greenwald* |

Page 1 of 2

Opt-Out: Not Defined

### STATE OF NEW JERSEY
### DEPARTMENT OF THE TREASURY
### DIVISION OF REVENUE AND ENTERPRISE SERVICES

## LAKEWOOD TENANTS ORGANIZATION, INC.

### 0100043825

IN TESTIMONY WHEREOF, I have
hereunto set my hand and affixed my
Official Seal at Trenton, this
16th day of January, 2014

Andrew P Sidamon-Eristoff
Acting State Treasurer

Certification# 130847537
Verify this certificate at
https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp

Page 2 of 2

Opt-Out: Not Defined

# CERTIFICATE OF INCUMBENCY

I, Solomon Moskowitz, the undersigned Secretary of LAKEWOOD TENANTS ORGANIZATION, INC., a New Jersey non-profit corporation (the "Corporation"), do hereby certify that the following persons were designated and appointed as officers and to the Board of Trustees, and that said persons continue to be officers and board members at this time:

| Name | Title |
| --- | --- |
| Meir N. Hertz | President |
| Simcha Greenwald | Vice President |
| Moshe Sofer | Treasurer |
| Solomon Moskowitz | Secretary |
| Lazer Hasenfeld | Board Member |
| Chaim B Wolf | Board Member |
| Yaakov Herman | Board Member |

IN WITNESS WHEREOF, the undersigned has executed this instrument effective this February 12, 2014.

Witness:

LAKEWOOD TENANTS ORGANIZATION, INC.

Name: _ZEV MOSHE SOFER_

By: _____

Solomon Moskowitz, its Secretary

Opt-Out: Not Defined



U. S. Department of Housing and Urban Development

New Jersey State Office
Thirteenth Floor
One Newark Center
Newark, NJ 07102-5260

JUL 2 1 1998

Mr. Meir N. Hertz, PHM
Executive Director
Lakewood RAP
600 W. Kennedy Blvd.
P.O. Box 856
Lakewood, NJ  08701

Dear Mr. Hertz:

Subject:  Amendment to the Annual Contributions Contract
          Project No.  NJ214-VO-0015 (Renewal)
                       NJ214-VO-0016 (Renewal)

     Enclosed is an executed copy of the Amendment to your
Annual Contract.

     If you have any questions, please contact Sharon Smith of my
staff at (973) 622-7900 extension 3630.

                                   Sincerely,

                                   Carmen Valenti
                                   Director
                                   Office of Public Housing

Enclosure

Visit our Web Site at:  http://www.hud.gov/local/njn/njnhome.html

PHA

Opt-Out: Not Defined

**Consolidated
Annual Contributions Contract**

Rental Certificate and Rental Voucher Programs

U.S. Department of Housing and Urban Development
Office of Public and Indian Housing

Lakewood RAP
Section 8  NJ214VO 0015 (Renewal)
NJ214VO 0016 (Renewal)

**Table of Sections**

| | page |
|---|---|
| 1. | Definitions ...........................................1 |
| 2. | Funding for HA Certificate or Voucher Program ..........1 |
| 3. | Term...............................................2 |
| 4. | HUD Payments for Program.........................2 |
| 5. | Maximum Payments for Program.....................2 |
| 6. | Reduction of Amount Payable by HUD ...............2 |
| 7. | ACC Reserve Account ..............................2 |
| 8. | Separate ACC for Funding Increment ...............2 |
| 9. | Budget and Requisition for Payment ................2 |
| 10. | HUD Requirements................................2 |

| | page |
|---|---|
| 11. | Use of Program Receipts..........................2 |
| 12. | Administrative Fee Reserve .......................3 |
| 13. | Depository ......................................3 |
| 14. | Program Records .................................3 |
| 15. | Default by HA ...................................3 |
| 16. | Fidelity Bond Coverage ...........................3 |
| 17. | Exclusion from Program...........................3 |
| 18. | Exclusion of Third Party Rights ...................4 |
| 19. | Consolidated ACC ...............................4 |

**1. Definitions**

**ACC** Annual contributions contract.

**ACC Reserve Account** An account established by HUD for a program from amounts by which the maximum payment to the HA under the consolidated ACC (during a HA fiscal year) exceeds the amount actually approved and paid.¹ This account is used as the source of additional payments for the program.

**Annual Contributions Contract** The contract for each funding increment. HUD's commitment to make payments for each funding increment ("project") listed in the funding exhibit constitutes a separate ACC.

**Budget Authority** The maximum amount of funds available for payment to the HA over the term of a funding increment. Budget authority is authorized and appropriated by the Congress.

**Consolidated Annual Contributions Contract (consolidated ACC)** This consolidated contract for the HA certificate program and voucher program. HUD's commitment to make payments for each funding increment in a program constitutes a separate ACC. However, commitments for all the funding increments are listed in this consolidated ACC.

**Contract Authority** The maximum annual payment by HUD to the HA for a funding increment. The amount of contract authority for each funding increment in a program is listed in the funding exhibit for the program.

**Fiscal Year** The HA fiscal year. The funding exhibit states the last month and day of the HA fiscal year.

**Funding Exhibit** An exhibit to the consolidated ACC. The funding exhibit states the amount and term of funding for a program. There are separate funding exhibits for the HA certificate program and voucher program.

**Funding Exhibit A** The funding exhibit for the HA certificate program.

**Funding Exhibit B** The funding exhibit for the HA voucher program.

**Funding Increment** (also called a "Project"). Each commitment of budget authority by HUD to the HA for a program under the consolidated ACC. The funding increments for the program are listed on the program funding exhibit.

**HA** Housing agency.

**Housing Agency (HA)** The agency that has entered this consolidated ACC with HUD.

**HUD** U.S. Department of Housing and Urban Development.

**Program** The HA certificate program or voucher program.

**Program Expenditures** Amounts which may be charged against program receipts in accordance with the consolidated ACC and HUD requirements.

**Program Receipts** Amounts paid by HUD to the HA for a program, and any other amounts received by the HA in connection with the program.

**Project** Funding increment for the program.

**2. Funding for HA Certificate or Voucher Program**

a. The funding increments in the HA certificate program or voucher program are listed in the funding exhibit for the program.

b. The amount of contract and budget authority for each funding increment in a program is stated in the program funding exhibit.

c. By giving written notice to the HA, HUD may revise the funding exhibit for a program:
   (1) To add a funding increment, or
   (2) To remove a funding increment for which the ACC term has expired.

d. The HUD notice must include a revised funding exhibit, specifying the term, contract authority and budget authority under each funding increment under the consolidated ACC. The HUD notice of a revised funding exhibit for a program constitutes an amendment of the consolidated ACC.

page 1 of 4

Form HUD-52520 (12/97)

Opt-Out: Not Defined

3. **Term.**
   a. The funding exhibit states the first date and last date of the ACC term for each funding increment.
   b. If the first or last date of the ACC term for a funding increment is not entered before the consolidated ACC is signed by the HA, HUD may enter the date subsequently, by giving written notice to the HA.

