## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

TOWNSHIP OF LAKEWOOD, NEW JERSEY
and LAKEWOOD TENANTS
ORGANIZATION, INC.,

                Plaintiff,

   v.

JULIAN CASTRO, Secretary,
United States Department of Housing
and Urban Development,

                Defendant.

Civ. Action No. 3:15-cv-06325-MAS-DEA

## DESIGNATION AND CERTIFICATION
## OF ADMINISTRATIVE RECORD

I, Milan M. Ozdinec, the Deputy Assistant Secretary for Public Housing and Voucher Programs in the Office of Public and Indian Housing, United States Department of Housing and Urban Development ("HUD"), do hereby certify that the attached pages identified in the accompanying ADMINISTRATIVE RECORD INDEX constitute a true and complete copy of the agency record, underlying the Principal Deputy Assistant Secretary Lourdes Castro Ramirez's August 11, 2015, determination that the Township of Lakewood's Housing Choice Voucher ("Section 8") Annual Contributions Contract was in default, as well as approved the remedy of that default to be the transfer the Township of Lakewood's Section 8 program to another public housing agency, the actions that have been complained of in this litigation.

In accordance with 28 U.S.C. § 1746, I hereby certify and declare under penalty of perjury that to the best of my knowledge, information, and belief, the foregoing is true and correct.

Dated: _4/29/16_

_____
Milan M. Ozdinec

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| TOWNSHIP OF LAKEWOOD, NEW JERSEY and LAKEWOOD TENANTS ORGANIZATION, INC.,<br><br>              Plaintiff,<br><br>      v.<br><br>JULIAN CASTRO, Secretary, United States Department of Housing and Urban Development,<br><br>              Defendant. | Civ. Action No. 3:15-cv-06325-MAS-DEA |

**ADMINISTRATIVE RECORD INDEX**

| **Document Custodian** | **Bates Numbers** |
|---|---|
| **Determination Of HCV [Housing Choice Voucher) Default And Transfer Of The Program By Principal Deputy Assistant Secretary [PDAS] Lourdes Castro Ramirez Dated August 11, 2015** | **000001 - 000078** |
| **Lourdes Castro Ramirez**<br>**PDAS (Decision Maker)**<br>**for Public and Indian Housing** | **000079 - 000087** |
| **Jennifer Jones**<br>**Special Assistant to the Principal Deputy Assistant Secretary**<br>**for Public and Indian Housing** | **000088 - 000184** |
| **Jemine A. Bryon**<br>**General Deputy Assistant Secretary for**<br>**Public and Indian Housing** | **000185 – 000212** |
| **Milan M. Ozdinec**<br>**Deputy Assistant Secretary for**<br>**Public Housing and Voucher Programs**<br>**Office of Public and Indian Housing** | **000213 - 000462** |
| **Amy L. Ginger**<br>**Director of Housing Choice Voucher Programs**<br>**Office of Public and Indian Housing** | **000463 - 000737** |

1

| **Document Custodian** | **Bates Numbers** |
|---|---|
| **MaryAnn Creager**<br>**Quality Assurance Division (QAD)**<br>**Office of Voucher Programs**<br>**Office of Public and Indian Housing** | **000738 - 002051** |
| **Joseph Russell**<br>**Quality Assurance Division (QAD)**<br>**Office of Voucher Programs**<br>**Office of Public and Indian Housing** | **002052 - 002237** |
| **Unabyrd L. Wadhams**<br>**Deputy Assistant Secretary for Field Operations**<br>**Office of Public and Indian Housing** | **002238 - 002241** |
| **Debra Torres,**<br>**Regional Director,**<br>**Office of Field Operations**<br>**Office of Public and Indian Housing** | **002242 - 002686** |
| **Sonia L. Burgos**<br>**Public Housing Director**<br>**Office of Public Housing**<br>**Office of Public and Indian Housing**<br>**Newark, New Jersey Field Office** | **002687 - 002924** |
| **Delores Melvin**<br>**Division Director**<br>**Office of Public Housing**<br>**Newark, New Jersey Field Office**<br>**Office of Public and Indian Housing** | **002925 - 003050** |
| **Balu K. Thumar**<br>**Division Director**<br>**Office of Public Housing**<br>**Newark, New Jersey Field Office** | **003051 - 003101** |
| **Tinia Lowman**<br>**Staff**<br>**Office of Public Housing**<br>**Office of Public and Indian Housing**<br>**Newark, New Jersey Field Office** | **003102 – 003178** |

2

| **Document Custodian** | **Bates Numbers** |
|---|---|
| **Melissa Bennett**<br>**Staff**<br>**Office of Field Operations**<br>**Office of Public Housing**<br>**Newark, New Jersey Field Office** | **003179 - 003413** |
| **Mirza Orriols**<br>**Deputy Regional Administrator**<br>**Office of Field Policy Management**<br>**New York Regional Office** | **003414 - 003489** |
| **Maria Maio-Messano**<br>**Field Office Director**<br>**Office of Field Policy Management**<br>**Newark, New Jersey Field Office** | **003490 - 003521** |
| **John Phillips**<br>**Division Director (Retired End of CY 2014)**<br>**Quality Assurance Division (QAD)**<br>**Office of Voucher Programs**<br>**Office of Public and Indian Housing** | **003522 - 003526** |



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-5000

PRINCIPAL DEPUTY ASSISTANT SECRETARY
FOR PUBLIC AND INDIAN HOUSING

AUG 1 1 2015

Hon. Albert Ackerman,
Mayor, Lakewood Township
231 Third Street
Lakewood, NJ 08701

Meir N. Hertz, CEO
Lakewood Township Residential Assistance Program
600 West Kennedy Blvd.
P.O. Box 856
Lakewood, NJ 08701

SUBJECT:   **DETERMINATION OF HCV ACC DEFAULT AND TRANSFER OF THE
PROGRAM**

Dear Sirs:

The U.S. Department of Housing and Urban Development (HUD) has determined that
the Township of Lakewood[1] (Lakewood) is in default of its Housing Choice Voucher (HCV)
Annual Contributions Contract (ACC)[2] with HUD.

First, HUD has determined that Lakewood is in default of its ACC by breaching ¶ 10(a)
which requires that: "The [public housing authority (PHA)] must comply . . . with the
requirements of the U.S. Housing Act of 1937 and all HUD regulations and other requirements . .
. ." *See* Ex. 2.  Lakewood did not comply with HUD regulation 24 C.F.R. § 982.158.  Section
982.158 contains Lakewood's record keeping responsibilities and its obligations to disclose
records and data to HUD, and it requires PHAs to authorize HUD to physically inspect
documents or data at the PHA office facility.  These regulatory requirements are also contractual
and contained in ¶ 14 of Lakewood's ACC.  *See* Ex. 2.

Second, HUD has determined that Lakewood is in default because it breached ¶ 14 (a)–
(c) of the ACC which requires Lakewood to: (a) maintain complete and accurate books of
account and records; (b) furnish HUD those records or data; and, (c) grant HUD or its proxy full
and free access to all HA offices and facilities for the purpose of inspecting those records. *See*
Ex. 2.

HUD makes the foregoing determination of default based on the following findings:
  i.   In September 2013, HUD's Office of Public and Indian Housing, Quality
       Assurance Division (QAD) performed an on-site Financial Management

---

[1]  *See* Ex. 1. April 14, 2014, letter from Sonia Burgos, Director, Newark Office of Public Housing to Meir Hertz, Executive Director,
   Lakewood Township Residential Assistance Program (LTRAP), HUD "determined that (1) LTRAP is an operating unit of the [Lakewood
   Tenants Organization (LTO); and (2) the Township and the LTO together constitute the PHA in this matter[.]"
[2]  Ex. 2. Consolidated Annual Contributions Contract, NJ214-VO-0015 & NJ214-VO-0016 (July, 21, 1998).

Review of Lakewood's HCV program.  As a result of the review, QAD issued a report on December 3, 2013.[3]  The report notes that "QAD staff was unable to review the administrative expenses" because "LTRAP refused to furnish the documents."  Ex. 3.  This "severely hampered [QADs] efforts to conduct a speedy and effective audit of the HCV program."  *Id.*

ii.    By letter dated January 2, 2014, Richard Price, Esq. responded to HUD's December 3, 2013, letter, and stated that "once the [administrative] fee is earned by LTO and paid to LTO by Lakewood Township the fee is defederalized and LTO is not accountable to HUD[.]"[4]

iii.   By letter dated February 14, 2014, Mr. Price remitted organizational documents for LTO to HUD after discussions with HUD staff.[5]  Based on these documents, review of correspondences, and other information available, HUD determined that the Township and LTO together constitute the PHA of the HCV program run by the Township.  *See* Ex. 1.

iv.    Instead of responding to the multiple points provided in the April 14, 2014 letter, LTRAP sent a letter to HUD on June 11, 2014, asking "why any further response is required[,]" relying on purported HUD statements concerning a management review conducted 13 years earlier.[6]

v.     On June 19, 2014, QAD sent a letter to Lakewood scheduling another Financial Management Review beginning July 8, 2014, to review, *among other things*, administrative expenses.[7]

vi.    LTRAP responded on June 20, 2014, once again asserting that "this entire question has been dealt with, cleared and closed in its entirety."[8]

vii.   By letter dated June 25, 2014, counsel for LTO stated that LTO "is not prepared to participate in the proposed on-site review process[.]"[9]

viii.  Contrary to the language in LTRAP's June 25, 2014, letter, Lakewood does not have the legal right to refuse participation in an on-site review process.  *See* Ex. 2, ¶ 14 (a)–(c); 24 C.F.R. § 982.158.

ix.    In a letter dated December 5, 2014, from John J. Cahill, HUD's Regional Counsel for New York/New Jersey, HUD demanded that Lakewood allow HUD's QAD to conduct a full Financial Management Review as described in the QAD's letter dated June 19, 2014.[10]  HUD informed Lakewood that it must comply with this demand within 30 days.  *See* Ex. 10.  HUD also advised Lakewood that if it failed to comply with this final demand, it would be considered in default of its ACC and the applicable program regulations.  *Id.*

x.     On February 10, 2015, representatives from HUD's Office of Regional Counsel for NY/NJ, Newark Office of Public Housing, and QAD met with

---

[3] Ex. 3.  Letter from MaryAnn Creager, Supervisory Program Analyst, QAD, to Meir Hertz, CEO, Lakewood Township RAP (Dec. 3, 2013).
[4] Ex. 4.  Letter from Richard M. Price, Esq., Nixon Peabody, to Balu Thumar, Acting Director, Office of Public Housing (Jan. 2, 2014).
[5] Ex. 5.  Letter from Richard M. Price, Esq., Nixon Peabody, to Balu Thumar, Acting Director, Office of Public Housing (February 14, 2014).
[6] Ex. 6.  Letter from Meir N. Hertz, CEO, LTRAP, to Sonia Burgos, Director, Office of Public Housing (June 11, 2014).
[7] Ex. 7.  Letter from Joseph R. Russel, Program Analyst, QAD to Meir Hertz, CEO, LTRAP (June 19, 2014).
[8] Ex. 8.  Letter from Meir Hertz, CEO, LTRAP to Joseph R. Russell, Program Analyst, QAD (June 20, 2014).
[9] Ex. 9.  Letter from Edward J. Dauber, Esq. to MaryAnn Creager, Supervisory Program Analyst, QAD (June 25, 2014)
[10] Ex. 10.  Letter from John J. Cahill, Regional Counsel for NY/NJ to Edward Dauber, Esq., Counsel for LTO/LTRAP (Dec. 5, 2014).

counsel for Lakewood and LTO at Lakewood's request.  At this meeting Lakewood's counsel proposed that, to resolve the financial review issues, a reserve could be established moving forward but this proposal would not include access to past records.  This proposal was unacceptable as it failed to grant the access all of Lakewood's records.  Accordingly, HUD rejected this offer.

xi.     HUD has waited more than 6 months to take action after its last compliance demand date, January 5, 2015.  See Ex. 10.  HUD has also tried to resolve Lakewood's ACC non-compliance with good faith negotiations.  From its actions, HUD can rationally conclude that Lakewood has no intent to comply with its regulatory and contractual responsibilities.  HUD will not negotiate terms with Lakewood that would allow it to remain out of compliance with its ACC and applicable regulations.

xii.    Since Lakewood has refused and continues to refuse to provide full access to all of its records at its facility, access that is mandated by ¶ 14 (a)–(c) of its ACC and 24 C.F.R. § 982.158, Lakewood is in default of its ACC.

Now that HUD has determined that Lakewood's ACC is in default, HUD has the authority pursuant to ¶ 15(a) of the ACC to "take possession of all or any HA property, rights or interests in connection with a program, including funds held by a depository, program receipts, and rights or interests under a contract for housing assistance payments with an owner[.]"  Ex. 2.  Accordingly, HUD will take possession of Lakewood's HCV program, which is comprised of 1,066 units, and transfer them to Lakewood Housing Authority.  HUD will also take possession of any accompanying HCV program funds for those 1,066 units.  The effective date of the transfer will be September 1, 2015.  HUD may also take any other administrative or legal action it deems appropriate.

Sincerely,

Lourdes Castro Ramirez
Principal Deputy Assistant Secretary
for Public and Indian Housing


cc:     Edward J. Dauber, Esq. (via email)
        James T. Massey, Esq. (via email)
        Michael P. Pasquale, Esq. (via email)

# [EXHIBIT 1]

AR 000004



U.S. Department of Housing and Urban Development
Office of Chief Counsel
One Newark Center, 12th Floor
Newark, NJ 07102-5260
Telephone: (973) 622-7900

APR 1 4 2014

Mr. Meir Hertz, Executive Director
Lakewood Township Rental Assistance Program
600 W. Kennedy Blvd.
P.O. Box 856
Lakewood, New Jersey   08701

Dear Mr. Hertz:

**SUBJECT: Newark Field Office Review of Documentation Related to**
**Lakewood Township Rental Assistance Program (LTRAP)**

  The Newark Field Office is in the process of addressing issues that resulted from two on-site reviews that were conducted at your agency in fiscal year 2013.  These reviews were conducted by the Newark Office of Fair Housing and Equal Opportunity in May 2013 and the Housing Voucher Quality Assurance Division in September 2013.

  This letter addresses the following issues: (1) the relationship between the Lakewood Township Rental Assistance Program (LTRAP) and the Lakewood Tenants Organization (LTO); (2) the validity of the use of federal funds in which the entire amount of LTRAP's Housing Choice Voucher Program Administrative Fees are paid to the LTO; and (3) claims by the LTO that the use of these fees are not subject to HUD review nor audit.

  The following documents are referred to throughout this letter for your information: (1) a letter dated 8/30/77 to the Township from Clarence L. Humphrey as Director of HUD's Housing Programs Management Branch (the "Humphrey Letter") (2) a letter dated 4/24/90 from John J. Franklin as the Township's mayor (the "Mayor's Letter") to Theodore Britton of HUD's Newark Field Office (3) a letter dated 9/20/95 addressed to the Executive Director of LTRAP, attaching an earlier version of the Consolidated ACC [Form HUD-52520 (6/93)] (the "1995 ACC") with no funding exhibits attached, that is signed by the then-mayor of the Township on 10/5/95 on behalf of the LTRAP (4) the Employment Agreement dated 12/28/95 (the "Employment Contract") between the Executive Director of LTRAP and the LTO (5) a letter dated 7/9/96 to the Executive Director of the LTO from Kevin E. Marchman as HUD's Acting Assistant Secretary for Public and Indian Housing (the "Marchman Letter") (6) a letter dated 7/21/98 to the Executive Director of LTRAP attaching a copy of a Consolidated ACC [Form HUD-52520 (12/97)](the "1998 ACC") that is signed by the Executive Director of LTRAP but lists the Township of Lakewood (the "Township") as the HA on the "PIH Section 8 - Funding Exhibit," and (7) two letters dated 12/15/00 and 1/2/14 from Richard Michael Price, Esq. of

Nixon Peabody LLP. We assume that these documents are readily available for your reference since either you or your representatives have provided us with copies.

Our review revealed that the LTO operates LTRAP on behalf of the Township. The LTO and LTRAP are not separate entities. The LTO (not LTRAP) is the name of the legal entity that acts to administer the Township's Section 8 programs pursuant to the terms of the Agency Agreement. LTRAP is an operating unit of the LTO. Also, the LTO's Agency Agreement was not approved by HUD. We have not found any evidence that the substance of the Agency Agreement received the approval of HUD or that the selection of the LTO satisfies State and/or Local procurement requirements, if applicable. We have determined the following:

A. <u>No evidence that HUD approved Agency Agreement.</u>

We disagree with a conclusion made by Mr. Price in his 12/15/00 and 1/2/14 letters that HUD has determined "the [Agency Agreement] was appropriate and remains so." As evidence of this conclusion, Mr. Price points to the Humphrey Letter and Marchman Letter. However, neither makes that assertion. The Humphrey Letter merely states that since HUD is not a party to the agreement, HUD's review and approval thereof shall not be required. The Marchman Letter states only that HUD's procurement rules do not apply to the LTO's selection as a public housing agency. Neither letter addresses the substance of the Agency Agreement. Accordingly, these letters cannot support a claim that HUD has found the Agency Agreement to be appropriate. Therefore, we have not seen any evidence that HUD determined the Agency Agreement to be appropriate or otherwise granted its approval of the agreement.

B. <u>Applicability of Procurement Rules.</u>

The Marchman Letter makes clear that HUD's procurement rules do not apply to the Township's "selection of LTO as a public housing agency." *See, the Marchman Letter.* Notwithstanding the inapplicability of HUD's procurement rules, State and Local laws regarding procurement may apply to such selection. Nothing in the documentation with which we have been provided indicates whether or not the selection of the LTO satisfies any applicable State or local procurement rules.

The Township and the LTO are together the "PHA" under the ACC. We have determined that both the Township and the LTO constitute a "PHA" in this matter.

C. <u>PHA defined.</u>

The Housing Choice Voucher Program, which if also referred to as the "Section 8 Program", is generally administered by State or local government entities called public housing agencies (or PHAs). HUD provides housing assistance funds and funds for PHA administration of this program to the PHA. *See, 24 C.F.R.*

§982.1(a). A PHA includes "...both (1) any State, county, municipality, or other governmental entity or public body which is authorized to administer the program (or an agency or instrumentality of such entity), and ...(2)(ii) [a]ny other public or private non-profit entity that was administering a Section 8 tenant-based assistance program pursuant to a contract with the contract administrator of such program (HUD or PHA) on October 21, 1998.' *See*, 24 C.F.R. §982.4(b).

Based on the information that we have been presented, it appears that the LTO is a non-profit entity that has been administering a Section 8 tenant-based assistance program for the Township since 10/21/98 and before, as evidenced by both the 1998 ACC and the Agency Agreement. For this reason, we find that the Township and the LTO together meet the definition of a PHA and therefore constitute the PHA of the Housing Choice Voucher Program run by the Township in Lakewood, New Jersey. The identity of the PHA in this instance should be shared by both the Township and the LTO, which appears to be consistent with the parties shared responsibility on the copies of the Consolidated ACCs. Particularly, since they both refer to LTRAP, which we have determined above to be an operational unit of the LTO, and name the Township as the HA on a funding exhibit.

D. <u>LTO is not merely a contractor or service provider.</u>

The PHA must have authority to administer the program. *See*, 24 C.F.R. §982.51(a). In fact, the Marchman Letter that Mr. Price often references in and attaches to his correspondence with HUD on this matter, specifically concludes that the LTO qualifies as a public housing agency. Furthermore, the Marchman Letter specifies that the LTO was selected by the Township to act as a public housing agency; not as a contractor or service provider. We note that the Township does not also see itself as a public housing agency.

A PHA is required to submit evidence of any change that affects its status as a PHA, its authority to administer the program, or its jurisdiction. *See*, 24 C.F.R. §982.51(b). We have not received any documentation that suggests that the LTO has made a case that it has undergone a change that affects its status as a PHA pursuant to the governing regulations. For these reasons, we disagree with the repeated characterization of the LTO as merely a contractor or service provider.

In addition, the unsupported payment of Administrative Fees to the LTO violates HUD's rules. We have determined that LTRAP's unsupported payment of the full amount of the administrative fees to the LTO violates HUD's financial management rules applicable to the Section 8 HCV program.

E. <u>No evidence of such Agreement found.</u>

We could not find any evidence in the Agency Agreement to establish the Township's agreement to pay the full amount of the administrative fees to the

LTO, in exchange for its administration of LTRAP. Although the Cohn Letter
makes reference to the Agency Agreement having been amended over the years,
the Newark Field Office have not been provided with these agreements.
Reference to a financial arrangement between the Township and the LTO is
however noted in the Mayor's Letter. Specifically, the Mayor's Letter describes
the agreement to be that LTRAP "would not draw on the Township's
resources:" the LTO was required to be "economically self-sufficient." Nothing
in the Agency Agreement or the Mayor's Letter suggests that the LTO should
be allowed to charge a fee against program receipts that is not supported by
allowable program expenses. Moreover, even if such a written agreement could
be found, the regulations suggest that the Township could not agree to such an
arrangement.

F.   The LTO must comply with HUD requirements, including audit.

The governing regulations require that the PHA comply with HUD regulations
and other HUD requirements for the program, in addition to the consolidated
ACC and the PHA's HUD-approved applications for program funding. *See, 24
C.F.R. §982.52 and §982.153.* Such compliance requirements are similarly
echoed in the terms of the ACC. *See, Paragraph 10 of the 1998 ACC.*
Accordingly, as a PHA, both the Township and the LTO are required to comply
with all applicable HUD regulations and requirements and the terms of the
Consolidated ACCs and any and all HUD-approved application(s) pursuant to
which the HCV program receives HUD funding.

LTO did not respond to HUD's requirements in notice PIH-2014-01, Guidance on
Reporting Public Housing Agency Executive Compensation HUD-52725.  The
notice applies to all PHAs that administer a public housing or housing choice
voucher program.  This notice supersedes those parts of PIH-2011-48.  The
guidance in that notice pertaining to conducting comparability analysis remains in
effect.  The key changes include:

a.   There are no reporting exemptions;
b.   The submission date is not tied to the submission of the HUD-52723 form;
c.   Data must be submitted for the top management official and top financial
     official;
d.   The types of compensation that must be reported have changed;
e.   Compensation data is required for no more than three employees, and
f.   Source of funds must be reported for those employees with total cash
     compensation exceeding $155,500

Please be advised that applicable HUD requirements include subjecting a PHA to its
audit requirements. *See, 24 CFR 982.159(b).*  Therefore, we find that the Township and the LTO
are both subject to HUD's audit requirements.  However, notwithstanding our determination that
the LTO (together with the Township)constitutes a PHA in this matter, the Agency Agreement,
by its own terms, makes it clear that the LTO agrees "to act as the designated agency of the

Township to administer said program pursuant to <u>applicable Federal, State and local laws and regulation."</u> Furthermore, the failure to administer the program in accordance with the laws, statutes, ordinance, rules and regulations and directives of HUD constitutes "reasonable cause" that can serve as a basis, under the Agency Agreement, for the Township to rescind its resolution designating the LTO as its agency to administer the Township's Section 8 program.

       G.  <u>HUD regulates the use of Administrative Fees.</u>

In accordance with the ACC, HUD agrees to make payments to the PHA, over a specified term, for housing assistance payments to owners and for the PHA administrative fee. *See, 24 C.F.R. §982.151(a)(1).* Generally, administrative fees are calculated based on the amount of rental assistance vouchers being administered by a PHA in a fiscal year. *See, HUD Notice PIH 2013-25.* They are paid to a PHA based on its projection regarding vouchers covered by

tenant leases. *See, Section 20.6 of the Guidebook.* Administrative fees may only be used to cover costs incurred to perform the administrative responsibilities for the program in accordance with HUD regulations and requirements. *See, 24 C.F.R. §982.152, and Paragraph 4(b)(2) of the 1998 ACC.* Specifically, amounts paid by HUD to the PHA for a program and any other amounts received by the PHA in connection with the program (which are defined as "program receipts"), may only be used to pay program expenditures. *See, Paragraph 11(a) of the 1998 ACC.* The term "program expenditures" is defined to refer to those amounts which may be charged against program receipts in accordance with the Consolidated ACC and HUD requirements. *See, the 1998 ACC.*

Recognizing that the administrative fees are calculated based on projections and not based on allowable expenses that may be incurred by a PHA, HUD rules require that any funds received in excess of allowable program expenditures be maintained in an Administrative Fee Reserve, returned to HUD or invested in accordance with HUD requirements. *See, 24 C.F.R. §982.155 and Paragraphs 11(d) and 12 of the 1998 ACC.* Although it is conceivable that the full amount of administrative fees may be used to pay for allowable program expenditures of LTRAP and therefore no Administrative Fee Reserve need to be maintained, HUD is not able to make that determination because neither the Township nor the LTO have produced evidence that the administrative fees are being charged against allowable program expenditures.

Most importantly, any contention that the parties may contract to set the LTO's fee at the full amount of the administrative fees paid by HUD seems contrary to the purpose of the administrative fees and efforts by HUD to control such spending using taxpayer dollars. We emphasize this in light of recent reductions in appropriations. By way of example, we note that HUD has implemented a cap on the amount of executive compensation that can be paid from Section 8 funds. *See, HUD's Notice PIH 2012-14*

*2012-14 (HA)*.  Therefore, we disagree with any contention that the administrative fees paid to the LTO are "de-federalized," or otherwise beyond the scrutiny of HUD.

Based on the discussion above, we have determined that (1) LTRAP is an operating unit of the LTO; (2) the Township and the LTO together constitute the PHA in this matter; (3) the unsupported payment of the entire amount of the program's administrative fees to the LTO violates HUD's rules regarding the use of administrative fees; (4) use of administrative fees are subject to HUD's review and approval; and (5) we find no claims that the use of these fees are not subject to HUD review nor audit.

If you should have any questions, please contact me at (973) 776-7210.

Sonia L. Burgos

4/14/14

Director
Office of Public Housing

Cc:     Debra Torres, Regional Administrator
        Shie-Fong sun, Associate Regional Counsel
        Wanda Nieves, Director, FHEO
        MaryAnn Creager, Supervisor Program Analyst, QAD

AR 000010

# [EXHIBIT 2]

AR 000011



U. S. Department of Housing and Urban Development

New Jersey State Office
Thirteenth Floor
One Newark Center
Newark, NJ 07102-5260

JUL 2 1 1998

Mr. Meir N. Hertz, PHM
Executive Director
Lakewood RAP
600 W. Kennedy Blvd.
P.O. Box 856
Lakewood, NJ  08701

Dear Mr. Hertz:

Subject:  Amendment to the Annual Contributions Contract
          Project No.  NJ214-VO-0015 (Renewal)
                       NJ214-VO-0016 (Renewal)

     Enclosed is an executed copy of the Amendment to your
Annual Contract.

     If you have any questions, please contact Sharon Smith of my
staff at (973) 622-7900 extension 3630.

                              Sincerely,

                              Carmen Valenti
                              Director
                              Office of Public Housing

Enclosure

Visit our Web Site at:  http://www.hud.gov/local/njn/njnhome.html

PHA

# Consolidated Annual Contributions Contract

Rental Certificate and Rental Voucher Programs

**U.S. Department of ~~H~~ousing and Urban Development**
**Office of Public and Indian Housing**

Section 8

*Lakewood RAP*
*NJ214VO 0015 (Renewal)*
*NJ214VO 0016 (Renewal)*

## Table of Sections

| | | page |
|---|---|---|
| 1. | Definitions | 1 |
| 2. | Funding for HA Certificate or Voucher Program | 1 |
| 3. | Term | 2 |
| 4. | HUD Payments for Program | 2 |
| 5. | Maximum Payments for Program | 2 |
| 6. | Reduction of Amount Payable by HUD | 2 |
| 7. | ACC Reserve Account | 2 |
| 8. | Separate ACC for Funding Increment | 2 |
| 9. | Budget and Requisition for Payment | 2 |
| 10. | HUD Requirements | 2 |

| | | page |
|---|---|---|
| 11. | Use of Program Receipts | 2 |
| 12. | Administrative Fee Reserve | 3 |
| 13. | Depository | 3 |
| 14. | Program Records | 3 |
| 15. | Default by HA | 3 |
| 16. | Fidelity Bond Coverage | 3 |
| 17. | Exclusion from Program | 3 |
| 18. | Exclusion of Third Party Rights | 4 |
| 19. | Consolidated ACC | 4 |

## 1. Definitions

**ACC** Annual contributions contract.

**ACC Reserve Account** An account established by HUD for a program from amounts by which the maximum payment to the HA under the consolidated ACC (during a HA fiscal year) exceeds the amount actually approved and paid. This account is used as the source of additional payments for the program.

**Annual Contributions Contract** The contract for each funding increment. HUD's commitment to make payments for each funding increment ("project") listed in the funding exhibit constitutes a separate ACC.

**Budget Authority** The maximum amount of funds available for payment to the HA over the term of a funding increment. Budget authority is authorized and appropriated by the Congress.

**Consolidated Annual Contributions Contract (consolidated ACC)** This consolidated contract for the HA certificate program and voucher program. HUD's commitment to make payments for each funding increment in a program constitutes a separate ACC. However, commitments for all the funding increments are listed in this consolidated ACC.

**Contract Authority** The maximum annual payment by HUD to the HA for a funding increment. The amount of contract authority for each funding increment in a program is listed in the funding exhibit for the program.

**Fiscal Year** The HA fiscal year. The funding exhibit states the last month and day of the HA fiscal year.

**Funding Exhibit** An exhibit to the consolidated ACC. The funding exhibit states the amount and term of funding for a program. There are separate funding exhibits for the HA certificate program and voucher program.

**Funding Exhibit A** The funding exhibit for the HA certificate program.

**Funding Exhibit B** The funding exhibit for the HA voucher program.

**Funding Increment (also called a "Project")** Each commitment of budget authority by HUD to the HA for a program under the consolidated ACC. The funding increments for the program are listed on the program funding exhibit.

**HA** Housing agency.

**Housing Agency (HA)** The agency that has entered this consolidated ACC with HUD.

**HUD** U.S. Department of Housing and Urban Development.

**Program** The HA certificate program or voucher program.

**Program Expenditures** Amounts which may be charged against program receipts in accordance with the consolidated ACC and HUD requirements.

**Program Receipts** Amounts paid by HUD to the HA for a program, and any other amounts received by the HA in connection with the program.

**Project** A funding increment for the program.

## 2. Funding for HA Certificate or Voucher Program

a. The funding increments in the HA certificate program or voucher program are listed in the funding exhibit for the program.

b. The amount of contract and budget authority for each funding increment in a program is stated in the program funding exhibit.

c. By giving written notice to the HA, HUD may revise the funding exhibit for a program:

(1) To add a funding increment, or

(2) To remove a funding increment for which the ACC term has expired.

d. The HUD notice must include a revised funding exhibit, specifying the term, contract authority and budget authority for each funding increment under the consolidated ACC. The HUD notice of a revised funding exhibit for a program constitutes an amendment of the consolidated ACC.

Form HUD-52520 (12/97)

AR 000013

3. **Term**
   a. The funding exhibit states the first date and last date of the ACC term for each funding increment.
   b. If the first or last date of the ACC term for a funding increment is not entered before the consolidated ACC is signed by the HA, HUD may enter the date subsequently, by giving written notice to the HA.

4. **HUD Payments for Program**
   a. HUD will make payments to the HA for a program in accordance with HUD regulations and requirements.
   b. For each HA fiscal year, HUD will pay the HA the amount approved by HUD to cover:
      (1) Housing assistance payments by the HA for a program.
      (2) HA fees for administration of the program.
   c. The amount of the HUD payment may be reduced, as determined by HUD, by the amount of program receipts (such as interest income) other than the HUD payment.

5. **Maximum Payments for Program**
   a. **Annual Limit**   Except for payments from the consolidated ACC reserve account, the HUD annual payments for a program during a fiscal year must not be more than the sum of the contract authority amounts for the funding increments in the program.
   b. **Limit on Payments for Funding Increment**   The total amount of payments for any funding increment over the increment term must not exceed budget authority for the funding increment.

6. **Reduction of Amount Payable by HUD**
   a. If HUD determines that the HA has failed to comply with any obligations under the consolidated ACC, HUD may reduce to an amount determined by HUD:
      (1) The amount of the HUD payment for any funding increment.
      (2) The contract authority or budget authority for any funding increment.
   b. HUD must give the HA written notice of the reduction.
   c. The HUD notice must include a revised funding exhibit specifying the term, contract authority, and budget authority for each funding increment under the consolidated ACC. The HUD notice of revisions to the funding exhibit for a program constitutes an amendment of the consolidated ACC.

7. **ACC Reserve Account**
   An ACC reserve account may be established and maintained by HUD. The amount in the account is determined by HUD. The ACC reserve account may be used by HUD to pay any portion of the program payment approved by HUD for a fiscal year.

8. **Separate ACC for Funding Increment**

HUD's commitment to make payments for each funding increment ("project"), listed in the funding exhibit constitutes a separate ACC.

Form HUD-52520  (12/97)

AR 000014

9. **Budget and Requisition for Payment**
   a. Each fiscal year, the HA must submit to HUD an estimate of the HUD payments for the program. The estimate and supporting data must be submitted at such time and in such form as HUD may require, and are subject to HUD approval and revision.
   b. The HA must requisition periodic payments on account of each annual HUD payment. Each requisition must be in the form prescribed by HUD. Each requisition must include certification that:
      (1) Housing assistance payments have been made in accordance with contracts in the form prescribed by HUD and in accordance with HUD requirements; and
      (2) Units have been inspected by the HA in accordance with HUD requirements.
   c. If HUD determines that payments by HUD to the HA for a fiscal year exceed the amount of the annual payment approved by HUD for the fiscal year, the excess must be applied as determined by HUD. Such applications, determined by HUD may include, but are not limited to, application of the excess payment against the amount of the annual payment for a subsequent fiscal year. The HA must take any actions required by HUD respecting the excess payment, and must, upon demand by HUD, promptly remit the excess payment to HUD.

10. **HUD Requirements**
   a. The HA must comply, and must require owners to comply, with the requirements of the U.S. Housing Act of 1937 and all HUD regulations and other requirements, including any amendments or changes in the law or HUD requirements.
   b. The HA must comply with its HUD-approved administrative plan, and HUD-approved program funding applications.
   c. The HA must use the program forms required by HUD.
   d. The HA must proceed expeditiously with the programs under this consolidated ACC.

11. **Use of Program Receipts**
   a. The HA must use program receipts to provide decent, safe, and sanitary housing for eligible families in compliance with the U.S. Housing Act of 1937 and all HUD requirements. Program receipts may only be used to pay program expenditures.
   b. The HA must not make any program expenditures, except in accordance with the HUD-approved budget estimate and supporting data for a program.
   c. Interest on the investment of program receipts constitutes program receipts.
   d. If required by HUD, program receipts in excess of current needs must be promptly remitted to HUD or must be invested in accordance with HUD requirements.

12. **Administrative Fee Reserve**
   a. The HA must maintain an administrative fee reserve for a program. The HA must credit to the administrative fee reserve the total of:
      (1) The amount by which program administrative fees paid by HUD for a fiscal year exceed HA administrative expenses for the fiscal year, plus
      (2) Interest earned on the administrative fee reserve.
   b. The HA must use funds in the administrative fee reserve to pay administrative expenses in excess of program receipts. If any funds remain in the administrative fee reserve, the HA may use the administrative reserve funds for other housing purposes if permitted by State and local law.
   c. If the HA is not adequately administering any Section 8 program in accordance with HUD requirements, HUD may:
      (1) Direct the HA to use the funds to improve administration of the Section 8 program or for reimbursement of ineligible expenses.
      (2) Prohibit HA use of administrative fee reserve funds.

13. **Depositary**
   a. Unless otherwise required or permitted by HUD, all program receipts must be promptly deposited with a financial institution selected as depositary by the HA in accordance with HUD requirements.
   b. The HA must enter an agreement with the depositary institution in the form required by HUD.
   c. The HA may only withdraw deposited program receipts for use in connection with the program in accordance with HUD requirements.
   d. The agreement with the depositary institution must provide that if required under a written notice from HUD to the depositary:
      (1) The depositary must not permit any withdrawal of deposited funds by the HA unless withdrawals by the HA are expressly authorized by written notice from HUD to the depositary.
      (2) The depositary must permit withdrawals of deposited funds by HUD.
   e. If approved by HUD, the HA may deposit under the depositary agreement monies received or held by the HA in connection with any contract between the HA and HUD.

14. **Program Records**
   a. The HA must maintain complete and accurate books of account and records for a program. The books and records must be in accordance with HUD requirements, and must permit a speedy and effective audit.
   b. The HA must furnish HUD such financial and program reports, records, statements, and documents at such times, in such form, and accompanied by such supporting data as required by HUD.

Form HUD-52520 (12/97)

AR 000015

c.  HUD and the Comptroller General of the United States, or their duly authorized representatives, must have full and free access to all HA offices and facilities, and to all the books, documents and records of the HA relevant to administration of the program, including the right to audit and to make copies.

d.  The HA must engage and pay an independent public accountant to conduct audits that are required by HUD. The cost of audits required by HUD may be charged against program receipts.

15. **Default by HA**

a.  Upon written notice to the HA, HUD may take possession of all or any HA property, rights or interests in connection with a program, including funds held by a depositary, program receipts, and rights or interests under a contract for housing assistance payments with an owner, if HUD determines that:

(1)  The HA has failed to comply with any obligations under this consolidated ACC; or

(2)  The HA has failed to comply with obligations under a contract for housing assistance payments with an owner; or

(3)  The HA has failed to take appropriate action, to HUD's satisfaction or as directed by HUD, for enforcement of the HA's rights under a contract for housing assistance payments (including requiring actions by the owner to cure a default, termination, or reduction of housing assistance payments, termination of the contract for housing assistance payments, or recovery of overpayments); or

(4)  The HA has made any misrepresentation to HUD of any material fact.

b.  HUD's exercise or non-exercise of any right or remedy under the consolidated ACC is not a waiver of HUD's right to exercise that or any other right or remedy at any time.

16. **Fidelity Bond Coverage**

The HA must carry adequate fidelity bond coverage, as required by HUD, of its officers, agents, or employees handling cash or authorized to sign checks or certify vouchers.

17. **Exclusion from Program**

Single-headed households, pregnant females, and recipients of public assistance may not be excluded from participation in or be denied the benefit of a program because of such status.

AR 000016

18. **Exclusion of Third Party Rights**
   a. A family that is eligible for housing assistance under this consolidated ACC is not a party to or third party beneficiary of the consolidated ACC.
   b. Nothing in the consolidated ACC shall be construed as creating any right of any third party to enforce any provision of this consolidated ACC, or to assert any claim against HUD or the HA.

19. **Consolidated ACC**
   a. The consolidated ACC is a contract between HUD and the HA.
   b. This consolidated ACC supersedes any previous annual contributions contract for a program. Matters relating to funding or operation of the program under a previous annual contributions contract are governed by this consolidated ACC.

---

| United States of America | Secretary of Housing and Urban Development | Date signed: |
|---|---|---|
| | Signature of Authorized Representative | |
| | X | 7/31/88 |
| | Name & Official Title: (print or type) | |

---

| Housing Agency | Name of Agency: (print or type) | |
|---|---|---|
| | Signature of Authorized Representative: | Date signed: |
| | X | |
| | Name & Official Title: (print or type) | |

---

Form HUD-52520  (12/97)

AR 000017

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
PIH SECTION 8 - FUNDING EXHIBIT
PROGRAM-BASED

ACC NUMBER: NJ214VO

FIELD OFFICE: 2FPH
OFFICE OF PUBLIC HOUSING

HA NUMBER: NJ214
LAKEWOOD TOWNSHIP
231 THIRD ST

LAKEWOOD          , NJ  087010000

HA FISCAL YEAR-END: 12/31

PROGRAM TYPE: VOUCHER PROGRAM

| FI NUMBER | FIRST DATE OF TERM | LAST DATE OF TERM | CONTRACT TERM | CONTRACT AUTHORITY | BUDGET AUTHORITY |
|---|---|---|---|---|---|
| NJ214V00008 | 10/01/93 | 09/30/98 | 60 | 251,449 | 891,851 |
| NJ214V00009 | 06/01/94 | 05/31/98 | 48 | 0 | 618,672 |
| NJ214V00010 | 09/01/94 | 08/31/98 | 48 | 268,535 | 1,074,140 |
| NJ214V00011 | 09/01/94 | 08/31/99 | 60 | 134,936 | 674,681 |
| NJ214V00012 | 04/01/97 | 03/31/98 | 12 | 0 | 1,230,600 |
| NJ214V00013 | 04/01/98 | 03/31/99 | 12 | 1,189,590 | 1,189,590 |
| NJ214V00014 | 06/01/98 | 05/31/99 | 12 | 139,680 | 139,680 |
| NJ214V00015 | 10/01/98 | 09/30/99 | 12 | 216,384 | 216,384 |
| NJ214V00016 | 09/01/98 | 08/31/99 | 12 | 235,200 | 235,200 |
| NJ214V06001 | 01/01/98 | 12/31/98 | 12 | 3,994 | 3,994 |
| NJ214V08001 | 05/01/98 | 04/30/99 | 12 | 74,502 | 74,502 |

AR 000018



**U. S. Department of Housing and Urban Development**

New Jersey State Office
Thirteenth Floor
One Newark Center
Newark, NJ 07102-5260

SEP 20 1995

Mr. Meir M. Hertz, PHM
Executive Director
LAKEWOOD PHA
P.O. Box 371
419 First St.
Lakewood, NJ 08701-0371

Dear Mr. Hertz:

Subject:   Amendment of the Annual Contributions
           Amendment No. 25
           Project No:  NJ-211-CE-0020 (RENEWAL)
                        NJ-214-CE-0001 (RENEWAL)

    Enclosed you will find documents necessary to effectuate an
Amendment to the Annual Contributions Contract (ACC) for the above
referenced project.

    Please return two (2) executed copies to this office at your
earliest convenience. Also, please submit a budget revision
incorporating all projects on the Funding Exhibit. A fully executed
copy will be returned to you at a later date.

    If you have any questions, please contact the Financial Analyst
assigned to your PHA.

                              Sincerely,

                              Florence M. Claggor
                              Florence M. Claggor
                              Director
                              Finance and Budget Division
                              Office of Public Housing

Enclosure

PHA

# Consolidated Annual Contributions Contract

Rental Certificate Program
and Rental Voucher Program

**U.S. Department of Housing and Urban Development**
**Office of Public and Indian Housing**

Section 8

*Lakewood RAP*

*NJ214 CE 0020 (Renewa*
*✱ NJ214 CE 0021 (Renewal*
*OF ✱ MOD REHAB NJ39K214 PROJ*

## Table of Sections

| | page |
|---|---|
| 1. Definitions | 1 |
| 2. Funding for HA Certificate or Voucher Program ... | 2 |
| 3. Term | 2 |
| 4. HUD Payments for Program | 2 |
| 5. Maximum Payments for Program | 2 |
| 6. Reduction of Amount Payable by HUD | 2 |
| 7. ACC Reserve Account | 2 |
| 8. Separate ACC for Funding Increment | 2 |
| 9. Budget and Requisition for Payment | 2 |
| 10. Depository | 3 |
| 11. Use of Program Receipts | 3 |
| 12. Administrative Fee Reserve | 3 |
| 13. Depositary | 3 |
| 14. Program Records | 3 |
| 15. Default by HA | 3 |
| 16. Fidelity Bond Coverage | 4 |
| 17. Exclusion from Program | 4 |
| 18. Conflict of Interest Provisions | 4 |
| 19. Interest of Member of or Delegate to Congress | 4 |
| 20. Exclusion of Third Party Rights | 4 |
| 21. Consolidated ACC | 4 |

## 1. Definitions

**ACC.** Annual contributions contract.

**ACC Reserve Account.** An account established by HUD for a program from amounts by which the maximum payment to the HA under the consolidated ACC (during a HA fiscal year) exceeds the amount actually approved and paid. This account is used as the source of additional payments for the program.

**Annual Contributions Contract.** The contract for each funding increment. HUD's commitment to make payments for each funding increment ("project") listed in the funding exhibit constitutes a separate ACC.

**Budget Authority.** The maximum amount of funds available for payment to the HA over the term of a funding increment. Budget authority is authorized and appropriated by the Congress.

**Consolidated Annual Contributions Contract (consolidated ACC).** This consolidated contract for the HA certificate program and voucher program. HUD's commitment to make payments for each funding increment in a program constitutes a separate ACC. However, commitments for all the funding increments are listed in this consolidated ACC.

**Contract Authority.** The maximum annual payment by HUD to the HA for a funding increment. The amount of contract authority for each funding increment in a program is listed in the funding exhibit for the program.

**Fiscal Year.** The HA fiscal year. The funding exhibit states the last month and day of the HA fiscal year.

**Funding Exhibit.** An exhibit to the consolidated ACC. The funding exhibit states the amount and term of funding for a program. There are separate funding exhibits for the HA certificate program and voucher program.

**Funding Exhibit A.** The funding exhibit for the HA certificate program.

**Funding Exhibit B.** The funding exhibit for the HA voucher program.

**Funding Increment (also called a "Project").** Each commitment of budget authority by HUD to the HA for a program under the consolidated ACC. The funding increments for the program are listed on the program funding exhibit.

**HA.** Housing agency.

**Housing Agency (HA).** The agency that has entered this consolidated ACC with HUD.

**HUD.** U.S. Department of Housing and Urban Development.

**Program.** The HA certificate program or voucher program.

**Program Expenditures.** Amounts which may be charged against program receipts in accordance with the consolidated ACC and HUD requirements.

**Program Receipts.** Amounts paid by HUD to the HA for a program, and any other amounts received by the HA in connection with the program.

**Project.** A funding increment for the program.

form HUD-52520 (6/93)

AR 000020

## 2   Funding for HA Certificate or Voucher Program

(a)   The funding increments in the HA certificate program or voucher program are listed in the funding exhibit for the program.

(b)   The amount of contract and budget authority for each funding increment in a program is stated in the program funding exhibit.

(c)   By giving written notice to the HA, HUD may revise a funding exhibit:
(1)   To add a cost amendment project.
(2)   To remove a project for which the ACC term has expired.

## 3.   Term

(a)   The funding exhibit states the first date and last date of the ACC term for each funding increment.

(b)   If the first or last date of the ACC term for a funding increment is not entered before the consolidated ACC is signed by the HA, HUD may enter the date subsequently, by giving written notice to the HA

## 4.   HUD Payments for Program

(a)   HUD will make payments to the HA for a program in accordance with HUD regulations and requirements.

(b)   For each HA fiscal year, HUD will pay the HA the amount approved by HUD to cover:
(1)   Housing assistance payments by the HA for a program.
(2)   HA fees for administration of the program.

(c)   The amount of the HUD payment may be reduced, as determined by HUD, by the amount of program receipts (such as interest income) other than the HUD payment.

## 5.   Maximum Payments for Program

(a)   Annual Limit   Except for payments from the consolidated ACC reserve account, the HUD annual payments for a program during a fiscal year must not be more than the sum of the contract authority amounts for the funding increments in the program.

(b)   Limit on Payments for Funding Increment   The total amount of payments for any funding increment over the increment term must not exceed budget authority for the funding increment.

## 6.   Reduction of Amount Payable by HUD

(a)   If HUD determines that the HA has failed to comply with any obligations under the consolidated ACC, HUD may reduce to an amount determined by HUD:
The amount of the HUD payment for any funding
(1)   increment.
The contract authority or budget authority for any
(2)   funding increment.

(b)   HUD must give HA written notice of the reduction.

(c)   The HUD notice may include a revised funding exhibit to state the reduction in the amount of contract authority or budget authority for a funding increment. The notice of a revised funding exhibit, or of revisions to the funding exhibit for a program constitutes an amendment of the consolidated ACC.

## 7.   ACC Reserve Account

An ACC reserve account may be established and maintained by HUD. The amount in the account is determined by HUD. The ACC reserve account may be used by HUD to pay any portion of the program payment approved by HUD for a fiscal year.

## 8.   Separate ACC for Funding Increment

HUD's commitment to make payments for each funding increment ("project") listed in the funding exhibit constitutes a separate ACC.

## 9.   Budget and Requisition for Payment

(a)   Each fiscal year, the HA must submit to HUD and estimate of the HUD payments for the program. The estimate and supporting data must be submitted at such time and in such form as HUD may require, and are subject to HUD approval and revision.

(b)   The HA must requisition periodic payments on account of each annual HUD payment. Each requisition must be in the form prescribed by HUD:
(1)   Housing assistance payments have been made in accordance with contracts in the form prescribed by HUD and in accordance with HUD requirements; and
(2)   Units have been inspected by the HA in accordance with HUD requirements.

(c)   If HUD determines that payments by HUD to the HA for a fiscal year exceed the amount of the annual payment approved by HUD for the fiscal year, the excess must be applied as determined by HUD. Such applications determined by HUD may include, but are not limited to, application of the excess payment against the amount of the annual payment for a subsequent fiscal year. The HA must take any actions required by HUD respecting the excess payment, and must, upon demand by HUD, promptly remit the excess payment to

form HUD-52520  (6/93)

AR 000021

## 10. HUD Requirements

(a) The HA must comply, and must require owners to comply, with the requirements of the U.S. Housing Act of 1937 and all HUD regulations and other requirements, including any amendments or changes in the law or HUD requirements.

(b) The HA must comply with its HUD-approved administrative plan, equal opportunity housing plan and HUD-approved program funding applications.

(c) The HA must use the program forms required by HUD.

(d) The HA must proceed expeditiously with the programs under this consolidated ACC.

## 11. Use of Program Receipts

(a) The HA must use program receipts to provide decent, safe, and sanitary housing for eligible families in compliance with the U.S. Housing Act of 1937 and all HUD requirements. Program receipts may only be used to pay program expenditures.

(b) The HA must not make any program expenditures, except in accordance with the HUD-approved budget estimate and supporting data for a program.

(c) Interest on the investment of program receipts constitutes program receipts.

(d) If required by HUD, program receipts in excess of current needs must be promptly remitted to HUD or must be invested in accordance with HUD

## 12. Administrative Fee Reserve

(a) The HA must maintain an administrative fee reserve for a program. The HA must credit to the administrative fee reserve the total of:
(1) The amount by which program administrative fees paid by HUD for a fiscal year exceed HA administrative expenses for the fiscal year, plus
(2) Interest earned on the administrative fee reserve.

(b) The HA must use funds in the administrative fee reserve to pay administrative expenses in excess of program receipts. If any funds remain in the administrative fee reserve, the HA may use the administrative reserve funds for other housing purposes if permitted by State and local law.

(c) If the HA is not adequately administering any Section 8 program in accordance with HUD requirements, HUD may:
(1) Direct the HA to use the funds to improve administration of the Section 8 program or for reimbursement of ineligible expenses.
(2) Prohibit HA use of administrative fee reserve funds.

## 13. Depositary

(a) Unless otherwise required or permitted by HUD, all program receipts must be promptly deposited with a financial institution selected as depositary by the HA in accordance with HUD requirements.

(b) The HA must enter an agreement with the depositary institution in the form required by HUD.

(c) The HA may only withdraw deposited program receipts for use in connection with the program in accordance with HUD requirements.

(d) The agreement with the depositary institution must provide that if required under a written notice from HUD to the depositary:
(1) The depositary must not permit any withdrawal of deposited funds by the HA unless withdrawals by the HA are expressly authorized by written notice from HUD to the depositary.
(2) The depositary must permit withdrawals of deposited funds by HUD.

(e) If approved by HUD, the HA may deposit under the depositary agreement monies received or held by the HA in connection with any contract between the HA and HUD.

## 14. Program Records

(a) The HA must maintain complete and accurate books of account and records for a program. The books and records must be in accordance with HUD requirements, and must permit a speedy and effective audit.

(b) The HA must furnish HUD such financial and program reports, records, statements, and documents at such times, in such form, and accompanied by such supporting data as required by HUD.

(c) HUD and the Comptroller General of the United States, or their duly authorized representatives, must have full and free access to all HA offices and facilities, and to all the books, documents and records of the HA relevant to administration of the program, including the right to audit and to make copies.

(d) The HA must engage and pay an independent public accountant to conduct audits that are required by HUD. The cost of audits required by HUD may be charged against program receipts.

## 15. Default by HA

(a) Upon written notice to the HA, HUD may take possession of all or any HA property, rights or interests in connection with a program, including funds held by a depositary, program receipts, and rights or interests

form HUD-52520 (6/93)

AR 000022

under a contract for housing assistance payments with an owner, if HUD determines that:

(1) The HA has failed to comply with any obligations under this consolidated ACC; or

(2) The HA has failed to comply with obligations under a contract for housing assistance payments with an owner, or has failed to take appropriate action, to HUD's satisfaction or as directed by HUD, for enforcement of the HA's rights under a contract for housing assistance payments (including requiring actions by the owner to cure a default, termination, or reduction of housing assistance payments, termination of the contract for housing assistance payments, or recovery of overpayments); or

(2) The HA has made any misrepresentation to HUD or any material fact.

(b) HUD's exercise or non-exercise of any right or remedy under the consolidated ACC is not a waiver of HUD's right to exercise that or any other right or remedy at any time.

## 16. Fidelity Bond Coverage

The HA must carry adequate fidelity bond coverage, as required by HUD, of its officers, agents, or employees handling cash or authorized to sign checks or certify vouchers.

## 17. Exclusion from Program

Single-headed households, pregnant females, and recipients of public assistance may not be excluded from participation in or be denied the benefit of a program because of such status.

## 18. Conflict of Interest Provisions

(a) Neither the HA nor any of its contractors or their subcontractors may enter into any contract, subcontract, or arrangement in connection with a program in which any of the following classes of persons has an interest, direct or indirect, during tenure or for one year thereafter:

(1) Any present or former member or officer of the PHA (except a tenant commissioner).

(2) Any employee of the HA who formulates policy or who influences decisions with respect to a

(3) program.

Any public official, member of a governing body, or State of local legislator who exercises functions or

(b) Any member of these classes of persons must disclose the member's interest or prospective interest to the HA and HUD.

(c) The requirements of this section may be waived by HUD for good cause. No person for whom a waiver is granted shall be permitted to exercise responsibilities or functions with respect to a contract for housing assistance payments executed, or to be executed, on

behalf, or with respect to a contract for housing assistance payments to which this person is a party.

(d) The provisions of this section do not apply to the depositary agreement, or to utility service for which the rates are fixed or controlled by a governmental agency.

## 19. Interest of Member of or Delegate to Congress

No member of or delegate to the Congress of the United States of America or resident commissioner shall be admitted to any share or part of this consolidated ACC or to any benefits which may arise from it.

## 20. Exclusion of Third Party Rights

(a) A family that is eligible for housing assistance under this consolidated ACC is not a party to or third party beneficiary of the consolidated ACC.

(b) Nothing in the consolidated ACC shall be construed as creating any right of any third party to enforce any provision of this consolidated ACC, or to assert any claim against HUD or the HA.

## 21. Consolidated ACC

(a) The consolidated ACC is a contract between HUD and the HA.

(b) This consolidated ACC supersedes any previous annual contributions contract for a program. Matters relating to funding or operation of the program under a previous annual contributions contract are governed by this consolidated ACC.

AR 000023

| | |
|---|---|
| **United States of America** | Secretary of Housing and Urban Development<br>Signature of Authorized Representative: |

Date signed:

X _____

Name & Official Title:  (print or type)

| | |
|---|---|
| **Housing Agency** | Name of Agency:  (print or type)<br>Lakewood Township<br>Rental Assistance Program (LTRAP)<br>Signature of Authorized Represenative: |

Date signed:

X *Richard L Work*          10/5/95

Name & Official Title:  (print or type)   RICHARD L. WORK, MAYOR

form HUD-52520  (6/93)

AR 000024

# [EXHIBIT 3]

AR 000025



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-5000

OFFICE OF PUBLIC AND INDIAN HOUSING
Quality Assurance Division

December 3, 2013

Meir Hertz, CEO
Lakewood Township RAP
600 W. Kennedy
Blvd. Lakewood,
NJ 08701

Dear Mr. Hertz:

The Department of Housing and Urban Development (HUD), Office of Public and Indian Housing, Quality Assurance Division (QAD) was recently onsite at the Lakewood Township Rental Assistance Program (LTRAP) to conduct a Financial Management Review of the Housing Choice Voucher (HCV) program. The primary purpose of the review was to ensure that HCV program funds have been expended and reported appropriately.

The specific purpose of our visit from September 10 – 12, 2013 was to:

- Validate the Net Restricted Assets (NRA) balance ending December 2011, December 2012, and July 2013.
- Validate the Unrestricted Net Assets (UNA) as of July 2013.
- Validation and analysis of Administrative Expenses for current period July 2012 through June 2013.
- Analysis of specific line items on the Lakewood Township RAP Financial Data Schedule (FDS) submission including *Prior period adjustments.*
- Confirm the availability of cash and/or investments sufficient to support the UNA and NRA balances calculated.

The results of our review are presented in the enclosed report. The report contains one finding and two concerns for which a formal Corrective Action Plan (CAP) must be prepared and sent to Mr. Joseph Russell at Joseph.R.Russell@hud.gov , with a copy furnished to Ms. Sonia Burgos at Sonia.L.Burgos@hud.gov . Your response must be received within 30 days from the date of this report.

We appreciate the cooperation extended to the QAD staff during our visit.

Sincerely,

MaryAnn Creager
Supervisor Program Analyst
Quality Assurance Division

Enclosure

cc: Sonia Burgos, Director of Public Housing Baltimore Hub Office
    Barbara Lamb, Division Director, Financial Management Center
    Miguel Fontanez, Director, Financial Management Division

**Background:**  The Shortfall Prevention Team (SPT) requested that the QAD review the Housing Assistance Payments (HAP) expenses and the NRA balances as of December 2011, December 2012 and July 2013; and the administrative expenses and the UNA balance as of July 2013 as reported by LTRAP in the Voucher Management System (VMS).  In the process of working with the LTRAP regarding a potential shortfall of HAP funds, the SPT discovered significant fluctuations in reported monthly HAP and NRA making it difficult to accurately determine if the housing authority was in fact facing a scenario of not having enough HAP funds to pay for their current voucher obligations.  Further, without a reported UNA balance that may be used to cover any funding shortfall, the SPT was unable to determine the true amount of funds available to the PHA to avoid termination of participants.  Also, in the process of scheduling the review, QAD realized the LTRAP does not report an Unrestricted Net Asset (UNA) balance in VMS.  Upon further inquiry with the housing authority QAD learned that the LTRAP contracts with a non-profit organization, the Lakewood Tenants Organization (LTO), to administer the Housing Choice Voucher (HCV) program.  Under the contract, LTRAP via "pass through' the entire monthly Administrative Fee disbursement  received from HUD is transferred to the LTO, and the LTO administers the HCV program paying all of the HCV administrative expenses.  As a result, the LTRAP proclaims the transfer of monthly Administrative Fee disbursements to the LTO results in a de-federalization of the fees and the funds are no longer subject to HUD regulation.  As a result, even though requested, the QAD was not provided with any source records that would permit us to validate the UNA balance.

The QAD informed the Newark HUD Field Office of LTRAP's position regarding the Administrative Fees and reporting of their UNA.  Since source records were not made available to the QAD to allow us to review the administrative expenses and validate a UNA balance, a determination was made to review and validate only those portions of the HCV program affecting HAP and NRA.   The Newark HUD Field Office will continue to work with LTRAP regarding their contractual arrangement with the LTO and the LTRAP legal obligations under the HCV program.

## Verification of Net Restricted Assets (NRA)

**Verification of Net Restricted Assets (NRA) balances as of December 31, 2011, December 31, 2012, and July 31, 2013.**

The Quality Assurance Division (QAD) completed an analysis of the NRA account balance for the Housing Assistance Payments (HAP) related funds received and expended during calendar years 2005-2012; for calendar year 2013 our analysis covered the period through July 2013.  The HAP incremental payments listed in HUD's Central Accounting and Payment System (HUDCAPS) for each month in the review period were used to determine the total HAP funding.

The general ledgers and other financial source documentation provided by the LTRAP financial staff were used to determine the amount of Fraud Recovery, interest income, FSS Escrow Forfeitures and the total HAP related expenses incurred.  The total validated expenditures were deducted from the revenue for the same time period to arrive at the NRA balances at the three periods within the scope of our review.

*Table No.1, Column 1,* indicates the amount that should have been used to calculate any NRA off-set to the PHA's 2012 renewal funding.  QAD also identified the cash available for offset as of **December 31, 2011**.  *Table No. 1, Columns 2 and 3* indicate what the NRA balance should have been and reconciled cash balances as of **December 31, 2012 and July 31, 2013, respectively.**

*Table 1*

|  | 12.31.2011 | 12.31.2012 | 7.31.2013 |
|---|---|---|---|
| Validated NRA Balance per QAD | $1,549,683 | $686,259 | ($31,802) |
| NRA Balance Per VMS | $1,497,369 | $637,338 | $0.00 |
| **QAD NRA - PHA NRA VMS (Variance)** | **($52,314)** | **($49,921)** | **$31,802** |
| Validated Cash Balance (reconciled) | $1,378,373 | $534,003 | $9,637 |
| **QAD NRA - PHA Cash (Variance)** | **($171,310)** | **($152,256)** | **$22,165** |

The primary cause of the variance between the PHA reported NRA balance and the QAD validated NRA balance is a result of the PHA accruing their HAP expenses throughout the years, which creates artificially lower NRA balances in VMS.  This is further explained under "Findings" below.

---

**FINDINGS**

---

**Finding No 1: The cash balances were insufficient to support the NRA validated balances.**

**Condition**: The LTRAP total cash and investments as of December 31, 2011 and December 31, 2012 were insufficient to support the validated NRA balance as indicated in Table No. 1.

**Criteria: The 24 CFR 982.151** provides that under the Annual Contributions Contract (ACC) the PHA agrees to "*to administer the program in accordance with HUD regulations and requirements*" and that the "*program receipts in excess of current needs must be promptly invested in accordance with HUD requirements*". **Under 24 CFR 982.156 the PHA "*must practice good cash management and invest all funds received in excess of current needs*".** This means that the NRA must be backed by cash or cash equivalents that can be liquidated within 24 hours.

**PIH Notice 2011-27** and **PIH Notice 2012-9** advise PHA's "*that funds in the HAP NRA account shall only be used for eligible HAP needs in the current and future CYs. The ACC requires PHAs to use HAP funding to cover rental assistance payments only. HAP and/or HAP NRA shall not under any circumstances be used for any other purpose, such as to cover administrative expenses or be loaned, advanced or transferred (referred to as operating transfers due to/due from) to other component units or other programs such as Low Rent Public Housing. Use of HAP for any purpose other than eligible HAP needs is a violation of law, and such illegal uses or transfers will result in sanctions and possible breach of the ACC. In instances where a PHA is found to have misappropriated HAP*"

*and/or HAP NRA funds by using the funds for any purpose other than valid HAP expenses for units up to the baseline, HUD will require the immediate return of the funds to the HAP or HAP NRA account. HUD may take action against a PHA or any party that has used HAP funds and/or the HAP NRA account for non-HAP purposes.*"

**Cause:**  The HCV program was over-leased was by 467 vouchers for calendar year 2007 causing an additional $126,776 of HAP funds to be inappropriately expended.  If over leasing occurs such that a Housing Authority exceeds its baseline units under the ACC for the calendar year, then all funds necessary to cover the cost of excess units above the baseline must come from reserves in the Unrestricted Net Assets account.  Currently, the LTRAP has an Accounts Receivable - LTO recorded in the sum of $130,148, which includes the amount for over leasing.  The remaining $3,372 ($130,148 - $126,776) is the result of incorrectly accounting for Fraud Recovery resulting in excess funds being sent to LTO as administrative funds, when a portion was HAP (see Concern No. 1 below for additional details).

**Effect:** The PHA is at risk for breach of the Annual Contributions Contract (ACC) as a result of failing to maintain sufficient cash to back the validated NRA balance and for spending HCV HAP funds to cover operating costs. The shortage of HAP funds prevents the PHA from fulfilling their primary purpose of assisting as many families as possible with funds made available. Further, the misrepresentation of funds failed to provide HUD with information that would allow early intervention to avoid potential shortfall resulting in possible termination of participants.

**Corrective Action No. 1**:   The LTRAP must immediately ensure that $130,148 in HAP funds are returned from LTO to the HCV HAP account.   The LTRAP must work with the Field Office in developing a repayment agreement if deemed necessary.

**Corrective Action No. 2:** The LTRAP must correct fund balances in VMS beginning with December 2012 and come forward to July 2013 so the balances match the QAD validated NRA balances for the same time periods.

---

## CONCERNS

---

**Concern No. 1:  The NRA balance was incorrectly calculated and reported in VMS.**

**Condition:**  The LTRAP under-reported the NRA equity balances as indicated in Table 1 due to reporting HAP expenses in VMS on an accrual basis.

**Cause:  PIH Notice 2010-16 states** "*NRA is the amount reported on the income statement at line 11180 – Housing Assistance Payment Equity. The NRA that shall be reported in the VMS must then be updated through the end of each reporting month*". This field provides the "present" NRA balance by adjusting NRA to reflect HAP funds received and ***expended*** to date since the end of the most recent PHA fiscal year (FY). Please note the term 'expended' means actually paid, not accrued.

**PIH Notice 2011-67** provides "*HUD is required to control disbursement of funds to PHAs in such a way as to ensure that PHAs do not receive federal funds before they are needed. Treasury Financial Manual, Vol.1, Part 6, Section 2025 states: "Advances to a recipient organization will be limited to the minimum amounts necessary for immediate disbursement*

*needs and will be timed to be in accord only with the actual immediate cash requirements of the recipient organization in carrying out the purpose of an approved program or project. The timing and amount of cash advances will be as close as is administratively feasible to the actual disbursements by the recipient organization for direct program costs and the proportionate share of any allowable indirect costs.*"

**Effect:**  The process of disbursing only the funds required for current HAP costs has resulted in the reestablishment of HUD-held program reserves, whereby excess HAP funds will remain obligated but undisbursed at the HUD level rather than being held by the PHAs. This will move new budget authority into the program reserves if it is not needed for current costs. Also, of more importance, the existing NRA balances currently held by PHAs will ultimately also be transitioned to the cash management process and the program reserves. This shall be accomplished either via their use in lieu of HUD disbursing additional budget authority and/or through a final transition effected through the PHA returning funds to HUD to be held on their behalf.

The practice of reporting HAP expenses in VMS before expending the funds, and likewise reducing the NRA reported balance by the same amounts, will result in an incorrect amount of NRA being transitioned back to HUD. If LTRAP continues to report NRA in the VMS as reduced by accrued HAP, the 'true' NRA balance, as backed by cash, will remain unknown to HUD when final transition of PHA held reserves is completed.

**Recommended Corrective Action No. 1:**  As stated under Corrective Action No. 2, the LTRAP must correct fund balances in VMS beginning with December 2012 and come forward to July 2013 so the balances match the QAD validated NRA balances for the same time periods.

**Recommended Corrective Action No. 2:**  The LTRAP staff must report the NRA balance for VMS based on those funds that are ***expended*** for HAP instead of accrued.

**Concern No. 2:  Fraud Recovery was incorrectly reported in VMS.**

**Condition:**  LTRAP reported in the VMS 100% of the Fraud Recovery collected and reduced the HAP expenses by the same amount.

**Cause:**  The LTRAP misunderstood the VMS reporting requirements pertaining to Fraud Recovery.  The VMS User's Manual defines the reporting requirements as follows:

- *Fraud Recovery – Total Collected this Month* as the "Total dollar amount recouped by the HA as fraud recoveries during the month that is applied to the NRA account.  This consists of the lesser of one-half the amount recovered of the total recovery minus the costs incurred by the PHA in the recovery.  This amount should NOT be deducted from HAP expenses as reported for the month in the HAP expenses sections.  Total dollar amount recouped is cash collected – not revenue recorded."

**Effect:**  By failing to accurately report in VMS the LTRAP failed to provide HUD with information useful in determining the housing authority's actual financial position.

**Recommended Corrective Action No. 3:** The LTRAP must make the necessary corrections in VMS beginning in December 2012 and come forward to the most recent submission in VMS.

**Recommended Corrective Action No. 4:**  As mentioned under Corrective Action No. 1, LTRAP is owed $3,372 back from the LTO and aggressive action must be taken immediately to recover those funds.

## ADMINISTRATIVE EXPENSES REVIEW

The QAD staff was unable to review the administrative expenses as explained above.  Although we requested the administrative financial records on more than one occasion, the LTRAP refused to furnish the documents.   The inability to review administrative financial records severely hampered our efforts to conduct a speedy and effective audit of the HCV program.   The Newark Field Office will follow-up on this situation with the LTRAP Executive Director.   QAD reserves the right to conduct a follow-up onsite visit once this issue is resolved.

## TECHICAL ASSISTANCE

The QAD staff worked with the LTRAP staff on how to properly account for Fraud Recovery and the proper calculation of the NRA balance.

# [EXHIBIT 4]

AR 000032



ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

**Richard Michael Price**
*Partner*
T 202-585-8716
rprice@nixonpeabody.com

Nixon Peabody LLP
401 9th Street NW
Suite 900
Washington, DC 20004-2128
202-585-8000

January 2, 2014

Mr. Balu Thumar
Acting Director
Office of Public Housing
U.S. Department of Housing and Urban Development
One Newark Center, 13th Floor
Newark, NJ 07102-5620

Re:     Lakewood Township Rental Assistance Program ("LTRAP")
        Housing Choice Voucher Program

Dear Mr. Thumar:

This letter is in response to your December 3, 2013 letter to Mr. Hertz. Please advise us of the status of the on-site reviews.

At the outset we believe there are certain basic misunderstandings as to the existence and nature of Lakewood Township Residential Assistance Program ("LTRAP") and Lakewood Tenants Organization ("LTO"). LTRAP is a federally-funded (HUD) program sponsored by Lakewood Township as the PHA under an ACC with HUD. LTRAP has no separate incorporation. LTO is an existing entity that contracts with the Township to administer Lakewood Township's Residential Assistance Program, including the Section 8 Housing Choice Voucher ("HCV") program. LTO's fee is set at the HCV Administrative Fees; the Administrative Fees are set by HUD annually and are per se reasonable. As such, once the fee is earned by LTO and paid to LTO by Lakewood Township the fee is defederalized and LTO is not accountable to HUD, as LTO is a contractor, not a grant sub-recipient.

We are enclosing a copy of an August 30, 1977 letter by Clarence L. Humphrey, Director, Housing Programs Management Branch to Thomas L. LaPointe, Municipal Manager of Lakewood Township. Mr. Humphrey explains that LTO's selection was beyond HUD's review and approval. We are also enclosing a copy of an April 24, 1990 letter from John Franklin, Mayor of Lakewood Township to Theodore Britton, responding to an earlier inquiry into LTO's selection and status. Finally, we are enclosing a July 9, 1996 letter from Kevin E. Marchman, HUD Acting Assistant Secretary for Public and Indian Housing to Mr. Hertz confirming that LTO's selection was appropriate and remains so.

Mr. Balu Thumar
January 2, 2014
Page 2

It appears that this issue is re-explored every so often, but we are not aware of any information that requires a repeat of the same inquiry at this time. We believe this letter appropriately addresses your concerns.

Sincerely,

Richard Michael Price

Enclosures

14764844.3

CAMDEN AREA OFFICE
THE PARKADE BUILDING, 519 FEDERAL STREET, CAMDEN, NEW JERSEY 08103

August 30, 1977

REGION II
26 Federal Plaza
N. Y., New York 10007

IN REPLY REFER TO:
2.3HHO

Mr. Thomas L. LaPointe
Municipal Manager
Township of Lakewood
Municipal Building
Lakewood, New Jersey  08701

Dear Mr. LaPointe:

We acknowledge receipt of your letter dated
August 19, 1977 transmitting a copy of the
Township's Contract with the Lakewood Tenants
Organization to administer the Section 8 Existing
Housing Program.

HUD is not a party to this Contract, and consequently
our review and approval of the Contract is not re-
quired. Accordingly, the third or penultimate
paragraph on page 2 requiring HUD approval should
be deleted. We do reemphasize our position that
HUD looks to the approved Public Housing Agency
as the party responsible for the administration
of the ACC in accordance with the Regulations, see
24CFR 832.116. Additionally, the PHA shall not
delegate its statutory responsibility to authorize
eviction.

Upon deletion of the aforesaid inapplicable paragraph,
we would appreciate a copy of the Contract for our
files.

Sincerely,

Clarence L. Humphrey
Director
Housing Programs Management Branch

9/2/77.....
Referred to  Attorney to delete the above mentioned paragraph.
on 9/1/77.

G. Doyle, Clerk

AR 000035



# *Township of Lakewood*

MUNICIPAL BUILDING
LAKEWOOD, NEW JERSEY 08701 • 201 364-2500



John J. Franklin, *Mayor*
H. George Buckwald, *Deputy Mayor*
*Committeemen:*
  Jerome Greenberg
  Robert W. Singer
  Richard L. Work

April 24, 1990

Theodore R. Britton, Jr., Manager
U.S. Department of Housing
 and Urban Development
Newark Office, Region II
Military Park Building
60 Park Place
Newark, NJ  07102-5504

Dear Mr. Britton:

This letter is written in response to your letter dated April 3, about your receipt of an "anonymous" letter containing various allegations about the operation of the Lakewood Housing Authority and the Lakewood Township Rental Assistance Program.

Thank you for bringing these complaints to my attention, and for according to the Township the right to respond.

Preliminarily, I should like to state, that while the letter which you received may be anonymous to you, it is not all that anonymous to the governing body of this Township.  While we cannot be absolutely certain as to the true identity of the author of the letter containing these false allegations, we do believe that it was penned, or "inspired", by a former commissioner of the Authority, whom the Township Committee declined to re-appoint to the Lakewood Housing Authority Board of Commissioners, for ample reason.  Even without getting into the history, grounds for this conclusion are the record of similar past efforts by this party, as well as an established pattern of focusing personal attacks repeatedly against the two named individuals.  In short, what we apparently have here is a personal, rather than a real, issue.

As to the specific concerns raised in the anonymous letter, they indicate a basic misunderstanding which must be cleared-up; namely, the nature, role and relationship which the Township of Lakewood has with the Section 8 programs and its contract administrative agency, the Lakewood Tenants Organization.  The



AR 000036

Township of Lakewood is not a Public Housing Authority.  It contracted with HUD in 1977 (via the Annual Contributions Contract) to operate the Section 8 Programs by default, after the then Board of Commissioners of the Lakewood Housing Authority declined for the third time in three years (1975-1977) HUD's invitation to operate the Section 8 program.  Lacking an in-house administrative capacity to operate the program, the Township sub-contracted with the Lakewood Tenants Organization to administer the program, with the understanding and agreement that the operation would not draw on Township resources, but would have to be economically self-sufficient.  This arrangement was reached at the time with the explicit consent and written approval of the HUD Field Office, and has worked very well since the inception of the programs.  This recitation of the relationship between the Township and the Lakewood Tenants Organization, its contract administrative agency, is not intended as a dis-association from the primary role and responsibility of the Township regarding the operation of these programs. On the contrary, the Township justifiably takes immense, direct pride in the fact that the programs are well administered and well received locally.

The point is that we have locally an atypical situation; not that of a PHA, and one which was fashioned of necessity and has proven extremely successful. Since the administration of the Section 8 programs are performed by a contract agency, similar to other Township contract services, the Township looks to goal achievement and performance criteria to measure the success of the programs' administration. I can state without reservation, as we have stressed all along in every application to the Department for additional funding, that by any yardstick, the present administration is run by an extremely competent, universally acclaimed (property owners as well as renters) administration. Since its inception in 1977, the program has grown steadily from 80 units to nearly 700.  The program is run on a sound fiscal basis, with a healthy operating reserve. Over the past twelve years, the Township has received few, if any, verifiable complaints regarding the operation of its Section 8 programs by the Lakewood Tenants Organization.  The Executive Director and staff at L.T.R.A.P. are thoroughly trained and very knowledgeable.

Notwithstanding all the foregoing, as to the Executive Director personally, please be assured that Rabbi Hertz ably serves both as the Executive Director of the Lakewood Township Rental Assistance Program and the Lakewood Housing Authority.  He splits his daily work load and work time between these two Agencies. In addition, Rabbi Hertz spends many hours evenings and week-ends in meetings as well as at the office, on L.T.R.A.P. business.

Rabbi Hertz is readily accessible all day, every day, at either one of these offices (364-1300 or 367-0660).  Indeed, the allegation itself is deliberately mis-leading.  The distance between the offices of the two Agencies is less than two minutes travel time; far less than the distance and time spent in routine travel by Executive Directors at other PHAs in the normal course of their duties traveling from site to site. Rabbi Hertz draws a salary commensurate with the duties, responsibilities, professional requirements, and the actual hours invested in his positions at both the Lakewood Township Rental Assistance Program and the Lakewood Housing Authority.

Rabbi Hertz served in the capacity of Executive Director of the Lakewood Township Rental Assistance Program with distinction for 8 years (1977-1985)

2

AR 000037

before being asked jointly by the Township Committee of the Township of Lakewood and the Board of Commissioners of the Lakewood Housing Authority to assume the additional position of Executive Director of the Lakewood Housing Authority. The Township Committee and the Board of Commissioners in turning to Rabbi Hertz firmly felt that the Authority needed strong, proven leadership. Rabbi Hertz joined the Authority at a most difficult time, when the former Executive Director resigned after findings of gross mismanagement were reported in a comprehensive, highly critical study issued by a local Blue Ribbon panel (which included the Chairman of the Authority at the time, Mr. William Melton, who still serves as a Commissioner). This report, issued in March 1985, was forwarded to the HUD Area Office at the time and should still be in your files.

Assumption by Rabbi Hertz of the dual positions was strongly recommended by the Board of Commissioners and the Township Committee in view of Rabbi Hertz's uncontested record of professionalism, housing expertise, and integrity. Furthermore, this move was cleared in advance with the HUD-Newark Area Office and won its approval. I recall that at the time, there was a shared feeling that, in addition to gaining an able administrator for the Housing Authority, bringing both Agencies under a single administrator would prove advantageous as far as uniformity of internal administrative procedures, economies of scale, closer adherence to federal regulations, and better service to the public through the elimination of conflicting standards and procedures.

We have not regretted this decision. Its benefits locally have proven themselves through the expansion of the programs and their smooth coordination. You have to look no further than your own Management Reviews, as well as five Fiscal Audits at the Lakewood Housing Authority, and many more at L.T.R.A.P., all completed without a single finding. The remarkable growth of the programs at L.T.R.A.P., from 80 units to 700 units administered, and the meticulous attention to detail and close adherence to all federal regulations also attest to Rabbi Hertz's intimate, constant professional involvement and ability. As you are aware, LTRAP has earned every award issued by your Area Office for Voucher lease-up and various programs' implementation. LTRAP, led by Rabbi Hertz, has served the Newark Area Office as well on a voluntary basis, by sharing its experience and expertise with other PHAs and offering day-long training to other PHAs. It is because of all the above, the long-established record of success and achievement of Rabbi Hertz, that we find the anonymous allegations to be so insidious and objectionable.

It would be most unfortunate if mischievous allegations would succeed in casting aspersions on the fine reputation of a person who has accomplished so much for the needy of our community. We understand your own sensitivity to any complaint, regardless of its source and merit, and your need to address the same. It is for precisely this reason that we have taken the trouble to fully assure you that the complaints which you received lack any foundation or merit.

With respect to Mr. La Pointe, this allegation is similarly without foundation, and purely malicious. Mr. LaPointe does not get paid for each meeting of the Lakewood Housing Authority Board of Commissioners. Mr. LaPointe does not get any payment whatever from the Lakewood Housing Authority, in any shape, form or manner; nor does the Township of Lakewood derive any payment from the Lakewood Housing Authority other than the PILOT. Mr. LaPointe's position as

3

AR 000038

the Township's Housing Coordinator, and his position as City Manager, are both paid for by the Township.

I hope that I was able to answer your questions and also shed some light on this matter. Unfortunately, I cannot guarantee that you will not receive similar mischievous letters in the future. I can assure you, however, that this Township's governing body takes its Housing Authority appointments seriously, has a Township Committeeman assigned to the Authority as permanent liaison, and has a close, cooperative working relationship with the Authority. We therefore find satisfaction and take pride in the work of the Lakewood Housing Authority.

Again, I thank you for your courtesy in affording us the right to respond fully to your inquiry. If you have any other questions at any time, we will be most willing to provide further information and assistance.

Sincerely,

TOWNSHIP OF LAKEWOOD

John J. Franklin
Mayor

JJF:eh

c.c. Mr. Siegfried W. Steele, Chairman
     Lakewood Housing Authority

AR 000039

07/09/96  04:30    HUD ASST SEC FOR PIH → 2029737750                    NO.673  P002



U. S. Department of Housing and Urban Development
Washington, D.C. 20410-5000

JUL - 9 1996

OFFICE OF THE ASSISTANT SECRETARY
FOR PUBLIC AND INDIAN HOUSING

Mr. Meir Hertz
Executive Director
Lakewood Tenants Organization
600 West Kennedy Boulevard
Box 871
Lakewood, NJ  08701

        RE:  Procurement Requirements

Dear Mr. Hertz:

        We received the June 19, 1996 letter from your counsel,
Charles L. Edson, describing the history and status of the
Lakewood Tenants Organization ("LTO"). Based on the facts as
stated in Mr. Edson's letter, and our general understanding of
LTO's status, we understand that Lakewood Township previously
designated LTO as its agency for certain limited purposes. As
such, LTO qualifies as a public housing agency under the U.S.
Housing Act of 1937 as amended. HUD's procurement rules do not
apply to Lakewood Township's selection of LTO as a public housing
agency. Selection is a different question from operation, and we
do not address, nor have before use, any questions regarding
public housing agency procurement of goods or services.
Accordingly, we have no information that would lead us to
question either LTO's designation, or the present structure under
which LTO operates.

                                Sincerely,

                                Kevin E. Marchman
                                Acting Assistant Secretary for
                                  Public and Indian Housing

AR 000040

# [EXHIBIT 5]

AR 000041



**NIXON PEABODY**

ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

**Richard Michael Price**
*Partner*
T 202-585-8716
rprice@nixonpeabody.com

Nixon Peabody LLP
401 9th Street NW
Suite 900
Washington, DC  20004-2128
202-585-8000

February 14, 2014

Mr. Balu Thumar
Acting Director
Office of Public Housing
U.S. Department of Housing and Urban Development
One Newark Center, 13th Floor
Newark, NJ  07102-5620

Re:     Lakewood Township Rental Assistance Program ("LTRAP")
        Housing Choice Voucher Program

Dear Mr. Thumar:

This letter follows up our January 2, 2014 letter and discussions with HUD staff.  We appreciate consideration that LTO is a fee for services independent company, not a sub-grantee or sub-recipient and as such fees earned by LTO are de-federalized.  We also appreciate your understanding that LTRAP is a program name for Lakewood Township.

We still do not understand how the documents requested in your December 3, 2013 letter can be relevant to LTRAP.  We also do not understand why HUD continues to request organizational information decades after first accepting the current organizational structure.  That said, attached please find:

1.     By-Laws for LTO
2.     Articles of Incorporation  for LTO
3.     Registration and Good Standing Certificates for LTO
4.     Incumbancy Certificate

Thank you for your time.

Sincerely,

*Richard Micha Price*

Richard Michael Price

RECEIVED
CHIEF COUNSEL'S OFFICE

FEB 1 8 2014

WTS NO 14-151
ASSIGNEE

Enclosures
cc:    Ms. Diana Caballero
14857822.2

XR7000042

# BY-LAWS
## OF
# LAKEWOOD TENANTS ORGANIZATION, INC.

## Article I: ORGANIZATION

**1.     Name**

The name of this Organization shall be:  LAKEWOOD TENANTS ORGANIZATION, INC.

**2.     Seal**

The Organization shall have a seal that shall be in the following form:



**3.     Change of Name**

The Organization may, at its pleasure, by a vote of the membership body, change its name.

## Article II: PURPOSE

The purposes for which the Organization is formed are as stated in the Amended Certificate of Incorporation.

## Article III: MEMBERSHIP

**1.     Eligibility**

Any person who is a resident of the Township of Lakewood, County of Ocean, and State of New Jersey, shall be eligible for membership, provided such person is not a property owner who derives rental income benefits from the rent subsidy programs operated by LTO, and further provided that such person is:

        a).     a tenant himself, or

AR 000043

   b)    has demonstrated a significant commitment or concern for the protection and advancement of tenants' rights.

2.    Selection

New members may be proposed by any member in good standing for acceptance by the Board of Trustees.

3.    Removal for Cause

Any member may be removed from membership by a majority vote of the regular members, at any meeting of said members called for such purpose, upon grounds that his words or conduct have been intentionally detrimental to the purposes of the Organization. Any member whose removal is sought shall be served with written notice of the nature of the complaints against him at least 10 days prior to the meeting at which his removal will be considered, and shall be given an opportunity to be heard at such meeting.

4.    Dues

The dues of this Organization shall be $5.00 per dwelling unit per year, or $7.00 per unit for two years. The dues of this Organization for tenants belonging to a tenants association of 10 members or more which is affiliated with this Organization shall be $2.00 per dwelling unit per year and $3.00 per dwelling unit for two years. Dues for senior citizens shall be $1.00 per dwelling unit per year. Members who have belonged to the Organization for a minimum of three years may purchase a lifetime membership in lieu of all future dues for a one time additional payment of $15.00. Unless otherwise specified at the time payment is made, all membership dues shall be attributed to the calendar year in which they are paid.

5.    Membership Term

All annual and biannual memberships shall run by calendar years and shall be effective from the date that dues for that calendar year are paid. Annual memberships shall expire on December 31 of the calendar year in which the membership commenced. Biannual memberships shall expire on December 31 of the calendar year following the year in which the membership commenced.

6.    Suspension and Removal for Non-Payment of Dues

Subject to further restrictions concerning voting as provided for in paragraph VII, no one may exercise any rights or privileges of membership in the Organization during any calendar year until any dues owed for that year have been paid. Nevertheless, members whose membership expired on December 31 of the prior calendar year shall remain on the Organization's mailing list and membership rolls until August 1 of the current calendar year, at which time they shall be automatically removed from the membership rolls of the Organization if dues owed for that calendar year have still not been paid.

AR 000044

# Article IV:  BOARD OF TRUSTEES

## 1.      General Duties and Authority

The Board of Trustees shall be the governing body of the corporation. Its duties shall include, but not be limited to, carrying out the stated purposes of the corporation and determining its charitable, fiscal, and personnel policies. The Board shall also be vested with the authority to establish the rights, privileges, and duties of members of the Organization.

## 2.      Composition, Term and Selection

The Board of Trustees shall be composed of at least 5, but not more than 9 Board members. The exact number of Board members within these limits will be specified by an ordinary resolution of the Board of Trustees.  At regular annual elections of Board members, normally held at the general membership meeting in the Fall, as many Board members will be elected as necessary to fill all vacancies in the Board of Trustees as of January 1 of the following calendar year.  At emergency elections of Board members or at regular elections postponed until January or later, all vacancies in the Board of Trustees existing on the date of the emergency election will be filled.

Beginning with the regular annual election of Board members to be held in calendar 2005, each new term of office for a Board member will be for the minimum number of years that will result in that Board member's term of office ending in a different year than any other Board member's term of office.  When two or more Board members are elected in the same election, their terms will be staggered to the extent necessary so that none of them are granted a term in office of more years than necessary in order to avoid having a newly elected Board member's term end in the same year as any other Board member.

To be eligible to be a member of the Board of Trustees, an individual must either have been a member in good standing of the Organization for a period of at least 3 years prior to his or her election to the Board of Trustees, or must be a member of the Organization who has demonstrated, to the satisfaction of the Board of Trustees, an active interest and participation in the cause of tenants' rights.

Regular terms of Board members shall begin on January 1 and shall terminate on December 31 of the appropriate calendar years. If an election is postponed beyond January 1, in accordance with Article VII, the incumbent Board will continue to serve until a valid election is held.

## 3.      Vacancies

Should a vacancy occur on the Board of Trustees for any reason, the remaining members of the Board shall choose a successor to serve out the unexpired term of the vacant Board position.

4.      **Meetings**

a).     The Board shall meet regularly, but not less than 4 times annually, at a place and time designated by a majority of the members of the Board, or, in default of their designation, at a place and time designated by the Chairman of the Board. All Board members shall be notified of the time and place of regularly scheduled meetings at least one week prior to the meeting date.   Agendas for regular meetings shall be prepared in advance and available for inspection at least one day prior to the scheduled meeting. Board members wishing to add items for discussion to the agenda shall contact the Secretary at least five days prior to the meeting at which the Board member wishes the item to be discussed.

b).     Special meetings of this Board may be called by the President or upon the request of any 3 members of the Board, when they deem it in the best interest of the Organization. Notices for special meetings shall be delivered to all Board members at least 3 days before the date set for the meeting. The notice of a special meeting shall state the reason that the meeting has been called, the business to be transacted at the meeting, and by whom it was called.

c).     Emergency meetings may be called upon 24 hours' notice by any member of the Board. The reason for the meeting and the business to be brought before the Board shall be given to each Board member. No other business can be conducted at an emergency meeting other than that business for which the meeting was called.

d).     For regular, special or emergency meetings, a quorum shall consist of not less than 3 members of the Board.

e).     Except where otherwise specified, the decisions of the Board shall be by majority vote. Each member shall have one vote and such voting may be done by proxy, to the extent not prohibited by law. The Board of Trustees may make such rules and regulations covering its meetings as it may determine appropriate.

5.      **Termination of Board Membership**

Any Board member absent for 2 regular or special meetings during any calendar year without proper excuse will be subject to possible termination for that reason. A Board member may also be removed whenever other sufficient cause exists for such removal. A vote of two thirds (2/3) of the members of the Board is required to remove any member of the Board. Removal of a Board member may only be voted upon at a meeting if the notice for that meeting specifically states that the issue of removal of that particular individual will be considered and specifically states the reason for which such removal is sought. The Board member whose removal is sought shall be given an opportunity to be heard at that meeting.

6.      **Committees**

The Board may establish from time to time such ad hoc or standing committees as it may consider appropriate.

## 7.     Nominating Committee

The chairman shall select from the Board of Trustees a nominating committee to present a slate of Board members to the general membership. Said committee shall be approved by two thirds (2/3) of the Board members present at the meeting where these items are on the agenda.

# Article V: OFFICERS

## 1.     Titles and Selections

The officers of the corporation shall consist of a President, Vice-President, Secretary, Treasurer, and such Assistant Secretaries and Assistant Treasurers as may be appointed by the Board from time to time. The term of all officers shall be to serve at the pleasure of the Board of Trustees.

## 2.     President

The President shall be the chief executive officer of the corporation, shall preside at General Membership meetings, and shall be vested with the necessary authority and responsibility to conduct the day-to-day affairs of the Organization and to execute the policies and mandates of the Board. The President shall act as the duly authorized representative of the corporation and the Board in all matters for which the Board has not formally designated some other person to act. He shall be one of the officers who may sign the checks or drafts of the corporation. He shall serve as an ex-officio member of all committees. The President, if a member of the Board, shall also serve as Chairman of the Board.

## 3.     Vice-President

The Vice-President shall, in the event of the absence or inability of the President to exercise his office, become acting President of the Corporation with all rights, privileges and powers as if he had been duly elected President. He shall also perform such other duties as are assigned to him from time to time by the President or the Board.

## 4.     Secretary

The Secretary shall be charged with preparation and dissemination of agendas, notices, minutes, and records of the Board and the corporation, and shall also act as custodian of all such records and documents. He shall present to the membership at any meetings any communication addressed to him as Secretary of the corporation. He shall attend to all correspondence of the corporation and shall exercise all duties incident to the office of Secretary.

**5.    Treasurer**

The Treasurer shall be charged with the collection, banking, and disbursement of dues and other funds, as well as the maintenance of all necessary accounts and records and the preparation of financial statements on a quarterly basis. He shall exercise all duties incident to the office of Treasurer.

## Article VI:  EMPLOYEES AND COMPENSATION

**1.    Manner of Fixing Compensation**

The Board of Trustees or whomever they so delegate shall hire and fix the compensation of any and all employees that they, or their delegate, may determine to be necessary for effective accomplishment of the purpose of the Organization. All other personnel policies and the powers attendant thereto shall also be vested in the Board of Trustees or its delegate.

**2.    No Compensation for Trustees and Officers**

No trustee or officer shall by reason of his office be entitled to receive any salary or compensation, but nothing herein shall be construed to prevent a trustee or officer from receiving any compensation from the Organization for duties other than as a trustee or officer, provided, however, that said trustee or officer shall not participate in any decision directly affecting the amount of compensation he is to receive.

## Article VII:  ELECTIONS AND MEMBERSHIP MEETINGS

**1.    General Membership Meeting**

A meeting of all members of the Organization shall be held once during each calendar year, at a time and place designated by the Board of Trustees for the express, but not sole, purpose of electing a new Board of Trustees. At said meeting, the outgoing officers and Board will advise the membership of the current activities and financial status of the corporation. The membership shall vote upon any questions submitted to it by the Board of Trustees. Other general membership meetings may be called from time to time at the discretion of the Board of Trustees.

The Order of Business at general meetings shall be:

1.  Roll Call
2.  Reading of the minutes of the preceding meeting
3.  Reports of Committees
4.  Reports of Officers
5.  Old and unfinished business

AR 000048

  6. New Business
  7. Adjournment

**2.       Nominations**

a).      Not less than 80 days prior to a scheduled general membership meeting at which an
election of Trustees will be held, the President will cause all members in good standing to
be mailed notice of the time and place of the meeting and of the nominations and election
procedures. All nominations for members of the Board of Trustees must be submitted in
writing to the President no less than 60 days prior to the date scheduled for the annual
general membership meeting.

b).      All nominations to the Board of Trustees shall be by slate only, which must consist of a
full list of names of as many individuals as there are positions to be filled on the Board of
Trustees at the following election. To be valid, each nominating slate must be signed by
every individual who is nominated on that slate, as well as by two other members of the
Organization, then in good standing. No individual member may sign more than one slate
for any election in any capacity. The slate submitted by the nominating committee, as
provided for in Section 7 of Article IV, shall be signed by a majority of the members of
the nominating committee. If any signature or any name on a proposed slate are invalid or
ineligible, the entire slate shall be disqualified. Where terms of differing lengths are to be
voted on at a single election, slates must specify for each candidate the term for which
that candidate has been nominated.

**3.       Voting Eligibility**

To be eligible to vote at any General Membership meeting, members must have belonged to the
Organization and have paid their current dues at least thirty days prior to the date the election is
held.

**4.       Voting Methods**

Voting at all general membership meetings, including the election of Trustees, may be by voice
vote, hand count or paper ballot; except that for any contested election of officers or trustees,
paper ballots shall be provided and there shall not appear in any place on the ballots any mark
that might tend to indicate the person who cast the ballot. Each dwelling unit shall have one vote.

**5.       Voting by Slate Only**

Voting for Trustees shall be by slate only, in accordance with nominating procedures set forth in
Section 2 of this Article. The slate receiving the most votes shall be elected provided it receives
more than one third of the votes cast. If no slate receives more than one third of the votes cast, a
runoff election shall be held at the same meeting between the top three slates. (If a tie occurs for
third place, the top four slates will participate in the runoff.) If two slates receive more than one
third (1/3) of the votes cast, and are tied, a runoff election shall be held at the same meeting

between the top two slates. Balloting shall continue, if necessary, until one slate has received a plurality of votes in excess of one third (1/3) of the votes cast

6.    Certification of Voting

At all votes by ballot the chairman of the meeting shall appoint a committee of three who shall act as Inspectors of Election and who shall, at the conclusion of such balloting, certify in writing to the Chairman the results. The certified copy shall be physically affixed to the minutes of that meeting. No Inspector of Election shall be a candidate for office or be personally interested in the question voted upon.

7.    Postponing Elections

If weather, transportation problems, or other causes beyond the control of the Board interfere with attendance at or the conduct of a general membership meeting, the Board shall have the power to reschedule the election to a subsequent meeting to be held within 30 days. If all slates proposed for election to the Board are disqualified after the deadline for nominations, the Board shall reschedule the election to allow sufficient time for new nominations.

## Article VIII: AMENDMENTS

Any member of the Board may propose an amendment to the By-Laws for consideration by the Board. The By-Laws of the Organization may be amended at any meeting of the Board, provided that the agenda for that meeting specifically states an amendment to the By-Laws will be considered at the meeting, and further provided that each member of the Board has received a copy of the text of the proposed amendment 10 days prior to that meeting. The proposed amendment may be modified at the Board meeting at which it is considered. The vote of two thirds (2/3) of the full Board of Trustees shall be required for the adoption of any amendment to the By-Laws.

I certify that the foregoing is a true copy of the By-Laws of Lakewood Tenants Organization, Inc. adopted by the Board of Trustees on the _15th_ of _Dec_, 2005.

_____
, Secretary

AR 000050

## Amended Certificate of Incorporation
## of the
## LAKEWOOD TENANTS ORGANIZATION, INC.

The original Certificate of Incorporation for Lakewood Tenants Organization, Inc., which was filed with the office of the New Jersey Secretary of State on or about July 18, 1977, is hereby amended as follows:

We, the undersigned, desiring to form a nonprofit corporation, pursuant to the New Jersey Nonprofit Corporation Statute, N.J.S. 15A:1-1, et seq., do hereby make, subscribe and acknowledge this certificate as follows:

1.  **Name:**  The name of the Corporation shall be LAKEWOOD TENANTS ORGANIZATION, INC. [the Corporation].

2.  **Purpose:**  The Corporation is formed exclusively for purposes for which a corporation may be formed under the New Jersey Nonprofit Corporation Act, N.J.S. 15A:1-1, et seq., and not for pecuniary profit or financial gain, and more specifically, for the purposes expressed in Section 501(c)(3) of the Internal Revenue Code of 1986.  These purposes shall specifically include advancement, promotion, and administration of initiatives and programs providing affordable housing opportunities; homeownership; tenants' rights and tenant counseling; low-income mortgage program counseling; housing placement; arbitration and mediation of housing-related issues; dissemination of information concerning affordable housing and tenants' rights; acting as a monitor of topics concerning-, and a "watch-dog" of abuses concerning-, tenants' rights, housing quality, landlord–tenant laws and affordable housing issues; promotion and organization of tenants' associations; operation, administration and facilitation of programs (whether federally, state, locally or privately funded) benefiting tenants and/or fostering affordable housing, specifically including (as examples) rental assistance programs, housing rehabilitation programs, mortgage subsidy programs, programs transitioning renters to homeownership, housing rehabilitation and neighborhood revitalization programs; economic, community, and business development programs benefiting lower-income persons; programs for the acquisition, development, construction, operation, rental and/or sale of housing for lower-

income families, and such economic resources and programs as are designed to economically uplift and empower lower-income persons or families.

No part of the assets, income, or profit of the Corporation shall be distributable to, or inure to the benefit of its members, trustees or officers, except to the extent permitted under the New Jersey Nonprofit Corporation Act, N.J.S. 15A:1-1, et seq., and the applicable sections of Subchapter F – Exempt Organizations of the Internal Revenue Code of 1986. The Corporation shall not operate any listing service of its members, trustees or officers, or take steps which will serve to facilitate the transaction of specific business by its members trustees or officers, or promote the private interest of any member, trustee or officer, or engage in any activities which would constitute a regular business of a kind ordinarily carried on for profit.

4.     **Duration:** The period of duration of the Corporation shall be perpetual.

5.     **Powers:** In furtherance of the purposes of the Corporation, the Corporation shall have all general powers enumerated in the New Jersey Nonprofit Corporation Act, N.J.S. 15A:1-1, et seq. The Corporation shall have the power, either directly or indirectly, either alone or in conjunction or cooperation with others, to do any and all lawful acts and things and to engage in any and all lawful activities which may be necessary, useful, suitable, desirable, or proper for the furtherance, accomplishment, fostering or attainment of any and all of the purposes for which the Corporation is organized, and to aid or assist other organizations whose activities are such as to further, accomplish, foster or attain any of such purposes. Notwithstanding anything herein to the contrary, the Corporation shall exercise only such powers as are in furtherance of the exempt purposes of organizations as set forth in Section 501(c)(3) of the Internal Revenue Code of 1986 and the regulations thereunder as the same may now exist or as they may be hereafter amended from time to time.

6.     **Distribution on Dissolution or Liquidation:** In the event of the liquidation or dissolution of the Corporation, whether voluntary or involuntary, no member, trustee or officer shall be entitled to any distribution or division of its remaining property or its proceeds, and the

balance of all money and other property received by the Corporation from any source, after the payment of all debts and obligations of the Corporation, shall be used or distributed subject to the direction of the Board of Trustees, or, in the alternative, in accordance with the order of the Superior Court of the State of New Jersey as provided by law, exclusively to qualified tax exempt organizations promoting tenants' rights, and to the greatest extent possible, consistent with the purposes of this Corporation as set forth hereinabove and in the Corporation's bylaws, and within the intendment of Section 501(c)(3) of the Internal Revenue Code of 1986 and the regulations thereunder as the same may now exist or as they may be hereafter amended from time to time.

7.    **Income and Distribution:**  No part of the income of the Corporation shall inure to the benefit of any member, trustee, or officer of the corporation or any private individual (except that reasonable compensation may be paid for services rendered to or for the Corporation affecting one or more of its purposes), and no member, trustee, officer of the Corporation or any private individual shall be entitled to share in the distribution of any of the Corporate assets on dissolution of the Corporation.

8.    **Prohibited Activities:**  No part of the activities of the Corporation shall be carrying on propaganda, or otherwise attempting to influence legislation, or participating in, or intervening in (including the publication and distribution of statements), any political campaign on behalf of any candidate for public office.

9.    **Principal Office:**  The current principal office of the Corporation is located at 600 West Kennedy Boulevard, Lakewood, New Jersey.  The location of the principal office may be changed by the Corporation, from time to time, by resolution of the Board of Trustees.

10.  **Registered Agent:**  The current registered agent for service of process and for delivery of all notices shall be Meir N. Hertz, 600 West Kennedy Boulevard, Lakewood, NJ 08701.

11. **Number of Trustees:**  The number of trustees shall be not less than three.

12.  **Names of Trustees:**  The names and addresses of the current Board of Trustees of the Corporation are as follows:

| *Name* | *Address* |
| --- | --- |
| Meir Hertz | 210 Miller Road<br>Lakewood, NJ  08701 |
| Edith Goldstein | 500 Clifton Avenue<br>Lakewood, NJ  08701 |
| Judith Pizzarelli | 100 Woehr Avenue, Apartment 5G<br>Lakewood, NJ  08701 |
| Simcha Greenwald | 82 Cabinfield Circle<br>Lakewood, NJ  08701 |
| Ahron Notis | 157 East 9th Street<br>Lakewood, NJ  08701 |
| Moshe Sofer | 119 Fifth Street<br>Lakewood, NJ  08701 |
| Elimelech Mitnick | 22 East 6th Street<br>Lakewood, NJ  08701 |

13.  **Membership Corporation:**  This is a membership corporation.  Qualification of members shall be as stated in the by-laws.

14.  **Election of Trustees:**  The Trustees of the Corporation shall be elected in the manner provided by the bylaws.

15.  **Age of Subscriber:**  The subscriber is of the age of 18 years or over.

THIS AMENDED CERTIFICATE OF INCORPORATION has been duly adopted by the Board of Trustees of the Corporation and ratified by the membership of the Corporation in accordance with the Corporation's initial Certificate of Incorporation, its By-Laws, and all applicable laws.

I certify that the foregoing is a true copy of
an Amended Certificate of Incorporation
duly adopted by the Board of Trustees of the
Corporation on July 16, 2001, and ratified
by the membership of the Corporation on
November 13, 2001.

Ahron Notis, Secretary

AR 000055

### STATE OF NEW JERSEY
### DEPARTMENT OF THE TREASURY
### DIVISION OF REVENUE AND ENTERPRISE SERVICES

**LAKEWOOD TENANTS ORGANIZATION, INC.**
0100043825

*I, the Treasurer of the State of New Jersey, do hereby certify that the above-named New Jersey Non Profit Corporation was registered by this office on July 13, 1977.*

*As of the date of this certificate, said business continues as an active business in good standing in the State of New Jersey, and its Annual Reports are current.*

*I further certify that the registered agent and registered office are:*

Henya Richter
600 W. Kennedy Blvd

Lakewood, NJ 08701

*I further certify that as of the date of this certificate, the following amendments and changes are on file in this office:*

| | |
|---|---|
| Revoked For Failure To Pay Annual Reports | 02/16/2002 |
| Reinstated (Annual Reports) | 06/21/2002 |
| Revoked For Failure To Pay Annual Reports | 02/16/2005 |
| Change Of Agent And Office | 01/16/2014 |
| Reinstatement With Agent Change | 01/16/2014 |

*IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Official Seal at Trenton, this 16th day of January, 2014*

Andrew P Sidamon-Eristoff
State Treasurer

Certification# 130847544

Verify this certificate at
https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp

Page 1 of 1

AR 000056

**STATE OF NEW JERSEY**
**DEPARTMENT OF THE TREASURY**
**DIVISION OF REVENUE AND ENTERPRISE SERVICES**

**LAKEWOOD TENANTS ORGANIZATION, INC.**

*0100043825*

*I, the Treasurer of the State of New Jersey, do hereby certify that the above-named New Jersey Non Profit Corporation was registered by this office on July 13, 1977.*

*As of the date of this certificate, said business continues as an active business in good standing in the State of New Jersey, and its Annual Reports are current.*

*I further certify that the registered agent and registered office are:*

> *Henya Richter*
> *600 W. Kennedy Blvd*
>
> *Lakewood, NJ 08701*

*I further certify that the incorporator is:*

> *Xx*
> *Xx*
> *Xx*
> *Xx, NJ 99999*

*I further certify that as of the date of this certificate, the following were listed as officers/directors of this business on the last Annual Report filed in this office on: January 16, 2014.*

| | |
|---|---|
| *President* | *Meir Hertz*<br>*210 Miller Road*<br>*Lakewood, NJ 08701* |
| *Secretary* | *Solomon Moskowitz*<br>*300 12th Street*<br>*Lakewood, NJ 08701* |
| *Treasurer* | *Moshe Sofer*<br>*119 5th Street*<br>*Lakewood, NJ 08701* |
| *Vice President* | *Simcha Greenwald*<br>*82 Cabinfield Circle*<br>*Lakewood, NJ 08701* |

AR 000057

# STATE OF NEW JERSEY
## DEPARTMENT OF THE TREASURY
### DIVISION OF REVENUE AND ENTERPRISE SERVICES

## LAKEWOOD TENANTS ORGANIZATION, INC.

### 0100043825



IN TESTIMONY WHEREOF, I have
hereunto set my hand and affixed my
Official Seal at Trenton, this
16th day of January, 2014

*Andrew P Sidamon-Eristoff*
*Acting State Treasurer*

Certification# 130847537
Verify this certificate at
https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp

AR 000058

# CERTIFICATE OF INCUMBENCY

I, Solomon Moskowitz, the undersigned Secretary of LAKEWOOD TENANTS ORGANIZATION, INC., a New Jersey non-profit corporation (the "Corporation"), do hereby certify that the following persons were designated and appointed as officers and to the Board of Trustees, and that said persons continue to be officers and board members at this time:

| Name | Title |
|---|---|
| Meir N. Hertz | President |
| Simcha Greenwald | Vice President |
| Moshe Sofer | Treasurer |
| Solomon Moskowitz | Secretary |
| Lazer Hasenfeld | Board Member |
| Chaim B Wolf | Board Member |
| Yaakov Herman | Board Member |

IN WITNESS WHEREOF, the undersigned has executed this instrument effective this February 12, 2014.

Witness:

LAKEWOOD TENANTS ORGANIZATION, INC.

Name: _ZEV MOSHE SOFER_

By: _Solomon Moskowitz_

Solomon Moskowitz, its Secretary

AR 000059

# [EXHIBIT 6]

AR 000060

# LAKEWOOD TOWNSHIP
## RESIDENTIAL ASSISTANCE PROGRAM

600 West Kennedy Boulevard • P.O. Box 856 • Lakewood, N.J. 08701
732.367.0660 • F: 732.367.6645 • www.ltrap.org • E: info@ltrap.org

**MEIR N. HERTZ, CEO**
**HENYA RICHTER, CFO**



*Keeping the Promise of Affordable Housing for over Four Decades*

June 11, 2014

Ms. Sonia L. Burgos
Director
Office of Public Housing
U.S. Dept. of HUD
1 Newark Center
Newark, NJ 07102

> Re:    Newark Field Office Review of Documentation Related to
>         Lakewood Township Rental Assistance Program (LTRAP)

Dear Ms. Burgos:

As I advised you in a prior email, I forwarded your most recent letter, received April 22, 2014, to counsel, and they have come back to me with a threshold inquiry. The issues identified in your letter have been substantively addressed in the HUD-Newark Field Office Management Review of LTRAP conducted from October 16, 2000 to May 1, 2001. After a thorough HUD-Newark examination, by letter dated May 1, 2001, your predecessor, Mr. Carmen Valenti, Director, Office of Public Housing, wrote: "Based on the responses contained in this letter, the Section 8 review is cleared in its entirety."

Please clarify why these issues have been reopened, and why any further response is required.

Sincerely,

LAKEWOOD TOWNSHIP
RESIDENTIAL ASSISTANCE PROGRAM

Meir N. Hertz
CEO
CC:     Legal Team
        Debra Torres, Regional Administrator
        Shie-Fong sun, Associate Regional Counsel
        Wanda Nieves, Director, FHEO
        MaryAnn Creager, Supervisor Program Analyst, QAD
        Balu K. Thumar, HUD Newark Office

# [EXHIBIT 7]

AR 000062



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC  20410-5000

**OFFICE OF PUBLIC AND INDIAN HOUSING**
Quality Assurance Division

June 19, 2014

Mr. Meir Hertz, CEO
Lakewood Township Residential Assistance Program
600 West Kennedy Boulevard
P.O. Box 856
Lakewood, NJ  08701

Dear Mr. Hertz:

In accordance with 24 CFR 982.158(a) through (d), and at the decision of The Department of Housing and Urban Development (HUD) Office of General Council, the HUD Office of Public and Indian Housing, Quality Assurance Division (QAD) has scheduled the Lakewood Township Residential Assistance Program (LTRAP), an operating unit of Lakewood Tenants Organization (LTO), together constituting the Public Housing Authority (PHA) for participation in a Financial Management Review. The primary purpose of the review will be to ensure that HCV administrative program funds have been expended and reported appropriately.

The review objectives include:

- Reconciliation of the Unrestricted Net Position (UNP) balance ending with the most current closed accounting month, anticipated to be June 2014.
- Analysis of Administrative Expenses charged to the HCV program for the **PHAs fiscal year 2010 through June 2014.**
- Confirm the availability of cash and/or investments sufficient to support the validated UNP balance as of June 2014.
- The QAD also reserves the right to examine additional documentation and financial records deemed necessary during the course of our review.

The scope of the Financial Management review for the UNP and analysis of administrative expenses will begin with the PHA's fiscal year 2010 through the most current closed accounting month, which is anticipated to be June 2014.  The review will be conducted onsite by viewing the PHA financial and program utilization source documents for the *detailed* Administrative Expenses (AE).

The review has been scheduled to begin **Tuesday, July 8, 2014 with an entrance conference beginning at 9:00 A.M**.  We would appreciate all appropriate staff members being available at this time. The QAD review team will include:

John Phillips, Director, Quality Assurance Division
Ms. MaryAnn Creager, Supervisory Program Analyst
Mr. Jon McLaughlin, Senior Quality Assurance Specialist
Mr. Joe Russell, Program Analyst

In addition to the QAD staff, we anticipate the attendance of at least one Newark Field Office staff for all or a portion of the review.

2

In order to quickly and efficiently complete the review please ensure all source documents supporting your UNP balances, and current administrative expenses for the period under review are available to the QAD staff upon their arrival, <u>with the exception of those highlighted on the next page that are necessary in advance of our arrival.</u>  If you have any questions, please contact me at 614.469.5737 ext. 8228 or via e-mail at: joseph.r.russell@hud.gov.

An email notification to you regarding this planned review was sent on June 18, 2014 for which we have had no response.   We will appreciate acknowledgement of this introduction letter no later than close of normal business on **June 24, 2014**.

Sincerely,

Joseph R. Russell
Program Analyst, Quality Assurance Division

cc:  Milan Ozdinec, Deputy Assistance Secretary, Office of Public Housing and Voucher Programs
     Michael Dennis, Director, Office of Housing Choice Voucher Program
     John Phillips, Director, Quality Assurance Division – Office of Housing Choice Voucher Program
     Sonia Burgos, Director, Newark Hub Office of Public & Indian Housing
     Robert Boepple, Deputy Director, Financial Management Center
     MaryAnn Creager, Supervisory Program Analyst, Quality Assurance Division
     Honorable Menashe Miller, Mayor, Lakewood Township New Jersey

Attachment

**Attachment:**

**Supporting Documents Required for Financial Management Review will be required for LTRAP and LTO which together constitute the Public Housing Authority:**

**Please have all relevant HCV program financial documentation available to the QAD Staff upon their arrival at the Agency and/or provide information via email in advance of onsite review where noted below.**

Documents must cover the entire identified review period except where noted and must include all detail information for Administrative Expenses for the HCV program.   Documentation should include:

**1. PHA monthly final trial balances from the PHA FY2010 through June 2014.  We understand the month of June may not be closed as of the date of this letter.  (Please email these as soon as they have been gathered).**

2. PHA monthly closed general ledgers for the same periods as noted in paragraph No. 1 above.

3. Bank statements and ALL investment records (HCV Program only) for the latest closed accounting month reviewed, anticipated to be June 2014. Please also provide bank reconciliations.

4.  **Negotiated General Depository Agreement for all financial accounts that hold HCV funds**.

5. Additional financial records: General ledger detail, subsidiary ledgers, income statements, check registers, **balance sheets**, additional bank statements, etc., that the PHA may have used to record administrative transactions may be required if the trial balances do not provide sufficient information to allow the reviewers to conduct a speedy and effective review. Please have this additional documentation available upon our request if needed. Final trial balances and general ledgers required are those that contain ALL financial information related to the HCV Program.

6. All supporting documentation for any prior period adjustments or inter-program transfers that may have occurred in the past (including Due From/Due To).

7. Available IPA audit reports for the PHA's FYE 2010 through the most current audit.

8. All supporting documents that show the tracking and recording of Port-in HAP expenses, Port-in reimbursements and administrative fees earned on port-in vouchers, if not recorded separately in the trial balances and general ledgers.

9.  QAD reserves the right to re-visit the Restricted Net Position (RNP), formerly Net Restricted Assets (NRA) accounts if issues are uncovered during the course of this review that may warrant changes to the previous QAD review findings noted during our September 2013 review.

Space accommodations will be needed for the Quality Assurance and Field Office staff while on-site.  If possible, we would appreciate access to a telephone with conference calling capabilities.

**Please contact the QAD staff immediately if you have any questions regarding the documentation requested.**

# [EXHIBIT 8]

AR 000066

# LAKEWOOD TOWNSHIP
## RESIDENTIAL ASSISTANCE PROGRAM

600 West Kennedy Boulevard • P.O. Box 856 • Lakewood, N.J. 08701
732.367.0660 • F: 732.367.6645 • www.ltrap.org • E: info@ltrap.org

**MEIR N. HERTZ, CEO**
**HENYA RICHTER, CFO**



*Keeping the Promise of Affordable Housing for over Four Decades*

June 20, 2014

Mr. Joseph R. Russell
Program Analyst
Department of Housing & Urban Development
PIH-Quality Assurance Division
200 N. High Street, Suite 717
Columbus, Oh 43215

Dear Mr. Russell:

This letter is written in response to your email dated June 18, 2014 in which you request to schedule a Financial Management Review (FMR) of LTRAP's Unrestricted Net Position (UNP).

By letter dated June 11, 2014, a copy of which was sent to Ms. MaryAnn Creager , this agency responded to Ms. Sonia Burgos' letter received by this agency on April 22, 2014, which may potentially impact this issue. This agency is still awaiting a response from the field office, inasmuch as this entire question has been dealt with, cleared and closed in its entirety.

Sincerely,

LAKEWOOD TOWNSHIP
RESIDENTIAL ASSISTANCE PROGRAM

Meir N. Hertz
CEO

AR 000067

# [EXHIBIT 9]

AR 000068

GDE&T   GREENBERG DAUBER EPSTEIN & TUCKER | COUNSELLORS AT LAW

A PROFESSIONAL CORPORATION

EDWARD J. DAUBER

June 25, 2014

***Via email at MaryAnn.Creager@hud.gov***

Ms. MaryAnn Creager
Department of Housing & Urban Development
Supervisory Program Analyst
OHVP, Quality Assurance Division, Team 1
Columbus Center
Columbus, OH 43215

Re:   Lakewood Tenants Organization

Dear Ms. Creager:

This Firm represents the Lakewood Tenants Organization ("LTO"). We are in receipt of the recent communications exchanged between LTO and HUD, including your June 23, 2014 email to Meir Hertz and Joseph Russell's June 19, 2014 letter to Meir Hertz. Both communications concern a Financial Management Review that your office has unilaterally scheduled for July 8 through July 10. We have also been provided a copy of Sonia Burgos' undated letter, received by LTO on April 22, 2014, and Meir Hertz's June 11, 2014 letter responding to Ms. Burgos to which, we understand, HUD has not responded.

In the recent communications, you have dismissed LTO's questions and concerns and demanded access to LTO's books and records, as distinguished from the records of the Lakewood Township Residential Assistance Program ("LTRAP") which HUD has consistently been provided. The basis for this newly asserted position appears to be a decision from the HUD Office of General Counsel. Given that LTO has not been provided a copy of that decision, we cannot comment upon it.

Nonetheless, it appears that HUD is now revisiting an issue that it has raised many times over the years, with each time HUD approving LTO's actions involving LTRAP. More specifically, from in or about 1977, LTO has worked to make LTRAP one of the premier public housing agencies ("PHA") in the country. Indeed, LTO frequently receives HUD's highest performance ratings for its management of this PHA, receiving a perfect 100% SEMAP score in each of the past three years. For over 37 years, HUD understood, recognized and acquiesced that LTRAP is the program created by Lakewood and constitutes the PHA for the Township's Section 8 program and that LTO is the fee for service, third party administrator of LTRAP. Indeed, beginning, in August 1977, Clarence Humphrey, the Director of Housing Programs Management Branch, differentiated between LTRAP, the program created by Lakewood Township, and LTO, the administrator of the program.

Ms. MaryAnn Creager
June 25, 2014
Page 2

Similarly, HUD has understood, recognized and acquiesced that LTRAP, as the PHA, paid LTO the entire administrative fee that it received to manage the PHA. As a result, LTRAP did not create or maintain any administrative fee reserve fund because it had no excess administrative fee to deposit into that fund.

Periodically over the years, HUD has raised questions concerning the administrative fee reserve fund and each time HUD approved LTO's and LTRAP's actions with respect to that fund. Indeed, for example, HUD raised this very issue during a 2000 management review. On December 29, 2000, LTRAP responded to this concern by, among other things, quoting from its auditor's opinion that LTRAP did not need an administrative fee reserve because the entire administrative fee was paid to LTO, so there was nothing for deposit into that reserve account.

On January 26, 2001, Mr. Valenti, the Director of the HUD-Newark Office of Public Housing, responded to LTRAP's explanations and closed HUD's "concern" pertaining to the absence of an administrative fee reserve. Specifically, he explained that upon "further review, based on the current contract that LTO has with Lakewood Township, the Lakewood Tenants Organization is entitled to all Administrative Fees and therefore an Administrative Fee would not accrue." Ultimately, by May 1, 2001 letter, Mr. Valenti cleared the review in its entirety.

In fact, more recently in August 2011, Patricia Young, Financial Analyst at the HUD Financial Management Center, reached out to LTRAP and explained that she was familiar with LTRAP's payment of its entire administrative fee to LTO and also that, as a result, LTRAP did not maintain a UNA account. Ms. Young did not question or criticize the relationship or the payment of the entire administrative fee, but simply asked LTRAP to enter a zero in a computer entry for UNA, and then in the "Expense/Comments" tab, to make a notation "about the contract with LTO and that you don't have a UNA."

In short, for the past 37 years, HUD approved both the payment by LTRAP, as the PHA, of the entire administrative fee to LTO for it to manage the PHA and that LTRAP did not need to create or maintain a UNA. HUD did not seek to audit LTO or to regulate or approve of what LTO did with the monies that it earned and received from Lakewood to manage LTRAP.

In your June 23, 2014 email, you insist on reviewing LTO's books and records and assert that this issue has been resolved because of an internal decision that we have not seen. That purported resolution, however, ignores and is contrary to 37 years of interactions between the parties, not to mention 37 years of HUD taking a contrary position. The basis for HUD's reversal of its prior position is unclear and not explained. More importantly, we question both whether HUD may suddenly change its position and whether it may attempt to do so retroactively and unilaterally. Given this, we request that you forward this letter to HUD's Office of General Counsel for an explanation and a response.

Ms. MaryAnn Creager
June 25, 2014
Page 3

Finally, while we disagree entirely with the direction HUD is taking on this matter, and without waiving our objections to both that direction and to the Department's demand for review of LTO's financial records, we trust that you can determine from LTO's filed Form 990s for the years 2010, 2011, 2012 and 2013 that LTO's total expenses of administering the LTRAP program for that four year period have exceeded the administrative fees received from the Township. Moreover, my client has just learned that the pro-rated administrative fee for the Housing Choice Voucher Program (HCVP) will be 64% of eligibility, reduced from 68.5% in 2013, a pro-rata level that already resulted in an operating loss of $186,000 for LTO in 2013 alone, and will surely eliminate any net revenues in 2014.

In the meantime, given HUD's long-standing approval of the contractual relationship between the Township and LTO, the curious, unexplained change in HUD's position and the fact that LTO has incurred expenses in excess of administrative fees paid in the years of your proposed inquiry, my client is not prepared to participate in the proposed on-site review process you propose until we have received the requested explanation and response from the Office of General Counsel.

Very truly yours,

Edward J. Dauber

EJD/lac
cc:  Milan Ozdinec, *via e-mail*
     Michael Dennis, *via e-mail*
     John Phillips, *via e-mail*
     Sonia Burgos, *via e-mail*
     Joseph R. Russell, *via e-mail*
     Robert Boepple, *via e-mail*
     Shie-Fong Sun, Esq., *via e-mail*
     Honorable Mensashe Miller, *via e-mail*
     Meir Hertz, *via e-mail*

# [EXHIBIT 10]

AR 000072



**U.S. Department of Housing and Urban Development**
New York State Office
Jacob K. Javits Federal Building
26 Federal Plaza
New York, New York 10278-0068
http://www.hud.gov/local/nyn/nynopen.html

December 5, 2014

Edward J. Dauber, Esq.
Greenberg Dauber Epstein & Tucker PC
One Gateway Center, Suite 600
Newark, New Jersey 07102

      Re:    <u>Lakewood Tenants Organization</u>

Dear Mr. Dauber:

      This responds to your June 25, 2014, letter requesting an explanation as to the legal basis for an on-site review of Lakewood Tenants Organization, Inc. ("LTO") by HUD's Quality Assurance Division ("QAD"). You claim that Lakewood Township created Lakewood Township Residential Assistance Program ("LTRAP") to serve as the PHA for the Township's Section 8 program and that LTO is "the fee for service, third party administrator of LTRAP." HUD has long "understood, recognized and acquiesced" in this arrangement, part of which is that LTRAP pays over its entire Section 8 administrative fee to LTO to manage LTRAP, as the PHA. Since all of the administrative fee is paid over to LTO, no administrative fee reserve fund was created by LTRAP because it had no excess income to credit to a reserve. You also claim that LTO's Form 990s demonstrate that LTO's total expenses of administering the LTRAP program exceeded the paid administrative fees. Thus, a financial review is not necessary.

      This is sheer sophistry.

      Under the regulatory scheme and the Annual Contributions Contract (ACC), administrative fees may only be used for certain purposes and any excess funds must be deposited into a reserve, which may only be used for limited purposes. Your position is that once LTRAP pays LTO all of the administrative fees, there is nothing left to audit or review. If this were true, HUD could not ensure that administrative fees were properly expended in accordance with the regulations.

      The fact of the matter is that LTRAP is simply a program office of LTO and the name that LTO takes when it administers Lakewood's Section 8 program. Both have the same employees, address, and have shared the same counsel. LTO's IRS filings indicate that it is the organization that has been receiving and administering federal funds provided by HUD for Lakewood's Section 8 program. Accordingly, HUD's QAD has the authority to review LTO's records pursuant to 24 C.F.R. § 982.158.

2

## The regulatory scheme.

The Housing Choice Voucher Program regulations provide that the PHA must maintain complete and accurate accounts and other records for the program in accordance with HUD requirements, in a manner that permits speedy and effective audit. 24 C.F.R. § 982.158(a); ACC ¶ 14(a).   The PHA must furnish to HUD accounts and other records, reports, documents and information, as required by HUD. 24 C.F.R. § 982.158(b); ACC ¶ 14(b).   HUD and the Comptroller General of the United States shall have full and free access to all PHA offices and facilities, and to all accounts and other records of the PHA that are pertinent to administration of the program, including the right to examine or audit the records and to make copies.  ACC ¶ 14(c)  The PHA must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and shall provide any information or assistance needed to access the records.  24 C.F.R. § 982.158(c).

HUD may approve administrative fees to the PHA for certain purposes, including ongoing administrative fees, certain extraordinary costs, and costs to assist families. 24 C.F.R. § 982.152(a)(1).  Administrative fees may only be used to cover costs incurred to perform PHA responsibilities for the program in accordance with HUD regulations and requirements.  24 C.F.R § 982.152(a)(3).

The PHA must maintain an administrative fee reserve for the program.  24 C.F.R. § 982.155(a); ACC ¶ 12.  The PHA must credit to the reserve the total of:  (1) the amount by which program administrative fees paid by HUD for a PHA fiscal year exceed the PHA program administrative expenses for the fiscal year; plus (2) interest earned on the reserve. 24 C.F.R. § 982.155(a)(2), ACC ¶ 12(a).  The PHA must use funds in the reserve to pay program administrative expenses in excess of administrative fees paid by HUD for a PHA fiscal year. Since 2004, any administrative fees that are subsequently moved into the Unrestricted Net Assets[1] account (formerly known as the administrative fee reserve) at the PHA's fiscal year (FY) end must only be used for activities related to the provision of tenant-based rental assistance authorized under Section 8, including related development activities.  See HUD Notice PIH 2014-05.  If the PHA has not adequately administered the program, HUD may prohibit use of funds in the reserve, and may direct the PHA to use funds in the reserve to improve administration of the program or to reimburse ineligible expenses.  24 C.F.R. § 982.155(b)(3); ACC ¶ 12(c).

Unless otherwise required or permitted by HUD, all program receipts[2] must be promptly deposited with a financial institution selected as depositary by the PHA in accordance with HUD

---

[1]   Under the Governmental Accounting Standards Board (GASB) updated terminology in accordance with  GASB Statement No. 63 regarding equity, Unrestricted Net Assests is reffered to as Unrestricted Net Position.
[2]   "Program receipts" means HUD payments to the PHA under the consolidated ACC, and any other amounts received by the PHA in connection with the program.  24 C.F.R. § 982.4 (Definitions).

AR 000074

requirements. 24 C.F.R. § 982.156(a); ACC ¶ 13(a).  The PHA may only withdraw deposited program receipts for use in connection with the program in accordance with HUD requirements. 24 C.F.R. § 982.156(b); ACC ¶ 13(c).

### LTRAP is a program office of LTO and the name that LTO takes when it is administering rental assistance programs on behalf of Lakewood Township.

Shortly after its founding, LTO contracted with Lakewood Township to administer Section 8 Rental Assistance Programs.  *See Employment Agreement between Meir N. Hertz and Lakewood Tenants Organization, Inc.* (Dec. 28, 1995) (hereinafter *"Employment Contract"); Letter from Richard Michael Price, Counsel for LTO/LTRAP to Carmen Valenti, Director – Office of Public Housing* (Dec. 15, 2000) (hereinafter *"Price 12/15/00 Letter"); and Letter from Richard Michael Price, Counsel for LTO/LTRAP to Balu Thumar, Acting Director – Office of Public Housing* (Jan 2, 2014).  These agreements between Lakewood Township and LTO were entered into because the Lakewood Housing Authority initially refused HUD's invitation to administer Section 8 programs, and Lakewood Township did not possess the administrative capacity to run the program itself.  *See Letter from John Franklin, Lakewood Township Mayor to Theodore Britton, HUD Newark Field Office* (Apr. 24, 1990), (hereinafter *"Franklin 4/24/1990 Letter"*).  According to a letter from then-Mayor John Franklin, LTO was thus brought in as a "contract administrative agency" to administer these Section 8 Housing programs, which are run under the name LTRAP.  *See id.*  Accordingly, LTRAP has no incorporation or organization of its own and is not a separate legal entity from LTO.  Instead it is merely the name of the Section 8 program run by LTO as an agent of Lakewood Township.  *See Agreement dated 6/1/77 between Lakewood Township and LTO.*[3]

Notably, this fact has been clearly expressed by LTO, as well as by LTO/LTRAP's own counsel.  LTO Board of Trustees resolutions have explicitly stated that LTO administers LTRAP.  *See LTO Board of Trustees Resolution 9512-03* ("Hertz is a key employee of the [LTO] in its administration of [LTRAP]").  LTO/LTRAP's counsel also affirmed this fact in a 2000 letter:

> It seems that HUD believes that LTRAP is a separate entity from LTO.  However . . . LTRAP is the name of the program that LTO operates, and, as such, LTRAP has no separate incorporation . . . [the Director of Public Housing] also questions that LTRAP receives HUD funds, but the funds were posted to LTO.  **Again,**

---

[3] Your letter refers to LTRAP as the PHA.  PHA is defined as "[a]ny State, county, municipality, or other governmental entity or public body which is authorized to administer the program (*or an agency or instrumentality of such an entity*).  24 C.F.R. § 982.4 (emphasis added).  The agreement between LTO and Lakewood states that LTO is to "act as the designated agency of the Township of Lakewood to administer [the Section 8] program pursuant to applicable Federal, State and local laws and regulation [and] to account for all funds received pursuant to the aforesaid applicable laws[.]"

AR 000075

> **LTRAP is the name of the program that LTO operates and under which LTO receives and disburses funds under the Section 8 program.**

*Price 12/15/00 Letter* (emphasis added).  Finally, the New Jersey Superior Court has taken a similar view on the relationship and structure of LTO/LTRAP, describing it in the following manner:

> Pursuant to an agreement dated August 27, 1982, between the Township of Lakewood and LTO, all programs theretofore administered by LTO were to be carried out thereafter under the name of LTRAP. **LTO was immediately to commence use of such name when acting as the Township's designee with respect to rental assistance programs. All references hereafter to LTRAP or LTO shall be deemed interchangeable.**

*Lakewood Residents Ass'n, Inc. v. Township of Lakewood*, 294 N.J. Super. 207, 212 fn. 2, 682 A.2d 1232 (Law Div.1994) (emphasis added) (affirmed by *Lakewood Residents Ass'n, Inc. v. Lakewood Housing Authority*, 294 N.J. Super. 146, 149, 682 A.2d 1201 (App. Div. 1996).[4]

> **LTO's tax filings indicate that notwithstanding any program names or formalities it may use, it is the actual organization receiving funds from HUD for Lakewood's Section 8 Program.**

Since LTRAP is merely the name that LTO takes on when it is acting as the agency of the Township for the Section 8 program, it is clear that any funds provided to LTRAP are actually received and used by LTO.  *See Price 12/15/00 Letter.*  However, this fact is also clearly evidenced by LTO's IRS filings.  Part VIII of LTO's IRS Form 990 indicates that LTO's source of income is: Line (1E) Government Grants.  This is in contrast to LTO's claims that it derives its income from management fees.  This arrangement is further illustrated by the fact that LTO's filings indicate that it receives 92% of its funding from a governmental unit.  *See LTO IRS Form 990 – Schedule A Reason for Public Charity Status.*  Finally, on LTO's IRS Form 990 Schedule O, *LTO indicates that it has a Section 8 contract with HUD.  See Id. Schedule O.*

### QAD financial review demands.

Notwithstanding any representations that were made in the past, HUD has a right under the ACC and the program regulations to full and free access to all PHA offices and facilities, and to all accounts and other records of the PHA that are pertinent to administration of the program. HUD does not have to establish cause for such a request.  It does not matter who is in control of

---

[4] You cite to an August 1977 letter from Clarence Humphrey, Director of Housing Programs Management Branch as evidence that HUD has changed its position over the years.  You state that the letter "differentiated between LTRAP, the program created by Lakewood Township, and LTO[.]" (August 30, 1977)  At no point does Mr. Humphrey mention LTRAP so he could not have differentiated between it and LTO.

5

the information HUD seeks, it simply must be provided by the PHA, who has ultimate responsibility for the documentation.

After QAD attempted to schedule a full Financial Management Review of the program, Henya Richter, LTRAP's CFO, responded by email dated August 14, 2013, stating:

> [O]ur agency is unique as it does not have UNA. The Lakewood Tenants Organization, Inc., (LTO) is contracted to administer the Lakewood Township Residential Assistance Program, (LTRAP). Under this contract, LTO receives the full administrative fees earned. All expenses are then paid out of LTO's accounts and not LTRAP. … The administrative fee is paid in full each month to LTO, so there is never any UNA. … As a result, the only item you will be reviewing is the NRA balances.

Contracts between non-federal entities do not supersede the requirements under federal regulations or the ACC. And unsubstantiated representations of an organization we are seeking to review do not trump HUD's right to ensure the protection of the public fisc.

On September 4, 2013, QAD requested, via email, a copy of the executed contract between LTO and LTRAP and any invoices that relate to LTO billing the LTRAP for administration of the program. On September 9, 2013, QAD followed up reminding LTRAP that there would be an on-site entrance conference the following morning and that "copies of invoices specifically showing the charges for services rendered by LTO to LTRAP" should be made available.

After LTO/LTRAP's unwillingness to cooperate, by letter dated June 19, 2014, QAD once again scheduled an on-site Financial Management Review and explained the objective and scope of such review. Once again, by your letter dated June 25, 2014, LTO/LTRAP refused to participate in the review.

These demands remain open. LTO/LTRAP must allow HUD to conduct a full Financial Management Review as described in QAD's June 19, 2014 letter within 30 days of date of this letter. Should LTO/LTRAP fail to comply with this final demand it will be considered in default of its ACC and the applicable program regulations. If LTO/LTRAP goes into default of its ACC over this issue, HUD will consider transferring LTO/LTRAP's entire HCV program to another PHA. HUD may also take any other administrative or legal actions it deems appropriate.

For the reasons set forth above, LTO must allow the QAD to conduct its financial review. If you have any questions, or wish to discuss this matter, please call Louis Gioia, Attorney-Advisor, at 212-542-7211.

Sincerely,

John J. Cahill
Regional Counsel for
New York/New Jersey

6

cc: Hon. Menashe Miller, Mayor, Township of Lakewood, NJ

AR 000078

| | |
|---|---|
| **From:** | Lourdes |
| **To:** | Castro-Ramirez, Lourdes M |
| **Sent:** | 3/13/2015 3:43:54 PM |
| **Subject:** | Fwd: Plane reading Materials |
| **Attachments:** | 2015 Legislative package chart 3.3.16.docx; 2015-02-13 SOHUD Memo re PR Public Housing Administration Funds Deposited in PR Government Development Bank FINAL.pdf; ATT00001.htm; ATT00002.htm; ATT00003.htm; ATT00004.htm; ATT00005.htm; ATT00006.htm; ATT00007.htm; ATT00008.htm; Draft First Week Schedule - Lourdes Castro Ramirez.docx; FY15 NOFA SCHEDULE.pdf; Hot Topics for Principal Deputy Assistant Secretary.docx; NGMS Overview - Deep Dive Appendix_2-26-15_final.pptx; PIH Deep Dive Slide Deck Final 2-23-15.pptx; rule chart for spring 2015 agenda 3-2-15.docx |

Sent from my iPhone

Begin forwarded message:

**From:** "Bryon, Jemine A" <Jemine.A.Bryon@hud.gov>
**Date:** March 6, 2015 at 7:20:02 PM EST
**To:** "'lulucastro@aol.com'" <lulucastro@aol.com>
**Subject: Plane reading Materials**

Hi Lourdes:
Yea, it's the weekend.
Yea, you join us on Monday.

Attached you will find various documents for your review.  I would suggest review in the following order:
- Ø    Draft First Week Schedule (the latest)
- Ø    Hot Topics for PDAS
- Ø    PIH Deep Dive Slide Deck
- Ø    NGMS Overview
- Ø    SOHUD PRPHA
- Ø    2015 Leg package chart
- Ø    Rule chart for spring 2015
- Ø    FY15 NOFA Schedule

You will receive a 2nd email in a few minutes that will contain materials for the MTW briefing we will provide to you on Monday.

Please feel free to call me with any questions. 267 738 0809.

**PIH Hot Topics**

Redacted

1



2



Redacted

3



**LTRAP Agency in New Jersey**

- LTO/TRAP has not accounted for any administrative fees earned for more than ten years, minimum of $5.3M could reach as high as $11M; they contended they did not have to account for funds because all funds were sent over to LTO as lump sum and at that point were no longer subject to HUD review. Recently, QAD has contacted them multiple times to schedule an onsite review and is continuously denied access to the PHAs financial records. This is in violation of 24 CFR 982 and HUD OGC determined QAD did indeed have right to access, because LTO and LTRAP were one in the same organization and considered 'the PHA'. After many discussions which included HUD Field Office staff, OGC, and LTO/LTRAP attorneys, the PHA maintains that they will not grant access to prior records showing where the PHA spent HUD administrative funds. They are also requesting a "clean slate" and state that going forward they will 'do the right thing' and then QAD can review "those" records. Note that in addition to this issue, the PHA is in violation of other HUD regulations, rules and policies related to management of the HCV program and the Field OGC states that this issue is getting heated very quickly as the PHA has made accusations of anti-Semitism, and targeting due to religion.

4



5



AR 000085



7



8

| From: | Nabors-Jackson, Nikol |
|---|---|
| To: | Jones, Jennifer C |
| Sent: | 3/9/2015 11:03:36 AM |
| Subject: | FW: Plane reading Materials |
| Attachments: | Hot Topics for Principal Deputy Assistant Secretary.docx |

Hi Jenn:

Jemine may have sent this to you already. Here is the final Hot Topics Doc that she provided. Thanks.

**Nikol Nabors-Jackson**
Senior Advisor
Office of the Assistant Secretary
    for Public and Indian Housing
**U.S. Department of Housing and Urban Development**
(202) 402-4575/Direct

**PIH Hot Topics**



1



Redacted

2



Redacted

3



**Office of Public Housing Voucher Programs (OPHVP)**

Redacted

**LTRAP Agency in New Jersey**
- LTO/TRAP has not accounted for any administrative fees earned for more than ten years,  minimum of $5.3M could reach as high as $11M;  they contended they did not have to account for funds because all funds were sent over to LTO as lump sum and at that point were no longer subject to HUD review. Recently, QAD has contacted them multiple times to schedule an onsite review and is continuously denied access to the PHAs financial records. This is in violation of 24 CFR 982 and HUD OGC determined QAD did indeed have right to access, because LTO and LTRAP were one in the same organization and considered 'the PHA'.  After many discussions which included HUD Field Office staff, OGC, and LTO/LTRAP attorneys, the PHA maintains that they will not grant access to prior records showing where the PHA spent HUD administrative funds. They are also requesting a "clean slate" and state that going forward they will 'do the right thing' and then QAD can review "those" records. Note that in addition to this issue, the PHA is in violation of other HUD regulations, rules and policies related to management of the HCV program and the Field OGC states that this issue is getting heated very quickly as the PHA has made accusations of anti-Semitism, and targeting due to religion.

4



Redacted

5

AR 000093



6



AR 000095



8

| | |
|---|---|
| **From:** | Ginger, Amy L |
| **To:** | Radosevich, Tara J; Jones, Jennifer C |
| **CC:** | Ozdinec, Milan M |
| **Sent:** | 7/10/2015 1:45:53 PM |
| **Subject:** | FW: Draft - LTRAP Program Transfer Letter |
| **Attachments:** | Exhibit 1 - April 14, 2014 letter from Newark PIH to LTRAP.pdf; Exhibit 2 - Consolidated Annual Contribution Contracts.pdf; Exhibit 3 - Dec. 3, 2013 Letter from QAD to LTRAP re Financial Review Report.pdf; Exhibit 4 - Nixon Peabody Letter 1-2-14.pdf; Exhibit 5 - Feb. 14, 2014 letter from Nixon Peabody to Newark PIH.pdf; Exhibit 6 - June 11, 2014 Letter from LTRAP to Newark PIH.pdf; Exhibit 7 - June 19, 2014 Letter from QAD to LTRAP re Scheduling of Financial Managment Review.pdf; Exhibit 8 - June 20, 2014 LTRAP Response to QAD re Scheduling of Financial Managment Review.pdf; Exhibit 9 - June 25, 2014 letter from Dauber to QAD.pdf; Exhibit 10 - Dec. 5, 2014 letter from HUD Regional Counsel to Counsel for LTRAP.pdf; LTRAP - Transfer - OGC edits 6.19.2015.docx |

Here is the letter, along with all the attachments.  I have a call in to David Reizes to further discuss, can update you later if needed.

Thanks.

Amy Ginger
Director
Office of Housing Voucher Programs
202-402-5152

**From:** Burgos, Sonia L
**Sent:** Thursday, July 09, 2015 12:19 PM
**To:** Ginger, Amy L
**Subject:** FW: Draft - LTRAP Program Transfer Letter
**Importance:** High

Redact

**From:** Burgos, Sonia L
**Sent:** Monday, June 29, 2015 12:46 PM
**To:** Ginger, Amy L
**Subject:** FW: Draft - LTRAP Program Transfer Letter
**Importance:** High

Good afternoon Amy, please call me when you get a moment. Thanks!

Sonia L. Burgos
Director
Office of Public Housing
U.S. Dept. of Housing & Urban Development
One Newark Center
1085 Raymond Blvd.  12th Floor
Newark, NJ 07102
Phone: 973-776-7227
Cell: 202-536-9105
Email: Sonia.l.Burgos@hud.gov

Communications on or through the United States Department of Housing and Urban Development computer systems may be monitored to secure effective system operation and for other lawful purposes. If you have received this email in error, please email the sender by replying to this message. All reasonable precautions have been taken to ensure no viruses are present in this email. The United States Department of Housing and Urban Development cannot accept responsibility for loss or damage arising from the use of this email or attachments and recommend that you subject these to your virus checking procedures prior to use.

---

**From:** Torres, Debra A
**Sent:** Monday, June 22, 2015 2:09 PM
**To:** Wadhams, Unabyrd; Ozdinec, Milan M
**Cc:** Burgos, Sonia L
**Subject:** FW: Draft - LTRAP Program Transfer Letter
**Importance:** High

Byrd and Milan,

We are getting closer to taking official action on the LTRAP issue.  Attached is the draft transfer letter that has been reviewed and revised per OGC and Program Staff.  I just want to confirm with you that this has been shared with the PDAS since she is signing the letter.  Also, we do not want to proceed with the action for another couple of weeks as the Lakewood Housing Authority (where the program is being transferred to) has two vacant Board positions and they need at least one more filled to be able to pass the resolution for the transfer.  There are two Rabbis on the Board who likely will recuse themselves from a vote so they need one more Board person for a quorum.  Let us know if you have any questions.

Thank you!

---

**From:** Burgos, Sonia L
**Sent:** Monday, June 22, 2015 10:20 AM
**To:** Torres, Debra A
**Subject:** FW: Draft - LTRAP Program Transfer Letter

If you have a moment, I would like to talk to you.

---

**From:** Gioia, Louis J
**Sent:** Monday, June 22, 2015 7:56 AM
**To:** Burgos, Sonia L; Cahill, John J; Nakles, Ned J
**Cc:** Thumar, Balu K; Melvin, Delores A
**Subject:** RE: Draft - LTRAP Program Transfer Letter


Redact

Louis J. Gioia
Office of Regional Counsel
Dept. of Housing and Urban
  Development – Region II
26 Federal Plaza

AR 000098

New York, NY 10278
(212) 542-7211

This message is intended for designated recipients only, and may contain information that is privileged, attorney work product or exempt from disclosure under applicable law. If you have received this message in error, please delete the original and all copies and notify the sender immediately. Federal law prohibits the disclosure or other use of this information.

**From:** Burgos, Sonia L
**Sent:** Wednesday, June 17, 2015 4:58 PM
**To:** Gioia, Louis J; Cahill, John J; Nakles, Ned J
**Cc:** Thumar, Balu K; Melvin, Delores A
**Subject:** RE: Draft - LTRAP Program Transfer Letter

Looks good to me.

**From:** Gioia, Louis J
**Sent:** Tuesday, June 16, 2015 4:03 PM
**To:** Burgos, Sonia L; Cahill, John J; Nakles, Ned J
**Cc:** Thumar, Balu K; Melvin, Delores A
**Subject:** RE: Draft - LTRAP Program Transfer Letter


Redact

Louis J. Gioia
Office of Regional Counsel
Dept. of Housing and Urban
  Development – Region II
26 Federal Plaza
New York, NY 10278
(212) 542-7211

This message is intended for designated recipients only, and may contain information that is privileged, attorney work product or exempt from disclosure under applicable law. If you have received this message in error, please delete the original and all copies and notify the sender immediately. Federal law prohibits the disclosure or other use of this information.

**From:** Burgos, Sonia L
**Sent:** Thursday, May 07, 2015 11:17 AM
**To:** Cahill, John J; Gioia, Louis J; Nakles, Ned J
**Cc:** Thumar, Balu K; Melvin, Delores A
**Subject:** FW: Draft - LTRAP Program Transfer Letter

Please see draft. I am recommending that the letter be signed by the Principal Assistant Secretary.

**From:** Thumar, Balu K
**Sent:** Wednesday, May 06, 2015 4:22 PM
**To:** Burgos, Sonia L
**Cc:** Bennett, Melissa L; Melvin, Delores A
**Subject:** Draft - LTRAP Program Transfer Letter

Hi Sonia: Per our conversations, Melissa and I have put together attached draft letter. Should you require any

AR 000099

specific edit, please do so. Thanks

Balu Thumar
Office of Public Housing, Division Director
1085 Raymond Boulevard, One Newark Center
Newark, NJ 07102
973-645-2270 (fax)
973-776-7237 (office)





U.S. Department of Housing and Urban Development
Office of Chief Counsel
One Newark Center, 12th Floor
Newark, NJ 07102-5260
Telephone: (973) 622-7900

APR 14 2014

Mr. Meir Hertz, Executive Director
Lakewood Township Rental Assistance Program
600 W. Kennedy Blvd.
P.O. Box 856
Lakewood, New Jersey   08701

Dear Mr. Hertz:

**SUBJECT: Newark Field Office Review of Documentation Related to
Lakewood Township Rental Assistance Program (LTRAP)**

The Newark Field Office is in the process of addressing issues that resulted from two on-site reviews that were conducted at your agency in fiscal year 2013.  These reviews were conducted by the Newark Office of Fair Housing and Equal Opportunity in May 2013 and the Housing Voucher Quality Assurance Division in September 2013.

This letter addresses the following issues: (1) the relationship between the Lakewood Township Rental Assistance Program (LTRAP) and the Lakewood Tenants Organization (LTO); (2) the validity of the use of federal funds in which the entire amount of LTRAP's Housing Choice Voucher Program Administrative Fees are paid to the LTO; and (3) claims by the LTO that the use of these fees are not subject to HUD review nor audit.

The following documents are referred to throughout this letter for your information: (1) a letter dated 8/30/77 to the Township from Clarence L. Humphrey as Director of HUD's Housing Programs Management Branch (the "Humphrey Letter") (2) a letter dated 4/24/90 from John J. Franklin as the Township's mayor (the "Mayor's Letter") to Theodore Britton of HUD's Newark Field Office (3) a letter dated 9/20/95 addressed to the Executive Director of LTRAP, attaching an earlier version of the Consolidated ACC [Form HUD-52520 (6/93)] (the "1995 ACC") with no funding exhibits attached, that is signed by the then-mayor of the Township on 10/5/95 on behalf of the LTRAP (4) the Employment Agreement dated 12/28/95 (the "Employment Contract") between the Executive Director of LTRAP and the LTO (5) a letter dated 7/9/96 to the Executive Director of the LTO from Kevin E. Marchman as HUD's Acting Assistant Secretary for Public and Indian Housing (the "Marchman Letter") (6) a letter dated 7/21/98 to the Executive Director of LTRAP attaching a copy of a Consolidated ACC [Form HUD-52520 (12/97)](the "1998 ACC") that is signed by the Executive Director of LTRAP but lists the Township of Lakewood (the "Township") as the HA on the "PIH Section 8 - Funding Exhibit," and (7) two letters dated 12/15/00 and 1/2/14 from Richard Michael Price, Esq. of

AR 000101

Nixon Peabody LLP. We assume that these documents are readily available for your reference since either you or your representatives have provided us with copies.

Our review revealed that the LTO operates LTRAP on behalf of the Township. The LTO and LTRAP are not separate entities. The LTO (not LTRAP) is the name of the legal entity that acts to administer the Township's Section 8 programs pursuant to the terms of the Agency Agreement. LTRAP is an operating unit of the LTO. Also, the LTO's Agency Agreement was not approved by HUD. We have not found any evidence that the substance of the Agency Agreement received the approval of HUD or that the selection of the LTO satisfies State and/or Local procurement requirements, if applicable. We have determined the following:

A. <u>No evidence that HUD approved Agency Agreement.</u>

We disagree with a conclusion made by Mr. Price in his 12/15/00 and 1/2/14 letters that HUD has determined "the [Agency Agreement] was appropriate and remains so." As evidence of this conclusion, Mr. Price points to the Humphrey Letter and Marchman Letter. However, neither makes that assertion. The Humphrey Letter merely states that since HUD is not a party to the agreement, HUD's review and approval thereof shall not be required. The Marchman Letter states only that HUD's procurement rules do not apply to the LTO's selection as a public housing agency. Neither letter addresses the substance of the Agency Agreement. Accordingly, these letters cannot support a claim that HUD has found the Agency Agreement to be appropriate. Therefore, we have not seen any evidence that HUD determined the Agency Agreement to be appropriate or otherwise granted its approval of the agreement.

B. <u>Applicability of Procurement Rules.</u>

The Marchman Letter makes clear that HUD's procurement rules do not apply to the Township's "selection of LTO as a public housing agency." *See, the Marchman Letter.* Notwithstanding the inapplicability of HUD's procurement rules, State and Local laws regarding procurement may apply to such selection. Nothing in the documentation with which we have been provided indicates whether or not the selection of the LTO satisfies any applicable State or local procurement rules.

The Township and the LTO are together the "PHA" under the ACC. We have determined that both the Township and the LTO constitute a "PHA" in this matter.

C. <u>PHA defined.</u>

The Housing Choice Voucher Program, which if also referred to as the "Section 8 Program", is generally administered by State or local government entities called public housing agencies (or PHAs). HUD provides housing assistance funds and funds for PHA administration of this program to the PHA. *See, 24 C.F.R.*

AR 000102

§982.1(a). A PHA includes "...both (1) any State, county, municipality, or other governmental entity or public body which is authorized to administer the program (or an agency or instrumentality of such entity), and ...(2)(ii) [a]ny other public or private non-profit entity that was administering a Section 8 tenant-based assistance program pursuant to a contract with the contract administrator of such program (HUD or PHA) on October 21, 1998. *See, 24 C.F.R. §982.4(b)*.

Based on the information that we have been presented, it appears that the LTO is a non-profit entity that has been administering a Section 8 tenant-based assistance program for the Township since 10/21/98 and before, as evidenced by both the 1998 ACC and the Agency Agreement. For this reason, we find that the Township and the LTO together meet the definition of a PHA and therefore constitute the PHA of the Housing Choice Voucher Program run by the Township in Lakewood, New Jersey. The identity of the PHA in this instance should be shared by both the Township and the LTO, which appears to be consistent with the parties shared responsibility on the copies of the Consolidated ACCs. Particularly, since they both refer to LTRAP, which we have determined above to be an operational unit of the LTO, and name the Township as the HA on a funding exhibit.

### D.   LTO is not merely a contractor or service provider.

The PHA must have authority to administer the program. *See, 24 C.F.R. §982.51(a)*. In fact, the Marchman Letter that Mr. Price often references in and attaches to his correspondence with HUD on this matter, specifically concludes that the LTO qualifies as a public housing agency. Furthermore, the Marchman Letter specifies that the LTO was selected by the Township to act as a public housing agency; not as a contractor or service provider. We note that the Township does not also see itself as a public housing agency.

A PHA is required to submit evidence of any change that affects its status as a PHA, its authority to administer the program, or its jurisdiction. *See, 24 C.F.R. §982.51(b)*. We have not received any documentation that suggests that the LTO has made a case that it has undergone a change that affects its status as a PHA pursuant to the governing regulations. For these reasons, we disagree with the repeated characterization of the LTO as merely a contractor or service provider.

In addition, the unsupported payment of Administrative Fees to the LTO violates HUD's rules. We have determined that LTRAP's unsupported payment of the full amount of the administrative fees to the LTO violates HUD's financial management rules applicable to the Section 8 HCV program.

### E.   No evidence of such Agreement found.

We could not find any evidence in the Agency Agreement to establish the Township's agreement to pay the full amount of the administrative fees to the

LTO, in exchange for its administration of LTRAP. Although the Cohn Letter makes reference to the Agency Agreement having been amended over the years, the Newark Field Office have not been provided with these agreements. Reference to a financial arrangement between the Township and the LTO is however noted in the Mayor's Letter. Specifically, the Mayor's Letter describes the agreement to be that LTRAP "would not draw on the Township's resources;" the LTO was required to be "economically self-sufficient." Nothing in the Agency Agreement or the Mayor's Letter suggests that the LTO should be allowed to charge a fee against program receipts that is not supported by allowable program expenses. Moreover, even if such a written agreement could be found, the regulations suggest that the Township could not agree to such an arrangement.

F.  The LTO must comply with HUD requirements, including audit.

The governing regulations require that the PHA comply with HUD regulations and other HUD requirements for the program, in addition to the consolidated ACC and the PHA's HUD-approved applications for program funding. *See, 24 C.F.R. §982.52 and §982.153.* Such compliance requirements are similarly echoed in the terms of the ACC. *See, Paragraph 10 of the 1998 ACC.* Accordingly, as a PHA, both the Township and the LTO are required to comply with all applicable HUD regulations and requirements and the terms of the Consolidated ACCs and any and all HUD-approved application(s) pursuant to which the HCV program receives HUD funding.

LTO did not respond to HUD's requirements in notice PIH-2014-01, Guidance on Reporting Public Housing Agency Executive Compensation HUD-52725. The notice applies to all PHAs that administer a public housing or housing choice voucher program. This notice supersedes those parts of PIH-2011-48. The guidance in that notice pertaining to conducting comparability analysis remains in effect. The key changes include:

a.  There are no reporting exemptions;
b.  The submission date is not tied to the submission of the HUD-52723 form;
c.  Data must be submitted for the top management official and top financial official;
d.  The types of compensation that must be reported have changed;
e.  Compensation data is required for no more than three employees, and
f.  Source of funds must be reported for those employees with total cash compensation exceeding $155,500

Please be advised that applicable HUD requirements include subjecting a PHA to its audit requirements. *See, 24 CFR 982.159(b).* Therefore, we find that the Township and the LTO are both subject to HUD's audit requirements. However, notwithstanding our determination that the LTO (together with the Township)constitutes a PHA in this matter, the Agency Agreement, by its own terms, makes it clear that the LTO agrees "to act as the designated agency of the

Township to administer said program pursuant to <u>applicable Federal, State and local laws and regulation.</u>" Furthermore, the failure to administer the program in accordance with the laws, statutes, ordinance, rules and regulations and directives of HUD constitutes "reasonable cause" that can serve as a basis, under the Agency Agreement, for the Township to rescind its resolution designating the LTO as its agency to administer the Township's Section 8 program.

G. <u>HUD regulates the use of Administrative Fees.</u>

In accordance with the ACC, HUD agrees to make payments to the PHA, over a specified term, for housing assistance payments to owners and for the PHA administrative fee. *See, 24 C.F.R. §982.151(a)(1).* Generally, administrative fees are calculated based on the amount of rental assistance vouchers being administered by a PHA in a fiscal year. *See, HUD Notice PIH 2013-25.* They are paid to a PHA based on its projection regarding vouchers covered by

tenant leases. *See, Section 20.6 of the Guidebook.* Administrative fees may only be used to cover costs incurred to perform the administrative responsibilities for the program in accordance with HUD regulations and requirements. *See, 24 C.F.R. §982.152, and Paragraph 4(b)(2) of the 1998 ACC.* Specifically, amounts paid by HUD to the PHA for a program and any other amounts received by the PHA in connection with the program (which are defined as "program receipts"), may only be used to pay program expenditures. *See, Paragraph 11(a) of the 1998 ACC.* The term "program expenditures" is defined to refer to those amounts which may be charged against program receipts in accordance with the Consolidated ACC and HUD requirements. *See, the 1998 ACC.*

Recognizing that the administrative fees are calculated based on projections and not based on allowable expenses that may be incurred by a PHA, HUD rules require that any funds received in excess of allowable program expenditures be maintained in an Administrative Fee Reserve, returned to HUD or invested in accordance with HUD requirements. *See, 24 C.F.R. §982.155 and Paragraphs 11(d) and 12 of the 1998 ACC.* Although it is conceivable that the full amount of administrative fees may be used to pay for allowable program expenditures of LTRAP and therefore no Administrative Fee Reserve need to be maintained, HUD is not able to make that determination because neither the Township nor the LTO have produced evidence that the administrative fees are being charged against allowable program expenditures.

Most importantly, any contention that the parties may contract to set the LTO's fee at the full amount of the administrative fees paid by HUD seems contrary to the purpose of the administrative fees and efforts by HUD to control such spending using taxpayer dollars. We emphasize this in light of recent reductions in appropriations. By way of example, we note that HUD has implemented a cap on the amount of executive compensation that can be paid from Section 8 funds. *See, HUD's Notice PIH 2012-14*

*2012-14 (HA)*.  Therefore, we disagree with any contention that the administrative fees paid to the LTO are "de-federalized," or otherwise beyond the scrutiny of HUD.

Based on the discussion above, we have determined that (1) LTRAP is an operating unit of the LTO; (2) the Township and the LTO together constitute the PHA in this matter; (3) the unsupported payment of the entire amount of the program's administrative fees to the LTO violates HUD's rules regarding the use of administrative fees; (4) use of administrative fees are subject to HUD's review and approval; and (5) we find no claims that the use of these fees are not subject to HUD review nor audit.

If you should have any questions, please contact me at (973) 776-7210.

Sonia L. Burgos

4/14/14

Director
Office of Public Housing

Cc:    Debra Torres, Regional Administrator
        Shie-Fong sun, Associate Regional Counsel
        Wanda Nieves, Director, FHEO
        MaryAnn Creager, Supervisor Program Analyst, QAD



**U. S. Department of Housing and Urban Development**

New Jersey State Office
Thirteenth Floor
One Newark Center
Newark, NJ 07102-5260

JUL 2 1 1998

Mr. Meir N. Hertz, PHM
Executive Director
Lakewood RAP
600 W. Kennedy Blvd.
P.O. Box 856
Lakewood, NJ  08701

Dear Mr. Hertz:

Subject:  Amendment to the Annual Contributions Contract
          Project No.  NJ214-VO-0015 (Renewal)
                       NJ214-VO-0016 (Renewal)

    Enclosed is an executed copy of the Amendment to your
Annual Contract.

    If you have any questions, please contact Sharon Smith of my
staff at (973) 622-7900 extension 3630.

                        Sincerely,

                        Carmen Valenti
                        Director
                        Office of Public Housing

Enclosure

Visit our Web Site at:  http://www.hud.gov/local/njn/njnhome.html

PHA

# Consolidated Annual Contributions Contract

**U.S. Department of Housing and Urban Development**
**Office of Public and Indian Housing**

Rental Certificate and Rental Voucher Programs

Section 8

*Lakewood RAP*
*NJ214V00015 (Renewal)*
*NJ214V00016 (Renewal)*

**Table of Sections**

| | page |
|---|---|
| 1. Definitions | 1 |
| 2. Funding for HA Certificate or Voucher Program | 1 |
| 3. Term | 2 |
| 4. HUD Payments for Program | 2 |
| 5. Maximum Payments for Program | 2 |
| 6. Reduction of Amount Payable by HUD | 2 |
| 7. ACC Reserve Account | 2 |
| 8. Separate ACC for Funding Increment | 2 |
| 9. Budget and Requisition for Payment | 2 |
| 10. HUD Requirements | 2 |

| | page |
|---|---|
| 11. Use of Program Receipts | 2 |
| 12. Administrative Fee Reserve | 3 |
| 13. Depositary | 3 |
| 14. Program Records | 3 |
| 15. Default by HA | 3 |
| 16. Fidelity Bond Coverage | 3 |
| 17. Exclusion from Program | 3 |
| 18. Exclusion of Third Party Rights | 4 |
| 19. Consolidated ACC | 4 |

## 1. Definitions

**ACC** Annual contributions contract.

**ACC Reserve Account** An account established by HUD for a program from amounts by which the maximum payment to the HA under the consolidated ACC (during a HA fiscal year) exceeds the amount actually approved and paid. This account is used as the source of additional payments for the program.

**Annual Contributions Contract** The contract for each funding increment. HUD's commitment to make payments for each funding increment ("project") listed in the funding exhibit constitutes a separate ACC.

**Budget Authority** The maximum amount of funds available for payment to the HA over the term of a funding increment. Budget authority is authorized and appropriated by the Congress.

**Consolidated Annual Contributions Contract (consolidated ACC)** This consolidated contract for the HA certificate program and voucher program. HUD's commitment to make payments for each funding increment in a program constitutes a separate ACC. However, commitments for all the funding increments are listed in this consolidated ACC.

**Contract Authority** The maximum annual payment by HUD to the HA for a funding increment. The amount of contract authority for each funding increment in a program is listed in the funding exhibit for the program.

**Fiscal Year** The HA fiscal year. The funding exhibit states the last month and day of the HA fiscal year.

**Funding Exhibit** An exhibit to the consolidated ACC. The funding exhibit states the amount and term of funding for a program. There are separate funding exhibits for the HA certificate program and voucher program.

**Funding Exhibit A** The funding exhibit for the HA certificate program.

**Funding Exhibit B** The funding exhibit for the HA voucher program.

**Funding Increment (also called a "Project").** Each commitment of budget authority by HUD to the HA for a program under the consolidated ACC. The funding increments for the program are listed on the program funding exhibit.

**HA** Housing agency.

**Housing Agency (HA)** The agency that has entered this consolidated ACC with HUD.

**HUD** U.S. Department of Housing and Urban Development.

**Program** The HA certificate program or voucher program.

**Program Expenditures** Amounts which may be charged against program receipts in accordance with the consolidated ACC and HUD requirements.

**Program Receipts** Amounts paid by HUD to the HA for a program, and any other amounts received by the HA in connection with the program.

**Project** A funding increment for the program.

## 2. Funding for HA Certificate or Voucher Program

a. The funding increments in the HA certificate program or voucher program are listed in the funding exhibit for the program.

b. The amount of contract and budget authority for each funding increment in a program is stated in the program funding exhibit.

c. By giving written notice to the HA, HUD may revise the funding exhibit for a program:
   (1) To add a funding increment, or
   (2) To remove a funding increment for which the ACC term has expired.

d. The HUD notice must include a revised funding exhibit, specifying the term, contract authority and budget authority for each funding increment under the consolidated ACC. The HUD notice of a revised funding exhibit for a program constitutes an amendment of the consolidated ACC.

Form HUD-52520 (12/97)

AR 000108

3. **Term**
   a. The funding exhibit states the first date and last date of the ACC term for each funding increment.
   b. If the first or last date of the ACC term for a funding increment is not entered before the consolidated ACC is signed by the HA, HUD may enter the date subsequently, by giving written notice to the HA.

4. **HUD Payments for Program**
   a. HUD will make payments to the HA for a program in accordance with HUD regulations and requirements.
   b. For each HA fiscal year, HUD will pay the HA the amount approved by HUD to cover:
      (1) Housing assistance payments by the HA for a program.
      (2) HA fees for administration of the program.
   c. The amount of the HUD payment may be reduced, as determined by HUD, by the amount of program receipts (such as interest income) other than the HUD payment.

5. **Maximum Payments for Program**
   a. Annual Limit   Except for payments from the consolidated ACC reserve account, the HUD annual payments for a program during a fiscal year must not be more than the sum of the contract authority amounts for the funding increments in the program.
   b. Limit on Payments for Funding Increment   The total amount of payments for any funding increment over the increment term must not exceed budget authority for the funding increment.

6. **Reduction of Amount Payable by HUD**
   a. If HUD determines that the HA has failed to comply with any obligations under the consolidated ACC, HUD may reduce to an amount determined by HUD:
      (1) The amount of the HUD payment for any funding increment.
      (2) The contract authority or budget authority for any funding increment.
   b. HUD must give the HA written notice of the reduction.
   c. The HUD notice must include a revised funding exhibit specifying the term, contract authority, and budget authority for each funding increment under the consolidated ACC.  The HUD notice of revisions to the funding exhibit for a program constitutes an amendment of the consolidated ACC.

7. **ACC Reserve Account**
   An ACC reserve account may be established and maintained by HUD.  The amount in the account is determined by HUD.  The ACC reserve account may be used by HUD to pay any portion of the program payment approved by HUD for a fiscal year.

8. **Separate ACC for Funding Increment**

HUD's commitment to make payments for each funding increment ("project"), listed in the funding exhibit constitutes a separate ACC.

Form HUD-52520  (12/97)

AR 000109

9. **Budget and Requisition for Payment**
   a. Each fiscal year, the HA must submit to HUD an estimate of the HUD payments for the program. The estimate and supporting data must be submitted at such time and in such form as HUD may require, and are subject to HUD approval and revision.
   b. The HA must requisition periodic payments on account of each annual HUD payment. Each requisition must be in the form prescribed by HUD. Each requisition must include certification that:
      (1) Housing assistance payments have been made in accordance with contracts in the form prescribed by HUD and in accordance with HUD requirements; and
      (2) Units have been inspected by the HA in accordance with HUD requirements.
   c. If HUD determines that payments by HUD to the HA for a fiscal year exceed the amount of the annual payment approved by HUD for the fiscal year, the excess must be applied as determined by HUD. Such applications, determined by HUD may include, but are not limited to, application of the excess payment against the amount of the annual payment for a subsequent fiscal year. The HA must take any actions required by HUD respecting the excess payment, and must, upon demand by HUD, promptly remit the excess payment to HUD.

10. **HUD Requirements**
   a. The HA must comply, and must require owners to comply, with the requirements of the U.S. Housing Act of 1937 and all HUD regulations and other requirements, including any amendments or changes in the law or HUD requirements.
   b. The HA must comply with its HUD-approved administrative plan, and HUD-approved program funding applications.
   c. The HA must use the program forms required by HUD.
   d. The HA must proceed expeditiously with the programs under this consolidated ACC.

11. **Use of Program Receipts**
   a. The HA must use program receipts to provide decent, safe, and sanitary housing for eligible families in compliance with the U.S. Housing Act of 1937 and all HUD requirements. Program receipts may only be used to pay program expenditures.
   b. The HA must not make any program expenditures, except in accordance with the HUD-approved budget estimate and supporting data for a program.
   c. Interest on the investment of program receipts constitutes program receipts.
   d. If required by HUD, program receipts in excess of current needs must be promptly remitted to HUD or must be invested in accordance with HUD requirements.

12. **Administrative Fee Reserve**
   a. The HA must maintain an administrative fee reserve for a program. The HA must credit to the administrative fee reserve the total of:
      (1) The amount by which program administrative fees paid by HUD for a fiscal year exceed HA administrative expenses for the fiscal year, plus
      (2) Interest earned on the administrative fee reserve.
   b. The HA must use funds in the administrative fee reserve to pay administrative expenses in excess of program receipts. If any funds remain in the administrative fee reserve, the HA may use the administrative reserve funds for other housing purposes if permitted by State and local law.
   c. If the HA is not adequately administering any Section 8 program in accordance with HUD requirements, HUD may:
      (1) Direct the HA to use the funds to improve administration of the Section 8 program or for reimbursement of ineligible expenses.
      (2) Prohibit HA use of administrative fee reserve funds.

13. **Depositary**
   a. Unless otherwise required or permitted by HUD, all program receipts must be promptly deposited with a financial institution selected as depositary by the HA in accordance with HUD requirements.
   b. The HA must enter an agreement with the depositary institution in the form required by HUD.
   c. The HA may only withdraw deposited program receipts for use in connection with the program in accordance with HUD requirements.
   d. The agreement with the depositary institution must provide that if required under a written notice from HUD to the depositary:
      (1) The depositary must not permit any withdrawal of deposited funds by the HA unless withdrawals by the HA are expressly authorized by written notice from HUD to the depositary.
      (2) The depositary must permit withdrawals of deposited funds by HUD.
   e. If approved by HUD, the HA may deposit under the depositary agreement monies received or held by the HA in connection with any contract between the HA and HUD.

14. **Program Records**
   a. The HA must maintain complete and accurate books of account and records for a program. The books and records must be in accordance with HUD requirements, and must permit a speedy and effective audit.
   b. The HA must furnish HUD such financial and program reports, records, statements, and documents at such times, in such form, accompanied by such supporting data as required by HUD.

Form HUD-52520 (12/97)

AR 000110

c. HUD and the Comptroller General of the United States, or their duly authorized representatives, must have full and free access to all HA offices and facilities, and to all the books, documents and records of the HA relevant to administration of the program, including the right to audit and to make copies.

d. The HA must engage and pay an independent public accountant to conduct audits that are required by HUD. The cost of audits required by HUD may be charged against program receipts.

15. **Default by HA**

a. Upon written notice to the HA, HUD may take possession of all or any HA property, rights or interests in connection with a program, including funds held by a depositary, program receipts, and rights or interests under a contract for housing assistance payments with an owner, if HUD determines that:

(1) The HA has failed to comply with any obligations under this consolidated ACC, or

(2) The HA has failed to comply with obligations under a contract for housing assistance payments with an owner, or

(3) The HA has failed to take appropriate action, to HUD's satisfaction or as directed by HUD, for enforcement of the HA's rights under a contract for housing assistance payments (including requiring actions by the owner to cure a default, termination, or reduction of housing assistance payments, termination of the contract for housing assistance payments, or recovery of overpayments); or

(4) The HA has made any misrepresentation to HUD of any material fact.

b. HUD's exercise or non-exercise of any right or remedy under the consolidated ACC is not a waiver of HUD's right to exercise that or any other right or remedy at any time.

16. **Fidelity Bond Coverage**

The HA must carry adequate fidelity bond coverage, as required by HUD, of its officers, agents, or employees handling cash or authorized to sign checks or certify vouchers.

17. **Exclusion from Program**

Single-headed households, pregnant females, and recipients of public assistance may not be excluded from participation in or be denied the benefit of a program because of such status.

Form HUD-52520  (12/97)

AR 000111

18. **Exclusion of Third Party Rights**
   a.  A family that is eligible for housing assistance under this consolidated ACC is not a party to or third party beneficiary of the consolidated ACC.
   b.  Nothing in the consolidated ACC shall be construed as creating any right of any third party to enforce any provision of this consolidated ACC, or to assert any claim against HUD or the HA.

19. **Consolidated ACC**
   a.  The consolidated ACC is a contract between HUD and the HA.
   b.  This consolidated ACC supersedes any previous annual contributions contract for a program. Matters relating to funding or operation of the program under a previous annual contributions contract are governed by this consolidated ACC.

| United States of America | Secretary of Housing and Urban Development Signature of Authorized Representative | Date signed: |
|---|---|---|
| | x | 7/21/98 |
| | Name & Official Title: (print or type) | |

| Housing Agency | Name of Agency: (print or type) | |
|---|---|---|
| | Signature of Authorized Representative | Date signed: |
| | x | |
| | Name & Official Title: (print or type) | |

Form HUD-52520   (12/97)

AR 000112



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
PIH SECTION 8 - FUNDING EXHIBIT
PROGRAM-BASED

ACC NUMBER: NJ214V0

FIELD OFFICE: 2FPH
OFFICE OF PUBLIC HOUSING

HA NUMBER: NJ214
LAKEWOOD TOWNSHIP
231 THIRD ST

LAKEWOOD          , NJ 087010000

HA FISCAL YEAR-END: 12/31

PROGRAM TYPE: VOUCHER PROGRAM

| FI NUMBER-CR. | FIRST DATE OF TERM | LAST DATE OF TERM | CONTRACT TERM | CONTRACT AUTHORITY | BUDGET AUTHORITY |
|---|---|---|---|---|---|
| NJ214V00008 | 10/01/93 | 09/30/98 | 60 | 251,449 | 891,851 |
| NJ214V00009 | 06/01/94 | 05/31/98 | 48 | 0 | 618,672 |
| NJ214V00010 | 09/01/94 | 08/31/98 | 48 | 268,638 | 1,074,140 |
| NJ214V00011 | 09/01/94 | 08/31/99 | 60 | 134,936 | 674,681 |
| NJ214V00012 | 04/01/97 | 03/31/98 | 12 | 0 | 1,230,600 |
| NJ214V00013 | 04/01/98 | 03/31/99 | 12 | 1,189,590 | 1,189,590 |
| NJ214V00014 | 06/01/98 | 05/31/99 | 12 | 137,680 | 137,680 |
| NJ214V00015 | 10/01/98 | 09/30/99 | 12 | 216,384 | 216,384 |
| NJ214V00016 | 09/01/98 | 08/31/99 | 12 | 236,200 | 236,200 |
| NJ214V08001 | 01/01/98 | 12/31/98 | 12 | 3,994 | 3,994 |
| NJ214V08001 | 05/01/98 | 04/30/99 | 12 | 74,802 | 74,802 |

AR 000113



U. S. Department of Housing and Urban Development

New Jersey State Office
Thirteenth Floor
One Newark Center
Newark, NJ 07102-5260

SEP 20 1995

Mr. Meir M. Hertz, Exe.
Executive Director
LAKEWOOD PHA
P.O. Box 371
419 First St.
Lakewood, NJ 08701-0371

Dear Mr. Hertz:

Subject:   Amendment to the Annual Contributions
           Amendment No. 25
           Project No:  NJ-211-CE-0020 (RENEWAL)
                        NJ-214-CE-0021 (RENEWAL)

    Enclosed you will find documents necessary to effectuate an
Amendment to the Annual Contributions Contract (ACC) for the above
referenced project.

    Please return two (2) executed copies to this office at your
earliest convenience.  You should submit a budget page in
incorporating all projects on the Funding Exhibit.  A fully executed
copy will be returned to you at a later date.

    If you have any questions, please contact the Financial Analyst
assigned to your PHA.

                                    Sincerely,

                                    Florence M. Clagger.
                                    Florence M. Clagger
                                    Director
                                    Finance and Budget Division
                                    Office of Public Housing

Enclosure

PHA

# Consolidated Annual Contributions Contract

Rental Certificate Program
and Rental Voucher Program

**U.S. Department of Housing and Urban Development**
**Office of Public and Indian Housing**

Section 8

*Lakewood RAP*
*NJ214 CE 0020 (Renewi*
*NJ214 CE 0021 (Renewal*
*OF * MOD REHAB NJ39K214project*

| Table of Sections | page | | |
|---|---|---|---|
| 1. Definitions | 1 | 12. Administrative Fee Reserve | 3 |
| 2. Funding for HA Certificate or Voucher Program | 2 | 13. Depositary | 3 |
| 3. Term | 2 | 14. Program Records | 3 |
| 4. HUD Payments for Program | 2 | 15. Default by HA | 3 |
| 5. Maximum Payments for Program | 2 | 16. Fidelity Bond Coverage | 4 |
| 6. Reduction of Amount Payable by HUD | 2 | 17. Exclusion from Program | 4 |
| 7. ACC Reserve Account | 2 | 18. Conflict of Interest Provisions | 4 |
| 8. Separate ACC for Funding Increment | 2 | 19. Interest of Member of or Delegate to Congress | 4 |
| 9. Budget and Requisition for Payment | 2 | 20. Exclusion of Third Party Rights | 4 |
| 10. Depositary | 3 | 21. Consolidated ACC | 4 |
| 11. Use of Program Receipts | 3 | | |

## 1. Definitions

**ACC.** Annual contributions contract.

**ACC Reserve Account.** An account established by HUD for a program from amounts by which the maximum payment to the HA under the consolidated ACC (during a HA fiscal year) exceeds the amount actually approved and paid. This account is used as the source of additional payments for the program.

**Annual Contributions Contract.** The contract for each funding increment. HUD's commitment to make payments for each funding increment ("project") listed in the funding exhibit constitutes a separate ACC.

**Budget Authority.** The maximum amount of funds available for payment to the HA over the term of a funding increment. Budget authority is authorized and appropriated by the Congress.

**Consolidated Annual Contributions Contract (consolidated ACC).** This consolidated contract for the HA certificate program and voucher program. HUD's commitment to make payments for each funding increment in a program constitutes a separate ACC. However, commitments for all the funding increments are listed in this consolidated ACC.

**Contract Authority.** The maximum annual payment by HUD to the HA for a funding increment. The amount of contract authority for each funding increment in a program is listed in the funding exhibit for the program.

**Fiscal Year.** The HA fiscal year. The funding exhibit states the last month and day of the HA fiscal year.

**Funding Exhibit.** An exhibit to the consolidated ACC. The funding exhibit states the amount and term of funding for a program. There are separate funding exhibits for the HA certificate program and voucher program.

**Funding Exhibit A.** The funding exhibit for the HA certificate program.

**Funding Exhibit B.** The funding exhibit for the HA voucher program.

**Funding Increment (also called a "Project").** Each commitment of budget authority by HUD to the HA for a program under the consolidated ACC. The funding increments for the program are listed on the program funding exhibit.

**HA.** Housing agency.

**Housing Agency (HA).** The agency that has entered this consolidated ACC with HUD.

**HUD.** U.S. Department of Housing and Urban Development.

**Program.** The HA certificate program or voucher program.

**Program Expenditures.** Amounts which may be charged against program receipts in accordance with the consolidated ACC and HUD requirements.

**Program Receipts.** Amounts paid by HUD to the HA for a program, and any other amounts received by the HA in connection with the program.

**Project.** A funding increment for the program.

form HUD-52520 (6/93)

AR 000115

**2  Funding for HA Certificate or Voucher Program**

(a) The funding increments in the HA certificate program or voucher program are listed in the funding exhibit for the program.

(b) The amount of contract and budget authority for each funding increment in a program is stated in the program funding exhibit.

(c) By giving written notice to the HA, HUD may revise a funding exhibit:
(1) To add a cost amendment project.
(2) To remove a project for which the ACC term has expired.

**3.  Term**

(a) The funding exhibit states the first date and last date of the ACC term for each funding increment.

(b) If the first or last date of the ACC term for a funding increment is not entered before the consolidated ACC is signed by the HA, HUD may enter the date subsequently, by giving written notice to the HA

**4.  HUD Payments for Program**

(a) HUD will make payments to the HA for a program in accordance with HUD regulations and requirements.

(b) For each HA fiscal year, HUD will pay the HA the amount approved by HUD to cover:
(1) Housing assistance payments by the HA for a program.
(2) HA fees for administration of the program.

(c) The amount of the HUD payment may be reduced, as determined by HUD, by the amount of program receipts (such as interest income) other than the HUD payment.

**5.  Maximum Payments for Program**

(a) Annual Limit   Except for payments from the consolidated ACC reserve account, the HUD annual payments for a program during a fiscal year must not be more than the sum of the contract authority amounts for the funding increments in the program.

(b) Limit on Payments for Funding Increment   The total amount of payments for any funding increment over the increment term must not exceed budget authority for the funding increment.

**6.  Reduction of Amount Payable by HUD**

(a) If HUD determines that the HA has failed to comply with any obligations under the consolidated ACC, HUD may

reduce to an amount determined by HUD:
(1) The amount of the HUD payment for any funding increment.
(2) The contract authority or budget authority for any funding increment.

(b) HUD must give HA written notice of the reduction.

(c) The HUD notice may include a revised funding exhibit to state the reduction in the amount of contract authority or budget authority for a funding increment. The notice of a revised funding exhibit, or of revisions to the funding exhibit for a program constitutes an amendment of the consolidated ACC.

**7.  ACC Reserve Account**

An ACC reserve account may be established and maintained by HUD.  The amount in the account is determined by HUD. The ACC reserve account may be used by HUD to pay any portion of the program payment approved by HUD for a fiscal year.

**8.  Separate ACC for Funding Increment**

HUD's commitment to make payments for each funding increment ("project") listed in the funding exhibit constitutes a separate ACC.

**9.  Budget and Requisition for Payment**

(a) Each fiscal year, the HA must submit to HUD and estimate of the HUD payments for the program.  The estimate and supporting data must be submitted at such time and in such form as HUD may require, and are subject to HUD approval and revision.

(b) The HA must requisition periodic payments on account of each annual HUD payment.  Each requisition must be in the form prescribed by HUD:
(1) Housing assistance payments have been made in accordance with contracts in the form prescribed by HUD and in accordance with HUD requirements; and
(2) Units have been inspected by the HA in accordance with HUD requirements.

(c) If HUD determines that payments by HUD to the HA for a fiscal year exceed the amount of the annual payment approved by HUD for the fiscal year, the excess must be applied as determined by HUD.  Such applications determined by HUD may include, but are not limited to, application of the excess payment against the amount of the annual payment for a subsequent fiscal year. The HA must take any actions required by HUD respecting the excess payment, and must, upon demand by HUD, promptly remit the excess payment to

form HUD-52520  (6/93)

AR 000116

## 10. HUD Requirements

(a) The HA must comply, and must require owners to comply, with the requirements of the U.S. Housing Act of 1937 and all HUD regulations and other requirements, including any amendments or changes in the law or HUD requirements.

(b) The HA must comply with its HUD-approved administrative plan, equal opportunity housing plan and HUD-approved program funding applications.

(c) The HA must use the program forms required by HUD.

(d) The HA must proceed expeditiously with the programs under this consolidated ACC.

## 11. Use of Program Receipts

(a) The HA must use program receipts to provide decent, safe, and sanitary housing for eligible families in compliance with the U.S. Housing Act of 1937 and all HUD requirements. Program receipts may only be used to pay program expenditures.

(b) The HA must not make any program expenditures, except in accordance with the HUD-approved budget estimate and supporting data for a program.

(c) Interest on the investment of program receipts constitutes program receipts.

(d) If required by HUD, program receipts in excess of current needs must be promptly remitted to HUD or must be invested in accordance with HUD

## 12. Administrative Fee Reserve

(a) The HA must maintain an administrative fee reserve for a program. The HA must credit to the administrative fee reserve the total of:
(1) The amount by which program administrative fees paid by HUD for a fiscal year exceed HA administrative expenses for the fiscal year, plus
(2) Interest earned on the administrative fee reserve.

(b) The HA must use funds in the administrative fee reserve to pay administrative expenses in excess of program receipts. If any funds remain in the administrative fee reserve, the HA may use the administrative reserve funds for other housing purposes if permitted by State and local law.

(c) If the HA is not adequately administering any Section 8 program in accordance with HUD requirements, HUD may:
(1) Direct the HA to use the funds to improve administration of the Section 8 program or for reimbursement of ineligible expenses.
(2) Prohibit HA use of administrative fee reserve funds.

## 13. Depositary

(a) Unless otherwise required or permitted by HUD, all program receipts must be promptly deposited with a financial institution selected as depositary by the HA in accordance with HUD requirements.

(b) The HA must enter an agreement with the depositary institution in the form required by HUD.

(c) The HA may only withdraw deposited program receipts for use in connection with the program in accordance with HUD requirements.

(d) The agreement with the depositary institution must provide that if required under a written notice from HUD to the depositary:
(1) The depositary must not permit any withdrawal of deposited funds by the HA unless withdrawals by the HA are expressly authorized by written notice from HUD to the depositary.
(2) The depositary must permit withdrawals of deposited funds by HUD.

(e) If approved by HUD, the HA may deposit under the depositary agreement monies received or held by the HA in connection with any contract between the HA and HUD.

## 14. Program Records

(a) The HA must maintain complete and accurate books of account and records for a program. The books and records must be in accordance with HUD requirements, and must permit a speedy and effective audit.

(b) The HA must furnish HUD such financial and program reports, records, statements, and documents at such times, in such form, and accompanied by such supporting data as required by HUD.

(c) HUD and the Comptroller General of the United States, or their duly authorized representatives, must have full and free access to all HA offices and facilities, and to all the books, documents and records of the HA relevant to administration of the program, including the right to audit and to make copies.

(d) The HA must engage and pay an independent public accountant to conduct audits that are required by HUD. The cost of audits required by HUD may be charged against program receipts.

## 15. Default by HA

(a) Upon written notice to the HA, HUD may take possession of all or any HA property, rights or interests in connection with a program, including funds held by a depositary, program receipts, and rights or interests

form HUD-52520 (6/93)

AR 000117

under a contract for housing assistance payments with an owner, if HUD determines that:

(1) The HA has failed to comply with any obligations under this consolidated ACC; or

(2) The HA has failed to comply with obligations under a contract for housing assistance payments with an owner, or has failed to take appropriate action, to HUD's satisfaction or as directed by HUD, for enforcement of the HA's rights under a contract for housing assistance payments (including requiring actions by the owner to cure a default, termination, or reduction of housing assistance payments, termination of the contract for housing assistance payments, or recovery of overpayments); or

(2) The HA has made any misrepresentation to HUD of any material fact.

(b) HUD's exercise or non-exercise of any right or remedy under the consolidated ACC is not a waiver of HUD's right to exercise that or any other right or remedy at any time.

## 16. Fidelity Bond Coverage

The HA must carry adequate fidelity bond coverage, as required by HUD, of its officers, agents, or employees handling cash or authorized to sign checks or certify vouchers.

## 17. Exclusion from Program

Single-headed households, pregnant females, and recipients of public assistance may not be excluded from participation in or be denied the benefit of a program because of such status.

## 18. Conflict of Interest Provisions

(a) Neither the HA nor any of its contractors or their subcontractors may enter into any contract, subcontract, or arrangement in connection with a program in which any of the following classes of persons has an interest, direct or indirect, during tenure or for one year thereafter:

(1) Any present or former member or officer of the PHA (except a tenant commissioner).

(2) Any employee of the HA who formulates policy or who influences decisions with respect to a

(3) program. Any public official, member of a governing body, or State of local legislator who exercises functions or

(b) Any member of these classes of persons must disclose the member's interest or prospective interest to the HA and HUD.

(c) The requirements of this section may be waived by HUD for good cause. No person for whom a waiver is granted shall be permitted to exercise responsibilities or functions with respect to a contract for housing assistance payments executed, or to be executed, on

behalf, or with respect to a contract for housing assistance payments to which this person is a party.

(d) The provisions of this section do not apply to the depositary agreement, or to utility service for which the rates are fixed or controlled by a governmental agency.

## 19. Interest of Member of or Delegate to Congress

No member of or delegate to the Congress of the United States of America or resident commissioner shall be admitted to any share or part of this consolidated ACC or to any benefits which may arise from it.

## 20. Exclusion of Third Party Rights

(a) A family that is eligible for housing assistance under this consolidated ACC is not a party to or third party beneficiary of the consolidated ACC.

(b) Nothing in the consolidated ACC shall be construed as creating any right of any third party to enforce any provision of this consolidated ACC, or to assert any claim against HUD or the HA.

## 21. Consolidated ACC

(a) The consolidated ACC is a contract between HUD and the HA.

(b) This consolidated ACC supersedes any previous annual contributions contract for a program. Matters relating to funding or operation of the program under a previous annual contributions contract are governed by this consolidated ACC.

form HUD-52520  (6/93)

AR 000118

| United States of America | Secretary of Housing and Urban Development |
|---|---|

Signature of Authorized Representative:                                                           Date signed:

X _____

Name & Official Title:  (print or type)

| Housing Agency | Name of Agency:  (print or type) |
|---|---|

**Lakewood Township**
Rental Assistance Program (LTRAP)

Signature of Authorized Represenative:                                                           Date signed:

X _Richard L Work_                          10/5/95

Name & Official Title:  (print or type)   RICHARD L. WORK, MAYOR

form HUD-52520  (6/93)

AR 000119



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-5000

OFFICE OF PUBLIC AND INDIAN HOUSING
Quality Assurance Division

December 3, 2013

Meir Hertz, CEO
Lakewood Township RAP
600 W. Kennedy
Blvd. Lakewood,
NJ 08701

Dear Mr. Hertz:

The Department of Housing and Urban Development (HUD), Office of Public and Indian Housing, Quality Assurance Division (QAD) was recently onsite at the Lakewood Township Rental Assistance Program (LTRAP) to conduct a Financial Management Review of the Housing Choice Voucher (HCV) program. The primary purpose of the review was to ensure that HCV program funds have been expended and reported appropriately.

The specific purpose of our visit from September 10 – 12, 2013 was to:

- Validate the Net Restricted Assets (NRA) balance ending December 2011, December 2012, and July 2013.
- Validate the Unrestricted Net Assets (UNA) as of July 2013.
- Validation and analysis of Administrative Expenses for current period July 2012 through June 2013.
- Analysis of specific line items on the Lakewood Township RAP Financial Data Schedule (FDS) submission including *Prior period adjustments.*
- Confirm the availability of cash and/or investments sufficient to support the UNA and NRA balances calculated.

The results of our review are presented in the enclosed report. The report contains one finding and two concerns for which a formal Corrective Action Plan (CAP) must be prepared and sent to Mr. Joseph Russell at Joseph.R.Russell@hud.gov , with a copy furnished to Ms. Sonia Burgos at Sonia.L.Burgos@hud.gov . Your response must be received within 30 days from the date of this report.

We appreciate the cooperation extended to the QAD staff during our visit.

Sincerely,

MaryAnn Creager
Supervisor Program Analyst
Quality Assurance Division

Enclosure

cc: Sonia Burgos, Director of Public Housing Baltimore Hub Office
    Barbara Lamb, Division Director, Financial Management Center
    Miguel Fontanez, Director, Financial Management Division

AR 000120

**Background:** The Shortfall Prevention Team (SPT) requested that the QAD review the Housing Assistance Payments (HAP) expenses and the NRA balances as of December 2011, December 2012 and July 2013; and the administrative expenses and the UNA balance as of July 2013 as reported by LTRAP in the Voucher Management System (VMS). In the process of working with the LTRAP regarding a potential shortfall of HAP funds, the SPT discovered significant fluctuations in reported monthly HAP and NRA making it difficult to accurately determine if the housing authority was in fact facing a scenario of not having enough HAP funds to pay for their current voucher obligations. Further, without a reported UNA balance that may be used to cover any funding shortfall, the SPT was unable to determine the true amount of funds available to the PHA to avoid termination of participants. Also, in the process of scheduling the review, QAD realized the LTRAP does not report an Unrestricted Net Asset (UNA) balance in VMS. Upon further inquiry with the housing authority QAD learned that the LTRAP contracts with a non-profit organization, the Lakewood Tenants Organization (LTO), to administer the Housing Choice Voucher (HCV) program. Under the contract, LTRAP via "pass through' the entire monthly Administrative Fee disbursement received from HUD is transferred to the LTO, and the LTO administers the HCV program paying all of the HCV administrative expenses. As a result, the LTRAP proclaims the transfer of monthly Administrative Fee disbursements to the LTO results in a de-federalization of the fees and the funds are no longer subject to HUD regulation. As a result, even though requested, the QAD was not provided with any source records that would permit us to validate the UNA balance.

The QAD informed the Newark HUD Field Office of LTRAP's position regarding the Administrative Fees and reporting of their UNA. Since source records were not made available to the QAD to allow us to review the administrative expenses and validate a UNA balance, a determination was made to review and validate only those portions of the HCV program affecting HAP and NRA. The Newark HUD Field Office will continue to work with LTRAP regarding their contractual arrangement with the LTO and the LTRAP legal obligations under the HCV program.

## Verification of Net Restricted Assets (NRA)

## Verification of Net Restricted Assets (NRA) balances as of December 31, 2011, December 31, 2012, and July 31, 2013.

The Quality Assurance Division (QAD) completed an analysis of the NRA account balance for the Housing Assistance Payments (HAP) related funds received and expended during calendar years 2005-2012; for calendar year 2013 our analysis covered the period through July 2013. The HAP incremental payments listed in HUD's Central Accounting and Payment System (HUDCAPS) for each month in the review period were used to determine the total HAP funding.

The general ledgers and other financial source documentation provided by the LTRAP financial staff were used to determine the amount of Fraud Recovery, interest income, FSS Escrow Forfeitures and the total HAP related expenses incurred. The total validated expenditures were deducted from the revenue for the same time period to arrive at the NRA balances at the three periods within the scope of our review.

*Table No.1, Column 1,* indicates the amount that should have been used to calculate any NRA off-set to the PHA's 2012 renewal funding.  QAD also identified the cash available for offset as of **December 31, 2011**.  *Table No. 1, Columns 2 and 3* indicate what the NRA balance should have been and reconciled cash balances as of **December 31, 2012 and July 31, 2013, respectively.**

*Table 1*

|  | 12.31.2011 | 12.31.2012 | 7.31.2013 |
|---|---|---|---|
| Validated NRA Balance per QAD | $1,549,683 | $686,259 | ($31,802) |
| NRA Balance Per VMS | $1,497,369 | $637,338 | $0.00 |
| **QAD NRA - PHA NRA VMS (Variance)** | **($52,314)** | **($49,921)** | **$31,802** |
| Validated Cash Balance (reconciled) | $1,378,373 | $534,003 | $9,637 |
| **QAD NRA - PHA Cash (Variance)** | **($171,310)** | **($152,256)** | **$22,165** |

The primary cause of the variance between the PHA reported NRA balance and the QAD validated NRA balance is a result of the PHA accruing their HAP expenses throughout the years, which creates artificially lower NRA balances in VMS.  This is further explained under "Findings" below.

---

## FINDINGS

---

### Finding No 1: The cash balances were insufficient to support the NRA validated balances.

**Condition**: The LTRAP total cash and investments as of December 31, 2011 and December 31, 2012 were insufficient to support the validated NRA balance as indicated in Table No. 1.

**Criteria: The 24 CFR 982.151** provides that under the Annual Contributions Contract (ACC) the PHA agrees to "*to administer the program in accordance with HUD regulations and requirements*" and that the "*program receipts in excess of current needs must be promptly invested in accordance with HUD requirements*". **Under 24 CFR 982.156 the PHA** "*must practice good cash management and invest all funds received in excess of current needs*". This means that the NRA must be backed by cash or cash equivalents that can be liquidated within 24 hours.

**PIH Notice 2011-27** and **PIH Notice 2012-9** advise PHA's "*that funds in the HAP NRA account shall only be used for eligible HAP needs in the current and future CYs. The ACC requires PHAs to use HAP funding to cover rental assistance payments only. HAP and/or HAP NRA shall not under any circumstances be used for any other purpose, such as to cover administrative expenses or be loaned, advanced or transferred (referred to as operating transfers due to/due from) to other component units or other programs such as Low Rent Public Housing. Use of HAP for any purpose other than eligible HAP needs is a violation of law, and such illegal uses or transfers will result in sanctions and possible breach of the ACC. In instances where a PHA is found to have misappropriated HAP*

*and/or HAP NRA funds by using the funds for any purpose other than valid HAP expenses for units up to the baseline, HUD will require the immediate return of the funds to the HAP or HAP NRA account. HUD may take action against a PHA or any party that has used HAP funds and/or the HAP NRA account for non-HAP purposes.*"

**Cause:**  The HCV program was over-leased was by 467 vouchers for calendar year 2007 causing an additional $126,776 of HAP funds to be inappropriately expended.  If over leasing occurs such that a Housing Authority exceeds its baseline units under the ACC for the calendar year, then all funds necessary to cover the cost of excess units above the baseline must come from reserves in the Unrestricted Net Assets account.  Currently, the LTRAP has an Accounts Receivable - LTO recorded in the sum of $130,148, which includes the amount for over leasing. The remaining $3,372 ($130,148 - $126,776) is the result of incorrectly accounting for Fraud Recovery resulting in excess funds being sent to LTO as administrative funds, when a portion was HAP (see Concern No. 1 below for additional details).

**Effect:** The PHA is at risk for breach of the Annual Contributions Contract (ACC) as a result of failing to maintain sufficient cash to back the validated NRA balance and for spending HCV HAP funds to cover operating costs. The shortage of HAP funds prevents the PHA from fulfilling their primary purpose of assisting as many families as possible with funds made available. Further, the misrepresentation of funds failed to provide HUD with information that would allow early intervention to avoid potential shortfall resulting in possible termination of participants.

**Corrective Action No. 1**:   The LTRAP must immediately ensure that $130,148 in HAP funds are returned from LTO to the HCV HAP account.   The LTRAP must work with the Field Office in developing a repayment agreement if deemed necessary.

**Corrective Action No. 2:** The LTRAP must correct fund balances in VMS beginning with December 2012 and come forward to July 2013 so the balances match the QAD validated NRA balances for the same time periods.

## CONCERNS

**Concern No. 1:  The NRA balance was incorrectly calculated and reported in VMS.**

**Condition:**  The LTRAP under-reported the NRA equity balances as indicated in Table 1 due to reporting HAP expenses in VMS on an accrual basis.

**Cause:  PIH Notice 2010-16 states** "*NRA is the amount reported on the income statement at line 11180 – Housing Assistance Payment Equity. The NRA that shall be reported in the VMS must then be updated through the end of each reporting month*". This field provides the "present" NRA balance by adjusting NRA to reflect HAP funds received and ***expended*** to date since the end of the most recent PHA fiscal year (FY). Please note the term 'expended' means actually paid, not accrued.

**PIH Notice 2011-67** provides "*HUD is required to control disbursement of funds to PHAs in such a way as to ensure that PHAs do not receive federal funds before they are needed. Treasury Financial Manual, Vol.1, Part 6, Section 2025 states: "Advances to a recipient organization will be limited to the minimum amounts necessary for immediate disbursement*

AR 000123

*needs and will be timed to be in accord only with the actual immediate cash requirements of the recipient organization in carrying out the purpose of an approved program or project. The timing and amount of cash advances will be as close as is administratively feasible to the actual disbursements by the recipient organization for direct program costs and the proportionate share of any allowable indirect costs."*

**Effect:**   The process of disbursing only the funds required for current HAP costs has resulted in the reestablishment of HUD-held program reserves, whereby excess HAP funds will remain obligated but undisbursed at the HUD level rather than being held by the PHAs. This will move new budget authority into the program reserves if it is not needed for current costs. Also, of more importance, the existing NRA balances currently held by PHAs will ultimately also be transitioned to the cash management process and the program reserves. This shall be accomplished either via their use in lieu of HUD disbursing additional budget authority and/or through a final transition effected through the PHA returning funds to HUD to be held on their behalf.

The practice of reporting HAP expenses in VMS before expending the funds, and likewise reducing the NRA reported balance by the same amounts, will result in an incorrect amount of NRA being transitioned back to HUD. If LTRAP continues to report NRA in the VMS as reduced by accrued HAP, the 'true' NRA balance, as backed by cash, will remain unknown to HUD when final transition of PHA held reserves is completed.

**Recommended Corrective Action No. 1:**   As stated under Corrective Action No. 2, the LTRAP must correct fund balances in VMS beginning with December 2012 and come forward to July 2013 so the balances match the QAD validated NRA balances for the same time periods.

**Recommended Corrective Action No. 2:**   The LTRAP staff must report the NRA balance for VMS based on those funds that are *expended* for HAP instead of accrued.

**Concern No. 2:  Fraud Recovery was incorrectly reported in VMS.**

**Condition:**  LTRAP reported in the VMS 100% of the Fraud Recovery collected and reduced the HAP expenses by the same amount.

**Cause:**  The LTRAP misunderstood the VMS reporting requirements pertaining to Fraud Recovery.  The VMS User's Manual defines the reporting requirements as follows:

- *Fraud Recovery – Total Collected this Month* as the "Total dollar amount recouped by the HA as fraud recoveries during the month that is applied to the NRA account.  This consists of the lesser of one-half the amount recovered of the total recovery minus the costs incurred by the PHA in the recovery.  This amount should NOT be deducted from HAP expenses as reported for the month in the HAP expenses sections.  Total dollar amount recouped is cash collected – not revenue recorded."

**Effect:**  By failing to accurately report in VMS the LTRAP failed to provide HUD with information useful in determining the housing authority's actual financial position.

AR 000124

**Recommended Corrective Action No. 3:** The LTRAP must make the necessary corrections in VMS beginning in December 2012 and come forward to the most recent submission in VMS.

**Recommended Corrective Action No. 4:** As mentioned under Corrective Action No. 1, LTRAP is owed $3,372 back from the LTO and aggressive action must be taken immediately to recover those funds.

## ADMINISTRATIVE EXPENSES REVIEW

The QAD staff was unable to review the administrative expenses as explained above. Although we requested the administrative financial records on more than one occasion, the LTRAP refused to furnish the documents. The inability to review administrative financial records severely hampered our efforts to conduct a speedy and effective audit of the HCV program. The Newark Field Office will follow-up on this situation with the LTRAP Executive Director. QAD reserves the right to conduct a follow-up onsite visit once this issue is resolved.

## TECHNICAL ASSISTANCE

The QAD staff worked with the LTRAP staff on how to properly account for Fraud Recovery and the proper calculation of the NRA balance.



**NIXON PEABODY**

ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

**Richard Michael Price**
*Partner*
T 202-585-8716
rprice@nixonpeabody.com

Nixon Peabody LLP
401 9th Street NW
Suite 900
Washington, DC 20004-2128
202-585-8000

January 2, 2014

Mr. Balu Thumar
Acting Director
Office of Public Housing
U.S. Department of Housing and Urban Development
One Newark Center, 13th Floor
Newark, NJ 07102-5620

Re:   Lakewood Township Rental Assistance Program ("LTRAP")
      Housing Choice Voucher Program

Dear Mr. Thumar:

   This letter is in response to your December 3, 2013 letter to Mr. Hertz. Please advise us of the status of the on-site reviews.

   At the outset we believe there are certain basic misunderstandings as to the existence and nature of Lakewood Township Residential Assistance Program ("LTRAP") and Lakewood Tenants Organization ("LTO"). LTRAP is a federally-funded (HUD) program sponsored by Lakewood Township as the PHA under an ACC with HUD. LTRAP has no separate incorporation. LTO is an existing entity that contracts with the Township to administer Lakewood Township's Residential Assistance Program, including the Section 8 Housing Choice Voucher ("HCV") program. LTO's fee is set at the HCV Administrative Fees; the Administrative Fees are set by HUD annually and are per se reasonable. As such, once the fee is earned by LTO and paid to LTO by Lakewood Township the fee is defederalized and LTO is not accountable to HUD, as LTO is a contractor, not a grant sub-recipient.

   We are enclosing a copy of an August 30, 1977 letter by Clarence L. Humphrey, Director, Housing Programs Management Branch to Thomas L. LaPointe, Municipal Manager of Lakewood Township. Mr. Humphrey explains that LTO's selection was beyond HUD's review and approval. We are also enclosing a copy of an April 24, 1990 letter from John Franklin, Mayor of Lakewood Township to Theodore Britton, responding to an earlier inquiry into LTO's selection and status. Finally, we are enclosing a July 9, 1996 letter from Kevin E. Marchman, HUD Acting Assistant Secretary for Public and Indian Housing to Mr. Hertz confirming that LTO's selection was appropriate and remains so.

14761844.3

AR 000126

Mr. Balu Thumar
January 2, 2014
Page 2

It appears that this issue is re-explored every so often, but we are not aware of any information that requires a repeat of the same inquiry at this time.  We believe this letter appropriately addresses your concerns.

Sincerely,

Richard Michael Price

Enclosures

14764844.3

CAMDEN AREA OFFICE
THE PARKADE BUILDING, 519 FEDERAL STREET, CAMDEN, NEW JERSEY 08103

August 30, 1977

REGION II
26 Federal Plaza
N. Y., New York 10007

IN REPLY REFER TO:
2.5HHO

Mr. Thomas L. LaPointe
Municipal Manager
Township of Lakewood
Municipal Building
Lakewood, New Jersey  08701

Dear Mr. LaPointe:

We acknowledge receipt of your letter dated
August 19, 1977 transmitting a copy of the
Township's Contract with the Lakewood Tenants
Organization to administer the Section 8 Existing
Housing Program.

HUD is not a party to this Contract, and consequently
our review and approval of the Contract is not re-
quired. Accordingly, the third or penultimate
paragraph on page 2 requiring HUD approval should
be deleted. We do reemphasize our position that
HUD looks to the approved Public Housing Agency
as the party responsible for the administration
of the ACC in accordance with the Regulations, see
24CFR 892.116. Additionally, the PHA shall not
delegate its statutory responsibility to authorize
eviction.

Upon deletion of the aforesaid inapplicable paragraph,
we would appreciate a copy of the Contract for our
files.

Sincerely,

Clarence L. Humphrey
Director
Housing Programs Management Branch

9/2/77.....
Referred to  Attorney to delete the above mentioned paragraph.
on 9/1/77.

G. Doyle, Clerk

AR 000128



# Township of Lakewood

MUNICIPAL BUILDING
LAKEWOOD, NEW JERSEY 08701 • 201-364-2500



John J. Franklin, *Mayor*
H. George Buckwald, *Deputy Mayor*
*Committeemen:*
 Jerome Greenberg
 Robert W. Singer
 Richard L. Work

April 24, 1990

Theodore R. Britton, Jr., Manager
U.S. Department of Housing
 and Urban Development
Newark Office, Region II
Military Park Building
60 Park Place
Newark, NJ  07102-5504

Dear Mr. Britton:

This letter is written in response to your letter dated April 3, about your receipt of an "anonymous" letter containing various allegations about the operation of the Lakewood Housing Authority and the Lakewood Township Rental Assistance Program.

Thank you for bringing these complaints to my attention, and for according to the Township the right to respond.

Preliminarily, I should like to state, that while the letter which you received may be anonymous to you, it is not all that anonymous to the governing body of this Township.  While we cannot be absolutely certain as to the true identity of the author of the letter containing these false allegations, we do believe that it was penned, or "inspired", by a former commissioner of the Authority, whom the Township Committee declined to re-appoint to the Lakewood Housing Authority Board of Commissioners, for ample reason.  Even without getting into the history, grounds for this conclusion are the record of similar past efforts by this party, as well as an established pattern of focusing personal attacks repeatedly against the two named individuals.  In short, what we apparently have here is a personal, rather than a real, issue.

As to the specific concerns raised in the anonymous letter, they indicate a basic misunderstanding which must be cleared-up; namely, the nature, role and relationship which the Township of Lakewood has with the Section 8 programs and its contract administrative agency, the Lakewood Tenants Organization.  The



AR 000129

Township of Lakewood is not a Public Housing Authority. It contracted with HUD in 1977 (via the Annual Contributions Contract) to operate the Section 8 Programs by default, after the then Board of Commissioners of the Lakewood Housing Authority declined for the third time in three years (1975-1977) HUD's invitation to operate the Section 8 program. Lacking an in-house administrative capacity to operate the program, the Township sub-contracted with the Lakewood Tenants Organization to administer the program, with the understanding and agreement that the operation would not draw on Township resources, but would have to be economically self-sufficient. This arrangement was reached at the time with the explicit consent and written approval of the HUD Field Office, and has worked very well since the inception of the programs. This recitation of the relationship between the Township and the Lakewood Tenants Organization, its contract administrative agency, is not intended as a dis-association from the primary role and responsibility of the Township regarding the operation of these programs. On the contrary, the Township justifiably takes immense, direct pride in the fact that the programs are well administered and well received locally.

The point is that we have locally an atypical situation; not that of a PHA, and one which was fashioned of necessity and has proven extremely successful. Since the administration of the Section 8 programs are performed by a contract agency, similar to other Township contract services, the Township looks to goal achievement and performance criteria to measure the success of the programs' administration. I can state without reservation, as we have stressed all along in every application to the Department for additional funding, that by any yardstick, the present administration is run by an extremely competent, universally acclaimed (property owners as well as renters) administration. Since its inception in 1977, the program has grown steadily from 80 units to nearly 700. The program is run on a sound fiscal basis, with a healthy operating reserve. Over the past twelve years, the Township has received few, if any, verifiable complaints regarding the operation of its Section 8 programs by the Lakewood Tenants Organization. The Executive Director and staff at L.T.R.A.P. are thoroughly trained and very knowledgeable.

Notwithstanding all the foregoing, as to the Executive Director personally, please be assured that Rabbi Hertz ably serves both as the Executive Director of the Lakewood Township Rental Assistance Program and the Lakewood Housing Authority. He splits his daily work load and work time between these two Agencies. In addition, Rabbi Hertz spends many hours evenings and week-ends in meetings as well as at the office, on L.T.R.A.P. business.

Rabbi Hertz is readily accessible all day, every day, at either one of these offices (364-1300 or 367-0660). Indeed, the allegation itself is deliberately mis-leading. The distance between the offices of the two Agencies is less than two minutes travel time; far less than the distance and time spent in routine travel by Executive Directors at other PHAs in the normal course of their duties traveling from site to site. Rabbi Hertz draws a salary commensurate with the duties, responsibilities, professional requirements, and the actual hours invested in his positions at both the Lakewood Township Rental Assistance Program and the Lakewood Housing Authority.

Rabbi Hertz served in the capacity of Executive Director of the Lakewood Township Rental Assistance Program with distinction for 8 years (1977-1985)

2

before being asked jointly by the Township Committee of the Township of Lakewood and the Board of Commissioners of the Lakewood Housing Authority to assume the additional position of Executive Director of the Lakewood Housing Authority. The Township Committee and the Board of Commissioners in turning to Rabbi Hertz firmly felt that the Authority needed strong, proven leadership. Rabbi Hertz joined the Authority at a most difficult time, when the former Executive Director resigned after findings of gross mismanagement were reported in a comprehensive, highly critical study issued by a local Blue Ribbon panel (which included the Chairman of the Authority at the time, Mr. William Melton, who still serves as a Commissioner). This report, issued in March 1985, was forwarded to the HUD Area Office at the time and should still be in your files.

Assumption by Rabbi Hertz of the dual positions was strongly recommended by the Board of Commissioners and the Township Committee in view of Rabbi Hertz's uncontested record of professionalism, housing expertise, and integrity. Furthermore, this move was cleared in advance with the HUD-Newark Area Office and won its approval. I recall that at the time, there was a shared feeling that, in addition to gaining an able administrator for the Housing Authority, bringing both Agencies under a single administrator would prove advantageous as far as uniformity of internal administrative procedures, economies of scale, closer adherence to federal regulations, and better service to the public through the elimination of conflicting standards and procedures.

We have not regretted this decision. Its benefits locally have proven themselves through the expansion of the programs and their smooth coordination. You have to look no further than your own Management Reviews, as well as five Fiscal Audits at the Lakewood Housing Authority, and many more at L.T.R.A.P., all completed without a single finding. The remarkable growth of the programs at L.T.R.A.P., from 80 units to 700 units administered, and the meticulous attention to detail and close adherence to all federal regulations also attest to Rabbi Hertz's intimate, constant professional involvement and ability. As you are aware, LTRAP has earned every award issued by your Area Office for Voucher lease-up and various programs' implementation. LTRAP, led by Rabbi Hertz, has served the Newark Area Office as well on a voluntary basis, by sharing its experience and expertise with other PHAs and offering day-long training to other PHAs. It is because of all the above, the long-established record of success and achievement of Rabbi Hertz, that we find the anonymous allegations to be so insidious and objectionable.

It would be most unfortunate if mischievous allegations would succeed in casting aspersions on the fine reputation of a person who has accomplished so much for the needy of our community. We understand your own sensitivity to any complaint, regardless of its source and merit, and your need to address the same. It is for precisely this reason that we have taken the trouble to fully assure you that the complaints which you received lack any foundation or merit.

With respect to Mr. La Pointe, this allegation is similarly without foundation, and purely malicious. Mr. LaPointe does not get paid for each meeting of the Lakewood Housing Authority Board of Commissioners. Mr. LaPointe does not get any payment whatever from the Lakewood Housing Authority, in any shape, form or manner; nor does the Township of Lakewood derive any payment from the Lakewood Housing Authority other than the PILOT. Mr. LaPointe's position as

3

the Township's Housing Coordinator, and his position as City Manager, are both paid for by the Township.

I hope that I was able to answer your questions and also shed some light on this matter.  Unfortunately, I cannot guarantee that you will not receive similar mischievous letters in the future. I can assure you, however, that this Township's governing body takes its Housing Authority appointments seriously, has a Township Committeeman assigned to the Authority as permanent liaison, and has a close, cooperative working relationship with the Authority. We therefore find satisfaction and take pride in the work of the Lakewood Housing Authority.

Again, I thank you for your courtesy in affording us the right to respond fully to your inquiry.  If you have any other questions at any time, we will be most willing to provide further information and assistance.

Sincerely,

TOWNSHIP OF LAKEWOOD

John J. Franklin
Mayor

JJF:eh

c.c. Mr. Siegfried W. Steele, Chairman
     Lakewood Housing Authority

07/09/96  04:30   HUD ASST SEC FOR PIH → 2029737750          NO.673  P002



**U. S. Department of Housing and Urban Development**
Washington, D.C. 20410-5000

JUL - 9 1996

OFFICE OF THE ASSISTANT SECRETARY
FOR PUBLIC AND INDIAN HOUSING

Mr. Meir Hertz
Executive Director
Lakewood Tenants Organization
600 West Kennedy Boulevard
Box 871
Lakewood, NJ  08701

        RE:  Procurement Requirements

Dear Mr. Hertz:

        We received the June 19, 1996 letter from your counsel,
Charles L. Edson, describing the history and status of the
Lakewood Tenants Organization ("LTO"). Based on the facts as
stated in Mr. Edson's letter, and our general understanding of
LTO's status, we understand that Lakewood Township previously
designated LTO as its agency for certain limited purposes. As
such, LTO qualifies as a public housing agency under the U.S.
Housing Act of 1937 as amended. HUD's procurement rules do not
apply to Lakewood Township's selection of LTO as a public housing
agency. Selection is a different question from operation, and we
do not address, nor have before use, any questions regarding
public housing agency procurement of goods or services.
Accordingly, we have no information that would lead us to
question either LTO's designation, or the present structure under
which LTO operates.

                                Sincerely,

                                Kevin E. Marchman
                                Acting Assistant Secretary for
                                 Public and Indian Housing

AR 000133



**NIXON PEABODY**

ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

**Richard Michael Price**
*Partner*
T 202-585-8716
rprice@nixonpeabody.com

Nixon Peabody LLP
401 9th Street NW
Suite 900
Washington, DC  20004-2128
202-585-8000

February 14, 2014

Mr. Balu Thumar
Acting Director
Office of Public Housing
U.S. Department of Housing and Urban Development
One Newark Center, 13th Floor
Newark, NJ  07102-5620

Re:   Lakewood Township Rental Assistance Program ("LTRAP")
      <u>Housing Choice Voucher Program</u>

Dear Mr. Thumar:

This letter follows up our January 2, 2014 letter and discussions with HUD staff.  We appreciate consideration that LTO is a fee for services independent company, not a sub-grantee or sub-recipient and as such fees earned by LTO are de-federalized.  We also appreciate your understanding that LTRAP is a program name for Lakewood Township.

We still do not understand how the documents requested in your December 3, 2013 letter can be relevant to LTRAP.  We also do not understand why HUD continues to request organizational information decades after first accepting the current organizational structure.  That said, attached please find:

1.   By-Laws for LTO
2.   Articles of Incorporation  for LTO
3.   Registration and Good Standing Certificates for LTO
4.   Incumbancy Certificate

Thank you for your time.

Sincerely,

*Richard Michael Price*

Richard Michael Price

RECEIVED
CHIEF COUNSEL'S OFFICE

FEB 18 2014

WTS NC 14-15

ASSIGNEE

Enclosures
cc:   Ms. Diana Caballero
14857822.2

# BY-LAWS
## OF
# LAKEWOOD TENANTS ORGANIZATION, INC.

## Article I: ORGANIZATION

**1.      Name**

The name of this Organization shall be: LAKEWOOD TENANTS ORGANIZATION, INC.

**2.      Seal**

The Organization shall have a seal that shall be in the following form:



**3.      Change of Name**

The Organization may, at its pleasure, by a vote of the membership body, change its name.

## Article II: PURPOSE

The purposes for which the Organization is formed are as stated in the Amended Certificate of Incorporation.

## Article III: MEMBERSHIP

**1.      Eligibility**

Any person who is a resident of the Township of Lakewood, County of Ocean, and State of New Jersey, shall be eligible for membership, provided such person is not a property owner who derives rental income benefits from the rent subsidy programs operated by LTO, and further provided that such person is:

        a).      a tenant himself, or

AR 000135

b)    has demonstrated a significant commitment or concern for the protection and advancement of tenants' rights.

2.    Selection

New members may be proposed by any member in good standing for acceptance by the Board of Trustees.

3.    Removal for Cause

Any member may be removed from membership by a majority vote of the regular members, at any meeting of said members called for such purpose, upon grounds that his words or conduct have been intentionally detrimental to the purposes of the Organization. Any member whose removal is sought shall be served with written notice of the nature of the complaints against him at least 10 days prior to the meeting at which his removal will be considered, and shall be given an opportunity to be heard at such meeting.

4.    Dues

The dues of this Organization shall be $5.00 per dwelling unit per year, or $7.00 per unit for two years. The dues of this Organization for tenants belonging to a tenants association of 10 members or more which is affiliated with this Organization shall be $2.00 per dwelling unit per year and $3.00 per dwelling unit for two years. Dues for senior citizens shall be $1.00 per dwelling unit per year. Members who have belonged to the Organization for a minimum of three years may purchase a lifetime membership in lieu of all future dues for a one time additional payment of $15.00. Unless otherwise specified at the time payment is made, all membership dues shall be attributed to the calendar year in which they are paid.

5.    Membership Term

All annual and biannual memberships shall run by calendar years and shall be effective from the date that dues for that calendar year are paid. Annual memberships shall expire on December 31 of the calendar year in which the membership commenced. Biannual memberships shall expire on December 31 of the calendar year following the year in which the membership commenced.

6.    Suspension and Removal for Non-Payment of Dues

Subject to further restrictions concerning voting as provided for in paragraph VII, no one may exercise any rights or privileges of membership in the Organization during any calendar year until any dues owed for that year have been paid. Nevertheless, members whose membership expired on December 31 of the prior calendar year shall remain on the Organization's mailing list and membership rolls until August 1 of the current calendar year, at which time they shall be automatically removed from the membership rolls of the Organization if dues owed for that calendar year have still not been paid.

## Article IV:  BOARD OF TRUSTEES

### 1.     General Duties and Authority

The Board of Trustees shall be the governing body of the corporation. Its duties shall include, but not be limited to, carrying out the stated purposes of the corporation and determining its charitable, fiscal, and personnel policies. The Board shall also be vested with the authority to establish the rights, privileges, and duties of members of the Organization.

### 2.     Composition, Term and Selection

The Board of Trustees shall be composed of at least 5, but not more than 9 Board members. The exact number of Board members within these limits will be specified by an ordinary resolution of the Board of Trustees.  At regular annual elections of Board members, normally held at the general membership meeting in the Fall, as many Board members will be elected as necessary to fill all vacancies in the Board of Trustees as of January 1 of the following calendar year.  At emergency elections of Board members or at regular elections postponed until January or later, all vacancies in the Board of Trustees existing on the date of the emergency election will be filled.

Beginning with the regular annual election of Board members to be held in calendar 2005, each new term of office for a Board member will be for the minimum number of years that will result in that Board member's term of office ending in a different year than any other Board member's term of office.  When two or more Board members are elected in the same election, their terms will be staggered to the extent necessary so that none of them are granted a term in office of more years than necessary in order to avoid having a newly elected Board member's term end in the same year as any other Board member.

To be eligible to be a member of the Board of Trustees, an individual must either have been a member in good standing of the Organization for a period of at least 3 years prior to his or her election to the Board of Trustees, or must be a member of the Organization who has demonstrated, to the satisfaction of the Board of Trustees, an active interest and participation in the cause of tenants' rights.

Regular terms of Board members shall begin on January 1 and shall terminate on December 31 of the appropriate calendar years. If an election is postponed beyond January 1, in accordance with Article VII, the incumbent Board will continue to serve until a valid election is held.

### 3.     Vacancies

Should a vacancy occur on the Board of Trustees for any reason, the remaining members of the Board shall choose a successor to serve out the unexpired term of the vacant Board position.

AR 000137

4.    **Meetings**

a).   The Board shall meet regularly, but not less than 4 times annually, at a place and time designated by a majority of the members of the Board, or, in default of their designation, at a place and time designated by the Chairman of the Board. All Board members shall be notified of the time and place of regularly scheduled meetings at least one week prior to the meeting date.  Agendas for regular meetings shall be prepared in advance and available for inspection at least one day prior to the scheduled meeting. Board members wishing to add items for discussion to the agenda shall contact the Secretary at least five days prior to the meeting at which the Board member wishes the item to be discussed.

b).   Special meetings of this Board may be called by the President or upon the request of any 3 members of the Board, when they deem it in the best interest of the Organization. Notices for special meetings shall be delivered to all Board members at least 3 days before the date set for the meeting. The notice of a special meeting shall state the reason that the meeting has been called, the business to be transacted at the meeting, and by whom it was called.

c).   Emergency meetings may be called upon 24 hours' notice by any member of the Board. The reason for the meeting and the business to be brought before the Board shall be given to each Board member. No other business can be conducted at an emergency meeting other than that business for which the meeting was called.

d).   For regular, special or emergency meetings, a quorum shall consist of not less than 3 members of the Board.

e).   Except where otherwise specified, the decisions of the Board shall be by majority vote. Each member shall have one vote and such voting may be done by proxy, to the extent not prohibited by law. The Board of Trustees may make such rules and regulations covering its meetings as it may determine appropriate.

5.    **Termination of Board Membership**

Any Board member absent for 2 regular or special meetings during any calendar year without proper excuse will be subject to possible termination for that reason. A Board member may also be removed whenever other sufficient cause exists for such removal. A vote of two thirds (2/3) of the members of the Board is required to remove any member of the Board. Removal of a Board member may only be voted upon at a meeting if the notice for that meeting specifically states that the issue of removal of that particular individual will be considered and specifically states the reason for which such removal is sought. The Board member whose removal is sought shall be given an opportunity to be heard at that meeting.

6.    **Committees**

The Board may establish from time to time such ad hoc or standing committees as it may consider appropriate.

### 7.    Nominating Committee

The chairman shall select from the Board of Trustees a nominating committee to present a slate of Board members to the general membership. Said committee shall be approved by two thirds (2/3) of the Board members present at the meeting where these items are on the agenda.

## Article V: OFFICERS

### 1.    Titles and Selections

The officers of the corporation shall consist of a President, Vice-President, Secretary, Treasurer, and such Assistant Secretaries and Assistant Treasurers as may be appointed by the Board from time to time. The term of all officers shall be to serve at the pleasure of the Board of Trustees.

### 2.    President

The President shall be the chief executive officer of the corporation, shall preside at General Membership meetings, and shall be vested with the necessary authority and responsibility to conduct the day-to-day affairs of the Organization and to execute the policies and mandates of the Board. The President shall act as the duly authorized representative of the corporation and the Board in all matters for which the Board has not formally designated some other person to act. He shall be one of the officers who may sign the checks or drafts of the corporation. He shall serve as an ex-officio member of all committees. The President, if a member of the Board, shall also serve as Chairman of the Board.

### 3.    Vice-President

The Vice-President shall, in the event of the absence or inability of the President to exercise his office, become acting President of the Corporation with all rights, privileges and powers as if he had been duly elected President. He shall also perform such other duties as are assigned to him from time to time by the President or the Board.

### 4.    Secretary

The Secretary shall be charged with preparation and dissemination of agendas, notices, minutes, and records of the Board and the corporation, and shall also act as custodian of all such records and documents. He shall present to the membership at any meetings any communication addressed to him as Secretary of the corporation. He shall attend to all correspondence of the corporation and shall exercise all duties incident to the office of Secretary.

AR 000139

**5.**      **Treasurer**

The Treasurer shall be charged with the collection, banking, and disbursement of dues and other funds, as well as the maintenance of all necessary accounts and records and the preparation of financial statements on a quarterly basis. He shall exercise all duties incident to the office of Treasurer.

## Article VI:  EMPLOYEES AND COMPENSATION

**1.**      **Manner of Fixing Compensation**

The Board of Trustees or whomever they so delegate shall hire and fix the compensation of any and all employees that they, or their delegate, may determine to be necessary for effective accomplishment of the purpose of the Organization. All other personnel policies and the powers attendant thereto shall also be vested in the Board of Trustees or its delegate.

**2.**      **No Compensation for Trustees and Officers**

No trustee or officer shall by reason of his office be entitled to receive any salary or compensation, but nothing herein shall be construed to prevent a trustee or officer from receiving any compensation from the Organization for duties other than as a trustee or officer, provided, however, that said trustee or officer shall not participate in any decision directly affecting the amount of compensation he is to receive.

## Article VII:  ELECTIONS AND MEMBERSHIP MEETINGS

**1.**      **General Membership Meeting**

A meeting of all members of the Organization shall be held once during each calendar year, at a time and place designated by the Board of Trustees for the express, but not sole, purpose of electing a new Board of Trustees. At said meeting, the outgoing officers and Board will advise the membership of the current activities and financial status of the corporation. The membership shall vote upon any questions submitted to it by the Board of Trustees. Other general membership meetings may be called from time to time at the discretion of the Board of Trustees.

The Order of Business at general meetings shall be:

1. Roll Call
2. Reading of the minutes of the preceding meeting
3. Reports of Committees
4. Reports of Officers
5. Old and unfinished business

AR 000140

6. New Business
7. Adjournment

## 2.  Nominations

a). Not less than 80 days prior to a scheduled general membership meeting at which an election of Trustees will be held, the President will cause all members in good standing to be mailed notice of the time and place of the meeting and of the nominations and election procedures. All nominations for members of the Board of Trustees must be submitted in writing to the President no less than 60 days prior to the date scheduled for the annual general membership meeting.

b). All nominations to the Board of Trustees shall be by slate only, which must consist of a full list of names of as many individuals as there are positions to be filled on the Board of Trustees at the following election. To be valid, each nominating slate must be signed by every individual who is nominated on that slate, as well as by two other members of the Organization, then in good standing. No individual member may sign more than one slate for any election in any capacity. The slate submitted by the nominating committee, as provided for in Section 7 of Article IV, shall be signed by a majority of the members of the nominating committee. If any signature or any name on a proposed slate are invalid or ineligible, the entire slate shall be disqualified. Where terms of differing lengths are to be voted on at a single election, slates must specify for each candidate the term for which that candidate has been nominated.

## 3.  Voting Eligibility

To be eligible to vote at any General Membership meeting, members must have belonged to the Organization and have paid their current dues at least thirty days prior to the date the election is held.

## 4.  Voting Methods

Voting at all general membership meetings, including the election of Trustees, may be by voice vote, hand count or paper ballot; except that for any contested election of officers or trustees, paper ballots shall be provided and there shall not appear in any place on the ballots any mark that might tend to indicate the person who cast the ballot. Each dwelling unit shall have one vote.

## 5.  Voting by Slate Only

Voting for Trustees shall be by slate only, in accordance with nominating procedures set forth in Section 2 of this Article. The slate receiving the most votes shall be elected provided it receives more than one third of the votes cast. If no slate receives more than one third of the votes cast, a runoff election shall be held at the same meeting between the top three slates. (If a tie occurs for third place, the top four slates will participate in the runoff.) If two slates receive more than one third (1/3) of the votes cast, and are tied, a runoff election shall be held at the same meeting

AR 000141

between the top two slates. Balloting shall continue, if necessary, until one slate has received a plurality of votes in excess of one third (1/3) of the votes cast

6.    **Certification of Voting**

At all votes by ballot the chairman of the meeting shall appoint a committee of three who shall act as Inspectors of Election and who shall, at the conclusion of such balloting, certify in writing to the Chairman the results. The certified copy shall be physically affixed to the minutes of that meeting. No Inspector of Election shall be a candidate for office or be personally interested in the question voted upon.

7.    **Postponing Elections**

If weather, transportation problems, or other causes beyond the control of the Board interfere with attendance at or the conduct of a general membership meeting, the Board shall have the power to reschedule the election to a subsequent meeting to be held within 30 days. If all slates proposed for election to the Board are disqualified after the deadline for nominations, the Board shall reschedule the election to allow sufficient time for new nominations.

## Article VIII: AMENDMENTS

Any member of the Board may propose an amendment to the By-Laws for consideration by the Board. The By-Laws of the Organization may be amended at any meeting of the Board, provided that the agenda for that meeting specifically states an amendment to the By-Laws will be considered at the meeting, and further provided that each member of the Board has received a copy of the text of the proposed amendment 10 days prior to that meeting. The proposed amendment may be modified at the Board meeting at which it is considered. The vote of two thirds (2/3) of the full Board of Trustees shall be required for the adoption of any amendment to the By-Laws.

I certify that the foregoing is a true copy of the By-Laws of Lakewood Tenants Organization, Inc. adopted by the Board of Trustees on the _15th_ of _Dec_, 2005.

_Solomon Massey_

_____, Secretary

# Amended Certificate of Incorporation
## of the
## LAKEWOOD TENANTS ORGANIZATION, INC.

The original Certificate of Incorporation for Lakewood Tenants Organization, Inc., which was filed with the office of the New Jersey Secretary of State on or about July 18, 1977, is hereby amended as follows:

We, the undersigned, desiring to form a nonprofit corporation, pursuant to the New Jersey Nonprofit Corporation Statute, N.J.S. 15A:1-1, et seq., do hereby make, subscribe and acknowledge this certificate as follows:

1.   **Name:**   The name of the Corporation shall be *LAKEWOOD TENANTS ORGANIZATION, INC.* [the Corporation].

2.   **Purpose:**   The Corporation is formed exclusively for purposes for which a corporation may be formed under the New Jersey Nonprofit Corporation Act, N.J.S. 15A:1-1, et seq., and not for pecuniary profit or financial gain, and more specifically, for the purposes expressed in Section 501(c)(3) of the Internal Revenue Code of 1986.  These purposes shall specifically include advancement, promotion, and administration of initiatives and programs providing affordable housing opportunities; homeownership; tenants' rights and tenant counseling; low-income mortgage program counseling; housing placement; arbitration and mediation of housing-related issues; dissemination of information concerning affordable housing and tenants' rights; acting as a monitor of topics concerning-, and a "watch-dog" of abuses concerning-, tenants' rights, housing quality, landlord–tenant laws and affordable housing issues; promotion and organization of tenants' associations; operation, administration and facilitation of programs (whether federally, state, locally or privately funded) benefiting tenants and/or fostering affordable housing, specifically including (as examples) rental assistance programs, housing rehabilitation programs, mortgage subsidy programs, programs transitioning renters to homeownership, housing rehabilitation and neighborhood revitalization programs; economic, community, and business development programs benefiting lower-income persons; programs for the acquisition, development, construction, operation, rental and/or sale of housing for lower-

AR 000143

income families, and such economic resources and programs as are designed to economically uplift and empower lower-income persons or families.

No part of the assets, income, or profit of the Corporation shall be distributable to, or inure to the benefit of its members, trustees or officers, except to the extent permitted under the New Jersey Nonprofit Corporation Act, N.J.S. 15A:1-1, et seq., and the applicable sections of Subchapter F – Exempt Organizations of the Internal Revenue Code of 1986. The Corporation shall not operate any listing service of its members, trustees or officers, or take steps which will serve to facilitate the transaction of specific business by its members trustees or officers, or promote the private interest of any member, trustee or officer, or engage in any activities which would constitute a regular business of a kind ordinarily carried on for profit.

4.      **Duration:** The period of duration of the Corporation shall be perpetual.

5.      **Powers:** In furtherance of the purposes of the Corporation, the Corporation shall have all general powers enumerated in the New Jersey Nonprofit Corporation Act, N.J.S. 15A:1-1, et seq. The Corporation shall have the power, either directly or indirectly, either alone or in conjunction or cooperation with others, to do any and all lawful acts and things and to engage in any and all lawful activities which may be necessary, useful, suitable, desirable, or proper for the furtherance, accomplishment, fostering or attainment of any and all of the purposes for which the Corporation is organized, and to aid or assist other organizations whose activities are such as to further, accomplish, foster or attain any of such purposes. Notwithstanding anything herein to the contrary, the Corporation shall exercise only such powers as are in furtherance of the exempt purposes of organizations as set forth in Section 501(c)(3) of the Internal Revenue Code of 1986 and the regulations thereunder as the same may now exist or as they may be hereafter amended from time to time.

6.      **Distribution on Dissolution or Liquidation:** In the event of the liquidation or dissolution of the Corporation, whether voluntary or involuntary, no member, trustee or officer shall be entitled to any distribution or division of its remaining property or its proceeds, and the

Case 3:15-cv-06325-MAS-DEA   Document 35   Filed 05/06/16   Page 149 of 228 PageID: 885
Certificate of Incorporation of
LAKEWOOD TENANTS ORGANIZATION, INC.                                    PAGE 3

balance of all money and other property received by the Corporation from any source, after the payment of all debts and obligations of the Corporation, shall be used or distributed subject to the direction of the Board of Trustees, or, in the alternative, in accordance with the order of the Superior Court of the State of New Jersey as provided by law, exclusively to qualified tax exempt organizations promoting tenants' rights, and to the greatest extent possible, consistent with the purposes of this Corporation as set forth hereinabove and in the Corporation's bylaws, and within the intendment of Section 501(c)(3) of the Internal Revenue Code of 1986 and the regulations thereunder as the same may now exist or as they may be hereafter amended from time to time.

7.   **Income and Distribution:**  No part of the income of the Corporation shall inure to the benefit of any member, trustee, or officer of the corporation or any private individual (except that reasonable compensation may be paid for services rendered to or for the Corporation affecting one or more of its purposes), and no member, trustee, officer of the Corporation or any private individual shall be entitled to share in the distribution of any of the Corporate assets on dissolution of the Corporation.

8.   **Prohibited Activities:**  No part of the activities of the Corporation shall be carrying on propaganda, or otherwise attempting to influence legislation, or participating in, or intervening in (including the publication and distribution of statements), any political campaign on behalf of any candidate for public office.

9.   **Principal Office:**  The current principal office of the Corporation is located at 600 West Kennedy Boulevard, Lakewood, New Jersey.  The location of the principal office may be changed by the Corporation, from time to time, by resolution of the Board of Trustees.

10.  **Registered Agent:**  The current registered agent for service of process and for delivery of all notices shall be Meir N. Hertz, 600 West Kennedy Boulevard, Lakewood, NJ 08701.

11. **Number of Trustees:** The number of trustees shall be not less than three.

12. **Names of Trustees:**  The names and addresses of the current Board of Trustees of the Corporation are as follows:

| Name | Address |
|------|---------|
| Meir Hertz | 210 Miller Road<br>Lakewood, NJ 08701 |
| Edith Goldstein | 500 Clifton Avenue<br>Lakewood, NJ 08701 |
| Judith Pizzarelli | 100 Woehr Avenue, Apartment 5G<br>Lakewood, NJ 08701 |
| Simcha Greenwald | 82 Cabinfield Circle<br>Lakewood, NJ 08701 |
| Ahron Notis | 157 East 9th Street<br>Lakewood, NJ 08701 |
| Moshe Sofer | 119 Fifth Street<br>Lakewood, NJ 08701 |
| Elimelech Mitnick | 22 East 6th Street<br>Lakewood, NJ 08701 |

13. **Membership Corporation:**  This is a membership corporation.  Qualification of members shall be as stated in the by-laws.

14. **Election of Trustees:**  The Trustees of the Corporation shall be elected in the manner provided by the bylaws.

15. **Age of Subscriber:**  The subscriber is of the age of 18 years or over.

THIS AMENDED CERTIFICATE OF INCORPORATION has been duly adopted by the Board of Trustees of the Corporation and ratified by the membership of the Corporation in accordance with the Corporation's initial Certificate of Incorporation, its By-Laws, and all applicable laws.

I certify that the foregoing is a true copy of an Amended Certificate of Incorporation duly adopted by the Board of Trustees of the Corporation on July 16, 2001, and ratified by the membership of the Corporation on November 13, 2001.

Ahron Notis, Secretary

*STATE OF NEW JERSEY*
*DEPARTMENT OF THE TREASURY*
*DIVISION OF REVENUE AND ENTERPRISE SERVICES*

*LAKEWOOD TENANTS ORGANIZATION, INC.*
*0100043825*

*I, the Treasurer of the State of New Jersey, do hereby certify that the above-named New Jersey Non Profit Corporation was registered by this office on July 13, 1977.*

*As of the date of this certificate, said business continues as an active business in good standing in the State of New Jersey, and its Annual Reports are current.*

*I further certify that the registered agent and registered office are:*

*Henya Richter*
*600 W. Kennedy Blvd*

*Lakewood, NJ 08701*

*I further certify that as of the date of this certificate, the following amendments and changes are on file in this office:*

| | |
|---|---|
| *Revoked For Failure To Pay Annual Reports* | *02/16/2002* |
| *Reinstated (Annual Reports)* | *06/21/2002* |
| *Revoked For Failure To Pay Annual Reports* | *02/16/2005* |
| *Change Of Agent And Office* | *01/16/2014* |
| *Reinstatement With Agent Change* | *01/16/2014* |

*IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Official Seal at Trenton, this 16th day of January, 2014*

*Andrew P Sidamon-Eristoff*
*State Treasurer*

Certification# 130847544

Verify this certificate at
https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp

AR 000148

### STATE OF NEW JERSEY
### DEPARTMENT OF THE TREASURY
### DIVISION OF REVENUE AND ENTERPRISE SERVICES

#### LAKEWOOD TENANTS ORGANIZATION, INC.

*0100043825*

I, the Treasurer of the State of New Jersey, do hereby certify that the above-named New Jersey Non Profit Corporation was registered by this office on July 13, 1977.

As of the date of this certificate, said business continues as an active business in good standing in the State of New Jersey, and its Annual Reports are current.

I further certify that the registered agent and registered office are:

> Henya Richter
> 600 W. Kennedy Blvd
>
> Lakewood, NJ 08701

I further certify that the incorporator is:

> Xx
> Xx
> Xx
> Xx, NJ 99999

I further certify that as of the date of this certificate, the following were listed as officers/directors of this business on the last Annual Report filed in this office on: January 16, 2014.

| | |
|---|---|
| President | Meir Hertz |
| | 210 Miller Road |
| | Lakewood, NJ 08701 |
| Secretary | Solomon Moskowitz |
| | 300 12th Street |
| | Lakewood, NJ 08701 |
| Treasurer | Moshe Sofer |
| | 119 5th Street |
| | Lakewood, NJ 08701 |
| Vice President | Simcha Greenwald |
| | 82 Cabinfield Circle |
| | Lakewood, NJ 08701 |

AR 000149

## STATE OF NEW JERSEY
## DEPARTMENT OF THE TREASURY
## DIVISION OF REVENUE AND ENTERPRISE SERVICES

### LAKEWOOD TENANTS ORGANIZATION, INC.

*0100043825*



IN TESTIMONY WHEREOF, I have
hereunto set my hand and affixed my
Official Seal at Trenton, this
16th day of January, 2014

*Andrew P Sidamon-Eristoff*
*Acting State Treasurer*

Certification# 130847537
Verify this certificate at
https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp

AR 000150

# CERTIFICATE OF INCUMBENCY

I, Solomon Moskowitz, the undersigned Secretary of LAKEWOOD TENANTS ORGANIZATION, INC., a New Jersey non-profit corporation (the "Corporation"), do hereby certify that the following persons were designated and appointed as officers and to the Board of Trustees, and that said persons continue to be officers and board members at this time:

| Name | Title |
|------|-------|
| Meir N. Hertz | President |
| Simcha Greenwald | Vice President |
| Moshe Sofer | Treasurer |
| Solomon Moskowitz | Secretary |
| Lazer Hasenfeld | Board Member |
| Chaim B Wolf | Board Member |
| Yaakov Herman | Board Member |

IN WITNESS WHEREOF, the undersigned has executed this instrument effective this February 12, 2014.

Witness:

LAKEWOOD TENANTS ORGANIZATION, INC.

Name: _ZEV MOSHE SOFER_

By: _Solomon Moskowitz_

Solomon Moskowitz, its Secretary

AR 000151



# LAKEWOOD TOWNSHIP
## RESIDENTIAL ASSISTANCE PROGRAM

600 West Kennedy Boulevard • P.O. Box 856 • Lakewood, N.J. 08701
732.367.0660 • F: 732.367.6645 • www.ltrap.org • E: info@ltrap.org

*Keeping the Promise of Affordable Housing for over Four Decades*

**MEIR N. HERTZ, CEO**
**HENYA RICHTER, CFO**



June 11, 2014

Ms. Sonia L. Burgos
Director
Office of Public Housing
U.S. Dept. of HUD
1 Newark Center
Newark, NJ 07102

> Re:   Newark Field Office Review of Documentation Related to
>        Lakewood Township Rental Assistance Program (LTRAP)

Dear Ms. Burgos:

As I advised you in a prior email, I forwarded your most recent letter, received April 22, 2014, to counsel, and they have come back to me with a threshold inquiry.  The issues identified in your letter have been substantively addressed in the HUD-Newark Field Office Management Review of LTRAP conducted from October 16, 2000 to May 1, 2001.  After a thorough HUD-Newark examination, by letter dated May 1, 2001, your predecessor, Mr. Carmen Valenti, Director, Office of Public Housing, wrote: "Based on the responses contained in this letter, the Section 8 review is cleared in its entirety."

Please clarify why these issues have been reopened, and why any further response is required.

Sincerely,

LAKEWOOD TOWNSHIP
RESIDENTIAL ASSISTANCE PROGRAM

Meir N. Hertz
CEO
CC:      Legal Team
         Debra Torres, Regional Administrator
         Shie-Fong sun, Associate Regional Counsel
         Wanda Nieves, Director, FHEO
         MaryAnn Creager, Supervisor Program Analyst, QAD
         Balu K. Thumar, HUD Newark Office



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC  20410-5000

OFFICE OF PUBLIC AND INDIAN HOUSING
Quality Assurance Division

June 19, 2014

Mr. Meir Hertz, CEO
Lakewood Township Residential Assistance Program
600 West Kennedy Boulevard
P.O. Box 856
Lakewood, NJ  08701

Dear Mr. Hertz:

In accordance with 24 CFR 982.158(a) through (d), and at the decision of The Department of Housing and Urban Development (HUD) Office of General Council, the HUD Office of Public and Indian Housing, Quality Assurance Division (QAD) has scheduled the Lakewood Township Residential Assistance Program (LTRAP), an operating unit of Lakewood Tenants Organization (LTO), together constituting the Public Housing Authority (PHA) for participation in a Financial Management Review. The primary purpose of the review will be to ensure that HCV administrative program funds have been expended and reported appropriately.

The review objectives include:

- Reconciliation of the Unrestricted Net Position (UNP) balance ending with the most current closed accounting month, anticipated to be June 2014.
- Analysis of Administrative Expenses charged to the HCV program for the **PHAs fiscal year 2010 through June 2014.**
- Confirm the availability of cash and/or investments sufficient to support the validated UNP balance as of June 2014.
- The QAD also reserves the right to examine additional documentation and financial records deemed necessary during the course of our review.

The scope of the Financial Management review for the UNP and analysis of administrative expenses will begin with the PHA`s fiscal year 2010 through the most current closed accounting month, which is anticipated to be June 2014.  The review will be conducted onsite by viewing the PHA financial and program utilization source documents for the *detailed* Administrative Expenses (AE).

The review has been scheduled to begin **Tuesday, July 8, 2014 with an entrance conference beginning at 9:00 A.M**.  We would appreciate all appropriate staff members being available at this time. The QAD review team will include:

> John Phillips, Director, Quality Assurance Division
> Ms. MaryAnn Creager, Supervisory Program Analyst
> Mr. Jon McLaughlin, Senior Quality Assurance Specialist
> Mr. Joe Russell, Program Analyst

In addition to the QAD staff, we anticipate the attendance of at least one Newark Field Office staff for all or a portion of the review.

In order to quickly and efficiently complete the review please ensure all source documents supporting your UNP balances, and current administrative expenses for the period under review are available to the QAD staff upon their arrival, <u>with the exception of those highlighted on the next page that are necessary in advance of our arrival.</u>  If you have any questions, please contact me at 614.469.5737 ext. 8228 or via e-mail at: joseph.r.russell@hud.gov.

An email notification to you regarding this planned review was sent on June 18, 2014 for which we have had no response.   We will appreciate acknowledgement of this introduction letter no later than close of normal business on **June 24, 2014**.

Sincerely,

Joseph R. Russell
Program Analyst, Quality Assurance Division

cc:  Milan Ozdinec, Deputy Assistance Secretary, Office of Public Housing and Voucher Programs
Michael Dennis, Director, Office of Housing Choice Voucher Program
John Phillips, Director, Quality Assurance Division – Office of Housing Choice Voucher Program
Sonia Burgos, Director, Newark Hub Office of Public & Indian Housing
Robert Boepple, Deputy Director, Financial Management Center
MaryAnn Creager, Supervisory Program Analyst, Quality Assurance Division
Honorable Menashe Miller, Mayor, Lakewood Township New Jersey

Attachment

**Attachment:**

**Supporting Documents Required for Financial Management Review will be required for LTRAP and LTO which together constitute the Public Housing Authority:**

Please have all relevant HCV program financial documentation available to the QAD Staff upon their arrival at the Agency and/or provide information via email in advance of onsite review where noted below.

Documents must cover the entire identified review period except where noted and must include all detail information for Administrative Expenses for the HCV program.   Documentation should include:

**1. PHA monthly final trial balances from the PHA FY2010 through June 2014.**  We understand the month of June may not be closed as of the date of this letter.  (Please email these as soon as they have been gathered).

2. PHA monthly closed general ledgers for the same periods as noted in paragraph No. 1 above.

3. Bank statements and ALL investment records (HCV Program only) for the latest closed accounting month reviewed, anticipated to be June 2014. Please also provide bank reconciliations.

**4.  Negotiated General Depository Agreement for all financial accounts that hold HCV funds**.

5. Additional financial records: General ledger detail, subsidiary ledgers, income statements, check registers, **balance sheets**, additional bank statements, etc., that the PHA may have used to record administrative transactions may be required if the trial balances do not provide sufficient information to allow the reviewers to conduct a speedy and effective review. Please have this additional documentation available upon our request if needed. Final trial balances and general ledgers required are those that contain ALL financial information related to the HCV Program.

6. All supporting documentation for any prior period adjustments or inter-program transfers that may have occurred in the past (including Due From/Due To).

7. Available IPA audit reports for the PHA's FYE 2010 through the most current audit.

8. All supporting documents that show the tracking and recording of Port-in HAP expenses, Port-in reimbursements and administrative fees earned on port-in vouchers, if not recorded separately in the trial balances and general ledgers.

9.  QAD reserves the right to re-visit the Restricted Net Position (RNP), formerly Net Restricted Assets (NRA) accounts if issues are uncovered during the course of this review that may warrant changes to the previous QAD review findings noted during our September 2013 review.

Space accommodations will be needed for the Quality Assurance and Field Office staff while on-site.  If possible, we would appreciate access to a telephone with conference calling capabilities.

**Please contact the QAD staff immediately if you have any questions regarding the documentation requested.**

AR 000155

# LAKEWOOD TOWNSHIP
## RESIDENTIAL ASSISTANCE PROGRAM

600 West Kennedy Boulevard • P.O. Box 856 • Lakewood, N.J. 08701
732.367.0660 • F: 732.367.6645 • www.ltrap.org • E: info@ltrap.org

Keeping the Promise of Affordable Housing for over Four Decades

**MEIR N. HERTZ, CEO**
**HENYA RICHTER, CFO**



June 20, 2014

Mr. Joseph R. Russell
Program Analyst
Department of Housing & Urban Development
PIH-Quality Assurance Division
200 N. High Street, Suite 717
Columbus, Oh 43215

Dear Mr. Russell:

This letter is written in response to your email dated June 18, 2014 in which you request to schedule a Financial Management Review (FMR) of LTRAP's Unrestricted Net Position (UNP).

By letter dated June 11, 2014, a copy of which was sent to Ms. MaryAnn Creager , this agency responded to Ms. Sonia Burgos' letter received by this agency on April 22, 2014, which may potentially impact this issue. This agency is still awaiting a response from the field office, inasmuch as this entire question has been dealt with, cleared and closed in its entirety.

Sincerely,

LAKEWOOD TOWNSHIP
RESIDENTIAL ASSISTANCE PROGRAM

Meir N. Hertz
CEO

AR 000156

GREENBERG DAUBER EPSTEIN & TUCKER    COUNSELLORS AT LAW

A PROFESSIONAL CORPORATION

EDWARD J. DAUBER

June 25, 2014

***Via email at MaryAnn.Creager@hud.gov***

Ms. MaryAnn Creager
Department of Housing & Urban Development
Supervisory Program Analyst
OHVP, Quality Assurance Division, Team 1
Columbus Center
Columbus, OH 43215

Re:    Lakewood Tenants Organization

Dear Ms. Creager:

This Firm represents the Lakewood Tenants Organization ("LTO"). We are in receipt of the recent communications exchanged between LTO and HUD, including your June 23, 2014 email to Meir Hertz and Joseph Russell's June 19, 2014 letter to Meir Hertz. Both communications concern a Financial Management Review that your office has unilaterally scheduled for July 8 through July 10. We have also been provided a copy of Sonia Burgos' undated letter, received by LTO on April 22, 2014, and Meir Hertz's June 11, 2014 letter responding to Ms. Burgos to which, we understand, HUD has not responded.

In the recent communications, you have dismissed LTO's questions and concerns and demanded access to LTO's books and records, as distinguished from the records of the Lakewood Township Residential Assistance Program ("LTRAP") which HUD has consistently been provided. The basis for this newly asserted position appears to be a decision from the HUD Office of General Counsel. Given that LTO has not been provided a copy of that decision, we cannot comment upon it.

Nonetheless, it appears that HUD is now revisiting an issue that it has raised many times over the years, with each time HUD approving LTO's actions involving LTRAP. More specifically, from in or about 1977, LTO has worked to make LTRAP one of the premier public housing agencies ("PHA") in the country. Indeed, LTO frequently receives HUD's highest performance ratings for its management of this PHA, receiving a perfect 100% SEMAP score in each of the past three years. For over 37 years, HUD understood, recognized and acquiesced that LTRAP is the program created by Lakewood and constitutes the PHA for the Township's Section 8 program and that LTO is the fee for service, third party administrator of LTRAP. Indeed, beginning, in August 1977, Clarence Humphrey, the Director of Housing Programs Management Branch, differentiated between LTRAP, the program created by Lakewood Township, and LTO, the administrator of the program.

Ms. MaryAnn Creager
June 25, 2014
Page 2

Similarly, HUD has understood, recognized and acquiesced that LTRAP, as the PHA, paid LTO the entire administrative fee that it received to manage the PHA. As a result, LTRAP did not create or maintain any administrative fee reserve fund because it had no excess administrative fee to deposit into that fund.

Periodically over the years, HUD has raised questions concerning the administrative fee reserve fund and each time HUD approved LTO's and LTRAP's actions with respect to that fund. Indeed, for example, HUD raised this very issue during a 2000 management review. On December 29, 2000, LTRAP responded to this concern by, among other things, quoting from its auditor's opinion that LTRAP did not need an administrative fee reserve because the entire administrative fee was paid to LTO, so there was nothing for deposit into that reserve account.

On January 26, 2001, Mr. Valenti, the Director of the HUD-Newark Office of Public Housing, responded to LTRAP's explanations and closed HUD's "concern" pertaining to the absence of an administrative fee reserve. Specifically, he explained that upon "further review, based on the current contract that LTO has with Lakewood Township, the Lakewood Tenants Organization is entitled to all Administrative Fees and therefore an Administrative Fee would not accrue." Ultimately, by May 1, 2001 letter, Mr. Valenti cleared the review in its entirety.

In fact, more recently in August 2011, Patricia Young, Financial Analyst at the HUD Financial Management Center, reached out to LTRAP and explained that she was familiar with LTRAP's payment of its entire administrative fee to LTO and also that, as a result, LTRAP did not maintain a UNA account. Ms. Young did not question or criticize the relationship or the payment of the entire administrative fee, but simply asked LTRAP to enter a zero in a computer entry for UNA, and then in the "Expense/Comments" tab, to make a notation "about the contract with LTO and that you don't have a UNA."

In short, for the past 37 years, HUD approved both the payment by LTRAP, as the PHA, of the entire administrative fee to LTO for it to manage the PHA and that LTRAP did not need to create or maintain a UNA. HUD did not seek to audit LTO or to regulate or approve of what LTO did with the monies that it earned and received from Lakewood to manage LTRAP.

In your June 23, 2014 email, you insist on reviewing LTO's books and records and assert that this issue has been resolved because of an internal decision that we have not seen. That purported resolution, however, ignores and is contrary to 37 years of interactions between the parties, not to mention 37 years of HUD taking a contrary position. The basis for HUD's reversal of its prior position is unclear and not explained. More importantly, we question both whether HUD may suddenly change its position and whether it may attempt to do so retroactively and unilaterally. Given this, we request that you forward this letter to HUD's Office of General Counsel for an explanation and a response.

Ms. MaryAnn Creager
June 25, 2014
Page 3

Finally, while we disagree entirely with the direction HUD is taking on this matter, and without waiving our objections to both that direction and to the Department's demand for review of LTO's financial records, we trust that you can determine from LTO's filed Form 990s for the years 2010, 2011, 2012 and 2013 that LTO's total expenses of administering the LTRAP program for that four year period have exceeded the administrative fees received from the Township. Moreover, my client has just learned that the pro-rated administrative fee for the Housing Choice Voucher Program (HCVP) will be 64% of eligibility, reduced from 68.5% in 2013, a pro-rata level that already resulted in an operating loss of $186,000 for LTO in 2013 alone, and will surely eliminate any net revenues in 2014.

In the meantime, given HUD's long-standing approval of the contractual relationship between the Township and LTO, the curious, unexplained change in HUD's position and the fact that LTO has incurred expenses in excess of administrative fees paid in the years of your proposed inquiry, my client is not prepared to participate in the proposed on-site review process you propose until we have received the requested explanation and response from the Office of General Counsel.

Very truly yours,

Edward J. Dauber

EJD/lac
cc:  Milan Ozdinec, *via e-mail*
      Michael Dennis, *via e-mail*
      John Phillips, *via e-mail*
      Sonia Burgos, *via e-mail*
      Joseph R. Russell, *via e-mail*
      Robert Boepple, *via e-mail*
      Shie-Fong Sun, Esq., *via e-mail*
      Honorable Mensashe Miller, *via e-mail*
      Meir Hertz, *via e-mail*



**U.S. Department of Housing and Urban Development**
New York State Office
Jacob K. Javits Federal Building
26 Federal Plaza
New York, New York 10278-0068
http://www.hud.gov/local/nyn/nynopen.html

December 5, 2014

Edward J. Dauber, Esq.
Greenberg Dauber Epstein & Tucker PC
One Gateway Center, Suite 600
Newark, New Jersey 07102

Re:   Lakewood Tenants Organization

Dear Mr. Dauber:

This responds to your June 25, 2014, letter requesting an explanation as to the legal basis for an on-site review of Lakewood Tenants Organization, Inc. ("LTO") by HUD's Quality Assurance Division ("QAD"). You claim that Lakewood Township created Lakewood Township Residential Assistance Program ("LTRAP") to serve as the PHA for the Township's Section 8 program and that LTO is "the fee for service, third party administrator of LTRAP." HUD has long "understood, recognized and acquiesced" in this arrangement, part of which is that LTRAP pays over its entire Section 8 administrative fee to LTO to manage LTRAP, as the PHA. Since all of the administrative fee is paid over to LTO, no administrative fee reserve fund was created by LTRAP because it had no excess income to credit to a reserve. You also claim that LTO's Form 990s demonstrate that LTO's total expenses of administering the LTRAP program exceeded the paid administrative fees. Thus, a financial review is not necessary.

This is sheer sophistry.

Under the regulatory scheme and the Annual Contributions Contract (ACC), administrative fees may only be used for certain purposes and any excess funds must be deposited into a reserve, which may only be used for limited purposes. Your position is that once LTRAP pays LTO all of the administrative fees, there is nothing left to audit or review. If this were true, HUD could not ensure that administrative fees were properly expended in accordance with the regulations.

The fact of the matter is that LTRAP is simply a program office of LTO and the name that LTO takes when it administers Lakewood's Section 8 program. Both have the same employees, address, and have shared the same counsel. LTO's IRS filings indicate that it is the organization that has been receiving and administering federal funds provided by HUD for Lakewood's Section 8 program. Accordingly, HUD's QAD has the authority to review LTO's records pursuant to 24 C.F.R. § 982.158.

2

### The regulatory scheme.

The Housing Choice Voucher Program regulations provide that the PHA must maintain complete and accurate accounts and other records for the program in accordance with HUD requirements, in a manner that permits speedy and effective audit. 24 C.F.R. § 982.158(a); ACC ¶ 14(a).  The PHA must furnish to HUD accounts and other records, reports, documents and information, as required by HUD. 24 C.F.R. § 982.158(b); ACC ¶ 14(b).  HUD and the Comptroller General of the United States shall have full and free access to all PHA offices and facilities, and to all accounts and other records of the PHA that are pertinent to administration of the program, including the right to examine or audit the records and to make copies.  ACC ¶ 14(c)  The PHA must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and shall provide any information or assistance needed to access the records. 24 C.F.R. § 982.158(c).

HUD may approve administrative fees to the PHA for certain purposes, including ongoing administrative fees, certain extraordinary costs, and costs to assist families. 24 C.F.R. § 982.152(a)(1).  Administrative fees may only be used to cover costs incurred to perform PHA responsibilities for the program in accordance with HUD regulations and requirements. 24 C.F.R § 982.152(a)(3).

The PHA must maintain an administrative fee reserve for the program. 24 C.F.R. § 982.155(a); ACC ¶ 12.  The PHA must credit to the reserve the total of:  (1) the amount by which program administrative fees paid by HUD for a PHA fiscal year exceed the PHA program administrative expenses for the fiscal year; plus (2) interest earned on the reserve. 24 C.F.R. § 982.155(a)(2), ACC ¶ 12(a).  The PHA must use funds in the reserve to pay program administrative expenses in excess of administrative fees paid by HUD for a PHA fiscal year. Since 2004, any administrative fees that are subsequently moved into the Unrestricted Net Assets[1] account (formerly known as the administrative fee reserve) at the PHA's fiscal year (FY) end must only be used for activities related to the provision of tenant-based rental assistance authorized under Section 8, including related development activities.  See HUD Notice PIH 2014-05. If the PHA has not adequately administered the program, HUD may prohibit use of funds in the reserve, and may direct the PHA to use funds in the reserve to improve administration of the program or to reimburse ineligible expenses. 24 C.F.R. § 982.155(b)(3); ACC ¶ 12(c).

Unless otherwise required or permitted by HUD, all program receipts[2] must be promptly deposited with a financial institution selected as depositary by the PHA in accordance with HUD

---

[1]   Under the Governmental Accounting Standards Board (GASB) updated terminology in accordance with  GASB Statement No. 63 regarding equity, Unrestricted Net Assests is reffered to as Unrestricted Net Position.

[2]   "Program receipts" means HUD payments to the PHA under the consolidated ACC, and any other amounts received by the PHA in connection with the program. 24 C.F.R. § 982.4 (Definitions).

AR 000161

requirements. 24 C.F.R. § 982.156(a); ACC ¶ 13(a).  The PHA may only withdraw deposited program receipts for use in connection with the program in accordance with HUD requirements. 24 C.F.R. § 982.156(b); ACC ¶ 13(c).

### LTRAP is a program office of LTO and the name that LTO takes when it is administering rental assistance programs on behalf of Lakewood Township.

Shortly after its founding, LTO contracted with Lakewood Township to administer Section 8 Rental Assistance Programs.  *See Employment Agreement between Meir N. Hertz and Lakewood Tenants Organization, Inc.* (Dec. 28, 1995) (hereinafter *"Employment Contract"*); *Letter from Richard Michael Price, Counsel for LTO/LTRAP to Carmen Valenti, Director – Office of Public Housing* (Dec. 15, 2000) (hereinafter *"Price 12/15/00 Letter"*); *and Letter from Richard Michael Price, Counsel for LTO/LTRAP to Balu Thumar, Acting Director – Office of Public Housing* (Jan 2, 2014).  These agreements between Lakewood Township and LTO were entered into because the Lakewood Housing Authority initially refused HUD's invitation to administer Section 8 programs, and Lakewood Township did not possess the administrative capacity to run the program itself.  *See Letter from John Franklin, Lakewood Township Mayor to Theodore Britton, HUD Newark Field Office* (Apr. 24, 1990), (hereinafter *"Franklin 4/24/1990 Letter"*).  According to a letter from then-Mayor John Franklin, LTO was thus brought in as a "contract administrative agency" to administer these Section 8 Housing programs, which are run under the name LTRAP.  *See id.*  Accordingly, LTRAP has no incorporation or organization of its own and is not a separate legal entity from LTO.  Instead it is merely the name of the Section 8 program run by LTO as an agent of Lakewood Township.  *See Agreement dated 6/1/77 between Lakewood Township and LTO.*[3]

Notably, this fact has been clearly expressed by LTO, as well as by LTO/LTRAP's own counsel.  LTO Board of Trustees resolutions have explicitly stated that LTO administers LTRAP.  *See LTO Board of Trustees Resolution 9512-03* ("Hertz is a key employee of the [LTO] in its administration of [LTRAP]").  LTO/LTRAP's counsel also affirmed this fact in a 2000 letter:

It seems that HUD believes that LTRAP is a separate entity from LTO.  However . . . LTRAP is the name of the program that LTO operates, and, as such, LTRAP has no separate incorporation . . . [the Director of Public Housing] also questions that LTRAP receives HUD funds, but the funds were posted to LTO.  **Again,**

---

[3] Your letter refers to LTRAP as the PHA.  PHA is defined as "[a]ny State, county, municipality, or other governmental entity or public body which is authorized to administer the program (*or an agency or instrumentality of such an entity*).  24 C.F.R. § 982.4 (emphasis added).  The agreement between LTO and Lakewood states that LTO is to "act as the designated agency of the Township of Lakewood to administer [the Section 8] program pursuant to applicable Federal, State and local laws and regulation [and] to account for all funds received pursuant to the aforesaid applicable laws[.]"

4

> **LTRAP is the name of the program that LTO operates and under which**
> **LTO receives and disburses funds under the Section 8 program.**

*Price 12/15/00 Letter* (emphasis added).  Finally, the New Jersey Superior Court has taken a similar view on the relationship and structure of LTO/LTRAP, describing it in the following manner:

> Pursuant to an agreement dated August 27, 1982, between the Township of
> Lakewood and LTO, all programs theretofore administered by LTO were to be
> carried out thereafter under the name of LTRAP. **LTO was immediately to**
> **commence use of such name when acting as the Township's designee with**
> **respect to rental assistance programs. All references hereafter to LTRAP or**
> **LTO shall be deemed interchangeable.**

*Lakewood Residents Ass'n, Inc. v. Township of Lakewood*, 294 N.J. Super. 207, 212 fn. 2, 682 A.2d 1232 (Law Div.1994) (emphasis added) (affirmed by *Lakewood Residents Ass'n, Inc. v. Lakewood Housing Authority*, 294 N.J. Super. 146, 149, 682 A.2d 1201 (App. Div. 1996).[4]

> **LTO's tax filings indicate that notwithstanding any program names or formalities it**
> **may use, it is the actual organization receiving funds from HUD for Lakewood's**
> **Section 8 Program.**

Since LTRAP is merely the name that LTO takes on when it is acting as the agency of the Township for the Section 8 program, it is clear that any funds provided to LTRAP are actually received and used by LTO. *See Price 12/15/00 Letter.*  However, this fact is also clearly evidenced by LTO's IRS filings.  Part VIII of LTO's IRS Form 990 indicates that LTO's source of income is: Line (1E) Government Grants.  This is in contrast to LTO's claims that it derives its income from management fees.  This arrangement is further illustrated by the fact that LTO's filings indicate that it receives 92% of its funding from a governmental unit. *See LTO IRS Form 990 – Schedule A Reason for Public Charity Status.*  Finally, on LTO's IRS Form 990 Schedule O, *LTO indicates that it has a Section 8 contract with HUD.  See Id. Schedule O.*

### QAD financial review demands.

Notwithstanding any representations that were made in the past, HUD has a right under the ACC and the program regulations to full and free access to all PHA offices and facilities, and to all accounts and other records of the PHA that are pertinent to administration of the program.  HUD does not have to establish cause for such a request.  It does not matter who is in control of

---

[4] You cite to an August 1977 letter from Clarence Humphrey, Director of Housing Programs Management Branch as evidence that HUD has changed its position over the years.  You state that the letter "differentiated between LTRAP, the program created by Lakewood Township, and LTO[.]" (August 30, 1977)  At no point does Mr. Humphrey mention LTRAP so he could not have differentiated between it and LTO.

5

the information HUD seeks, it simply must be provided by the PHA, who has ultimate responsibility for the documentation.

After QAD attempted to schedule a full Financial Management Review of the program, Henya Richter, LTRAP's CFO, responded by email dated August 14, 2013, stating:

> [O]ur agency is unique as it does not have UNA. The Lakewood Tenants Organization, Inc., (LTO) is contracted to administer the Lakewood Township Residential Assistance Program, (LTRAP). Under this contract, LTO receives the full administrative fees earned. All expenses are then paid out of LTO's accounts and not LTRAP. ... The administrative fee is paid in full each month to LTO, so there is never any UNA. ... As a result, the only item you will be reviewing is the NRA balances.

Contracts between non-federal entities do not supersede the requirements under federal regulations or the ACC. And unsubstantiated representations of an organization we are seeking to review do not trump HUD's right to ensure the protection of the public fisc.

On September 4, 2013, QAD requested, via email, a copy of the executed contract between LTO and LTRAP and any invoices that relate to LTO billing the LTRAP for administration of the program. On September 9, 2013, QAD followed up reminding LTRAP that there would be an on-site entrance conference the following morning and that "copies of invoices specifically showing the charges for services rendered by LTO to LTRAP" should be made available.

After LTO/LTRAP's unwillingness to cooperate, by letter dated June 19, 2014, QAD once again scheduled an on-site Financial Management Review and explained the objective and scope of such review. Once again, by your letter dated June 25, 2014, LTO/LTRAP refused to participate in the review.

These demands remain open. LTO/LTRAP must allow HUD to conduct a full Financial Management Review as described in QAD's June 19, 2014 letter within 30 days of date of this letter. Should LTO/LTRAP fail to comply with this final demand it will be considered in default of its ACC and the applicable program regulations. If LTO/LTRAP goes into default of its ACC over this issue, HUD will consider transferring LTO/LTRAP's entire HCV program to another PHA. HUD may also take any other administrative or legal actions it deems appropriate.

For the reasons set forth above, LTO must allow the QAD to conduct its financial review. If you have any questions, or wish to discuss this matter, please call Louis Gioia, Attorney-Advisor, at 212-542-7211.

Sincerely,

*John J. Cahill*

John J. Cahill
Regional Counsel for
New York/New Jersey

AR 000164

6

cc: Hon. Menashe Miller, Mayor, Township of Lakewood, NJ

AR 000165

(This needs to go on "Office of the Assistant Secretary" or "PIH HQ" letterhead)

Hon. Albert Ackerman,
Mayor, Lakewood Township
231 Third Street
Lakewood, NJ 08701

Meir N. Hertz, CEO
Lakewood Township Residential Assistance Program
600 West Kennedy Blvd.
P.O. Box 856
Lakewood, NJ 08701

**SUBJECT:   DETERMINATION OF HCV ACC DEFAULT AND TRANSFER
OF THE PROGRAM**

Dear Sirs:

The U.S. Department of Housing and Urban Development (HUD) has
determined that the Township of Lakewood[1] (Lakewood) is in default of its Housing
Choice Voucher (HCV) Annual Contributions Contract (ACC)[2] with HUD.

First, HUD has determined that Lakewood is in default of its ACC by breaching ¶
10(a) which requires that: "The [public housing authority (PHA)] must comply . . . with
the requirements of the U.S. Housing Act of 1937 and all HUD regulations and other
requirements . . . ." *See* Ex. 2.  Lakewood did not comply with HUD regulation 24
C.F.R. § 982.158.  Section 982.158 contains Lakewood's record keeping responsibilities
and its obligations to disclose records and data to HUD, and it requires PHAs to authorize
HUD to physically inspect documents or data at the PHA office facility.  These
regulatory requirements are also contractual and contained in ¶ 14 of Lakewood's ACC.
*See* Ex. 2.

Second, HUD has determined that Lakewood is in default because it breached ¶
14 (a)–(c) of the ACC which requires Lakewood to: (a) maintain complete and accurate
books of account and records; (b) furnish HUD those records or data; and, (c) grant HUD
or its proxy full and free access to all HA offices and facilities for the purpose of
inspecting those records. *See* Ex. 2.

HUD makes the foregoing determination of default based on the following
findings:

---

[1] *See* Ex. 1.  April 14, 2014, letter from Sonia Burgos, Director, Newark Office of Public
    Housing to Meir Hertz, Executive Director, Lakewood Township Residential
    Assistance Program (LTRAP), HUD "determined that (1) LTRAP is an operating unit
    of the [Lakewood Tenants Organization (LTO); and] (2) the Township and the LTO
    together constitute the PHA in this matter[.]"

[2] Ex. 2.  Consolidated Annual Contributions Contract, NJ214-VO-0015 & NJ214-VO-
    0016 (July, 21, 1998).

AR 000166

i.   In September 2013, HUD's Office of Public and Indian Housing, Quality Assurance Division (QAD) performed an on-site Financial Management Review of Lakewood's HCV program.  As a result of the review, QAD issued a report on December 3, 2013.[3]  The report notes that "QAD staff was unable to review the administrative expenses" because "LTRAP refused to furnish the documents."  Ex. 3.  This "severely hampered [QADs] efforts to conduct a speedy and effective audit of the HCV program."  *Id.*

ii.  By letter dated January 2, 2014, Richard Price, Esq. responded to HUD's December 3, 2013, letter, and stated that "once the [administrative] fee is earned by LTO and paid to LTO by Lakewood Township the fee is defederalized and LTO is not accountable to HUD[.]"[4]

iii. By letter dated February 14, 2014, Mr. Price remitted organizational documents for LTO to HUD after discussions with HUD staff.[5]  Based on these documents, review of correspondences, and other information available, HUD determined that the Township and LTO together constitute the PHA of the HCV program run by the Township.  *See* Ex. 1.

iv.  Instead of responding to the multiple points provided in the April 14, 2014 letter, LTRAP sent a letter to HUD on June 11, 2014, asking "why any further response is required[,]" relying on purported HUD statements concerning a management review conducted 13 years earlier.[6]

v.   On June 19, 2014, QAD sent a letter to Lakewood scheduling another Financial Management Review beginning July 8, 2014, to review, *among other things*, administrative expenses.[7]

vi.  LTRAP responded on June 20, 2014, once again asserting that "this entire question has been dealt with, cleared and closed in its entirety."[8]

---

[3] Ex. 3.  Letter from MaryAnn Creager, Supervisory Program Analyst, QAD, to Meir Hertz, CEO, Lakewood Township RAP (Dec. 3, 2013).

[4] Ex. 4.  Letter from Richard M. Price, Esq., Nixon Peabody, to Balu Thumar, Acting Director, Office of Public Housing (Jan. 2, 2014).

[5] Ex. 5.  Letter from Richard M. Price, Esq., Nixon Peabody, to Balu Thumar, Acting Director, Office of Public Housing (February 14, 2014).

[6] Ex. 6.  Letter from Meir N. Hertz, CEO, LTRAP, to Sonia Burgos, Director, Office of Public Housing (June 11, 2014).

[7] Ex. 7.  Letter from Joseph R. Russel, Program Analyst, QAD to Meir Hertz, CEO, LTRAP (June 19, 2014).

[8] Ex. 8.  Letter from Meir Hertz, CEO, LTRAP to Joseph R. Russell, Program Analyst, QAD (June 20, 2014).

**vii.** By letter dated June 25, 2014, counsel for LTO stated that LTO "is not prepared to participate in the proposed on-site review process[.]"[9]

**viii.** Contrary to the language in LTRAP's June 25, 2014, letter, Lakewood does not have the legal right to refuse participation in an on-site review process. *See* Ex. 2, ¶ 14 (a)–(c); 24 C.F.R. § 982.158.

**ix.** In a letter dated December 5, 2014, from John J. Cahill, HUD's Regional Counsel for NewYork/New Jersey, HUD demanded that Lakewood allow HUD's QAD to conduct a full Financial Management Review as described in the QAD's letter dated June 19, 2014.[10] HUD informed Lakewood that it must comply with this demand within 30 days. *See* Ex. 10. HUD also advised Lakewood that if it failed to comply with this final demand, it would be considered in default of its ACC and the applicable program regulations. *Id.*

**x.** On February 10, 2015, representatives from HUD's Office of Regional Counsel for NY/NJ, Newark Office of Public Housing, and QAD met with counsel for Lakewood and LTO at Lakewood's request. At this meeting Lakewood's counsel proposed that, to resolve the financial review issues, a reserve could be established moving forward but this proposal would not include access to past records. This proposal was unacceptable as it failed to grant the access all of Lakewood's records. Accordingly, HUD rejected this offer.

**xi.** HUD has waited more than 6 months to take action after its last compliance demand date, January 5, 2015. See Ex. 10. HUD has also tried to resolve Lakewood's ACC non-compliance with good faith negotiations. From its actions, HUD can rationally conclude that Lakewood has no intent to comply with its regulatory and contractual responsibilities. HUD will not negotiate terms with Lakewood that would allow it to remain out of compliance with its ACC and applicable regulations.

**xii.** Since Lakewood has refused and continues to refuse to provide full access to all of its records at its facility, access that is mandated by ¶ 14 (a)–(c) of its ACC and 24 C.F.R. § 982.158, Lakewood is in default of its ACC.

---

[9] Ex. 9. Letter from Edward J. Dauber, Esq. to MaryAnn Creager, Supervisory Program Analyst, QAD (June 25, 2014).

[10] Ex. 10. Letter from John J. Cahill, Regional Counsel for NY/NJ to Edward Dauber, Esq., Counsel for LTO/LTRAP (Dec. 5, 2014).

Now that HUD has determined that Lakewood's ACC is in default, HUD has the authority pursuant to ¶ 15(a) of the ACC to "take possession of all or any HA property, rights or interests in connection with a program, including funds held by a depository, program receipts, and rights or interests under a contract for housing assistance payments with an owner[.]" Ex. 2.  Accordingly, HUD will take possession of Lakewood's HCV program, which is comprised of 1,066 units, and transfer them to Lakewood Housing Authority.   HUD will also take possession of any accompanying HCV program funds for those 1,066 units. The effective date of the transfer will be _____, 2015.  HUD may also take any other administrative or legal action it deems appropriate.


Sincerely,



Lourdes Castro Ramirez
Principal Deputy Assistant Secretary
of Public and Indian Housing


cc:    Edward J. Dauber, Esq. (via email)
       James T. Massey, Esq. (via email)
       Michael P. Pasquale, Esq. (via email)

| | |
|---|---|
| **From:** | Jones, Jennifer C |
| **To:** | Szubrowski, Leigh; Herrell, Arlen E |
| **Sent:** | 7/27/2015 10:49:38 AM |
| **Subject:** | Lakewood Township - Flagging since this may become an issue on both the congressional and intergovernmental side |
| **Attachments:** | LTRAP - Transfer - OGC edits 6.19.2015.docx |

Can the three of us find time for a brief chat today?

In short, we are transferring a voucher program from one PHA to another. We don't do it that often but the Mayor (same Mayor for both agencies) is unaware that this is occurring, the receiving agency is ready to bring it to their board for a vote (board meetings are public) in the next two weeks (they wanted to do it today but I am trying to get that pulled down) and I am not sure what if any congressional interest there will be in this. CD4 – Republican Chris Smith.

Let me know if you have a few minutes later this afternoon.

Attached is the nearly final draft letter informing the default PHA of the transfer. It has not been sent.

Thanks, J2

**Jenn Jones**
Chief of Staff to the Assistant Secretary
Office of Public and Indian Housing
U.S. Department of Housing and Urban Development
451 Seventh Street SW, Room 4100
Washington, DC 20410
Phone: (202) 402-4604 (direct)
jennifer.c.jones@hud.gov
www.hud.gov
---
*Disclaimer: This email and / or any attachments contained are subject to the Privacy Act of 1974 (5 U.S.C. 552a, as amended). Personal information contained in the attachment may be used only by authorized persons in the conduct of official business. Any individual responsible for unauthorized disclosure or misuse of personal information will be prosecuted to the maximum extent possible under law.*

| | |
|---|---|
| **From:** | Jones, Jennifer C |
| **To:** | Herrell, Arlen E |
| **CC:** | Szubrowski, Leigh |
| **Sent:** | 7/30/2015 12:22:55 PM |
| **Subject:** | FW: LTRAP Program Transfer |

Per our conversation on Tuesday, here are answers to the question raised. Let's connect on notifications later today or tomorrow.

**Jenn Jones**

Chief of Staff to the Assistant Secretary

Office of Public and Indian Housing

U.S. Department of Housing and Urban Development

451 Seventh Street SW, Room 4100

Washington, DC 20410

Phone: (202) 402-4604 (direct)

jennifer.c.jones@hud.gov

www.hud.gov

---

*Disclaimer:  This email and / or any attachments contained are subject to the Privacy Act of 1974 (5 U.S.C. 552a, as amended). Personal information contained in the attachment may be used only by authorized persons in the conduct of official business. Any individual responsible for unauthorized disclosure or misuse of personal information will be prosecuted to the maximum extent possible under law.*

**From:** Burgos, Sonia L
**Sent:** Tuesday, July 28, 2015 5:19 PM
**To:** Ginger, Amy L; Jones, Jennifer C
**Cc:** Torres, Debra A; Gioia, Louis J
**Subject:** RE: LTRAP Program Transfer

**From:** Ginger, Amy L
**Sent:** Tuesday, July 28, 2015 4:39 PM
**To:** Burgos, Sonia L; Jones, Jennifer C
**Cc:** Torres, Debra A
**Subject:** RE: LTRAP Program Transfer

Thanks Sonia.  In any of our correspondence to them did we say "if you fail to comply, you risk having your entire program transferred away from you"?

 Yes, NY Regional Counsel's  Dec 5, 2014 letter. It was previously attached.  Would you like another copy?

AR 000171

And did we ever give the previous mayor (or the current mayor) the opportunity to enforce some action through his/her role as the appointing authority?

No, the matter about having the Mayor involve in an enforcement action is coming up now. What action would you now suggest? Every time we have a discussion with this PHA is through their legal representation. This HA was given several opportunities to cooperate. The last 10-15 years, QAD estimates 10 mil dollars not reported the correct financial information to HUD or the IRS.

Amy Ginger

Director

Office of Housing Voucher Programs

202-402-5152

_____

**From:** Burgos, Sonia L
**Sent:** Tuesday, July 28, 2015 4:17 PM
**To:** Jones, Jennifer C
**Cc:** Ginger, Amy L; Torres, Debra A
**Subject:** FW: LTRAP Program Transfer

Please see below.

From: Jones, Jennifer C

Sent: Tuesday, July 28, 2015 1:25 PM

To: Ginger, Amy L; Burgos, Sonia L

Subject: RE: LTRAP Program Transfer

Thanks Amy.

A few questions that I think you or Sonia can answer:

1.     Can I get the name of the two PHAs – both default and receiving PHA. I have the default PHA per the transfer letter

 The Default PHA is Lakewood Township Rental Assistance Program- NJ214 (LTRAP).  The Receiving PHA is Lakewood Housing Authority (NJ054).

2.     Reason for taking this action – more detail than what is in the letter.

 The primary reason for taking this action is that LTRAP failed to comply with a HUD audit that was conducted by the Quality Assurance Division (QAD).  LTRAP failed to provide the QAD with documents necessary to complete their Financial Management Review in order to obtain a full and accurate account of LTRAP's financial position specifically the  administrative income and expenses.  The briefing papers << File: LTRAP - Hot Issues 9-18-2014r5.docx >> and  << File: LTRAP_LTO Decision Paper_Synopsis Final.docx >> letters details a full account of the sequence of events leading to the Default, which was reviewed and presented by Regional Counsel in consultation with HQ Program and Litigation OGC.

a.     History – how long has this been underway and does the default PHA understand that this is the enforcement action we will take if they remain non-compliant? Just want to ensure that they are refusing

to comply understanding the ramifications?

This has been underway for at least the past three years. We are of the opinion that the Default PHA understands that HUD will take enforcement action if they remain non-compliant.

3.     Confirm that there is only one Mayor to notify? When did he/she take office and what do they know – if anything about this issue? I am surprised the former Mayor did not attempt to compel the default PHA to comply?

On December 5, 2014, the Mayor Minashe Miller was notified by OGC. Mayor position is appointed by the council members and they rotate every two years. Current Mayor is Albert Ackerman appointed in February 2015

4.     Are both PHAs in the same congressional district so we would only be notifying one representative and two senators?

Both of the PHAs are in the same district.

5.     Do we have any insight on the impact of the transfer to both PHAs = funding/job losses, etc....

The default agency will have to determine the LTO contract which administers their HCV Program. The receiving PHA currently manages approx. the same size inventory, which would double in size.

Jenn Jones

Chief of Staff to the Assistant Secretary Office of Public and Indian Housing U.S. Department of Housing and Urban Development

451 Seventh Street SW, Room 4100

Washington, DC 20410

Phone: (202) 402-4604 (direct)

jennifer.c.jones@hud.gov>

www.hud.gov>

---

Disclaimer: This email and / or any attachments contained are subject to the Privacy Act of 1974 (5 U.S.C. 552a, as amended). Personal information contained in the attachment may be used only by authorized persons in the conduct of official business. Any individual responsible for unauthorized disclosure or misuse of personal information will be prosecuted to the maximum extent possible under law.

From: Ginger, Amy L

Sent: Tuesday, July 28, 2015 1:07 PM

To: Burgos, Sonia L; Jones, Jennifer C; Ozdinec, Milan M

Cc: Maio-Messano, Maria T

Subject: RE: LTRAP Program Transfer

Good Afternoon,

Just to summarize the emails.

FPM Director Maria Maio-Messano will notify the Major, and CIR will notify senators and representatives? And this will happen once we have the new board date, hopefully sometime next week?

Thanks for confirming.

Amy Ginger

Director

Office of Housing Voucher Programs

202-402-5152

From: Burgos, Sonia L

Sent: Tuesday, July 28, 2015 9:57 AM

To: Jones, Jennifer C; Ginger, Amy L; Ozdinec, Milan M

Cc: Maio-Messano, Maria T

Subject: RE: LTRAP Program Transfer

The FO Director Maria Maio-Messano.

From: Jones, Jennifer C

Sent: Tuesday, July 28, 2015 9:56 AM

To: Burgos, Sonia L; Ginger, Amy L; Ozdinec, Milan M

Subject: RE: LTRAP Program Transfer

Can I ask – who would be making the call to the Mayor from FPM?

Jenn Jones

Chief of Staff to the Assistant Secretary Office of Public and Indian Housing U.S. Department of Housing and Urban Development

451 Seventh Street SW, Room 4100

Washington, DC 20410

Phone: (202) 402-4604 (direct)

jennifer.c.jones@hud.gov>

www.hud.gov>

---

Disclaimer:  This email and / or any attachments contained are subject to the Privacy Act of 1974 (5 U.S.C. 552a, as amended). Personal information contained in the attachment may be used only by authorized persons in the conduct of official business. Any individual responsible for unauthorized

disclosure or misuse of personal information will be prosecuted to the maximum extent possible under law.

From: Burgos, Sonia L

Sent: Tuesday, July 28, 2015 9:55 AM

To: Jones, Jennifer C; Ginger, Amy L; Ozdinec, Milan M

Subject: RE: LTRAP Program Transfer

I haven't heard that from the receiving PHA,  So I don't know. That's why we would prefer CIR HQ make the notifications as this will be highly sensitive. The suggestion to have FPM Director make the call to the Mayor was that came from the local HUB Office.  That's certainly a HQ call. But whatever is decided all calls should be placed at the same time.

From: Jones, Jennifer C

Sent: Tuesday, July 28, 2015 9:48 AM

To: Burgos, Sonia L; Ginger, Amy L; Ozdinec, Milan M

Subject: RE: LTRAP Program Transfer

Sorry. Just asking if we expect either the rep covering Lakewood Township or if we would expect any other Rep or Sen to weigh in on the transfer?

Jenn Jones

Chief of Staff to the Assistant Secretary Office of Public and Indian Housing U.S. Department of Housing and Urban Development

451 Seventh Street SW, Room 4100

Washington, DC 20410

Phone: (202) 402-4604 (direct)

jennifer.c.jones@hud.gov>

www.hud.gov>

---

Disclaimer:  This email and / or any attachments contained are subject to the Privacy Act of 1974 (5 U.S.C. 552a, as amended). Personal information contained in the attachment may be used only by authorized persons in the conduct of official business. Any individual responsible for unauthorized disclosure or misuse of personal information will be prosecuted to the maximum extent possible under law.

From: Burgos, Sonia L

Sent: Tuesday, July 28, 2015 9:46 AM

To: Ginger, Amy L; Ozdinec, Milan M; Jones, Jennifer C

Subject: FW: LTRAP Program Transfer

AR 000175

From: Jones, Jennifer C

Sent: Monday, July 27, 2015 6:07 PM

To: Ginger, Amy L

Cc: Burgos, Sonia L; Ozdinec, Milan M

Subject: RE: LTRAP Program Transfer

I am talking to CIR tomorrow morning. Amy, you are welcome to join if you would like but if FPM is taking the lead on notifying the new Mayor, it would seem that intergovernmental doesn't have a significant role. I am curious about what if any response we would expect from the congressman from the district. Any equities we should be aware of?

Jenn Jones

Chief of Staff to the Assistant Secretary Office of Public and Indian Housing U.S. Department of Housing and Urban Development

451 Seventh Street SW, Room 4100

Washington, DC 20410

Phone: (202) 402-4604 (direct)

jennifer.c.jones@hud.gov>

www.hud.gov>

---

Disclaimer:  This email and / or any attachments contained are subject to the Privacy Act of 1974 (5 U.S.C. 552a, as amended). Personal information contained in the attachment may be used only by authorized persons in the conduct of official business. Any individual responsible for unauthorized disclosure or misuse of personal information will be prosecuted to the maximum extent possible under law.

From: Ginger, Amy L

Sent: Monday, July 27, 2015 3:54 PM

To: Jones, Jennifer C

Cc: Burgos, Sonia L; Ozdinec, Milan M

Subject: LTRAP Program Transfer

Importance: High

Jenn,


Here is the Final Transfer letter for LTRAP and the associated attachments.  Please share with CIR.

1.      The agenda item has been pulled from the receiving agency's BOD meeting.  They can have an emergency meeting in the next week or so.  I suggest we tell them to aim for mid to late next week.

2.      The current Mayor has not been officially notified (previous mayor was notified).  Our thoughts are that FPM would notify the mayor, once we have a BOD date.  We are open to suggestions on that.  We don't think there will be an issue.

3.      We will now wait on a signal from you and CIR.

Thanks much, let me know if you need anything else from me.

Amy Ginger

Director

Office of Housing Voucher Programs

202-402-5152

| | |
|---|---|
| **From:** | Jones, Jennifer C |
| **To:** | Ginger, Amy L |
| **CC:** | Ozdinec, Milan M (Milan.M.Ozdinec@hud.gov); Herrell, Arlen E |
| **Sent:** | 8/3/2015 5:49:39 PM |
| **Subject:** | RE: LTRAP Program Transfer |

Amy:


Sorry I didn't get back to you on Friday after speaking to CIR.


They simply need to know when we want to green light this and they will schedule notifications accordingly.


What is the target data for having the receiving PHA get their board resolution? Once we know that, CIR can determine when they will take care of congressional notifications which would probably occur the afternoon prior to the board reso.




Jenn Jones

Chief of Staff to the Assistant Secretary

Office of Public and Indian Housing

U.S. Department of Housing and Urban Development

451 Seventh Street SW, Room 4100

Washington, DC 20410

Phone: (202) 402-4604 (direct)

jennifer.c.jones@hud.gov

www.hud.gov

---

Disclaimer: This email and / or any attachments contained are subject to the Privacy Act of 1974 (5 U.S.C. 552a, as amended). Personal information contained in the attachment may be used only by authorized persons in the conduct of official business. Any individual responsible for unauthorized disclosure or misuse of personal information will be prosecuted to the maximum extent possible under law.


From: Ginger, Amy L
Sent: Thursday, July 30, 2015 3:11 PM
To: Jones, Jennifer C
Subject: RE: LTRAP Program Transfer


Did you notify CIR? I'm trying to wrap this up before I head out on vacation late next week.

AR 000178

Amy Ginger

Director

Office of Housing Voucher Programs

202-402-5152


From: Jones, Jennifer C
Sent: Tuesday, July 28, 2015 9:30 PM
To: Ginger, Amy L; Burgos, Sonia L
Cc: Torres, Debra A; Gioia, Louis J
Subject: Re: LTRAP Program Transfer


Yes.
Jennifer C. Jones
Chief of Staff
Office of Public & Indian Housing


From: Ginger, Amy L
Sent: Tuesday, July 28, 2015 05:39 PM
To: Burgos, Sonia L; Jones, Jennifer C
Cc: Torres, Debra A; Gioia, Louis J
Subject: Re: LTRAP Program Transfer


Thanks Sonia. I think as long as we've been clear with the consequences for their inaction,
were okay to go. Jenn would you agree?

Amy Ginger
Director
Office of Housing Voucher Programs
202-402-5152


From: Burgos, Sonia L
Sent: Tuesday, July 28, 2015 05:19 PM
To: Ginger, Amy L; Jones, Jennifer C
Cc: Torres, Debra A; Gioia, Louis J
Subject: RE: LTRAP Program Transfer


_____
From: Ginger, Amy L
Sent: Tuesday, July 28, 2015 4:39 PM
To: Burgos, Sonia L; Jones, Jennifer C
Cc: Torres, Debra A
Subject: RE: LTRAP Program Transfer

Thanks Sonia. In any of our correspondence to them did we say "if you fail to comply, you risk
having your entire program transferred away from you"?

Yes, NY Regional Counsel's Dec 5, 2014 letter. It was previously attached. Would you like
another copy?

And did we ever give the previous mayor (or the current mayor) the opportunity to enforce some
action through his/her role as the appointing authority?

AR 000179

No, the transfer is already complete. May we set up a brief conference call to discuss. What action would you now suggest? Every time we have a discussion with this PHA is through their legal representation. This HA was given several opportunities to cooperate. The last 10-15 years, QAD estimates 10 mil dollars not reported the correct financial information to HUD or the IRS.

Amy Ginger

Director

Office of Housing Voucher Programs

202-402-5152

_____
From: Burgos, Sonia L
Sent: Tuesday, July 28, 2015 4:17 PM
To: Jones, Jennifer C
Cc: Ginger, Amy L; Torres, Debra A
Subject: FW: LTRAP Program Transfer

Please see below.

From: Jones, Jennifer C

Sent: Tuesday, July 28, 2015 1:25 PM

To: Ginger, Amy L; Burgos, Sonia L

Subject: RE: LTRAP Program Transfer

Thanks Amy.

A few questions that I think you or Sonia can answer:


1. Can I get the name of the two PHAs – both default and receiving PHA. I have the default PHA per the transfer letter

The Default PHA is Lakewood Township Rental Assistance Program- NJ214 (LTRAP). The Receiving PHA is Lakewood Housing Authority (NJ054).

2. Reason for taking this action – more detail than what is in the letter.

The primary reason for taking this action is that LTRAP failed to comply with a HUD audit that was conducted by the Quality Assurance Division (QAD). LTRAP failed to provide the QAD with documents necessary to complete their Financial Management Review in order to obtain a full and accurate account of LTRAP's financial position specifically the administrative income and expenses. The briefing papers << File: LTRAP – Hot Issues 9-18-2014r5.docx >> and << File: LTRAP_LTO Decision Paper_Synopsis Final.docx >> letters details a full account of the sequence of events leading to the Default, which was reviewed and presented by Regional Counsel in consultation with HQ Program and Litigation OGC.

a. History – how long has this been underway and does the default PHA understand that this is the enforcement action we will take if they remain non-compliant? Just want to ensure that they are refusing to comply understanding the ramifications?

This has been underway for at least the past three years. We are of the opinion that the Default PHA understands that HUD will take enforcement action if they remain non-compliant.

3. Confirm that there is only one Mayor to notify? When did he/she take office and what do they know – if anything about this issue? I am surprised the former Mayor did not attempt to compel the default PHA to comply?

On December 5, 2014, the Mayor Minashe Miller was notified by OGC. Mayor position is appointed by the council members and they rotate every two years. Current Mayor is Albert Ackerman appointed in February 2015

4. Are both PHAs in the same congressional district so we would only be notifying one representative and two senators?

Both of the PHAs are in the same district.

5. Do we have any insight on the impact of the transfer to both PHAs = funding/job losses, etc....

The default agency will have to determine the LTO contract which administers their HCV Program. The receiving PHA currently manages approx. the same size inventory, which would double in size.

Jenn Jones

Chief of Staff to the Assistant Secretary Office of Public and Indian Housing U.S. Department of Housing and Urban Development

451 Seventh Street SW, Room 4100

Washington, DC 20410

Phone: (202) 402-4604 (direct)

jennifer.c.jones@hud.gov

www.hud.gov

---

Disclaimer: This email and / or any attachments contained are subject to the Privacy Act of 1974 (5 U.S.C. 552a, as amended). Personal information contained in the attachment may be used only by authorized persons in the conduct of official business. Any individual responsible for unauthorized disclosure or misuse of personal information will be prosecuted to the maximum extent possible under law.

From: Ginger, Amy L

Sent: Tuesday, July 28, 2015 1:07 PM

To: Burgos, Sonia L; Jones, Jennifer C; Ozdinec, Milan M

Cc: Maio-Messano, Maria T

Subject: RE: LTRAP Program Transfer

Good Afternoon,

Just to summarize the emails:

FPM Director Maria Maio-Messano will notify the Major, and CIR will notify senators and representatives? And this will happen once we have the new board date, hopefully sometime next week?

Thanks for confirming.

Amy Ginger

Director

Office of Housing Voucher Programs

202-402-5152

From: Burgos, Sonia L

Sent: Tuesday, July 28, 2015 9:57 AM

To: Jones, Jennifer C; Maio-Messano, Maria T; Henriquez, Sandra B

Cc: Maio-Messano, Maria T

Subject: RE: LTRAP Program Transfer

The FO Director Maria Maio-Messano.

From: Jones, Jennifer C

Sent: Tuesday, July 28, 2015 9:56 AM

To: Burgos, Sonia L; Ginger, Amy L; Ozdinec, Milan M

Subject: RE: LTRAP Program Transfer

Can I ask - who would be making the call to the Mayor from FPM?

Jenn Jones

Chief of Staff to the Assistant Secretary Office of Public and Indian Housing U.S. Department of Housing and Urban Development

451 Seventh Street SW, Room 4100

Washington, DC 20410

Phone: (202) 402-4604 (direct)

jennifer.c.jones@hud.gov

www.hud.gov

---

Disclaimer: This email and / or any attachments contained are subject to the Privacy Act of 1974 (5 U.S.C. 552a, as amended). Personal information contained in the attachment may be used only by authorized persons in the conduct of official business. Any individual responsible for unauthorized disclosure or misuse of personal information will be prosecuted to the maximum extent possible under law.

From: Burgos, Sonia L

Sent: Tuesday, July 28, 2015 9:55 AM

To: Jones, Jennifer C; Ginger, Amy L; Ozdinec, Milan M

Subject: RE: LTRAP Program Transfer

I haven't heard that from the receiving PHA, So I don't know. That's why we would prefer CIR HQ make the notifications as this will be highly sensitive. The suggestion to have FPM Director make the call to the Mayor was that came from the local HUB Office. That's certainly a HQ call. But whatever is decided all calls should be placed at the same time.

From: Jones, Jennifer C

Sent: Tuesday, July 28, 2015 9:48 AM

To: Burgos, Sonia L; Ginger, Amy L; Ozdinec, Milan M

Subject: RE: LTRAP Program Transfer

Sorry. Just asking if we expect either the rep covering Lakewood Township or if we would expect any other Rep or Sen to weigh in on the transfer?

Jenn Jones

Chief of Staff to the Assistant Secretary Office of Public and Indian Housing U.S. Department

451 Seventh Street SW, Room 4100

Washington, DC 20410

Phone: (202) 402-4604 (direct)

jennifer.c.jones@hud.gov

www.hud.gov

---

Disclaimer: This email and / or any attachments contained are subject to the Privacy Act of 1974 (5 U.S.C. 552a, as amended). Personal information contained in the attachment may be used only by authorized persons in the conduct of official business. Any individual responsible for unauthorized disclosure or misuse of personal information will be prosecuted to the maximum extent possible under law.

From: Burgos, Sonia L

Sent: Tuesday, July 28, 2015 9:46 AM

To: Ginger, Amy L; Ozdinec, Milan M; Jones, Jennifer C

Subject: FW: LTRAP Program Transfer

What is meant by equities?

From: Jones, Jennifer C

Sent: Monday, July 27, 2015 6:07 PM

To: Ginger, Amy L

Cc: Burgos, Sonia L; Ozdinec, Milan M

Subject: RE: LTRAP Program Transfer

I am talking to CIR tomorrow morning. Amy, you are welcome to join if you would like but if FPM is taking the lead on notifying the new Mayor, it would seem that intergovernmental doesn't have a significant role. I am curious about what if any response we would expect from the congressman from the district. Any equities we should be aware of?

Jenn Jones

Chief of Staff to the Assistant Secretary Office of Public and Indian Housing U.S. Department of Housing and Urban Development

451 Seventh Street SW, Room 4100

Washington, DC 20410

Phone: (202) 402-4604 (direct)

jennifer.c.jones@hud.gov

www.hud.gov

---

Disclaimer: This email and / or any attachments contained are subject to the Privacy Act of 1974 (5 U.S.C. 552a, as amended). Personal information contained in the attachment may be used only by authorized persons in the conduct of official business. Any individual responsible for unauthorized disclosure or misuse of personal information will be prosecuted to the maximum extent possible under law.

AR 000183

From: Ginger, Amy

Sent: Monday, July 27, 2015 3:54 PM

To: Jones, Jennifer C

Cc: Burgos, Sonia L; Ozdinec, Milan M

Subject: LTRAP Program Transfer

Importance: High

Jenn,


Here is the Final Transfer letter for LTRAP and the associated attachments. Please share with CIR.


1. The agenda item has been pulled from the receiving agency's BOD meeting. They can have an emergency meeting in the next week or so. I suggest we tell them to aim for mid to late next week.

2. The current Mayor has not been officially notified (previous mayor was notified). Our thoughts are that FPM would notify the mayor, once we have a BOD date. We are open to suggestions on that. We don't think there will be an issue.

3. We will now wait on a signal from you and CIR.

Thanks much, let me know if you need anything else from me.

Amy Ginger

Director

Office of Housing Voucher Programs

202-402-5152

AR 000184

| From: | Nabors-Jackson, Nikol |
|---|---|
| To: | Bryon, Jemine A |
| Sent: | 3/4/2015 7:40:42 PM |
| Subject: | PIH Hot Topics for Review and Other Docs |
| Attachments: | 2015 Legislative package chart 3.3.16.docx; 2015-02-13 SOHUD Memo re PR Public Housing Administration Funds Deposited in PR Government Development Bank FINAL.pdf; NGMS Overview - Deep Dive Appendix_2-26-15_final.pptx; PIH Deep Dive Slide Deck Final 2-23-15.pptx; PIH Hot Topics for Principal Deputy Assistant Secretary.docx; rule chart for spring 2015 agenda 3-2-15.docx |

Hi Jemine:

Attached please find a draft of the compiled list of Hot Topics for the PDAS. I am also giving you a hard copy with my questions/comments.  Also attached are the Deep Dive and NGMS Slide decks. I have included the 2015 Legislative Package and Rule Chart for Spring 2015 from Danielle if you want to include.

Thanks, Nikol

**Nikol Nabors-Jackson**
Senior Advisor
Office of the Assistant Secretary
    for Public and Indian Housing
**U.S. Department of Housing and Urban Development**
(202) 402-4575/Direct

---

**From:** Bryon, Jemine A
**Sent:** Wednesday, March 04, 2015 10:37 AM
**To:** Nabors-Jackson, Nikol
**Subject:**

In addition to this issue as a hot topic, please add it to a file that we will transmit to Lourdes tomorrow.  Also for transmission, the Deep Dive document.

**PIH Hot Topics**




Redacted







Redacted

**LTRAP Agency in New Jersey**

- LTO/TRAP has not accounted for any administrative fees earned for more than ten years, minimum of $5.3M could reach as high as $11M; they contended they did not have to account for funds because all funds were sent over to LTO as lump sum and at that point were no longer subject to HUD review. Recently, QAD has contacted them multiple times to schedule an onsite review and is continuously denied access to the PHAs financial records. This is in violation of 24 CFR 982 and HUD OGC determined QAD did indeed have right to access, because LTO and LTRAP were one in the same organization and considered 'the PHA'. After many discussions which included HUD Field Office staff, OGC, and LTO/LTRAP attorneys, the PHA maintains that they will not grant access to prior records showing where the PHA spent HUD administrative funds. They are also requesting a "clean slate" and state that going forward they will 'do the right thing' and then QAD can review "those" records. Note that in addition to this issue, the PHA is in violation of other HUD regulations, rules and policies related to management of the HCV program and the Field OGC states that this issue is getting heated very quickly as the PHA has made accusations of anti-Semitism, and targeting due to religion.

Redacted





AR 000192





| | |
|---|---|
| **From:** | Bryon, Jemine A |
| **To:** | 'lulucastro@aol.com' |
| **Sent:** | 3/6/2015 7:20:03 PM |
| **Subject:** | Plane reading Materials |
| **Attachments:** | 2015 Legislative package chart 3.3.16.docx; 2015-02-13 SOHUD Memo re PR Public Housing Administration Funds Deposited in PR Government Development Bank FINAL.pdf; Draft First Week Schedule - Lourdes Castro Ramirez.docx; FY15 NOFA SCHEDULE.pdf; Hot Topics for Principal Deputy Assistant Secretary.docx; NGMS Overview - Deep Dive Appendix_2-26-15_final.pptx; PIH Deep Dive Slide Deck Final 2-23-15.pptx; rule chart for spring 2015 agenda 3-2-15.docx |

Hi Lourdes:

Yea, it's the weekend.

Yea, you join us on Monday.

Attached you will find various documents for your review.  I would suggest review in the following order:

Ø Draft First Week Schedule (the latest)
Ø Hot Topics for PDAS
Ø PIH Deep Dive Slide Deck
Ø NGMS Overview
Ø SOHUD PRPHA
Ø 2015 Leg package chart
Ø Rule chart for spring 2015
Ø FY15 NOFA Schedule

You will receive a 2nd email in a few minutes that will contain materials for the MTW briefing we will provide to you on Monday.

Please feel free to call me with any questions. 267 738 0809.

**PIH Hot Topics**



1



2



3



Redacted

**LTRAP Agency in New Jersey**
- LTO/TRAP has not accounted for any administrative fees earned for more than ten years,  minimum of $5.3M could reach as high as $11M;  they contended they did not have to account for funds because all funds were sent over to LTO as lump sum and at that point were no longer subject to HUD review. Recently, QAD has contacted them multiple times to schedule an onsite review and is continuously denied access to the PHAs financial records. This is in violation of 24 CFR 982 and HUD OGC determined QAD did indeed have right to access, because LTO and LTRAP were one in the same organization and considered 'the PHA'.  After many discussions which included HUD Field Office staff, OGC, and LTO/LTRAP attorneys, the PHA maintains that they will not grant access to prior records showing where the PHA spent HUD administrative funds. They are also requesting a "clean slate" and state that going forward they will 'do the right thing' and then QAD can review "those" records. Note that in addition to this issue, the PHA is in violation of other HUD regulations, rules and policies related to management of the HCV program and the Field OGC states that this issue is getting heated very quickly as the PHA has made accusations of anti-Semitism, and targeting due to religion.

4



Redacted

AR 000200



Redacted

6



AR 000202



8

| | |
|---|---|
| **From:** | Bryon, Jemine A |
| **To:** | Nabors-Jackson, Nikol |
| **Sent:** | 3/6/2015 7:29:40 PM |
| **Subject:** | FW: Plane reading Materials |
| **Attachments:** | 2015 Legislative package chart 3.3.16.docx; 2015-02-13 SOHUD Memo re PR Public Housing Administration Funds Deposited in PR Government Development Bank FINAL.pdf; Draft First Week Schedule - Lourdes Castro Ramirez.docx; FY15 NOFA SCHEDULE.pdf; Hot Topics for Principal Deputy Assistant Secretary.docx; NGMS Overview - Deep Dive Appendix_2-26-15_final.pptx; PIH Deep Dive Slide Deck Final 2-23-15.pptx; rule chart for spring 2015 agenda 3-2-15.docx |

---

**From:** Bryon, Jemine A
**Sent:** Friday, March 06, 2015 7:20 PM
**To:** 'lulucastro@aol.com'
**Subject:** Plane reading Materials

Hi Lourdes:
Yea, it's the weekend.
Yea, you join us on Monday.

Attached you will find various documents for your review.  I would suggest review in the following order:
- Ø Draft First Week Schedule (the latest)
- Ø Hot Topics for PDAS
- Ø PIH Deep Dive Slide Deck
- Ø NGMS Overview
- Ø SOHUD PRPHA
- Ø 2015 Leg package chart
- Ø Rule chart for spring 2015
- Ø FY15 NOFA Schedule

You will receive a 2nd email in a few minutes that will contain materials for the MTW briefing we will provide to you on Monday.

Please feel free to call me with any questions. 267 738 0809.

**PIH Hot Topics**

Redacted

1



2



3



Redacted

**LTRAP Agency in New Jersey**

- LTO/TRAP has not accounted for any administrative fees earned for more than ten years,  minimum of $5.3M could reach as high as $11M;  they contended they did not have to account for funds because all funds were sent over to LTO as lump sum and at that point were no longer subject to HUD review. Recently, QAD has contacted them multiple times to schedule an onsite review and is continuously denied access to the PHAs financial records. This is in violation of 24 CFR 982 and HUD OGC determined QAD did indeed have right to access, because LTO and LTRAP were one in the same organization and considered 'the PHA'.  After many discussions which included HUD Field Office staff, OGC, and LTO/LTRAP attorneys, the PHA maintains that they will not grant access to prior records showing where the PHA spent HUD administrative funds. They are also requesting a "clean slate" and state that going forward they will 'do the right thing' and then QAD can review "those" records. Note that in addition to this issue, the PHA is in violation of other HUD regulations, rules and policies related to management of the HCV program and the Field OGC states that this issue is getting heated very quickly as the PHA has made accusations of anti-Semitism, and targeting due to religion.

4



5



6



Redacted

7



8

| From: | Reames, Lindsey S |
|-------|-------------------|
| To: | Henriquez, Sandra B; Hernandez, Deborah A; Ozdinec, Milan M |
| CC: | Jones, Jennifer C; Metrakas, Eugenia |
| Sent: | 9/25/2013 10:27:25 PM |
| Subject: | FW: Hot Issues Report - LTRAP |
| Attachments: | img-920160534-0001.pdf; LTRAP - Hot Issues 9-20 13.docx |

Heads up—an issue with a PHA who has contracted with a Tenant Organization to administer their HCV program—investigations by OGC and FHEO ongoing.   Field office is waiting on results of QAD review.


Lindsey S. Reames

Offiice of Public Housing—Field Operations

(202) 402-6296—DC Office

(202) 422-8503--HUD Blackberry

(616) 309-2837--Grand Rapids Office


**From:** Torres, Debra A
**Sent:** Monday, September 23, 2013 3:55 PM
**To:** Reames, Lindsey S
**Subject:** FW: Hot Issues Report - LTRAP


FYI and a heads up on a Newark FO issue.


**From:** Thumar, Balu K
**Sent:** Friday, September 20, 2013 4:18 PM
**To:** Burgos, Sonia L
**Cc:** Melvin, Delores A; Thumar, Balu K; Torres, Debra A
**Subject:** Hot Issues Report - LTRAP


See attached  draft report. You may edit  and submit to Debra. thanks


**Balu Thumar,  Division  Director**

Office of Public  Housing

1185 Raymond Bouleward

One Newark Center, Newark, NJ 07102

973-776-7237 Phone

973-645-2270 Fax

AR 000213

Case 3:15-cv-06325-MAS-DEA   Document 35   Filed 05/06/16   Page 218 of 228 PageID: 954





LTRAP - Hot Issues 9-20 13.docx



img-920160534-0001.pdf



image001.gif



image004.png



image005.png

AR 000214

# Hot Issues Report

Date: 9/20/2013
Office: Newark Office of Public Housing, 2FPH
Director: Sonia L. Burgos
Contact Number: (973) 776-7210
Response Due Date: N/A

## Issue (brief, concise description):

The Township of Lakewood Rental Assistance Program (LTRAP) receives an administrative fee from HUD and LTRAP pays Lakewood Tenant Organization (LTO) the entire administrative fee amount in exchange for LTO administering the HCVP.  The OHVP QAD conducted an on-site review at LTRAP in September 2013.  They were unable to validate the Administrative Fee Reserve/Unrestricted Net Assets (UNA), due to a lack of information.  In addition, the FHEO Division conducted an on-site review of LTRAP in May 2013.  They raised concerns about LTRAP's operations in a memo to Sonia Burgos dated July 16, 2013, regarding (1) digital record keeping (2) procurement and scope of LTRAP's Counsel and (3) possible conflict of interest between LTRAP's Executive Director and the Board of Directors of LTO.

Although the previous Director of the Newark OPH, previous Director of Housing Programs Manager Branch, previous Field Office Manager, previous Acting Assistant Secretary and LTRAP's previous Independent Auditor has rendered determinations regarding  LTRAP's and LTO's operations and relationship, we have deemed it necessary to re-visit these issues. (refer to the attachments)  In addition, we have not received the results of the on-site QAD nor the FHEO reviews.  However, we want to ensure that all questionable practices have been adequately addressed.

## Field Office Response:
Describe how your office became aware of the issue:

As indicated above, the Newark OPH addressed these matters in the past but the Offices of FHEO and HVP QAD provided the current leadership with information relative to questionable practices at LTRAP.  Therefore, the Newark OPH participated in several discussions with the FHEO and QA Divisions to discuss their concerns.  (see attached memo from Wanda Nieves, Director, FHEO dated 7/16/13 and email from MaryAnn Creager dated 9/10/13)

In addition, the Newark OPH forwarded a memorandum dated 9/20/13 accompanied by a file of available documentation to the Newark OGC for review and determination.  The

Redact



Redact

## Any additional information that is pertinent to the discussion:

This PHA has been designated a "High Performer" every year for the past ten (10) years. LTRAP has no audit findings in the past ten years. See below is the financial history in PIC for Section 8 program administered by LTRAP for the past 5 years.

| | | | |
|---|---|---|---|
| **HA :** | **NJ214** | **Hub :** | **2HNWK Newark Hub** |
| **Field Office :** | **2FPH NEWARK HUB OFFICE** | | |

## HA Funding

Section 8 As Of  04/27/2013

| Certificate / V | Fiscal Year | Authorized Funds | Disbursed Funds | Obligated Funds | Expended Funds |
|---|---|---|---|---|---|
| Vouchers | 2013 | $5,977,168.00 | $5,977,168.00 | | |
| | 2012 | $13,906,192.00 | $13,906,192.00 | | |
| | 2011 | $13,370,658.00 | $13,370,658.00 | | |
| | 2010 | $13,959,808.00 | $13,959,808.00 | | |
| | 2009 | $12,635,211.00 | $12,635,211.00 | | |
| **Grant Total** | | **$59,849,037.00** | **$59,849,037.00** | | |

| Mod Rehab | Fiscal Year | Authorized | Disbursed | Obligated | Expended |
|---|---|---|---|---|---|

| Fundi | | Funds | Funds | Funds | Funds |
|---|---|---|---|---|---|
| Mod-Rehab | 2013 | $85,420.00 | $31,682.00 | | |
| | 2012 | $87,175.00 | $79,194.00 | | |
| | 2011 | $82,491.00 | $69,167.00 | | |
| | 2010 | $76,694.00 | $76,694.00 | | |
| | 2009 | $70,740.00 | $70,740.00 | | |
| **Grant Total** | | **$402,520.00** | **$327,477.00** | | |

**Section 8 Total**      **$60,251,557.00**    **$60,176,514.00**

AR 000217

Lakewood Township Residential Assistance Program (LTRAP)/Lakewood Tenants Organization (LTO)

## MONITORING HISTORY

- The issue at LTRAP is all related to the administrative fees earned and the PHAs failure to account for how those fees were used or to establish an unrestricted net asset balance to record any excess fees earned over expenses incurred.  Their refusal to allow HUD access to the administrative financial records resulted in the ACC breach.

- Based on routine risk assessment QAD conducted the following reviews which do '**not**' include a review of administrative fees or expenses
  - FFYs 2010, 2011 and 2012 – Remote VMS/FASS Analysis which simply compares the HAP expenses reported in VMS to what is reported on the PHAs financial data scheduled in FASS.
  - FFY 2012 -  Rent Reasonableness Portfolio Review (remote)  which certifies through use of the REIS Database that rents approved for units assisted under HCV are reasonable in relation to rents for unassisted comparable units.

    Since administrative fees/expenses were not reviewed we would have not noticed the issue.

- In FFY 2013 the PHA notified HUD that it was facing a funding shortfall and as a result our Shortfall Prevention Team became involved with the PHA. During their work they noticed financial anomalies and alerted the QAD Financial Management Team to the need for a Financial Management Review.   It was this review that uncovered the mismanagement that has now resulted in the program being removed.   QAD involvement was the impetus to seeking an OGC opinion that determined the PHA was indeed subject to all rules and regulations requiring the PHA to allow HUD to review their financial records.

**Reasons that the PHA <u>may</u> have escaped notice on risk assessment by FO, FMC and REAC.**

- The PHA had never set up an administrative fee reserve account. It was their contention that they were not subject to that requirement because their program was managed by a contractor "LTO".  LTRAP sent all AF earned to LTO, and once they did that their contention was that HUD no longer had a right to review the use of those funds; they further stated that any excess AF earned would belong to 'the contractor'.    It was not until QAD became involved and requested the OGC opinion on this that it was legally determined that LTO and LTRAP are one in the same – the PHA.

- Since LTRAP always showed administrative expenses that exactly equaled administrative fees on their FDS in FASS any red flags that arose as a result of that oddity may have been explained away by the PHA by stating to REAC, FMC etc. that a contractor ran their program and all fees earned were paid to that contractor and shown as one line item on the FDS.

| | |
|---|---|
| **From:** | Nieves, Wanda S |
| **To:** | Burgos, Sonia L; Thumar, Balu K; Bennett, Melissa L; Lowman, Tinia L; Ozdinec, Milan M; Phillips, John; Creager, MaryAnn; Melvin, Delores A; Russell, Joseph R; Torres, Debra A; Dennis, Michael S; Edmondson, Brenda D |
| **Sent:** | 6/19/2014 4:27:35 PM |
| **Subject:** | RE: LTRAP Discussion |

ACCEPT

-----Original Appointment-----
**From:** Burgos, Sonia L
**Sent:** Thursday, June 19, 2014 1:22 PM
**To:** Thumar, Balu K; Bennett, Melissa L; Lowman, Tinia L; Ozdinec, Milan M; Phillips, John; Creager, MaryAnn; Melvin, Delores A; Russell, Joseph R; Torres, Debra A; Dennis, Michael S
**Cc:** Nieves, Wanda S; Edmondson, Brenda D
**Subject:** LTRAP Discussion
**When:** Monday, June 23, 2014 11:00 AM-12:00 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Via-Conf Call
**Importance:** High

Call in Number:
1-888-363-4749/1880141

**From:** Creager, MaryAnn
**Sent:** Wednesday, June 18, 2014 10:34 PM
**To:** Burgos, Sonia L; Melvin, Delores A; Thumar, Balu K
**Cc:** Russell, Joseph R
**Subject:** Contact with LTRAP
**Importance:** High

Hi-

Just as an FYI we have made our initial contact with LTRAP via email to Meir Hertz advising him that we want to schedule a Financial Management review of the LTRAP HCV administrative operation to begin January 8th. We normally do not cc the FO on this initial contact as it is just preliminary notification to the PHA of the date we propose and we expect to firm up the date before we send the intro letter. We **will** cc you on the next email that will include the formal introduction letter. We sent the email to him this morning at 7:41 am, and we have had no response. If we get no response by noon tomorrow. I will send a stronger  email myself to him, with a demand for response from him  - additionally my email will contain the introduction letter, signed by Joe Russell but we will CC to you, John Phillips, Michael Dennis and Milan Ozdinec. This lets him know, even though he has not responded we are coming to visit him.     If it is necessary, we will follow this up with another letter signed by John Phillips or Milan.   However, if we still receive no response from him, the chances that we would have any documents to audit when we get there is highly unlikely, so we will need to touch base with you if that happens.   In any event I will be in touch with you in the next couple days.   Did you have any success in getting an audience with Milan?  I know they have been extremely busy.

As you requested, below is our standard listing of the documents that we request for reviews.   Some of the below may be modified for this second visit to LTRAP since we have already completed the restricted net position (HAP equity) portion of the review i.e. we do not need the FSS Escrow deposits and balances.

- Monthly **final** trial balance for each month of the review period. **(we ask that these be sent via email as soon as the review is scheduled).  It is important to stress that we must have the final trial balances so that all adjustments made at month and year end are included in the documents we are provided).**
- Month-end closed detail general ledgers,  we request this when additional detail is needed or when a final trial balance is unavailable.
- Other financial documentation used in the normal process of accounting for HCV revenue and expenses and for recording of all HCV  financial transactions i.e... balance sheets, income statements, profit and loss statements; check registers.   .
- Bank and investment account statements (both actual bank statements and the **reconciled** accounts) **for all** HCV held funds at  December 31, 2013, and the most recent closed month (additional bank and investment

AR 000220

account statements may be required if a PHA has comingled funds with other programs").

- Documentation related to reporting and recording of Family Self-Sufficiency deposits and escrow balances.
- Documentation related to the reporting and tracking of portability administered units (port-in).
- Supporting documentation for any Due to/Due From reported in the PHA's FASS submission.
- Supporting documentation for any transfer in/out transactions.
- Hard copies of the PHA's audits for the review period.
- Supporting documentation for any fixed assets over the capitalization threshold for which the PHA is recording depreciation expense.
- The PHAs chart of accounts
- Executed General Depository Agreement (HUD Form 51999)

Specific to LTRAP:  Copy of the contract between LTRAP and LTO.

**Joe:  If I have forgotten anything we need specific to LTRAP let me know**

Thanks MaryAnn

*MaryAnn Creager*
**Supervisory Program Analyst**
**OHVP, Quality Assurance Division, Team 1**
**Columbus Center**
**(614) 469-5737 x 8226**
**(614) 469-5123 (fax)**
**(740) 590-0459 (cell)**

AR 000221

| | |
|---|---|
| **From:** | Gordon, Linda J |
| **To:** | Ozdinec, Milan M; Sorrells, Shauna M; Dennis, Michael S |
| **Sent:** | 8/21/2014 7:11:48 AM |
| **Subject:** | 1-on-1 Draft |
| **Attachments:** | 21Aug2014 1on1.docx |

All-

Need you to look at this ASAP.  The meeting is this morning and I want to get this over as soon as I can this morning before the meeting.


We already missed the deadline yesterday (inputs were still coming in after 5pm)


Thanks!!


Very Respectfully,


L. J. Gordon

Public and Indian Housing

U.S. Department of Housing and Urban Development

Desk - (202) 402-5717

BlackBerry - (202) 251-8096

linda.j.gordon@hud.gov


Bit o' Wisdom: "A politician needs the ability to foretell what is going to happen tomorrow, next week, next month, and next year. And to have the ability afterwards to explain why it didn't happen." ~ Sir Winston Churchill




21Aug2014 1on1.docx

| | |
|---|---|
| **From:** | Creager, MaryAnn |
| **To:** | Ozdinec, Milan M |
| **CC:** | Phillips, John; Russell, Joseph R |
| **Sent:** | 9/18/2014 12:06:38 PM |
| **Subject:** | LTRAP Memo |
| **Attachments:** | MEMORANDUM FOR RECORD_LTRAP.docx |

Hi Milan –

Here is the memo we prepared in June 2014

MaryAnn Creager

**Supervisory Program Analyst**

**OHVP, Quality Assurance Division, Team 1**

**Columbus Center**

**(614) 469-5737 x 8226**

**(614) 469-5123 (fax)**

**(740) 755-5234 (cell)**



MEMORANDUM FOR RECORD_LTRAP.docx

**MEMORANDUM FOR RECORD**

**DATE:    June 20, 2014**

**SUBJECT:   Lakewood Township Residential Assistance Program (LTRAP)/ Lakewood Tenants Organization (LTO) NJ214.**

The purpose of this memorandum is to summarize the situation at LTRAP/LTO to allow for an informed decision regarding how each Division and Office shall move forward in monitoring, reviewing, and auditing of this PHA; as well as any enforcement actions that may be required.

**Background:**   A OHVP Quality Assurance Division (QAD) Financial Management Review (FMR)  includes validation of the Housing Choice Voucher (HCV) program Restricted Net Position (RNP) account, the Unrestricted Net Position (UNP) account, verification of cash and investments on hand to ensure sufficient funds are available to back the equity balances, determination if HCV funds were appropriately expended, and review and analysis of the PHAs financial management system for proper recording and reporting of HAP and administrative expenses.  A FMR analyzes the PHAs entire financial management of the HCV program and in some cases where inter-program transfers may exist, bleeds over into the entity wide financial management.    The QAD reviews result in Findings and Concerns, but for fact finding purposes only, we have no enforcement authorizations.

The regulatory and statutory guidelines under which QAD operates for purposes of FMRs are found primarily at 24 CFR 982.158(a) through (d).  QAD also uses numerous REAC Accounting Briefs, PIH Notices, Government Accounting Standards Board (GASB) Statements, and Treasury manuals.

**Discussion:**

1.   During September 2013, the PIH OHVP Quality Assurance Division (QAD) at the request of the QAD Shortfall Prevention Team, scheduled a full FMR at Lakewood Township Residential Assistance Program (LTRAP).   During the course of normal scheduling and obtaining financial records to permit the review to proceed, the LTRAP CEO, Rabbi Meir Hertz, advised us that he would not provide QAD staff with the financial records related to any administrative expenses for LTRAP.   His opinion was that HUD had no rights to review or audit those financial records.  His decision was followed by a September 9, 2013 letter from Michael A. Conn, Attorney at Law, who represented himself as legal counsel for **Lakewood Tenants Organization (LTO)**.   The letter stated that the entire HCV administrative fees earned by **LTRAP** were payable to **LTO**.  Further, Attorney Cohen stated that since LTO receives its funding from LTRAP it is no different than any other employee or service whose earned compensation is no longer HUD's money, nor is it subject to HUD regulation.   The letter mentions that Nixon Peabody LLP agrees with Attorney Cohen's opinion. At the time QADs view was that LTO was using LTRAP as a pass through to circumvent the laws governing the use of administrative fees and the requirement to establish an administrative fee reserve account. Specifically because there was no contract produced between LTO and LTRAP, nor any source