**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
:
TOWNSHIP OF LAKEWOOD, NEW :
JERSEY, et al., :
: Civil Action No. 15-6325-BRM-DEA
Plaintiff, :
:
v. :
:
JULIAN CASTRO, :
Secretary, United States Department of :
Housing and Urban Development, :
: **OPINION**
Defendant. :
_____:

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is a Motion for Judgment on the Pleadings, pursuant to Fed. R. Civ. P. 12(c), filed by Defendant Julian Castro, Secretary, United States Department of Housing and Urban Development ("HUD" or "Defendant"). (ECF No. 43.) This motion is opposed by Plaintiffs Meir N. Hertz, Henya Richter, Rachel Freundlich, Ruth Berl, Broch Jacobs, Sara Lewin, and Simcha Hoffman (collectively, the "Individual Plaintiffs") (ECF No. 55), and also by the Lakewood Tenants Organization, Inc. ("LTO") and the Township of Lakewood ("Lakewood" or the "Township") (collectively, the "Plaintiffs") (ECF No. 56). Pursuant to Fed. R. Civ. P. 78(b), no oral argument was heard. For the reasons set forth below, Defendant's motion is **DENIED**.

1

## I. BACKGROUND[1]

### A. FACTUAL BACKGROUND

Plaintiffs commenced this action for injunctive, declaratory, and legal relief challenging HUD's determination that the Township was in violation of HUD's regulations for administering certain housing-assistance funds received from HUD. (*See* ECF No. 30 at ¶ 1.)

The Amended Complaint alleges that, for almost 40 years, the Township, as a public housing agency ("PHA"), has had a Housing Choice Voucher ("HCV") Program, pursuant to Section 8 of the United States Housing Act of 1937 ("Section 8"). (*Id*. at ¶ 3; *see also id.* at ¶¶ 35-39.) The Township's HCV Program, called the Lakewood Township Residential Assistance Program (the "Program" or "LTRAP"), is pursuant to certain Annual Contribution Contracts (collectively, the "ACCs" and, individually, each is an "ACC"), between the Township and HUD. (*Id*.)

"From its inception, the Township has sub-contracted with LTO to administer LTRAP, a practice often utilized by PHAs." (*Id*. at ¶ 4; *see also id.* at ¶¶ 36-39.) Allegedly, "LTRAP is the largest private sector, federal-assisted affordable housing program in Ocean County, New Jersey, and one of the largest in New Jersey. Its Section 8 program presently serves more than 11,400 New Jersey, low-income households consisting of approximately 8,700 individual Program beneficiaries," the majority of which are "elderly, the disabled, and children." (*Id*. at ¶ 6.)

According to the Amended Complaint, "[t]he Township forwarded its original sub-contract with LTO for administration of LTRAP to HUD for approval," to which "HUD responded by letter[,] dated August 30, 1977, stating: 'HUD is not a party to this Contract, and consequently our review and approval of the Contract is not required. . . .'" (*Id*. at ¶ 5; *see also id.* at ¶ 36.) Further,

---

[1] The facts set forth in this Opinion are taken from Plaintiff's Amended Complaint (ECF No. 30), the parties' briefs and related filings.

"[d]uring the almost 40 years of its existence, LTRAP has been administered with great success" and "very few complaints from the Program's tenants and participating landlords and has established an outstanding audit track record of fiscal responsibility and program integrity, as well as regulatory compliance with all applicable HUD policies, practices, and procedures." (*Id*. at ¶¶ 7, 10.) Specifically, Plaintiffs allege, under "the HUD Section Eight Management Assessment Program ("SEMAP")[2], the Township's Program under the administration of LTO has consistently attained nearly perfect scores and SEMAP's highest performance rating." (*Id*. at ¶ 8.) In fact, "LTRAP's average SEMAP score for the most recent 4-year period is 99.34% - one of the highest in the nation."[3] (*Id*. at ¶ 9.)