4. **HUD Payments for Program.**
   a. HUD will make payments to the HA for a program in accordance with HUD regulations and requirements.
   b. For each HA fiscal year, HUD will pay the HA the amount approved by HUD to cover:
      (1) Housing assistance payments by the HA for a program.
      (2) HA fees for administration of the program.
   c. The amount of the HUD payment may be reduced, as determined by HUD, by the amount of program receipts (such as interest income) other than the HUD payment.

5. **Maximum Payments for Program**
   a. Annual Limit   Except for payments from the consolidated ACC reserve account, the HUD annual payments for a program during a fiscal year must not be more than the sum of the contract authority amounts for the funding increments in the program.
   b. Limit on Payments for Funding Increment   The total amount of payments for any funding increment over the increment term must not exceed budget authority for the funding increment.

6. **Reduction of Amount Payable by HUD**
   a. If HUD determines that the HA has failed to comply with any obligations under the consolidated ACC, HUD may reduce to an amount determined by HUD:
      (1) The amount of the HUD payment for any funding increment.
      (2) The contract authority or budget authority for any funding increment.
   b. HUD must give the HA written notice of the reduction.
   c. The HUD notice must include a revised funding exhibit specifying the term, contract authority, and budget authority for each funding increment under the consolidated ACC. The HUD notice of revisions to the funding exhibit for a program constitutes an amendment of the consolidated ACC.

7. **ACC Reserve Account**
   An ACC reserve account may be established and maintained by HUD. The amount in the account is determined by HUD. The ACC reserve account may be used by HUD to pay any portion of the program payment approved by HUD for a fiscal year.

8. **Separate ACC for Funding Increment**
   HUD's commitment to make payments for each funding increment ("project"), listed in the funding exhibit constitutes a separate ACC.

Opt-Out: Not Defined

9. **Budget and Requisition for Payment**

a. Each fiscal year, the HA must submit to HUD an estimate of the HUD payments for the program. The estimate and supporting data must be submitted at such time and in such form as HUD may require, and are subject to HUD approval and revision.

b. The HA must requisition periodic payments on account of each annual HUD payment. Each requisition must be in the form prescribed by HUD. Each requisition must include certification that:

   (1) Housing assistance payments have been made in accordance with contracts in the form prescribed by HUD and in accordance with HUD requirements; and

   (2) Units have been inspected by the HA in accordance with HUD requirements.

c. If HUD determines that payments by HUD to the HA for a fiscal year exceed the amount of the annual payment approved by HUD for the fiscal year, the excess must be applied as determined by HUD. Such applications, determined by HUD may include, but are not limited to, application of the excess payment against the amount of the annual payment for a subsequent fiscal year. The HA must take any actions required by HUD respecting the excess payment, and must, upon demand by HUD, promptly remit the excess payment to HUD.

10. **HUD Requirements**

a. The HA must comply, and must require owners to comply, with the requirements of the U.S. Housing Act of 1937 and all HUD regulations and other requirements, including any amendments or changes in the law or HUD requirements.

b. The HA must comply with its HUD-approved administrative plan, and HUD-approved program funding applications.

c. The HA must use the program forms required by HUD.

d. The HA must proceed expeditiously with the program under this consolidated ACC.

11. **Use of Program Receipts**

a. The HA must use program receipts to provide decent, safe, and sanitary housing for eligible families, in compliance with the U.S. Housing Act of 1937 and all HUD requirements. Program receipts may only be used to pay program expenditures.

b. The HA must not make any program expenditures, except in accordance with the HUD-approved budget estimate and supporting data for a program.

c. Interest on the investment of program receipts constitute program receipts.

d. If required by HUD, program receipts in excess of current needs must be promptly remitted to HUD or must be invested in accordance with HUD requirements.

12. **Administrative Fee Reserve**

a. The HA must maintain an administrative fee reserve for a program. The HA must credit to the administrative fee reserve the total of:

   (1) The amount by which program administrative fees paid by HUD for a fiscal year exceed HA administrative expenses for the fiscal year, plus

   (2) Interest earned on the administrative fee reserve.

b. The HA must use funds in the administrative fee reserve to pay administrative expenses in excess of program receipts. If any funds remain in the administrative fee reserve, the HA may use the administrative reserve funds for other housing purposes if permitted by State and local law.

c. If the HA is not adequately administering any Section 8 program in accordance with HUD requirements, HUD may:

   (1) Direct the HA to use the funds to improve administration of the Section 8 program or for reimbursement of ineligible expenses.

   (2) Prohibit HA use of administrative fee reserve funds.

13. **Depositary**

a. Unless otherwise required or permitted by HUD, all program receipts must be promptly deposited with a financial institution selected as depositary by the HA in accordance with HUD requirements.

b. The HA must enter an agreement with the depositary institution in the form required by HUD.

c. The HA may only withdraw deposited program receipts for use in connection with the program in accordance with HUD requirements.

d. The agreement with the depositary institution must provide that if required under a written notice from HUD to the depositary:

   (1) The depositary must not permit any withdrawal of deposited funds by the HA unless withdrawals by the HA are expressly authorized by written notice from HUD to the depositary.

   (2) The depositary must permit withdrawals of deposited funds by HUD.

e. If approved by HUD, the HA may deposit under the depositary agreement monies received or held by the HA in connection with any contract between the HA and HUD.

14. **Program Records**

a. The HA must maintain complete and accurate books of account and records for a program. The books and records must be in accordance with HUD requirements, and must permit a speedy and effective audit.

b. The HA must furnish HUD such financial and program reports, records, statements, and documents at such times, in such form, and accompanied by such supporting data as required by HUD.

Opt-Out: Not Defined

c. HUD and the Comptroller General of the United States, or their duly authorized representatives, must have full and free access to all HA offices and facilities, and to all the books, documents, and records of the HA relevant to administration of the program, including the right to audit and to make copies.

d. The HA must engage and pay an independent public accountant to conduct audits that are required by HUD. The cost of audits required by HUD may be charged against program receipts.

15. **Default by HA.**

    a. Upon written notice to the HA, HUD may take possession of all of any HA property, rights or interests in connection with a program, including funds held by a depositary, program receipts, and rights or interests under a contract for housing assistance payments with an owner, if HUD determines that:

       (1) The HA has failed to comply with any obligations under this consolidated ACC; or

       (2) The HA has failed to comply with obligations under a contract for housing assistance payments with an owner; or

       (3) The HA has failed to take appropriate action, to HUD's satisfaction or as directed by HUD, for enforcement of the HA's rights under a contract for housing assistance payments (including requiring action by the owner to cure a default, termination, or reduction of housing assistance payments, termination of the contract for housing assistance payments, or recovery of overpayments); or

       (4) The HA has made any misrepresentation to HUD of any material fact.

    b. HUD's exercise or non-exercise of any right or remedy under the consolidated ACC is not a waiver of HUD's right to exercise that or any other right or remedy at any time.

16. **Fidelity Bond Coverage**

The HA must carry adequate fidelity bond coverage, as required by HUD, of its officers, agents, or employees handling cash or authorized to sign checks or certify vouchers.