Beginning in the fall of 2011, however, HUD allegedly "began waging a campaign of baseless, unjustified, and excessive investigations of the Program, after LTRAP discontinued assistance to an individual Section 8 tenant, referred to herein as 'Mr. N,' whom the LTO and the Township had determined was illegally collecting double Section 8 subsidies . . ." (*Id*. at ¶ 11; *see also id.* at ¶¶ 41-45.) According to the Amended Complaint, this campaign "became even more intense approximately one year later when the LTO refused to reinstate Mr. N after a[ HUD] official . . . contacted LTO and unlawfully demanded that Mr. N's voucher be reinstated and threatened retaliation against LTO if this demand was not met." (*Id*. at ¶ 12; *see also id.* at ¶¶ 46-62.) When the Township and LTO continued to refuse to reinstate Mr. N, "HUD then initiated demands that LTO submit to . . . a retroactive audit of LTO's internal corporate books and ledgers,"

---

[2] SEMAP is "HUD's method for measuring the annual performance of Section 8 programs," and "measures the performance of the [PHAs] that administer the [HCV] program in 14 key areas." (*Id*. at ¶ 8.)

[3] "By comparison, the average SEMAP score for Section 8 housing in New Jersey is 77.39%." (*Id*. at ¶ 9; *see also id.* at ¶ 130 (describing "LTRAP's unblemished administrative record and very high overall SEMA scores".)

something "HUD had never before requested." (*Id*. at ¶ 13; *see also id.* at ¶¶ 63-73.) The Amended Complaint alleges "this retroactive audit of internal LTO books and ledgers [was] over and beyond the regular annual Independent Public Accountant (IPA) audit of the LTRAP books and ledgers." (*Id*. at ¶ 14; *see also id.* at ¶¶ 74-77.) As such, "LTO was unable to comply with [HUD's] demand because such records were never previously required, and did not exist in the form now being demanded by HUD." (*Id*. at ¶ 14.)

The gravamen of Plaintiffs' allegations is, "[d]espite LTO's explanation that the requested documents did not exist and that its annual filings of IRS Form 990 tax returns identified most of the information presently being demanded, HUD threatened to terminate, and ultimately attempted to terminate, the Township's successful and beneficial Program . . . because LTO did not comply with HUD's unwarranted, unprecedented, and unjustified demands that HUD examine the LTO's internal, non-programmatic corporate books and ledgers." (*Id*. at ¶ 14; *see also id.* at ¶ 107.)

Additionally, Plaintiffs allege "HUD officials made a number of anti-Semitic remarks to LTO personnel and questioned LTO personnel about their religious observances."[4] (*Id*. at ¶ 15; *see also id.* at ¶¶ 108-111.) Plaintiffs further allege "HUD's excessive and unjustified abuse of power and disparate treatment of LTO and the Program was the result of anti-Semitism directed particularly to Orthodox Jewish people and was retaliation for LTO's fulfilling its responsibilities to uphold program integrity by refusing to reinstate" Mr. N's Section 8 benefits. (*Id*. at ¶ 15.) According to Plaintiffs, "[t]he purported bases for HUD's enforcement actions were . . . pretextual" and "the relentless, non-stop audits and investigations evidence a pattern and practice of religious bias and anti-Semitic targeting." (*Id*. at ¶ 16.)

---

[4] "LTO is run in large part by members of the Orthodox Jewish community, reflecting the fact that the majority of Lakewood's population is of the Orthodox Jewish faith." (*Id*. at ¶. 15.)

4

Ultimately, "[b]y letter dated December 5, 2014 (the "Threatened Termination Letter"), HUD threatened to terminate the contract for LTRAP . . . if LTO failed to submit to an audit of LTO's internal books and records." (Id. at ¶ 106.) On February 10, 2015, attorneys for the Plaintiffs met in person with [several] HUD representative . . . [to] discuss[] the Threatened Termination Letter and the history of" the parties' dispute. (*Id*. at ¶¶ 112-13.) As alleged in the Amended Complaint, "Plaintiffs' representatives left the meeting with the impression that HUD would look into Plaintiffs' claims and that the parties would work together toward a global resolution of any outstanding claims." (*Id*. at ¶ 113.) In fact, at the meeting, HUD allegedly "agreed to 'speak to with [Plaintiffs' attorneys] before taking any further action against [the] Township or LTO in regard to the issues [they] discussed, including any formal declaration by HUD that the Township is in default of the ACC." (*Id*. at ¶ 114.) The parties allegedly memorialized this agreement in an email from Plaintiffs' attorneys to HUD's counsel, dated February 17, 2015. (*Id*.)