17. **Exclusion from Program**

Single-headed households, pregnant females, and recipients of public assistance may not be excluded from participation in or be denied the benefit of a program because of such status.

Opt-Out: Not Defined

18. **Exclusion of Third Party Rights**
   a. A family that is eligible for housing assistance under this consolidated ACC is not a party to or third party beneficiary of the consolidated ACC.
   b. Nothing in the consolidated ACC shall be construed as creating any right of any third party to enforce any provision of this consolidated ACC, or to assert any claim against HUD or the HA.

19. **Consolidated ACC**
   a. The consolidated ACC is a contract between HUD and the HA.
   b. This consolidated ACC supersedes any previous annual contributions contract for a program. Matters relating to funding or operation of the program under a previous annual contributions contract are governed by this consolidated ACC.

---

**United States of America**   Secretary of Housing and Urban Development
Signature of Authorized Representative:                               Date signed:

X _____

Name & Official Title: (print or type)

---

**Housing Agency**   Name of Agency: (print or type)

Signature of Authorized Representative:                               Date signed:

X _____

Name & Official Title: (print or type)

---

page 5 of 4                                              Form HUD-52520 (12/97)

Opt-Out: Not Defined

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
PIH SECTION 8 - FUNDING EXHIBIT
PROGRAM-BASED

ACC NUMBER: NJ214VO

FIELD OFFICE: 2FPK
OFFICE OF PUBLIC HOUSING

HA NUMBER: NJ214
LAKEWOOD TOWNSHIP
231 THIRD ST

LAKEWOOD          , NJ  087010000

HA FISCAL YEAR-END: 12/31

PROGRAM TYPE: VOUCHER PROGRAM

| PI NUMBER CH. | FIRST DATE OF TERM | LAST DATE OF TERM | CONTRACT TERM | CONTRACT AUTHORITY | BUDGET AUTHORITY |
|---|---|---|---|---|---|
| NJ214V00008 | 10/01/93 | 09/30/98 | 60 | 251,449 | 691,851 |
| NJ214V00009 | 06/01/94 | 08/31/98 | 40 | 0 | 616,472 |
| NJ214V00010 | 07/01/94 | 08/31/98 | 48 | 566,838 | 1,074,140 |
| NJ214V00011 | 09/01/94 | 08/31/99 | 60 | 134,934 | 674,691 |
| NJ214V00012 | 04/01/97 | 03/31/98 | 12 | 0 | 1,230,600 |
| NJ214V00013 | 04/01/98 | 03/31/99 | 12 | 1,109,890 | 1,109,890 |
| NJ214V00014 | 06/01/98 | 05/31/99 | 12 | 137,660 | 137,600 |
| NJ214V00015 | 10/01/98 | 09/30/99 | 12 | 244,384 | 244,384 |
| NJ214V0001K | 09/01/98 | 08/31/99 | 12 | 236,200 | 236,200 |
| NJ214VD6001 | 01/01/98 | 12/31/98 | 12 | 3,994 | 3,994 |
| NJ214V08001 | 05/01/98 | 04/30/99 | 12 | 74,502 | 74,502 |

Opt-Out: Not Defined



U. S. Department of Housing and Urban Development
New Jersey State Office
Thirteenth Floor
One Newark Center
Newark, NJ 07102-5260

SEP 20 1995

Mr. Mair N. Marto, Sr.
Executive Director
LAKEWOOD PHA
P.O. Box 37
419 First St.
Lakewood, NJ 08701-0971

Dear Mr. Marto:

Subject:   Amendment to the Annual Contributions
           Amendment No. 25
           Project No:   NJ-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 (RENEWAL)
                         IU-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 (RENEWAL)

     Enclosed you will find documents necessary to effectuate an
Amendment to the Annual Contributions Contract (ACC) for the above
referenced project.

     Please return two (2) substituted copies to this ACC at your
earliest convenience. You should submit a budget revision
incorporating all projections on the Funding Exhibit. A fully executed
copy will be returned to you at a later date.

     If you have any questions, please contact the Financial Analyst
assigned to your PHA.

                                        Sincerely,

                                        Horace N. Claggon
                                        Horace N. Claggon
                                        Director
                                        Finance and Budget Division
                                        Office of Public Housing

Enclosure

PHA

# Consolidated Annual Contributions Contract
## Rental Certificate Program and Rental Voucher Program

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

Section 8

*Lakewood RAP.*
*NJ214 CE 0020 (Renew.*
*★ NJ214 CE 0021 (Renewal*
*OF ★ MOD REHAB NJ39K2 Project*

## Table of Sections

| | page | | page |
|---|---|---|---|
| 1. Definitions | 1 | 12. Administrative Fee Reserve | 3 |
| 2. Funding for HA Certificate or Voucher Program | | 13. Depositary | 3 |
| 3. Term | 2 | 14. Program Records | 3 |
| 4. HUD Payments for Program | 2 | 15. Default by HA | 3 |
| 5. Maximum Payments for Program | 2 | 16. Fidelity Bond Coverage | 4 |
| 6. Reduction of Amount Payable by HUD | 2 | 17. Exclusion from Program | 4 |
| 7. ACC Reserve Account | 2 | 18. Conflict of Interest Provisions | 4 |
| 8. Separate ACC for Funding Increment | 2 | 19. Interest of Member of or Delegate to Congress | 4 |
| 9. Budget and Requisition for Payment | 2 | 20. Exclusion of Third Party Rights | 4 |
| 10. Depositary | 3 | 21. Consolidated ACC | 4 |
| 11. Use of Program Receipts | 3 | | |

## 1. Definitions

**ACC.** Annual contributions contract.

**ACC Reserve Account.** An account established by HUD for a program from amounts by which the maximum payment to the HA under the consolidated ACC (during a HA fiscal year) exceeds the amount actually approved and paid. This account is used as the source of additional payments for the program.

**Annual Contributions Contract.** The contract for each funding increment. HUD's commitment to make payments for each funding increment ("project") listed in the funding exhibit constitutes a separate ACC.

**Budget Authority.** The maximum amount of funds available for payment to the HA over the term of a funding increment. Budget authority is authorized and appropriated by the Congress.

**Consolidated Annual Contributions Contract (consolidated ACC).** This consolidated contract for the HA certificate program and voucher program. HUD's commitment to make payments for each funding increment in a program constitutes a separate ACC. However, commitments for all the funding increments are listed in this consolidated ACC.

**Contract Authority.** The maximum annual payment by HUD to the HA for a funding increment. The amount of contract authority for each funding increment in a program is listed in the funding exhibit for the program.

**Fiscal Year.** The HA fiscal year. The funding exhibit states the last month and day of the HA fiscal year.

**Funding Exhibit.** An exhibit to the consolidated ACC. The funding exhibit states the amount and term of funding for a program. There are separate funding exhibits for the HA certificate program and voucher program.

**Funding Exhibit A.** The funding exhibit for the HA certificate program.

**Funding Exhibit B.** The funding exhibit for the HA voucher program.

**Funding Increment (also called a "Project").** Each commitment of budget authority by HUD to the HA for a program under the consolidated ACC. The funding increments for the program are listed on the program funding exhibit.