Allegedly, however, HUD did not "speak" to Plaintiffs' attorneys prior to taking action against the Township or LTO. (*Id*. at ¶ 115.) Instead, on or about August 7, 2015 and without any prior notice, Lakewood's Mayor, Albert Akerman, was contacted by HUD and advised that, in the following week, HUD would be transferring the Program to the Lakewood Housing Authority ("LHA"). (*Id*. at ¶ 116.) Thereafter, at a special meeting called for August 11, 2015, the Board of Commissioners of LHA voted to accept HUD's transfer of the Program from the Township and LTO. (*Id*. at ¶ 119.) The following day, HUD sent a "Termination Letter" to Plaintiffs, advising that the Township was in default of its ACC and, as a result, HUD would take control of the Program and transfer it to LHA effective September 1, 2015. (*Id*. at ¶ 121.) Plaintiffs maintain "HUD [did] not tr[y] to resolve the [parties'] issues 'with good faith negotiations' and "did not contact Plaintiffs to resolve any issues following the February 10, 2015 meeting." (*Id*. at ¶ 124.)

5

Plaintiffs contend HUD's conduct "substantially burdened the LTO personnel's exercise of the Orthodox Jewish religion by disparaging their religious observances and by 'profiling' Orthodox Jews implying they are unethical." (*Id.* at ¶ 15; *see also id.* at ¶ 110.) HUD's conduct is also alleged to "contravene the 1937 Housing Act, the Religious Freedom Restoration Act, Presidential Executive Orders, and HUD's mission as expressed by Congress." (*Id.* at ¶ 16.)

**B.    PROCEDURAL HISTORY**

Plaintiffs commenced this action on August 21, 2015. (ECF No. 1.) Plaintiffs' original Complaint asserted four (4) causes of action: (1) due process violations, for failing to provide procedural due process and an opportunity to respond; (2) equal protection violations, arising out of the alleged denial of equal protection and disparate treatment and impact because of HUD's discrimination against Orthodox Jews; (3) breach of contract, arising out of HUD's termination of the Program; and (4) violations of the Administrative Procedures Act ("APA"), 5 U.S.C. § 701, *et seq.*, and for relief under the Declaratory Judgment Act, 28 U.S.C. § 2201. (ECF No. 1.) Plaintiffs sought injunctive, declaratory and other legal relief. (*Id.*)

On August 24, 2015, Plaintiffs filed a Motion for Order to Show Cause, seeking to temporarily restrain HUD, pending a determination on the merits of Plaintiffs' application for a preliminary injunction, from: (1) taking possession of LTRAP or any property, rights or interest in connection therewith, or transferring any of the foregoing to the Lakewood Housing Authority or taking any action based on the Township's alleged default under the ACC; (2) transferring current and historical information and documentation relating to the Program; and (3) terminating, limiting or impairing Plaintiffs' access to HUD data systems of any kind. (ECF No. 4.)

6

The parties entered into a Stipulation and Consent Order resolving Plaintiffs' application for an Order to Show Cause (ECF No. 8), which was So-Ordered by the Honorable Michael A. Shipp, U.S.D.J., on August 28, 2015 (ECF No. 10).[5]

On April 8, 2016, pursuant to the Court's Initial Scheduling Order (ECF No. 28) and with HUD's consent, Plaintiffs filed a First Amended Complaint (ECF No. 30). Plaintiffs' Amended Complaint asserts the same causes of action as their original Complaint, and adds a fifth claim for violations of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. 2000bb, for allegedly placing a substantial burden on the exercise of the Orthodox Jewish religion. (*Id.* at ¶¶ 185-194.)

HUD now moves for judgment on the pleadings dismissing Counts I-III, V of Plaintiffs' Amended Complaint, pursuant to Fed. R. Civ. P. 12(c). (ECF No. 43.)[6] Plaintiffs oppose the motion. (ECF Nos. 55 and 56.)

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(c) provides: "After the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "The difference between a motion to dismiss pursuant to Rule 12(b)(6) and Rule 12(c) is only a matter of timing and the Court applies the same standard to a Rule 12(c) motion as it would to a Rule 12(b)(6)." *Newton v. Greenwich Twp.*, 2012 WL 3715947, at *2 (D.N.J. Aug. 27, 2012); *see also Muhammad v. Sarkos*, 2014 WL 4418059 (D.N.J. Sept. 8, 2014) ("Where a defendant's motion is one for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), it

---

[5] This matter was reassigned to the undersigned on August 9, 2016. (ECF No. 40.)