**HA.** Housing agency.

**Housing Agency (HA).** The agency that has entered this consolidated ACC with HUD.

**HUD.** U.S. Department of Housing and Urban Development.

**Program.** The HA certificate program or voucher program.

**Program Expenditures.** Amounts which may be charged against program receipts in accordance with the consolidated ACC and HUD requirements.

**Program Receipts.** Amounts paid by HUD to the HA for a program, and any other amounts received by the HA in connection with the program.

**Project.** A funding increment for the program.

form HUD-52520 (6/93)

Opt-Out: Not Defined

2  **Funding for HA Certificate or Voucher Program**

(a)  The funding increments in the HA certificate program or voucher program are listed in the funding exhibit for the program.

(b)  The amount of contract and budget authority for each funding increment in a program is stated in the program funding exhibit.

(c)  By giving written notice to the HA, HUD may revise a funding exhibit:
(1)  To add a cost amendment project.
(2)  To remove a project for which the ACC term has expired.

3.  **Term**

(a)  The funding exhibit states the first date and last date of the ACC term for each funding increment.

(b)  If the first or last date of the ACC term for a funding increment is not entered before the consolidated ACC is signed by the HA, HUD may enter the date subsequently, by giving written notice to the HA

4.  **HUD Payments for Program**

(a)  HUD will make payments to the HA for a program in accordance with HUD regulations and requirements.

(b)  For each HA fiscal year, HUD will pay the HA the amount approved by HUD to cover:
(1)  Housing assistance payments by the HA for a program.
(2)  HA fees for administration of the program.

(c)  The amount of the HUD payment may be reduced, as determined by HUD, by the amount of program receipts (such as interest income) other than the HUD payment.

5.  **Maximum Payments for Program**

(a)  Annual Limit   Except for payments from the consolidated ACC reserve account, the HUD annual payments for a program during a fiscal year must not be more than the sum of the contract authority amounts for the funding increments in the program.

(b)  Limit on Payments for Funding Increment   The total amount of payments for any funding increment over the increment term must not exceed budget authority for the funding increment.

6.  **Reduction of Amount Payable by HUD**

(a)  If HUD determines that the HA has failed to comply with any obligations under the consolidated ACC, HUD may

reduce to an amount determined by HUD:
The amount of the HUD payment for any funding
(1)  increment.
The contract authority or budget authority for any
(2)  funding increment.

(b)  HUD must give HA written notice of the reduction.

(c)  The HUD notice may include a revised funding exhibit to state the reduction in the amount of contract authority or budget authority for a funding increment. The notice of a revised funding exhibit, or of revisions to the funding exhibit for a program constitutes an amendment of the consolidated ACC.

7.  **ACC Reserve Account**

An ACC reserve account may be established and maintained by HUD. The amount in the account is determined by HUD. The ACC reserve account may be used by HUD to pay any portion of the program payment approved by HUD for a fiscal year.

8.  **Separate ACC for Funding Increment**

HUD's commitment to make payments for each funding increment ("project") listed in the funding exhibit constitutes a separate ACC.

9.  **Budget and Requisition for Payment**

(a)  Each fiscal year, the HA must submit to HUD and estimate of the HUD payments for the program. The estimate and supporting data must be submitted at such time and in such form as HUD may require, and are subject to HUD approval and revision.

(b)  The HA must requisition periodic payments on account of each annual HUD payment. Each requisition must be in the form prescribed by HUD:
(1)  Housing assistance payments have been made in accordance with contracts in the form prescribed by HUD and in accordance with HUD requirements; and
(2)  Units have been inspected by the HA in accordance with HUD requirements.

(c)  If HUD determines that payments by HUD to the HA for a fiscal year exceed the amount of the annual payment approved by HUD for the fiscal year, the excess must be applied as determined by HUD.  Such applications determined by HUD may include, but are not limited to, application of the excess payment against the amount of the annual payment for a subsequent fiscal year. The HA may take any actions required by HUD respecting the excess payment, and must, upon demand by HUD, promptly remit the excess payment to

form HUD-52520  (8/93)

## 10. HUD Requirements

(a) The HA must comply, and must require owners to comply, with the requirements of the U.S. Housing Act of 1937 and all HUD regulations and other requirements, including any amendments or changes in the law or HUD requirements.

(b) The HA must comply with its HUD-approved administrative plan, equal opportunity housing plan and HUD-approved program funding applications.

(c) The HA must use the program forms required by HUD.

(d) The HA must proceed expeditiously with the programs under this consolidated ACC.

## 11. Use of Program Receipts

(a) The HA must use program receipts to provide decent, safe, and sanitary housing for eligible families in compliance with the U.S. Housing Act of 1937 and all HUD requirements. Program receipts may only be used to pay program expenditures.

(b) The HA must not make any program expenditures, except in accordance with the HUD-approved budget estimate and supporting data for a program.

(c) Interest on the investment of program receipts constitutes program receipts.

(d) If required by HUD, program receipts in excess of current needs must be promptly remitted to HUD or must be invested in accordance with HUD

## 12. Administrative Fee Reserve

(a) The HA must maintain an administrative fee reserve for a program. The HA must credit to the administrative fee reserve the total of:
(1) The amount by which program administrative fees paid by HUD for a fiscal year exceed HA administrative expenses for the fiscal year, plus
(2) Interest earned on the administrative fee reserve.

(b) The HA must use funds, in the administrative fee reserve to pay administrative expenses in excess of program receipts. If any funds remain in the administrative fee reserve, the HA may use the administrative reserve funds for other housing purposes if permitted by State and local law.

(c) If the HA is not adequately administering any Section 8 program in accordance with HUD requirements, HUD may:
(1) Direct the HA to use the funds to improve administration of the Section 8 program or for reimbursement of ineligible expenses.
(2) Prohibit HA use of administrative fee reserve funds.

## 13. Depositary

(a) Unless otherwise required or permitted by HUD, all program receipts must be promptly deposited with a financial institution selected as depositary by the HA in accordance with HUD requirements.

(b) The HA must enter an agreement with the depositary institution in the form required by HUD.

(c) The HA may only withdraw deposited program receipts for use in connection with the program in accordance with HUD requirements.

(d) The agreement with the depositary institution must provide that if required under a written notice from HUD to the depositary:
(1) The depositary must not permit any withdrawal of deposited funds by the HA unless withdrawals by the HA are expressly authorized by written notice from HUD to the depositary.
(2) The depositary must permit withdrawals of deposited funds by HUD.

(e) If approved by HUD, the HA may deposit under the depositary agreement monies received or held by the HA in connection with any contract between the HA and HUD.

## 14. Program Records

(a) The HA must maintain complete and accurate books of account and records for a program. The books and records must be in accordance with HUD requirements, and must permit a speedy and effective audit.

(b) The HA must furnish HUD such financial and program reports, records, statements, and documents at such times, in such form, and accompanied by such supporting data as required by HUD.

(c) HUD and the Comptroller General of the United States, or their duly authorized representatives, must have full and free access to all HA offices and facilities, and to all the books, documents and records of the HA relevant to administration of the program, including the right to audit and to make copies.