[6] In its motion, HUD also requested a stay of discovery. (*Id.*) Pursuant to a September 13, 2016 Letter Order (ECF No. 47), HUD filed a separate Motion for Protective Order to Preclude Discovery and Motion to Stay Discovery (ECF No. 48). In an Order, dated February 17, 2017, the Honorable Douglas E. Arpert, U.S.M.J. denied, without prejudice, HUD's motion for a protective order and granted HUD's Motion to Stay. (ECF No. 64.) As such, this Court will only address that portion of HUD's motion seeking judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c).

is treated under the same standards as a Rule 12(b)(6) motion where it alleges that a plaintiff has failed to state a claim.") (citing *Turbe v. Gov't of V.I.*, 938 F.2d 427, 428 (3d Cir. 1991); *Gebhart v. Steffen*, 2014 WL 3765715, at *2 (3d Cir. Aug. 1, 2014)).

"In deciding a Rule 12(c) motion, the court does not consider matters outside the pleadings" and must "view[] the complaint 'in the light most favorable to the plaintiff' . . . [to determine whether] 'there is no material issue of fact to resolve, and [the moving party] is entitled to judgment in its favor as a matter of law.'" *Mele v. Federal Reserve Bank of New York*, 359 F.3d 251, 257 (3d Cir. 2004) (quoting *Leamer v. Fauver*, 288 F.3d 532, 534 (3d Cir. 2002)); *see also Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (pursuant to Fed. R. Civ. P. 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff].").

"While a complaint attacked by a Rule 12[] motion . . . does not need detailed factual allegations," *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007), the "plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is

8

liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* (citing *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than 'an unadorned, the defendant-harmed-me accusation'" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

### III.  DECISION

Defendant argues judgment on the pleadings should be granted "as to Claim I, II, III, and V, for failing to state a claim upon which relief can [be] granted" because "Plaintiffs have failed to allege any plausible or non-conclusory allegations that would support each of those four respective claims." (ECF No. 43-1 at 1.) Defendant additionally argues "[c]laim IV, the Plaintiffs' APA claim, should proceed to Summary Judgment." (*Id*.) Essentially, HUD contends Plaintiffs' Amended Complaint merely "raises a number of ancillary or immaterial issues . . . regarding its dispute with HUD" because, in HUD's view, the letter sent "on August 11, 2015, by HUD's Principal Deputy Assistant Secretary (PDAS) for Public and Indian Housing, Lourdes Castro Ramirez . . . determining that Lakewood was in violation of HUD regulations and in breach of its [ACC]" fully documents and supports HUD's decision to terminate the Township's participation in the Program. (*Id*. at 2-3.)

9

Plaintiffs oppose the motion, arguing it "is based almost entirely on HUD's version of facts which are 'assumed to be false' for purposes of this Motion." (ECF No. 56 at 1.)[7] Defendant's motion, they argue, impermissibly relies upon "'facts' outside the pleadings" to suggest "Plaintiffs' facts are facially implausible." (*Id*.) According to Plaintiffs, the Amended Complaint's "allegations detail a bad-faith, discriminatory, and shocking campaign by HUD to terminate the Township's forty-year-old Section 8 program for illegal reasons with no foundation in law or fact," and with a level of specificity and facial-plausibility that "easily surpasses the Rule 12(c) standard." (*Id*.)

The Court agrees with Plaintiffs. Accordingly, and for the reasons discussed below, Defendant's motion is denied.

### A.   COUNT I – DUE PROCESS CLAIMS

Plaintiffs' first claim for relief is for "due process" violations. (ECF No. 30 at ¶¶ 135-148.) "[D]ue process, unlike some legal rules is not a technical conception with a fixed content unrelated to time, place and circumstances. Due process is flexible and calls for such procedural protections as the particular situation demands." *Knox v. Union Twp. Bd. of Educ.*, 13-cv-5875, 2015 U.S. Dist. LEXIS 21536, at *22 (D.N.J. Feb. 23, 2015) (citing *Biliski v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 574 F.3d 214, 220 (3d Cir. 2009)). "The essential requirements of any due process claim are notice and the opportunity to be heard." *Id*. (quoting *Zappan v. Pa. Bd. of Probation & Parole*, 152 F. App'x 211, 220 (3d Cir. 2005)). Although not delineated in the Amended Complaint, Plaintiffs assert both (1) an explicit procedural due process claim relating to

---

[7] Lakewood and LTO, on the one hand, and the Individual Plaintiffs, on the other hand, filed separate briefs in opposition to Defendant's motion (ECF Nos. 55 and 56), but all join in the arguments asserted by the others. As such, for convenience, the Court refers to Plaintiffs' arguments generically and collectively.