(d) The HA must engage and pay an independent public accountant to conduct audits that are required by HUD. The cost of audits required by HUD may be charged against program receipts.

## 15. Default by HA

(a) Upon written notice to the HA, HUD may take possession of all or any HA property, rights or interests in connection with a program, including funds held by a depositary, program receipts, and rights or interests

under a contract for housing assistance payments with an owner, if HUD determines that:

(1) The HA has failed to comply with any obligations under this consolidated ACC; or

(2) The HA has failed to comply with obligations under a contract for housing assistance payments with an owner, or has failed to take appropriate action, to HUD's satisfaction or as directed by HUD, for enforcement of the HA's rights under a contract for housing assistance payments (including requiring actions by the owner to cure a default, termination, or reduction of housing assistance payments, termination of the contract for housing assistance payments, or recovery of overpayments); or

(2) The HA has made any misrepresentation to HUD of any material fact.

(b) HUD's exercise or non-exercise of any right or remedy under the consolidated ACC is not a waiver of HUD's right to exercise that or any other right or remedy at any time.

## 16. Fidelity Bond Coverage

The HA must carry adequate fidelity bond coverage, as required by HUD, of its officers, agents, or employees handling cash or authorized to sign checks or certify vouchers.

## 17. Exclusion from Program

Single-headed households, pregnant females, and recipients of public assistance may not be excluded from participation in or be denied the benefit of a program because of such status.

## 18. Conflict of Interest Provisions

(a) Neither the HA nor any of its contractors or their subcontractors may enter into any contract, subcontract, or arrangement in connection with a program in which any of the following classes of persons has an interest, direct or indirect, during tenure or for one year thereafter:

(1) Any present or former member or officer of the PHA (except a tenant commissioner).

(2) Any employee of the HA who formulates policy or who influences decisions with respect to a

(3) program.

Any public official, member of a governing body, or State or local legislator who exercises functions or

(b) Any member of these classes of persons must disclose the member's interest or prospective interest to the HA and HUD.

(c) The requirements of this section may be waived by HUD for good cause. No person for whom a waiver is granted shall be permitted to exercise responsibilities or functions with respect to a contract for housing assistance payments executed, or to be executed, on

behalf, or with respect to a contract for housing assistance payments to which this person is a party.

(d) The provisions of this section do not apply to the depository agreement, or to utility service for which the rates are fixed or controlled by a governmental agency.

## 19. Interest of Member of or Delegate to Congress

No member of or delegate to the Congress of the United States of America or resident commissioner shall be admitted to any share or part of this consolidated ACC or to any benefits which may arise from it.

## 20. Exclusion of Third Party Rights

(a) A family that is eligible for housing assistance under this consolidated ACC is not a party to or third party beneficiary of the consolidated ACC.

(b) Nothing in the consolidated ACC shall be construed as creating any right of any third party to enforce any provision of this consolidated ACC, or to assert any claim against HUD or the HA.

## 21. Consolidated ACC

(a) The consolidated ACC is a contract between HUD and the HA.

(b) This consolidated ACC supersedes any previous annual contributions contract for a program. Matters relating to funding or operation of the program under a previous annual contributions contract are governed by this consolidated ACC.

Opt-Out: Not Defined

**United States of America**     Secretary of Housing and Urban Development
                                  Signature of Authorized Representative:                                    Date signed:

X _____

                                  Name & Official Title:  (print or type)

**Housing Agency**               Name of Agency:  (print or type)
                                  Lakewood Township
                                  Rental Assistance Program (I/IRAP)
                                  Signature of Authorized Representative:                                    Date signed:

X _Richard L. Work_    10/5/95

                                  Name & Official Title:  (print or type)   RICHARD L. WORK, MAYOR

form HUD-52520  (5/93)

Opt-Out: Not Defined

Opt-Out: Not Defined

To: 917323676645          From: (2027080696)          08/12/15 10:38 AM    Page 70 of 76

CAMDEN AREA OFFICE
THE PARKADE BUILDING, 519 FEDERAL STREET, CAMDEN, NEW JERSEY 08103

August 30, 1977

OFFICE A:
26 Federal Plaza
New York, New York 10007

IN REPLY REFER TO:
2.5HHO

Mr. Thomas L. LaPointe
Municipal Manager
Township of Lakewood
Municipal Building
Lakewood, New Jersey 08701

Dear Mr. LaPointe:

We acknowledge receipt of your letter dated
August 19, 1977 transmitting a copy of the
Township's Contract with the Lakewood Tenants
Organization to administer the Section 8 Existing
Housing Program.

HUD is not a party to this Contract, and consequently
our review and approval of the Contract is not re-
quired.  Accordingly, the third or penultimate
paragraph on page 2 requiring HUD approval should
be deleted.  We do reemphasize our position that
HUD looks to the approved Public Housing Agency
as the party responsible for the administration
of the ACC in accordance with the Regulations, see
24CFR 882.116.  Additionally, the PHA shall not
delegate its statutory responsibility to authorize
eviction.

Upon deletion of the aforesaid inapplicable paragraph,
we would appreciate a copy of the Contract for our
files.

Sincerely,

Clarence L. Humphrey
Director
Housing Program Management Branch

9/2/77.....
Referred to   Attorney to delete the above mentioned paragraph.
on 9/1/77.

G. Doyle, Clerk

Opt-Out: Not Defined



# *Township of Lakewood*

MUNICIPAL BUILDING
LAKEWOOD, NEW JERSEY 08701 • 201 364-2500



John J. Franklin, *Mayor*
H. George Buckwald, *Deputy Mayor*
*Committeemen:*
  Jerome Greenberg
  Robert W. Singer
  Richard I. Wark

April 24, 1990

Theodore R. Britton, Jr., Manager
U.S. Department of Housing
  and Urban Development
Newark Office, Region II
Military Park Building
60 Park Place
Newark, NJ  07102-5504

Dear Mr. Britton:

This letter is written in response to your letter dated April 3, about your receipt of an "anonymous" letter containing various allegations about the operation of the Lakewood Housing Authority and the Lakewood Township Rental Assistance Program.

Thank you for bringing these complaints to my attention, and for according to the Township the right to respond.

Preliminarily, I should like to state, that while the letter which you received may be anonymous to you, it is not all that anonymous to the governing body of this Township. While we cannot be absolutely certain as to the true identity of the author of the letter containing those false allegations, we do believe that it was penned, or "inspired", by a former commissioner of the Authority, whom the Township Committee declined to re-appoint to the Lakewood Housing Authority Board of Commissioners, for ample reason. Even without getting into the history, grounds for this conclusion are the record of similar past efforts by this party, as well as an established pattern of focusing personal attacks repeatedly against the two named individuals. In short, what we apparently have here is a personal, rather than a real, issue.