Lakewood's property interest in the Section 8 program funds (ECF No. 30 at ¶¶ 135-148), and (2) an implicit substantive due process claim alleging Defendant's actions were "shocking to the conscience" (*id.* at ¶ 140).

### i. PROCEDURAL DUE PROCESS

To state a procedural due process claim, Plaintiffs "must show that the Defendant[] deprived him of a protected property interest and that the state procedure for challenging the deprivation was constitutionally inadequate." *Perano v. Twp. of Tilden*, 423 F. App'x 234, 237 (3d Cir. 2011) (citing *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006); *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 138 (3d Cir. 2010)).

HUD admits "Lakewood's Section 8 program is a property right protected by [the] procedural due process requirements of the Fifth Amendment." (ECF No. 43-1 at 12 (citing *Linan-Faye, Constr. Co. v. Housing Auth.*, 49 F.3d 915, 932 (3d Cir. 1995).) Nonetheless, Defendant argues it "satisfied the procedural requirements in the ACC" and "provided [Plaintiffs] with ample notice and an opportunity to be heard before HUD staff, while represented by counsel, prior to HUD taking action to terminate Lakewood's Section 8 program" and even "has a post-deprivation judicial remedy in its APA claim." (*Id.* at 13-14.) According to HUD, "[t]he sum of these parts negates any claim of a violation of procedural process." (*Id.*)

Defendant's arguments largely ignore Plaintiffs' well-plead allegations that HUD and its agents improperly targeted LTO for illegal and discriminatory reasons, initiated several improper investigations, repeatedly threatened closure, and ultimately sought to terminate Lakewood's Section 8 Program, despite its earlier representations to the contrary. While HUD argues its determination letter adequately supports its decision and provided sufficient due process, Plaintiffs allege HUD's conduct was merely pre-textual. Similarly, while HUD contends the February 10,

11

2015 meeting of counsel was the functional equivalent of a hearing, for due process purposes, Plaintiffs describe that meeting as a preliminary settlement discussion and maintain they were never afforded a meaningful opportunity to be heard. Ultimately, this will be a factual determination, but Plaintiffs have sufficiently alleged a constitutional violation.

Although Defendant correctly argues that "[i]t is the law in [the Third] Circuit that a state provides adequate due process when it provides 'reasonable remedies to rectify a legal error by a local administrative body,'" *Bello v. Walker*, 840 F.2d 1124 (3d Cir. 1988) (holding that, because "Pennsylvania affords a full judicial mechanism with which to challenge the administrative decision" at issue, "plaintiffs have no justifiable due process claim") (abrogated in part on other grounds by *United Artists Theater Cir. v. Twp. of Warrenton*, 316 F.3d 392, 400 (2003)), HUD offers no support for its argument that constitutional due process is always satisfied whenever an APA claim is available and the cases HUD does rely upon are distinguishable. *Bello*, for example, was decided by the district court at the summary judgment stage, and affirmed by the Third Circuit, because the plaintiff "set forth [no] behavioral or structural allegations from which [the court could] infer that process was unconstitutional." *Id*. at 1128 (citing *Rogin v. Bensalem Twp*., 616 F.2d 680, 695 (3d Cir. 1980), *cert. denied*, 450 U.S. 1029 (1981)). Unlike in *Bello*, Plaintiffs' Amended Complaint sets forth both behavioral and structural allegations from which the Court can infer HUD's process was unconstitutional.

Whether a discriminatory motive played a part in HUD's decision to terminate the Program, as Plaintiffs allege, or whether the Township, in fact, breached the ACC, as HUD contends, is a factual determination that is ill-suited to resolution on the pleadings alone.[8] At this

---

[8] Indeed, the cases cited by HUD are, for the most part, summary judgment decisions, made after a full opportunity for discovery. *See, e.g., Revell*, 598 F.3d at 128 (granting summary judgment on constitutional due process claims relating to the alleged taking of plaintiff's firearm); *Bello*, 840

stage, however, Plaintiffs have sufficiently alleged a procedural due process violation such that their claims should be allowed to proceed.