As to the specific concerns raised in the anonymous letter, they indicate a basic misunderstanding which must be cleared-up; namely, the nature, role and relationship which the Township of Lakewood has with the Section 8 programs and its contract administrative agency, the Lakewood Tenants Organization. The



Township of Lakewood is not a Public Housing Authority.  It contracted with HUD in 1977 (via the Annual Contributions Contract) to operate the Section 8 Programs by default, after the then Board of Commissioners of the Lakewood Housing Authority declined for the third time in three years (1975-1977) HUD's invitation to operate the Section 8 program.  Lacking an in-house administrative capacity to operate the program, the Township sub-contracted with the Lakewood Tenants Organization to administer the program, with the understanding and agreement that the operation would not draw on Township resources, but would have to be economically self-sufficient.  This arrangement was reached at the time with the explicit consent and written approval of the HUD Field Office, and has worked very well since the inception of the programs.   This recitation of the relationship between the Township and the Lakewood Tenants Organization, its contract administrative agency, is not intended as a dis-association from the primary role and responsibility of the Township regarding the operation of these programs. On the contrary, the Township justifiably takes immense, direct pride in the fact that the programs are well administered and well received locally.

The point is that we have locally an atypical situation; not that of a PHA, and one which was fashioned of necessity and has proven extremely successful. Since the administration of the Section 8 programs are performed by a contract agency, similar to other Township contract services, the Township looks to goal achievement and performance criteria to measure the success of the programs' administration. I can state without reservation, as we have stressed all along in every application to the Department for additional funding, that by any yardstick, the present administration is run by an extremely competent, universally acclaimed (property owners as well as renters) administration. Since its inception in 1977, the program has grown steadily from 80 units to nearly 700.  The program is run on a sound fiscal basis, with a healthy operating reserve. Over the past twelve years, the Township has received few, if any, verifiable complaints regarding the operation of its Section 8 programs by the Lakewood Tenants Organization.  The Executive Director and staff at L.T.R.A.P. are thoroughly trained and very knowledgeable.

Notwithstanding all the foregoing, as to the Executive Director personally, please be assured that Rabbi Hertz ably serves both as the Executive Director of the Lakewood Township Rental Assistance Program and the Lakewood Housing Authority.  He splits his daily work load and work time between these two Agencies. In addition, Rabbi Hertz spends many hours evenings and week-ends in meetings as well as at the office, on L.T.R.A.P. business.

Rabbi Hertz is readily accessible all day, every day, at either one of these offices (364-1300 or 367-0660). Indeed, the allocation itself is deliberately mis-leading.  The distance between the offices of the two Agencies is less than two minutes travel time; far less than the distance and time spent in routine travel by Executive Directors at other PHAs in the normal course of their duties traveling from site to site. Rabbi Hertz draws a salary commensurate with the duties, responsibilities, professional requirements, and the actual hours invested in his positions at both the Lakewood Township Rental Assistance Program and the Lakewood Housing Authority.

Rabbi Hertz served in the capacity of Executive Director of the Lakewood Township Rental Assistance Program with distinction for 8 years (1977-1985)

before being asked jointly by the Township Committee of the Township of Lakewood and the Board of Commissioners of the Lakewood Housing Authority to assume the additional position of Executive Director of the Lakewood Housing Authority. The Township Committee and the Board of Commissioners in turning to Rabbi Hertz firmly felt that the Authority needed strong, proven leadership. Rabbi Hertz joined the Authority at a most difficult time, when the former Executive Director resigned after findings of gross mismanagement were reported in a comprehensive, highly critical study issued by a local Blue Ribbon panel (which included the Chairman of the Authority at the time, Mr. William Melton, who still serves as a Commissioner). This report, issued in March 1985, was forwarded to the HUD Area Office at the time and should still be in your files.

Assumption by Rabbi Hertz of the dual positions was strongly recommended by the Board of Commissioners and the Township Committee in view of Rabbi Hertz's uncontested record of professionalism, housing expertise, and integrity. Furthermore, this move was cleared in advance with the HUD-Newark Area Office and won its approval. I recall that at the time, there was a shared feeling that, in addition to gaining an able administrator for the Housing Authority, bringing both Agencies under a single administrator would prove advantageous as far as uniformity of internal administrative procedures, economies of scale, closer adherence to federal regulations, and better service to the public through the elimination of conflicting standards and procedures.

We have not regretted this decision. Its benefits locally have proven themselves through the expansion of the programs and their smooth coordination. You have to look no further than your own Management Reviews, as well as five Fiscal Audits at the Lakewood Housing Authority, and many more at L.T.R.A.P., all completed without a single finding. The remarkable growth of the programs at L.T.R.A.P., from 80 units to 700 units administered, and the meticulous attention to detail and close adherence to all federal regulations also attest to Rabbi Hertz's intimate, constant professional involvement and ability. As you are aware, LTRAP has earned every award issued by your Area Office for Voucher lease-up and various programs' implementation. LTRAP, led by Rabbi Hertz, has served the Newark Area Office as well on a voluntary basis, by sharing its experience and expertise with other PHAs and offering day-long training to other PHAs. It is because of all the above, the long-established record of success and achievement of Rabbi Hertz, that we find the anonymous allegations to be so insidious and objectionable.

It would be most unfortunate if mischievous allegations would succeed in casting aspersions on the fine reputation of a person who has accomplished so much for the needy of our community. We understand your own sensitivity to any complaint, regardless of its source and merit, and your need to address the same. It is for precisely this reason that we have taken the trouble to fully assure you that the complaints which you received lack any foundation or merit.

With respect to Mr. La Pointe, this allegation is similarly without foundation, and purely malicious. Mr. LaPointe does not get paid for each meeting of the Lakewood Housing Authority Board of Commissioners. Mr. LaPointe does not get any payment whatever from the Lakewood Housing Authority, in any shape, form or manner; nor does the Township of Lakewood derive any payment from the Lakewood Housing Authority other than the PILOT. Mr. LaPointe's position as

the Township's Housing Coordinator, and his position as City Manager, are both paid for by the Township.

I hope that I was able to answer your questions and also shed some light on this matter.  Unfortunately, I cannot guarantee that you will not receive similar mischievous letters in the future. I can assure you, however, that this Township's governing body takes its Housing Authority appointments seriously, has a Township Committeeman assigned to the Authority as permanent liaison, and has a close, cooperative working relationship with the Authority. We therefore find satisfaction and take pride in the work of the Lakewood Housing Authority.

Again, I thank you for your courtesy in affording us the right to respond fully to your inquiry.  If you have any other questions at any time, we will be most willing to provide further information and assistance.

Sincerely,

TOWNSHIP OF LAKEWOOD


John J. Franklin
Mayor


JJF:eh

c.c. Mr. Siegfried W. Steele, Chairman
     Lakewood Housing Authority

07/09/96  04:33   HUD ASST SEC FOR PIH → 2029737750                    NO.673  P002



U. S. Department of Housing and Urban Development
Washington, D.C. 20410-5000

JUL - 9 1996

OFFICE OF THE ASSISTANT SECRETARY
FOR PUBLIC AND INDIAN HOUSING

Mr. Meir Hertz
Executive Director
Lakewood Tenants Organization
600 West Kennedy Boulevard
Box 871
Lakewood, NJ  08701

RE:  Procurement Requirements

Dear Mr. Hertz:

    We received the June 19, 1996 letter from your counsel,
Charles L. Edson, describing the history and status of the
Lakewood Tenants Organization ("LTO"). Based on the facts as
stated in Mr. Edson's letter, and our general understanding of
LTO's status, we understand that Lakewood Township previously
designated LTO as its agency for certain limited purposes. As
such, LTO qualifies as a public housing agency under the U.S.
Housing Act of 1937 as amended. HUD's procurement rules do not
apply to Lakewood Township's selection of LTO as a public housing
agency. Selection is a different question from operation, and we
do not address, nor have before us, any questions regarding
public housing agency procurement of goods or services.
Accordingly, we have no information that would lead us to
question either LTO's designation, or the present structure under
which LTO operates.