### ii. SUBSTANTIVE DUE PROCESS

"The core of the concept of due process is protection against arbitrary action." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 425 (3d Cir. 2006). "To establish a substantive due process claim, a plaintiff must prove the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that protected interest shocks the conscience." *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008) (citing *United Artists Theatre Circuit, Inc. v. Township of Warrington, PA*, 316 F.3d 392, 400-02 (3d Cir. 2003). The Third Circuit has held "that a violation of . . . law will constitute conscience shocking behavior when it contains 'allegations of corruption, self-dealing, bias against an ethnic group, or additional facts that suggest conscience-shocking behavior.'" *Whittaker v. Cnty. of Lawrence*, 437 F. App'x 105, 109 (3d Cir. 2011) (citations omitted).

Despite recognizing that the Amended Complaint "refers to Jews, Judaism, and antisemitism [sic] over 50 times" (ECF No. 43-1 at 17 (citations omitted)), Defendant argues "the Court could at best plausibly understand these comments or questions to be uninformed, ignorant, insensitive, or discourteous" but not that they are "'shocking' in any common sense understanding of the word" (*id*. at 17-18). The Court disagrees.

Plaintiffs' Amended Complaint alleges, among other things, that HUD has gone on record with its concerns over "non-Jewish" discrimination in the Township and sought, under pretext, to terminate the Program, in part, because it was managed by Orthodox Jews. (*See, e.g.*, ECF No. 30

---

F.2d 1124 (reversing district court's order granting summary judgment on substantive due process claims, but affirming dismissal of procedural due process claims).

at ¶¶ 41-62.) The Amended Complaint details a years-long crusade and relentless pursuit of this objective, and describes specific incidents of anti-Orthodox Jewish acts allegedly taken by HUD. (*Id*. at ¶¶ 15, 41-73, 96-99, 108-11.) Accepted as true, as they must be for purposes of this motion, these allegations plausibly suggest that HUD's actions in seeking to terminate the Program "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Kaucher*, 455 F.3d at 435.

At this stage of the proceedings, the Court declines to find, as a matter of law, that HUD's alleged conduct is not "shocking to the conscience." To do so would require to Court to accept HUD's version of the facts as true and discount Plaintiffs' well-pled "allegations of . . . bias against an ethnic groups, [and] additional facts that suggest conscience-shocking behavior," *Whittaker*, 437 F. App'x at 109, which would be contrary to Third Circuit precedent and the standards of Rule 12.

### B. COUNT II – EQUAL PROTECTION CLAIM

To state an equal-protection claim, Plaintiffs must allege facts showing: (1) Plaintiffs were treated differently from others similarly situated; (2) the selective treatment of Plaintiffs was intentional; and (3) there was no rational basis for the difference in treatment. *McCray v. Passaic County Jail*, 13-cv-6975, 2013 U.S. Dist. LEXIS 168481, at *11 (D.N.J. Nov. 25, 2013) (citing *Borough of Kutztown*, 455 F.3d at 239); *see also Government of V.I. v. Harrigan*, 791 F.2d 34, 36 (3d Cir 1986).

The Amended Complaint alleges HUD terminated the Program either because the Township had a subcontractor or HUD treated Lakewood more harshly than other similarly situated PHAs. (*See, e.g.*, ECF No. 30 at ¶¶ 40, 91, 155.) To support these allegations, Plaintiffs attach and refer to a "Table 1," which lists other PHAs that have Section 8 subcontractors. (*Id*. at

Ex. 1.) HUD argues its "determination letter and ACC . . . contradict these assertions" and "[t]o the extent Lakewood has characterized HUD's termination of the Section 8 program as differential treatment of Lakewood, it would be mistaken because the other PHAs are not in default of their ACCs, so they are not similarly situated." (ECF No. 43-1 at 19-20.)[9]

While HUD's denials might ultimately prove true, resolution of Plaintiffs' equal-protection claim requires the Court to decide disputes issues of fact. At the pleadings stage, however, the Court is required to view the allegations in the light most favorable to Plaintiffs and resolve any disputed issues of fact in their favor. Because HUD asks the Court to do the exact opposite, its motion must be denied.