                                    Sincerely,

                                    Kevin E. Marchman
                                    Acting Assistant Secretary for
                                     Public and Indian Housing

Opt-Out: Not Defined

# EXHIBIT AA

## Korn, Ellen

| | |
|---|---|
| **From:** | Pasquale, Michael |
| **Sent:** | Tuesday, February 17, 2015 4:46 PM |
| **To:** | 'John.J.Cahill@hud.gov' |
| **Cc:** | Jim Massey (JMassey@renocavanaugh.com) |
| **Subject:** | Lakewood Township & LTO meeting follow-up |

Mr. Cahill,

Thank you again for meeting with us on February 10th and for taking the time to discuss and consider the various issues and HUD inquiries in a comprehensive manner.  We appreciate that HUD is willing to consider a potential global resolution of the issues.  We also thank you for the professional courtesy of agreeing to speak with us before taking any further action against Lakewood Township or LTO in regard to the issues we discussed, including any formal declaration by HUD that the Township is in default of the ACC.  We look forward to working with you to resolve the issues.  Best regards,



**Michael Pasquale | Partner**
McCARTER & ENGLISH, LLP

100 Mulberry Street, Four Gateway Center | Newark, New Jersey 07102
T: 973-848-8613
C: 973-362-5344
F: 973-297-3717
mpasquale@mccarter.com | www.mccarter.com

BOSTON | HARTFORD | STAMFORD | NEW YORK | NEWARK
EAST BRUNSWICK | PHILADELPHIA  | WILMINGTON | WASHINGTON, DC

# EXHIBIT BB



8/12/2015

| | |
|---|---|
| From: | Chanda M. Bethea, MBA |
| Phone: | 202-708-1380 |
| Fax: | 202-708-0690 |
| Company Name: | U. S. Department of Housing and Urban Development |

| | |
|---|---|
| To: | Mr. Meir Hertz |
| Phone: | 732-367-0660 |
| Fax: | 732-367-6645 |

**Comments: LTRAP Letter**

Urgent:

Please contact the number listed above once you have received this letter.

☒ Urgent  ☐ For Review  ☐ Please Comment  ☐ Please Reply  ☐ Please Recycle

Opt-Out: Not Defined



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, DC 20410-5000

PRINCIPAL DEPUTY ASSISTANT SECRETARY
FOR PUBLIC AND INDIAN HOUSING

AUG 1 1 2013

Hon. Albert Ackerman,
Mayor, Lakewood Township
231 Third Street
Lakewood, NJ 08701

Meir N. Hertz, CEO
Lakewood Township Residential Assistance Program
600 West Kennedy Blvd.
P.O. Box 856
Lakewood, NJ 08701

### SUBJECT: DETERMINATION OF HCV ACC DEFAULT AND TRANSFER OF THE PROGRAM

Dear Sirs:

The U.S. Department of Housing and Urban Development (HUD) has determined that the Township of Lakewood[1] (Lakewood) is in default of its Housing Choice Voucher (HCV) Annual Contributions Contract (ACC)[2] with HUD.

First, HUD has determined that Lakewood is in default of its ACC by breaching ¶ 10(a) which requires that: "The [public housing authority (PHA)] must comply . . . with the requirements of the U.S. Housing Act of 1937 and all HUD regulations and other requirements . . . ." See Ex. 2. Lakewood did not comply with HUD regulation 24 C.F.R. § 982.158. Section 982.158 contains Lakewood's record keeping responsibilities and its obligations to disclose records and data to HUD, and it requires PHAs to authorize HUD to physically inspect documents or data at the PHA office facility. These regulatory requirements are also contractual and contained in ¶ 14 of Lakewood's ACC. See Ex. 2.

Second, HUD has determined that Lakewood is in default because it breached ¶ 14 (a)–(c) of the ACC which requires Lakewood to: (a) maintain complete and accurate books of account and records; (b) furnish HUD those records or data; and, (c) grant HUD or its proxy full and free access to all HA offices and facilities for the purpose of inspecting those records. See Ex. 2.

HUD makes the foregoing determination of default based on the following findings:
    i.   In September 2013, HUD's Office of Public and Indian Housing, Quality Assurance Division (QAD) performed an on-site Financial Management

---

[1] See Ex. 1, April 14, 2014, letter from Sonia Burgos, Director, Newark Office of Public Housing to Meir Hertz, Executive Director, Lakewood Township Residential Assistance Program (LTRAP), HUD "determined that (1) LTRAP is an operating unit of the [Lakewood Tenants Organization (LTO); and] (2) the Township and the LTO together constitute the PHA in this matter[.]"

[2] Ex. 2, Consolidated Annual Contributions Contract, NJ214-VO-0015 & NJ214-VO-0016 (July, 21, 1998).

www.hud.gov     espanol.hud.gov

Review of Lakewood's HCV program.  As a result of the review, QAD issued a report on December 3, 2013.[1]  The report notes that "QAD staff was unable to review the administrative expenses" because "LTRAP refused to furnish the documents." Ex. 3.  This "severely hampered [QADs] efforts to conduct a speedy and effective audit of the HCV program." *Id.*

ii.   By letter dated January 2, 2014, Richard Price, Esq. responded to HUD's December 3, 2013, letter, and stated that "once the [administrative] fee is earned by LTO and paid to LTO by Lakewood Township the fee is defederalized and LTO is not accountable to HUD[.]"[4]

iii.  By letter dated February 14, 2014, Mr. Price remitted organizational documents for LTO to HUD after discussions with HUD staff.[5]  Based on these documents, review of correspondences, and other information available, HUD determined that the Township and LTO together constitute the PHA of the HCV program run by the Township. *See* Ex. 1.

iv.   Instead of responding to the multiple points provided in the April 14, 2014 letter, LTRAP sent a letter to HUD on June 11, 2014, asking "why any further response is required[,]" relying on purported HUD statements concerning a management review conducted 13 years earlier.[6]

v.    On June 19, 2014, QAD sent a letter to Lakewood scheduling another Financial Management Review beginning July 8, 2014, to review, *among other things*, administrative expenses.[7]

vi.   LTRAP responded on June 20, 2014, once again asserting that "this entire question has been dealt with, cleared and closed in its entirety."[8]

vii.  By letter dated June 25, 2014, counsel for LTO stated that LTO "is not prepared to participate in the proposed on-site review process[.]"[9]

viii. Contrary to the language in LTRAP's June 25, 2014, letter, Lakewood does not have the legal right to refuse participation in an on-site review process. *See* Ex. 2, ¶ 14 (a)-(c); 24 C.F.R. § 982.158.