### C. COUNT III – BREACH OF CONTRACT CLAIM

Defendant argues that Plaintiffs' breach of contract claim fails because (1) only Lakewood is a party to any contract with HUD and (2) "Lakewood fails to plead damages for its contract claim." (ECF No. 43-1 at 25.) Plaintiffs concede the first point, but note that even HUD has suggested at times that LTO is, in fact, the PHA counter-party to the ACC. (*See id.* at p 2 n.1.) Regardless, the Court finds Plaintiffs have sufficiently plead and requested money damages – namely, an Order requiring HUD to honor and perform under the ACC, including HUD's payment of the monies provided for in the ACC.

HUD cites no case law to support its argument that a plaintiff must quantify its loss (*see* ECF No. 43-1 at 27), and the Court is aware of none. To the contrary, this District's Local Civil Rules expressly require: "A pleading which sets forth a claim for relief in the nature of unliquidated

---

[9] It did not go unnoticed that HUD's claims regarding similarly situated PHAs are not supported by any citation to the administrative record or other evidence. While a district court generally will not consider documents outside the pleadings on a Rule 12 motion, HUD relies almost exclusively on outside documents in support of its other arguments, and HUD's failure to do so here only underscores why judgment cannot be granted in its favor on the basis of the pleadings alone.

money damages shall state in the *ad damnum* clause a demand for damages generally without specifying the amount." L.Civ.R. 8.1; *see also* Fed. R. Civ. P. 8(a); *Decosta v. English*, 11-cv-2651, 2012 WL 528760, at *6 (D.N.J. Feb. 16, 2012) ("at this stage of the litigation [on a Rule 12(b)(6) motion], 'the Federal Rules do not require the Plaintiff to . . . specify damages that were incurred.'") (quoting *RehabCare Group East, Inc. v. Trenton Convalescent Operating Co.*, 06-cv-2128, 2006 WL 2711496, at *2 (D.N.J. Sept. 20, 2006)). Thus, there is no support for HUD's contention that "Plaintiffs must prove they suffered a 'quantifiable loss'" for their Amended Complaint to withstand a Rule 12 motion. (*See* ECF No. 43-1 at 26.)

HUD also fails to show the requested relief is barred either by statute or because an award would gravely impair HUD's fundamental functions. *FHA v. Burr*, 209 U.S. 242, 245 (1940) (holding that waivers of sovereign immunity, like those set forth in the Housing Act of 1937, are to be liberally construed and are only limited to the extent the Government agency can show the relief sought would gravely impair the agency's fundamental functions."); *FDIC v. Meyer*, 510 U.S. 471, 480-81 (1994) (explaining "*Burr* makes it clear that sue and be sued clauses cannot be limited by implication unless there has been a clea[r] show[ing] that certain types of suits are not consistent with the statutory or constitutional scheme, that an implied restriction of the general authority is necessary to avoid grave interference with the performance of a governmental function, or that for other reasons it was plainly the purpose of Congress to use the 'sue and be sued' clause in a narrow sense.").

In any event, the Amended Complaint's *ad damnum* clause is broad enough to encompass a request for monetary damages. But, even if it were not, nothing about the specifically-requested relief – a declaration that the proposed termination of the Program would be a breach of contract and an injunction precluding such a breach – interferes in any meaningful way with HUD's

16

fundamental functions or the intent of the Program. In short, Plaintiffs have sufficiently pled damages for their breach of contract claim that are neither barred by statute nor the terms of the contract.

### D. COUNT V – RFRA CLAIM

The "RFRA prohibits the 'Government from substantially burdening a person's exercise of religion even if the burden results from a rule of general applicability unless the Government 'demonstrates that application of the burden to the person- (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling interest.'" *Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751, 2761 (2016) (citing 42 U.S.C. 2000bb-1(a),(b)) (internal marks omitted).

HUD argues Plaintiffs' RFRA claim fails because the Amended Complaint does not "identif[y] any generally applicable HUD rule that substantially inhibits [Plaintiffs'] engagement in activities fundamental to [their] faith" or "any particular written directives . . . emails or any other personal communication from HUD staff . . . regarding . . . any HUD-imposed negative consequences for their current practices." (ECF No. 43-1 at 28.) Instead, HUD asserts "[t]here are no generally applicable Office Public and Indian Housing Notices that apply to Lakewood that govern PHA business hours cited by Lakewood." (*Id.*) According to HUD, its "[q]uestions and a few comments, even those perceived as negative, d[id] not 'significantly inhibit' any Lakewood employees from exercising their religion." (*Id.* (citing *Hobby Lobby*, 134 S.Ct. at 2775-76).) HUD's arguments, however, rest entirely upon its own self-serving denials of fact and interpretations of law.