ix.   In a letter dated December 5, 2014, from John J. Cahill, HUD's Regional Counsel for New York/New Jersey, HUD demanded that Lakewood allow HUD's QAD to conduct a full Financial Management Review as described in the QAD's letter dated June 19, 2014.[10]  HUD informed Lakewood that it must comply with this demand within 30 days. *See* Ex. 10.  HUD also advised Lakewood that if it failed to comply with this final demand, it would be considered in default of its ACC and the applicable program regulations. *Id.*

x.    On February 10, 2015, representatives from HUD's Office of Regional Counsel for NY/NJ, Newark Office of Public Housing, and QAD met with

---

[1] Ex. 3.  Letter from MaryAnn Creager, Supervisory Program Analyst, QAD, to Meir Hertz, CEO, Lakewood Township RAP (Dec. 3, 2013).
[4] Ex. 4.  Letter from Richard M. Price, Esq., Nixon Peabody, to Balu Thumar, Acting Director, Office of Public Housing (Jan. 2, 2014).
[5] Ex. 5.  Letter from Richard M. Price, Esq., Nixon Peabody, to Balu Thumar, Acting Director, Office of Public Housing (February 14, 2014).
[6] Ex. 6.  Letter from Meir N. Hertz, CEO, LTRAP, to Sonia Burgos, Director, Office of Public Housing (June 11, 2014).
[7] Ex. 7.  Letter from Joseph R. Russel, Program Analyst, QAD to Meir Hertz, CEO, LTRAP (June 19, 2014).
[8] Ex. 8.  Letter from Meir Hertz, CEO, LTRAP to Joseph R. Russell, Program Analyst, QAD (June 20, 2014).
[9] Ex. 9.  Letter from Edward J. Dauber, Esq. to MaryAnn Creager, Supervisory Program Analyst, QAD (June 25, 2014).
[10] Ex. 10.  Letter from John J. Cahill, Regional Counsel for NY/NJ to Edward Dauber, Esq., Counsel for LTO/LTRAP (Dec. 5, 2014).

counsel for Lakewood and LTO at Lakewood's request. At this meeting Lakewood's counsel proposed that, to resolve the financial review issues, a reserve could be established moving forward but this proposal would not include access to past records. This proposal was unacceptable as it failed to grant the access all of Lakewood's records. Accordingly, HUD rejected this offer.

xi.  HUD has waited more than 6 months to take action after its last compliance demand date, January 5, 2015. See Ex. 10. HUD has also tried to resolve Lakewood's ACC non-compliance with good faith negotiations. From its actions, HUD can rationally conclude that Lakewood has no intent to comply with its regulatory and contractual responsibilities. HUD will not negotiate terms with Lakewood that would allow it to remain out of compliance with its ACC and applicable regulations.

xii.  Since Lakewood has refused and continues to refuse to provide full access to all of its records at its facility, access that is mandated by ¶ 14 (a)–(c) of its ACC and 24 C.F.R. § 982.158, Lakewood is in default of its ACC.

Now that HUD has determined that Lakewood's ACC is in default, HUD has the authority pursuant to ¶ 15(a) of the ACC to "take possession of all or any HA property, rights or interests in connection with a program, including funds held by a depository, program receipts, and rights or interests under a contract for housing assistance payments with an owner[.]" Ex. 2. Accordingly, HUD will take possession of Lakewood's HCV program, which is comprised of 1,066 units, and transfer them to Lakewood Housing Authority. HUD will also take possession of any accompanying HCV program funds for those 1,066 units. The effective date of the transfer will be September 1, 2015. HUD may also take any other administrative or legal action it deems appropriate.

Sincerely,

Lourdes Castro Ramirez
Principal Deputy Assistant Secretary
for Public and Indian Housing

cc:    Edward J. Dauber, Esq. (via email)
       James T. Massey, Esq. (via email)
       Michael P. Pasquale, Esq. (via email)

Opt-Out: Not Defined

# EXHIBIT CC



**U.S. Department of Housing and Urban Development**
Newark Field Office- Region II
One Newark Center 12th Floor
Newark, New Jersey 07102-5260
Office (973) 622-7900
Fax (973) 645-2323

AUG 1 2 2015

Mr. Meir Hertz
Executive Director
Lakewood Township Residential Assistance Program
600 W. Kennedy Blvd.
P.O. Box 856
Lakewood, New Jersey   08701-0871

Dear Mr. Hertz:

**SUBJECT: Transfer of the Township of Lakewood HUD-funded Programs including the Housing Choice Voucher Program (HCV) to the Lakewood Housing Authority (LHA)**

Pursuant to the letter that you received from the Department on August 12, 2015, the Department informed you that the Township of Lakewood[1] is in default of its Annual Contributions Contract (ACC) and program regulations governing the HCV Program. As a result, the Township of Lakewood must transfer all of its HUD-funded programs to the Lakewood Housing Authority (LHA.).

The Township of Lakewood is required to transfer all of its current and historical information and documentation related to its HUD-funded program participants to the LHA upon receipt of this letter. These documents must include all program participant files containing but are not limited to documentation to support admissions, reexaminations, Family Self-Sufficiency Program, Waiting List(s) and any other documents and accounts related to HUD-funded programs. Also, the Township of Lakewood must transfer all of the information and documentation related to inspections, including a list of units under Housing Assistance Payment Contract (HAP) abatement to the LHA. This will ensure no interruptions or delays in the provision of housing assistance and supportive services to participating families.

In addition, all of the Township of Lakewood's HCV Program income and assets, HAP funds, Net Position of Assets (NPA), Unrestricted Position of Assets (UNA), tenant and other income related to its HUD-funded Programs must be transferred to the LHA. As a result, the Township of Lakewood's access to HUD systems will be terminated. The Township of Lakewood must fully comply with the demands stated in this letter within **14 calendar days from the date of this letter**.

---

[1] In an April 14, 2014, letter from Sonia Burgos, Director, Newark Office of Public Housing to Meir Hertz, Executive Director, Lakewood Township Residential Assistance Program (LTRAP), HUD "determined that (i) LTRAP is an operating unit of the [Lakewood Tenants Organization (LTO); and] (2) the Township and the LTO together constitute the PHA in this matter[.]"

We continue to emphasize that HUD requires the Township of Lakewood to maintain complete and accurate accounts and other records for its programs in accordance with governing regulations and the ACC. Therefore, we require that the Township of Lakewood fully comply with these demands and transfer all of the above-referenced documents to the LHA in such a manner that permits an expeditious transition of the Lakewood's HUD-funded programs to the LHA **no later than August 26, 2015**. In addition, please be advised that this does not preclude HUD from taking any other administrative or legal actions it deems appropriate.

Your cooperation in this matter would be greatly appreciated. Should you have any questions regarding this matter, please contact me at (973) 776-7227.

Sincerely,

Sonia L. Burgos
Director
Office of Public Housing

CC: Mayor Albert Akerman

Visit Our Web Site at: www.hud.gov