17

Initially, the Court rejects HUD's contention that a substantial burden, in violation of the RFRA, can only be shown by identifying a formal, written policy, rule, or directive.[10] "Although RFRA does not explicitly define the term 'substantial burden,' [the Third Circuit] ha[s] explained that a substantial burden exists where (1) 'a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other[s] versus abandoning one of the precepts of his religion in order to receive a benefit;' or (2) 'the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs.'" *Mack v. Warden Loretto FCI*, 2016 WL 5899173, at *11-12 (3d Cir. Oct. 11, 2016) (quoting *Washington v. Klem*, 497 F.3d 272-80 (3d Cir. 2007)). In *Mack*, the plaintiff-inmate alleged he was terminated from his paid work assignment for complaining to prison officials about two officers' anti-Muslim harassment, specifically that "the combination of Officer Roberts' anti-Muslim harassment and Officer Venslosky's tacit approval created a hostile work environment that caused him to stop praying at work." *Id.* at *11. "Although Mack concede[d] that the officers did not directly command him to cease praying," the Third Circuit explained "a burden can be 'substantial' even if it involves indirect coercion to betray one's religious beliefs." *Id.*; *see Lyng v. N.W. Indian Cemetery Protective Ass'n.*, 485 U.S. 439, 450 (holding "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions, are subject to scrutiny"). In short,

---

[10] The only case cited by HUD, *Harless v. Darr*, 937 F. Supp. 1339, 1346 (S.D. Ind. 1996), is neither controlling nor persuasive. Nothing in *Harless* suggests the referenced "threshold showing" for an RFRA claim requires a plaintiff to identify a specific rule or written directive that significantly inhibits the exercise of religion. In fact, quite the opposite. As the *Harless* court explicitly recognized, under Seventh Circuit law, both "a widespread practice that, although not authorized by written law or express municipal policy" and "an allegation that the constitutional injury was caused by a person with final policymaking authority" can give rise to a violation, even in the absence of a formal rule or directive. *Id.* at 1347-48. *Harless*, therefore, does not support HUD's position.

there is no support for HUD's contention that the RFRA violation alleged here can only be established by identifying some official "rule" or other "written directive."

Additionally, and contrary to HUD's assertions, the Amended Complaint makes clear that Plaintiffs allege far more than mere "discriminatory statements, racial slurs[,] epithets, and offensive speech." While HUD contends its "[q]uestions and a few comments, even those perceived as negative, d[id] not 'significantly inhibit' any Lakewood employees from exercising their religion," this is merely a denial of Plaintiffs' well-pled allegations which the Court must accept as true for purposes of this motion. Here, Plaintiffs allege and identify disparaging statements made by HUD during its allegedly unlawful campaign against the Township manifesting in hostility to Jews and the practice of Orthodox Judaism. (*See* ECF No. 30 at ¶¶ 15, 53, 108-09, 190.) HUD admits several of the alleged statements are attributable to HUD personnel. (*See, e.g.*, ECF No. 37 at ¶ 109.) The Individual Plaintiffs further allege these statements "caused LTO employees to fear that they would lose their livelihood because they were Orthodox Jews and observed the Orthodox Jewish religion." (*Id.* at ¶ 53.) One of the Individual Plaintiffs, for example, alleges she "feared that she might lose her livelihood that was necessary to support her large immediate family" because HUD's questions related "more to religious affiliation and religious practice than to work-related subjects." (*Id.* at ¶ 190.)

The Court finds Plaintiffs' allegations plausibly suggest HUD's conduct imposed a substantial burden on Plaintiffs' exercise of their faith, in violation of the RFRA. Accordingly, HUD's motion for dismissal of Plaintiffs' RFRA claim is denied.

## IV. CONCLUSION

For the reasons set forth above, HUD's Motion for Judgment on the Pleadings (ECF No. 43) is **DENIED**. An appropriate Order will follow.

**Date: April 3, 2017**                                    */s/ Brian R. Martinotti*
                                                           **HON. BRIAN R. MARTINOTTI**
                                                           **UNITED STATES DISTRICT JUDGE**